UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
(HOUSTON DIVISION)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>CITY OF HOUSTON,<br><br>        Defendant. | Civil Action No. 4:18-cv-00644<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff United States of America ("United States") alleges:

1. This action is brought on behalf of the United States to enforce the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII"). As set forth below, the United States alleges that Defendant, the City of Houston, Texas ("Defendant" or "the City"), has engaged in sex discrimination in violation of Title VII when it subjected former firefighters Jane Draycott ("Draycott") and Paula Keyes ("Keyes") to a hostile work environment based on their sex. The City further subjected Draycott to retaliation because of her complaints of sex discrimination which ultimately resulted in her constructive discharge.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action under 42 U.S.C. §§ 2000e-5(f), 28 U.S.C. §§ 1331, 1343(a), and 1345.

3. On July 15, 2009, Draycott filed a timely charge alleging sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). Draycott amended her charge to include additional allegations of retaliation on August 5, 2009 and April 6, 2010.

4. On December 17, 2010, the EEOC notified the City that it found reasonable cause to believe that the City violated Title VII by subjecting Draycott to a hostile work environment based on her sex and by retaliating against her for engaging in protected activity.

5. On July 16, 2009, Keyes filed a timely charge alleging sex and race discrimination with the EEOC.

6. On October 23, 2014, the EEOC notified the City that it found reasonable cause to believe that the City violated Title VII by subjecting Keyes to discrimination and harassment, including a hostile work environment based on her sex and/or race.

7. On April 4, 2016, the EEOC notified the City that efforts to conciliate Draycott's and Keyes' charges were unsuccessful, and the matters were forwarded to the Department of Justice.

8. All conditions precedent to the initiation of this lawsuit have been fulfilled.

9. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Southern District of Texas, Houston Division.  Therefore, venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1391(b).

**PARTIES**

10. Plaintiff, the United States of America ("Plaintiff" or "United States") is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3).

11. Defendant is a government body created pursuant to the laws of the State of Texas and is located within this judicial district.

12. Defendant maintains the Houston Fire Department ("HFD") which employs uniformed firefighters.

13. Defendant is a person within the meaning of 42 U.S.C. § 2000e(a).

14. Defendant is an employer within the meaning of Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and (h).

## FACTUAL ALLEGATIONS

### A. Draycott's and Keyes' Experiences as the Only Female Firefighters Permanently Assigned To Station 54.

15. On or about October 22, 2007, Draycott completed the requirements of Firefighter Master and Aircraft Rescue and Relief Fire ("AARF") Master as established by the Texas Commission on Fire Protection. AARF certification is a highly specialized type of firefighting that responds to aircraft accidents, disasters, and other emergencies at airports.

16. From 2008 to 2010, there were four AARF stations within the HFD. AARF Fire Station 54 is located at Bush Intercontinental Airport.

17. In July 2008, Draycott was transferred to Station 54 on a permanent basis as a firefighter.

18. On April 8, 2009, Paula Keyes was transferred to Station 54 on a permanent basis as a firefighter.

19. Draycott and Keyes were the only female firefighters permanently assigned to Station 54 at this time.

20. Between 2008 and 2010, Station 54 staffed firefighters on four shifts (A, B, C, and D). Firefighters worked two 24-hour shifts per week and filled in for other shifts as needed.

21. During their 24-hour shift, firefighters lived, ate, and slept at the station. They also trained, drilled, and responded to emergency calls. For all intents and purposes, the station

3

served as their home while they were on duty.

22. Between 2008 and 2010, each of the four shifts at Station 54 had a Senior Captain and Captain on duty to manage the operations of the station. The Senior Captain and Captain reported to an off-site District Chief. All ranks of Captain and above within the HFD were considered management-level employees with the ability to schedule, manage, and discipline firefighters, including Draycott and Keyes.

23. While Draycott and Keyes were assigned to Station 54, they were assigned to the A shift. The overseeing District Chief was George McAteer, the A shift Senior Captain was Isidro Tamez, and the A shift Captain was Erich Hencshel.

24. Station 54 contained separate sleeping and bathing quarters for men and women.

25. Prior to Draycott's transfer to Station 54, male firefighters regularly used the women's dormitory for their own purposes, including to read, watch television, study, and use the women's restroom.

## B. **Prior to Draycott's and Keyes' Assignments to Station 54, Women Had Complained about Discrimination by Male Firefighters.**

26. Prior to Draycott's and Keyes' assignments to Station 54 in 2008 and 2009, respectively, several female firefighters reported to the City that male firefighters were misusing the women's dormitory and bathroom in an attempt to drive the women away from the Station.

27. For example, from 2003 to 2004, Laura Saavedra frequently discovered urine on the toilet seats in the women's bathroom. On one occasion, Saavedra discovered a male firefighter using the women's bathroom during her shift. Saavedra also regularly found tobacco spit cups, coffee cups, and other trash scattered throughout the women's dormitory. She complained about these incidents and brought Senior Captain Robert Holmes and Captain Robert

4

Wisnowski into the bathroom to witness the urine on at least two occasions, and again to witness debris at least twice.  Neither Captain took meaningful action in response.

28. On or about September 2006, the City received a complaint alleging that a firefighter's wife, who was visiting Station 54, discovered urine on the countertop, wall, and sink and that the bathroom smelled like raw sewage and the dormitory smelled like urine.  The complaint was investigated by the City's Office of Inspector General ("OIG"), which confirmed those allegations and that other complaints of a similar nature had been made to station management, but closed the complaint because no wrongdoer could be identified.

29. Around 2006, firefighter Nefertari Alexander was assigned to "fill in" and occasionally work at Station 54.  Each time she worked at Station 54, Alexander observed urine in the sink, on the mirror, and around the toilet seat.  She also found fireworks taped to the inside of the toilet seats and, on another occasion, someone had defecated in one of the toilets and had purposely blocked the automatic flush sensor so that the toilet would not flush. Alexander reported these problems to Senior Captain Holmes and Captain Wisnoski.  The Captains' response to this complaint was to tell the male firefighters at a Roll Call to clean up after themselves when they used the women's dormitory.

30. The next time Alexander returned to Station 54, she found fingernail clippings in the female dormitory, observed urine on the bathroom sink and mirror, and smelled urine in the dormitory area and carpet.  On one occasion, she started her shift and discovered a male firefighter sleeping in a bed in the women's dormitory.

31. In February 2007, District Chief McAteer issued an internal bulletin prohibiting male firefighters from the women's dormitory and bathroom.  The bulletin also prohibited women from using the men's areas, despite no complaints of such behaviors.

5

### C. Male Firefighters Continued to Misuse the Women's Dormitory and Bathroom Notwithstanding Draycott's and Keyes' Permanent Assignments to Station 54.

32. Notwithstanding the City's awareness of the long-standing complaints about male firefighters' misuse of the women's dormitory and bathroom, when Draycott and Keyes transferred to Station 54, they encountered the same problems that other women had previously reported to management.

33. In the bathroom, Draycott regularly found the toilet seat up, urine on the outside of the toilet and on the floor, wet spots in the corner on the carpet that appeared to be urine, and yellow areas in the sink that she believed to be urine. In the dormitory, Draycott also found tobacco spit in her desk drawers, spilled drinks, dirty dishes, used Q-tips, and nail clippings on her bed and on the floor. On several occasions, her mattress was removed and replaced with an older, worn mattress.

34. Keyes experienced similar problems at Station 54, including regularly finding urine on the floor and toilet seat in the bathroom. In the dormitory, she found tobacco spit in her desk drawers, and spit cups in the women's dormitory. Her items were also moved around in her locker.

35. Male firefighters would not interact with Draycott or Keyes, often for their entire shifts. Though firefighters must live and work together in close quarters for 24-hour shifts, Draycott and Keyes were left to eat and pass time alone.

### D. Draycott Made Repeated Complaints about Men Misusing the Women's Dormitory and Bathroom.

36. In early 2009, Draycott reported to her Captain that a firecracker exploded when she opened the door to the stall in the women's bathroom. He laughed at her complaint.

6

37. Draycott made at least three verbal complaints regarding the conditions of the bathroom and dormitory to Captain Hencshel prior to April 10, 2009.

38. Beginning April 10, 2009, Hencshel began recording Draycott's complaints in the station Log Book. On April 10, 2009, Hencshel recorded that he met with Draycott and Keyes to discuss the television being removed from the women's dormitory and advised them to tell him if they encountered further problems in their bathroom or dormitory.

39. On May 12, 2009, Captain Hencshel recorded that he was asked to come witness urine on the women's toilet seat.

40. The following day, on May 13, 2009, Hencshel recorded that during a Roll Call, he questioned whether any firefighter had gone into the women's dormitory and reminded them that those areas were off limits.

41. On May 18, 2009, Hencshel recorded that urine on the toilet was again reported.

42. On June 19, 2009, Hencshel again recorded that he investigated urine in the women's bathroom.

43. The same day, Draycott reported to Hencshel that she had tried to take a shower and had been scalded by hot water. A later investigation revealed the cold water valve in the ceiling had been manually turned off, although there were no records of any shower maintenance work around that time.

44. On June 21, 2009, Hencshel emailed the other Captains at Station 54, informing them that he had received numerous complaints from Draycott about urine on the toilet seat and rim. Hencshel asked them to advise their staff that the women's dormitory and bathroom were off limits.

7

45. Following this notification, the announcement speakers in the female dormitory were manually turned off, causing Draycott to nearly miss a run when she was called to report and did not appear. The cables to the television in the women's dormitory also went missing.

46. District Chief McAteer was apprised of at least some of the problems Draycott and Keyes were encountering, but he merely instructed his Captains to manage the situation, without any further guidance.

### E. **Draycott Files Harassment Complaint with HFD's Staff Services.**

47. During the relevant time period, internal HFD complaints were received by the Houston Fire Department's Staff Services, which sent them to the OIG for investigation.

48. On June 29, 2009, Draycott, accompanied by Keyes, filed a complaint of harassment with Staff Services. Most of the firefighters on their shift were aware that Draycott and Keyes had gone to Staff Services to file a complaint. While there, Keyes and Draycott ran into Fire Chief Phil Boriskie.

49. In response to Draycott's June 29, 2009 complaint, OIG investigated the following allegations: (1) women's restroom conditions; (2) Draycott's locker being disturbed; (3) Draycott's mattress being removed; (4) cold water being turned off in the shower; (5) television cables being removed from the women's dormitory; (6) announcement speakers being turned down in the women's dormitory; and (7) debris left in the women's dormitory.

50. With respect to the June 29, 2009 complaint, OIG concluded that the allegations related to the shower and speakers could be sustained, but did not assign blame to anyone, and upon information and belief, did not make any recommendations to HFD as to any remedial or corrective action.

51. During the relevant time period, it was OIG's practice not to sustain a complaint if there was any competing evidence or testimony. OIG made no credibility determinations as part of its investigations. If a complaint was made against someone, and that person denied the complaint, it was OIG's practice not to sustain the complaint.

52. On information and belief, HFD failed to take prompt remedial action to correct or prevent further harassment upon receiving OIG's findings as to Draycott's June 29, 2009 complaint.

### F. **Eight Days after Draycott's Complaint, the Women's Dormitory Was Vandalized with Sex-Based and Racial Slurs.**

53. Eight days after she filed her complaint, on July 7, 2009, Draycott arrived to work and discovered sex-based and racial slurs written throughout the women's dormitory in black permanent marker. The slurs were directed at Draycott, who is white; Draycott's children; and Keyes, who is African-American.

54. Keyes arrived at the station shortly thereafter and also witnessed the vandalism and threats. Both Draycott and Keyes were extremely emotionally distraught by what they saw.

55. The following slurs were written in the women's dormitory:

    a. "Niggar lover" and "Die bitch" were written on the wall above Draycott's desk, which had a picture of her two children;

    b. On the wall to the left of Draycott's locker, "die bitch" was written;

    c. On the wall above Keyes' desk and on her pull down bed, "die niggar" was written;

    d. Two of Keyes' personal pictures were removed from her locker, written on, and left on the floor; and

  e. Inside Draycott's locker, someone wrote "dead" on the picture of her deceased daughter, who had been killed in an automobile accident, and "die" on Draycott's picture.

56. Draycott immediately reported the incident to Captain Hencshel and Senior Captain Tamez, who informed all levels of HFD management.

57. Draycott filed an EEOC Charge on July 15, 2009 and Keyes filed an EEOC Charge the following day.

### G. **Draycott Was Immediately Targeted as the Perpetrator During the Investigation.**

58. OIG commenced an investigation into the slurs, which was conducted by the Houston Police Department ("HPD").

59. As part of its investigation, the HPD ordered 18 firefighters who were present during the timeframe in which the slurs were written to sit for a polygraph. One firefighter, Donald Kern, received a conclusion of "deception indicated." Several other male firefighters, including Captain Hencshel, Elmer Williams, Earl Drummer, Gaston Popovich, and Ricky Bullard received a conclusion of "no opinion" or "inconclusive results" and were polygraphed a second time.

60. On July 16, 2009, Draycott was polygraphed by a private examiner, who determined she passed the examination without any deception. On July 21, 2009, she was polygraphed by a different private examiner, who similarly concluded she was not being deceptive. Draycott provided these results to HPD, but they were rejected and HPD sent these results for second opinions to the Defense Academy for Credibility Assessment ("DACA").

61. On July 20, 2009, Draycott was polygraphed by HPD. HPD reported "No Opinion (Suspected Countermeasures)."

62. HPD polygraphed Keyes on July 20, 2009, and concluded she was not being deceptive.

63. Draycott was the only person for whom HFD had polygraph results reviewed by DACA. HPD did not submit its results for Donald Kern, who was found to be deceptive, or Captain Hencshel, Elmer Williams, Earl Drummer, Gaston Popovich, and Ricky Bullard, who each received a "no opinion" or "inconclusive results" for at least one of their polygraph examinations, to DACA.

64. HPD also collected handwriting samples from a number of firefighters, including Draycott and Keyes. Based on its initial review of Draycott's handwriting sample, HPD claimed Draycott had written the slurs. However, the Texas Department of Public Safety and FBI reviewed the same handwriting samples and informed the City they were unable to identify any suspect.

65. During the investigation, Draycott and Keyes were placed on leave. Keyes eventually transferred to another station.

## H. HFD Sought to Dissuade Draycott From Returning to Work Because of Her Complaints.

66. In the fall of 2009, Draycott indicated her desire to return to Station 54.

67. On January 7, 2010, Chief Boriskie, along with his entire command staff, attended a meeting with the firefighter crew assigned to Draycott's shift to inform them that Draycott would be returning the following week and seek their feedback.

68. During this meeting, much of the crew expressed to Chief Boriskie that they adamantly did not want Draycott to return because of her prior complaints and concerns that she may file future complaints.

69. Following the meeting, Captain Brian Williamson, Draycott's Supervisor, organized a meeting of selected members of the crew at a restaurant. The group decided to publicly oppose Draycott's return and several of the group members wrote out derogatory statements or notes which they intended to present at the Roll Call when Draycott attempted to return to work. Their goal was to convince the command staff and/or Draycott to change their minds about Draycott's return and ultimately to prevent Draycott from returning.

70. On January 13, 2010, Draycott returned to work at Station 54 for the first time in approximately six months.

71. HFD's highest levels of command staff were present for the Roll Call on January 13, 2010, including Chief Boriskie, Assistant Fire Chiefs Omero Longoria and Daniel Snell, District Chief McAteer, AARF division-wide coordinator Ronald Krusleski, as well as HFD's psychologist and a Firefighters' Union representative.

72. On information and belief, it is not typical practice for HFD's entire command staff to attend a Roll Call at a fire station.

73. During the January 13, 2010 Roll Call meeting, several firefighters publicly disparaged Draycott and expressed their desire that she not return to Station 54 because of her complaints. During this meeting, Captain Williamson and other firefighters read statements alleging that Draycott was not mentally stable enough to "back the guys up on the line" and "no one wanted her back" because of her past complaints and fear that she would file future complaints, among others. All of this took place in the presence of Chief Boriskie, District Chief McAteer, Assistant Fire Chiefs Longoria and Snell, and AARF division-wide coordinator Ronald Krusleski, all of whom permitted the attacks to continue and did nothing to intervene.

74. Draycott was emotional and in tears during the January 13, 2010 Roll Call.

75. Chief Boriskie eventually directed the crew, along with HFD's psychologist, into a small group meeting in the Junior Captain's Office.

76. During the small group meeting, crew members were encouraged to share their uninhibited feelings. Similar to the Roll Call, Captain Williamson and most of the crew told Draycott she was not welcome back because of her complaints. Draycott was accused of damaging the marriages of some of the firefighters. Draycott was emotional and in tears during this meeting.

77. On or about March 30, 2010, OIG informed Draycott and Keyes that while it had sustained the July 7, 2009 Complaint, "there [was] not enough evidence to determine the identity of any person or persons who participated in this criminal act."

78. The same day, OIG sent its findings to Acting Fire Chief Rick Flanagan. Flanagan took no action in response to OIG's findings.

## I. Draycott Was Forced Into Disability Retirement As a Result of These Discriminatory Actions.

79. Following the January 13, 2010 meeting, Draycott was sent home and once again placed on leave.

80. Later in 2010, Draycott attempted to return to work at another station, but was unable to continue working. In August 2010, Draycott went back on medical leave due to her condition.

81. On information and belief, at the request of the City's Legal Department, Draycott was evaluated by Dr. Larry M. Nahmias, a clinical psychologist, in late 2010. On February 27, 2011, Dr. Nahmias deemed Draycott psychologically unable to perform her duties as a firefighter presently or in the future. As a result, Draycott sought medical disability retirement.

82. In connection with her disability retirement application, Draycott was also

evaluated by a psychiatrist, William K. Drell, hired by the Houston Firefighters' Relief and Retirement Fund ("HFRRF"). On July 11, 2011, Dr. Drell reported that Draycott could not perform the duties of a firefighter at the HFD due to her medical conditions. Dr. Drell concluded that, "Ms. Draycott's disabling symptoms are directly related to her work related incidents," including the sex discrimination and hostile work environment.

83. Relying on Dr. Drell's July 2011 report, the HFRRF recommended Draycott's application for on duty occupational disability retirement benefits be approved, and it was thereafter approved.

**J. The Incidents Had Serious Emotional and Physical Effects on Draycott and Keyes.**

84. Draycott has experienced significant pain and suffering, emotional distress, anxiety, stress, and loss of enjoyment of life caused by the allegations contained herein.

85. Keyes has experienced significant pain and suffering, emotional distress, anxiety, stress, and loss of enjoyment of life caused by the allegations contained herein.

**K. The Discriminatory Situation Persists at Station 54.**

86. Upon information and belief, since July 7, 2009, no female firefighters have been permanently assigned to Station 54.

87. Upon information and belief, a wall has been built in Section 54's female dormitory that reduces the dormitory's size to fit only a single bed. The remainder of the room has been converted into space for male firefighters. As a result, under the current configuration, no more than one female firefighter can be assigned to Station 54.

## COUNT I

Title VII, 42 U.S.C. § 2000e-2(a)
Hostile Work Environment – Sex
(On behalf of Draycott and Keyes)

88. The United States re-alleges and incorporates herein by reference all of the foregoing allegations.

89. As described in paragraphs 32 through 87, Draycott and Keyes were subjected to sex-based acts of harassment, humiliation, and intimidation in the workplace, including life-threatening slurs, from members of the HFD during their assignments to Station 54.

90. Draycott and Keyes made it known that the hostile work environment was unwelcome. They complained both internally and externally. The harassment described in paragraphs 32 through 87 was severe and/or pervasive and altered the conditions of their employment. Draycott and Keyes did find, and a reasonable person would have found, the conduct offensive.

91. Draycott's and Keyes' supervisors witnessed and were otherwise aware of the hostile work environment and did not take reasonable measures to prevent or correct the behavior.

92. The City otherwise failed to exercise reasonable care to prevent or correct the hostile work environment at Station 54. Draycott, Keyes, and other female firefighters complained of the hostile work environment to management. The City failed to take prompt corrective action to remedy the behaviors.

93. For the foregoing reasons, the City discriminated against Draycott and Keyes because of their sex in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), among other ways, by:

    a. Subjecting Draycott and Keyes to harassment based on sex, which created an intimidating, hostile, and/or offensive work environment that adversely affected the terms, conditions, and privileges of their employment; and

    b. Failing or refusing to take reasonable or appropriate steps to promptly prevent or correct the harassment; and

    c. Failing after actual or constructive knowledge of the harassment to take prompt and adequate action to stop it.

## COUNT II

Title VII, 42 U.S.C. § 2000e-3(a)
Retaliation
(On Behalf of Draycott Only)

94. The United States re-alleges and incorporates herein by reference all of the foregoing allegations.

95. Draycott engaged in protected activity, among other ways, when she filed her EEOC charges of discrimination and when she complained about the hostile work environment to management, including, but not limited to complaints to her Captain and Staff Services.

96. HFD, including Chief Boriskie, District Chief McAteer, Captain Williamson, and members of Station 54 crew, were all aware of Draycott's complaints.

97. Shortly after Draycott's complaints were made, HFD began engaging in a series of materially adverse actions against Draycott that would have dissuaded a reasonable person from complaining of discrimination. Among other ways, as outlined in paragraphs 53 through 76, Draycott was subjected to slurs and death threats written in the women's dorm, HFD targeted Draycott during its investigation, and, when she sought to return to work, permitted her co-workers to disparage her in an attempt to prevent her from returning to work.

98. Defendant took the aforementioned adverse actions against Draycott because of her protected activities.

99. Defendant's purported reasons for its retaliatory activities are pretext for discrimination.

100. For the foregoing reasons, Defendant discriminated against Draycott in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

## **COUNT III**

Title VII, 42 U.S.C. § 2000e-3(a)
Retaliatory Constructive Discharge
(on behalf of Draycott only)

101. The United States re-alleges and incorporates herein by reference all of the foregoing allegations.

102. Defendant subjected Draycott to intolerable working conditions when, among other things, it failed to take any meaningful action in response to Draycott's complaints; failed to take reasonable measures to correct the harassing conduct; targeted Draycott as the perpetrator of those acts, rather than as the victim of discrimination; and condoned and permitted her supervisor and colleagues, in the presence of the highest levels of management, to demean, disparage, and insult her in an effort to prevent her return to work.

103. This retaliatory conduct created working conditions so intolerable that a reasonable person would have felt compelled to resign. Despite attempts to return to work at HFD, Draycott found it impossible to return, and was medically forced into early disability retirement, severely curtailing both present and future earnings.

104. For the foregoing reasons, Defendant has discriminated against Draycott, in violation of Section 704(a) of Title VII, 52 U.S.C. § 2000e-3(a).

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays that the Court grant the following relief:

(a)   award all appropriate monetary relief, including lost wages where applicable, to Draycott and Keyes in an amount to be determined at trial to make each whole for any loss suffered as a result of the discrimination and retaliation as alleged in this complaint;

(b)   award Draycott and Keyes any prejudgment interest on the amount of lost wages and benefits determined to be due;

(c)   award compensatory damages to Draycott and Keyes to fully compensate them for the pain and suffering caused by Defendant's discrimination and retaliation as alleged in this complaint, pursuant to and within the statutory limitations of Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a;

(d)   enjoin Defendant from further discrimination and retaliation against Keyes;

(e)   order Defendant to develop and implement appropriate and effective measures to prevent discrimination and retaliation, including but not limited to implementing appropriate anti-discrimination and investigation policies and procedures applicable to employees working at Station 54, and implementing adequate training to all employees and officials, including but not limited to: (1) taking proper steps to investigate complaints of sexual harassment and sex-based discrimination; (2) disciplining employees found responsible for sexual harassment; (3) instituting effective anti-retaliation policies and procedures; (4) disciplining employees found responsible for retaliation; (5) distributing its anti-harassment and anti-retaliation policies to all employees; and (6) providing mandatory sexual harassment and anti-retaliation training for all supervisors and employees;

(f)   order any further relief necessary to make Draycott and Keyes whole; and

(g) award such additional relief as justice may require, together with the United States' cost and disbursements in this action.

## JURY DEMAND

The United States hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

Respectfully submitted,

| | |
|---|---|
| RYAN K. PATRICK<br>United States Attorney<br>Southern District of Texas | JOHN M. GORE<br>Acting Assistant Attorney General<br>Civil Rights Division |
| */s/ Keith Edward Wyatt*<br>KEITH EDWARD WYATT<br>Assistant United States Attorney<br>Texas Bar No. 22092900<br>Federal Bar No. 3480<br>1000 Louisiana, Suite 2300<br>Houston, Texas 77002<br>(713) 567-9713<br>(713) 718-3303 (fax)<br>Keith.Wyatt@usdoj.gov | DELORA L. KENNEBREW<br>GA Bar No. 414320<br>Chief<br>Employment Litigation Section<br>Civil Rights Division<br><br>KAREN D. WOODARD  (MD Bar)<br>Principal Deputy Chief<br>Employment Litigation Section<br>Civil Rights Division<br><br>*/s/ Jeremy P. Monteiro*<br>*/s/ Torie A. Atkinson*<br>JEREMY P. MONTEIRO (DC Bar No. 977628)<br>TORIE A. ATKINSON  (New York Bar)<br>Trial Attorneys<br>United States Department of Justice<br>Employment Litigation Section, PHB 4500<br>Civil Rights Division<br>950 Pennsylvania Avenue, NW<br>Washington, DC  20530<br>(202) 305-3034<br>(202) 514-1005 (fax)<br>Jeremy.Monteiro@usdoj.gov<br>Torie.Atkinson@usdoj.gov<br><br>*Attorneys for Plaintiff* |

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States of America

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See Attachment

## DEFENDANTS
City of Houston

County of Residence of First Listed Defendant   Harris County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Office of the City Attorney, Donald J. Fleming
City Hall Annex, 900 Bagby, 4th Floor
Houston, Texas (832) 393-6303

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question *(U.S. Government Not a Party)*
☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|   | PTF | DEF |   | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 2000 et. seq.
Brief description of cause:
Hostile Work Environment (Sex) and Retaliation in violation of Title VII of the Civil Rights Act of 1964 as amended

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $ 
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*:
JUDGE  Lee Rosenthal
DOCKET NUMBER  4:17-cv-03097

DATE  02/28/2018
SIGNATURE OF ATTORNEY OF RECORD  *Keith Wyatt*

**FOR OFFICE USE ONLY**

RECEIPT #  _____   AMOUNT  _____   APPLYING IFP  _____   JUDGE  _____   MAG. JUDGE  _____