# EXHIBIT Q

# Deposition of Wanda Andrews

Page 1

```
1            UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2                   HOUSTON DIVISION
3
   UNITED STATES OF AMERICA,   ) Civil Action
4      Plaintiff,              ) No. 4:18-CV-00644
                               )
5   vs.                        )
                               )
6  CITY OF HOUSTON,            )
      Defendant.               )
7   _____
8  JANE DRAYCOTT AND PAULA     )
   KEYES,                      )
9      Plaintiff-Intervenors,  )
                               )
10 vs.                         )
                               )
11  CITY OF HOUSTON,           )
       Defendant.              )
12
13
14 ****************************************************
15  FED. R. CIV. P.30(B)(6) DEPOSITION OF CITY OF HOUSTON
16             (WANDA L. ANDREWS)
17             August 13, 2019
18 ****************************************************
19   FED. R. CIV. P.30(B)(6) DEPOSITION OF CITY OF HOUSTON
   (WANDA L. ANDREWS), produced as a witness at the instance
20 of the Plaintiff and duly sworn, was taken in the
   above-styled and numbered cause on Tuesday, August 13,
21 2019, from 9:38 a.m. to 1:04 p.m., before JAMES M. PLAIR,
   Certified Shorthand Reporter in and for the State of
22 Texas, reported by computerized stenotype machine at the
   CITY OF HOUSTON LEGAL DEPARTMENT, 900 Bagby, Third Floor,
23 Houston, Texas 77002, pursuant to the Federal Rules of
   Civil Procedure and the provisions stated on the record or
24 attached hereto.
25 Job No. 407947
```

Page 2

```
1              APPEARANCES
2
3  REPRESENTING PLAINTIFF UNITED STATES OF AMERICA:

   Mr. Jeremy P. Monteiro
4  Mr. Hector F. Ruiz
   UNITED STATES DEPARTMENT OF JUSTICE
5  EMPLOYMENT LITIGATION - CIVIL RIGHTS DIVISION
   950 Pennsylvania Avenue, N.W.
6  Washington, D.C. 20530-0001
   202.616.9100 Telephone
7  202.514.1005 Fax
   Jeremy.Monteiro@usdoj.gov Email
8  Hector.Ruiz@usdoj.gov Email
9    and
10 Mr. Keith Wyatt
   UNITED STATES DEPARTMENT OF JUSTICE - U.S. ATTORNEY'S
11 OFFICE
   1000 Louisiana Street, Suite 2300
12 Houston, Texas 77002
   713.567.9767 Telephone
13 Elizabeth.Karpati@usdoj.gov Email
   Keith.Wyatt@usdoj.gov Email
14
15 REPRESENTING DEFENDANT CITY OF HOUSTON:
16 Ms. Deidra N. Sullivan
   CITY OF HOUSTON LEGAL DEPARTMENT
17 900 Bagby Street, Third Floor
   Houston, Texas 77002-2527
18 832.393.6457 Telephone
   832.393.6259 Fax
19 Deidra.Sullivan@houstontx.gov Email
20
   REPRESENTING PLAINTIFFS-INTERVENORS JANE DRAYCOTT AND
21 PAULA KEYES:
22 Mr. S. Nasim Ahmad
   Mr. Dwain Gregory Capodice II
23 AHMAD & CAPODICE, P.L.L.C.
   24900 Pitkin Road, Suite 300
24 The Woodlands, Texas 77386
   832.767.3207 Telephone
25 NAhmad@cline-ahmad.com Email
```

Page 3

```
1                   INDEX
2                                        PAGE
3
4  TESTIMONY OF WANDA L. ANDREWS
5  Examination by Mr. Ruiz                  4
6  Examination by Mr. Capodice             75
7  Examination by Ms. Sullivan             83
8  Further Examination by: Mr. Ruiz        86
9  Further Examination by: Mr. Capodice    96
10 Changes and Signature                   97
11 Reporter's Certificate                  99
12
13
14            EXHIBITS MARKED
15 30(B)(6)     DESCRIPTION           PAGE
16
17 Exhibit 13  Composite Exhibit: City of Houston      29
              interoffice correspondence dated
18            12-07-09; HFD Assessment Executive
              Summary; HFD Assessment; HFD Special
19            Bulletin; Executive Order 1-50 -
              HOU00002257 through 2318
20
21
22
23
24
25
```

Page 4

```
1             WANDA L. ANDREWS,
2  having first been duly sworn, was examined and testified
3  as follows:
4              EXAMINATION
5  BY MR. RUIZ:
6    Q.  Good morning, Ms. Andrews.
7    A.  Good morning.
8    Q.  My name is Hector Ruiz.  I'm with the
9  Department of Justice and I'm here today with Jeremy
10 Monteiro, who is also with the Civil Rights Division of
11 the Department of Justice and Mr. Keith Wyatt, to his
12 right; he's with the United States Attorney General's
13 Office here in Houston, Texas; and we're here in -- to
14 take your testimony in the case, the United States v. the
15 City of Houston.
16         Would you please state your full name for
17 the record?
18   A.  Wanda Lynnette Andrews.
19   Q.  Would you please provide your business address?
20   A.  1801 Smith Street, ZIP 77002 --
21   Q.  Thank you.
22   A.  -- Houston, Texas.
23   Q.  Have you ever lived your deposition taken
24 before?
25   A.  Not that I recall, no.
```



Page 5

1    Q.   Okay.  I'm just going to cover some rules --
2    **A.   Okay.**
3    Q.   -- of depositions so that we know how to proceed
4  today.
5            First of all, everything that you and I
6  discuss will be taken down by the court reporter here.
7  It's really important that he be able to take down what I
8  say and what you say, what I ask and how you answer.
9            So go ahead and would you please let me
10 finish my questions?  Even if you think you know what I'm
11 going to ask, go ahead and just let me finish my question
12 and then you can give me a complete answer.  Okay?
13   **A.   Sure.**
14   Q.   Also, it's important that you -- if the answer
15 is "yes" that you answer "yes" and not a nod because he
16 can only take down words and not a nod.  Is that okay?
17   **A.   That's not a nod?**
18   Q.   Yes.
19   **A.   Gotcha, yes.**
20           MS. SULLIVAN:  It ends up being a gesture.
21   Q.   (BY MR. RUIZ)  Now, if you don't hear my
22 question, just go ahead and say so, and I'll restate it.
23 Unless the attorney, your attorney, instructs you to not
24 answer, you should answer the question.
25   **A.   Okay.**

Page 6

1    Q.   Okay.  If you need a break, just say so.  I just
2  ask, if there is a question pending, that the question be
3  answered before the break, before you take the break.
4            Is that okay?
5    **A.   Yes.**
6    Q.   You're under oath.  Do you understand what
7  testifying completely and truthfully means?
8    **A.   I believe I do, yes.**
9    Q.   Is there any reason that prevents you from
10 testifying completely and truthfully today?
11   **A.   No.**
12   Q.   Ms. Andrews, I want to go through a process to
13 identify the topics that you have been designated to
14 testify about.
15           I'm handing you what was marked yesterday
16 as Deposition Exhibit 1.  Okay.  It's the Plaintiff's
17 Amended Notice of Federal Rules of Civil Procedure
18 30(b)(6) Deposition to Defendant, City of Houston.
19           Would you go ahead and take a moment to
20 review that, please?  It's dated August 2nd, 2019.
21           (Witness reviewing document)
22   Q.   (BY MR. RUIZ)  Have you seen a copy of this
23 notice before, Ms. Andrews?
24   **A.   It doesn't look familiar, no.**
25   Q.   Okay.

Page 7

1            What I'm going to hand you now is -- was
2  marked yesterday as Exhibit 2.  Okay?  And what it is, is
3  the Defendant's, City of Houston's, First Amended
4  Objections and Responses to Plaintiff's Amended Notice of
5  Federal Rules of Civil Procedure 30(b)(6) Deposition to
6  Defendant, City of Houston.
7    **A.   May I stop you for a moment?**
8    Q.   Absolutely.
9    **A.   I'm not exactly sure what I'm looking at here.**
10   Q.   It's a notice that the Department of Justice
11 sent to the City, requesting that they provide witnesses
12 to provide information about specific topics.
13   **A.   Oh, okay.**
14   Q.   If you haven't seen it, you haven't seen it.
15 It's okay.
16   **A.   Okay.  So I don't need to read through this?**
17   Q.   No.  If you haven't seen it --
18   **A.   Okay.**
19   Q.   -- we'll cover the different topics to make sure
20 you understand what you are testifying about today.
21   **A.   All right.**
22   Q.   Okay.  This is Exhibit 2.  Go ahead and take a
23 moment to review it.
24           (Witness reviewing document)
25           MS. SULLIVAN:  Is there a question pending?

Page 8

1            MR. RUIZ:  No.  I just asked her to review
2  it.
3            MS. SULLIVAN:  Okay.  Okay.
4    Q.   (BY MR. RUIZ)  Ms. Andrews, have you seen
5  Exhibit 2 before?
6    **A.   No.**
7    Q.   No, you haven't?
8    **A.   No.**
9    Q.   Okay.  If you would, would you please turn to
10 pages in Exhibit 2?  It's Pages 4 of 21.
11   **A.   (Witness complies).**
12   Q.   I want you to look at the top of the page that
13 says "1" and I'm going to refer to that as "topic 1".
14   **A.   Okay.**
15   Q.   Okay.  Now, the City has designated you to
16 testify with respect to topic 1(c), on the next page --
17   **A.   Okay.**
18   Q.   -- and 1(e) on the following page after that,
19 Page 6 of 21.
20           If you look on Page 5 of 21, at 1(c), it
21 says:  "Response, Defendant designates Wanda Andrews to
22 testify regarding HFD training on Human Resource issues
23 during the relevant time frame."
24   **A.   Okay.**
25   Q.   Do you see that?



Page 9

1    A.   I do.

2    Q.   Okay.  And if you turn to Page 7 of 21, in the

3 second supplemental response for 1(e), the last sentence,

4 states that Houston will present Ms. Andrews as designated

5 in its June 14th, 2019 response.  Do you see that?

6    A.   I'm sorry.  Repeat that.

7         MS. SULLIVAN:  I'm sorry.

8    A.   Oh, last sentence, yes.

9    Q.   (BY MR. RUIZ) Okay.  And would you please

10 review topics 1(c) and 1(e)?

11        (Witness reviewing document)

12        MS. SULLIVAN:  You don't have to read all

13 the objections and stuff like that.

14        THE WITNESS:  Oh.

15        MS. SULLIVAN:  That's legalese stuff.  He

16 just wants you to --

17        THE WITNESS:  To be clear on this one?

18        MS. SULLIVAN:  Yeah, this 1(c).

19        THE WITNESS:  Oh, okay.  All right.

20 Thanks.  All right.

21    Q.   (BY MR. RUIZ) Are you prepared to respond to

22 questions regarding these matters?

23    A.   Yes.

24    Q.   Okay.  Now, would you please turn to topics

25 2(c)?  2(c) you can find on Page 10 of 21, and 2(e), which

Page 10

1 is on Page 12 of 21.  Okay.

2    A.   And 2(e)?

3    Q.   2(e), yes, ma'am.

4    A.   Okay.

5    Q.   The City has also designated you to respond to

6 questions about these topics.

7         Are you prepared to respond to questions

8 regarding these topics?

9    A.   Yes.

10    Q.   Okay.  Would you please review topics 3(c) and

11 3(e)?

12    A.   What page?

13    Q.   3(c) is on Page 15 of 21 and it carries over

14 into 16 of 21.  3(e) begins on Page 16 of 21 and carries

15 over into Page 17 of 21.

16    A.   And what was on Page 17?

17        MS. SULLIVAN:  No.  It was just the

18 carryover.

19        THE WITNESS:  Just carry over.

20        MS. SULLIVAN:  Yeah, that's it.

21        THE WITNESS:  Oh, okay.

22    Q.   (BY MR. RUIZ) Are you prepared to respond to

23 questions regarding these topics?

24    A.   Yes.

25    Q.   Thank you very much.

Page 11

1         And would you please turn to topics 4(d)?

2 4(d), you can find on Page 19 of 21, and 4(f), and you can

3 also find that beginning on Page 19 of 21 and carrying

4 over to 20 of 21.

5         (Witness reviewing document)

6    Q.   (BY MR. RUIZ) Ms. Andrews, are you prepared to

7 answer questions regarding those topics?

8    A.   Yes.

9    Q.   And the last topic that you have been designated

10 to provide testimony as the City's representative is for

11 topic 5, which is on Page 20, okay, and that topic is HFD

12 complaint policy dissemination and training.

13        Now, for topic 5, you have only been

14 designated for the training aspect, not on the

15 dissemination.

16    A.   Uh-hm.

17    Q.   Do you see that?

18        MS. SULLIVAN:  You have to say "yes".

19        THE WITNESS:  Yes.  I'm sorry.  Yes.

20    Q.   (BY MR. RUIZ) And are you prepared to respond

21 to questions regarding this topic?

22    A.   Yes.

23    Q.   Thank you very much.

24        Ms. Andrews, when did you learn that you

25 were being designated as the City's representative for

Page 12

1 these topics?

2    A.   I think it may have been at least two weeks ago.

3    Q.   At least two weeks.

4         Could it have been more than a month ago?

5 Would it have been more than a month ago?

6    A.   I don't think it was more than a month ago.

7    Q.   So somewhere between a month and two weeks ago.

8 Does that sound right?

9    A.   (No audible response).

10    Q.   You said at least two weeks ago, but not more

11 than a month.  Is that accurate --

12    A.   Yes.

13    Q.   -- or to the best of your recollection?

14    A.   To the best of my recollection.

15    Q.   You can read them more, if you want to,

16 Ms. Andrews.

17        Ms. Andrews, I just want to cover some very

18 brief background before we go into the topics.

19    A.   Okay.

20    Q.   Can you please describe your educational

21 background for me?

22    A.   My educational background, I have a Bachelor's

23 Degree in Human Resources and I also have an HR

24 certification in Human Resources as well.

25    Q.   When did you obtain your Bachelor's Degree in



Page 13

1  Human Resources?

2      A.  Now, you want to know my age.  1978.

3      Q.  And you mentioned that you have an HR

4  certification?

5      A.  Yes.

6      Q.  What is that, ma'am?

7      A.  Basically, you take a test on various topics

8  dealing with HR issues to become certified in those

9  particular areas.

10     Q.  What organization administers the test?

11     A.  This was administered by the Human Resources,

12  HCRI, Certification Institute.  It's also administered by

13  SHRM, the Society of Human Resources, Human Resources and

14  Management.

15     Q.  When did you obtain that certifications?

16     A.  Wow, hmm.  I have had this certification for at

17  least -- I think at least 15 years.

18     Q.  What is your current position with the City?

19     A.  My current position is Human Resources Manager.

20     Q.  And how long have you held that position?

21     A.  Since 2005, so about 14, soon to be 15 years.

22     Q.  And what are your responsibilities in that

23  position?

24     A.  At this particular point, my responsibility

25  primarily deals with training reeducation.

Page 14

1      Q.  Is there a particular department in the City

2  that you are responsible for training and reeducation for?

3      A.  The Houston Fire Department.

4      Q.  The Houston Fire Department.

5          And how long have you had responsibilities

6  for training and reeducation for the Houston Fire

7  Department?

8      A.  I would say, at this point, about nine years.

9      Q.  Nine years.

10         And, before that, what were your

11  responsibilities?

12     A.  Before that, I was responsible for Human

13  Resources issues, such as FMLA, benefits administration,

14  those types of issues, recruiting, onboarding.

15     Q.  Is that also for the Houston Fire Department?

16     A.  Yes.

17     Q.  Ms. Andrews, did you spend time preparing for

18  this deposition?

19     A.  Yes.

20     Q.  How long did you spend?

21     A.  About two-and-a-half hours.

22     Q.  Two-and-a-half hours.

23         Would you please describe to me everything

24  you did to prepare for this deposition?

25     A.  Everything I did?

Page 15

1      Q.  Yes, ma'am.

2      A.  I met with the City attorneys, who gave me some

3  instructions as far as how to --

4          MS. SULLIVAN:  Wait, wait, wait.

5          MR. RUIZ:  Wait.

6          MS. SULLIVAN:  Don't talk about what we

7  discussed.

8          THE WITNESS:  Oh.

9      Q.  (BY MR. RUIZ) When you -- Thank you very much

10  for trying to describe.  I understand you were trying to

11  answer the question, but any conversations you had with

12  the City attorneys, those are between you and the City.

13  They are privileged.

14         So discussions you had with the City

15  attorneys, do not describe the content of the discussions.

16     A.  Okay.

17     Q.  Okay.  You can just say you met with the City

18  attorneys.

19     A.  I met with the City attorneys.

20     Q.  Okay.  Great.

21         What else did you do?

22     A.  I don't know how to answer that.  What else did

23  I do in regards to?

24     Q.  To preparing for this deposition.

25     A.  Other than meeting with the City attorneys?

Page 16

1      Q.  Yes, ma'am.

2      A.  That's how I prepared.

3      Q.  Okay.  Let me -- let me see if I can -- I'll try

4  and help you out.  Were you given any documents?

5      A.  I have documents, yes.

6      Q.  When you say you have documents, were they given

7  to you?

8      A.  I had the opportunity to review them.  I don't

9  have them.

10     Q.  Who gave you the documents?

11     A.  The City attorney.

12     Q.  And when you say the "City attorney", do you

13  mean the actual City Attorney?

14         MS. SULLIVAN:  Ron Lewis.

15     A.  Do you mean the head of Legal?  Then no.  It was

16  Deidra Sullivan and Marjorie Cohen.

17     Q.  (BY MR. RUIZ) Which documents did they provide

18  to you?

19     A.  Oh, Dear God.

20         THE WITNESS:  Am I to answer that?

21         MS. SULLIVAN:  You have to.  I can't --

22         THE WITNESS:  Would you repeat the

23  question, please?

24     Q.  (BY MR. RUIZ) Which documents did they provide

25  to you?



Page 17

1   A.   Documents with some questions for possible

2   consideration.

3   Q.   Did you review that document that had questions

4   for possible consideration?

5   A.   Yes.

6   Q.   Did it help you in preparing for today's

7   deposition?

8   A.   Yes.

9   Q.   Where is that document now?

10   A.   I'm not sure.  I don't have it.

11   Q.   Was it taken back from you?

12   A.   Yes.

13   Q.   Okay.  How long did you review the document?

14   A.   Again, we were in the meeting for about

15   two-and-a-half hours.

16   Q.   Was there any other documents that you were

17   given?

18   A.   No, not that I recall.

19   Q.   Have you reviewed any deposition transcripts in

20   preparation for this deposition?

21   A.   No.

22   Q.   Have you reviewed any complaint policies in

23   preparation for this deposition?

24   A.   No.

25   Q.   Have you reviewed the conclusions of any OIG

Page 18

1   investigation in preparation for this deposition?

2   A.   No.

3   Q.   Have you spoken with any members of the Houston

4   Fire Department in preparation for this deposition?

5   A.   No.

6   Q.   When did you meet with the City attorneys to

7   prepare for this deposition?

8   A.   I think that was Monday, August 5th, to the best

9   of my recollection.

10   Q.   Did you take any notes during the meeting?

11   A.   No.

12   Q.   Have you read the complaint by -- filed by the

13   United States in this lawsuit?

14   A.   No.

15   Q.   No.  Okay.

16       We're going to go ahead and dive into the

17   topics, then.  Thank you --

18   A.   Okay.

19   Q.   -- very much.

20       Let's go ahead and begin with topic 1(c),

21   and just so that we're clear on the same page, what you

22   can do is look back at topic 1(c).  It's Exhibit 2, and

23   you can turn to -- topic 1 is described on Page 4 of 21

24   and topic 1(c) is specifically on Page 5 of 21.  Okay.

25       Now, topic 1 is OIG 09-424, Defendant's

Page 19

1   response, recommendations, disciplinary actions,

2   corrective measures, or any other actions, taken as a

3   result of the findings issued with respect to OIG 09-424,

4   and that's on Page 4 of 21 of Exhibit 2.

5       Topic 1(c) is also a topic, and it's

6   training of firefighters at Fire Station 54 conducted in

7   response to OIG 09-424's findings (HOU5843) and

8   Investigative Synopsis (HOU5851 through 5865).

9       Do you see that?

10   A.   I do, yes.

11   Q.   Okay.  Now, I'm handing to you what has been

12   marked yesterday as Exhibit 3, and it's Bates stamped

13   HOU00005843.

14       Ms. Andrews, are you familiar with this

15   document?

16   A.   No.

17   Q.   Have you ever seen it before?

18   A.   No.

19   Q.   Let me show you another document.

20       It's -- it's been marked yesterday as

21   Exhibit No. 4, okay, and it is HOU00005852, and it runs

22   through HOU00005865, and I just want you to take a moment

23   to review that document, please.

24       (Witness reviewing document)

25       MS. SULLIVAN:  Do you want her to read the

Page 20

1   whole thing?

2       MR. RUIZ:  No.

3   Q.   (BY MR. RUIZ) Just, generally, I'm just going

4   to ask you if you have seen that before.

5   A.   No, I have not.

6   Q.   You have not seen that document before?

7   A.   No.

8   Q.   So the document that you did you review in

9   preparation for this deposition, it didn't -- it didn't

10   look like either of these documents?

11   A.   No, it did not.

12   Q.   And the document you did review did help you

13   prepare for this deposition?

14   A.   It did.

15       MR. RUIZ:  Deidra, I would kind of like to

16   see it, the document that she reviewed in preparation for

17   this deposition.

18       MS. SULLIVAN:  That one, Exhibit 2.

19       MR. RUIZ:  It was Exhibit 2?

20       MS. SULLIVAN:  Yes, yeah.

21       MR. RUIZ:  Okay.

22   Q.   (BY MR. RUIZ) Looking at Exhibit 2,

23   Ms. Andrews, do you recognize this document, Exhibit 2, as

24   the document that you reviewed?

25   A.   Yes.

Page 21

1    Q.   Exhibit 2 --
2    A.   Yes.
3    Q.   -- that's the document you reviewed?
4    A.   Yes.
5    Q.   Thank you very much.
6         Ms. Andrews, are you familiar with OIG's
7    investigation No. 09-424?
8    A.   No.
9    Q.   Okay.  I'm going to ask you some questions that
10   relate -- Okay.  I want to know if the City provided any
11   training specifically in response to the findings and
12   synopsis for OIG's investigation into 09-424.
13   A.   Not that I'm aware of.
14   Q.   Okay.
15        MR. RUIZ:  I know it's early.  Why don't we
16   take a break so we can meet together real quick.
17        MS. SULLIVAN:  Okay.
18        MR. RUIZ:  Just a couple-minute break.
19        (Recess from 10:06:14 a.m. to 10:11:09
20        a.m.)
21   Q.   (BY MR. RUIZ) Ms. Andrews, where we left off, I
22   was asking you about training that was -- well, we left
23   off asking you about the training that was specifically
24   performed in response to OIG's investigation into 09-424.
25        Do you remember that?

Page 22

1    A.   Yes.
2    Q.   I want to turn back to my questions about your
3    preparation for this deposition.  Okay?
4         Earlier, you identified one document that
5    you reviewed that was given to you in preparation.  Do you
6    remember that?
7    A.   Yes.
8    Q.   Did you review any other documents in
9    preparation for this deposition that were not given to
10   you?
11   A.   Yes.
12   Q.   Okay.  Which documents were those?
13   A.   There were various memos that was reviewed.
14   There was also the Horton assessment.
15   Q.   Okay.  Do you remember specifically which memos
16   that you reviewed?
17   A.   I recall one memo from an Assistant Chief or a
18   Fire Chief at the time, from Chief Rick Flanagan.
19   Q.   What was the memo about?
20   A.   That memo was about training.
21   Q.   And how did you obtain this memo?
22   A.   Someone must have given me a copy, because I
23   don't think I got it directly from the Chief, but I did
24   receive a copy for my files.
25   Q.   Okay.  So when you reviewed -- Let me ask you

Page 23

1    this:  Did you have this memo already when -- when you
2    were preparing for this deposition?
3    A.   Yes.
4    Q.   And you just reviewed a memo that you already
5    had in your possession?
6    A.   Yes.
7    Q.   Okay.  Do you remember the approximate date of
8    that memo, the one from Rick Flanagan?
9    A.   I'm thinking it was around March 2010.
10   Q.   Okay.  Did that -- did that -- reviewing that
11   memo help you prepare for this deposition?
12   A.   Yes.
13   Q.   Do you remember any -- any other memo that you
14   reviewed?
15   A.   I don't recall another -- Wait.
16        THE WITNESS:  A question?
17        MS. SULLIVAN:  Nuh-uhm.
18        THE WITNESS:  Just go on?
19        MS. SULLIVAN:  Yeah.
20        THE WITNESS:  Would you restate that
21   question?
22   Q.   (BY MR. RUIZ) Do you remember any other memo
23   that you reviewed?
24   A.   That was the key memo.  I don't recall another
25   specifically.

Page 24

1    Q.   Okay.  Did you provide the documents that you
2    reviewed to the City?
3    A.   Yes.
4    Q.   Okay.  And did you get to keep those documents
5    or did you turn them over to the City?
6    A.   I kept my originals.
7    Q.   You kept your originals.  Okay.
8         Where are those documents now?
9    A.   In my office.
10   Q.   Okay.  Is your office here?
11   A.   No.
12        MS. SULLIVAN:  We provided those documents.
13        MR. RUIZ:  You did?
14        MS. SULLIVAN:  Yeah.  They were in a couple
15   of productions ago.  She would have been the custodian of
16   it.
17        MR. RUIZ:  That would have been thousands
18   of records of -- You don't know it specifically?  I mean,
19   it doesn't identify it specifically, what she reviewed.
20   Right?
21        MS. SULLIVAN:  No, but what she's talked
22   about so far, it was provided with -- as a part of her
23   files.
24        MR. RUIZ:  Okay.  Deidra, would you be able
25   to identify the Bates number?



Page 25

1    MS. SULLIVAN:  I would have to go back and
2  pull it up.
3    MR. RUIZ:  Would you please, when you get a
4  chance, can we identify the documents you reviewed in
5  preparation for this deposition?
6    MS. SULLIVAN:  That, I don't -- Can we go
7  off the record?
8    MR. RUIZ:  Yes.
9    (Recess from 10:16:30 a.m. to 10:20:34
10    a.m.)
11    Q.  (BY MR. RUIZ) Ms. Andrews, I'm going to show
12  you something on this tablet, okay?  And you can just, on
13  the tablet, you can scroll up and down.
14    A.  Uh-hm.
15    Q.  Okay.  What it is, it is Bates marked on this
16  tablet as US015165 and the last electronic page is Bates
17  stamped US015168, okay, which you can just scroll through
18  that and tell me if you recognize that as the memo from
19  Rick Flanagan that you reviewed in preparation for this
20  deposition.
21    A.  I don't know if this is the same memo.
22    Q.  Okay.  Thank you.
23    You don't know if that -- You don't
24  recognize this as --
25    A.  I don't recall that being the same memo.

Page 26

1    Q.  Okay.
2    Ms. Andrews, do you recall giving the City
3  a copy of everything that you reviewed?
4    A.  Everything that I reviewed, yes.  To the best of
5  my recollection, I did.
6    Q.  And did you give those copies to Ms. Sullivan?
7    A.  Whatever copies I provided, yes, I gave to
8  Ms. Sullivan.
9    Q.  Thank you very much.
10    MR. RUIZ:  Do I have copies of everything
11  that she gave to you?
12    MS. SULLIVAN:  Everything they gave, I
13  produced.  I would have to go back and see, because it was
14  a couple of productions ago.
15    MR. RUIZ:  Okay.  Okay.
16    Q.  (BY MR. RUIZ) Ms. Andrews, when did you review
17  these materials?
18    A.  August 5th.
19    Q.  August 5th?
20    A.  Monday, August 5th.
21    Q.  And when did you provide these copies to
22  Ms. Sullivan?
23    A.  We had provided -- I had provided copies a week
24  or so before that.
25    Q.  So, like, July?

Page 27

1    A.  Yes.
2    Q.  Okay.
3    MR. RUIZ:  We can go off the record.
4    (Discussion off the record)
5    (Recess from 10:23:34 a.m. to 10:25:49
6    a.m.)
7    Q.  (BY MR. RUIZ) Ms. Andrews, when you say that
8  you provided Ms. Sullivan with documents that you reviewed
9  in a folder, okay, are we talking an electronic folder or
10  hard copies of documents?
11    A.  Hard copies.
12    Q.  And when did you provide these hard copies of
13  documents to Ms. Sullivan?
14    A.  Again, the latter part of July and additional
15  copies on August 5th.  I think there were some additional
16  copies.
17    Q.  Okay.  Approximately, how many hard copies --
18  how many pages did you provide to her?
19    A.  I don't recall how many pages.
20    Q.  Other than the documents that you have described
21  to me, various memos and the Horton assessment, can you
22  remember any other document that you provided to
23  Ms. Sullivan?
24    A.  There was some training from LegalWATCH.
25    Q.  Training from LegalWATCH.

Page 28

1    Can you describe the document which you are
2  referring to when you state the "training from
3  LegalWATCH"?
4    A.  The department hired a firm to come out and to
5  conduct some training for the Command Staff.
6    Q.  When did that happen?
7    A.  That was April 2010.
8    Q.  Okay.  And what does the document consist of?
9    A.  It was a handout from the company that did the
10  training to follow along with a PowerPoint presentation.
11    Q.  Do you remember any other documents that you
12  provided to the City?
13    A.  I also provided some PowerPoint presentations
14  that I had created for the Houston Fire Department.
15    Q.  And when had you created those?
16    A.  Oh, gee.  This goes back several years ago.
17  Like, I can't give you a specific time frame, but it was
18  more than a couple of years ago.
19    Q.  Okay.  Why did you select these documents to
20  provide to the City?
21    A.  I was asked to provide copies of any training we
22  had provided to the Houston Fire Department.
23    Q.  Ms. Andrews, you mentioned the Horton
24  assessment --
25    A.  Yes.

LEXITAS

Page 29

1    Q.  -- as one of the documents that you reviewed and
2  that you provided to the City.  Is --
3    **A.  Yes.**
4    Q.  -- that correct?
5          I'm going to hand you what I am marking as
6  Exhibit -- 30(b)(6) Deposition Exhibit No. 13.  Okay.
7          (Exhibit 13 marked)
8          MR. RUIZ:  It's Bates stamped HOU00002257
9  through HOU00002318.
10         MS. SULLIVAN:  Thank you.
11         **THE WITNESS:  Okay.**
12   Q.   (BY MR. RUIZ) Ms. Andrews, is this a copy of
13 the assessment that you're referring to?
14   **A.  Yes, it is.**
15   Q.  Okay.  Thank you.
16         I'm going to turn your attention back to
17 Exhibit 2, which is the City's designations as to who will
18 provide testimony on specific topics.  Okay.
19         Will you please turn to topic 2?  Topic 2
20 is -- You can find it on Page 9 of 21, and it is
21 OIG 09-407, Defendant's response, recommendations,
22 disciplinary actions, corrective measures, or any other
23 action, taken as a result of OIG's findings and synopsis
24 issued with respect to OIG 09-407 (HOU5460, HOU1472-1495).
25 Do you see that?

Page 30

1    **A.  I do, yes.**
2    Q.  And if you refer to topic 2(c), on the next
3  page, that -- that topic is training of firefighters at
4  Fire Station 54, conducted in response to OIG 09-407
5  findings and synopsis report.
6          Do you see that?
7    **A.  I do, yes.**
8    Q.  Now, the City designated you to answer questions
9  on this subtopic.  Do you see that?
10   **A.  Are you referring to (c) as a subtopic?**
11   Q.  Yes, ma'am.
12   **A.  Yes.**
13   Q.  If you look down to the response, the City
14 designated you to answer questions on this subtopic.
15         Do you see that?
16   **A.  Yes.**
17   Q.  I'm going to hand you what's been Bates stamped
18 as Exhibit 7.  It is Bates stamped -- It was marked -- I'm
19 sorry -- marked as Exhibit 7 yesterday, and the Bates
20 stamp on it is HOU00005460 through HOU00005462, and I want
21 you to just review that document for a minute, please.
22         (Witness reviewing document)
23   Q.   (BY MR. RUIZ) Ms. Andrews, are you familiar
24 with this document?
25   **A.  No, I'm not.**

Page 31

1    Q.  Have you ever seen it before?
2    **A.  No, I have not.**
3    Q.  Thank you very much.
4          I'm going to hand you what is Exhibit
5  No. 8, okay, and it is HOU00001472 through HOU00001495,
6  and I just want you to review it and I will ask you about
7  your familiarity with it.
8          MS. SULLIVAN:  Can we go off the record
9  while she's reviewing?  I'm going to go see if I can find
10 these documents.
11         MR. RUIZ:  Okay.
12         (Recess from 10:34:50 a.m. to 10:43:51
13         a.m.)
14   Q.   (BY MR. RUIZ) Ms. Andrews, before I move on to
15 these documents -- or I'm sorry.
16         Did you complete your review of the exhibit
17 that you were reviewing?
18   **A.  Yes, I did.**
19   Q.  Have you ever seen it before?
20   **A.  No, I have not.**
21   Q.  Are -- are you familiar with that -- that
22 investigation?
23   **A.  No, I'm not.**
24   Q.  You're not.  Okay.
25         Before I move on to ask you questions about

Page 32

1  the investigation detailed in Exhibit 8, which is
2  OIG 09-407, I need you to turn back to topic 1(e).
3    **A.  Uh-hm.**
4    Q.  Would you please turn back to topic 1(e)?  You
5  can find it on Page 6 of 21 in Exhibit 2.
6          Topic 1(e) relates to OIG 09-424.  Topic
7  1(e) is:  "Defendant's efforts to prevent reoccurrence of
8  the actions complained of in OIG 09-424, including but not
9  limited to the cold water being turned off in shower in
10 women's bathroom; speakers being turned off in women's
11 dormitory; males using the women's bathroom and urinating
12 outside of the toilet; the removal of mattresses from the
13 women's dormitory; the removal of items from lockers in
14 women's dormitory; and leaving of trash in the women's
15 dormitory."
16         Do you see that?
17   **A.  Yes.**
18   Q.  Ms. Andrews, after OIG 09-424 was completed and
19 OIG formed 09-424 findings and investigative synopsis was
20 issued, were any efforts taken to prevent the reoccurrence
21 of the actions complained of by Ms. Draycott in 09-424?
22   **A.  I'm not aware of any.**
23   Q.  Now, I want to turn now to topic 2, the two
24 documents that we were reviewing, and I want to turn first
25 to -- Well, topic 2 is OIG 09-407, Defendant's response,



Page 33

1   recommendations, disciplinary actions, corrective
2   measures, or any other action, taken as a result of OIG's
3   findings and synopsis issued with respect to OIG 09-407.
4        Do you see that?
5   **A.  Yes.**
6   Q.  Okay.  Looking at Exhibits 7 and 8 that you
7   reviewed, did the City conduct any training?
8        MS. SULLIVAN:  This is that one.
9        **THE WITNESS:  Okay.**
10  Q.  (BY MR. RUIZ) Did the City conduct any training
11  of firefighters at Station 54 in response to OIG's
12  09-407's findings or investigative synopsis?
13  **A.  Not to my knowledge.**
14  Q.  I want to turn now to topic 2(e), and topic 2(e)
15  you can find on Page 12 of 21, and topic 2(e) is
16  Defendant's efforts to prevent reoccurrence of actions
17  complained of, including but not limited to the racial and
18  gender slurs written in the women's dormitory at Fire
19  Station 54.
20       Do you see that?
21  **A.  I do.**
22  Q.  Now, after OIG's 407's investigation was
23  completed and OIG 09-407's investigative synopsis -- and
24  investigative synopsis was issued, were any efforts made
25  to prevent the reoccurrence of the actions complained of

Page 34

1   in 09-407?
2   **A.  Not to my knowledge.**
3   Q.  What efforts have, if any -- Let me back up.
4   Let me strike that.
5        Without limitation as to time, as in after
6   the issuance of those -- this synopsis and findings for
7   OIG No. 09-407, what efforts has the City taken to prevent
8   the reoccurrence of events described or made the basis of
9   09-407?
10       MS. SULLIVAN:  Objection.
11  **A.  It sounds like you're asking me --**
12       MS. SULLIVAN:  Objection.  Confusing.  But
13  go ahead.
14  **A.  It sounds like you're asking me the same**
15  **question I just answered, and that would be not to my**
16  **knowledge.**
17  Q.  (BY MR. RUIZ) Since this -- since the issuance
18  up until today, you know of no efforts that have been
19  taken to prevent the reoccurrence of those events
20  described in 09-407.  Is that correct?
21  **A.  Ask that question again.**
22  Q.  From the issuance of the synopsis and the
23  findings all the way through today, you can't describe any
24  actions or efforts taken by the City to prevent the
25  reoccurrence of the actions described or made the basis of

Page 35

1   the complaint in 09-407?
2   **A.  No.**
3   Q.  You mean you can't describe any?
4   **A.  I can't --**
5   Q.  Okay.
6   **A.  -- describe any.**
7   Q.  We're going to go ahead and move on to topic
8   No. 3, Ms. Andrews.  Okay.  Topic No. 3 is -- you can find
9   on Page 14 of 21.  Okay.
10       And on Page 14 of 21, topic 3 is OIG
11  10-311, Defendant's response, recommendations,
12  disciplinary actions, corrective measures, or any other
13  action, taken as a result of the findings issued with
14  respect to OIG 10-311 (HOU5671 through 5705).
15       Do you see that?
16  **A.  Yes, I do.**
17  Q.  Okay.  And if you turn to Page 15 of the City's
18  designations, which is Exhibit 2, you can please review
19  subtopic 2(c), which is training of firefighters at Fire
20  Station 54 conducted in response to OIG 09-424's findings
21  and investigative synopsis.
22       Do you see that?
23  **A.  Yes, I do.**
24  Q.  Ms. Andrews, I'm going to hand you what's
25  Exhibit 9, okay, and Exhibit 9 was marked yesterday.

Page 36

1        It is HOU0005671 through HOU00002834.
2   Okay.  After you do, I'm going to ask you about your
3   familiarity with this document.
4        (Witness reviewing document)
5   Q.  (BY MR. RUIZ) Are you -- Have you had a chance
6   to review the document, Ms. Andrews?
7   **A.  I have.**
8   Q.  Are you familiar with this document?
9   **A.  No, I am not.**
10  Q.  Have you ever seen it before?
11  **A.  No, I have not.**
12  Q.  Okay.  Now, are you aware of any training that
13  the City conducted of firefighters at Station 54 in
14  response to OIG's 10-311 investigative summary, that
15  document in front of you which is Exhibit 9?
16  **A.  No, I'm not.**
17       MR. RUIZ:  Let's take a short break.
18       MS. SULLIVAN:  Okay.
19       (Recess from 10:55:14 a.m. to 11:11:10
20  a.m.)
21  Q.  (BY MR. RUIZ) Ms. Andrews, before we stopped
22  for the break, we were covering topic 3, and I want to
23  turn your attention now to subtopic 3(e).
24       You can find it on Page 16 of the City's
25  designations, which is Exhibit 2.  At the bottom of

Page 37

1  Page 16, topic 3(e) is the Defendant's efforts to prevent
2  reoccurrence of actions complained of in OIG 10-311
3  (HOU5671 through 5705).
4       Do you see that?
5  **A.  Yes.**
6     Q.  Ms. Andrews, after OIG 10-311 was completed,
7  were any efforts taken to prevent reoccurrence of the
8  actions complained of in OIG 10-311?
9  **A.  Not to my knowledge, no.**
10    Q.  Ms. Andrews, I want you -- I want to turn your
11 attention to topic 4, and you can find topic 4 on Page 18
12 of Exhibit 2.
13 **A.  Okay.**
14    Q.  It's Page 18 of 21 and topic 4 is:  "Thompson &
15 Horton, LLP and Lemond & Lemond, LLC HFD Assessment
16 (HOU2259 through 2318) - Defendant's request for
17 assessment, review, response implementation, or any other
18 action taken in response to the assessment of the
19 effectiveness of HFD's policies, practices, and training
20 related to workplace harassment and discrimination."
21      Do you see that?
22 **A.  Yes, I do.**
23    Q.  Okay.  Now, we have previously marked
24 Exhibit 13, I think, and I'm going to ask you some
25 questions about Exhibit 13.  Okay.

Page 38

1       Are you familiar with Exhibit 13?
2  **A.  Yes.**
3    Q.  Okay.  What is Exhibit 13?
4  **A.  It is the Houston Fire Department's Assessment**
5  **Executive Summary by Thompson & Horton.**
6    Q.  Is it the -- Is the document what is described
7  in topic 4 Thompson & Horton, L.L.P.'s and Lemon & Lemon,
8  L.L.C.'s HFD assessment?
9  **A.  Yes.**
10   Q.  Is that what it is?
11 **A.  Yes.**
12   Q.  And how are you familiar with it?
13 **A.  I received a copy of it.**
14   Q.  When did you receive a copy of it?
15 **A.  Gee, I guess shortly after it was completed.**
16 **This is '09.  Possibly sometime in '010, 2010.**
17   Q.  Thank you very much.
18      Would you please refer to topic 4(d), which
19 can be found on Page 19 of the City's responses and
20 designations?
21 **A.  (Witness complies).**
22   Q.  4(d) is training of firefighters at Fire
23 Station 54 conducted in response to the assessment HOU2259
24 through 2318.
25      Do you see that, Ms. Andrews?

Page 39

1  **A.  I do.**
2    Q.  And do you see that the City has designated you
3  to answer questions about training of firefighters at Fire
4  Station 54?
5  **A.  Yes.**
6    Q.  Now, did the City conduct any training of
7  firefighters at Fire Station 54 in response to Exhibit 13?
8  **A.  Well, we conducted training, but not just for**
9  **Station 54.  I guess my answer would be yes.**
10   Q.  Okay.
11      The training that you are describing or
12 that you -- that you said was conducted, when was it
13 conducted?
14 **A.  I think this began in January of 2010.**
15   Q.  Did it continue after January 2010?
16 **A.  Yes.  We had face-to-face training for -- I**
17 **think it lasted only two years, two-and-a-half years, to**
18 **get to everyone.**
19   Q.  What was the format of the training?
20 **A.  That -- There was a handout.  I can't recall if**
21 **there was a PowerPoint presentation.  I think at this**
22 **point, there was a handout that was used in the training.**
23   Q.  Okay.  Was the format -- When I'm asking about
24 the format, was it -- was it live training, with a live
25 presenter?

Page 40

1  **A.  Oh, it was face-to-face training.**
2    Q.  Was it -- The face-to-face training, what --
3  what was the size of the groups that were being trained at
4  one time?
5  **A.  I guess it varied, depending on which district**
6  **we were dealing with at the time.  It could be anywhere**
7  **from 15 to 30 individuals.**
8    Q.  I want to ask you about the phrase.  When you
9  say "face-to-face training", that means -- Does that mean
10 there was a live presenter?
11 **A.  Yes.  We went out to the stations.**
12   Q.  Okay.  Did you yourself participate in the
13 training?
14 **A.  Yes, I did.**
15   Q.  So when you say that, "We went out to the
16 stations," who is "we"?
17 **A.  The training was initially started by City HR**
18 **and I was privy to observe them for a few months or so**
19 **before I became active in the training myself.**
20   Q.  Is City HR, does that actually mean the City's
21 HR Department or is that the City HR Company?
22 **A.  That is the City's HR Department.**
23   Q.  So it was the City's Human Resources Department
24 that was putting on the training?
25 **A.  Yes.**



Page 41

1   Q.  Do you remember the names of individuals in the
2   City's HR who, other than yourself, that was putting on
3   the training?
4   A.  There were two I recall.  There was Kelly
5   Shreck.  I think she was a manager at the time, and then
6   Juan Padilla worked for her.  He was a trainer as well.
7   Q.  Okay.
8        At the time that the -- Ms. Shreck and
9   Mr. Padilla were conducting the training, what were their
10  positions with the City?
11  A.  Oh, their official classifications?
12  Q.  Yes, ma'am.
13  A.  I -- I'm not certain of that.  I know Ms. Shreck
14  was a manager.  What kind of manager, I'm not sure.  And
15  Mr. Padilla was a trainer, if I recall.
16  Q.  In the organizational chart of the Human
17  Resources Department, would they -- were -- Would they
18  be -- Would Ms. Shreck be a lateral position to you, as a
19  manager?
20  A.  Yes.
21  Q.  She would be a lateral position.
22  A.  Hold on.  Yes, yes.
23  Q.  She didn't report to you?
24  A.  No, she did not report to me.
25  Q.  How about Mr. Padilla?

Page 42

1   A.  No.  Mr. Padilla reported directly to Kelly
2   Shreck.
3   Q.  What topics were presented with respect to this
4   training that you're describing?
5   A.  I think the -- the training was "EEOC,
6   Understanding Your Rights and Responsibilities".
7   Q.  Were there any other topics that were presented?
8   A.  I think we also talked about the process of
9   filing a complaint as a part of the training, and there
10  were also training scenarios.
11  Q.  Do you remember -- I'm sorry.
12       Do you remember any other topics that were
13  presented?
14  A.  No.
15  Q.  Okay.  Three topics that you have identified
16  that were presented were EEOC, Understanding Your Rights
17  and Responsibilities.  Is that correct?
18  A.  Yes.
19  Q.  The process of filing complaints.  Is that
20  correct?
21  A.  Yes.
22  Q.  And training scenarios.  Is that correct?
23  A.  Yes.
24  Q.  Okay.
25       Will you please tell me what the topic

Page 43

1   "EEOC, Understanding Your Rights and Responsibilities" is
2   about?
3   A.  I think it primarily covered Title VII,
4   discrimination, age discrimination, retaliation.
5   Q.  Is there anything else that that topic covered?
6   A.  Sexual harassment.
7   Q.  Were any other topics that you -- or any other
8   content that that topic covered?
9   A.  Those are the ones that I can recall.
10  Q.  Now, had the City provided training on that
11  prior to January of 2010?
12  A.  Not to my knowledge.
13       Now, you're asking about City HR, so I
14  can't answer that definitively, other than not to my
15  knowledge.  They are separate from Human -- separate from
16  the Fire Department, is what I'm saying.
17  Q.  Okay.  I'm sorry.
18       Do you know if either the Fire Department
19  or City HR ever provided personnel in the Fire Department
20  with the "EEOC, Understanding Your Rights and
21  Responsibilities" training prior to January of 2010?
22  A.  Not to my knowledge.
23  Q.  Ms. Andrews, I want to make sure I understand
24  the distinction between City HR and the Fire Department.
25       You work for the Human Resources Department

Page 44

1   for the Fire Department.  Right?
2   A.  Yes.
3   Q.  And the distinction, if I understand it, that
4   you were drawing was that this was put on by the City's
5   Human Resources Department?
6   A.  Yes.
7   Q.  Ms. Shreck and Mr. Padilla, did they work for
8   City HR?
9   A.  Yes.
10  Q.  So they were not -- I mean, they may have done
11  Human Resource work, but they weren't specifically
12  assigned to the Houston Fire Department?
13  A.  No, they were not.
14  Q.  But you were?
15  A.  Yes.
16  Q.  Thank you.
17       Now, during the time period that the
18  training was being conducted, I believe you said that it
19  was a period of over two years.  Is --
20  A.  Yes --
21  Q.  -- that correct?
22  A.  -- if I recall correctly.
23  Q.  Okay.  Did you present the -- the topic "EEOC,
24  Understanding Your Rights and Responsibilities" yourself?
25  A.  Yes.

Page 45

1    Q.   And did you present on the topic of process of
2  filing a complaint?
3    **A.   Yes.**
4    Q.   And did you present on different training
5  scenarios?
6    **A.   Yes.**
7    Q.   Okay.
8          The second topic that you -- that you
9  mentioned was the process of filing a complaint.  Can you
10  describe what that training was about?
11   **A.   Basically, if I recall correctly, it was about**
12  **the various options to file a complaint, City, State or**
13  **Federal, or OI- -- Well, Houston Fire Department, OIG,**
14  **State, Federal.**
15   Q.   You say it was applied to the various different
16  options, City, State or Federal.  Is that what you said?
17   **A.   Yes.**
18   Q.   And then you also stated City HFD.  Is that
19  correct?
20   **A.   Yes.**
21   Q.   OIG, and you also said State and Federal.  Is
22  that --
23   **A.   Yes.**
24   Q.   -- correct?
25         Well, what was the purpose of the

Page 46

1  instruction on process -- on the process of filing a
2  complaint?
3    **A.   I'm sorry?**
4    Q.   Just -- Would you just describe the training
5  that was provided with respect to the process of filing a
6  complaint?
7    **A.   We discussed Title VII issues as far as**
8  **discrimination, the topics I mentioned earlier, and if**
9  **individuals felt they were being impacted in these areas,**
10  **the remedy for addressing those issues.  So therein came**
11  **the process for filing complaints.**
12   Q.   Okay.
13         Was attendance at these training sessions
14  provided between January of 2010 and two years later, was
15  it optional or required?
16   **A.   It was mandatory.**
17   Q.   Did the City, in some way, or did the City or
18  the Fire Department, in some way track who had attended
19  this mandatory training?
20   **A.   Yes, we did.**
21   Q.   How did you -- How did the City or the Fire
22  Department track how a person attended mandatory training?
23   **A.   There were sign-in sheets with employee numbers**
24  **attached and this information was then entered into an HFD**
25  **training database at the time.**

Page 47

1    Q.   Ms. Andrews, I want to go back to the second
2  topic that you said that you were trained on, the process
3  of filing a complaint.
4    **A.   Uh-hm.**
5    Q.   Yes.  Had that training been provided before --
6    **A.   Not to my knowledge.**
7    Q.   -- either by the City or the Houston Fire
8  Department?
9    **A.   Here again, not to my knowledge.**
10   Q.   The training sessions that you refer to that
11  were presented as part of the training, can you tell me
12  what the training scenarios are or just describe briefly
13  what you are referring to when you say "training
14  scenarios"?
15   **A.   Hmm, I can only recall one in particular,**
16  **whereby a female officer was being inappropriate with a**
17  **newly-hired firefighter, and that was relating to sexual**
18  **harassment.**
19         **I can't recall the others.  I think there**
20  **were two or three others.  I can't recall specifically**
21  **what those were.**
22   Q.   Okay.  So "scenario" is like -- Let me see if I
23  can -- if I understand it.
24         Is this scenario a training tool where you
25  give the persons being trained, like, a situation that

Page 48

1  they may come across and you, like, identify what's going
2  on and train them on what they should do and what they
3  should not do?  Is that what you mean by "training
4  scenario"?
5    **A.   Yes, I do.**
6    Q.   Okay.  To your knowledge, had the -- had City HR
7  or the HFD provided training scenarios -- Well, let me
8  back up.
9          These training scenarios, did they cover
10  Title VII or instances that would implicate Title VII?
11   **A.   Yes.**
12   Q.   And had the City or the Houston Fire Department
13  used these training scenarios before the assessment was
14  administered and distributed to train Houston Fire
15  Department personnel before?
16   **A.   Not to my knowledge.**
17   Q.   Ms. Andrews, the training that you described
18  that has been conducted in response to the assessment
19  which is Exhibit 13, has that continued beyond that 2010
20  to, you know, two-year time frame afterwards?
21   **A.   Yes, it has.**
22   Q.   Is it still the same format?
23   **A.   It's taken different formats.**
24   Q.   Is it still being con- -- Is it still the City's
25  or the Houston Fire Department's practice to conduct it



Page 49

1 today?

2    **A.   Yes.**

3    Q.   What's the current format of the training that

4 is provided?

5    **A.   We provide newly-promoted officers training for**

6 **our new officers.   We have also just completed a biannual**

7 **training department-wide.**

8    Q.   I'm sorry.   What was that called?

9    **A.   Biannual training on sexual harassment and**

10 **retaliation.   We also train our cadets on Executive Order**

11 **1-50.**

12    Q.   Is there any other training that you can recall

13 that the City is doing today?

14    **A.   There have been times when I might get a call**

15 **from a Chief or someone who may be having an issue with**

16 **their group and they will ask me to put together something**

17 **specific for that area, to address those issues.**

18    Q.   When you say for a group, like, for a specific

19 station?

20    **A.   Or a division --**

21    Q.   Okay.

22    **A.   -- and/or station.**

23    Q.   The -- the training that is -- I want to go

24 through the different types of training that you have

25 described here, the newly-promoted officer's training, the

Page 50

1 biannual training and the -- the -- I think you said

2 Executive Order 1-50 training for cadets.   Is that right?

3    **A.   Yes.**

4    Q.   And I want to go through those so I can

5 understand exactly what those are.

6    **A.   Okay.**

7    Q.   The newly-promoted officer training, would you

8 please describe that training to me --

9    **A.   Uhm --**

10    Q.   -- as it relates to Title VII employment

11 discrimination issues?

12    **A.   Well, here again, we use Executive Order 1-50,**

13 **the Mayor's policy on discrimination or retaliation as a**

14 **part of that training.**

15           **We also talk about documentation, the**

16 **process for documenting instances that occur, and we also**

17 **use, again here, training scenarios on what the**

18 **newly-promoted officers may encounter as new officers in**

19 **their stations.**

20    Q.   Can you recall anything else that it covers?

21    **A.   That's about three hours, so that takes about**

22 **three hours to get all that done.**

23    Q.   When was newly-promoted officer training

24 initiated?

25           MS. SULLIVAN:   Objection.   Vague.

Page 51

1           Go ahead and answer.

2    **A.   I can tell you when I started participating.**

3 **That would have been in late 2013-'14.**

4    Q.   (BY MR. RUIZ) Do you know when newly-promoted

5 officer training started being -- Well, okay.

6           Let me ask you this:   Is newly-promoted

7 officer training required of all newly-promoted officers?

8    **A.   We do provide that, yes.**

9    Q.   It's required --

10    **A.   Yes.**

11    Q.   -- of newly-promoted officers?

12    **A.   Yes.**

13    Q.   How long has it been required of newly-promoted

14 officers?

15    **A.   Here again, to my knowledge, I got involved**

16 **probably in 2013, if not '14.**

17           MR. CAPODICE:   Objection.   Nonresponsive.

18    Q.   (BY MR. RUIZ) Do you know when it was first

19 required of newly-promoted officers?

20    **A.   No, I do not.**

21    Q.   Ms. Andrews, do you know who would know when

22 newly-promoted officer training was first required of

23 newly-promoted officers?

24    **A.   Hmm, I don't know if I can pinpoint anyone in**

25 **particular.**

Page 52

1    Q.   You don't?

2    **A.   No.   I -- To be specific, I can't tell you who**

3 **would know specifically.**

4    Q.   Okay.   Thank you.

5           You also mentioned that there was biannual

6 training that was provided.

7    **A.   Yes.**

8    Q.   Would you please describe the biannual training

9 that's provided?

10    **A.   The biannual training began -- I was asked by my**

11 **Executive Chief to create, here again, another PowerPoint**

12 **presentation to address the issue of sexual**

13 **harassment/retaliation, and we began this training on --**

14 **in August of last year and we are still doing some**

15 **training on that issue.**

16    Q.   Okay.   You said you were asked by your Executive

17 Chief?

18    **A.   My Executive Fire Chief, yes.**

19    Q.   Who is that?

20    **A.   Rodney West.**

21    Q.   And you reference a date, August of 2018.   Is

22 that -- or you said August of last year?

23    **A.   Yes.**

24    Q.   That would be August of 2018?

25    **A.   August of 2018.**



Page 53

1   Q.  Is that when he asked you or is that when the
2  biannual training began?
3     **A.  That's when the training actually began.**
4     Q.  And that training addresses sexual harassment
5  and retaliation.  Is that correct?
6     **A.  Yes.**
7     Q.  Who chose the topics that the biannual training
8  should cover?
9     **A.  I'm not sure.  I -- And the reason I say that is**
10  **that was not the only topic covered in the biannual**
11  **training.**
12    Q.  Okay.  What other topics does it cover?
13    **A.  Oh, boy.**
14    Q.  You know what?  Let's narrow it down.
15        What other topics does it cover with
16  respect to Title VII and employment discrimination?
17    **A.  That would have been my piece and that's the**
18  **only section that would have addressed that.**
19    Q.  So you personally addressed the sexual
20  harassment and retaliation component of that training?
21    **A.  Yes.**
22    Q.  Do you know if any -- do you know if any other
23  Title VII or employment discrimination issues are
24  addressed during that training, even if it's not you
25  that's the actual Human Resource professional that's doing

Page 54

1  it?
2     **A.  No, I do not know.**
3     Q.  Do you know that there are -- Are there any
4  other Title VII or employment discrimination issues that
5  are addressed during that training?
6     **A.  Not to my knowledge no.**
7     Q.  Okay.  Who is required to attend biannual --
8  this biannual training?
9     **A.  Everyone in the Houston Fire Department.**
10    Q.  Is that sworn-in and non-sworn personnel?
11    **A.  Yes.**
12    Q.  Okay.  What is the format of the training?
13    **A.  Classroom participation, classroom setting,**
14  **PowerPoint presentation, handouts, class participation,**
15  **training scenarios.**
16    Q.  I'm sorry if I asked you this question already
17  with respect to this, but is it man- -- it's mandatory for
18  everyone in HFD?
19    **A.  Yes, that was also mandatory training.**
20    Q.  How is a -- An employee's participation in this
21  training, is it tracked?
22    **A.  It is tracked.**
23    Q.  How is it tracked?
24    **A.  It's actually twofold.  On the HR side, we**
25  **gather the -- an acknowledgment form, here again, with the**

Page 55

1  employee's payroll number, and we enter that into our
2  training system on our side, Talent Management, and I
3  think it's also entered on the fire training database as
4  well.
5     Q.  So there is an electronic system capable of, I
6  guess -- Let me back up.
7        If you wanted to understand or know whether
8  a specific person actually took the required training,
9  what would you do?
10    **A.  We could run a report to determine that.**
11    Q.  When you said it was a classroom setting --
12    **A.  Yes.**
13    Q.  -- do attendees actually go to a -- a specific
14  area to take the training?
15    **A.  Yes.  All the training was conducted at the**
16  **Val Jahnke Training Facility.**
17    Q.  I'm sorry.  Would you pronounce the name of that
18  place again?
19    **A.  HFD's training facility --**
20    Q.  Okay.
21    **A.  -- also known as Val Jahnke, J-A-H-N-K-E,**
22  **Training Facility.**
23    Q.  Thank you.
24        And the other ongoing training that you
25  mentioned was training for cadets on EO 1-50.  Do you

Page 56

1  remember that?
2     **A.  Yes.**
3     Q.  What is EO 1-50?
4     **A.  That's the Mayor's policy on workplace**
5  **discrimination, retaliation, sexual harassment.**
6     Q.  When was that put into effect?
7     **A.  I believe 20- -- I'm sorry.  Which question are**
8  **you -- What was --**
9     Q.  I'm sorry.  When was EO 1-50 put into effect?
10    **A.  I think that was 2010.**
11    Q.  Okay.
12    **A.  Mayor Annise Parker.**
13    Q.  Okay.  And training on -- I believe you said
14  training on EO 1-50 is administered to cadets.  Is that
15  correct?
16    **A.  Yes, it is.**
17    Q.  How long has it been administered to cadets?
18    **A.  I can tell you when I started participating.  I**
19  **started participating probably in 2013.**
20        MR. CAPODICE:  Objection.  Nonresponsive.
21    Q.  (BY MR. RUIZ) Do you know if it was
22  administered to -- if training on EO 1-50 was administered
23  to the cadets prior to 2013?
24    **A.  Not to my knowledge.**
25        MR. CAPODICE:  Objection.  Nonresponsive.

Page 57

1      MS. SULLIVAN:  I'm going to also object as
2  it being outside the scope of the 30(b)(6) designation.
3      Q.  (BY MR. RUIZ) We were talking about the
4  Houston -- the assessment, and I asked you what training
5  was provided in response to the assessment.  Is that
6  correct?
7      A.  Yes.
8      Q.  And you stated that the training with respect to
9  the assessment's ongoing, but it's been modified over the
10  years.  Right?
11      A.  Yes.
12      Q.  Okay.  And you have described the training on
13  EO 1-50 as one of the modifications.  Is that correct?
14      MS. SULLIVAN:  You can go ahead and answer
15  it.
16      A.  A modification?
17      Q.  (BY MR. RUIZ) Or it's just evolved.  It's
18  changed over the years, the training that's been provided?
19      A.  Yes.
20      Q.  Okay.  So is this one of the different formats
21  that you have testified as the training -- Excuse me.
22          Is it your testimony that the EO 1-50
23  training that's administered to cadets is a response to
24  the Houston assessment?
25          MS. SULLIVAN:  Objection.  Vague as to

Page 58

1  time.
2          You can go ahead and answer.
3      A.  I can't say it's specifically tied to this
4  assessment.
5      Q.  (BY MR. RUIZ) You can't say whether it was done
6  in response to the Houston assessment?
7      A.  No, I cannot.
8      Q.  Okay.  Thanks.
9          The same question for the other two
10  trainings that we have been discussing, the newly -- The
11  newly-promoted officer training, was that in response to
12  the -- to Exhibit 13?
13      A.  I don't know.
14      Q.  Okay.  And do you know if the biannual training
15  that you have -- we have discussed previously, was that
16  done in response to Exhibit 13?
17      A.  I don't know that either.
18      Q.  Ms. Andrews, earlier, you mentioned a Ms. Shreck
19  that works for the City HR.  Is that right?
20      A.  Yes.
21      Q.  Do you know if she's still with the City's HR
22  Department?
23      A.  She is, yes.
24      Q.  And I know that you mentioned that she held a
25  management position.  Is that correct?

Page 59

1      A.  That is correct.
2      Q.  Do you know specifically what her title is?
3      A.  I think she was promoted to a division manager
4  position.  I couldn't tell you how long ago.
5      Q.  Do you know who Matthew Russell is?
6      A.  Yes.
7      Q.  Who is Matthew Russell?
8      A.  Matthew Russell also reported to Kelly Shreck,
9  as one of her trainers.
10      Q.  And Mr. Padilla, I believe you testified that he
11  was also one of the trainers below Ms. Shreck?
12      A.  Yes.
13      Q.  Ms. Andrews, I'm going to turn now to topic
14  4(f).  Okay.  4(f), if you look at Exhibit 2, 4(f) is on
15  Page 19 of 21.
16      A.  Okay.
17      Q.  Okay.  And topic 4(f) is Defendant's efforts to
18  implement the recommendations identified in the Assessment
19  HOU2259 through 2318, which is Exhibit 13.  Okay?
20      A.  Okay.
21      Q.  I want you to turn to -- in doc- -- in
22  Exhibit 13, I want you to turn to HOU0002261.
23      A.  (Witness complies).
24      Q.  Now, do you see in that assessment on that page,
25  there is a, in bold, top of the page, is "Key

Page 60

1  Recommendations"?
2      A.  Yes.
3      Q.  I'm going to ask you about these different
4  recommendations, okay, and I want to know what efforts the
5  City took to implement the recommendations on this page
6  and going through the next two pages.  Okay.
7          If you like, you can go ahead and take a
8  moment to review the recommendations and we can continue
9  when you're ready.
10          (Witness reviewing document)
11      Q.  Ms. Andrews -- I'm sorry -- I didn't mean to
12  disturb you while you were reading.
13          The City's actually designated two persons
14  for this, okay, yourself and Fire Marshal Michelle McLeod.
15  So there may be some recommendations that you know of or
16  that you understand what efforts the City has taken and
17  there may be some that you don't, and for those, we can
18  ask Fire Marshal Michelle McLeod.
19      A.  Okay.
20      Q.  And you just tell me which ones you're able to
21  address and we'll cover those and we'll remain -- we'll
22  leave the rest to Fire Marshal Michelle McLeod.
23      A.  Okay.  I can address (d); I can attempt to
24  address (a); (e).  Those are the ones I feel comfortable
25  addressing.



Page 61

1    Q.   Okay.  Thank you.  Okay.

2         The Key Recommendations, we'll start with

3    (a), okay, and (a) is Leadership Commitment.  It's on

4    Page HOU0002261, and it is:  "City and HFD leaders must

5    continue to build upon actions that demonstrate that

6    harassment and discrimination will not be tolerated and

7    that this commitment is a vital part of and not incidental

8    to HFD's mission."

9         Did I read that correctly?

10   A.   Yes.

11   Q.   Now, will you please describe the efforts that

12   the City has taken to implement that recommendation?

13   A.   I think this would certainly be tied to the

14   newly-promoted officers training as far as preparing new

15   officers to move into a position of management.  We have

16   also done some training for Command Staff as well on

17   leadership.

18        MR. CAPODICE:  Objection.  Nonresponsive.

19   Q.   (BY MR. RUIZ) When you say you think it's the

20   newly-promoted officer training, do you know if that

21   newly-promoted officer training was initiated specifically

22   in connection with this key recommendation?

23   A.   Do I know specifically, no.

24   Q.   And I have the same question for the training on

25   the Command Staff.

Page 62

1         Do you know whether it was specifically

2    initiated in response to this key recommendation letter

3    (a)?

4    A.   Specifically, no.

5    Q.   Do you know any specific efforts that the City

6    has taken to implement the Leadership Commitment

7    recommendation in Exhibit 13?

8    A.   Would you ask me that one more time, please?

9    Q.   Do you know what efforts specifically were taken

10   by the City in connection with the key recommendation

11   described in letter (a)?

12   A.   You're asking me to be specific?

13   Q.   If you know specifically what efforts were taken

14   by the City to implement the Leadership Commitment

15   recommendation in Exhibit 13.

16   A.   I felt comfortable in stating the newly-promoted

17   officers training.  However, you asked me another question

18   that gave me pause on that, so I'm not sure how to answer

19   that.

20   Q.   I know that the City has implemented this

21   newly-promoted officer training you described.

22        What I want to know is if -- what actions

23   were taken by the City specifically to implement the

24   recommendations in this document?

25   A.   I feel more comfortable leaving that to Chief

Page 63

1    McLeod.

2    Q.   Okay.  Is that for all of these recommendations

3    or letter (a)?

4    A.   For that one, improvement training, I can

5    answer.  Well, it depends on the question.  I'll say that.

6    Q.   Okay.

7    A.   But that, I would leave to her, as well as the

8    policies.

9    Q.   Okay.

10        So for letter (a), Leadership Commitment,

11   it's my understanding you can't describe what efforts were

12   taken specifically, what specific efforts were taken by

13   the City to implement the recommendation described in

14   letter (a).  Is that correct?

15   A.   Definitively, no.

16   Q.   But you do feel comfortable describing the

17   efforts specifically taken by the City for letter (d).  Is

18   that correct?

19   A.   Yes.

20   Q.   What efforts were taken by the City to implement

21   the recommendation in D, improve training?

22   A.   Well, here again, basically, what I have already

23   discussed, which was the face-to-face training, which was

24   conducted over a two-year period, on understanding your

25   rights; also the biannual training, which we are

Page 64

1    continuing with today; the training of our cadets as they

2    come in to the Fire Department.  Complaints, I can't

3    address that.

4    Q.   So, looking at letter D, those three that you

5    mentioned, the new-officer training, cadet training and

6    the biannual training, your understanding is those relate

7    to D(1).  Is that correct?

8    A.   D(1), D(2).  D(3), I can't answer that.

9    Q.   With respect to the actions that you're

10   describing that relate to D(1) and D(2), is it your

11   understanding that those were taken specifically in

12   response to the recommendation made here in the

13   assessment?

14   A.   Yes.

15   Q.   Ms. Andrews, do you -- Is it documented that the

16   training that you're describing is in response to the

17   assessment, Exhibit 13?

18   A.   I don't know if it's documented or not.

19   Q.   We'll move on to key recommendation (e), Provide

20   Human Resources Support.

21   A.   I'm not comfortable answering that one, because

22   it talks about employee complaint processes.  I'm not

23   involved in that.

24   Q.   Okay.  All right.  Okay.

25        You didn't identify any other key



Page 65

1  recommendations --

2    A.  No.

3    Q.  -- that you were able to provide testimony on.

4    A.  No.

5    Q.  Thank you very much.

6         MR. RUIZ:  Take a five-minute break.

7         (Recess from 12:03:48 p.m. to 12:20:30

8    p.m.)

9    Q.  (BY MR. RUIZ) Ms. Andrews, I want to turn to

10  our final topic today.  Okay.  It's topic 5.

11       You can find topic 5 on Page 20 of 21 on

12  Exhibit 2.  Topic 5 is HFD complaint policy, dissemination

13  and training.  Do you see that?

14   A.  Yes.

15   Q.  Topic 5 is broken down into two subtopics.

16  Topic (a) is 8/1/2005 HOU2821 through 2826, Defendant's

17  dissemination, training and implementation of this

18  complaint policy, and then (b) is 8/1/2018 (HOU2831-2834,

19  Defendant's dissemination, training and implementation of

20  this complaint policy.

21       Do you see where I have read from?

22   A.  I do.

23   Q.  Okay.  Now, the City has designated you to

24  respond to this topic with respect to training only.

25  Okay?

Page 66

1    A.  Okay.

2    Q.  The topic's about dissemination and training,

3  but the topic that you have been designated by the City to

4  talk to -- testify about is just about training.  Okay?

5         THE WITNESS:  I have a question for

6  clarification.  Can I ask that?

7         MS. SULLIVAN:  Well, let him have a

8  question --

9         THE WITNESS:  Okay.

10        MS. SULLIVAN:  -- and then if you need to

11  clarify based on his question, do that.

12        THE WITNESS:  Okay.

13        MR. RUIZ:  Thanks.

14   Q.  (BY MR. RUIZ) I'm going to hand you what was

15  marked yesterday as Exhibit 11.  Okay.

16        Exhibit 11 is Bates stamped HOU00002821 and

17  it runs through HOU00002826.  It's dated -- Houston Fire

18  Department, Subject Complaint, and -- Well, it's titled

19  that, and it's dated 8-1-05 at the bottom.

20        Would you please take a moment to review

21  that document, and I'm going to ask you questions about

22  it.

23        (Witness reviewing document)

24   A.  Okay.

25   Q.  (BY MR. RUIZ) Are you familiar with Exhibit 11?

Page 67

1    A.  I am familiar with it, yes.

2    Q.  How are you familiar with this one, Ms. Andrews?

3    A.  This was one of the handouts we used in our

4  newly-promoted officers training.

5    Q.  Are you familiar with it otherwise?

6    A.  No.

7    Q.  No.  Okay.

8         Now, the Exhibit 11 is dated August of 1,

9  2005.  Do you see that?

10   A.  I do.

11   Q.  When you say that it is one of the documents

12  that's been handed out to newly-promoted officer --

13  newly-promoted officer training, are you saying that there

14  is a complaint policy that's addressed for that specific

15  one that's dated that date that's handed out at that

16  training?

17        MS. SULLIVAN:  Objection.  Confusing.

18        Go ahead and answer it.

19   A.  I -- Do you --

20   Q.  (BY MR. RUIZ) Okay.  Let me rephrase it.

21        That specific Exhibit 11 has a date on

22  it --

23   A.  Uh-hm.

24   Q.  -- August 1, 2005.

25        Are you sure the one that's -- that you're

Page 68

1  saying is handed out at the newly-promoted officer

2  training, is that -- has that name?

3    A.  No, I'm not sure of that.

4    Q.  So it just may be a complaint policy?

5    A.  Right.

6    Q.  But not necessarily that version?

7    A.  Not necessarily this version.

8    Q.  I'm going to ask you questions about this

9  version.  Okay?

10        I know that there are -- Well, let me back

11  up.  I'm going to hand you what is Exhibit 12.  Okay?

12  Exhibit 12 is titled Houston Fire Department, Subject

13  Complaints, okay, and at the bottom of that, it's dated

14  August 1, 2018.

15        Would you please take a moment to review

16  that?

17        (Witness reviewing document)

18   A.  Okay.

19   Q.  (BY MR. RUIZ) Okay.  I'm going to ask you some

20  questions, but these questions are specifically about

21  Exhibit 11, the complaint policy that is dated August 1,

22  2005.  Okay?

23   A.  Okay.

24   Q.  All right.

25        Now, when that complaint policy -- or let

Page 69

1  me ask you this:  What training has the City provided to
2  Houston Fire Department employees with respect to
3  Exhibit 11?
4      **A.  I can't respond to that.  I don't know of any**
5  **training specifically regarding this exhibit.**
6      Q.  Exhibit 11?
7      **A.  Exhibit 11.**
8      Q.  Do you -- do you know when Exhibit 11 remained
9  in effect through?
10     **A.  (No audible response).**
11     Q.  The complaint policy, Exhibit 11, do you know
12  when it remained and effected through?
13     **A.  No, I can't answer that.**
14     Q.  Okay.
15         Do you know if training had ever been --
16  And we're sticking with Exhibit 11.  Okay?
17     **A.  Okay.**
18     Q.  Do you know if training on that complaint policy
19  had ever been developed but not administered to Houston
20  Fire Department employees?
21     **A.  Do I know that?**
22     Q.  Yes, ma'am.
23     **A.  No.**
24     Q.  Okay.
25         Do you know if training, training on

Page 70

1  Exhibit 11, the complaint policy, was ever planned and
2  not -- or planned to be delivered to Houston Fire
3  Department employees and not delivered?
4      **A.  No.**
5      Q.  Now, Ms. Andrews, I want to make sure I
6  understand your answers and what you know and what you
7  don't know, or what you can testify to.
8          Has training ever been conducted on
9  Exhibit 11?  Has training ever been conducted for Houston
10  Fire Department sworn personnel on Exhibit 11?
11     **A.  If I'm understanding what you're asking me, are**
12  **you asking me if training has specifically been put into**
13  **place for this particular exhibit?**
14     Q.  Correct.
15         For Exhibit 11, I want to know if training
16  was ever conducted specifically on that, the complaint
17  policy described in Exhibit 11.
18     **A.  As it -- I can answer that as it relates to**
19  **other training.**
20     Q.  Okay.  Did the other training specifically cover
21  the complaint policy that is Exhibit 11?
22     **A.  Yes.**
23     Q.  It did.  Okay.
24         When did that training occur?
25     **A.  This is a part of our newly-promoted officers**

Page 71

1  **training package.  So that would have started, as I stated**
2  **earlier, in 2013 or '14.**
3      Q.  Okay.  Now, I want to make sure that we're
4  absolutely clear.  Okay.
5          This Exhibit 11 is dated August 1st, 2005
6  and it's different from the one dated August 1, 2018.
7      **A.  I see that.**
8      Q.  So you're certain that the complaint policy
9  dated August 1, 2005 was part of the newly-promoted
10  officer training?
11     **A.  To the best of my ability, yes.**
12     Q.  Do you know if it was -- Other than the
13  newly-promoted officer training, was it ever a part of any
14  other training before the newly-promoted officer training?
15     **A.  I don't know that.**
16     Q.  The date on this policy is August 1st, 2005, and
17  I'm referring to Exhibit 11.
18     **A.  Okay.**
19     Q.  Was training provided on this, on this policy in
20  2005, when it was put into effect?
21     **A.  I don't know that.**
22     Q.  Do you know if it was -- if training on this
23  policy was put into effect any time between 2005 and 2010?
24     **A.  I don't know that either.**
25     Q.  Okay.  Do you know if any training on this

Page 72

1  policy was put into place between 2010 and 2012?
2      **A.  I don't know that.**
3      Q.  And do you know if any training on Exhibit 11
4  was put into place between August 12 -- or 2012 and 2015?
5      **A.  Again, that goes back to my recollection of it**
6  **being used in the newly-promoted officers training.**
7      Q.  Which I believe you -- your recollection is it
8  started maybe around 2013?
9      **A.  Yes.**
10     Q.  Okay.  Thank you.
11         Have you made any efforts to determine when
12  training on this particular exhibit had been administered?
13     **A.  No.**
14     Q.  You testified that it has -- Exhibit 11 has been
15  a part of the newly-promoted officer training, and I
16  believe it's at least sometime in 2013.  Is that correct?
17     **A.  Yes.**
18     Q.  What type of training -- What are persons --
19  What have persons been trained with respect to -- or for
20  that new promoted -- newly-promoted officer training, what
21  were they trained on with respect to Exhibit 11?
22     **A.  This particular exhibit was trained on by Chief**
23  **McLeod.  This was her area of expertise, so she was the**
24  **one who would take them through this particular process,**
25  **this particular policy.**



Page 73

1    Q.  Do you know what Chief McLeod would cover with
2  respect to this policy?
3    A.  I can't speak for her specifically, no.
4    Q.  Now, I want to switch to subtopic 5(b), which is
5  Defendant's dissemination, training and implementation of
6  this complaint policy, which is Exhibit 12.  Okay?
7    A.  Okay.
8    Q.  Exhibit 12 is also titled Houston Fire
9  Department, Subject Complaints, and it just has a
10  different date --
11    A.  Right.
12    Q.  -- at the bottom, August 1st, 2018.  Do you see
13  that on Exhibit 12?
14    A.  I do, yes.
15    Q.  Are you familiar with this exhibit?
16    A.  No, I'm not.
17    Q.  Okay.
18        Has training been provided by the Houston
19  Fire Department or the City to the Houston Fire Department
20  personnel on or with respect to Exhibit 12?
21    A.  I don't know.
22    Q.  Do you know if training on Exhibit 12 has ever
23  been planned by the Houston Fire Department?
24    A.  Has ever been planned?  I don't know that
25  either.

Page 74

1    Q.  For Exhibit 11, which is the complaint policy
2  dated August 1st, 2005, you identified Chief McLeod as the
3  person who would have expertise in that complaint policy.
4    A.  Yes --
5    Q.  Is that correct?
6    A.  -- that is correct.
7    Q.  To your understanding, would that be the same
8  for Exhibit 12?
9    A.  Actually, I think Exhibit -- Exhibit 12 is now
10  under Chief Alfredo Martinez.  He would probably be the
11  Chief to address that one, that Exhibit 12.
12    Q.  Okay.
13        And the Chief -- And the City has
14  identified Mr. Alfredo, or Chief Alfredo Martinez, with
15  respect to dissemination, but identified you with respect
16  to being able to testify about training on -- on
17  Exhibit 12.
18        Are you -- Have you made any efforts to
19  find out what training has been administered with respect
20  to Exhibit 12?
21    A.  No.
22        MR. RUIZ:  Ms. Andrews, for now, those are
23  the questions that I have.  Thank you very much for
24  answering them.  Okay?
25        THE WITNESS:  Okay.  Thank you.

Page 75

1        MR. RUIZ:  Somebody else gets a chance to
2  ask a few follow-ups.
3        THE WITNESS:  Oh, God.  Okay.
4            EXAMINATION
5  BY MR. CAPODICE:
6    Q.  Hi, Ms. Andrews.
7    A.  Hello.
8    Q.  My name is Dwain Capodice.  I represent
9  Ms. Draycott and Ms. Keyes in this matter.  I just have a
10  couple of follow-up questions I want to make sure that
11  we're on the same wavelength on.
12        Earlier, you were asked the documents that
13  you had reviewed to prepare for your deposition.  Do you
14  recall that question?
15    A.  Yes.
16    Q.  One of the things that you said you reviewed is
17  something that had questions for consideration, is what
18  you said, and I'm just kind of curious, like, what you saw
19  that was, like, questions for consideration.
20    A.  It was something similar to this (indicating).
21    Q.  Was it that exact document or were there
22  questions that were created that you may have to answer at
23  the deposition?
24    A.  It was this document (indicating).
25    Q.  Okay.

Page 76

1        Did you talk to Ms. Shreck at all in
2  advance of this deposition?
3    A.  No.
4    Q.  Why not?
5    A.  Why would I?
6    Q.  Do you think she would have had information as
7  to the training that was conducted by this Fire Department
8  in response to any of the questions that you were asked
9  today that would have helped answer any of these
10  questions?
11    A.  I wasn't responsible for gathering that
12  information.
13    Q.  What role did Ms. Shreck have back in 2009-2010,
14  if you know?
15    A.  Again, Ms. Shreck's area was responsible for
16  creating the training document and implementing it and
17  then her staff also assisted in carrying out that
18  implementation.
19    Q.  And that's your current role, correct, or do I
20  have that wrong?
21    A.  I'm sorry.  What?
22    Q.  Is that your current role with HR and the City?
23    A.  My current role?
24    Q.  Did you replace Ms. Shreck?
25    A.  No.



Page 77

1   Q.   Okay.

2   A.   We're in two different departments.

3   Q.   Okay.

4        So Ms. Shreck created the training

5   materials that were used by your department to train

6   firefighters?

7   A.   Yes.

8   Q.   Okay.  You didn't think there was any

9   information that she might have as to the training that

10  was conducted in response to the assessment, asking her in

11  particular whether she created any materials in response

12  to the assessment?

13       MS. SULLIVAN:  Objection.  That misstates

14  the facts and evidence and the testimony of this witness.

15       You can go ahead and answer.

16  A.   I'm not following your question.

17  Q.   (BY MR. CAPODICE) Sure.

18       Obviously, you weren't tasked with creating

19  training materials after the assessment.  Correct?

20  A.   Right.

21  Q.   Ms. Shreck was?

22  A.   Yes.

23  Q.   And so in terms of figuring out which materials

24  were created in response to the assessment --

25       MS. SULLIVAN:  Thompson Horton assessment.

Page 78

1        MR. CAPODICE:  Right.

2   Q.   (BY MR. CAPODICE) You know what I'm saying when

3   I say "assessment".  Don't you?

4   A.   Well, I'm --

5   Q.   The Exhibit 13 that we looked at earlier, I

6   think is the correct number.

7   A.   Yes.

8   Q.   And when answering questions about what training

9   was done in response to that assessment, you don't think

10  Ms. Shreck would have had any knowledge about that?

11  A.   I can't speak for Ms. Shreck.

12  Q.   I guess she would be the person that the City

13  would have been tasked with creating training materials in

14  response to that assessment, from your understanding?

15       MS. SULLIVAN:  Objection.

16       Misstates the facts and the evidence and

17  the testimony of this witness.

18  A.   Again, I can't speak for Ms. Shreck.

19  Q.   (BY MR. CAPODICE) Okay.  And then I guess,

20  obviously, we talked about Mr. Padilla, and who was the

21  other person that was the trainers?  What was the other

22  person's name?

23  A.   The person was --

24  Q.   Russell?

25  A.   -- Matt, Matt Russell.

Page 79

1   Q.   Would they -- I mean, why -- Would they have

2   information in response to anything today, that you're

3   aware of?

4   A.   They are both deceased.

5   Q.   But Ms. Shreck would know what information they

6   would have, correct, as her manager?

7        I mean, she's the one that would have

8   tasked them with doing things?

9        MS. SULLIVAN:  Objection.  Calls for

10  speculation.

11  A.   Here again, I can't speak for Ms. Shreck.

12  Q.   (BY MR. CAPODICE) Okay.

13       With regard to the training that was done

14  in response to any of these investigations, let me ask

15  you, just generally, have you ever seen training being

16  ordered in response to an OIG investigation?

17  A.   I have never been privy to that, no.

18  Q.   And, obviously, in your role, would you track

19  any training that would be responsive to a particular

20  investigation?

21       Like, is there a way in your system to

22  track, you know, general training, annual/biannual

23  training, versus OIG-specific in response to an

24  investigation training?

25       MS. SULLIVAN:  Objection.  Compound.

Page 80

1        Go ahead and answer.

2   A.   I am not responsible for that.

3   Q.   (BY MR. CAPODICE) Okay.  You have reviewed

4   training records for individual employees.  Correct?

5   A.   Have I done what, again?

6   Q.   In your job, you have reviewed training records

7   for individual employees?

8   A.   Training records in regard to --

9   Q.   In regard to HR training.

10  A.   Are you saying compiling information?

11  Q.   No.  I'm asking -- You're aware that the City

12  tracks the training that they provide employees.  Correct?

13  A.   Yes.

14  Q.   And, in that, they try to track the courses that

15  they take, including some of the courses that you talked

16  about today, the biannual training and the face-to-face

17  training and things of that nature.  Correct?

18  A.   Yes.

19  Q.   And they keep an individual record for each

20  employee of the training that they have taken?

21  A.   Yes.

22  Q.   Okay.

23       Is there any way of tracking in those

24  personnel training records any training that was a

25  response to an investigation?

LEXITAS

Page 81

1   A.  Not to my knowledge.

2   Q.  Okay.

3        And then you also talked a little bit about

4   ARFF, Station 54, not requesting any training specifically

5   that you're aware of.

6        Were you aware of ARFF ever requesting --

7   That these stations can request particular training.  Were

8   you ever area of either Station 54 or ARFF requesting any

9   training directly?

10       MS. SULLIVAN:  Objection.  Compound and

11  misstates the testimony, but go ahead and answer.

12  A.  Ask me --

13  Q.  (BY MR. CAPODICE)  I know it was a pretty

14  confusing question.  Let me try to clear it up.

15  A.  Yes.

16  Q.  You testified a little bit earlier about you

17  performing training at a particular station if it was

18  requested.

19  A.  Yes.

20  Q.  Are you aware of Station 54 ever requesting

21  particular training?

22  A.  Yes.

23  Q.  When?

24  A.  God, 2000- -- sitting on my board.  This is

25  speculation.  I -- I think in 2012 --

Page 82

1   Q.  Okay.

2   A.  -- 2013, somewhere in there.

3   Q.  And do you recall what training you requested?

4   A.  We went out for review on the Executive Order

5   1-50 training.

6   Q.  Okay.  So they asked for additional follow-up on

7   1-50?

8   A.  Yes.

9   Q.  Okay.  What about ARFF?  Any specific training

10  requested in any one -- any of the stations in ARFF?

11  A.  Yes, we did the same thing there.

12  Q.  And I guess, just so I'm clear, you know, that

13  was one of the things that you did after 1-50 was

14  implemented, right?

15       You made sure you went to the each of the

16  stations and had training on it.  Correct?

17  A.  Actually, the 1-50 training was online.

18  Q.  Okay.

19  A.  But if we were requested to go to a station to

20  address an issue or do a refresh, then we would do that.

21  Q.  Were there any particular issues or -- that they

22  were having at these stations that needed follow-up?

23  A.  It could be anything, from issues between

24  employees.

25  Q.  All right.

Page 83

1        MR. CAPODICE:  Let me take a quick break

2   and make sure that there is not anything else that we need

3   to go over.

4        (Recess from 12:46:23 p.m. to 12:48:57

5        p.m.)

6        MR. CAPODICE:  I'll pass the witness,

7   subject to receiving the materials that Deidra said she's

8   going to make sure and confirm with regard to the

9   memorandum that we talked about earlier and any other

10  materials reviewed for the deposition.

11       MS. SULLIVAN:  Okay.  I just have a few

12  follow-up questions.

13           EXAMINATION

14  BY MS. SULLIVAN:

15  Q.  You were asked specifically as it relates to

16  training following the release of the findings and

17  investigative synopses for three investigations.

18       Do you recall that?

19  A.  Yes.

20  Q.  Okay.  Prior to the release of those, the

21  investigative findings and synopses, was -- was there

22  training on EEO-related topics?

23  A.  Yes.

24  Q.  And, to your knowledge, was any training done

25  specifically because of the three OIG investigations?

Page 84

1   A.  No.

2   Q.  Okay.  And, again, just to clarify, you were

3   asked questions about training specific to Station 54.

4        Do you recall that?

5   A.  Yes.

6   Q.  Okay.  And it was in conjunction with the three

7   OIG investigations that we have talked about.

8        Do you recall that?

9   A.  Yes.

10  Q.  Okay.  Now, is it your testimony that the

11  individuals at 54 received training but not specific to

12  those investigations?

13       MR. RUIZ:  Objection.  Leading.

14  A.  Yes.

15       MR. CAPODICE:  I'm going to object to the

16  extent it calls for speculation, no personal knowledge of

17  the training that was done.

18       MS. SULLIVAN:  Okay.

19  Q.  (BY MS. SULLIVAN)  After the release of the

20  Thompson Horton assessment, if a complaint came back that

21  was not sustained, or even if it was sustained, do you

22  recall having to provide any training to the parties to

23  that investigation?

24  A.  Yes.

25  Q.  When did you start doing that?



Page 85

1    **A.  That was under Chief McLeod, possibly 2012.**

2    Q.   And what was the nature of that training?

3    **A.  Basically, to -- before the individual was**

4    **returned to the station, to make sure that they were aware**

5    **of the executive orders that related to any type of**

6    **disciplinary actions.**

7    Q.   Now, I'm not sure if this was exactly clear.

8         We were talking about the newly-promoted

9    officer training.  Do you recall that?

10   **A.  Yes.**

11   Q.   Okay.

12        Did the newly-promoted officer training

13   cover other topics besides EEO-related matters?

14   **A.  Yes.**

15   Q.   Is it your recollection -- Is it your

16   understanding that it covered topics such as operations?

17   **A.  Yes.**

18   Q.   Now, you were informed at the beginning of this

19   deposition, and prior to, that you would be testifying to

20   specific topics.  Do you recall that?

21   **A.  Yes.**

22   Q.   Okay.

23        You are not here to testify about EEO

24   training that occurred prior to the Thompson Horton

25   assessment.  Is that correct?

Page 86

1    **A.  Yes.**

2         MR. RUIZ:  Objection.  Leading.

3    Q.   (BY MS. SULLIVAN)  Now, I recall your testimony

4    that the EEO Rights and Responsibilities training that

5    began in early 2010 initially was developed by Kelly

6    Shreck.  Is that correct?

7    **A.  Yes.**

8    Q.   Okay.  After the training with regard to EEO

9    Rights and Responsibilities, did you develop training

10   related to EEO issues?

11   **A.  Yes.**

12   Q.   Now, in the newly-promoted officer training,

13   your topic was EEO-related issues.  Is that fair to say?

14   **A.  Yes, it is.**

15   Q.   And did you present with somebody else?

16   **A.  I did.**

17   Q.   And who was that?

18   **A.  That would have been Chief Michelle McLeod.**

19   Q.   So you were present at the time that she did

20   her -- her component of the training?

21   **A.  Yes.**

22        MS. SULLIVAN:  Okay.  Pass the witness.

23        FURTHER EXAMINATION

24   BY MR. RUIZ:

25   Q.   I want to ask you some questions that relate to

Page 87

1    the Thompson Horton assessment.

2         Ms. Sullivan asked you questions about

3    training that occurs when a complaint comes back as either

4    sustained or not sustained.  Do you remember that, a

5    couple of those questions?

6    **A.  Yes.**

7    Q.   Okay.  And it sounded like training was, like,

8    provided to an individual but I did not hear, or I don't

9    think you identified what individuals training was

10   provided to.  Okay.

11        And I believe you testified that before a

12   person was allowed -- an individual was allowed to return

13   to work, they had to go through training.  Correct?

14   **A.  Well, let me be clear.  To the station.  I don't**

15   **want to say work per se.**

16   Q.   Okay.  When a complaint comes back as not

17   sustained, is there some type of training that's now

18   provided?

19   **A.  Under Chief McLeod, if there was a situation**

20   **where she felt the individual needed a refresh on**

21   **Executive Order 1-50, I would sit with that particular**

22   **person and go over that particular policy.**

23   Q.   Okay.  Is -- is there a written policy regarding

24   this process?

25   **A.  That's on Staff Services side.  I can't answer**

Page 88

1    **definitely.**

2    Q.   How is it that you learned that Chief McLeod

3    wants you to provide training to a particular individual

4    in response to a sustained or not sustained OIG finding?

5    **A.  I would usually be brought in, given the folder**

6    **on what's -- what was discussed, what the issues were and**

7    **what the findings were at that point, and tailor the**

8    **training to address those particular issues, so I was**

9    **given that information by Staff Services.**

10   Q.   So Staff Services, let me -- I'm -- I want to

11   make sure I really understand this process.  Okay.

12        So Staff Services brings you in when it

13   believes that training is necessary with respect to a

14   particular OIG investigation.  Is that correct?

15   **A.  Yes.**

16   Q.   Okay.  And when they bring you in, what is it

17   that they tell you?

18   **A.  Basically, I have an opportunity to review**

19   **whatever is in the folder --**

20   Q.   Okay.

21   **A.  -- the information, and then make a**

22   **determination as to what it is we need to talk about in**

23   **regard to Executive Order 1-50.**

24   Q.   So they present you with a folder and you're

25   asked to review the folder, and is it you that makes the



Page 89

1  determination whether or not training or refresher
2  training is -- is required or appropriate?
3      A.  No.  Usually, if I receive a folder, it's
4  already been determined by someone in Staff Services that
5  the training is now required or being requested.
6      Q.  Okay.  So you -- Staff Services is making a
7  determination that training is not required?
8      A.  Required or not required.
9      Q.  Oh, required or not required?
10     A.  Yes.
11     Q.  Okay.  So do you -- do you receive folders where
12  the -- where Staff Services has already determined that
13  training is not required?
14     A.  No.
15     Q.  No.  You only receive those folders where Staff
16  Services has determined that training is required?
17     A.  Yes.
18     Q.  Now, in those situations -- Well, let's cover
19  the not-required situations.
20         Do you know who makes the determinations in
21  Staff Services, who makes the determination that training
22  is not required with respect to an OIG investigation?
23     A.  I guess I would have to go back to the Chiefs,
24  whichever Chief is in -- over that area.
25     Q.  Do you know who makes the determination either

Page 90

1  way?
2      A.  (No audible response).
3      Q.  Do you know who in Staff Services makes the
4  determination either way, whether training is required or
5  not required with respect to the conclusion of the
6  investigation?
7      A.  Here again, that would have come with me, from
8  Chief McLeod, her area, her group.
9      Q.  I'm sorry, Ms. Andrews.  I'm trying to
10  understand.
11     A.  I think what you're asking me is, is she the
12  one?  I can't tell you definitively that she is the only
13  one to make that determination.
14     Q.  I think maybe that I don't understand whether or
15  not you're involved with the Staff Services determination
16  or not.
17     A.  I'm not.
18     Q.  You're not.  Okay.
19         That file is sent to you by Staff Services.
20  Is that correct?
21     A.  Yes.
22     Q.  And, at that point, someone has already
23  determined -- somebody in Staff Services has already
24  determined whether training is needed.  Is that right?
25     A.  Yes.

Page 91

1      Q.  Okay.  Do you know who that particular person
2  is?
3      A.  No.
4      Q.  Okay.  Do you know if it's a particular group
5  within Staff Services?
6      A.  No.
7      Q.  Now.  Okay.
8         Have they -- Has that group met with you to
9  come up with a method of determining whether or not
10  training is needed?
11     A.  No.
12     Q.  Okay.  So is it that you only receive files that
13  some group or person within Staff Services has determined
14  a need for training?
15     A.  Yes.
16     Q.  Okay.
17         If that group or person within Staff
18  Services has not determined a need for training, do you
19  ever see that file?
20     A.  No.
21     Q.  Okay.  How long has that process been ongoing?
22     A.  I think it started under Chief McLeod in 2012,
23  2013, somewhere in there.
24     Q.  Okay.  And when those files come to you and
25  there is a determination for a need for additional

Page 92

1  training, is the need for additional training always
2  related to EEO 150, or do I have that number right?
3      A.  You got it right.  Yes.
4      Q.  Is there ever a recommendation for training
5  other than EO 1-50 that comes to you?
6      A.  That comes to me, no.
7      Q.  For those -- those situations where there is a
8  determination that somebody should be trained, is it
9  generally who -- who would be offered the training?
10     A.  Whichever member was involved in the process.
11     Q.  Would that typically be the respondent in an OIG
12  investigation?
13     A.  Oh, that's a good question.  I don't know.
14     Q.  You don't know.  Okay.
15         It could be anybody involved --
16     A.  It could be, yes.
17     Q.  I'm sorry.  Let me finish my question.
18         It could be anybody involved in the
19  investigation?
20     A.  Yes.
21     Q.  Okay.  Meaning either the person that complained
22  or the person they complained about?
23     A.  Yes.
24     Q.  Okay.
25         Have you ever seen a recommendation where

LEXITAS

Page 93

1 several persons were identified as probably appropriate
2 persons to go through refresher training?
3        MS. SULLIVAN: Objection. Vague.
4        Go ahead and answer.
5    Q.  (BY MR. RUIZ) Is it -- Are there times where
6 there's more than one person who Staff Services has
7 determined should -- should be the subject of more
8 training?
9    **A.  We do have a policy, well, a practice in place**
10 **of conflict resolution, where we bring two parties**
11 **together to try to work out issues.**
12        **Now, that may not necessarily be tied to an**
13 **OIG investigation.**
14   Q.  You know, I don't think my question's clear.
15 Let me make sure.
16   **A.  Okay.**
17   Q.  In those situations where OIG -- I'm sorry --
18 Staff Services has sent you a determination and that
19 determination that there should be more training offered
20 to in this situation, is there ever -- is it ever a
21 situation where the individual that they think should be
22 given more training is actually more than one individual,
23 but a group of persons?
24   **A.  I don't recall, no.**
25   Q.  Okay.

Page 94

1        And in those situations where OIG has
2 determined that it's appropriate to provide more training,
3 is it your practice, or your office practice, to always
4 provide that training?
5        MS. SULLIVAN: Objection. Misstates the
6 facts and evidence and the testimony of this witness.
7        Go ahead and answer.
8    **A.  It's not OIG. Here again, it's Staff Services.**
9    Q.  (BY MR. RUIZ) Oh, correct. Okay.
10        When staff Services makes that
11 recommendation that training was to be provided, is it
12 always provided?
13   **A.  If they make a recommendation, yes, it is.**
14   Q.  It's always provided.
15        And is training mandatory for the person
16 identified before they return to work?
17   **A.  I don't necessarily know if it's mandatory or**
18 **not.**
19   Q.  Do they -- Does the person that the Staff
20 Services recommends for training, do they have to go to
21 the training?
22   **A.  I don't know that.**
23   Q.  You don't know that.  Okay.  Oh, I'm sorry.
24        Earlier, when we were talking about
25 Exhibit 12, you testified that you could not provide

Page 95

1 testimony with respect to the training that has been
2 administered on Exhibit 12.  Is that correct?
3    **A.  Yes.**
4    Q.  Okay.
5        You were identified as the person who could
6 provide testimony, and I just want to get that on the
7 record so that we can get the City to actually provide
8 somebody that can provide answers to questions with
9 relating -- relating to 12.  Okay.
10        MS. SULLIVAN: Okay.
11        MR. MONTEIRO: It's 11, too.
12        MR. RUIZ: To the extent that she was not
13 able to answer questions with respect to 11 --
14        MS. SULLIVAN: Okay.
15        MR. RUIZ: -- is that okay?  You --
16        MS. SULLIVAN: Yeah.
17        MR. RUIZ: -- agree to that?  Okay.
18        MR. MONTEIRO: Can we get that someone
19 tomorrow or Thursday for that?  I mean, we have McLeod
20 scheduled already, so...
21        MS. SULLIVAN: I'll -- I'll check on the
22 2018 one, since this is the most recent one.  So I'll
23 check on that one.
24        McLeod should be able to.  If not, I'll
25 make sure that she is, so...

Page 96

1        MR. RUIZ: Thank you very much.
2        Ms. Andrews, those are the questions that I
3 have.  Thank you very much.
4        **THE WITNESS: Thank you.**
5        FURTHER EXAMINATION
6 BY MR. CAPODICE:
7    Q.  Did you have all the information that you needed
8 to answer all the questions today?
9    **A.  Yes.**
10        MR. CAPODICE: Okay.  I pass the witness.
11        MS. SULLIVAN: I pass.  We're done.  Read
12 and sign, please.
13        (Deposition concluded at 01:04:58 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

**Page 97**

```
1              CHANGES AND SIGNATURE

2    ORAL DEPOSITION OF WANDA L. ANDREWS AUGUST 13, 2019

3  PAGE LINE CHANGE                  REASON

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25
```

**Page 98**

```
1      I, WANDA L. ANDREWS, have read the foregoing

2  deposition and hereby affix my signature that same is true

3  and correct, except as noted herein.

4

5                   _____

6                   WANDA L. ANDREWS

7

8  THE STATE OF _____)

9  COUNTY OF _____)

10     Before me, _____, on this day

11 personally appeared WANDA L. ANDREWS, known to me (or

12 proved to me under oath or through

13 _____)(description of identity card or other

14 document) to be the person whose name is subscribed to the

15 foregoing instrument and acknowledged to me that they

16 executed the same for the purposes and consideration

17 therein expressed.

18     Given under my hand and seal of office on this

19 _____ day of _____, 2019.

20

21                   _____

                     NOTARY PUBLIC IN AND FOR

22                   THE STATE OF _____

23

24 My Commission expires: _____

25
```

**Page 99**

```
1  STATE OF TEXAS

2  COUNTY OF HARRIS

3      I, JAMES M.PLAIR, a Certified Shorthand Reporter in

4  and for the State of Texas, do hereby certify that,

5  pursuant to the notice issued and the agreement

6  hereinbefore set forth, there came before me on the _____

7  day of _____, A. D., 2019, at 9:38 a.m.,

8  at the offices of CITY OF HOUSTON LEGAL DEPARTMENT, 900

9  Bagby, Third Floor, Houston, Texas 77002, the following

10 named person, to-wit:  WANDA L. ANDREWS, who was by me

11 duly cautioned and sworn to testify the truth, the whole

12 truth, and nothing but the truth of her knowledge touching

13 and concerning the matters in controversy in this cause;

14 and that she was thereupon carefully examined upon her

15 oath and her examination reduced to typewriting under my

16 supervision; that the deposition is a true record of the

17 testimony given by the witness; that the witness has

18 requested a review pursuant to Rule 30(e)(2), same to be

19 sworn to, and subscribed, by said witness before any

20 Notary Public, pursuant to the agreement of the parties.

21     I further certify that I am neither attorney nor

22 counsel for, nor related to or employed by, any of the

23 parties to the action in which this deposition is taken;

24 and further that I am not a relative or employee of any

25 attorney or counsel employed by the parties hereto, or
```

**Page 100**

```
1  financially interested in the action.

2      I further certify that the amount of time used by

   each counsel at the time of the deposition is as follows:

4
       Mr. Hector F. Ruiz           -(03:10:02)
5          Attorney for PLAINTIFF UNITED STATES OF AMERICA
       Ms. Deidra N. Sullivan       -(00:04:42)
6          Attorney for DEFENDANT CITY OF HOUSTON
       Mr. Keith Wyatt              -(00:00:00)
7          Attorney for PLAINTIFF UNITED STATES OF AMERICA
       Mr. Dwain Gregory Capodice II -(00:31:00)
8          Attorney for PLAINTIFFS-INTERVENORS JANE DRAYCOTT
           AND PAULA KEYES

9

10     GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the

11 4th day of September, A.D., 2019.

12

13

14

15                   James M. Plair

16 JAMES M. PLAIR, CSR
   Texas CSR 4409

17 Expiration:  12-31-2019
   Lexitas - Firm Registration No. 95

18 13101 Northwest Freeway, Suite 210
   Houston, Texas 77040

19 281-469-5580

20

21

22

23

24

25
```

**Exhibits**

**Andrews Exh 013** 3:17 29:6,7 37:24,25 38:1,3 39:7 48:19 58:12,16 59:19,22 62:7,15 64:17 78:5

**(**

**(a)** 60:24 61:3 62:3,11 63:3,10,14 65:16

**(b)** 65:18

**(c)** 30:10

**(d)** 60:23 63:17

**(e)** 60:24 64:19

**0**

**010** 38:16

**01:04:58** 96:13

**09** 38:16

**09-407** 29:21,24 30:4 32:2,25 33:3 34:1,7,9,20 35:1

**09-407's** 33:12,23

**09-424** 18:25 19:3 21:7,12,24 32:6, 8,18,19,21

**09-424's** 19:7 35:20

**1**

**1** 6:16 8:13 18:23,25 67:8,24 68:14, 21 71:6,9

**1(c)** 8:16,20 9:10,18 18:20,22,24 19:5

**1(e)** 8:18 9:3,10 32:2,4,6,7

**1-50** 3:19 49:11 50:2,12 55:25 56:3, 9,14,22 57:13,22 82:5,7,13,17 87:21 88:23 92:5

**10** 9:25

**10-311** 35:11,14 36:14 37:2,6,8

**10:06:14** 21:19

**10:11:09** 21:19

**10:16:30** 25:9

**10:20:34** 25:9

**10:23:34** 27:5

**10:25:49** 27:5

**10:34:50** 31:12

**10:43:51** 31:12

**10:55:14** 36:19

**11** 66:15,16,25 67:8,21 68:21 69:3,6, 7,8,11,16 70:1,9,10,15,17,21 71:5,17 72:3,14,21 74:1 95:11,13

**11:11:10** 36:19

**12** 10:1 33:15 68:11,12 72:4 73:6,8, 13,20,22 74:8,9,11,17,20 94:25 95:2, 9

**12-07-09** 3:18

**12:03:48** 65:7

**12:20:30** 65:7

**12:46:23** 83:4

**12:48:57** 83:4

**13** 1:17,20 3:17 29:6,7 37:24,25 38:1, 3 39:7 48:19 58:12,16 59:19,22 62:7, 15 64:17 78:5

**14** 13:21 35:9,10 51:16 71:2

**14th** 9:5

**15** 10:13 13:17,21 35:17 40:7

**150** 92:2

**16** 10:14 36:24 37:1

**17** 10:15,16

**18** 37:11,14

**1801** 4:20

**19** 11:2,3 38:19 59:15

**1978** 13:2

**1:04** 1:21

**1st** 71:5,16 73:12 74:2

**2**

**2** 7:2,22 8:5,10 18:22 19:4 20:18,19, 22,23 21:1 29:17,19 32:5,23,25 35:18 36:25 37:12 59:14 65:12

**2(c)** 9:25 30:2 35:19

**2(e)** 9:25 10:2,3 33:14,15

**20** 11:4,11 65:11

**20-** 56:7

**2000-** 81:24

**2005** 13:21 67:9,24 68:22 71:5,9,16, 20,23 74:2

**2009-2010** 76:13

**2010** 23:9 28:7 38:16 39:14,15 43:11,21 46:14 48:19 56:10 71:23 72:1 86:5

**2012** 72:1,4 81:25 85:1 91:22

**2013** 51:16 56:19,23 71:2 72:8,16 82:2 91:23

**2013-'14** 51:3

**2015** 72:4

**2018** 52:21,24,25 68:14 71:6 73:12 95:22

**2019** 1:17,21 6:20 9:5

**202.514.1005** 2:7

**20530-0001** 2:6

**21** 8:10,19,20 9:2,25 10:1,13,14,15 11:2,3,4 18:23,24 19:4 29:20 32:5 33:15 35:9,10 37:14 59:15 65:11

**2300** 2:11

**2318** 3:19 37:16 38:24 59:19

**2826** 65:16

**29** 3:17

**2nd** 6:20

**3**

**3** 19:12 35:8,10 36:22

**3(c)** 10:10,13

**3(e)** 10:11,14 36:23 37:1

**30** 40:7

**30(b)(6)** 3:15 6:18 7:5 29:6 57:2

**300** 2:23

**4**

**4** 3:5 8:10 18:23 19:4,21 37:11,14 38:7

**4(d)** 11:1,2 38:18,22

**4(f)** 11:2 59:14,17

**407's** 33:22

**407947** 1:25

**4:18-CV-00644** 1:4



## 5

**5** 8:20 11:11,13 18:24 65:10,11,12,15

**5(b)** 73:4

**54** 19:6 30:4 33:11,19 35:20 36:13 38:23 39:4,7,9 81:4,8,20 84:3,11

**5705** 35:14 37:3

**5865** 19:8

**5th** 18:8 26:18,19,20 27:15

## 6

**6** 8:19 32:5

## 7

**7** 9:2 30:18,19 33:6

**75** 3:6

**77002** 1:23 2:12 4:20

**77002-2527** 2:17

**77386** 2:24

## 8

**8** 31:5 32:1 33:6

**8-1-05** 66:19

**8/1/2005** 65:16

**8/1/2018** 65:18

**83** 3:7

**832.393.6457** 2:18

**86** 3:8

## 9

**9** 29:20 35:25 36:15

**900** 1:22 2:17

**96** 3:9

**97** 3:10

**99** 3:11

**9:38** 1:21

## A

**a.m.** 1:21 21:19,20 25:9,10 27:5,6 31:12,13 36:19,20

**ability** 71:11

**above-styled** 1:20

**absolutely** 7:8 71:4

**accurate** 12:11

**acknowledgment** 54:25

**action** 1:3 29:23 33:2 35:13 37:18

**actions** 19:1,2 29:22 32:8,21 33:1, 16,25 34:24,25 35:12 37:2,8 61:5 62:22 64:9 85:6

**active** 40:19

**actual** 16:13 53:25

**additional** 27:14,15 82:6 91:25 92:1

**address** 4:19 49:17 52:12 60:21,23, 24 64:3 74:11 82:20 88:8

**addressed** 53:18,19,24 54:5 67:14

**addresses** 53:4

**addressing** 46:10 60:25

**administered** 13:11,12 48:14 56:14,17,22 57:23 69:19 72:12 74:19 95:2

**administers** 13:10

**administration** 14:13

**advance** 76:2

**age** 13:2 43:4

**agree** 95:17

**ahead** 5:9,11,22 6:19 7:22 18:16,20 34:13 35:7 51:1 57:14 58:2 60:7 67:18 77:15 80:1 81:11 93:4 94:7

**Ahmad** 2:22,23

**Alfredo** 74:10,14

**allowed** 87:12

**Amended** 6:17 7:3,4

**AMERICA** 1:3 2:2

**and/or** 49:22

**Andrews** 1:16,19 3:4 4:1,6,18 6:12, 23 8:4,21 9:4 11:6,24 12:16,17 14:17 19:14 20:23 21:6,21 25:11 26:2,16 27:7 28:23 29:12 30:23 31:14 32:18 35:8,24 36:6,21 37:6,10 38:25 43:23

**47:1** 48:17 51:21 58:18 59:13 60:11 64:15 65:9 67:2 70:5 74:22 75:6 90:9 96:2

**Annise** 56:12

**annual/biannual** 79:22

**answering** 64:21 74:24 78:8

**answers** 70:6 95:8

**APPEARANCES** 2:1

**applied** 45:15

**approximate** 23:7

**Approximately** 27:17

**April** 28:7

**area** 49:17 55:14 72:23 76:15 81:8 89:24 90:8

**areas** 13:9 46:9

**ARFF** 81:4,6,8 82:9,10

**aspect** 11:14

**assessment** 3:18 22:14 27:21 28:24 29:13 37:15,17,18 38:4,8,23 43:13,18 57:4,5,24 58:4,6 59:18,24 64:13,17 77:10,12,19,24,25 78:3,9,14 84:20 85:25 87:1

**assessment's** 57:9

**assigned** 44:12

**Assistant** 22:17

**assisted** 76:17

**attached** 1:24 46:24

**attempt** 60:23

**attend** 54:7

**attendance** 46:13

**attended** 46:18,22

**attendees** 55:13

**attention** 29:16 36:23 37:11

**attorney** 4:12 5:23 16:11,12,13

**ATTORNEY'S** 2:10

**attorneys** 15:2,12,15,18,19,25 18:6

**audible** 12:9 69:10 90:2

**August** 1:17,20 6:20 18:8 26:18,19, 20 27:15 52:14,21,22,24,25 67:8,24 68:14,21 71:5,6,9,16 72:4 73:12 74:2

**Avenue** 2:5

**aware** 21:13 32:22 36:12 79:3 80:11 81:5,6,20 85:4



## B

**Bachelor's** 12:22,25

**back** 17:11 18:22 22:2 25:1 26:13 28:16 29:16 32:2,4 34:3 47:1 48:8 55:6 68:10 72:5 76:13 84:20 87:3,16 89:23

**background** 12:18,21,22

**Bagby** 1:22 2:17

**based** 66:11

**basically** 13:7 45:11 63:22 85:3 88:18

**basis** 34:8,25

**Bates** 19:12 24:25 25:15,16 29:8 30:17,18,19 66:16

**bathroom** 32:10,11

**began** 39:14 52:10,13 53:2,3 86:5

**begin** 18:20

**beginning** 11:3 85:18

**begins** 10:14

**believes** 88:13

**benefits** 14:13

**biannual** 49:6,9 50:1 52:5,8,10 53:2,7,10 54:7,8 58:14 63:25 64:6 80:16

**bit** 81:3,16

**board** 81:24

**bold** 59:25

**bottom** 36:25 66:19 68:13 73:12

**boy** 53:13

**break** 6:1,3 21:16,18 36:17,22 65:6 83:1

**briefly** 47:12

**bring** 88:16 93:10

**brings** 88:12

**broken** 65:15

**brought** 88:5

**build** 61:5

**Bulletin** 3:19

**business** 4:19

## C

**cadet** 64:5

**cadets** 49:10 50:2 55:25 56:14,17, 23 57:23 64:1

**call** 49:14

**called** 49:8

**calls** 79:9 84:16

**capable** 55:5

**Capodice** 2:22,23 3:6,9 51:17 56:20,25 61:18 75:5,8 77:17 78:1,2, 19 79:12 80:3 81:13 83:1,6 84:15 96:6,10

**carries** 10:13,14

**carry** 10:19

**carrying** 11:3 76:17

**carryover** 10:18

**case** 4:14

**Certificate** 3:11

**certification** 12:24 13:4,12,16

**certifications** 13:15

**certified** 1:21 13:8

**chance** 25:4 36:5 75:1

**changed** 57:18

**chart** 41:16

**check** 95:21,23

**Chief** 22:17,18,23 49:15 52:11,17,18 62:25 72:22 73:1 74:2,10,11,13,14 85:1 86:18 87:19 88:2 89:24 90:8 91:22

**Chiefs** 89:23

**chose** 53:7

**City** 1:6,11,15,19,22 2:15,16 3:17 4:15 6:18 7:3,6,11 8:15 10:5 13:18 14:1 15:2,12,14,17,19,25 16:11,12,13 18:6 21:10 24:2,5 26:2 28:12,20 29:2 30:8,13 33:7,10 34:7,24 36:13 39:2,6 40:17,20,21 41:10 43:10,13,19,24 44:8 45:12,16,18 46:17,21 47:7 48:6, 12 49:13 58:19 60:5,16 61:4,12 62:5, 10,14,20,23 63:13,17,20 65:23 66:3 69:1 73:19 74:13 76:22 78:12 80:11 95:7

**City's** 11:10,25 29:17 35:17 36:24 38:19 40:20,22,23 41:2 44:4 48:24 58:21 60:13

## C (right column)

**CIV** 1:15,19

**Civil** 1:3,23 2:5 4:10 6:17 7:5

**clarification** 66:6

**clarify** 66:11 84:2

**class** 54:14

**classifications** 41:11

**classroom** 54:13 55:11

**clear** 9:17 18:21 71:4 81:14 82:12 85:7 87:14 93:14

**Cohen** 16:16

**cold** 32:9

**comfortable** 60:24 62:16,25 63:16 64:21

**Command** 28:5 61:16,25

**commitment** 61:3,7 62:6,14 63:10

**company** 28:9 40:21

**compiling** 80:10

**complained** 32:8,21 33:17,25 37:2,8 92:21,22

**complaint** 11:12 17:22 18:12 35:1 42:9 45:2,9,12 46:2,6 47:3 64:22 65:12,18,20 66:18 67:14 68:4,21,25 69:11,18 70:1,16,21 71:8 73:6 74:1,3 84:20 87:3,16

**complaints** 42:19 46:11 64:2 68:13 73:9

**complete** 5:12 31:16

**completed** 32:18 33:23 37:6 38:15 49:6

**completely** 6:7,10

**complies** 8:11 38:21 59:23

**component** 53:20 86:20

**Composite** 3:17

**Compound** 79:25 81:10

**computerized** 1:22

**con-** 48:24

**concluded** 96:13

**conclusion** 90:5

**conclusions** 17:25

**conduct** 28:5 33:7,10 39:6 48:25

**conducted** 19:6 30:4 35:20 36:13 38:23 39:8,12,13 44:18 48:18 55:15 63:24 70:8,9,16 76:7 77:10



conducting 41:9

confirm 83:8

conflict 93:10

confusing 34:12 67:17 81:14

conjunction 84:6

connection 61:22 62:10

consideration 17:2,4 75:17,19

consist 28:8

content 15:15 43:8

continue 39:15 60:8 61:5

continued 48:19

continuing 64:1

conversations 15:11

copies 26:6,7,10,21,23 27:10,11,12,
15,16,17 28:21

copy 6:22 22:22,24 26:3 29:12
38:13,14

correct 29:4 34:20 42:17,20,22
44:21 45:19,24 53:5 56:15 57:6,13
58:25 59:1 63:14,18 64:7 70:14 72:16
74:5,6 76:19 77:19 78:6 79:6 80:4,12,
17 82:16 85:25 86:6 87:13 88:14
90:20 94:9 95:2

corrective 19:2 29:22 33:1 35:12

correctly 44:22 45:11 61:9

correspondence 3:17

couple 24:14 26:14 28:18 75:10
87:5

couple-minute 21:18

courses 80:14,15

court 1:1 5:6

cover 5:1 7:19 12:17 48:9 53:8,12,
15 60:21 70:20 73:1 85:13 89:18

covered 43:3,5,8 53:10 85:16

covering 36:22

covers 50:20

create 52:11

created 28:14,15 75:22 77:4,11,24

creating 76:16 77:18 78:13

curious 75:18

current 13:18,19 49:3 76:19,22,23

custodian 24:15

**D**

D(1) 64:7,8,10

D(2) 64:8,10

D(3) 64:8

D.C. 2:6

database 46:25 55:3

date 23:7 52:21 67:15,21 71:16
73:10

dated 3:17 6:20 66:17,19 67:8,15
68:13,21 71:5,6,9 74:2

dealing 13:8 40:6

deals 13:25

Dear 16:19

deceased 79:4

Defendant 1:6,11 2:15 6:18 7:6
8:21

Defendant's 7:3 18:25 29:21 32:7,
25 33:16 35:11 37:1,16 59:17 65:16,
19 73:5

definitively 43:14 63:15 88:1 90:12

Degree 12:23,25

Deidra 2:16 16:16 20:15 24:24 83:7

Deidra.sullivan@houstontx.
gov 2:19

delivered 70:2,3

demonstrate 61:5

department 1:22 2:4,10,16 4:9,11
7:10 14:1,3,4,7,15 18:4 28:4,14,22
40:21,22,23 41:17 43:16,18,19,24,25
44:1,5,12 45:13 46:18,22 47:8 48:12,
15 54:9 58:22 64:2 66:18 68:12 69:2,
20 70:3,10 73:9,19,23 76:7 77:5

Department's 38:4 48:25

department-wide 49:7

departments 77:2

depending 40:5

depends 63:5

deposition 1:15,19 4:23 6:16,18
7:5 14:18,24 15:24 17:7,19,20,23
18:1,4,7 20:9,13,17 22:3,9 23:2,11
25:5,20 29:6 75:13,23 76:2 83:10
85:19 96:13

depositions 5:3

describe 12:20 14:23 15:10,15 28:1
34:23 35:3,6 45:10 46:4 47:12 50:8
52:8 61:11 63:11

describing 39:11 42:4 63:16 64:10,
16

DESCRIPTION 3:15

designated 6:13 8:15 9:4 10:5
11:9,14,25 30:8,14 39:2 60:13 65:23
66:3

designates 8:21

designation 57:2

designations 29:17 35:18 36:25
38:20

detailed 32:1

determination 88:22 89:1,7,21,25
90:4,13,15 91:25 92:8 93:18,19

determinations 89:20

determine 55:10 72:11

determined 89:4,12,16 90:23,24
91:13,18 93:7 94:2

determining 91:9

develop 86:9

developed 69:19 86:5

directly 22:23 42:1 81:9

disciplinary 19:1 29:22 33:1 35:12
85:6

discrimination 37:20 43:4 46:8
50:11,13 53:16,23 54:4 56:5 61:6

discuss 5:6

discussed 15:7 46:7 58:15 63:23
88:6

discussing 58:10

discussion 27:4

discussions 15:14,15

dissemination 11:12,15 65:12,17,
19 66:2 73:5 74:15

distinction 43:24 44:3

distributed 48:14

district 1:1 40:5

disturb 60:12

dive 18:16

division 1:2 2:5 4:10 49:20 59:3

doc- 59:21



**document** 6:21 7:24 9:11 11:5
17:3,9,13 19:15,19,23,24 20:6,8,12,
16,23,24 21:3 22:4 27:22 28:1,8
30:21,22,24 36:3,4,6,8,15 38:6 60:10
62:24 66:21,23 68:17 75:21,24 76:16

**documentation** 50:15

**documented** 64:15,18

**documenting** 50:16

**documents** 16:4,5,6,10,17,24
17:1,16 20:10 22:8,12 24:1,4,8,12
25:4 27:8,10,13,20 28:11,19 29:1
31:10,15 32:24 67:11 75:12

**dormitory** 32:11,13,14,15 33:18

**drawing** 44:4

**Draycott** 1:8 2:20 32:21 75:9

**duly** 1:20 4:2

**Dwain** 2:22 75:8

---

**E**

**earlier** 22:4 46:8 58:18 71:2 75:12
78:5 81:16 83:9 94:24

**early** 21:15 86:5

**educational** 12:20,22

**EEO** 85:23 86:4,8,10 92:2

**EEO-RELATED** 83:22 85:13
86:13

**EEOC** 42:5,16 43:1,20 44:23

**effect** 56:6,9 69:9 71:20,23

**effected** 69:12

**effectiveness** 37:19

**efforts** 32:7,20 33:16,24 34:3,7,18,
24 37:1,7 59:17 60:4,16 61:11 62:5,9,
13 63:11,12,17,20 72:11 74:18

**electronic** 25:16 27:9 55:5

**Elizabeth.karpati@usdoj.gov**
2:13

**Email** 2:7,8,13,19,25

**employee** 46:23 64:22 80:20

**employee's** 54:20 55:1

**employees** 69:2,20 70:3 80:4,7,12
82:24

**employment** 2:5 50:10 53:16,23
54:4

**encounter** 50:18

**ends** 5:20

**enter** 55:1

**entered** 46:24 55:3

**EO** 55:25 56:3,9,14,22 57:13,22 92:5

**events** 34:8,19

**evidence** 77:14 78:16 94:6

**evolved** 57:17

**exact** 75:21

**Examination** 3:5,6,7,8,9 4:4 75:4
83:13 86:23 96:5

**examined** 4:2

**Excuse** 57:21

**executive** 3:18,19 38:5 49:10 50:2,
12 52:11,16,18 82:4 85:5 87:21 88:23

**exhibit** 3:17 6:16 7:2,22 8:5,10
18:22 19:4,12,21 20:18,19,22,23 21:1
29:6,7,17 30:18,19 31:4,16 32:1,5
35:18,25 36:15,25 37:12,24,25 38:1,3
39:7 48:19 58:12,16 59:14,19,22
62:7,15 64:17 65:12 66:15,16,25
67:8,21 68:11,12,21 69:3,5,6,7,8,11,
16 70:1,9,10,13,15,17,21 71:5,17
72:3,12,14,21,22 73:6,8,13,15,20,22
74:1,8,9,11,17,20 78:5 94:25 95:2

**Exhibits** 3:14 33:6

**expertise** 72:23 74:3

**extent** 84:16 95:12

---

**F**

**face-to-face** 39:16 40:1,2,9 63:23
80:16

**facility** 55:16,19,22

**facts** 77:14 78:16 94:6

**fair** 86:13

**familiar** 6:24 19:14 21:6 30:23
31:21 36:8 38:1,12 66:25 67:1,2,5
73:15

**familiarity** 31:7 36:3

**Fax** 2:7,18

**FED** 1:15,19

**Federal** 1:23 6:17 7:5 45:13,14,16,
21

**feel** 60:24 62:25 63:16

**felt** 46:9 62:16 87:20

**female** 47:16

**figuring** 77:23

**file** 45:12 90:19 91:19

**filed** 18:12

**files** 22:24 24:23 91:12,24

**filing** 42:9,19 45:2,9 46:1,5,11 47:3

**final** 65:10

**find** 9:25 11:2,3 29:20 31:9 32:5
33:15 35:8 36:24 37:11 65:11 74:19

**finding** 88:4

**findings** 19:3,7 21:11 29:23 30:5
32:19 33:3,12 34:6,23 35:13,20
83:16,21 88:7

**finish** 5:10,11 92:17

**fire** 14:3,4,6,15 18:4 19:6 22:18
28:14,22 30:4 33:18 35:19 38:4,22
39:3,7 43:16,18,19,24 44:1,12 45:13
46:18,21 47:7 48:12,14,25 52:18 54:9
55:3 60:14,18,22 64:2 66:17 68:12
69:2,20 70:2,10 73:8,19,23 76:7

**firefighter** 47:17

**firefighters** 19:6 30:3 33:11 35:19
36:13 38:22 39:3,7 77:6

**firm** 28:4

**five-minute** 65:6

**Flanagan** 22:18 23:8 25:19

**Floor** 1:22 2:17

**FMLA** 14:13

**folder** 27:9 88:5,19,24,25 89:3

**folders** 89:11,15

**follow** 28:10

**follow-up** 75:10 82:6,22 83:12

**follow-ups** 75:2

**form** 54:25

**format** 39:19,23,24 48:22 49:3
54:12

**formats** 48:23 57:20

**formed** 32:19

**found** 38:19

**frame** 8:23 28:17 48:20

**front** 36:15

**full** 4:16



## G

gather 54:25

gathering 76:11

gave 15:2 16:10 26:7,11,12 62:18

gee 28:16 38:15

gender 33:18

general 79:22

General's 4:12

generally 20:3 79:15 92:9

gesture 5:20

get all 50:22

give 5:12 26:6 28:17 47:25

giving 26:2

God 16:19 75:3 81:24

good 4:6,7 92:13

Gotcha 5:19

Great 15:20

Gregory 2:22

group 49:16,18 90:8 91:4,8,13,17 93:23

groups 40:3

guess 38:15 39:9 40:5 55:6 78:12, 19 82:12 89:23

## H

hand 7:1 29:5 30:17 31:4 35:24 66:14 68:11

handed 67:12,15 68:1

handing 6:15 19:11

handout 28:9 39:20,22

handouts 54:14 67:3

happen 28:6

harassment 37:20 43:6 47:18 49:9 53:4,20 56:5 61:6

harassment/retaliation 52:13

hard 27:10,11,12,17

HCRI 13:12

head 16:15

hear 5:21 87:8

Hector 2:4 4:8

Hector.ruiz@usdoj.gov 2:8

held 13:20 58:24

helped 76:9

hereto 1:24

HFD 3:18 8:22 11:11 37:15 38:8 45:18 46:24 48:7 54:18 61:4 65:12

HFD's 37:19 55:19 61:8

hired 28:4

hmm 13:16 47:15 51:24

Hold 41:22

Horton 22:14 27:21 28:23 37:15 38:5,7 77:25 84:20 85:24 87:1

HOU00001472 31:5

HOU00001495 31:5

HOU00002257 3:19 29:8

HOU00002318 29:9

HOU00002821 66:16

HOU00002826 66:17

HOU00002834 36:1

HOU00005460 30:20

HOU00005462 30:20

HOU00005843 19:13

HOU00005852 19:21

HOU00005865 19:22

HOU0002261 59:22 61:4

HOU0005671 36:1

HOU1472-1495 29:24

HOU2259 37:16 38:23 59:19

HOU2821 65:16

HOU2831-2834 65:18

HOU5460 29:24

HOU5671 35:14 37:3

HOU5843 19:7

HOU5851 19:8

hours 14:21,22 17:15 50:21,22

Houston 1:2,6,11,15,19,22,23 2:12, 15,16,17 3:17 4:13,15,22 6:18 7:6 9:4 14:3,4,6,15 18:3 28:14,22 38:4 44:12 45:13 47:7 48:12,14,25 54:9 57:4,24 58:6 66:17 68:12 69:2,19 70:2,9 73:8, 18,19,23

Houston's 7:3

HR 12:23 13:3,8 40:17,20,21,22 41:2 43:13,19,24 44:8 48:6 54:24 58:19,21 76:22 80:9

Human 8:22 12:23,24 13:1,11,13,19 14:12 40:23 41:16 43:15,25 44:5,11 53:25 64:20

## I

identified 22:4 42:15 59:18 74:2, 14,15 87:9 93:1 94:16 95:5

identify 6:13 24:19,25 25:4 48:1 64:25

II 2:22

impacted 46:9

implement 59:18 60:5 61:12 62:6, 14,23 63:13,20

implementation 37:17 65:17,19 73:5 76:18

implemented 62:20 82:14

implementing 76:16

implicate 48:10

important 5:7,14

improve 63:21

improvement 63:4

inappropriate 47:16

incidental 61:7

including 32:8 33:17 80:15

INDEX 3:1

indicating 75:20,24

individual 80:4,7,19 85:3 87:8,12, 20 88:3 93:21,22

individuals 40:7 41:1 46:9 84:11 87:9

information 7:12 46:24 76:6,12 77:9 79:2,5 80:10 88:9,21 96:7

informed 85:18

initially 40:17 86:5

initiated 50:24 61:21 62:2

instance 1:19

instances 48:10 50:16

Institute 13:12

instruction 46:1



**instructions** 15:3

**instructs** 5:23

**interoffice** 3:17

**investigation** 18:1 21:7,12,24
31:22 32:13 79:16,20,24 80:25
84:23 88:14 89:22 90:6 92:12,19
93:13

**investigations** 79:14 83:17,25
84:7,12

**investigative** 19:8 32:19 33:12,23,
24 35:21 36:14 83:17,21

**involved** 51:15 64:23 90:15 92:10,
15,18

**issuance** 34:6,17,22

**issue** 49:15 52:12,15 82:20

**issued** 19:3 29:24 32:20 33:3,24
35:13

**issues** 8:22 13:8 14:13,14 46:7,10
49:17 50:11 53:23 54:4 82:21,23
86:10,13 88:6,8 93:11

**items** 32:13

---

### J

**J-A-H-N-K-E** 55:21

**Jahnke** 55:16,21

**JAMES** 1:21

**JANE** 1:8 2:20

**January** 39:14,15 43:11,21 46:14

**Jeremy** 2:3 4:9

**Jeremy.monteiro@usdoj.gov**
2:7

**job** 1:25 80:6

**Juan** 41:6

**July** 26:25 27:14

**June** 9:5

**Justice** 2:4,10 4:9,11 7:10

---

### K

**Keith** 2:10 4:11

**Keith.wyatt@usdoj.gov** 2:13

**Kelly** 41:4 42:1 59:8 86:5

**key** 23:24 59:25 61:2,22 62:2,10
64:19,25

**Keyes** 1:8 2:21 75:9

**kind** 20:15 41:14 75:18

**knowledge** 33:13 34:2,16 37:9
43:12,15,22 47:6,9 48:6,16 51:15
54:6 56:24 78:10 81:1 83:24 84:16

---

### L

**L.l.c.'s** 38:8

**L.l.p.'s** 38:7

**lasted** 39:17

**late** 51:3

**lateral** 41:18,21

**lawsuit** 18:13

**leaders** 61:4

**leadership** 61:3,17 62:6,14 63:10

**Leading** 84:13 86:2

**learn** 11:24

**learned** 88:2

**leave** 60:22 63:7

**leaving** 32:14 62:25

**left** 21:21,22

**Legal** 1:22 2:16 16:15

**legalese** 9:15

**Legalwatch** 27:24,25 28:3

**Lemon** 38:7

**Lemond** 37:15

**letter** 62:2,11 63:3,10,14,17 64:4

**Lewis** 16:14

**limitation** 34:5

**limited** 32:9 33:17

**LITIGATION** 2:5

**live** 39:24 40:10

**lived** 4:23

**LLC** 37:15

**LLP** 37:15

**lockers** 32:13

**long** 13:20 14:5,20 17:13 51:13
56:17 59:4 91:21

**looked** 78:5

**Louisiana** 2:11

**Lynnette** 4:18

---

### M

**machine** 1:22

**made** 33:24 34:8,25 64:12 72:11
74:18 82:15

**make** 7:19 43:23 70:5 71:3 75:10
83:2,8 85:4 88:11,21 90:13 93:15
94:13 95:25

**makes** 88:25 89:20,21,25 90:3
94:10

**making** 89:6

**males** 32:11

**man-** 54:17

**management** 13:14 55:2 58:25
61:15

**manager** 13:19 41:5,14,19 59:3
79:6

**mandatory** 46:16,19,22 54:17,19
94:15,17

**March** 23:9

**Marjorie** 16:16

**marked** 3:14 6:15 7:2 19:12,20
25:15 29:7 30:18,19 35:25 37:23
66:15

**marking** 29:5

**Marshal** 60:14,18,22

**Martinez** 74:10,14

**materials** 26:17 77:5,11,19,23
78:13 83:7,10

**Matt** 78:25

**matter** 75:9

**matters** 9:22 85:13

**Matthew** 59:5,7,8

**mattresses** 32:12

**Mayor** 56:12

**Mayor's** 50:13 56:4

**Mcleod** 60:14,18,22 63:1 72:23 73:1
74:2 85:1 86:18 87:19 88:2 90:8
91:22 95:19,24

**Meaning** 92:21

**means** 6:7 40:9

**measures** 19:2 29:22 33:2 35:12

---



**meet** 18:6 21:16

**meeting** 15:25 17:14 18:10

**member** 92:10

**members** 18:3

**memo** 22:17,19,20,21 23:1,4,8,11, 13,22,24 25:18,21,25

**memorandum** 83:9

**memos** 22:13,15 27:21

**mentioned** 13:3 28:23 45:9 46:8 52:5 55:25 58:18,24 64:5

**met** 15:2,17,19 91:8

**method** 91:9

**Michelle** 60:14,18,22 86:18

**minute** 30:21

**mission** 61:8

**misstates** 77:13 78:16 81:11 94:5

**modification** 57:16

**modifications** 57:13

**modified** 57:9

**moment** 6:19 7:7,23 19:22 60:8 66:20 68:15

**Monday** 18:8 26:20

**Monteiro** 2:3 4:10 95:11,18

**month** 12:4,5,6,7,11

**months** 40:18

**morning** 4:6,7

**move** 31:14,25 35:7 61:15 64:19

---

**N**

**N.W.** 2:5

**NAHMAD@CLINE-AHMAD. COM** 2:25

**names** 41:1

**narrow** 53:14

**Nasim** 2:22

**nature** 80:17 85:2

**necessarily** 68:6,7 93:12 94:17

**needed** 82:22 87:20 90:24 91:10 96:7

**new-officer** 64:5

**newly** 58:10

**newly-hired** 47:17

**newly-promoted** 49:5,25 50:7,18, 23 51:4,6,7,11,13,19,22,23 58:11 61:14,20,21 62:16,21 67:4,12,13 68:1 70:25 71:9,13,14 72:6,15,20 85:8,12 86:12

**nod** 5:15,16,17

**non-sworn** 54:10

**Nonresponsive** 51:17 56:20,25 61:18

**not-required** 89:19

**notes** 18:10

**notice** 6:17,23 7:4,10

**Nuh-uhm** 23:17

**number** 24:25 55:1 78:6 92:2

**numbered** 1:20

**numbers** 46:23

---

**O**

**oath** 6:6

**object** 57:1 84:15

**Objection** 34:10,12 50:25 51:17 56:20,25 57:25 61:18 67:17 77:13 78:15 79:9,25 81:10 84:13 86:2 93:3 94:5

**objections** 7:4 9:13

**observe** 40:18

**obtain** 12:25 13:15 22:21

**occur** 50:16 70:24

**occurred** 85:24

**occurs** 87:3

**offered** 92:9 93:19

**office** 2:11 4:13 24:9,10 94:3

**officer** 47:16 50:7,23 51:5,7,22 58:11 61:20,21 62:21 67:12,13 68:1 71:10,13,14 72:15,20 85:9,12 86:12

**officer's** 49:25

**officers** 49:5,6 50:18 51:7,11,14,19, 23 61:14,15 62:17 67:4 70:25 72:6

**official** 41:11

**OI-** 45:13

**OIG** 17:25 18:25 19:3,7 29:21,24 30:4 32:2,6,8,18,19,25 33:3,23 34:7 35:10,14,20 37:2,6,8 45:13,21 79:16

**83:25 84:7 88:4,14 89:22 92:11 93:13,17 94:1,8**

**OIG's** 21:6,12,24 29:23 33:2,11,22 36:14

**OIG-SPECIFIC** 79:23

**onboarding** 14:14

**ongoing** 55:24 57:9 91:21

**online** 82:17

**operations** 85:16

**opportunity** 16:8 88:18

**optional** 46:15

**options** 45:12,16

**Order** 3:19 49:10 50:2,12 82:4 87:21 88:23

**ordered** 79:16

**orders** 85:5

**organization** 13:10

**organizational** 41:16

**originals** 24:6,7

---

**P**

**P.30(b)(6)** 1:15,19

**P.L.L.C.** 2:23

**p.m.** 1:21 65:7,8 83:4,5 96:13

**package** 71:1

**Padilla** 41:6,9,15,25 42:1 44:7 59:10 78:20

**pages** 8:10 27:18,19 60:6

**Parker** 56:12

**part** 24:22 27:14 42:9 47:11 50:14 61:7 70:25 71:9,13 72:15

**participate** 40:12

**participating** 51:2 56:18,19

**participation** 54:13,14,20

**parties** 84:22 93:10

**pass** 83:6 86:22 96:10,11

**PAULA** 1:8 2:21

**pause** 62:18

**payroll** 55:1

**pending** 6:2 7:25

**Pennsylvania** 2:5



**performed** 21:24

**performing** 81:17

**period** 44:17,19 63:24

**person** 46:22 55:8 74:3 78:12,21,23
87:12,22 91:1,13,17 92:21,22 93:6
94:15,19 95:5

**person's** 78:22

**personal** 84:16

**personally** 53:19

**personnel** 43:19 48:15 54:10 70:10
73:20 80:24

**persons** 47:25 60:13 72:18,19 93:1,
2,23

**phrase** 40:8

**piece** 53:17

**pinpoint** 51:24

**Pitkin** 2:23

**place** 55:18 70:13 72:1,4 93:9

**Plaintiff** 1:4,20 2:2

**Plaintiff's** 6:16 7:4

**Plaintiff-intervenors** 1:9

**PLAINTIFFS-INTERVENORS**
2:20

**PLAIR** 1:21

**planned** 70:1,2 73:23,24

**point** 13:24 14:8 39:22 88:7 90:22

**policies** 17:22 37:19 63:8

**policy** 11:12 50:13 56:4 65:12,18,20
67:14 68:4,21,25 69:11,18 70:1,17,21
71:8,16,19,23 72:1,25 73:2,6 74:1,3
87:22,23 93:9

**position** 13:18,19,20,23 41:18,21
58:25 59:4 61:15

**positions** 41:10

**possession** 23:5

**possibly** 38:16 85:1

**Powerpoint** 28:10,13 39:21 52:11
54:14

**practice** 48:25 93:9 94:3

**practices** 37:19

**preparation** 17:20,23 18:1,4 20:9,
16 22:3,5,9 25:5,19

**prepare** 14:24 18:7 20:13 23:11
75:13

**prepared** 9:21 10:7,22 11:6,20 16:2

**preparing** 14:17 15:24 17:6 23:2
61:14

**present** 9:4 44:23 45:1,4 86:15,19
88:24

**presentation** 28:10 39:21 52:12
54:14

**presentations** 28:13

**presented** 42:3,7,13,16 47:11

**presenter** 39:25 40:10

**pretty** 81:13

**prevent** 32:7,20 33:16,25 34:7,19,
24 37:1,7

**prevents** 6:9

**previously** 37:23 58:15

**primarily** 13:25 43:3

**prior** 43:11,21 56:23 83:20 85:19,24

**privileged** 15:13

**privy** 40:18 79:17

**Procedure** 1:23 6:17 7:5

**proceed** 5:3

**process** 6:12 42:8,19 45:1,9 46:1,5,
11 47:2 50:16 72:24 87:24 88:11
91:21 92:10

**processes** 64:22

**produced** 1:19 26:13

**productions** 24:15 26:14

**professional** 53:25

**promoted** 59:3 72:20

**pronounce** 55:17

**provide** 4:19 7:11,12 11:10 16:17,
24 24:1 26:21 27:12,18 28:20,21
29:18 49:5 51:8 64:19 65:3 80:12
84:22 88:3 94:2,4,25 95:6,7,8

**provided** 21:10 24:12,22 26:7,23
27:8,22 28:12,13,22 29:2 43:10,19
46:5,14 47:5 48:7 49:4 52:6,9 57:5,18
69:1 71:19 73:18 87:8,10,18 94:11,
12,14

**provisions** 1:23

**pull** 25:2

**purpose** 45:25

**pursuant** 1:23

**put** 44:4 49:16 56:6,9 70:12 71:20,23
72:1,4

**putting** 40:24 41:2

---

**Q**

**question** 5:11,22,24 6:2 7:25 15:11
16:23 23:16,21 34:15,21 54:16 56:7
58:9 61:24 62:17 63:5 66:5,8,11
75:14 77:16 81:14 92:13,17

**question's** 93:14

**questions** 5:10 9:22 10:6,7,23
11:7,21 17:1,3 21:9 22:2 30:8,14
31:25 37:25 39:3 66:21 68:8,20 74:23
75:10,17,19,22 76:8,10 78:8 83:12
84:3 86:25 87:2,5 95:8,13 96:2,8

**quick** 21:16 83:1

---

**R**

**racial** 33:17

**read** 7:16 9:12 12:15 18:12 19:25
61:9 65:21 96:11

**reading** 60:12

**ready** 60:9

**real** 21:16

**reason** 6:9 53:9

**recall** 4:25 17:18 22:17 23:15,24
25:25 26:2 27:19 39:20 41:4,15 43:9
44:22 45:11 47:15,19,20 49:12 50:20
75:14 82:3 83:18 84:4,8,22 85:9,20
86:3 93:24

**receive** 22:24 38:14 89:3,11,15
91:12

**received** 38:13 84:11

**receiving** 83:7

**recent** 95:22

**recess** 21:19 25:9 27:5 31:12 36:19
65:7 83:4

**recognize** 20:23 25:18,24

**recollection** 12:13,14 18:9 26:5
72:5,7 85:15

**recommendation** 61:12,22 62:2,
7,10,15 63:13,21 64:12,19 92:4,25
94:11,13

**recommendations** 19:1 29:21
33:1 35:11 59:18 60:1,4,5,8,15 61:2
62:24 63:2 65:1

**recommends** 94:20



**record** 1:23 4:17 25:7 27:3,4 31:8 80:19 95:7

**records** 24:18 80:4,6,8,24

**recruiting** 14:14

**reeducation** 13:25 14:2,6

**refer** 8:13 30:2 38:18 47:10

**reference** 52:21

**referring** 28:2 29:13 30:10 47:13 71:17

**refresh** 82:20 87:20

**refresher** 89:1 93:2

**regard** 79:13 80:8,9 83:8 86:8 88:23

**relate** 21:10 64:6,10 86:25

**related** 37:20 85:5 86:10 92:2

**relates** 32:6 50:10 70:18 83:15

**relating** 47:17 95:9

**release** 83:16,20 84:19

**relevant** 8:23

**remain** 60:21

**remained** 69:8,12

**remedy** 46:10

**remember** 21:25 22:6,15 23:7,13, 22 27:22 28:11 41:1 42:11,12 56:1 87:4

**removal** 32:12,13

**reoccurrence** 32:7,20 33:16,25 34:8,19,25 37:2,7

**repeat** 9:6 16:22

**rephrase** 67:20

**replace** 76:24

**report** 30:5 41:23,24 55:10

**reported** 1:22 42:1 59:8

**reporter** 1:21 5:6

**Reporter's** 3:11

**represent** 75:8

**representative** 11:10,25

**REPRESENTING** 2:2,15,20

**request** 37:16 81:7

**requested** 81:18 82:3,10,19 89:5

**requesting** 7:11 81:4,6,8,20

**required** 46:15 51:7,9,13,19,22 54:7 55:8 89:2,5,7,8,9,13,16,22 90:4,

5

**resolution** 93:10

**Resource** 8:22 44:11 53:25

**Resources** 12:23,24 13:1,11,13,19 14:13 40:23 41:17 43:25 44:5 64:20

**respect** 8:16 19:3 29:24 33:3 35:14 42:3 46:5 53:16 54:17 57:8 64:9 65:24 69:2 72:19,21 73:2,20 74:15,19 88:13 89:22 90:5 95:1,13

**respond** 9:21 10:5,7,22 11:20 65:24 69:4

**respondent** 92:11

**response** 8:21 9:3,5 12:9 19:1,7 21:11,24 29:21 30:4,13 32:25 33:11 35:11,20 36:14 37:17,18 38:23 39:7 48:18 57:5,23 58:6,11,16 62:2 64:12, 16 69:10 76:8 77:10,11,24 78:9,14 79:2,14,16,23 80:25 88:4 90:2

**responses** 7:4 38:19

**responsibilities** 13:22 14:5,11 42:6,17 43:1,21 44:24 86:4,9

**responsibility** 13:24

**responsible** 14:2,12 76:11,15 80:2

**responsive** 79:19

**rest** 60:22

**restate** 5:22 23:20

**result** 19:3 29:23 33:2 35:13

**retaliation** 43:4 49:10 50:13 53:5, 20 56:5

**return** 87:12 94:16

**returned** 85:4

**review** 6:20 7:23 8:1 9:10 10:10 16:8 17:3,13 19:23 20:8,12 22:8 26:16 30:21 31:6,16 35:18 36:6 37:17 60:8 66:20 68:15 82:4 88:18,25

**reviewed** 17:19,22,25 20:16,24 21:3 22:5,13,16,25 23:4,14,23 24:2, 19 25:4,19 26:3,4 27:8 29:1 33:7 75:13,16 80:3,6 83:10

**reviewing** 6:21 7:24 9:11 11:5 19:24 23:10 30:22 31:9,17 32:24 36:4 60:10 66:23 68:17

**Rick** 22:18 23:8 25:19

**rights** 2:5 4:10 42:6,16 43:1,20 44:24 63:25 86:4,9

**Road** 2:23

**Rodney** 52:20

**role** 76:13,19,22,23 79:18

**Ron** 16:14

**Ruiz** 2:4 3:5,8 4:5,8 5:21 6:22 8:1,4 9:9,21 10:22 11:6,20 15:5,9 16:17,24 20:2,3,15,19,21,22 21:15,18,21 23:22 24:13,17,24 25:3,8,11 26:10,15,16 27:3,7 29:8,12 30:23 31:11,14 33:10 34:17 36:5,17,21 51:4,18 56:21 57:3, 17 58:5 61:19 65:6,9 66:13,14,25 67:20 68:19 74:22 75:1 84:13 86:2,24 93:5 94:9 95:12,15,17 96:1

**rules** 1:23 5:1 6:17 7:5

**run** 55:10

**runs** 19:21 66:17

**Russell** 59:5,7,8 78:24,25

---

## S

**scenario** 47:22,24 48:4

**scenarios** 42:10,22 45:5 47:12,14 48:7,9,13 50:17 54:15

**scheduled** 95:20

**scope** 57:2

**scroll** 25:13,17

**section** 53:18

**select** 28:19

**sentence** 9:3,8

**separate** 43:15

**Services** 87:25 88:9,10,12 89:4,6, 12,16,21 90:3,15,19,23 91:5,13,18 93:6,18 94:8,10,20

**sessions** 46:13 47:10

**setting** 54:13 55:11

**sexual** 43:6 47:17 49:9 52:12 53:4, 19 56:5

**sheets** 46:23

**short** 36:17

**Shorthand** 1:21

**shortly** 38:15

**show** 19:19 25:11

**shower** 32:9

**Shreck** 41:5,8,13,18 42:2 44:7 58:18 59:8,11 76:1,13,24 77:4,21 78:10,11,18 79:5,11 86:6

**Shreck's** 76:15



**SHRM** 13:13

**side** 54:24 55:2 87:25

**sign** 96:12

**sign-in** 46:23

**Signature** 3:10

**similar** 75:20

**sit** 87:21

**sitting** 81:24

**situation** 47:25 87:19 93:20,21

**situations** 89:18,19 92:7 93:17 94:1

**size** 40:3

**slurs** 33:18

**Smith** 4:20

**Society** 13:13

**sound** 12:8

**sounded** 87:7

**sounds** 34:11,14

**SOUTHERN** 1:1

**speak** 73:3 78:11,18 79:11

**speakers** 32:10

**Special** 3:18

**specific** 7:12 28:17 29:18 49:17,18 52:2 55:8,13 62:5,12 63:12 67:14,21 82:9 84:3,11 85:20

**specifically** 18:24 21:11,23 22:15 23:25 24:18,19 44:11 47:20 52:3 58:3 59:2 61:21,23 62:1,4,9,13,23 63:12, 17 64:11 68:20 69:5 70:12,16,20 73:3 81:4 83:15,25

**speculation** 79:10 81:25 84:16

**spend** 14:17,20

**spoken** 18:3

**staff** 28:5 61:16,25 76:17 87:25 88:9, 10,12 89:4,6,12,15,21 90:3,15,19,23 91:5,13,17 93:6,18 94:8,10,19

**stamp** 30:20

**stamped** 19:12 25:17 29:8 30:17,18 66:16

**start** 61:2 84:25

**started** 40:17 51:2,5 56:18,19 71:1 72:8 91:22

**state** 1:21 4:16 28:2 45:12,14,16,21

**stated** 1:23 45:18 57:8 71:1

**states** 1:1,3 2:2,4,10 4:12,14 9:4 18:13

**stating** 62:16

**station** 19:6 30:4 33:11,19 35:20 36:13 38:23 39:4,7,9 49:19,22 81:4,8, 17,20 82:19 84:3 85:4 87:14

**stations** 40:11,16 50:19 81:7 82:10, 16,22

**stenotype** 1:22

**sticking** 69:16

**stop** 7:7

**stopped** 36:21

**Street** 2:11,17 4:20

**strike** 34:4

**stuff** 9:13,15

**subject** 66:18 68:12 73:9 83:7 93:7

**subtopic** 30:9,10,14 35:19 36:23 73:4

**subtopics** 65:15

**Suite** 2:11,23

**Sullivan** 2:16 3:7 5:20 7:25 8:3 9:7, 12,15,18 10:17,20 11:18 15:4,6 16:14,16,21 19:25 20:18,20 21:17 23:17,19 24:12,14,21 25:1,6 26:6,8, 12,22 27:8,13,23 29:10 31:8 33:8 34:10,12 36:18 50:25 57:1,14,25 66:7,10 67:17 77:13,25 78:15 79:9,25 81:10 83:11,14 84:18,19 86:3,22 87:2 93:3 94:5 95:10,14,16,21 96:11

**summary** 3:18 36:14 38:5

**supplemental** 9:3

**Support** 64:20

**sustained** 84:21 87:4,17 88:4

**switch** 73:4

**sworn** 1:20 4:2 70:10

**sworn-in** 54:10

**synopses** 83:17,21

**synopsis** 19:8 21:12 29:23 30:5 32:19 33:3,12,23,24 34:6,22 35:21

**system** 55:2,5 79:21

---

**T**

**tablet** 25:12,13,16

**tailor** 88:7

**takes** 50:21

**Talent** 55:2

**talk** 15:6 50:15 66:4 76:1 88:22

**talked** 24:21 42:8 78:20 80:15 81:3 83:9 84:7

**talking** 27:9 57:3 85:8 94:24

**talks** 64:22

**tasked** 77:18 78:13 79:8

**Telephone** 2:6,12,18,24

**terms** 77:23

**test** 13:7,10

**testified** 4:2 57:21 59:10 72:14 81:16 87:11 94:25

**testify** 6:14 8:16,22 66:4 70:7 74:16 85:23

**testifying** 6:7,10 7:20 85:19

**testimony** 3:4 4:14 11:10 29:18 57:22 65:3 77:14 78:17 81:11 84:10 86:3 94:6 95:1,6

**Texas** 1:1,22,23 2:12,17,24 4:13,22

**thing** 20:1 82:11

**things** 75:16 79:8 80:17 82:13

**thinking** 23:9

**Thompson** 37:14 38:5,7 77:25 84:20 85:24 87:1

**thousands** 24:17

**Thursday** 95:19

**tied** 58:3 61:13 93:12

**time** 8:23 14:17 22:18 28:17 34:5 40:4,6 41:5,8 44:17 46:25 48:20 58:1 62:8 71:23 86:19

**times** 49:14 93:5

**title** 43:3 46:7 48:10 50:10 53:16,23 54:4 59:2

**titled** 66:18 68:12 73:8

**today** 4:9 5:4 6:10 7:20 34:18,23 49:1,13 64:1 65:10 76:9 79:2 80:16 96:8

**today's** 17:6

**toilet** 32:12

**tolerated** 61:6

**tomorrow** 95:19



**tool** 47:24

**top** 8:12 59:25

**topic** 8:13,16 11:9,11,13,21 18:20,
22,23,24,25 19:5 29:19 30:2,3 32:2,4,
6,23,25 33:14,15 35:7,8,10 36:22
37:1,11,14 38:7,18 42:25 43:5,8
44:23 45:1,8 47:2 53:10 59:13,17
65:10,11,12,15,16,24 66:3 86:13

**topic's** 66:2

**topics** 6:13 7:12,19 9:10,24 10:6,8,
10,23 11:1,7 12:1,18 13:7 18:17
29:18 42:3,7,12,15 43:7 46:8 53:7,12,
15 83:22 85:13,16,20

**track** 46:18,22 79:18,22 80:14

**tracked** 54:21,22,23

**tracking** 80:23

**tracks** 80:12

**train** 48:2,14 49:10 77:5

**trained** 40:3 47:2,25 72:19,21,22
92:8

**trainer** 41:6,15

**trainers** 59:9,11 78:21

**training** 8:22 11:12,14 13:25 14:2,6
19:6 21:11,22,23 22:20 27:24,25
28:2,5,10,21 30:3 33:7,10 35:19
36:12 37:19 38:22 39:3,6,8,11,16,19,
22,24 40:1,2,9,13,17,19,24 41:3,9
42:4,5,9,10,22 43:10,21 44:18 45:4,
10 46:4,13,19,22,25 47:5,10,11,12,
13,24 48:3,7,9,13,17 49:3,5,7,9,12,
23,24,25 50:1,2,7,8,14,17,23 51:5,7,
22 52:6,8,10,13,15 53:2,3,4,7,11,20,
24 54:5,8,12,15,19,21 55:2,3,8,14,15,
16,19,22,24,25 56:13,14,22 57:4,8,
12,18,21,23 58:11,14 61:14,16,20,21,
24 62:17,21 63:4,21,23,25 64:1,5,6,
16 65:13,17,19,24 66:2,4 67:4,13,16
68:2 69:1,5,15,18,25 70:8,9,12,15,19,
20,24 71:1,10,13,14,19,22,25 72:3,6,
12,15,18,20 73:5,18,22 74:16,19
76:7,16 77:4,9,19 78:8,13 79:13,15,
19,22,23,24 80:4,6,8,9,12,16,17,20,
24 81:4,7,9,17,21 82:3,5,9,16,17
83:16,22,24 84:3,11,17,22 85:2,9,12,
24 86:4,8,9,12,20 87:3,7,9,13,17
88:3,8,13 89:1,2,5,7,13,16,21 90:4,24
91:10,14,18 92:1,4,9 93:2,8,19,22
94:2,4,11,15,20,21 95:1

**trainings** 58:10

**transcripts** 17:19

**trash** 32:14

**truthfully** 6:7,10

**Tuesday** 1:20

**turn** 8:9 9:2,24 11:1 18:23 22:2 24:5
29:16,19 32:2,4,23,24 33:14 35:17
36:23 37:10 59:13,21,22 65:9

**turned** 32:9,10

**two-and-a-half** 14:21,22 17:15
39:17

**two-year** 48:20 63:24

**twofold** 54:24

**type** 72:18 85:5 87:17

**types** 14:14 49:24

**typically** 92:11

#### U

**U.S.** 2:10

**Uh-hm** 11:16 25:14 32:3 47:4 67:23

**Uhm** 50:9

**understand** 6:6 7:20 15:10 43:23
44:3 47:23 50:5 55:7 60:16 70:6
88:11 90:10,14

**understanding** 42:6,16 43:1,20
44:24 63:11,24 64:6,11 70:11 74:7
78:14 85:16

**United** 1:1,3 2:2,4,10 4:12,14 18:13

**urinating** 32:11

**US015165** 25:16

**US015168** 25:17

#### V

**Vague** 50:25 57:25 93:3

**Val** 55:16,21

**varied** 40:5

**version** 68:6,7,9

**versus** 79:23

**VII** 43:3 46:7 48:10 50:10 53:16,23
54:4

**vital** 61:7

#### W

**wait** 15:4,5 23:15

**wanda** 1:16,19 3:4 4:1,18 8:21

**wanted** 55:7

**Washington** 2:6

**water** 32:9

**wavelength** 75:11

**week** 26:23

**weeks** 12:2,3,7,10

**West** 52:20

**whichever** 89:24 92:10

**witnesses** 7:11

**women's** 32:10,11,13,14 33:18

**Woodlands** 2:24

**words** 5:16

**work** 43:25 44:7,11 87:13,15 93:11
94:16

**worked** 41:6

**workplace** 37:20 56:4

**works** 58:19

**Wow** 13:16

**written** 33:18 87:23

**wrong** 76:20

**Wyatt** 2:10 4:11

#### Y

**year** 52:14,22

**years** 13:17,21 14:8,9 28:16,18
39:17 44:19 46:14 57:10,18

**yesterday** 6:15 7:2 19:12,20 30:19
35:25 66:15

#### Z

**ZIP** 4:20

