# EXHIBIT S

# Deposition of Michelle McLeod

Page 1

```
 1          UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF TEXAS
 2                HOUSTON DIVISION
 3
    UNITED STATES OF AMERICA,    ) Civil Action
 4      Plaintiff,        ) No. 4:18-CV-00644
                          )
 5  vs.                   )
                          )
 6  CITY OF HOUSTON,      )
      Defendant.          )
 7  _____)
 8  JANE DRAYCOTT AND PAULA    )
      KEYES,              )
 9     Plaintiff-Intervenors,  )
                          )
10  vs.                   )
                          )
11  CITY OF HOUSTON,      )
        Defendant.        )
12
13  ****************************************************
14  FED. R. CIV. P.30(B)(6) DEPOSITION OF CITY OF HOUSTON
15       (FIRE MARSHAL MICHELLE McLEOD)
16           August 15, 2019
17  ****************************************************
18     FED. R. CIV. P.30(B)(6) DEPOSITION OF CITY OF HOUSTON
    (FIRE MARSHAL MICHELLE McLEOD), produced as a witness at
19  the instance of the Plaintiff and duly sworn, was taken in
    the above-styled and numbered cause on Thursday, August
20  15, 2019, from 2:33 p.m. to 4:46 p.m., before JAMES M.
    PLAIR, Certified Shorthand Reporter in and for the State
21  of Texas, reported by computerized stenotype machine at
    the CITY OF HOUSTON LEGAL DEPARTMENT, 900 Bagby, Third
22  Floor, Houston, Texas 77002, pursuant to the Federal Rules
    of Civil Procedure and the provisions stated on the record
23  or attached hereto.
24  Job No. 408841
25
```

Page 2

```
 1           APPEARANCES
 2
    REPRESENTING PLAINTIFF UNITED STATES OF AMERICA:
 3
    Mr. Jeremy P. Monteiro
 4  Mr. Hector F. Ruiz
    UNITED STATES DEPARTMENT OF JUSTICE
 5  EMPLOYMENT LITIGATION - CIVIL RIGHTS DIVISION
    950 Pennsylvania Avenue, N.W.
 6  Washington, D.C. 20530-0001
    202.616.9100 Telephone
 7  202.514.1005 Fax
    Jeremy.Monteiro@usdoj.gov Email
 8  Hector.Ruiz@usdoj.gov Email
 9      and
10  Ms. Elizabeth F. Karpati
    UNITED STATES DEPARTMENT OF JUSTICE - U.S. ATTORNEY'S
11  OFFICE
    1000 Louisiana Street, Suite 2300
12  Houston, Texas 77002
    713.567.9767 Telephone
13  Elizabeth.Karpati@usdoj.gov Email
14
    REPRESENTING DEFENDANT CITY OF HOUSTON:
15
    Ms. Deidra N. Sullivan
16  CITY OF HOUSTON LEGAL DEPARTMENT
    900 Bagby Street, Third Floor
17  Houston, Texas 77002-2527
    832.393.6457 Telephone
18  832.393.6259 Fax
    Deidra.Sullivan@houstontx.gov Email
19
20  REPRESENTING PLAINTIFFS-INTERVENORS JANE DRAYCOTT AND
    PAULA KEYES:
21
    Mr. S. Nasim Ahmad
22  Mr. Dwain Gregory Capodice II
    AHMAD & CAPODICE, P.L.L.C.
23  24900 Pitkin Road, Suite 300
    The Woodlands, Texas 77386
24  832.767.3207 Telephone
    NAhmad@cline-ahmad.com Email
25
```

Page 3

```
 1                 INDEX
 2                            PAGE
 3
 4  TESTIMONY OF FIRE MARSHAL MICHELLE McLEOD
 5  Examination by Mr. Monteiro             8
 6  Examination by Mr. Capodice            66
 7  Examination by Ms. Sullivan            72
 8  Further Examination by: Mr. Monteiro   75
 9  Further Examination by: Mr. Capodice   77
10  Changes and Signature                  78
11  Reporter's Certificate                 80
12
13
14
15              EXHIBITS
16
17           (None offered)
18
19
20
21
22
23
24
25
```

Page 4

```
 1        MR. MONTEIRO:  Good afternoon, Chief
 2  McLeod.
 3        THE WITNESS:  Good afternoon.
 4        MR. MONTEIRO:  How are you, today?
 5        THE WITNESS:  I'm well.  Thank you.
 6        MR. MONTEIRO:  Good.
 7        I'm just going to take care of one
 8  housekeeping matter, which probably doesn't pertain to
 9  you, before we begin.
10        So with respect to topic 4(a) on Exhibit 2,
11  Deposition Exhibit 2, which states:  "Defendant's decision
12  to assess the effectiveness of HFD's policies, practices
13  and training related to workplace harassment and
14  discrimination," does the City have a witness?  Is the
15  City offering a witness on this topic?
16        MS. SULLIVAN:  No, to the extent that it
17  would be seeking attorney-client or work product
18  privilege.
19        MR. MONTEIRO:  Okay.  So just to kind of
20  ferret out the nature of that objection, I'm going to
21  proffer a handful of questions, and if you can let us --
22  let me know whether the City will -- can present someone
23  on that or will maintain its objection.
24        MS. SULLIVAN:  And so present someone to
25  say that it was out of conversations --
```

Page 5

1         MR. MONTEIRO:  No.

2         MS. SULLIVAN:  -- with --

3         MR. MONTEIRO:  No.  Whether the City would

4   permit a witness to answer my question or assert a

5   privilege.

6         MS. SULLIVAN:  Okay.

7         MR. MONTEIRO:  All right.

8         So why did the City decide to assess the

9   effectiveness of the HFD's policies, practices and

10   training related to workplace harassment and

11   discrimination in 2009?

12         MS. SULLIVAN:  Based on the information

13   available to me at that time, my understanding was that

14   that was based on communications with the City Attorney at

15   that time.  So are you --

16         MR. MONTEIRO:  So you would not permit a

17   witness to answer that question based on privilege.  Is

18   that correct?

19         MS. SULLIVAN:  That -- that would be my

20   understanding of that, yes.

21         MR. MONTEIRO:  Well, I mean --

22         MS. SULLIVAN:  That's --

23         MR. MONTEIRO:  -- is that your objection?

24         MS. SULLIVAN:  Yes --

25         MR. MONTEIRO:  Okay.  Thank you.

Page 6

1         MS. SULLIVAN:  -- that would be my

2   objection.

3         MR. MONTEIRO:  Was the assessment requested

4   as part of the City's response to any of the events that

5   occurred at Station 54 in 2009?

6         MS. SULLIVAN:  I don't have any information

7   that would suggest that, but I could -- Uhm, I potentially

8   could present somebody to answer that question.

9         MR. MONTEIRO:  So you will not claim that

10   that was privileged?

11         MS. SULLIVAN:  No.

12         MR. MONTEIRO:  You wouldn't assert

13   privilege on that?

14         MS. SULLIVAN:  No.

15         MR. MONTEIRO:  Was the assessment requested

16   as part of the City's remedial action as a result of any

17   of the events that occurred at Station 54 in 2009?

18         MS. SULLIVAN:  I could -- I could present

19   somebody.

20         You know what?  I -- I think, now that I

21   know what you're asking, I think I can present somebody

22   to -- to answer those questions.

23         MR. MONTEIRO:  Was the City -- Was the

24   assessment requested as part of the City's corrective

25   action as a result of any of the events that occurred at

Page 7

1   Station 54 in 2009?

2         MS. SULLIVAN:  I can present somebody that

3   can answer that question.

4         MR. MONTEIRO:  Was the assessment requested

5   in response to Ms. Draycott's complaints regarding the

6   events that occurred at Station 54 in 2009?

7         MS. SULLIVAN:  I can present somebody that

8   can answer that question.

9         MR. MONTEIRO:  And was the assessment

10   requested an attempt to prevent the reoccurrence of any of

11   the events complained about by Ms. Draycott or Ms. Keyes

12   at Station 54 in 2009?

13         MS. SULLIVAN:  I can present somebody that

14   can answer that question.

15         MR. MONTEIRO:  Okay.

16         MS. SULLIVAN:  Okay.

17         MR. MONTEIRO:  Thank you for the

18   clarification.

19         MS. SULLIVAN:  Yes.

20         MR. MONTEIRO:  We'll have to confer

21   further, then, when we do that.

22         MS. SULLIVAN:  Okay.

23         MR. MONTEIRO:  I assume Chief McLeod is not

24   the person that -- is not prepared to answer those

25   questions today.

Page 8

1         MS. SULLIVAN:  No, not today.  I have not

2   put anything in front of her that would help you.

3         MR. MONTEIRO:  Fair enough.  Okay.

4         FIRE MARSHAL MICHELLE McLEOD,

5   having first been duly sworn, was examined and testified

6   as follows:

7               EXAMINATION

8   BY MR. MONTEIRO:

9   Q.  Chief, my name is Jeremy Monteiro.  I'm an

10   attorney with the Department of Justice and I'm going to

11   be taking your deposition today.

12   **A.  Okay.**

13   Q.  Have you had your deposition taken before?

14   **A.  I have.**

15   Q.  Okay.

16   **A.  In re- -- Not in regard to this.**

17   Q.  Understood.

18         Just when was the last -- when was the last

19   time you were deposed?

20   **A.  Approximately three years ago.**

21   Q.  Okay.  I'm just going to go over the ground

22   rules for the deposition, just so you will understand how

23   we'll proceed today.  Is that okay?

24   **A.  Okay.**

25   Q.  If you don't understand any of my questions,



Page 9

1  please state so and I'll my best to rephrase them.  Is
2  that okay?
3  **A.   That is okay.**
4      Q.   And if you don't hear my question, let me know
5  and I'll also restate my question or have the court
6  reporter read it back to you.
7  **A.   Okay.**
8      Q.   To -- The court reporter's taking everything
9  down that you say and I say.  So in order to ensure a
10  clean transcript, you need to make sure to respond with --
11  You need to make sure to wait to respond to my question
12  until I'm finished.
13  **A.   Okay.**
14      Q.   Is that okay?
15  **A.   Yes.**
16      Q.   And I will do the same for you and do my best
17  not to cut you off.
18  **A.   Okay.**
19      Q.   If you need a break -- I don't expect us to be
20  here very long, but if you need a break, please let me
21  know and we'll do our best to accommodate you.
22  **A.   Okay.**
23      Q.   The only caveat I will give is that, if there is
24  a question pending, I'll ask that you an answer the
25  question before we take our break.

Page 10

1  **A.   Okay.**
2      Q.   And, unless the City's attorney instructs you
3  not to answer a question, please answer all my questions
4  today.  Is that okay?
5  **A.   Yes.**
6      Q.   You're under oath.  Do you understand what
7  testifying truthfully means?
8  **A.   Yes.**
9      Q.   And is there any reason that prevents you from
10  testifying fully and truthfully today?
11  **A.   No.**
12      Q.   Okay.  Now, you understand that -- Let me step
13  back for a minute.
14          Can you give me your business address?
15  **A.   1801 Smith Street, Seventh Floor, Houston,**
16  **Texas.**
17      Q.   The ZIP code?
18  **A.   77002.**
19      Q.   Thank you.
20          Do you understand that you have been
21  designated as the City as its representative to answer
22  certain questions on behalf of the City for this
23  litigation?
24  **A.   Yes.**
25      Q.   And you have agreed to be the City's

Page 11

1  representative for purposes of this deposition?
2  **A.   Yes.**
3      Q.   As part of your role as being the City's
4  representative, did you spend time preparing for this
5  deposition?
6  **A.   Yes.**
7      Q.   How long did you spend preparing for this
8  deposition?
9  **A.   Approximately three hours.**
10      Q.   And can you tell me what you -- everything you
11  did to prepare for your deposition today?
12  **A.   Reviewed the Thompson Horton assessment and the**
13  **Excel spreadsheet, with the responses.**
14      Q.   And --
15  **A.   And --**
16      Q.   I'm sorry.  Go ahead.
17  **A.   And also pulled a couple of other documents that**
18  **were related.**
19      Q.   Can you identify what those document are,
20  sitting here today?
21  **A.   One was a manual that we presented in our**
22  **newly-promoted officers training with HR; that's where the**
23  **Captains, Senior Captains and the District Chiefs that**
24  **were newly-promoted.**
25      Q.   What is the manual?  What does it contain?

Page 12

1  **A.   It has 1-50, the Mayor's Executive Order 1-50;**
2  **1-39, the Office of Inspector General; 1-18, I believe**
3  **that's the social media policy; the complaint guideline,**
4  **the -- like, where to file a complaint and the designated**
5  **department reps contact numbers, EEOC contact numbers, and**
6  **Office of Inspector General contact.**
7      Q.   So are these basically -- Is it basically like a
8  training manual?
9  **A.   It's a training manual because it has the**
10  **scenarios in it as well, complaint flowchart.  So it's**
11  **what we gave to them to take with them, and a copy of the**
12  **PowerPoint that we presented.**
13      Q.   And is this a specific version of that manual?
14  Is it a current version?  Is it a version that was
15  presented years ago?  Do you know?
16  **A.   It's changed over time.  We changed out the --**
17  **I'm not doing -- I'm not in that office anymore, but when**
18  **we were or were presenting the classes Wanda Andrews, who**
19  **was in HR, we would change out the scenarios, update them**
20  **based on current allegations that we felt needed to be**
21  **addressed.  If a guideline or rules and regs were updated,**
22  **we changed -- changed that portion out.**
23      Q.   And the version that you reviewed was from when?
24  **A.   I don't know.  I just pulled one just to see**
25  **what all was -- remind myself what was in it.**

LEXITAS

Page 13

1    MS. SULLIVAN:  We're actually making the
2  copies now.  She brought it, so I'll hand it to you.
3    MR. MONTEIRO:  Okay.
4    MS. SULLIVAN:  They're bringing it in.
5    MR. MONTEIRO:  Do you know if it's been
6  produced in discovery, prior to today?
7    MS. SULLIVAN:  She has given me a lot of
8  stuff.  Do you --
9    **THE WITNESS:  I don't think you have that.**
10    MS. SULLIVAN:  Okay.
11    MR. MONTEIRO:  Okay.  Thank you.
12   Q.  (BY MR. MONTEIRO) Okay.  So you identified the
13  man- -- Excuse me.  You identified the training manual
14  that was provided to newly-promoted officers.
15    Were there any other documents that you
16  reviewed in preparation for your deposition today?
17   **A.  I looked at some of my old emails to try to get**
18  **a timeline kind of in my head as far as when -- when**
19  **things occurred.**
20   Q.  And when you say "when things occurred", what
21  are you referring to?  What were you trying to figure out?
22   **A.  Well, like, when our newly-promoted officer**
23  **training started, because when we first started, the**
24  **Office of Professional Standards, which we call Staff**
25  **Services, I had a slot for the newly-promoted officers for**

Page 14

1  an hour and Wanda Andrews had a slot for HR for an hour,
2  **and we had back-to-back, the -- my class asked questions**
3  **that fell in her area, so anyway, we combined efforts**
4  **because there was such crossover and increased the class**
5  **by an hour.**
6    **So part of the timeline was to see when we**
7  **actually started the classes, teaching the classes when we**
8  **combined efforts, things of that nature.**
9   Q.  And were you able to determine when the Fire
10  Department instituted newly-promoted officer training?
11   **A.  They had been doing that prior, already, but the**
12  **end of 2013 is when Wanda and I combined efforts.**
13   Q.  That's when you began or were you doing it
14  before then?
15   **A.  We each did a class separate, prior to that, but**
16  **that was also, I believe, sooner, in 2013.**
17   Q.  And what were the -- What was the history in
18  terms of newly-promoted officer training prior to when you
19  started in 2013?
20   **A.  My understanding, it was more geared toward**
21  **tactical and what paperwork the new officer would be**
22  **responsible for, and sometime even prior to Wanda and I,**
23  **when they had added the presentation from the**
24  **psychologist, and I believe Wanda was already teaching a**
25  **segment, and then my segment was the piece that was added**

Page 15

1  **in '13.**
2   Q.  And I'm sorry.  What was your segment
3  represented?
4   **A.  Staff Services Procedures.**
5   Q.  So that relates to the complaint policy.  Is
6  that right?
7   **A.  Uh-hm, complaints, grievances, how to handle a**
8  **complaint, how to document.**
9   Q.  So when you started in 2013, you -- you began
10  offering training on the complaint policy during the --
11   **A.  Right, and then --**
12   Q.  -- newly-promoted officer training?
13   **A.  -- that evolved into how to address the**
14  **complaint.**
15    MS. SULLIVAN:  Let him finish his question.
16    **THE WITNESS:  Oh, I'm sorry.**
17    MR. MONTEIRO:  That's okay.
18    MS. SULLIVAN:  Because he can't type both
19  of you talking at the same time.
20   Q.  (BY MR. MONTEIRO) And, prior to your
21  involvement, is it your understanding that there was no
22  training on the complaint policy as part of the
23  newly-promoted officer training?
24   **A.  I would be unaware of that.**
25   Q.  Because I thought you said we -- They added it

Page 16

1  when you began.
2   **A.  They added my piece.**
3    **I don't know if somebody before -- So I**
4  **went to Staff Services December of 2010, so from December**
5  **of 2010 to 2013, I didn't present anything on the**
6  **complaint process. I don't know if it was presented by**
7  **someone else or not.**
8   Q.  Okay.  Okay.  And we started that topic by
9  looking at all the emails that you reviewed.
10    Were there any other documents that you
11  reviewed as part of your preparation?
12   **A.  That was -- that was mostly it.**
13   Q.  Did you speak with anyone within the Fire
14  Department, in preparation -- to prepare for your
15  deposition?
16   **A.  I asked Wanda for a copy of the -- the manual.**
17   Q.  Anyone -- any other conversations with anyone
18  within the Fire Department?
19   **A.  No.**
20   Q.  Did you speak with any anyone about their
21  depositions in this case to prepare for your deposition
22  today?
23   **A.  I did not.  The only conversation I knew, that**
24  **Alfredo Martinez had to testify and that was it.**
25   Q.  You spoke with Mr. Martinez?

Page 17

1    A.  Because, yeah, I was needing him for something.

2  He had to come over here to give his deposition.

3    Q.  What was the nature of your conversation with

4  him?

5    A.  That he was coming over and that was it.

6    Q.  That was all.  Okay.  All right.

7        Can you tell me what your current position

8  is with the Fire Department?

9    A.  Fire Marshal.

10   Q.  How long have you been the Fire Marshal?

11   A.  Since July of 2017.

12   Q.  And what are your duties and responsibilities as

13  the Fire Department --

14   A.  I --

15   Q.  -- I'm sorry -- as the Fire Marshal?

16   A.  -- oversee inspections and arson investigations.

17   Q.  Do you have staff, a staff?

18   A.  I do.

19   Q.  How large is your staff?

20   A.  There are about 127 inspectors.  That includes

21  the Deputy Chief, the Chief Inspectors and seniors in

22  inspector rank, and on the Arson side, there is 70 Arson

23  Investigators, but -- let's see, seven -- about ten of

24  them are assigned to the Office of Professional Standards.

25  So chief Martinez oversees those.

Page 18

1    Q.  And what was your -- Did you hold a position

2  with the Fire Department prior to becoming Fire Marshal in

3  July 2017?

4    A.  Hold what position?

5    Q.  Did you hold a position with the Fire Department

6  prior to July of 2017?

7    A.  Yes.  I was in -- over Staff Services.

8    Q.  What was your title?

9    A.  Assistant Chief.

10   Q.  And what period of time were you Assistant Chief

11  of Staff Services?

12   A.  December 2010 until July 2017.

13   Q.  And what were your duties and responsibilities

14  as Assistant Chief for Staff Services?

15   A.  To oversee complaint investigations, grievances,

16  mediation, conflict resolution, strategic plan and

17  accreditation.

18   Q.  I'm sorry.  What was the last part?

19   A.  And accreditation.

20   Q.  Thank you.

21        Is -- During that time period, did Staff

22  Services have investigators on staff?

23   A.  We did.

24   Q.  And what sorts of -- what -- Did the

25  investigators investigate complaints?

Page 19

1    A.  Correct.

2    Q.  What kind of complaints did this -- did Staff

3  Services have investigatory authority over?

4    A.  So in July or August of 2010, the old Office of

5  Inspector General was dissolved and moved directly under

6  the Mayor's Office, and those investigators that were off

7  of Riesner -- I don't know what their area was called at

8  the time -- they would do criminal, things involving

9  criminal complaints or criminal allegations, and more

10  serious complaints would go -- go through them, and then

11  Staff Services only took the non-criminal or low-level

12  complaints.

13        Once the Office of Inspector General was

14  moved under the Mayor, those investigators came to Staff

15  Services and they investigate -- investigate and still do

16  all complaints other than -- than those involving

17  discrimination, retaliation and harassment, because those

18  go to the Inspector General; and then the lower-level,

19  first-time offenders on AWOLs, rudeness, things of that

20  nature, those will get distributed to the Field

21  Investigators, which are the District Chiefs, so they --

22  they do all others.

23   Q.  Can Staff -- can Staff Services receive a

24  complaint of discrimination?

25   A.  We can receive it, and if it's anything even

Page 20

1  remotely or even if we're unsure but appears to be

2  retaliated to discrimination, harassment, retaliation, we

3  would send it to the Inspector General, who would review

4  it and determine if they should investigate it or send it

5  back to our group.

6    Q.  Okay.

7        And prior to being the Assistant Chief for

8  Staff Services, did you hold a position with HFD?

9    A.  I did.  I was in Arson, as a Chief Investigator.

10   Q.  And how long were you Chief Investigator of

11  Arson?

12   A.  I'm not sure.  I think it was 2008, until the

13  time that I was promoted to Assistant Chief.

14   Q.  Approximately 2010?

15   A.  Correct.

16   Q.  So I'm going to show you what's been marked as

17  Exhibit 2, and I'm going to represent to you that this is

18  the City's response and designations to the United States

19  30(b)(6) deposition notice.

20        Have you seen Exhibit 2 before?

21   A.  I have.

22   Q.  I want to direct you to Page 18, and it's a

23  double-sided document, and under topic 4, there are

24  several subtopics which all relate to kind of the City's

25  response to the Thompson & Horton report, which you



Page 21

1 mentioned earlier.
2   **A.  Okay.**
3   Q.  If we look at subtopic (b), it says:
4 "Defendant's policies, procedures and practices for the
5 review of the assessment," the assessment being the
6 Thompson & Horton --
7   **A.  Horton.**
8   Q.  -- report, and you understand that the City's
9 designated you in response to -- or to testify about that
10 subtopic?
11  **A.  Yes.**
12  Q.  Okay.  And subtopic (c) is:  "Defendant's
13 efforts to review the assessment," and, again, you
14 understand the City has designated you to testify
15 regarding that topic?
16  **A.  Yes.**
17  Q.  Topic (e) -- subtopic (e) is:  "Defendant's
18 efforts to review, revise or modify HFD's policies or
19 procedures in response to the assessment."
20      Again, you understand you have been
21 designated to testify regarding that subtopic?
22  **A.  Yes.**
23  Q.  And then subtopic (f) is:  "Defendant's efforts
24 to implement the recommendations identified in the
25 assessment," and the City -- you understand the City's

Page 22

1 identified yourself, as well as Wanda Andrews, to offer
2 testimony on that topic.  Is that correct?
3   **A.  Yes.**
4   Q.  Okay.  And, just so you know, we -- Wanda
5 Andrews was deposed on Tuesday and handled some of our
6 questions, but I will likely have some questions on that
7 subtopic for you as well.
8   **A.  Okay.**
9   Q.  Directing your attention to topic 5, which is
10 the HFD complaint policy dissemination and training, there
11 is a subtopic (a), which relates to the 2005 version of
12 the HFD's complaint policy.
13      The City had previously designated Wanda
14 Andrews with respect to training on that policy and there
15 were some questions that I believe she said that you may
16 be able to answer.
17      So I -- I'm -- and I think the City agreed
18 to present you on -- on that topic.
19  **A.  On that one, the only thing I'm aware of would**
20 **be what was listed on the Thompson Horton spreadsheet**
21 **response --**
22  Q.  Okay.
23  **A.  -- which the initial portion was completed by**
24 **Chief Snell and that -- I think it said 2009 training was**
25 **conducted on the complaint policy.**

Page 23

1   Q.  Okay.
2       And then how about subtopic (b)?  Do you
3 have information -- Without getting into the specifics, do
4 you -- Are you -- are you able to testify as the City's
5 representative regarding the Defendant's training and
6 implementation of the 2018 version of the HFD's complaint
7 policy?
8   **A.  That would be Chief Martinez.**
9   Q.  Okay.  You're not able to answer questions on
10 that?
11  **A.  No, sir.**
12  Q.  Do you have any personal knowledge gained
13 through your employment on any of these subtopics?
14  **A.  On which section?**
15  Q.  Well, let's talk about --
16  **A.  All of them?**
17  Q.  -- the Thompson & Horton report.
18      Did you have any involvement in your
19 employment with respect to the Thompson & Horton report?
20  **A.  Yes, and I believe it was the end of 2011.**
21 **Chief Garrison had a Command Staff meeting where he**
22 **directed each one of us to review the Thompson Horton**
23 **assessment and review the spreadsheet and the management's**
24 **response so far.  He wanted to take what was presented**
25 **and further evaluate what else has been done and what else**

Page 24

1 **we could do.**
2   Q.  And that's Fire Chief Garrison?
3   **A.  Yes, sir.**
4   Q.  Okay.  So that -- And is that the first time in,
5 approximately, the end of 2011 that you became involved
6 with any sort of response or review of the Thompson &
7 Horton report?
8   **A.  Yes.**
9   Q.  Are you aware of any efforts prior to the end of
10 2011?
11  **A.  To assess it, I wouldn't know because they --**
12 **they released the findings, or the Thompson Horton report**
13 **was published before I was appointed to the Command Staff**
14 **and we were receiving training and I assume that was in**
15 **response to the assessment.**
16  Q.  And the spreadsheet that you have referenced,
17 this -- did the spreadsheet represent the City's efforts
18 from when the assessment was released through the end of
19 2011?
20  **A.  Correct.**
21  Q.  Okay.  So everything the City had done between
22 the release of the assessment through when you had this
23 meeting at the end of 2011 was reflected on the
24 spreadsheet?
25  **A.  I don't know if everything was there, but the**



Page 25

1  items that were listed, like, the LegalWATCH training,

2  some of -- some of what they said had taken place, I had

3  participated in.

4      Q.   And then in terms of subtopic (b) -- or I'm

5  sorry -- excuse me -- it's been a long week -- subtopic 5,

6  topic 5, have you had any involvement in the training

7  related to the HFD complaint policy?

8      A.   We revised -- When I was in Staff Services, we

9  revised the complaint policy and that gets shipped out as

10  a guideline.

11     Q.   And can -- can I just ask a follow-up question

12  on that?

13     A.   Sure.

14     Q.   When -- What version of that did you revise, if

15  you know?

16     A.   I don't remember the year.  I'm guessing around

17  2012 or when we revised the rules and regs and maybe the

18  2013.

19     Q.   Okay.  And I'm sorry.

20          Did I cut you off from something else you

21  were going to say earlier?

22     A.   No.  I was just trying to recall --

23     Q.   Okay.

24     A.   -- the time period.

25     Q.   Any other involvement with training with respect

Page 26

1  to the complaint policy --

2      A.   I --

3      Q.   -- personal involvement?

4      A.   During the NPO class, we reviewed the complaint

5  policy, how to file a complaint, and then it would refocus

6  on how to prevent the complaint from happening in the

7  first place.

8      Q.   And there was -- Your participation with that, I

9  think you said earlier, began in --

10     A.   2013.

11     Q.   -- late 2013?

12     A.   Yes.

13     Q.   Any other involvement with the complaint

14  training, with respect to the complaint policy, other than

15  what you have told us?

16     A.   That's all I can recall right now.

17     Q.   Okay.  Let me show you Exhibit 13.  I'm showing

18  you what's been previously marked as Deposition

19  Exhibit 13.  For identification purposes, it is -- It has

20  the Bates numbers of HOU2257 through 2318.

21          Have you seen this document before?

22     A.   Yes, I have.

23     Q.   What is it?

24     A.   It's the Thompson Horton assessment.

25     Q.   And is this the --

Page 27

1      A.   It's the summary, plus the actual -- the actual

2  assessment document.

3      Q.   And is this the document that you -- you

4  reviewed in preparation for your deposition today?

5      A.   Yes.

6      Q.   All right.  So topic 4(b) is Defendant's

7  policies, procedures and practices for review of the

8  assessment.

9          Did the City have any specific policy in

10  place by which it handled the review of the assessment?

11     A.   I don't know if they had a specific policy in

12  place.  My directive came from Chief Garrison.

13     Q.   In 2011?

14     A.   Correct.

15     Q.   Okay.  Are you aware of any efforts to review

16  the assessment prior to 2011?

17     A.   Only due to the spreadsheet being completed.

18     Q.   And when did you first see the spreadsheet?

19     A.   In -- I believe 2011 was the first time I saw

20  it.

21     Q.   Do you know who prepared this spreadsheet?

22     A.   I was told Chief Snell prepared the spreadsheet.

23     Q.   The efforts that you began in -- at the end of

24  2011, after the Command Staff meeting, can you kind of

25  describe what you all did to -- it sounds like continued

Page 28

1  the review of the assessment?

2      A.   Mainly, Chief Garrison wanted us to document our

3  efforts.

4          When we were first promoted on the Command

5  Staff, he was -- had already directed -- Like, for myself,

6  he wanted to establish the expectations for the

7  membership, train to those expectations, monitor

8  performance and hold people accountable, and he had

9  directed me to make sure it was in a fair and consistent

10  manner.

11          He had addressed confidentiality.  Prior --

12  I guess when I took over, it was all peace officers,

13  trained investigators that were in the office.  Prior to

14  that, it would be a Captain from Suppression or a Senior

15  Captain or such, and they had a previous practice of, if

16  they did an investigation, the respondent got all the

17  witness statements and pretty much the case file, and as a

18  trained investigator, that -- that wasn't something I was

19  familiar with; so we stopped that.

20          One, it was creating retaliation complaints

21  because people would get mad that somebody witnessed --

22  provided a negative witness statement against the

23  respondent.

24     Q.   And I'm sorry.  Just to ask a follow-up

25  question, the ending of that process, was that related to

LEXITAS

Page 29

1  your efforts to implement the Thompson & Horton report?
2      A.  That was not related because I hadn't really
3  reviewed the Thompson Horton in great detail.
4      Q.  Okay.
5      A.  That was based on Chief Garrison's directive.
6          I don't know what motivated his directive
7  on confidentiality and the consistent and fair practice,
8  other than that's the right way to do it.
9      Q.  And what was Chief Garrison's directive?
10     A.  To ensure fair and consistent investigations and
11 to keep the information confidential.
12     Q.  And he ended the practice of sharing the --
13     A.  All the witness --
14     Q.  -- sharing witness statements with the target of
15 the investigation?
16     A.  Correct.
17     Q.  And was that documented in any way?
18     A.  I may have put it in the Thompson Horton
19 spreadsheet, but as far as a -- a policy, that was not.
20     Q.  You mentioned that -- you mentioned earlier that
21 you were -- you weren't familiar with that practice when
22 you first came on?  You were a trained investigator and
23 you weren't familiar with that practice?  What do you mean
24 by that?
25     A.  As a -- In a criminal investigation, we would

Page 30

1  never give an arsonist all the witness statements against
2  him.
3      Q.  And --
4      A.  So when I saw that --
5          MS. SULLIVAN:  Let him finish the question.
6          THE WITNESS:  Oh.
7      Q.  (BY MR. MONTEIRO) I'm sorry.  You were going to
8  say?
9      A.  So when I -- It didn't seem the proper way to do
10 an investigation.  So when I found out that the respondent
11 on non-criminal investigation was getting all the witness
12 statements, that's the practice that I cut out, by
13 Government Code, they get a copy of the complaint and
14 that's -- that's the only requirement.
15     Q.  Okay.  So that applies -- you mentioned Arson,
16 but that applies to non-criminal and criminal?
17     A.  We applied it across the board.
18     Q.  Across the board, to all -- all of the units
19 that are investigating complaints?
20     A.  All of the investigators in Staff Services.
21     Q.  Okay.  And -- and why did you feel that practice
22 was improper or inappropriate?
23     A.  It was --
24         MS. SULLIVAN:  Objection.  It calls for
25 proper opinion, but go ahead and answer.

Page 31

1      A.  It was difficult to get a clean witness
2  statement, especially if the complaint was against the
3  Captain.  So, in essence, I was asking the firefighter to
4  report in a witness statement any bad behavior that the
5  Captain may have displayed.
6      Q.  (BY MR. MONTEIRO) And the current practice, I
7  think you said, is to provide the complaint --
8  complainant's statement?
9      A.  Correct.  So if you're the respondent --
10     Q.  Right.
11     A.  -- you're entitled to a copy of the complaint
12 against you.
13     Q.  Okay.  Anything else?
14     A.  48-hour notice, 30-day letters, procedural
15 items.
16     Q.  And that's a change in the City's practice, as
17 opposed to a change in the law.  Is that correct?
18         MS. SULLIVAN:  Objection.  Vague.
19         Go ahead and answer it.
20     A.  Yes, if I understand your question.
21     Q.  (BY MR. MONTEIRO) Okay.
22         There was -- You changed that practice --
23 you changed that practice in response to concerns you had
24 about the practice.  Correct?
25     A.  Yes.

Page 32

1      Q.  Okay.  You didn't change the practice as a
2  result of a change in what state law requires you to
3  provide to a witness.  Is that correct?
4      A.  Right.  It was -- There was no change in state
5  law.
6      Q.  Okay.  Thank you.  All right.
7          So what steps did -- did the City take to
8  review the Thompson Horton assessment after your -- the
9  Command Staff meeting at the end of 2011?
10     A.  Each Command Staff member was directed to
11 document what they had done, what each person had done to
12 address the recommendations and the findings on the
13 assessment.
14     Q.  And were you looking -- were you looking -- were
15 you looking back in time to what had already been done or
16 were you looking prospectively, documenting prospectively
17 what had been done?
18     A.  I looked back in time from the point that I was
19 appointed, and then moving forward, some of the immediate
20 plans.
21     Q.  Okay.  And were those efforts documented?
22     A.  Right.
23         Each of us were supposed to put what we've
24 done or planned to do to address the concerns in the
25 assessment and put it on the spreadsheet and it was



Page 33

1  funneled to Pat O'Gilvey, who was administrative assistant
2  to Chief Garrison.
3      Q.   So was this -- When -- Was the spreadsheet
4  already created when you started working on it?
5      A.   Yes.
6      Q.   Okay.  And you were -- Were you supplementing,
7  adding supplemental information?
8      A.   Yes.
9      Q.   And the information you were providing was on
10 behalf of Staff Services?
11     A.   Yes.
12     Q.   Okay.  You have referenced Command Staff a
13 couple of times.
14          What do you -- Who do you mean by "Command
15 Staff"?
16     A.   Assistant Chiefs.
17     Q.   For each of the -- Is it departments, divisions?
18 What's the correct terminology?
19     A.   Divisions.  It was the Fire Chief, Executive
20 Assistant Fire Chief, as part of the Command Staff, and
21 then Assistant Fire Chief.
22     Q.   Okay.  If we could look at -- on Page 3 of the
23 report, which is Key Recommendations, and it runs from A
24 through L, a couple of pages.
25     A.   Okay.

Page 34

1      Q.   And you have been designated to testify in terms
2  of the City's efforts to implement the recommendations.
3          Can you identify which of these
4  recommendations you are prepared to testify on behalf of
5  the City about today?
6      A.   E and F, I have limited knowledge on; G, I have
7  some knowledge; J, I am not prepared to testify on; the
8  rest, I'm okay with.
9      Q.   Okay.  Thank you.
10         So let's focus -- find topic B, which it
11 says "Improve and Consolidate Policies".
12         As I understand it, the Thompson Horton
13 report made certain recommendations pertaining to revision
14 of the City and HFD's policies and procedures.  Is that
15 fair?
16     A.   Yes.
17     Q.   Okay.  And what did the City do to -- to improve
18 or consolidate its policies?
19     A.   Mayor Parker updated 1-20 as Executive Order,
20 and then later on she consolidated 1-8, 1-20, into 1-50.
21 They updated the Office of Inspector General 1-39, when it
22 was moved underneath the Mayor's Office.  Chief Garrison
23 directed us to update all of our policies, all of our
24 guidelines.
25         With regard to the rules and regs, there

Page 35

1  was inconsistencies even within the rules and regs
2  guideline, so -- and then that fell under my area.  So we
3  formed a committee -- by "committee", it was four of us --
4  to review the rules and regs, consolidate, eliminate
5  any -- any inconsistencies.  The consolidation case was
6  because it was long and some parts were confusing.
7          The corresponding Behavior Manual, which
8  listed the consequences for a rule violation, we revised
9  that and streamlined that.
10         So after our committee came out with what
11 we felt was a good product, then we met with labor
12 attorneys, Deidra being one of them, and another labor
13 attorney to go through and make sure it was consistent
14 with City policy.  We also added a clear rule, tying back
15 to workplace discrimination, harassment, retaliation, and
16 then discrimination based on sexual orientation to tie
17 back to 1-50 and 1-39.
18     Q.   And the last thing you mentioned, the clarifying
19 the rule on workplace discrimination and sexual
20 orientation discrimination, is that correct --
21     A.   Yes.
22     Q.   -- where was -- how was that modified or
23 where -- where was it modified?  Was that from the rules
24 and regulations?
25     A.   That's the HFD rules and regs.  It's 6.01 and

Page 36

1  6.02.
2      Q.   So those were modified?
3      A.   Yes, and I think they were in separate places
4  before, so we put it in one spot so it was clear that you
5  can't -- can't do that, you can't discriminate.
6      Q.   Okay.  You mentioned that the guidelines were
7  updated.  What do you mean by "guidelines"?
8      A.   So we have operational guidelines, like, how to
9  raise a ladder, things of that nature.  The other one, the
10 administrative guidelines, will be, like, a transfer
11 policy.
12         I'm trying to think of some of the other
13 ones off -- the rules and regs falls under that.  The
14 complaint guideline, leaves and absences, things of that
15 nature, are in the administrative portion.  So each
16 Assistant Chief that was over that particular area was
17 tasked with updating their guideline.
18     Q.   And who was on your committee?  You said there
19 were four people.  Right?
20     A.   Chief Stone, Ms. Terry Stone, Chief Kelvin
21 Reeves, Chief John Douglas.  His participation was limited
22 because he was still on the shift, so when he was on
23 shift, he would meet with us.  Chief Bryan Sky-Eagle
24 originally was going to help with that but ended up
25 updating our alternative dispute resolution guideline,



Page 37

1  mediation guideline.

2     Q.  Okay.  And I'm sorry.  What was the last

3  person's name?

4     A.  Bryan Sky-Eagle.  He ended up being -- working

5  on a different project, though.

6     Q.  Okay.

7        Were there any recommendations with respect

8  to improving or consolidating the policies that were not

9  implemented by the HFD?

10       MS. SULLIVAN:  Objection.  Confusing.

11       MR. MONTEIRO:  Let me re- -- Let me try to

12  rephrase it.

13    Q.  (BY MR. MONTEIRO) Did the City decline to

14  follow any of the recommendations in the Thompson & Horton

15  report related -- relating to improving or consolidating

16  its policies?

17    A.  Not that I'm aware of.

18    Q.  Okay.

19       And I think we touched on -- You may have

20  just touched on recommendation C a minute ago, where you

21  talked about some of the work you did on the Behavior

22  Manual?

23    A.  Yes.

24    Q.  So can you describe the City's efforts to

25  improve the HFD Behavior/Discipline Manual?

Page 38

1     A.  We -- I think it was about 60-something pages

2  when we started and there was a lot of information that

3  either conflicted with itself and the same policy or

4  conflicted with, like, the complaint guideline.

5        So we took out the stuff that was already

6  addressed in a different guideline, just to consolidate

7  it, just for -- to make it more clear and concise.

8        We -- Part of the information on training

9  to expectations and things of that nature, they created a

10  separate -- it's called the red book; it's an

11  accountability manual; and there was separate training on

12  that, like, if you are a Houston firefighter, these are

13  the expectations and this is how we expect you to behave

14  for self-accountability.

15    Q.  I'm sorry.  Just let me ask a question follow-up

16  question.  Is the red book contained within the Behavior

17  Manual?

18    A.  It is not.  It is now a separate document and

19  every firefighter was issued one, signed one, and was

20  given training on it.

21    Q.  And what did -- Remind -- Can you tell me what

22  was in -- what's in the red book?  What are the policies

23  and procedures?

24    A.  It's more geared toward our values --

25    Q.  Okay.

Page 39

1     A.  -- the Fire Department values.

2     Q.  So it doesn't contain -- Does it contain, like,

3  an antidiscrimination policy or something like that?

4     A.  It -- Not directly, but it's treating people

5  and -- it's how you treat people.

6     Q.  It may say, "Treat people fairly or equally"?

7     A.  Right.

8     Q.  As opposed to, "Don't discriminate against

9  someone based on their gender or race" --

10    A.  Correct --

11    Q.  -- or something like that?

12    A.  -- and I brought a copy of one.

13    Q.  Okay.  Great.  We'll take a look at that at a

14  break.

15       And the recommendation says that:  "The

16  Fire Department should update the manual to provide

17  training to ensure that specified rule violations,

18  particularly those pertaining to discrimination and

19  harassment, have appropriate penalties in place."

20       Do you see that?

21    A.  I do.

22    Q.  What was the City's response to that?  How did

23  the City implement that, if it did?

24    A.  So when we revised it, like I said, we had the

25  committee, had two labor attorneys review it and make sure

Page 40

1  that it was in line with the -- with what the City's

2  intentions were, and every rule that's in the HFD rules

3  and regulations, the consequence of violating that rule is

4  listed, and the Code of Administrative Procedure is what

5  we changed the name to.

6        And there is different categories.  You

7  can't give every example, but generally, if you do this,

8  this is how many days suspension you may receive, or, if

9  you do this, you may receive a counseling.  So it's

10  every -- We tried to make sure everything lined up.

11       We presented an online CE class that

12  everyone had to participate in, and then Wanda and I,

13  during the newly-promoted officer training, would review

14  that.  That was in their -- their manual.

15    Q.  Okay.  And when was the Code of Administrative

16  Procedure first issued, if you know?

17    A.  2012.

18    Q.  And that contained the modifications that you

19  have just described?

20    A.  Yes.

21    Q.  So if I were to look in that Code, I would find

22  a specific penalty for discrimination?

23    A.  Correct, yeah, that 6.01 in the rules and regs

24  and then 6.01 in the Code of Administrative Procedure

25  lists -- lists the violations --



Page 41

1   Q.   Okay.

2   A.   -- and the -- I mean, the consequences of the
3   violations.

4   Q.   Okay.  Got it.  Thank you.

5        Let's move on to topic recommendation D,
6   which was "Improve Training".

7        There is the first recommendation, and
8   there is "general workplace conduct training for all
9   employees".  Was that modified?  Was the general workplace
10  conduct training modified in response to the Thompson &
11  Horton report?

12  A.   HR presented training to the cadets.  I'm not
13  sure how long that had been going on.

14       I -- In 1994, I didn't receive that
15  training, but -- And then, periodically, we receive
16  training from HR regarding harassment, discrimination.
17  Back in the day, it used to be called "Tolerance
18  Training", but that was years ago, and we have a sexual
19  harassment training coming up --

20  Q.   So is --

21  A.   -- next month.

22  Q.   I'm sorry.

23       Is what you're describing -- I just want to
24  make sure I understand this.  Is what you're describing
25  the Fire Department's annual training or is this something

Page 42

1   that was specifically instituted in response to the
2   report, if you know?

3   A.   Directly in response to the report was the
4   LegalWATCH training.

5   Q.   Okay.  And what was your involvement in the
6   LegalWATCH training?

7   A.   That was before I was appointed to Assistant
8   Chief, so I was a student.

9   Q.   And was Wanda Andrews involved in that?

10  A.   She was not.  They hired a -- the outside -- I
11  don't know if their name was LegalWATCH or whatever.  They
12  had an outside agency come in and do -- conduct that
13  training.

14       And then the other training we had to do on
15  a shift level, and that was before 1-8, 1-20 and 1-50 were
16  combined, that each Chief had to review it with their --
17  whoever was under their command, each Chief, like District
18  Chief.

19  Q.   And what -- what was that training?

20  A.   It was 1-8, 1-20 and 1-50.

21  Q.   It was just on the text of those Executive
22  Orders?

23  A.   Correct.

24  Q.   Okay.  So when --

25  A.   And we had to review it with people under us.

Page 43

1   Q.   So is it that when -- when the Executive Orders
2   were released, the -- you reviewed it with your staff --

3   A.   Correct.

4   Q.   -- those Executive Orders with your staff?

5   A.   And then there was leadership training that
6   was -- that was conducted after the report came out, and I
7   believe -- I can't remember if it was prior to me being
8   appointed or not.

9   Q.   Okay.  Was that in response to the Thompson &
10  Horton report?

11  A.   Yes.

12  Q.   Who was -- What was the leadership training?

13  A.   Well, we also had EEOC, Knowing Your Rights
14  training, because those kind of blend together.  HR
15  presented that.  I believe Kelly Shreck was involved,
16  Wanda Andrews and Juan Padilla.

17  Q.   I'm sorry.

18       They presented both Know Your Rights and
19  leadership training or are these separate?

20  A.   They were separate classes.  I can't remember
21  who presented which one.

22  Q.   Who was the leadership training provided to?

23  A.   That, I don't remember, because I -- I can't
24  remember if that was after I got appointed or not.  The
25  LegalWATCH was Senior Captains and up.

Page 44

1   Q.   And the Know Your Rights was department-wide.
2   Is that correct?

3   A.   The Know Your Rights was department-wide and
4   that was -- that was in person, face to face, from HR.

5   Q.   So for the LegalWATCH training, the Junior
6   Captains, did not receive it.  Is that correct?

7   A.   I believe it was Senior Captains and up.

8   Q.   And I may have already asked you this, but who
9   received the leadership training?

10  A.   That's the part I can't remember right now.

11  Q.   You can't remember.

12  A.   Nuh-hm.

13  Q.   Okay.  And then subtopic (2), or section (2),
14  under D, says:  "Hands-on personal management training as
15  a prerequisite to promotion to supervisory positions."

16       Can you describe the City's efforts to
17  implement that recommendation?

18  A.   That would be the newly-promoted officer
19  training.

20  Q.   And, earlier in your deposition, we talked about
21  the -- the time frame in which the newly-promoted officer
22  training was implemented.

23       You only knew as of 2013, I think, when you
24  became involved.  Is that right?

25  A.   Right.



Page 45

1    Q.   You weren't -- you weren't aware of what was
2 going on between 2010 and 2013?
3    A.   I don't know if -- if HR had a piece in that
4 during that time period or not.
5        I do know that there was a newly-promoted
6 officer course.  In '05 and early '10, it was geared
7 toward I only know that because that's an accreditation
8 cycle.  The documents that were provided were primarily
9 tactical.
10    Q.   Okay.
11        So since the law firm -- Since Thompson &
12 Horton was making the recommendation in December of 2009
13 to implement hands-on personal management training, does
14 that -- Is it fair to assume that there was no
15 newly-promoted officer training on EEO issues prior to
16 that?
17        MS. SULLIVAN:  Objection.  Mischaracterizes
18 the evidence in the record, but go ahead.
19    A.   That would be an assumption.  I don't have any
20 direct knowledge.
21    Q.   (BY MR. MONTEIRO) You don't know?
22    A.   Correct.
23    Q.   Okay.  All right.
24        And then was it -- Were there any other
25 efforts, other than the newly-promoted officer training,

Page 46

1 to respond to section (2), D(2) -- I'm sorry -- which
2 was --
3    A.   I can't think of any directly related to
4 promotion other than adding 1-50, the rules and regs,
5 things of that nature, as a study, study material for
6 testing.
7    Q.   Okay.  And does newly-promoted officer training
8 begin at the Junior Captain level?
9    A.   It does.
10    Q.   Subtopic (3), under D is:  "Practical
11 investigation training to those charged with reviewing,
12 processing, and resolving HFD complaints and charges."
13    A.   Uh-hm.
14    Q.   Are you aware of any efforts by the City to
15 implement those recommendations?
16    A.   Yes.  We had investigating Title VII
17 allegations.
18    Q.   That was the training initiative?
19    A.   That was by labor -- actually, Deidra provided
20 that training.
21    Q.   Who was that provided to?
22        MR. MONTEIRO:  And, Deidra, you can't
23 answer.
24        MS. SULLIVAN:  The one time City Legal told
25 me.

Page 47

1    A.   Yeah.  All the investigators in Staff Services,
2 investigators, Senior Chief, myself.
3    Q.   (BY MR. MONTEIRO) When was that administered?
4    A.   Around 2011, 2012, somewhere.
5    Q.   And was it more than once or just one time?
6    A.   We had that training, we had a couple of
7 webinars that the Inspector General also attended and the
8 Chief provided follow-up training to the webinars.
9    Q.   What was the topic of the webinars?
10    A.   One of them was on documentation and the other
11 one, I don't remember.  It was regarding discrimination.
12 I don't remember the title of it, and then, since they're
13 all peace officers and trained Arson Investigators, they
14 have to continue with their CE hours and that's per Texas
15 Commission on Law Enforcement.
16    Q.   Okay.  So any training encompassed within the
17 CE -- or you're referencing any training that's
18 encompassed within their CE requirements?
19    A.   Correct.
20    Q.   Okay.  Was the investigating Title VII
21 complaints training provided to -- provided outside of
22 Staff Services?
23    A.   It was not.
24        The other training with -- because,
25 earlier, I had mentioned that, like, AWOLs, rudeness,

Page 48

1 things of that nature, went to the District Chiefs.
2    Q.   Right.
3    A.   So we funneled those complaints through the --
4 the Deputy Chiefs.  They passed that complaint onto the
5 District Chiefs.
6        Chief Stone, who was on the rules and regs
7 committee, created a class from December 2010 to January
8 '11 and delivered it to all the shift commanders, who
9 trained all the District Chiefs, and then each District
10 Chief got the binder with the training materials and the
11 class packet, the scenarios; it was also put online for
12 them to follow up with.  So all of the District Chiefs
13 received that training.
14    Q.   (BY MR. MONTEIRO) Okay.
15        Was there any Title VII training provided
16 to any of the OIG investigators, investigators within OIG?
17    A.   Yeah.
18        I can't remember.  They may have attended
19 the one that Deidra put on, but they, for sure, attended
20 the -- the webinars and the follow-up with the Inspector
21 General.
22        MR. MONTEIRO:  All right.  Can we take a
23 five-minute break.  Go off the record.
24        (Recess from 03:41:11 p.m. to 03:49:11
25        p.m.)

Page 49

1   Q.   (BY MR. MONTEIRO) Can we look at recommendation

2   H, which is on Page 4 of the report, which is the titled

3   "Ensure Confidentiality"?

4   A.   Uh-hm.

5   Q.   Is that related to what we talked about before,

6   when you said they stopped sharing the witness statements?

7   A.   Yes.  I was -- That was part of it.

8   Q.   What else has been done, besides that?

9   A.   There were a lot of -- We made sure that all of

10  our computers logged off automatically.  Before, the door,

11  the Staff Services, would be left open, people would

12  wander in, so start locking up when we left, made sure all

13  the files were secured.

14        Also, on the notices, like, the 48-hour

15  notice, the 30-day letter, there is several places where

16  it says that you are ordered not to discuss the complaint,

17  contact the -- the respondent contact the complainant.

18  Q.   I'm sorry.

19        Was that -- The 48-hour notice, was there a

20  change or a modification?

21  A.   We -- It had been on there.  We just made sure

22  the language was clear.

23  Q.   Okay.  You modified the language?

24  A.   Yes.

25  Q.   And was that across --

Page 50

1   A.   We met with --

2   Q.   -- beyond Staff Services?

3   A.   Right.

4        We met with the Office of Inspector General

5   when Robin Curtis became the Inspector General, to make

6   sure our language was similar.

7   Q.   Any other efforts to ensure confidentiality?

8   A.   That's all I can think of, at the moment.

9   Q.   Okay.  Let's move on to topic I, which is

10  "Non-Sustained Complaints", and it says:  "When workplace

11  misconduct occurs, even if a particular perpetrator is not

12  identified, further action should nonetheless be taken to

13  minimize repeat occurrences."

14        What has the City done to implement this

15  recommendation?

16  A.   If it was not sustained, especially if it was a

17  member against another member of the same station, we

18  would send them to conflict resolution with Wanda Andrews.

19  Because -- just because the complaint's not sustained

20  doesn't mean they're not going to have ongoing issues

21  after that.

22        So they would meet with her, discuss the

23  elephant in the room, and discuss ways that they are going

24  to be able to work together peacefully.  If it was a

25  behavior, maybe a -- possibly it was related to some

Page 51

1   emotional issue that some-- somebody may have, we would

2   refer them to the Employee Assistance Program or one of

3   our two staff psychologists.

4        And then, if it was a non-sustained

5   complaint that seemed to be pervasive throughout the

6   station, then Wanda and I would make a trip out to the

7   station and then go over the same manual that we presented

8   to our newly-promoted officers.

9   Q.   Can you give me an example of any instances

10  where there -- there was a pervasive issue at a station

11  that you and Wanda made a presentation along those lines?

12  A.   Station 96.

13  Q.   What was the issue?

14  A.   The -- Let's see.  The respondent was an

15  engineer operator and the allegation was against his

16  Captain.  I think it was race-related, I remember, but

17  then that was associated with another complaint where the

18  same Captain that he was filing on, a previous complaint,

19  that Captain and that EO seemed to be targeting a

20  firefighter and then that firefighter had filed a

21  complaint.  I mean, it was -- The complaints were going

22  back and forth.

23  Q.   Okay.

24  A.   So it involved most of the station members.

25        So we went out, did our class, tried to

Page 52

1   address the issue.  Eventually, everybody got moved out,

2   because even after conflict resolution, they could not

3   show that they could work together peacefully.

4   Q.   And is there any sort of written policy or

5   procedure with respect to the initiatives that you

6   describe with respect to -- regarding non-sustained

7   complaints?

8   A.   The -- We have a Policy Awareness Program.  I

9   believe that's in -- I have to double-check now; I don't

10  know if it's still in there -- the Code of Administrative

11  Procedure.

12  Q.   What is the Policy Awareness Program?

13  A.   Usually, we have used it on non-sus- --

14  non-sustained complaints and more often on complaints that

15  got filed but were never formalized, and to formalize it,

16  you have to have a Notary sign it.

17        So somebody would be mad, come file a

18  complaint, and then say, "You know what?  I have changed

19  my mind," but it was -- It might be a low-level issue, but

20  it was still an issue that needed to be addressed.

21        So we would assign it to the deputy, to the

22  District Chief, to make this person aware that if they

23  indeed did what they are alleged of, it would be a

24  violation of this policy, just to make them aware that the

25  policy exists.

LEXITAS

Page 53

1   Q.   Okay.  And that would -- and that primarily
2  would be for non-formalized complaints?
3     **A.   Primarily.  We used it on not-sustained**
4  **complaints, too, because even though we couldn't find**
5  **enough evidence, it's possible that it did happen, so we**
6  **would have to review the policy with them.**
7   Q.   And that's contained within the Code of
8  Administrative Procedure.  That initiative is contained
9  within the --
10    **A.   I believe that's --**
11   Q.   -- Code of Administrative Procedure?
12    **A.   -- in the Code of Administrative Procedure.  I**
13  **can't -- I would have to verify that piece.**
14   Q.   Any other efforts that you are aware of?
15    **A.   Those are the major ones.**
16   Q.   And what was the policy with respect to
17  non-sustained complaints prior to the changes that were
18  made in response to the Thompson Horton report?
19    **A.   A letter went out to the respondent and the**
20  **complainant that they were not sustained, and I believe**
21  **that was called the follow-up.**
22        **Another prac- -- And Chief Martinez started**
23  **this.  When it -- When Staff Services was staffed by**
24  **non-peace officers, their -- some of the complaints were**
25  **being closed with what we felt was an improper way as**

Page 54

1  **exceeded 180 days.  By Government Code, we have 180 days**
2  **to investigate the complaint, when they should be closed,**
3  **not sustained, sustained, exonerated, unfounded.**
4        **So if it exceeded the 180 days, it appeared**
5  **that some of the investigations weren't even completed.**
6  **So even if it did get past the 180, Chief Martinez and**
7  **then -- because I came in after him, started completing**
8  **the investigation, find out if it was sustained.  If it**
9  **was sustained past the 180, we may not -- we can't give**
10  **punitive discipline, but you can address the issue.**
11   Q.   So I'm sorry.  I was not clear.
12        What was the change that was implemented?
13    **A.   Closing them properly as sustained, not**
14  **sustained, exonerated or unfounded.**
15        **Prior to that, some of the cases were**
16  **closed -- closed, and the reason exceeded 180 days --**
17   Q.   Okay.
18    **A.   -- so the investigation wasn't completed or it**
19  **wasn't examined to see what the findings were.**
20   Q.   So they were closed without investigating --
21  without completing the investigation, because it -- they
22  had hit the 180-day mark?
23    **A.   Correct.**
24   Q.   And the current procedure is to continue the
25  investigation, but you cannot take any punitive action.

Page 55

1  Is that --
2     **A.   Per Government Code, you can't -- you can't**
3  **suspend them --**
4   Q.   Right.
5     **A.   -- if it's to that level, but the problem still**
6  **needs to be addressed.**
7   Q.   And -- and you're allowed to take
8  non-disciplinary corrective action?
9        MS. SULLIVAN:  Objection to the -- to the
10  characterization, but go ahead.
11        MR. MONTEIRO:  I'm sorry.
12   Q.   (BY MR. MONTEIRO)  Let me -- let me rephrase it.
13        Are you allowed to take non-disciplinary
14  corrective action?
15    **A.   Yes, up to a written reprimand.**
16   Q.   Okay.
17    **A.   Or some of it may involve training, referral to**
18  **Employee Assistance Program, counseling, things of that**
19  **nature.**
20   Q.   Let's move on to topic L, which is "Assignment
21  of OIG Complaints", which is on Page 5, and it says -- it
22  discusses how complaints are assigned within OIG.
23        Can you describe the City's efforts to
24  implement this recommendation?
25    **A.   Mayor Parker restructured that within HFD and**

Page 56

1  **moved the inspector -- Office of Inspector General**
2  **directly underneath her, and then that's when our**
3  **investigators that were under OIG moved to Staff Services**
4  **and then staffed that office.**
5        **And Staff Services can receive the**
6  **complaints, but if it says anything to do or appears to**
7  **have anything to do with discrimination, harassment or**
8  **retaliation, Staff Services will forward that to the**
9  **Office of Inspector General, who is staffed by some of the**
10  **Civil Rights attorneys, to conduct that investigation.**
11   Q.   I'm sorry.  I didn't catch the last thing you
12  said.
13        What about a Civil Rights attorney?
14    **A.   Some of the -- The Office of Inspector General,**
15  **they're all attorneys and they investigate that matter.**
16   Q.   The investigators are attorneys --
17    **A.   Uh-hm.**
18   Q.   -- within OIG?
19    **A.   Yes, they were at the time.  I don't know what**
20  **the current practice is, but...**
21   Q.   Okay.
22    **A.   But at the time that we were forwarding them**
23  **over there, they were attorneys.**
24   Q.   This makes reference to the employee
25  investigators within the Employee Relations Unit of the



Page 57

1  OIG.

2        Is that what you're referencing?

3     A.  The Employee Relations Unit was under HPD.  That

4  wasn't HFD personnel.

5     Q.  And did -- Was that changed in response to this

6  report?

7     A.  I -- I never worked with Employee Relations

8  Unit.  I knew that they existed, but the Office of

9  Inspector General was -- the whole office was moved

10  underneath the Mayor.

11     Q.  Okay.  And your testimony is that the

12  investigators who had -- who investigate discrimination

13  complaints in that office are attorneys?

14     A.  Under the Office of Inspector General, the way

15  it's set up now.

16     Q.  Okay.  Thank you.

17        It also says that the investigators should

18  receive specialized training in EEO matters and

19  investigative techniques and the manager of that unit

20  should determine what rules, policies and/or orders, if

21  any, have been violated.

22        What do you know about the investigators,

23  the training that the investigators receive on EEO matters

24  and investigative techniques?

25     A.  The -- the training that we mentioned earlier,

Page 58

1  investigating Title VII complaints, the webinars,

2  follow-up with the Inspector General and then

3  investigative technique, they're all -- they're all

4  trained investigators.

5        So the continu- -- We have all been to --

6  We're all certified, certified Arson Investigators, and

7  then the continued training would be -- that's required by

8  the Texas Commission on Law Enforcement.

9     Q.  Okay.  Anything beyond what you testified about

10  earlier?

11     A.  Not that I can think of right now.

12     Q.  And then it says:  "The manager of that

13  unit should determine what rules, policies or orders, if

14  any, have been violated."

15        Has that been implemented?

16     A.  Yeah.  So in Staff Services, what all the peace

17  officers got, the investigator will conduct the

18  investigation, then it go -- it went to a Senior

19  Investigator, who reviewed the investigative practices and

20  then the Senior Investigator's involved during the

21  investigation to make sure it's progressing.

22        We -- Through City ordinance, we had a

23  Chief Investigator dedicated to Staff Services.  The Chief

24  Investigator would review the findings and make a

25  determination, and then the Assistant Chief, which was me

Page 59

1  from 2010 to 2017, and then later Chief Martinez, reviews

2  the entire case findings --

3     Q.  And do you know what --

4     A.  -- and presents it to the Fire Chief.

5     Q.  I'm sorry.  I didn't mean to interrupt you.

6        Do you know what the procedure was in OIG?

7     A.  The Inspector General's investigators will

8  conduct the investigation, and I don't know what the

9  layer, if there are any layers, but then the Inspector

10  General would review and write the final synopsis, and

11  then I'm assuming it gets presented to the Mayor, but I

12  don't know; but it does get presented back to the Fire

13  Chief and then Chief Garrison at the time would bring it

14  to me so I could compare it with similar violations,

15  ensure there are consistent discipline, if needed.

16     Q.  I -- Was there involvement with OIG complaints

17  or Staff Services complaints?

18     A.  The only involvement with OIG was when the

19  Inspector General turned it back in to Chief Garrison, and

20  then Chief Garrison would bring the case to me to look at

21  the allegations, see what the consequences should be, and

22  see what type of discipline was given in similar cases.

23        If I had a question, then I would meet with

24  the Inspector General to clarify the severity of the -- of

25  the violation.  It was usually what I needed clarification

Page 60

1  on.

2     Q.  And your recommend- -- You would make a

3  recommendation in terms of discipline to any disciplinary

4  action to be taken to Chief Garrison, and then --

5     A.  Correct.

6     Q.  -- he will be the final decision-maker on that?

7     A.  Yes.

8     Q.  When did that process -- When was that process

9  instituted, if you know?

10     A.  It was when Chief Martinez was still in Staff

11  Services.  He started that process, but he wasn't

12  Assistant Chief at the time, and then in 2000 -- starting

13  in December 2010, that's the procedure followed.

14     Q.  If you can just go back for one second to 229 --

15  Page 2292 of the report, and those Bates numbers at the

16  bottom, the small numbers --

17     A.  Oh.

18     Q.  -- at the bottom say "HOU".  It's Page 29 of the

19  report --

20     A.  Okay.

21     Q.  -- under I, "Non-Sustained Complaints".

22        We talked about that earlier, but the

23  Thompson & Horton report says that -- it discusses the

24  standard for sustaining a complaint is quite high.

25        What's your understanding of that standard?

Page 61

1    A.  It's not beyond a reasonable doubt.  It's more
2  likely than not.  We're investigators, so we find evidence
3  on the matter.
4    Q.  Okay.  Has that been modified?  Has that
5  standard been modified?
6    A.  I mean, quite high relative to what, I guess
7  would be my question on that?
8    Q.  Do you know if that standard has been modified
9  at all?
10   A.  I think the part that was modified was not
11  closing on those exceeding 180 days.
12   Q.  Okay.  All right.  We're going to shift to topic
13  5, which is training on the HFD complaint policy, and I
14  think this will be brief.
15        If I'm remembering right, when I asked you
16  earlier, you said that you had some information with
17  respect to the training on the 2005 policy but not on the
18  2018 policy.  Is that right?
19   A.  Yes.
20   Q.  Okay.  So if I can show you Exhibit -- If I can
21  give you Exhibit 11, this is the 2005 complaint policy
22  which has been marked as Deposition Exhibit 11.
23        Are you -- are you familiar with that
24  document?
25   A.  I am.

Page 62

1    Q.  So Exhibit 11 indicates that it went into effect
2  in -- on August 1st of 2005.  Is that correct?
3    A.  That's correct.
4    Q.  When the policy initially went into effect,
5  did -- was there any training provided by the City with
6  respect to the policy?
7    A.  When a policy goes -- is sent out as a special
8  bulletin, every guideline or policy that comes out, the
9  ranking officer at a station or in a particular unit is to
10  review the guideline with its members.
11   Q.  By "review the guideline", does that mean read
12  through the guideline?
13   A.  Right.
14   Q.  And was that the practice in 2005?
15   A.  Yes.
16   Q.  By the "ranking officer", who do you mean?  What
17  do you mean when you say "ranking officer"?
18   A.  It -- For example, the fire station, the highest
19  ranking officer is the Senior Captain and the Senior
20  Captain is responsible for ensuring that all members sit
21  down together and review the document.
22   Q.  Any other efforts?  Any other training that was
23  provided when this policy went into effect?
24   A.  On the Thompson Horton spreadsheet, I believe it
25  said it was conducted in 2009.

Page 63

1    Q.  Okay.  My question was just related to when the
2  policy initially went to -- went into effect in 2005.
3    A.  That would have been the only training I'm aware
4  of, is the review.
5    Q.  Okay.  And then you said that there was a
6  reference in the Thompson & Horton report to some sort of
7  complaint training in 2009?
8    A.  Yes.
9    Q.  Can you tell me about that?
10   A.  Other than it's listed on the Thompson & Horton
11  report or the spreadsheet.
12   Q.  Do you know who -- who provided that training?
13   A.  It would have been under the direction of Chief
14  Snell, but I don't know who the actual member was that
15  provided it.
16   Q.  And was that department-wide?
17   A.  I do not know.
18   Q.  Do you know who received the training?
19   A.  I do not.
20   Q.  So you have given me the -- or you have
21  described efforts that were made to train on the policy in
22  2005 and then also in response to the Thompson & Horton
23  report.
24   A.  Yes.
25   Q.  Between those -- between that period, are you

Page 64

1  aware of any efforts to provide training on Exhibit 11?
2    A.  Between 2005 and 2009?
3    Q.  Yes.
4    A.  I am not familiar with any training.
5    Q.  If I can direct your attention to Page 3 of the
6  complaint policy, under 6.01 B, and if you can just review
7  that paragraph and let me know when you have had a chance
8  to review that.
9        (Witness reviewing document)
10   A.  Okay.
11   Q.  (BY MR. MONTEIRO) So this appears to describe
12  the procedure by which complaints of -- complaints that
13  allege criminal violations or discrimination complaints
14  are forwarded to the Office of Inspector General.  Is that
15  fair?
16   A.  That's what that describes.
17   Q.  Okay.  Was there any training -- Are you aware
18  of any training that was provided in terms of -- Let me
19  step back for a minute.
20        The subparagraph references -- uses the
21  term "serious complaints".  Do you see that?
22   A.  I do.
23   Q.  And it's -- The policy provides that serious
24  complaints should be forwarded to the Office of Inspector
25  General.

Page 65

1          Was there any specialized training when
2 this policy went into effect in terms of what constitutes
3 a serious complaint?
4      A.  In the Behavior Manual, we -- That was in -- I
5 want to say it was '08.  It may have been in '05 also.
6 They discuss serious complaints versus non-serious, like,
7 what can be handled at the station level.
8      Q.  Okay.  Any other efforts to provide training on
9 what a serious complaint is?
10     A.  In this -- this part was later modified, that
11 it's every supervisor's responsibility to report
12 allegations of discrimination, harassment or retaliation.
13     Q.  When was that modified?
14     A.  I believe it was modified before 2010 and that
15 was addressed in some of the training that we were
16 receiving.
17     Q.  Were you involved in the modification?
18     A.  Not the initial modification, but when I revised
19 the rules and regs and the Code of Administrative
20 Procedure, we modified the language a little bit just to
21 make it more clearer.
22     Q.  Okay.  Do you know why the -- why the policy was
23 modified?
24     A.  I do not.
25     Q.  The -- the definition in the Behavior Manual in

Page 66

1 terms of serious complaints, your -- your belief is that
2 was instituted in 2008 or so?
3      A.  2005 or 2008.  I don't remember the original
4 Behavior Manual date.
5      Q.  So the terminology in the Behavior Manual that
6 refers to serious complaints, employees can rely on that
7 in determining whether a complaint is serious and needs to
8 go to OIG?  Is that the intention?
9      A.  During that -- that time period, I guess they
10 could.  That's not how that piece is done anymore.
11     Q.  Okay.
12         MR. MONTEIRO:  I don't have any other
13 questions.  Thank you for answering my questions.
14         Ms. Draycott and Ms. Keyes' attorneys may
15 have a few questions.
16         MR. CAPODICE:  Let's take a break real
17 quick and see if there is anything else.
18         THE WITNESS:  Okay.
19         (Recess from 04:18:34 p.m. to 04:23:46
20         p.m.)
21              EXAMINATION
22 BY MR. CAPODICE:
23     Q.  Ms. McLeod, I just have one quick question,
24 probably multiple sub-questions; but no.
25         With regard to the change that you made

Page 67

1 with regard to OIG witness statements being provided to
2 the accused, if you will, why are all the reasons that you
3 implemented that change?
4         MS. SULLIVAN:  Objection.  Mischaracterizes
5 the testimony.
6      Q.  (BY MR. CAPODICE)  Go ahead.
7      A.  Answer?
8         MS. SULLIVAN:  You said in OIG?
9      Q.  (BY MR. CAPODICE)  I said with regard to witness
10 statements.  She implemented a -- You implemented a
11 change, correct, to --
12     A.  In Staff Services.
13     Q.  In Staff Services.  Okay.
14         Why did you implement that change?
15     A.  It didn't seem like a proper way.  It came from
16 criminal investigations, where we would never give a
17 witness statement to an arsonist for fear of retaliation;
18 not Title VII type retaliation, but just the witness
19 trying to get back at the person.
20     Q.  Why not?
21     A.  Well, it was causing our complaints to go up
22 because the witness would say something in their witness
23 statement that the respondent and then the respondent
24 would file a complaint on the witness based on what they
25 said in their witness statement, and then the witness

Page 68

1 would -- and then it just kept going back and forth.  So
2 some of -- some of the complaints that we had were a
3 result of witnesses truthfully testifying.
4         The other reason, especially if it was a
5 complaint against the superior officer at the -- at the
6 location or at the fire station, the firefighters who may
7 have been witnesses and two ranks below the Captain were
8 reluctant to give a complete statement because they knew
9 that their Captain would be able to review everything that
10 they said about them and, following that, the firefighter
11 would still have to work underneath that Captain's
12 supervisor.
13     Q.  And I guess there were retaliation complaints in
14 their situations?
15     A.  Then we would have retaliation complaints.
16     Q.  Any other reasons?
17     A.  That was the primary reason.
18     Q.  What about with regards to the integrity of the
19 investigation?
20     A.  Well, under the confidentiality piece.
21     Q.  And I know -- What do you mean by the
22 "confidentiality piece"?
23     A.  Another issue that came -- came up, that I was
24 told, that a respondent will have all the witness
25 statements, the copy of the complaint, the whole package,



Page 69

1 and read it at the fire station table and then other --
2 other people who weren't even involved in the complaint
3 process would have access to that information.
4    Q.   Were there any concerns about the integrity of
5 the investigations in terms of a person that's being
6 accused getting all of the -- all of his ducks in a row
7 prior to providing his statement as to what happened?
8    A.   They got to know all the allegations against
9 them and I would re- -- review the information against
10 them.
11         They wouldn't know -- I wouldn't tell them
12 specifically who said what, but they have to be able to
13 defend themselves.  The respondent does have rights in
14 that situation, if I'm understanding.
15    Q.   Yeah, and I think maybe we're talking -- I'm
16 talking about only in the instance where the witness, the
17 witness statements are provided to the accused, not the
18 actual accusations by the person that's filing the
19 complaint.
20    A.   What was the question again?
21    Q.   Sure.  With regard to witness statements --
22    A.   Yes.
23    Q.   -- not the complainant's statements or the
24 complainant's charge against the person.
25    A.   Okay.

Page 70

1    Q.   Do you believe that providing those to the
2 accused unfairly taints the investigation, allowing the --
3 you know, the accused to get all their ducks in a row
4 about who said what in response to particular things?
5    A.   I don't think it unfairly taints the
6 investigation.
7         Like I said, as far as them getting their
8 ducks in a row, I would tell them that, "This is the
9 evidence I have -- have against you," because they may be
10 able to explain it, I mean.
11    Q.   But isn't there a difference between telling
12 them that ahead of time and then telling them that while
13 you're interviewing them?
14    A.   By the time we interview them, we -- we have got
15 the witness statements.
16    Q.   And I get that.  What I'm trying to understand
17 is let's just say -- let's try to make it a very simple
18 hypothetical.
19         Person A accuses Person B that something
20 happened --
21    A.   Uh-hm.
22    Q.   -- and you have a witness to that incident --
23    A.   Yes.
24    Q.   -- okay?  The person that's accused doesn't know
25 about the witness.

Page 71

1    A.   Okay.
2    Q.   Why do you provide the witness statement to the
3 accused?  Are you afraid of providing a witness statement
4 to the accused ahead of time will taint the investigation?
5         MS. SULLIVAN:  Objection.  Improper
6 hypothetical.  Go ahead.
7    A.   I wasn't so much concerned about tainting the
8 investigation as I was getting a truthful witness
9 statement or 100 percent -- If they would tell the truth,
10 I wanted all the details.  I need a detailed witness
11 statement and it does maintain the confidential --
12 confidentiality of the investigation if all of the
13 information -- if the respondent doesn't have all the
14 exact witness statements --
15    Q.   (BY MR. CAPODICE) So one --
16    A.   -- because they would receive hard copies of the
17 witness statements that can get lost or disseminated.
18    Q.   Yes.
19         So one of the concerns is, obviously,
20 because witness statements got lost and disseminated, that
21 people weren't being as truthful on their witness
22 statements as they could be because they feared
23 retaliation and then lack of confidentiality and things
24 like that.  Correct?
25         MS. SULLIVAN:  Objection.  Mischaracterizes

Page 72

1 earlier testimony, but go ahead and answer.
2    A.   I felt that they may not have been as open.
3    Q.   (BY MR. CAPODICE) So, obviously, this change
4 encourages them to be more open with regard to the
5 allegations?
6    A.   Yes.
7    Q.   Were there any concerns about those witness
8 statements impacting what you got back from an accused?
9    A.   I don't think -- I don't think I understand that
10 question.
11    Q.   In terms of -- I guess in terms of their
12 testimony or in terms of their position that they take in
13 response to a complaint, were you concerned that providing
14 the witness statements to the accused gave them, you know,
15 notice of all of the facts ahead of time before they
16 actually took a position in terms of what happened?
17    A.   My -- my main concern was maintaining the
18 confidentiality and not having those witness statements
19 out, out in public and also to cut down on the chance that
20 the respondent may retaliate against any of the witnesses.
21         MR. CAPODICE:  Okay.  Pass the witness.
22         MS. SULLIVAN:  I just have a few questions.
23         EXAMINATION
24 BY MS. SULLIVAN:
25    Q.   Where we just left off about the retaliation,

Page 73

1  what were you talking about in reference to your
2  experience?
3      A.  On the Arson side, that's a whole 'nother
4  manner.  I was afraid that, if a felon finds out who
5  turned him in, they might harm -- harm the person.
6      Q.  Okay.  From the Administrative side, then?
7      A.  On the Administrative side, I was afraid they
8  would either file a complaint or, if it was a supervisor,
9  that they would treat them unfairly in the workplace.
10          For example, there are -- a Captain finds
11  out a firefighter testified against him, he may not let
12  him write up or drive an apparatus or having a potential
13  for higher class, may send him in for a transfer.
14     Q.  So what -- what did you do to guard against --
15  Well, let's start first.
16          If you learned that some action was taken
17  of retaliation, how would you handle it?
18     A.  Depending on -- on the retaliation, we would
19  have to open a new complaint.  If the retaliation were
20  based on discrimination, harassment or any of those
21  things, it will get at least forwarded to the Office of
22  Inspector General to follow up on.
23     Q.  Okay.  And did you have instances where the
24  retaliation was not related to Title VII?
25     A.  Yes.

Page 74

1      Q.  Okay.  And what did you do in those situations?
2      A.  Assigned it to an investigator, assigned a new
3  case to the investigator, and we would go through the
4  whole complaint process.
5      Q.  Okay.
6          Now, did you make any changes to the intake
7  forms out of Staff Services as a result of the Thompson
8  Horton assessment?
9      A.  Yes.
10          Some of the complaints that came in were
11  either poorly written or they may have been written well
12  but didn't specify that they felt that the respondent --
13  they didn't clearly state that they felt it was because of
14  race, religion or any type of discriminatory practices.
15          And then at the end of the investigation,
16  they will say, "Well, how come you didn't sustain on them
17  for discrimination," and part of that reason will be
18  because it wasn't stated clear in the report.
19          So we created the form to ask those
20  simple -- simple, direct questions:  Do you believe this
21  is based on retaliation?  Do you believe this was based on
22  discrimination?  And then they would check the boxes of
23  the reasons that -- based on what type of discrimination.
24          So it cleared up the form.  I met with the
25  Inspector General who began using a similar form.

Page 75

1      Q.  Okay.
2      A.  It was to help us identify those types of
3  complaints more easily.
4      Q.  And as a result of implementing some of the
5  recommendations in Thompson Horton, did you see any
6  changes in the number of complaints that you were
7  handling?
8      A.  Yes.
9          It was well over 400 complaints by the end
10  of 2010, and then by the end of my last year there, it had
11  dropped down to 149 and you could even see a drop right
12  after the Thompson Horton report was released and I think
13  Chief Flanagan and Chief Snell had started implementing
14  practices and then we would make concentrated efforts to
15  reduce it and we could track it along the way.
16     Q.  And would these complaints include complaints
17  alleging discrimination and under Title VII, of
18  retaliation Title VII?
19     A.  Yes.  It was the total number of complaints,
20  including those.
21          MS. SULLIVAN:  Okay.  Pass the witness.
22          FURTHER EXAMINATION
23  BY MR. MONTEIRO:
24     Q.  I'm sorry.  Just for clarification, those were
25  the complaints that were filed with Staff Services?

Page 76

1      A.  The complaints that involved Fire Department
2  employees.  So even if they originated with the Office of
3  Inspector General, that included those complaints, too.
4      Q.  And is that documented somewhere?
5      A.  Is what documented?
6      Q.  The change in the number of complaints.
7      A.  Yes.
8      Q.  Where is that documented?
9      A.  I have a little graph.  I think I gave you a
10  copy of -- of the graph and then the rest would be in the
11  database under our stats.
12     Q.  What -- what was the graph prepared for?
13     A.  Chief Garrison, in 2010, wanted me to reduce the
14  complaints.  He came from a department where they didn't
15  have that many complaints.  I'm thinking '09 there were,
16  like, 485 complaints and then I dipped a little bit to,
17  like, 420 or 30-something.
18          So one of his directives was reduce the
19  number of complaints, get it to a manageable number where
20  we can start addressing it before it even becomes --
21  address the behavior before it even becomes a complaint.
22          MR. MONTEIRO:  And I thank you, ma'am.  No
23  further questions.
24
25



Page 77

1                FURTHER EXAMINATION
2 BY MR. CAPODICE:
3      Q.  The changes to the witness statements that we
4 talked about earlier, you made that in Staff Services.
5 Correct?
6      **A.   Yes.**
7      Q.  Not OIG?
8      **A.   The Inspector General changed some of their**
9 **language to where we were consistent.**
10     Q.  Okay.
11              MR. CAPODICE:  That's all I wanted to check
12 on.  Thanks.
13              MS. SULLIVAN:  All right.  Read and sign.
14
15              (Deposition concluded at 04:46:34 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 78

1               CHANGES AND SIGNATURE
2        ORAL DEPOSITION OF FIRE MARSHAL MICHELLE McLEOD
3                  AUGUST 15, 2019
4 PAGE LINE  CHANGE              REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 79

1      I, FIRE MARSHAL MICHELLE McLEOD, have read the
2 foregoing deposition and hereby affix my signature that
3 same is true and correct, except as noted herein.
4
5      _____
6         FIRE MARSHAL MICHELLE McLEOD
7
8 THE STATE OF _____)
9 COUNTY OF _____)
10      Before me, _____, on this day
11 personally appeared FIRE MARSHAL MICHELLE McLEOD, known to
12 me (or proved to me under oath or through
13 _____)(description of identity card or other
14 document) to be the person whose name is subscribed to the
15 foregoing instrument and acknowledged to me that they
16 executed the same for the purposes and consideration
17 therein expressed.
18      Given under my hand and seal of office on this
19 _____ day of _____, 2019.
20
21      _____
22         NOTARY PUBLIC IN AND FOR
22         THE STATE OF _____
23
24 My Commission expires:  _____
25

Page 80

1 STATE OF TEXAS
2 COUNTY OF HARRIS
3      I, JAMES M.PLAIR, a Certified Shorthand Reporter in
4 and for the State of Texas, do hereby certify that,
5 pursuant to the notice issued and the agreement
6 hereinbefore set forth, there came before me on the _____
7 day of _____, A. D., 2019, at 2:33 p.m.,
8 at the offices of CITY OF HOUSTON LEGAL DEPARTMENT, 900
9 Bagby, Third Floor, Houston, Texas 77002, the following
10 named person, to-wit:  FIRE MARSHAL MICHELLE McLEOD, who
11 was by me duly cautioned and sworn to testify the truth,
12 the whole truth, and nothing but the truth of her
13 knowledge touching and concerning the matters in
14 controversy in this cause; and that she was thereupon
15 carefully examined upon her oath and her examination
16 reduced to typewriting under my supervision; that the
17 deposition is a true record of the testimony given by the
18 witness; that the witness has requested a review pursuant
19 to Rule 30(e)(2), same to be sworn to, and subscribed, by
20 said witness before any Notary Public, pursuant to the
21 agreement of the parties.
22      I further certify that I am neither attorney nor
23 counsel for, nor related to or employed by, any of the
24 parties to the action in which this deposition is taken;
25 and further that I am not a relative or employee of any

Page 81

```
1    attorney or counsel employed by the parties hereto, or
2    financially interested in the action.
3         I further certify that the amount of time used by
4    each counsel at the time of the deposition is as follows:
5
          Mr. Jeremy P. Monteiro      -(01:42:42)
6              Attorney for PLAINTIFF UNITED STATES OF AMERICA
          Ms. Deidra N. Sullivan      -(00:03:55)
7              Attorney for DEFENDANT CITY OF HOUSTON
          Ms. Elizabeth F. Karpati    -(03:16:04)
8              Attorney for PLAINTIFF UNITED STATES OF AMERICA
          Mr. Dwain Gregory Capodice II -(00:22:48)
9              Attorney for PLAINTIFFS-INTERVENORS JANE DRAYCOTT
               AND PAULA KEYES
10
11        GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the
12   9th day of September, A.D., 2019.
13
14
15                    James Plair
16                    _____
17                    JAMES M. PLAIR, CSR
                      Texas CSR 4409
18                    Expiration:  12-31-2019
                      Lexitas - Firm Registration No. 95
19                    13101 Northwest Freeway, Suite 210
                      Houston, Texas 77040
20                    281-469-5580
21
22
23
24
25
```

**(**

**(2)** 44:13 46:1

**(3)** 46:10

**(a)** 22:11

**(b)** 21:3 23:2 25:4

**(c)** 21:12

**(e)** 21:17

**(f)** 21:23

**0**

**03:41:11** 48:24

**03:49:11** 48:24

**04:18:34** 66:19

**04:23:46** 66:19

**04:46:34** 77:15

**05** 45:6 65:5

**08** 65:5

**09** 76:15

**1**

**1-18** 12:2

**1-20** 34:19,20 42:15,20

**1-39** 12:2 34:21 35:17

**1-50** 12:1 34:20 35:17 42:15,20 46:4

**1-8** 34:20 42:15,20

**10** 45:6

**100** 71:9

**11** 48:8 61:21,22 62:1 64:1

**127** 17:20

**13** 15:1 26:17,19

**149** 75:11

**15** 1:16,20

**18** 20:22

**180** 54:1,4,6,9,16 61:11

**180-day** 54:22

**1801** 10:15

**1994** 41:14

**1st** 62:2

**2**

**2** 4:10,11 20:17,20

**2000** 60:12

**2005** 22:11 61:17,21 62:2,14 63:2,22 64:2 66:3

**2008** 20:12 66:2,3

**2009** 5:11 6:5,17 7:1,6,12 22:24 45:12 62:25 63:7 64:2

**2010** 16:4,5 18:12 19:4 20:14 45:2 48:7 59:1 60:13 65:14 75:10 76:13

**2011** 23:20 24:5,10,19,23 27:13,16, 19,24 32:9 47:4

**2012** 25:17 40:17 47:4

**2013** 14:12,16,19 15:9 16:5 25:18 26:10,11 44:23 45:2

**2017** 17:11 18:3,6,12 59:1

**2018** 23:6 61:18

**2019** 1:16,20

**202.514.1005** 2:7

**20530-0001** 2:6

**229** 60:14

**2292** 60:15

**2300** 2:11

**2318** 26:20

**24900** 2:23

**29** 60:18

**2:33** 1:20

**3**

**3** 33:22 64:5

**30(b)(6)** 20:19

**30-day** 31:14 49:15

**30-something** 76:17

**300** 2:23

**4**

**4** 20:23 49:2

**4(a)** 4:10

**4(b)** 27:6

**400** 75:9

**408841** 1:24

**420** 76:17

**48-hour** 31:14 49:14,19

**485** 76:16

**4:18-CV-00644** 1:4

**4:46** 1:20

**5**

**5** 22:9 25:5,6 55:21 61:13

**54** 6:5,17 7:1,6,12

**6**

**6.01** 35:25 40:23,24 64:6

**6.02** 36:1

**60-something** 38:1

**66** 3:6

**7**

**70** 17:22

**72** 3:7

**75** 3:8

**77** 3:9

**77002** 1:22 2:12 10:18

**77002-2527** 2:17

**77386** 2:23

**78** 3:10

**8**

**8** 3:5

**80** 3:11

**832.393.6259** 2:18

**832.767.3207** 2:24

**9**

**900** 1:21

**96** 51:12



## A

**above-styled** 1:19

**absences** 36:14

**access** 69:3

**accommodate** 9:21

**accountability** 38:11

**accountable** 28:8

**accreditation** 18:17,19 45:7

**accusations** 69:18

**accused** 67:2 69:6,17 70:2,3,24 71:3,4 72:8,14

**accuses** 70:19

**action** 1:3 6:16,25 50:12 54:25 55:8, 14 60:4 73:16

**actual** 27:1 63:14 69:18

**added** 14:23,25 15:25 16:2 35:14

**adding** 33:7 46:4

**address** 10:14 15:13 32:12,24 52:1 54:10 76:21

**addressed** 12:21 28:11 38:6 52:20 55:6 65:15

**addressing** 76:20

**administered** 47:3

**administrative** 33:1 36:10,15 40:4,15,24 52:10 53:8,11,12 65:19 73:6,7

**afraid** 71:3 73:4,7

**afternoon** 4:1,3

**agency** 42:12

**agreed** 10:25 22:17

**ahead** 11:16 30:25 31:19 45:18 55:10 67:6 70:12 71:4,6 72:1,15

**Ahmad** 2:21,22

**Alfredo** 16:24

**allegation** 51:15

**allegations** 12:20 19:9 46:17 59:21 65:12 69:8 72:5

**allege** 64:13

**alleged** 52:23

**alleging** 75:17

**allowed** 55:7,13

**allowing** 70:2

**alternative** 36:25

**AMERICA** 1:3 2:2

**and/or** 57:20

**Andrews** 12:18 14:1 22:1,5,14 42:9 43:16 50:18

**annual** 41:25

**answering** 66:13

**antidiscrimination** 39:3

**anymore** 12:17 66:10

**apparatus** 73:12

**APPEARANCES** 2:1

**appeared** 54:4

**appears** 20:1 56:6 64:11

**applied** 30:17

**applies** 30:15,16

**appointed** 24:13 32:19 42:7 43:8, 24

**approximately** 8:20 11:9 20:14 24:5

**area** 14:3 19:7 35:2 36:16

**arson** 17:16,22 20:9,11 30:15 47:13 58:6 73:3

**arsonist** 30:1 67:17

**assert** 5:4 6:12

**assess** 4:12 5:8 24:11

**assessment** 6:3,15,24 7:4,9 11:12 21:5,13,19,25 23:23 24:15,18,22 26:24 27:2,8,10,16 28:1 32:8,13,25 74:8

**assign** 52:21

**assigned** 17:24 55:22 74:2

**Assignment** 55:20

**Assistance** 51:2 55:18

**assistant** 18:9,10,14 20:7,13 33:1, 16,20,21 36:16 42:7 58:25 60:12

**assume** 7:23 24:14 45:14

**assuming** 59:11

**assumption** 45:19

**attached** 1:23

**attempt** 7:10

**attended** 47:7 48:18,19

**attention** 22:9 64:5

**attorney** 5:14 8:10 10:2 35:13 56:13

**ATTORNEY'S** 2:10

**attorney-client** 4:17

**attorneys** 35:12 39:25 56:10,15,16, 23 57:13 66:14

**August** 1:16,19 19:4 62:2

**authority** 19:3

**automatically** 49:10

**Avenue** 2:5

**aware** 22:19 24:9 27:15 37:17 45:1 46:14 52:22,24 53:14 63:3 64:1,17

**Awareness** 52:8,12

**AWOLS** 19:19 47:25

## B

**back** 9:6 10:13 20:5 32:15,18 35:14, 17 41:17 51:22 59:12,19 60:14 64:19 67:19 68:1 72:8

**back-to-back** 14:2

**bad** 31:4

**Bagby** 1:21 2:16

**based** 5:12,14,17 12:20 29:5 35:16 39:9 67:24 73:20 74:21,23

**basically** 12:7

**Bates** 26:20 60:15

**began** 14:13 15:9 16:1 26:9 27:23 74:25

**begin** 4:9 46:8

**behalf** 10:22 33:10 34:4

**behave** 38:13

**behavior** 31:4 35:7 37:21 38:16 50:25 65:4,25 66:4,5 76:21

**Behavior/discipline** 37:25

**belief** 66:1

**binder** 48:10

**bit** 65:20 76:16

**blend** 43:14

**board** 30:17,18

**book** 38:10,16,22

**bottom** 60:16,18



**boxes** 74:22

**break** 9:19,20,25 39:14 48:23 66:16

**bring** 59:13,20

**bringing** 13:4

**brought** 13:2 39:12

**Bryan** 36:23 37:4

**bulletin** 62:8

**business** 10:14

**C**

**cadets** 41:12

**call** 13:24

**called** 19:7 38:10 41:17 53:21

**calls** 30:24

**Capodice** 2:22 3:6,9 66:16,22 67:6, 9 71:15 72:3,21 77:2,11

**Captain** 28:14,15 31:3,5 46:8 51:16, 18,19 62:19,20 68:7,9 73:10

**Captain's** 68:11

**Captains** 11:23 43:25 44:6,7

**care** 4:7

**case** 16:21 28:17 35:5 59:2,20 74:3

**cases** 54:15 59:22

**catch** 56:11

**categories** 40:6

**causing** 67:21

**caveat** 9:23

**CE** 40:11 47:14,17,18

**Certificate** 3:11

**certified** 1:20 58:6

**chance** 64:7 72:19

**change** 12:19 31:16,17 32:1,2,4 49:20 54:12 66:25 67:3,11,14 72:3 76:6

**changed** 12:16,22 31:22,23 40:5 52:18 57:5 77:8

**characterization** 55:10

**charge** 69:24

**charged** 46:11

**charges** 46:12

**check** 74:22 77:11

**chief** 4:1 7:23 8:9 17:21,25 18:9,10, 14 20:7,9,10,13 22:24 23:8,21 24:2 27:12,22 28:2 29:5,9 33:2,19,20,21 34:22 36:16,20,21,23 42:8,16,17,18 47:2,8 48:6,10 52:22 53:22 54:6 58:23,25 59:1,4,13,19,20 60:4,10,12 63:13 75:13 76:13

**Chiefs** 11:23 19:21 33:16 48:1,4,5, 9,12

**City** 1:6,11,14,18,21 2:14,16 4:14,15, 22 5:3,8,14 6:23 10:21,22 21:14,25 22:13,17 24:21 27:9 32:7 34:5,14,17 35:14 37:13 39:23 46:14,24 50:14 58:22 62:5

**City's** 6:4,16,24 10:2,25 11:3 20:18, 24 21:8,25 23:4 24:17 31:16 34:2 37:24 39:22 40:1 44:16 55:23

**CIV** 1:14,18

**Civil** 1:3,22 2:5 56:10,13

**claim** 6:9

**clarification** 7:18 59:25 75:24

**clarify** 59:24

**clarifying** 35:18

**class** 14:2,4,15 26:4 40:11 48:7,11 51:25 73:13

**classes** 12:18 14:7 43:20

**clean** 9:10 31:1

**clear** 35:14 36:4 38:7 49:22 54:11 74:18

**cleared** 74:24

**clearer** 65:21

**closed** 53:25 54:2,16,20

**closing** 54:13 61:11

**code** 10:17 30:13 40:4,15,21,24 52:10 53:7,11,12 54:1 55:2 65:19

**combined** 14:3,8,12 42:16

**command** 23:21 24:13 27:24 28:4 32:9,10 33:12,14,20 42:17

**commanders** 48:8

**Commission** 47:15 58:8

**committee** 35:3,10 36:18 39:25 48:7

**communications** 5:14

**compare** 59:14

**complainant** 49:17 53:20

**complainant's** 31:8 69:23,24

**complained** 7:11

**complaint** 12:3,4,10 15:5,8,10,14, 22 16:6 18:15 19:24 22:10,12,25 23:6 25:7,9 26:1,4,5,6,13,14 30:13 31:2,7, 11 36:14 38:4 48:4 49:16 51:5,17,18, 21 52:18 54:2 60:24 61:13,21 63:7 64:6 65:3,9 66:7 67:24 68:5,25 69:2, 19 72:13 73:8,19 74:4 76:21

**complaint's** 50:19

**complaints** 7:5 15:7 18:25 19:2,9, 10,12,16 28:20 30:19 46:12 47:21 48:3 50:10 51:21 52:7,14 53:2,4,17, 24 55:21,22 56:6 57:13 58:1 59:16,17 60:21 64:12,13,21,24 65:6 66:1,6 67:21 68:2,13,15 74:10 75:3,6,9,16, 19,25 76:1,3,6,14,15,16,19

**complete** 68:8

**completed** 22:23 27:17 54:5,18

**completing** 54:7,21

**computerized** 1:21

**computers** 49:10

**concentrated** 75:14

**concern** 72:17

**concerned** 71:7 72:13

**concerns** 31:23 32:24 69:4 71:19 72:7

**concise** 38:7

**concluded** 77:15

**conduct** 41:8,10 42:12 56:10 58:17 59:8

**conducted** 22:25 43:6 62:25

**confer** 7:20

**confidential** 29:11 71:11

**confidentiality** 28:11 29:7 49:3 50:7 68:20,22 71:12,23 72:18

**conflict** 18:16 50:18 52:2

**conflicted** 38:3,4

**confusing** 35:6 37:10

**consequence** 40:3

**consequences** 35:8 41:2 59:21

**consistent** 28:9 29:7,10 35:13 59:15 77:9

**consolidate** 34:11,18 35:4 38:6

**consolidated** 34:20



**consolidating** 37:8,15

**consolidation** 35:5

**constitutes** 65:2

**contact** 12:5,6 49:17

**contained** 38:16 40:18 53:7,8

**continu-** 58:5

**continue** 47:14 54:24

**continued** 27:25 58:7

**conversation** 16:23 17:3

**conversations** 4:25 16:17

**copies** 13:2 71:16

**copy** 12:11 16:16 30:13 31:11 39:12
68:25 76:10

**correct** 5:18 19:1 20:15 22:2 24:20
27:14 29:16 31:9,17,24 32:3 33:18
35:20 39:10 40:23 42:23 43:3 44:2,6
45:22 47:14 54:23 60:5 62:2,3 67:11
71:24 77:5

**corrective** 6:24 55:8,14

**counseling** 40:9 55:18

**couple** 11:17 33:13,24 47:6

**court** 1:1 9:5,8

**created** 33:4 38:9 48:7 74:19

**creating** 28:20

**criminal** 19:8,9 29:25 30:16 64:13
67:16

**crossover** 14:4

**current** 12:14,20 17:7 31:6 54:24
56:20

**Curtis** 50:5

**cut** 9:17 25:20 30:12 72:19

**cycle** 45:8

**D**

**D(2)** 46:1

**D.C.** 2:6

**database** 76:11

**date** 66:4

**day** 41:17

**days** 40:8 54:1,4,16 61:11

**December** 16:4 18:12 45:12 48:7
60:13

**decide** 5:8

**decision** 4:11

**decision-maker** 60:6

**decline** 37:13

**dedicated** 58:23

**defend** 69:13

**Defendant** 1:6,11 2:14

**Defendant's** 4:11 21:4,12,17,23
23:5 27:6

**definition** 65:25

**Deidra** 2:15 35:12 46:19,22 48:19

**Deidra.sullivan@houstontx.
gov** 2:18

**delivered** 48:8

**department** 1:21 2:4,10,16 8:10
12:5 14:10 16:14,18 17:8,13 18:2,5
39:1,16 76:1,14

**Department's** 41:25

**department-wide** 44:1,3 63:16

**departments** 33:17

**Depending** 73:18

**deposed** 8:19 22:5

**deposition** 1:14,18 4:11 8:11,13,22
11:1,5,8,11 13:16 16:15,21 17:2
20:19 26:18 27:4 44:20 61:22 77:15

**depositions** 16:21

**deputy** 17:21 48:4 52:21

**describe** 27:25 37:24 44:16 52:6
55:23 64:11

**describes** 64:16

**describing** 41:23,24

**designated** 10:21 12:4 21:9,14,21
22:13 34:1

**designations** 20:18

**detail** 29:3

**detailed** 71:10

**details** 71:10

**determination** 58:25

**determine** 14:9 20:4 57:20 58:13

**determining** 66:7

**difference** 70:11

**difficult** 31:1

**dipped** 76:16

**direct** 20:22 45:20 64:5 74:20

**directed** 23:22 28:5,9 32:10 34:23

**Directing** 22:9

**direction** 63:13

**directive** 27:12 29:5,6,9

**directives** 76:18

**directly** 19:5 39:4 42:3 46:3 56:2

**disciplinary** 60:3

**discipline** 54:10 59:15,22 60:3

**discovery** 13:6

**discriminate** 36:5 39:8

**discrimination** 4:14 5:11 19:17,24
20:2 35:15,16,19,20 39:18 40:22
41:16 47:11 56:7 57:12 64:13 65:12
73:20 74:17,22,23 75:17

**discriminatory** 74:14

**discuss** 49:16 50:22,23 65:6

**discusses** 55:22 60:23

**displayed** 31:5

**dispute** 36:25

**disseminated** 71:17,20

**dissemination** 22:10

**dissolved** 19:5

**distributed** 19:20

**District** 1:1 11:23 19:21 42:17 48:1,
5,9,12 52:22

**DIVISION** 1:2 2:5

**divisions** 33:17,19

**document** 11:19 15:8 20:23 26:21
27:2,3 28:2 32:11 38:18 61:24 62:21
64:9

**documentation** 47:10

**documented** 29:17 32:21 76:4,5,8

**documenting** 32:16

**documents** 11:17 13:15 16:10
45:8

**door** 49:10

**double-check** 52:9

**double-sided** 20:23

**doubt** 61:1

**Douglas** 36:21



**Draycott** 1:8 2:20 7:11 66:14

**Draycott's** 7:5

**drive** 73:12

**drop** 75:11

**dropped** 75:11

**ducks** 69:6 70:3,8

**due** 27:17

**duly** 1:19 8:5

**duties** 17:12 18:13

**Dwain** 2:22

**E**

**earlier** 21:1 25:21 26:9 29:20 44:20
47:25 57:25 58:10 60:22 61:16 72:1
77:4

**early** 45:6

**easily** 75:3

**EEO** 45:15 57:18,23

**EEOC** 12:5 43:13

**effect** 62:1,4,23 63:2 65:2

**effectiveness** 4:12 5:9

**efforts** 14:3,8,12 21:13,18,23 24:9,
17 27:15,23 28:3 29:1 32:21 34:2
37:24 44:16 45:25 46:14 50:7 53:14
55:23 62:22 63:21 64:1 65:8 75:14

**elephant** 50:23

**eliminate** 35:4

**Elizabeth** 2:10

**Elizabeth.karpati@usdoj.gov**
2:13

**Email** 2:7,8,13,18,24

**emails** 13:17 16:9

**emotional** 51:1

**employee** 51:2 55:18 56:24,25
57:3,7

**employees** 41:9 66:6 76:2

**employment** 2:5 23:13,19

**encompassed** 47:16,18

**encourages** 72:4

**end** 14:12 23:20 24:5,9,18,23 27:23
32:9 74:15 75:9,10

**ended** 29:12 36:24 37:4

**ending** 28:25

**Enforcement** 47:15 58:8

**engineer** 51:15

**ensure** 9:9 29:10 39:17 49:3 50:7
59:15

**ensuring** 62:20

**entire** 59:2

**entitled** 31:11

**EO** 51:19

**equally** 39:6

**essence** 31:3

**establish** 28:6

**evaluate** 23:25

**events** 6:4,17,25 7:6,11

**Eventually** 52:1

**evidence** 45:18 53:5 61:2 70:9

**evolved** 15:13

**exact** 71:14

**Examination** 3:5,6,7,8,9 8:7 66:21
72:23 75:22 77:1

**examined** 8:5 54:19

**exceeded** 54:1,4,16

**exceeding** 61:11

**Excel** 11:13

**excuse** 13:13 25:5

**Executive** 12:1 33:19 34:19 42:21
43:1,4

**Exhibit** 4:10,11 20:17,20 26:17,19
61:20,21,22 62:1 64:1

**EXHIBITS** 3:15

**existed** 57:8

**exists** 52:25

**exonerated** 54:3,14

**expect** 9:19 38:13

**expectations** 28:6,7 38:9,13

**experience** 73:2

**explain** 70:10

**extent** 4:16

**F**

**face** 44:4

**facts** 72:15

**fair** 8:3 28:9 29:7,10 34:15 45:14
64:15

**fairly** 39:6

**falls** 36:13

**familiar** 28:19 29:21,23 61:23 64:4

**Fax** 2:7,18

**fear** 67:17

**feared** 71:22

**FED** 1:14,18

**Federal** 1:22

**feel** 30:21

**fell** 14:3 35:2

**felon** 73:4

**felt** 12:20 35:11 53:25 72:2 74:12,13

**ferret** 4:20

**Field** 19:20

**figure** 13:21

**file** 12:4 26:5 28:17 52:17 67:24 73:8

**filed** 51:20 52:15 75:25

**files** 49:13

**filing** 51:18 69:18

**final** 59:10 60:6

**find** 34:10 40:21 53:4 54:8 61:2

**findings** 24:12 32:12 54:19 58:24
59:2

**finds** 73:4,10

**finish** 15:15 30:5

**finished** 9:12

**fire** 1:15,18 3:4 8:4 14:9 16:13,18
17:8,9,10,13,15 18:2,5 24:2 33:19,20,
21 39:1,16 41:25 59:4,12 62:18 68:6
69:1 76:1

**firefighter** 31:3 38:12,19 51:20
68:10 73:11

**firefighters** 68:6

**firm** 45:11

**first-time** 19:19

**five-minute** 48:23

**Flanagan** 75:13

**Floor** 1:22 2:16 10:15



**flowchart** 12:10

**focus** 34:10

**follow** 37:14 48:12 73:22

**follow-up** 25:11 28:24 38:15 47:8
48:20 53:21 58:2

**form** 74:19,24,25

**formalize** 52:15

**formalized** 52:15

**formed** 35:3

**forms** 74:7

**forward** 32:19 56:8

**forwarded** 64:14,24 73:21

**forwarding** 56:22

**found** 30:10

**frame** 44:21

**front** 8:2

**fully** 10:10

**funneled** 33:1 48:3

**G**

**gained** 23:12

**Garrison** 23:21 24:2 27:12 28:2
33:2 34:22 59:13,19,20 60:4 76:13

**Garrison's** 29:5,9

**gave** 12:11 72:14 76:9

**geared** 14:20 38:24 45:6

**gender** 39:9

**general** 12:2,6 19:5,13,18 20:3
34:21 41:8,9 47:7 48:21 50:4,5 56:1,
9,14 57:9,14 58:2 59:10,19,24 64:14,
25 73:22 74:25 76:3 77:8

**General's** 59:7

**generally** 40:7

**get all** 70:3

**give** 9:23 10:14 17:2 30:1 40:7 51:9
54:9 61:21 67:16 68:8

**good** 4:1,3,6 35:11

**Government** 30:13 54:1 55:2

**graph** 76:9,10,12

**great** 29:3 39:13

**Gregory** 2:22

**grievances** 15:7 18:15

**ground** 8:21

**group** 20:5

**guard** 73:14

**guess** 28:12 61:6 66:9 68:13 72:11

**guessing** 25:16

**guideline** 12:3,21 25:10 35:2 36:14,
17,25 37:1 38:4,6 62:8,10,11,12

**guidelines** 34:24 36:6,7,8,10

**H**

**hand** 13:2

**handful** 4:21

**handle** 15:7 73:17

**handled** 22:5 27:10 65:7

**handling** 75:7

**hands-on** 44:14 45:13

**happen** 53:5

**happened** 69:7 70:20 72:16

**happening** 26:6

**harassment** 4:13 5:10 19:17 20:2
35:15 39:19 41:16,19 56:7 65:12
73:20

**hard** 71:16

**harm** 73:5

**head** 13:18

**hear** 9:4

**Hector** 2:4

**Hector.ruiz@usdoj.gov** 2:8

**hereto** 1:23

**HFD** 20:8 22:10 25:7 35:25 37:9,25
40:2 46:12 55:25 57:4 61:13

**HFD's** 4:12 5:9 21:18 22:12 23:6
34:14

**high** 60:24 61:6

**higher** 73:13

**highest** 62:18

**hired** 42:10

**history** 14:17

**hit** 54:22

**hold** 18:1,4,5 20:8 28:8

**Horton** 11:12 20:25 21:6,7 22:20
23:17,19,22 24:7,12 26:24 29:1,3,18
32:8 34:12 37:14 41:11 43:10 45:12
53:18 60:23 62:24 63:6,10,22 74:8
75:5,12

**HOU** 60:18

**HOU2257** 26:20

**hour** 14:1,5

**hours** 11:9 47:14

**housekeeping** 4:8

**Houston** 1:2,6,11,14,18,21,22 2:12,
14,16,17 10:15 38:12

**HPD** 57:3

**HR** 11:22 12:19 14:1 41:12,16 43:14
44:4 45:3

**hypothetical** 70:18 71:6

**I**

**identification** 26:19

**identified** 13:12,13 21:24 22:1
50:12

**identify** 11:19 34:3 75:2

**II** 2:22

**impacting** 72:8

**implement** 21:24 29:1 34:2 39:23
44:17 45:13 46:15 50:14 55:24 67:14

**implementation** 23:6

**implemented** 37:9 44:22 54:12
58:15 67:3,10

**implementing** 75:4,13

**improper** 30:22 53:25 71:5

**improve** 34:11,17 37:25 41:6

**improving** 37:8,15

**inappropriate** 30:22

**incident** 70:22

**include** 75:16

**included** 76:3

**includes** 17:20

**including** 75:20

**inconsistencies** 35:1,5

**increased** 14:4

**INDEX** 3:1



**information**  5:12 6:6 23:3 29:11 33:7,9 38:2,8 61:16 69:3,9 71:13

**initial**  22:23 65:18

**initially**  62:4 63:2

**initiative**  46:18 53:8

**initiatives**  52:5

**inspections**  17:16

**inspector**  12:2,6 17:22 19:5,13,18 20:3 34:21 47:7 48:20 50:4,5 56:1,9, 14 57:9,14 58:2 59:7,9,19,24 64:14, 24 73:22 74:25 76:3 77:8

**inspectors**  17:20,21

**instance**  1:19 69:16

**instances**  51:9 73:23

**instituted**  14:10 42:1 60:9 66:2

**instructs**  10:2

**intake**  74:6

**integrity**  68:18 69:4

**intention**  66:8

**intentions**  40:2

**interrupt**  59:5

**interview**  70:14

**interviewing**  70:13

**investigate**  18:25 19:15 20:4 54:2 56:15 57:12

**investigating**  30:19 46:16 47:20 54:20 58:1

**investigation**  28:16 29:15,25 30:10,11 46:11 54:8,18,21,25 56:10 58:18,21 59:8 68:19 70:2,6 71:4,8,12 74:15

**investigations**  17:16 18:15 29:10 54:5 67:16 69:5

**investigative**  57:19,24 58:3,19

**investigator**  20:9,10 28:18 29:22 58:17,19,23,24 74:2,3

**Investigator's**  58:20

**investigators**  17:23 18:22,25 19:6, 14,21 28:13 30:20 47:1,2,13 48:16 56:3,16,25 57:12,17,22,23 58:4,6 59:7 61:2

**investigatory**  19:3

**involve**  55:17

**involved**  24:5 42:9 43:15 44:24 51:24 58:20 65:17 69:2 76:1

**involvement**  15:21 23:18 25:6,25 26:3,13 42:5 59:16,18

**involving**  19:8,16

**issue**  51:1,10,13 52:1,19,20 54:10 68:23

**issued**  38:19 40:16

**issues**  45:15 50:20

**items**  25:1 31:15

---

### J

**JAMES**  1:20

**JANE**  1:8 2:20

**January**  48:7

**Jeremy**  2:3 8:9

**Jeremy.monteiro@usdoj.gov**  2:7

**Job**  1:24

**John**  36:21

**Juan**  43:16

**July**  17:11 18:3,6,12 19:4

**Junior**  44:5 46:8

**Justice**  2:4,10 8:10

---

### K

**Karpati**  2:10

**Kelly**  43:15

**Kelvin**  36:20

**Key**  33:23

**Keyes**  1:8 2:20 7:11

**Keyes'**  66:14

**kind**  4:19 13:18 19:2 20:24 27:24 43:14

**knew**  16:23 44:23 57:8 68:8

**Knowing**  43:13

**knowledge**  23:12 34:6,7 45:20

---

### L

**labor**  35:11,12 39:25 46:19

**lack**  71:23

**ladder**  36:9

**language**  49:22,23 50:6 65:20 77:9

**large**  17:19

**late**  26:11

**law**  31:17 32:2,5 45:11 47:15 58:8

**layer**  59:9

**layers**  59:9

**leadership**  43:5,12,19,22 44:9

**learned**  73:16

**leaves**  36:14

**left**  49:11,12 72:25

**Legal**  1:21 2:16 46:24

**Legalwatch**  25:1 42:4,6,11 43:25 44:5

**letter**  49:15 53:19

**letters**  31:14

**level**  42:15 46:8 55:5 65:7

**limited**  34:6 36:21

**lined**  40:10

**lines**  51:11

**listed**  22:20 25:1 35:8 40:4 63:10

**lists**  40:25

**litigation**  2:5 10:23

**location**  68:6

**locking**  49:12

**logged**  49:10

**long**  9:20 11:7 17:10 20:10 25:5 35:6 41:13

**looked**  13:17 32:18

**lost**  71:17,20

**lot**  13:7 38:2 49:9

**Louisiana**  2:11

**low-level**  19:11 52:19

**lower-level**  19:18

---

### M

**machine**  1:21

**mad**  28:21 52:17

**made**  34:13 49:9,12,21 51:11 53:18 63:21 66:25 77:4

**main**  72:17



**maintain** 4:23 71:11

**maintaining** 72:17

**major** 53:15

**make** 9:10,11 28:9 35:13 38:7 39:25
40:10 41:24 50:5 51:6 52:22,24
58:21,24 60:2 65:21 70:17 74:6 75:14

**makes** 56:24

**making** 13:1 45:12

**man-** 13:13

**manageable** 76:19

**management** 44:14 45:13

**management's** 23:23

**manager** 57:19 58:12

**manner** 28:10 73:4

**manual** 11:21,25 12:8,9,13 13:13
16:16 35:7 37:22,25 38:11,17 39:16
40:14 51:7 65:4,25 66:4,5

**mark** 54:22

**marked** 20:16 26:18 61:22

**Marshal** 1:15,18 3:4 8:4 17:9,10,15
18:2

**Martinez** 16:24,25 17:25 23:8 53:22
54:6 59:1 60:10

**material** 46:5

**materials** 48:10

**matter** 4:8 56:15 61:3

**matters** 57:18,23

**Mayor** 19:14 34:19 55:25 57:10
59:11

**Mayor's** 12:1 19:6 34:22

**Mcleod** 1:15,18 3:4 4:2 7:23 8:4
66:23

**means** 10:7

**media** 12:3

**mediation** 18:16 37:1

**meet** 36:23 50:22 59:23

**meeting** 23:21 24:23 27:24 32:9

**member** 32:10 50:17 63:14

**members** 51:24 62:10,20

**membership** 28:7

**mentioned** 21:1 29:20 30:15 35:18
36:6 47:25 57:25

**met** 35:11 50:1,4 74:24

**MICHELLE** 1:15,18 3:4 8:4

**mind** 52:19

**minimize** 50:13

**minute** 10:13 37:20 64:19

**Mischaracterizes** 45:17 67:4
71:25

**misconduct** 50:11

**modification** 49:20 65:17,18

**modifications** 40:18

**modified** 35:22,23 36:2 41:9,10
49:23 61:4,5,8,10 65:10,13,14,20,23

**modify** 21:18

**moment** 50:8

**monitor** 28:7

**Monteiro** 2:3 3:5,8 4:1,4,6,19 5:1,3,
7,16,21,23,25 6:3,9,12,15,23 7:4,9,
15,17,20,23 8:3,8,9 13:3,5,11,12
15:17,20 30:7 31:6,21 37:11,13 45:21
46:22 47:3 48:14,22 49:1 55:11,12
64:11 66:12 75:23 76:22

**month** 41:21

**motivated** 29:6

**move** 41:5 50:9 55:20

**moved** 19:5,14 34:22 52:1 56:1,3
57:9

**moving** 32:19

**multiple** 66:24

---

**N**

**N.W.** 2:5

**NAHMAD@CLINE-AHMAD.
COM** 2:24

**Nasim** 2:21

**nature** 4:20 14:8 17:3 19:20 36:9,15
38:9 46:5 48:1 55:19

**needed** 12:20 52:20 59:15,25

**needing** 17:1

**negative** 28:22

**newly-promoted** 11:22,24 13:14,
22,25 14:10,18 15:12,23 40:13 44:18,
21 45:5,15,25 46:7 51:8

**non-criminal** 19:11 30:11,16

**non-disciplinary** 55:8,13

**non-formalized** 53:2

**non-peace** 53:24

**non-serious** 65:6

**non-sus-** 52:13

**non-sustained** 50:10 51:4 52:6,14
53:17 60:21

**nonetheless** 50:12

**not-sustained** 53:3

**Notary** 52:16

**nother** 73:3

**notice** 20:19 31:14 49:15,19 72:15

**notices** 49:14

**NPO** 26:4

**Nuh-hm** 44:12

**number** 75:6,19 76:6,19

**numbered** 1:19

**numbers** 12:5 26:20 60:15,16

---

**O**

**O'GILVEY** 33:1

**oath** 10:6

**objection** 4:20,23 5:23 6:2 30:24
31:18 37:10 45:17 55:9 67:4 71:5,25

**occurred** 6:5,17,25 7:6 13:19,20

**occurrences** 50:13

**occurs** 50:11

**offenders** 19:19

**offer** 22:1

**offered** 3:17

**offering** 4:15 15:10

**office** 2:11 12:2,6,17 13:24 17:24
19:4,6,13 28:13 34:21,22 50:4 56:1,4,
9,14 57:8,9,13,14 64:14,24 73:21
76:2

**officer** 13:22 14:10,18,21 15:12,23
40:13 44:18,21 45:6,15,25 46:7 62:9,
16,17,19 68:5

**officers** 11:22 13:14,25 28:12 47:13
51:8 53:24 58:17

**OIG** 48:16 55:21,22 56:3,18 57:1
59:6,16,18 66:8 67:1,8 77:7



**ongoing** 50:20

**online** 40:11 48:11

**open** 49:11 72:2,4 73:19

**operational** 36:8

**operator** 51:15

**opinion** 30:25

**opposed** 31:17 39:8

**order** 9:9 12:1 34:19

**ordered** 49:16

**orders** 42:22 43:1,4 57:20 58:13

**ordinance** 58:22

**orientation** 35:16,20

**original** 66:3

**originally** 36:24

**originated** 76:2

**oversee** 17:16 18:15

**oversees** 17:25

---

**P**

**P.30(b)(6)** 1:14,18

**P.L.L.C.** 2:22

**p.m.** 1:20 48:24,25 66:19,20 77:15

**package** 68:25

**packet** 48:11

**Padilla** 43:16

**pages** 33:24 38:1

**paperwork** 14:21

**paragraph** 64:7

**Parker** 34:19 55:25

**part** 6:4,16,24 11:3 14:6 15:22 16:11 18:18 33:20 38:8 44:10 49:7 61:10 65:10 74:17

**participate** 40:12

**participated** 25:3

**participation** 26:8 36:21

**parts** 35:6

**Pass** 72:21 75:21

**passed** 48:4

**past** 54:6,9

**Pat** 33:1

**PAULA** 1:8 2:20

**peace** 28:12 47:13 58:16

**peacefully** 50:24 52:3

**penalties** 39:19

**penalty** 40:22

**pending** 9:24

**Pennsylvania** 2:5

**people** 28:8,21 36:19 39:4,5,6 42:25 49:11 69:2 71:21

**percent** 71:9

**performance** 28:8

**period** 18:10,21 25:24 45:4 63:25 66:9

**periodically** 41:15

**permit** 5:4,16

**perpetrator** 50:11

**person** 7:24 32:11 44:4 52:22 67:19 69:5,18,24 70:19,24 73:5

**person's** 37:3

**personal** 23:12 26:3 44:14 45:13

**personnel** 57:4

**pertain** 4:8

**pertaining** 34:13 39:18

**pervasive** 51:5,10

**piece** 14:25 16:2 45:3 53:13 66:10 68:20,22

**Pitkin** 2:23

**place** 25:2 26:7 27:10,12 39:19

**places** 36:3 49:15

**Plaintiff** 1:4,19 2:2

**Plaintiff-intervenors** 1:9

**PLAINTIFFS-INTERVENORS** 2:20

**PLAIR** 1:20

**plan** 18:16

**planned** 32:24

**plans** 32:20

**point** 32:18

**policies** 4:12 5:9 21:4,18 27:7 34:11,14,18,23 37:8,16 38:22 57:20 58:13

**policy** 12:3 15:5,10,22 22:10,12,14,

25 23:7 25:7,9 26:1,5,14 27:9,11 29:19 35:14 36:11 38:3 39:3 52:4,8, 12,24,25 53:6,16 61:13,17,18,21 62:4,6,7,8,23 63:2,21 64:6,23 65:2,22

**poorly** 74:11

**portion** 12:22 22:23 36:15

**position** 17:7 18:1,4,5 20:8 72:12, 16

**positions** 44:15

**possibly** 50:25

**potential** 73:12

**potentially** 6:7

**Powerpoint** 12:12

**prac-** 53:22

**Practical** 46:10

**practice** 28:15 29:7,12,21,23 30:12, 21 31:6,16,22,23,24 32:1 56:20 62:14

**practices** 4:12 5:9 21:4 27:7 58:19 74:14 75:14

**preparation** 13:16 16:11,14 27:4

**prepare** 11:11 16:14,21

**prepared** 7:24 27:21,22 34:4,7 76:12

**preparing** 11:4,7

**prerequisite** 44:15

**present** 4:22,24 6:8,18,21 7:2,7,13 16:5 22:18

**presentation** 14:23 51:11

**presented** 11:21 12:12,15 16:6 23:24 40:11 41:12 43:15,18,21 51:7 59:11,12

**presenting** 12:18

**presents** 59:4

**pretty** 28:17

**prevent** 7:10 26:6

**prevents** 10:9

**previous** 28:15 51:18

**previously** 22:13 26:18

**primarily** 45:8 53:1,3

**primary** 68:17

**prior** 13:6 14:11,15,18,22 15:20 18:2,6 20:7 24:9 27:16 28:11,13 43:7 45:15 53:17 54:15 69:7



**privilege**  4:18 5:5,17 6:13

**privileged**  6:10

**problem**  55:5

**procedural**  31:14

**procedure**  1:22 40:4,16,24 52:5,11
53:8,11,12 54:24 59:6 60:13 64:12
65:20

**procedures**  15:4 21:4,19 27:7
34:14 38:23

**proceed**  8:23

**process**  16:6 28:25 60:8,11 69:3
74:4

**processing**  46:12

**produced**  1:18 13:6

**product**  4:17 35:11

**Professional**  13:24 17:24

**proffer**  4:21

**Program**  51:2 52:8,12 55:18

**progressing**  58:21

**project**  37:5

**promoted**  20:13 28:4

**promotion**  44:15 46:4

**proper**  30:9,25 67:15

**properly**  54:13

**prospectively**  32:16

**provide**  31:7 32:3 39:16 64:1 65:8
71:2

**provided**  13:14 28:22 43:22 45:8
46:19,21 47:8,21 48:15 62:5,23
63:12,15 64:18 67:1 69:17

**providing**  33:9 69:7 70:1 71:3
72:13

**provisions**  1:22

**psychologist**  14:24

**psychologists**  51:3

**public**  72:19

**published**  24:13

**pulled**  11:17 12:24

**punitive**  54:10,25

**purposes**  11:1 26:19

**pursuant**  1:22

**put**  8:2 29:18 32:23,25 36:4 48:11,19

---

**Q**

**question**  5:4,17 6:8 7:3,8,14 9:4,5,
11,24,25 10:3 15:15 25:11 28:25 30:5
31:20 38:15,16 59:23 61:7 63:1 66:23
69:20 72:10

**questions**  4:21 6:22 7:25 8:25
10:3,22 14:2 22:6,15 23:9 66:13,15
72:22 74:20 76:23

**quick**  66:17,23

---

**R**

**race**  39:9 74:14

**race-related**  51:16

**raise**  36:9

**rank**  17:22

**ranking**  62:9,16,17,19

**ranks**  68:7

**re-**  8:16 37:11 69:9

**read**  9:6 62:11 69:1 77:13

**real**  66:16

**reason**  10:9 54:16 68:4,17 74:17

**reasonable**  61:1

**reasons**  67:2 68:16 74:23

**recall**  25:22 26:16

**receive**  19:23,25 40:8,9 41:14,15
44:6 56:5 57:18,23 71:16

**received**  44:9 48:13 63:18

**receiving**  24:14 65:16

**recess**  48:24 66:19

**recommend-**  60:2

**recommendation**  37:20 39:15
41:5,7 44:17 45:12 49:1 50:15 55:24
60:3

**recommendations**  21:24 32:12
33:23 34:2,4,13 37:7,14 46:15 75:5

**record**  1:22 45:18 48:23

**red**  38:10,16,22

**reduce**  75:15 76:13,18

**Reeves**  36:21

**refer**  51:2

**reference**  56:24 63:6 73:1

---

**referenced**  24:16 33:12

**references**  64:20

**referencing**  47:17 57:2

**referral**  55:17

**referring**  13:21

**refers**  66:6

**reflected**  24:23

**refocus**  26:5

**regard**  8:16 34:25 66:25 67:1,9
69:21 72:4

**regs**  12:21 25:17 34:25 35:1,4,25
36:13 40:23 46:4 48:6 65:19

**regulations**  35:24 40:3

**relate**  20:24

**related**  4:13 5:10 11:18 25:7 28:25
29:2 37:15 46:3 49:5 50:25 63:1
73:24

**relates**  15:5 22:11

**relating**  37:15

**Relations**  56:25 57:3,7

**relative**  61:6

**release**  24:22

**released**  24:12,18 43:2 75:12

**religion**  74:14

**reluctant**  68:8

**rely**  66:6

**remedial**  6:16

**remember**  25:16 43:7,20,23,24
44:10,11 47:11,12 48:18 51:16 66:3

**remembering**  61:15

**remind**  12:25 38:21

**remotely**  20:1

**reoccurrence**  7:10

**repeat**  50:13

**rephrase**  9:1 37:12 55:12

**report**  20:25 21:8 23:17,19 24:7,12
29:1 31:4 33:23 34:13 37:15 41:11
42:2,3 43:6,10 49:2 53:18 57:6 60:15,
19,23 63:6,11,23 65:11 74:18 75:12

**reported**  1:21

**reporter**  1:20 9:6

**reporter's**  3:11 9:8



**represent** 20:17 24:17

**representative** 10:21 11:1,4 23:5

**represented** 15:3

**REPRESENTING** 2:2,14,20

**reprimand** 55:15

**reps** 12:5

**requested** 6:3,15,24 7:4,10

**required** 58:7

**requirement** 30:14

**requirements** 47:18

**requires** 32:2

**resolution** 18:16 36:25 50:18 52:2

**resolving** 46:12

**respect** 4:10 22:14 23:19 25:25
26:14 37:7 52:5,6 53:16 61:17 62:6

**respond** 9:10,11 46:1

**respondent** 28:16,23 30:10 31:9
49:17 51:14 53:19 67:23 68:24 69:13
71:13 72:20 74:12

**response** 6:4 7:5 20:18,25 21:9,19
22:21 23:24 24:6,15 31:23 39:22
41:10 42:1,3 43:9 53:18 57:5 63:22
70:4 72:13

**responses** 11:13

**responsibilities** 17:12 18:13

**responsibility** 65:11

**responsible** 14:22 62:20

**rest** 34:8 76:10

**restate** 9:5

**restructured** 55:25

**result** 6:16,25 32:2 68:3 74:7 75:4

**retaliate** 72:20

**retaliated** 20:2

**retaliation** 19:17 20:2 28:20 35:15
56:8 65:12 67:17,18 68:13,15 71:23
72:25 73:17,18,19,24 74:21 75:18

**review** 20:3 21:5,13,18 23:22,23
24:6 27:7,10,15 28:1 32:8 35:4 39:25
40:13 42:16,25 53:6 58:24 59:10
62:10,11,21 63:4 64:6,8 68:9 69:9

**reviewed** 11:12 12:23 13:16 16:9,
11 26:4 27:4 29:3 43:2 58:19

**reviewing** 46:11 64:9

**reviews** 59:1

**revise** 21:18 25:14

**revised** 25:8,9,17 35:8 39:24 65:18

**revision** 34:13

**Riesner** 19:7

**rights** 2:5 43:13,18 44:1,3 56:10,13
69:13

**Road** 2:23

**Robin** 50:5

**role** 11:3

**room** 50:23

**row** 69:6 70:3,8

**rudeness** 19:19 47:25

**Ruiz** 2:4

**rule** 35:8,14,19 39:17 40:2,3

**rules** 1:22 8:22 12:21 25:17 34:25
35:1,4,23,25 36:13 40:2,23 46:4 48:6
57:20 58:13 65:19

**runs** 33:23

## S

**scenarios** 12:10,19 48:11

**section** 23:14 44:13 46:1

**secured** 49:13

**seeking** 4:17

**segment** 14:25 15:2

**self-accountability** 38:14

**send** 20:3,4 50:18 73:13

**Senior** 11:23 28:14 43:25 44:7 47:2
58:18,20 62:19

**seniors** 17:21

**separate** 14:15 36:3 38:10,11,18
43:19,20

**Services** 13:25 15:4 16:4 18:7,11,
14,22 19:3,11,15,23 20:8 25:8 30:20
33:10 47:1,22 49:11 50:2 53:23 56:3,
5,8 58:16,23 59:17 60:11 67:12,13
74:7 75:25 77:4

**set** 57:15

**Seventh** 10:15

**severity** 59:24

**sexual** 35:16,19 41:18

**sharing** 29:12,14 49:6

**shift** 36:22,23 42:15 48:8 61:12

**shipped** 25:9

**Shorthand** 1:20

**show** 20:16 26:17 52:3 61:20

**showing** 26:17

**Shreck** 43:15

**side** 17:22 73:3,6,7

**sign** 52:16 77:13

**Signature** 3:10

**signed** 38:19

**similar** 50:6 59:14,22 74:25

**simple** 70:17 74:20

**sir** 23:11 24:3

**sit** 62:20

**sitting** 11:20

**situation** 69:14

**situations** 68:14 74:1

**Sky-eagle** 36:23 37:4

**slot** 13:25 14:1

**small** 60:16

**Smith** 10:15

**Snell** 22:24 27:22 63:14 75:13

**social** 12:3

**some-** 51:1

**sooner** 14:16

**sort** 24:6 52:4 63:6

**sorts** 18:24

**sounds** 27:25

**SOUTHERN** 1:1

**speak** 16:13,20

**special** 62:7

**specialized** 57:18 65:1

**specific** 12:13 27:9,11 40:22

**specifically** 42:1 69:12

**specifics** 23:3

**spend** 11:4,7

**spoke** 16:25

**spot** 36:4



**spreadsheet** 11:13 22:20 23:23 24:16,17,24 27:17,18,21,22 29:19 32:25 33:3 62:24 63:11

**staff** 13:24 15:4 16:4 17:17,19 18:7, 11,14,21,22 19:2,11,14,23 20:8 23:21 24:13 25:8 27:24 28:5 30:20 32:9,10 33:10,12,15,20 43:2,4 47:1,22 49:11 50:2 51:3 53:23 56:3,5,8 58:16,23 59:17 60:10 67:12,13 74:7 75:25 77:4

**staffed** 53:23 56:4,9

**standard** 60:24,25 61:5,8

**Standards** 13:24 17:24

**start** 49:12 73:15 76:20

**started** 13:23 14:7,19 15:9 16:8 33:4 38:2 53:22 54:7 60:11 75:13

**starting** 60:12

**state** 1:20 9:1 32:2,4 74:13

**stated** 1:22 74:18

**statement** 28:22 31:2,4,8 67:17,23, 25 68:8 69:7 71:2,3,9,11

**statements** 28:17 29:14 30:1,12 49:6 67:1,10 68:25 69:17,21,23 70:15 71:14,17,20,22 72:8,14,18 77:3

**states** 1:1,3 2:2,4,10 4:11 20:18

**station** 6:5,17 7:1,6,12 50:17 51:6, 7,10,12,24 62:9,18 65:7 68:6 69:1

**stats** 76:11

**stenotype** 1:21

**step** 10:12 64:19

**steps** 32:7

**Stone** 36:20 48:6

**stopped** 28:19 49:6

**strategic** 18:16

**streamlined** 35:9

**Street** 2:11,16 10:15

**student** 42:8

**study** 46:5

**stuff** 13:8 38:5

**sub-questions** 66:24

**subparagraph** 64:20

**subtopic** 21:3,10,12,17,21,23 22:7, 11 23:2 25:4,5 44:13 46:10

**subtopics** 20:24 23:13

**suggest** 6:7

**Suite** 2:11,23

**Sullivan** 2:15 3:7 4:16,24 5:2,6,12, 19,22,24 6:1,6,11,14,18 7:2,7,13,16, 19,22 8:1 13:1,4,7,10 15:15,18 30:5, 24 31:18 37:10 45:17 46:24 55:9 67:4,8 71:5,25 72:22,24 75:21 77:13

**summary** 27:1

**superior** 68:5

**supervisor** 68:12 73:8

**supervisor's** 65:11

**supervisory** 44:15

**supplemental** 33:7

**supplementing** 33:6

**supposed** 32:23

**Suppression** 28:14

**suspend** 55:3

**suspension** 40:8

**sustain** 74:16

**sustained** 50:16,19 53:20 54:3,8,9, 13,14

**sustaining** 60:24

**sworn** 1:19 8:5

**synopsis** 59:10

---

**T**

---

**table** 69:1

**tactical** 14:21 45:9

**taint** 71:4

**tainting** 71:7

**taints** 70:2,5

**taking** 8:11 9:8

**talk** 23:15

**talked** 37:21 44:20 49:5 60:22 77:4

**talking** 15:19 69:15,16 73:1

**target** 29:14

**targeting** 51:19

**tasked** 36:17

**teaching** 14:7,24

**technique** 58:3

**techniques** 57:19,24

**Telephone** 2:6,12,17,24

**telling** 70:11,12

**ten** 17:23

**term** 64:21

**terminology** 33:18 66:5

**terms** 14:18 25:4 34:1 60:3 64:18 65:2 66:1 69:5 72:11,12,16

**Terry** 36:20

**testified** 8:5 58:9 73:11

**testify** 16:24 21:9,14,21 23:4 34:1:4, 7

**testifying** 10:7,10 68:3

**testimony** 3:4 22:2 57:11 67:5 72:1,12

**testing** 46:6

**Texas** 1:1,21,22 2:12,17,23 10:16 47:14 58:8

**text** 42:21

**thing** 22:19 35:18 56:11

**things** 13:19,20 14:8 19:8,19 36:9, 14 38:9 46:5 48:1 55:18 70:4 71:23 73:21

**thinking** 76:15

**Thompson** 11:12 20:25 21:6 22:20 23:17,19,22 24:6,12 26:24 29:1,3,18 32:8 34:12 37:14 41:10 43:9 45:11 53:18 60:23 62:24 63:6,10,22 74:7 75:5,12

**thought** 15:25

**Thursday** 1:19

**tie** 35:16

**time** 5:13,15 8:19 11:4 12:16 15:19 18:10,21 19:8 20:13 24:4 25:24 27:19 32:15,18 44:21 45:4 46:24 47:5 56:19,22 59:13 60:12 66:9 70:12,14 71:4 72:15

**timeline** 13:18 14:6

**times** 33:13

**title** 18:8 46:16 47:12,20 48:15 58:1 67:18 73:24 75:17,18

**titled** 49:2

**today** 4:4 7:25 8:1,11,23 10:4,10 11:11,20 13:6,16 16:22 27:4 34:5

**told** 26:15 27:22 46:24 68:24

**Tolerance** 41:17

**topic** 4:10,15 16:8 20:23 21:15,17 22:2,9,18 25:6 27:6 34:10 41:5 47:9



50:9 55:20 61:12

**total** 75:19

**touched** 37:19,20

**track** 75:15

**train** 28:7 63:21

**trained** 28:13,18 29:22 47:13 48:9
58:4

**training** 4:13 5:10 11:22 12:8,9
13:13,23 14:10,18 15:10,12,22,23
22:10,14,24 23:5 24:14 25:1,6,25
26:14 38:8,11,20 39:17 40:13 41:6,8,
10,12,15,16,18,19,25 42:4,6,13,14,19
43:5,12,14,19,22 44:5,9,14,19,22
45:13,15,25 46:7,11,18,20 47:6,8,16,
17,21,24 48:10,13,15 55:17 57:18,23,
25 58:7 61:13,17 62:5,22 63:3,7,12,
18 64:1,4,17,18 65:1,8,15

**transcript** 9:10

**transfer** 36:10 73:13

**treat** 39:5,6 73:9

**treating** 39:4

**trip** 51:6

**truth** 71:9

**truthful** 71:8,21

**truthfully** 10:7,10 68:3

**Tuesday** 22:5

**turned** 59:19 73:5

**tying** 35:14

**type** 15:18 59:22 67:18 74:14,23

**types** 75:2

---

**U**

**U.S.** 2:10

**Uh-hm** 15:7 46:13 49:4 56:17 70:21

**Uhm** 6:7

**unaware** 15:24

**underneath** 34:22 56:2 57:10
68:11

**understand** 8:22,25 10:6,12,20
21:8,14,20,25 31:20 34:12 41:24
70:16 72:9

**understanding** 5:13,20 14:20
15:21 60:25 69:14

**Understood** 8:17

**unfairly** 70:2,5 73:9

**unfounded** 54:3,14

**unit** 56:25 57:3,8,19 58:13 62:9

**United** 1:1,3 2:2,4,10 20:18

**units** 30:18

**unsure** 20:1

**update** 12:19 34:23 39:16

**updated** 12:21 34:19,21 36:7

**updating** 36:17,25

---

**V**

**Vague** 31:18

**values** 38:24 39:1

**verify** 53:13

**version** 12:13,14,23 22:11 23:6
25:14

**versus** 65:6

**VII** 46:16 47:20 48:15 58:1 67:18
73:24 75:17,18

**violated** 57:21 58:14

**violating** 40:3

**violation** 35:8 52:24 59:25

**violations** 39:17 40:25 41:3 59:14
64:13

---

**W**

**wait** 9:11

**Wanda** 12:18 14:1,12,22,24 16:16
22:1,4,13 40:12 42:9 43:16 50:18
51:6,11

**wander** 49:12

**wanted** 23:24 28:2,6 71:10 76:13
77:11

**Washington** 2:6

**ways** 50:23

**webinars** 47:7,8,9 48:20 58:1

**week** 25:5

**witnessed** 28:21

**witnesses** 68:3,7 72:20

**Woodlands** 2:23

**work** 4:17 37:21 50:24 52:3 68:11

**worked** 57:7

**working** 33:4 37:4

**workplace** 4:13 5:10 35:15,19
41:8,9 50:10 73:9

**write** 59:10 73:12

**written** 52:4 55:15 74:11

---

**Y**

**year** 25:16 75:10

**years** 8:20 12:15 41:18

---

**Z**

**ZIP** 10:17