# EXHIBIT T1

# Deposition of Alfredo Martinez (Part I)

# EXHIBIT T

# Deposition of Alfredo Martinez (Part I)

## Page 1

```
 1          UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
 2              HOUSTON DIVISION
 3
   UNITED STATES OF AMERICA,    ) Civil Action
 4      Plaintiff,         ) No. 4:18-CV-00644
                           )
 5   vs.                   )
                           )
 6   CITY OF HOUSTON,      )
        Defendant.         )
 7    _____
 8   JANE DRAYCOTT AND PAULA    )
     KEYES,                     )
 9      Plaintiff-Intervenors,  )
                                )
10   vs.                        )
                                )
11   CITY OF HOUSTON,           )
        Defendant.              )
12
13
14   ***********************************************
15   FED. R. CIV. P.30(B)(6) DEPOSITION OF CITY OF HOUSTON
16      (ASST. FIRE CHIEF ALFREDO MARTINEZ)
17            August 12, 2019
18   ***********************************************
19     FED. R. CIV. P.30(B)(6) DEPOSITION OF CITY OF HOUSTON
   (ASST. FIRE CHIEF ALFREDO MARTINEZ), produced as a witness
20 at the instance of the Plaintiff and duly sworn, was taken
   in the above-styled and numbered cause on Monday, August
21 12, 2019, from 9:36 a.m. to 1:25 p.m., before JAMES M.
   PLAIR, Certified Shorthand Reporter in and for the State
22 of Texas, reported by computerized stenotype machine at
   the CITY OF HOUSTON LEGAL DEPARTMENT, 900 Bagby, Third
23 Floor, Houston, Texas 77002, pursuant to the Federal Rules
   of Civil Procedure and the provisions stated on the record
24 or attached hereto.
25 Job No. 407946
```

## Page 2

```
 1            APPEARANCES
 2
   REPRESENTING PLAINTIFF UNITED STATES OF AMERICA:
 3
   Mr. Jeremy P. Monteiro
 4 Mr. Hector F. Ruiz
   UNITED STATES DEPARTMENT OF JUSTICE
 5 EMPLOYMENT LITIGATION - CIVIL RIGHTS DIVISION
   950 Pennsylvania Avenue, N.W.
 6 Washington, D.C. 20530-0001
   202.616.9100 Telephone
 7 202.514.1005 Fax
   Jeremy.Monteiro@usdoj.gov Email
 8 Hector.Ruiz@usdoj.gov Email
 9    and
10 Ms. Elizabeth F. Karpati
   Mr. Keith Wyatt
11 UNITED STATES DEPARTMENT OF JUSTICE - U.S. ATTORNEY'S
   OFFICE
12 1000 Louisiana Street, Suite 2300
   Houston, Texas 77002
13 713.567.9767 Telephone
   Elizabeth.Karpati@usdoj.gov Email
14 Keith.Wyatt@usdoj.gov Email
15
   REPRESENTING DEFENDANT CITY OF HOUSTON:
16
   Ms. Deidra N. Sullivan
17 CITY OF HOUSTON LEGAL DEPARTMENT
   900 Bagby Street, Third Floor
18 Houston, Texas 77002-2527
   832.393.6457 Telephone
19 832.393.6259 Fax
   Deidra.Sullivan@houstontx.gov Email
20
21 REPRESENTING PLAINTIFFS-INTERVENORS JANE DRAYCOTT AND
   PAULA KEYES:
22
   Mr. S. Nasim Ahmad
23 Mr. Dwain Gregory Capodice II
   AHMAD & CAPODICE, P.L.L.C.
24 24900 Pitkin Road, Suite 300
   The Woodlands, Texas 77386
25 832.767.3207 Telephone
   NAhmad@cline-ahmad.com Email
```

## Page 3

```
 1                INDEX
 2                         PAGE
 3
 4 TESTIMONY OF ASST. FIRE CHIEF ALFREDO MARTINEZ
 5 Examination by Mr. Monteiro          5
 6 Examination by Mr. Ahmad           122
 7 Examination by Ms. Sullivan        136
 8 Further Examination by: Mr. Monteiro       137
 9 Changes and Signature              138
10 Reporter's Certificate             140
11          EXHIBITS MARKED
12 30(B)(6)        DESCRIPTION          PAGE
13
14 Exhibit 1  Plaintiff's Amended Notice of Fed. R.    23
        CIV. P.30(B)(6) Deposition to
15      Defendant City of Houston
16 Exhibit 2  Defendant City of Houston's First    49
        Amended Objections and Responses to
17      Plaintiff's Amended Notice of FED. R.
        CIV. P.30(B)(6) Deposition to
18      Defendant City of Houston; and
        Defendant City of Houston's Second
19      Amended and Supplemental Objections
        and Responses to Plaintiff's Amended
20      Notice of FED. R. CIV. P.30(B)(6)
        Deposition
21
   Exhibit 3  City of Houston interoffice     52
22      correspondence dated 01-13-10 re. OIG
        COMPLAINT 2009-0424 - HOU00005843
23
   Exhibit 4  City of Houston interoffice     54
24      correspondence dated 01-13-10 re.
        Complaint of Ena Jane Draycott OIG
25      2009-0424 - HOU00005852 through 5865
```

## Page 4

```
 1          EXHIBITS MARKED (Cont'd.)
 2 30(B)(6)        DESCRIPTION          PAGE
 3 Exhibit 5  Statement of Ena Jane Draycott dated    67
        08-19-2009 - HOU00006027 through 6030
 4
   Exhibit 6  HFD Rules and Regulations policies,    69
 5      08-01-05, Sections 1.01 through 8.10 -
        HOU00002772 through 2786
 6
   Exhibit 7  City of Houston interoffice     80
 7      correspondence dated 03-30-10 re.
        Complaint of E. J. Draycott and P. D.
 8      Keyes, OIG 09-407 - HOU00005460
        through 5462
 9
   Exhibit 8  City of Houston interoffice     83
10      correspondence dated 03-30-10 re. OIG
        Case 2009-407 with Investigation
11      Summary - HOU00001472 through 1495
12 Exhibit 9  OIG Confidential File re. Complaint of    96
        Jane Draycott OIG 10-311 - HOU00005671
13      through 5705
14 Exhibit 10  Sworn Affidavit of Jane Draycott dated   104
        04-21-2010 - HOU00005759 through 5762
15
   Exhibit 11  HFD Complaints policies, 08-01-05,   108
16      Sections 1.01 through 6.06 -
        HOU00002810 through 2826
17
18 Exhibit 12  HFD Complaints policies, 08-01-2018,   116
        Sections 1.01 through 6.06 -
19      HOU00002831 through 2834
20
21
22
23
24
25
```



Page 5

1        ASST. FIRE CHIEF ALFREDO MARTINEZ,

2  having first been duly sworn, was examined and testified

3  as follows:

4                    EXAMINATION

5  BY MR. MONTEIRO:

6     Q.  Good morning, sir.

7           Would you please state your name, and spell

8  your last name for the record.

9     A.  Alfredo Martinez, M-A-R-T-I-N-E-Z.

10    Q.  Thank you.

11          And would you provide your business

12  address?

13    A.  1801 Smith Street, Houston, Texas 77002.

14    Q.  And what business is at 1801 Smith Street?

15    A.  The Houston Fire Department, Administration.

16    Q.  Have you had your deposition taken before?

17    A.  Yes.

18    Q.  When was the last time you had your deposition

19  taken?

20    A.  Oh, it would have to be at least ten years.

21    Q.  Okay.  So I'm just going to go over a couple of

22  reminders so you can understand how we'll proceed today.

23          If you don't understand any of my

24  questions, please state so and I'll do my best to restate

25  them.

Page 6

1          Do you understand that?

2     A.  Yes.

3     Q.  And if you don't hear my question, you can state

4  that as well and I'll do my best to restate my question.

5          Do you understand that?

6     A.  Yes.

7     Q.  In order to ensure a clean transcript, please

8  wait until I finish my question before you answer, so the

9  court reporter can take down both what I'm saying and

10  you're saying.

11          Do you understand that?

12    A.  Yes.

13    Q.  You also need to answer my questions verbally

14  rather than, you know, nodding your head, shaking your

15  head, body language, like that.  The court reporter can't

16  take down.

17          So do you understand that?

18    A.  Yes.

19    Q.  And if you do respond like that, which is

20  totally normal in this type of setting, I may just prompt

21  you -- I may ask you the same question again, just to make

22  sure that I get a verbal response, just -- Do you

23  understand that?

24    A.  Yes.

25    Q.  Unless the City's attorney instructs you not to

Page 7

1  answer a question, please answer all my questions today.

2          Do you understand that?

3     A.  Yes.

4     Q.  And if you need a break, please state so and

5  we'll do our best to accommodate that.

6          The only caveat I'll add to that is, if

7  there's a question pending, I'll ask that you answer that

8  question before we take the break.

9          Is that okay?

10    A.  Yes.

11    Q.  You're under oath.  Do you understand what

12  testifying truthfully means?

13    A.  Yes, sir.

14    Q.  And is there any reason that prevents you from

15  testifying truthfully and fully today?

16    A.  No.

17    Q.  Okay.  Do you understand that you've been

18  designated by the City as its representative, to answer

19  certain questions on behalf of the City today?

20    A.  Yes.

21    Q.  And have you agreed to be the City's

22  representative for purposes of today's deposition?

23    A.  Yes.

24    Q.  As part of your role of being the City's

25  representative today, did you spend time preparing for

Page 8

1  this deposition?

2     A.  Yes.

3     Q.  How long did you spend?

4     A.  I think we had two short meetings.  One was

5  approximately an hour.  The second meeting was an

6  hour-and-a-half, maybe two hours.

7     Q.  And when were those meetings held?

8     A.  One was early July and one was in August, but

9  I -- I don't remember the exact date.

10          I can look through my calendar, if need be.

11    Q.  Who did you meet with in connection with

12  those -- that preparation?

13    A.  So the first meeting was with two attorneys.  I

14  believe it was Ms. -- Ms. Sullivan and Ms. Cohen.  Also in

15  that meeting was Chief McLeod and Chief Stein.

16          The second meeting in August was only with

17  the same two attorneys and no one else.

18    Q.  Chief McLeod, is that Michelle McLeod?

19    A.  Yes, sir.

20    Q.  And what is Chief Stein's first name?

21    A.  Allison.

22    Q.  Allison.

23          Did you speak with anyone in the Fire

24  Department about -- I'm sorry.  Let me back up for a

25  minute.



Page 9

1    A.   Okay.

2    Q.   In connection with preparing for today's

3 deposition, did you speak with anyone in the Fire

4 Department?

5    A.   No.

6    Q.   Did you speak with anyone in the Office of

7 Inspector General?

8    A.   No, sir.

9    Q.   In the meeting with Chief McLeod and

10 Chief Stein, did -- did you have conversations with them

11 that helped you prepare for today's deposition?

12    A.   No, I didn't have conversation directly with

13 them.  We were just in the room, speaking in -- in general

14 of the deposition.

15    Q.   Did you speak with anyone about their

16 depositions in this case, to prepare for today's

17 deposition?

18    A.   No, sir.

19    Q.   Did you review any of the deposition

20 transcripts, to prepare for today's deposition?

21    A.   Yes.

22    Q.   Whose deposition -- Which depositions did you

23 review?

24    A.   It was Phil Boriskie and Rick Flanagan.

25    Q.   Any other deposition transcripts that you

Page 10

1 reviewed?

2    A.   No, sir.

3    Q.   Did you read the entire transcripts or were

4 there specific parts that you reviewed, that helped you

5 prepare for today's deposition?

6    A.   Well, I -- I attempted to read all of 'em.  I

7 mean, they were very lengthy, but for the most part, I did

8 get through -- through both of 'em.

9    Q.   Did you review any documents, to prepare for

10 today's deposition?

11    A.   Yes.

12    Q.   Can you identify those documents?

13    A.   I looked at previous complaint policies.  I -- I

14 read over the synopsis on three cases, OIG cases.

15    Q.   When you say "the synopsis on three OIG cases,"

16 are those the three cases -- or the three investigations

17 related to Jane Draycott?

18    A.   Yes, sir.

19    Q.   Any other documents that you reviewed, to

20 prepare for today's deposition.

21    A.   Not that I can recall.  I did review documents.

22 I just -- They're not coming to me now.  There may be --

23 maybe the Behavior Manual --

24    Q.   Okay.

25    A.   -- and the Code Administrative Procedure, which

Page 11

1 is what it's called now.

2    Q.   When you reviewed the three synopses related to

3 Ms. Draycott, was that the first time you had reviewed

4 those documents?

5    A.   Oh, I think I had seen one of them before, maybe

6 in 2009, when I was in Staff Services, but I just -- It's

7 such a long time ago, I'm not quite sure if I read the

8 entire thing.

9    Q.   Do -- Did you -- Were you involved, back in

10 2009-2010, in any of those three investigations?

11    A.   I believe in one of 'em, I was assigned to Staff

12 Services, where we would have received the synopsis from

13 OIG, but there are cases where, sometimes, they would go

14 directly to the Fire Chief and bypass Staff Services, so

15 I -- I can't confirm if that particular one came straight

16 to us or straight to the Fire Chief.

17    Q.   And do you know which one that is, that you're

18 speaking of?

19    A.   I believe it's 424.

20    Q.   Okay.

21    A.   But it could also be 407.  I'd have to take a

22 look at it.

23    Q.   So, back in 2009-2010, you worked in Staff

24 Services.  Is that correct?

25    A.   Yes.

Page 12

1    Q.   Okay.  And what was your position at that time?

2    A.   I was a Senior Investigator, assigned to Staff

3 Services as the supervisor there.

4    Q.   And your memory, your recollection, is that

5 there were times where the Office of Inspector General

6 would send synopses directly to Staff Services?

7    A.   Correct.

8    Q.   And then there were other times where the Office

9 of Inspector General would send synopses directly to the

10 Fire Chief?

11    A.   Right.  And -- I'm sorry.  They would --

12    Q.   Go ahead.

13    A.   They would make their way to our office if they

14 were sent to the Fire Chief and the -- and vice versa.  If

15 they were sent to us --

16    Q.   Okay.

17    A.   -- they would make their way to the Fire Chief.

18    Q.   Was there any specific procedure or policy

19 that --

20    A.   No.  I -- I don't remember.

21        MS. SULLIVAN:  Let him finish his question.

22        THE WITNESS:  Sorry.

23    Q.   (BY MR. MONTEIRO)  Yeah.  I know you're

24 anticipating my --

25    A.   Sure.



Page 13

1    Q.   -- my questions.  Just let me -- make sure to
2  let me finish.
3         Was there a specific procedure or policy
4  that laid out that process?
5    A.   No.
6    Q.   Okay.  And did the documents you reviewed help
7  you prepare for today's deposition?
8    A.   I'm sorry.  Could you ask it again?
9    Q.   Sure.
10        Did the documents that you reviewed to
11 prepare for today's deposition assist you in preparing for
12 the deposition?
13   A.   Yes, I believe they did.
14   Q.   Are you aware of the United States lawsuit in
15 this case?
16   A.   Yes, I'm aware of why I'm here.
17        I don't know that I read the entire lawsuit
18 itself, other than the paperwork that was given to me, to
19 be here today.
20   Q.   Okay.
21        Have you read any -- any -- or have you
22 read Ms. Draycott or Ms. Keyes' lawsuit in this case?
23   A.   No, sir, I can't recall reading it.
24   Q.   Are you aware of the claims that are being
25 asserted in this lawsuit?

Page 14

1    A.   Not clearly, on the actual claims, you know.
2  I -- I'd have to review the document.
3    Q.   Okay.  All right.
4         We started to talk briefly about your
5  employment history or your -- the work you did for Staff
6  Services back in 2009, but I just want to go through your
7  employment history a bit further.
8         You're currently employed with the City of
9  Houston, correct?
10   A.   Yes.
11   Q.   And what's your title?
12   A.   Assistant Chief.
13   Q.   How long have you been an Assistive -- Assistant
14 Chief?
15   A.   Two years.
16   Q.   What are your current duties and
17 responsibilities?
18   A.   I'm the Assistant Chief over the Professional
19 Standards Office, and in my area, we cover complaints,
20 grievances, accident reviews, also the Bilingual
21 Assessment, or the Bilingual Pay Area, is under that
22 section as well.
23   Q.   What kind of complaints does your office have
24 oversight over?
25   A.   As far as -- In -- In receiving complaints, we

Page 15

1  can receive any type of complaint.
2         If the complaint alleges discrimination or
3  retaliation or certain items such as fraud, we'll refer
4  those to OIG for investigation, the Office of Inspector
5  General; and the -- the remaining complaints, whether
6  they're violations of rules -- then we handle those --
7    Q.   Okay.
8    A.   -- at the Professional Standards Office.
9    Q.   Did the Professional Standards Office have a
10 different name --
11   A.   Yes.
12   Q.   -- in its history?
13        MS. SULLIVAN:  Hold on.
14        THE WITNESS:  Sorry.  I thought the
15 question was done.
16   Q.   (BY MR. MONTEIRO) That's okay.
17        Did the Professional Standards Office have
18 a different name prior to its current name?
19   A.   Yes.
20   Q.   Can you identify what that was?
21   A.   Staff Services.
22   Q.   Staff Services.
23        When did the name change, if you know?
24   A.   It changed last year, I would imagine.  I think
25 it was six months into -- let me see -- probably the

Page 16

1  beginning of 2018.
2    Q.   Do you know why -- why the name was changed?
3    A.   I had a few meetings with the Fire Chief and we
4  discussed the name change and -- and what Staff Services
5  actually meant in -- to the general public, to the
6  members, that we understood what it really covered.
7         So we just did some research on other names
8  for investigative divisions, particularly administrative
9  investigating divisions and "Professional Standards" seems
10 to be the new name that's being used across the country
11 in -- in different areas, so we just opted to go and
12 change the name.
13   Q.   Were there any other changes besides -- besides
14 the name change?
15        MS. SULLIVAN:  Objection.  Vague.
16        Go ahead and answer.
17   A.   So we -- we used to send investigations out to
18 District Chiefs, to handle minor violations, such as AWOL
19 violations and things like that.
20        Well, we were having some concern with
21 deadlines and things like that, that were being passed, so
22 what we did is we -- we removed that and assigned those
23 investigations to the investigators assigned to the
24 Professional Standards Office.
25   Q.   (BY MR. MONTEIRO) Any other significant changes



Page 17

1  that you recall, in connection with the name change?

2      **A.  Not that I can recall right now.**

3      Q.  Okay.  What types of grievances does the

4  Professional Standards Office handle?

5      **A.  Oh, any grievance that's brought on by a member.**

6  **They can grieve a multitude of things.  It could be over**

7  **transfers; it can be pay, different reasons; anything that**

8  **is not covered by a complaint.**

9      Q.  Does the Professional Standards Office receive

10  and investigate complaints of discrimination, currently?

11      **A.  They receive them, but, like I said earlier, we**

12  **don't investigate those.  We refer them to the Office of**

13  **Inspector General.**

14      Q.  How about complaints of -- complaints alleging

15  criminal allegations?

16      **A.  Yes.  We -- we investigate those in the**

17  **Professional Standards Office, as long as they're not tied**

18  **to any type of discrimination that can be tied to one of**

19  **our members committing that alleged act.**

20      Q.  If you have a situation where you have a

21  complaint that may be -- may involve criminal allegations

22  as well as discrimination --

23      **A.  Uh-hm.**

24      Q.  -- what would your -- what would the procedure

25  be for your office to --

Page 18

1      **A.  So if there's a question, we would refer it to**

2  **OIG for review and then they would either decide to keep**

3  **the case and, in some cases, they would return it back for**

4  **investigation by the Professional Standards Office.**

5      Q.  Are there specific criteria that OI- -- that OIG

6  uses to determine whether they hold onto it or not?

7          MS. SULLIVAN:  Objection.  Foundation.

8          Go ahead and answer.

9      Q.  (BY MR. MONTEIRO)  Let me rephrase it.

10          Do you know if there's specific criteria

11  that OIG would use to make that determination?

12      **A.  I don't know their entire process.  I do know**

13  **there's a -- a sheet in part of the new complaint process**

14  **that asks specific questions as it relates to**

15  **discrimination, retaliation or harassment, and they would**

16  **use that sheet to determine that.**

17          **But they do have the final say on which**

18  **cases they keep and which cases they send back.**

19      Q.  Okay.  What -- what -- Who's -- Let me start

20  over.

21          What is your current staff makeup?

22      **A.  So there are 13 members assigned, myself as the**

23  **Assistant Chief, and then there's a Chief Investigator;**

24  **there's a Senior Investigator; there's a Captain; a Senior**

25  **Captain; and a -- a Grievance Coordinator, which is an**

Page 19

1  **investigator; and then about six investigators.**

2          **I don't know if that totals 13.  Oh, there**

3  **is one Admin Specialist.**

4      Q.  Prior to becoming the Assistant Chief for

5  Professional Standards approximately two years ago, what

6  position did you hold?

7      **A.  Deputy Chief in the Arson Bureau.**

8      Q.  How long did you hold that position?

9      **A.  That was about six months.**

10      Q.  And what were your duties and responsibilities

11  in that role?

12      **A.  In that role, it was -- it was pretty much the**

13  **Police Chief of the Arson Division to -- to handle any**

14  **issues that arose in that -- in that area, in that**

15  **division.  It involved everything from budget to training,**

16  **just over -- overall oversight of the Arson Bureau.**

17      Q.  Does -- Did the Arson Bureau have any sort of

18  investigatory functions during the time that you were

19  Deputy Chief?

20      **A.  They do.  They investigate arson.  They**

21  **investigate fires, fire scenes, yes.**

22      Q.  Any other sorts of investigations that that

23  bureau does?

24      **A.  No, not particularly.  The investigators that**

25  **are assigned to Professional Standards are arson**

Page 20

1  **investigators who are currently investigating**

2  **administrative investigations.**

3          **But they are separated at that point, when**

4  **they're assigned to the Professional Standards Office.**

5      Q.  So these -- The six investigators that you

6  currently oversee, their background is in arson

7  investigation?

8      **A.  Yes.**

9      Q.  Is that the right?

10      **A.  Yes.**

11      Q.  And, prior to working as the Deputy Chief for

12  the Arson Bureau, what position did you hold?

13      **A.  It was Chief Investigator.**

14      Q.  Where were you assigned as Chief Investigator?

15      **A.  I think for a period of time I was on the night**

16  **shift on Sunday, Monday, Tuesday nights and --**

17      Q.  I'm sorry.  Was that in the Arson Bureau as

18  well?

19      **A.  Yes.**

20      Q.  Okay.

21      **A.  I'm sorry.  It's in the Arson Bureau.**

22      Q.  That's okay.

23          And how long were you the Chief

24  Investigator in the Arson Bureau?

25      **A.  I believe that was four years.**



Page 21

1    Q.   What position did you hold prior to that?

2    **A.   That would be Senior Investigator, also in the**

3    **Arson Bureau, and I believe that was about seven years.**

4    Q.   And did you hold a position prior to that?

5    **A.   Investigator in the Arson Bureau.**

6    Q.   When were you an investigator in the Arson

7    Bureau?

8    **A.   I believe that started in 2002 --**

9    Q.   So --

10   **A.   -- I believe to 2006.**

11   Q.   Okay.

12        When the arson investigators are assigned

13   to the -- or are hired within the -- to the Professional

14   Standards Office, do they receive any sort of

15   investigatory training or how does that work, if you know?

16   **A.   So when they -- When they're in the Arson**

17   **Division, they do receive training as far as interrogation**

18   **and -- and interview skills.**

19        **And those -- those are general training**

20   **that -- that bleeds over into handling any type of**

21   **investigation.  So they are trained in that sense.**

22   Q.   Within the Arson Bureau?

23   **A.   Yes.**

24   Q.   How about within the Professional Standards

25   Office?  Do they receive any specialized training?

Page 22

1    **A.   Yes.  They've -- they've attended training in**

2    **discipline -- in -- in administrative investigations.**

3         **For example, one of 'em was -- was taught**

4    **by Curt Varone.  He's a -- an investigator -- I'm sorry --**

5    **a District Chief and an attorney who teaches fire**

6    **departments administrative investigation techniques, I**

7    **guess, and rules.**

8    Q.   Any other training that they receive?

9    **A.   No.  Every now and then, they can request**

10   **training, each investigator, if they want, they find a**

11   **course that they're interested in, whether it's**

12   **interrogation skills or interview skills and -- but what**

13   **we try to do is, when they are assigned to the**

14   **Professional Standards Office, any training they request,**

15   **it's more related to that and not so much arson.**

16        **But keep in mind that they still work in**

17   **the Arson Bureau to some capacity, if there's overtime**

18   **needed, so they still need to keep up their training for**

19   **arson as well.  So it's just a -- a balance of trying to**

20   **approve the correct training for the investigator.**

21   Q.   Okay.  Do they receive any sort of specialized

22   training related to investigating complaints of

23   discrimination?

24   **A.   No, sir.**

25   Q.   And then, prior to being an investigator in the

Page 23

1    Arson Bureau, did you hold any other positions with HFD?

2    **A.   Yes.**

3    Q.   Okay.

4    **A.   I was an Engineer Operator and I believe that**

5    **was 2000 to 2002.**

6    Q.   Have you ever worked in RAA Air -- I'm

7    forgetting the acronym, but it's at the airport station?

8    **A.   No, I've never worked at the airport.**

9         MR. MONTEIRO:  Can we mark this as

10   Exhibit 1, please.

11        (Exhibit 1 marked)

12   Q.   (BY MR. MONTEIRO) I've just marked it, and it's

13   received your -- You've just received what's been marked

14   as Deposition Exhibit 1.

15        Take a look at it and let me know

16   when you've had a chance to review it.

17        (Witness reviewing document)

18   Q.   (BY MR. MONTEIRO) Have you had a chance to

19   review Exhibit 1?

20   **A.   Yes, sir.**

21   Q.   Have you seen this document before?

22   **A.   Yes.**

23   Q.   Okay.  When did you receive -- When have you

24   seen this document?

25   **A.   Well, actually, the one I received actually had**

Page 24

1    my name in it, as -- as being one of the people that was

2    deposed.  So it may not be the exact, same one but,

3    basically, it covered the same information, it seems.

4    Q.   Okay.  Just directing your attention to Page 2,

5    I think.

6    **A.   I have a thing that goes 3 to 3.**

7         MS. SULLIVAN:  Yes.

8         MR. MONTEIRO:  Oh.  Is it missing a page?

9         MS. SULLIVAN:  It's missing all the even

10   pages.

11        MR. MONTEIRO:  I'm so sorry.  We'll

12   substitute that --

13        MS. SULLIVAN:  Okay.

14        MR. MONTEIRO:  -- at a break.

15   Q.   (BY MR. MONTEIRO) But let me show you my copy,

16   and if you go up to the second page, do you --

17   **A.   Yes.  Now --**

18   Q.   -- see your name there?

19   **A.   I'm sorry.**

20   Q.   Is that -- Is that what you're -- Is that what

21   you're referring to?

22   **A.   Yes, sir.**

23   Q.   Okay.

24        MR. WYATT:  Deidra, do you want to look?

25        MS. SULLIVAN:  Oh.

Page 25

1        MR. RUIZ:  Is that a --
2        MR. WYATT:  It's got it on the back of the
3 page.
4        MS. SULLIVAN:  Yeah.
5        MR. RUIZ:  Okay.  Deidra?
6        MS. SULLIVAN:  Oh.
7        MR. RUIZ:  Do you want to see the complete
8 one?
9        MR. WYATT:  Sure.
10       MR. MONTEIRO:  It's just one that was --
11       MR. AHMAD:  It's just one.
12       MS. SULLIVAN:  No.  Mine was like that,
13 too.
14       MR. RUIZ:  Did you --
15       MR. AHMAD:  No.  His is -- His is right.
16 Yours is wrong, I think.
17       MR. WYATT:  You can go on with this one.
18       MR. AHMAD:  Is this the right one?
19    Q.   (BY MR. MONTEIRO) All right.
20       So I'd like you to turn to Page 4 and
21 you'll see a heading called "Matters", and there's a
22 sec -- there's a Section 1, which starts "OIG 424."
23       Do you see -- Are you there?
24    A.   Yes.
25    Q.   Okay.  And if you can review 1(a) through (i),

Page 26

1 and let me know when you've had a chance to review that.
2        (Witness reviewing document)
3        **THE WITNESS:  Okay.**
4    Q.   (BY MR. MONTEIRO) Now, my understanding is
5 you've been designated to testify to Topics 1(a).  Is that
6 correct?
7    **A.   Yes.**
8    Q.   1(b)?
9    **A.   Yes.**
10   Q.   1(d)?
11   **A.   Yes.**
12   Q.   1(g)?
13   **A.   Yes.**
14   Q.   1(h)?
15   **A.   Yes.**
16   Q.   And 1(i)?
17   **A.   Yes.**
18   Q.   Okay.  All right.
19       And do you have any prior -- Do you have
20 any personal knowledge regarding any of the information in
21 the subtopics?
22   **A.   No.**
23   Q.   All right.
24   **A.   Like I said, I was in -- I was in Staff Services**
25 **in '09, but I don't recall any personal knowledge of any**

Page 27

1 **meetings with anyone that was involved in these cases.**
2    Q.   Okay.  And I think you said earlier that Staff
3 Services may have received one of the investigations, but
4 you couldn't recall specifically what that was?
5    **A.   Yes.**
6    Q.   And you weren't active -- You weren't actually
7 involved in Staff Services, any actions that Staff
8 Services took in response to that complaint.
9        Is that fair?
10   **A.   I guess -- Can you ask that again?**
11   Q.   Sure.
12       You said -- You told us earlier that when
13 you worked in Staff Services, one of these complaints may
14 have come over from OIG.  Right?
15   **A.   Right.**
16   Q.   And my question is:  Were you a personally
17 involved in any actions that Staff Services may have taken
18 in response to receipt of -- of that investigation?
19   **A.   Not that I can recall.**
20   Q.   So does your knowledge about the subtopics exist
21 only to the extent that you spent time preparing to be
22 deposed about these subtopics?
23   **A.   Yes.**
24   Q.   All right.  Before we jump into the subtopics, I
25 just want to go through a few background questions, so

Page 28

1 that we're on the same page proceeding forward.
2        Are you aware of HFD's complaint policies
3 and procedures, as they existed in 2009 and 2010?
4    **A.   Yes.**
5    Q.   Did that -- HFD have a complaint policy in place
6 between 2009 and 2010, by which HFD members could report
7 complaints of discrimination?
8    **A.   They did -- They did have a complaint policy in**
9 **place.**
10   Q.   Am I correct that the Office of Inspector
11 General was responsible for receiving complaints alleging
12 criminal violations as well as discrimination in that time
13 period?
14   **A.   Yes.  I believe they -- they could accept them,**
15 **as well as Staff Services, who would refer them over,**
16 **so --**
17   Q.   Okay.
18   **A.   -- that both were accepted.**
19   Q.   And OIG was responsible for investigating those
20 types of complaints?
21   **A.   Yes.**
22   Q.   Was OIG responsible -- Let me step back for a
23 minute.
24       Do you know if OIG was responsible for
25 making a finding regarding those complaints?

Page 29

1    MS. SULLIVAN:  Objection.  Vague.

2    You can answer.

3    THE WITNESS:  All right, but by

4  "finding" -- I guess I just need a little clarity on

5  "finding".

6    Q.  (BY MR. MONTEIRO)  Sure.  Do you know if OIG was

7  responsible for making a determination regarding the

8  complaint?

9    A.  I believe they made the decision on whether to

10  sustain or not sustain on -- on particular violations.

11    Q.  And was OI -- Do you know if OIG was responsible

12  for then notifying the Fire Department of its findings --

13    A.  Yes.

14    Q.  -- or determinations?

15    A.  Yes.

16    Q.  How would OIG make the Fire Department aware of

17  its findings?

18    A.  I believe they sent over the synopsis of the

19  case.  I don't recall if they send the entire case or just

20  the synopsis.

21    Q.  Who would OIG send the report to?

22    A.  Oh, like I said earlier, it would come to Staff

23  Services or to the Fire Chief, but, for the most part, to

24  Staff Services.

25    Q.  Was there a specific written policy that laid

Page 30

1  out that procedure?

2    A.  Is that a policy in OIG or a policy in -- in

3  Staff Services of accepting that?

4    Q.  I -- Well, let's start with OIG.

5    A.  So I -- so I believe OIG had a set of policies

6  that they followed.

7    As far as Staff Services, there wasn't a

8  written policy that explained what to do.  It was more of

9  a practice of what was done when -- when it was received.

10    Q.  When you mentioned OIG's written policies, are

11  you referring to their standard operating procedures?

12    A.  Yes.

13    Q.  And what was Staff Services' practice that you

14  just referenced?

15    A.  So when a case was received from OIG, the Staff

16  Services Office would -- would read over the synopsis,

17  then go down to the Conclusion Section and if there was a

18  sustained charge on a named member, then that charge would

19  be compared to the Behavior Manual and assigned a

20  category, and depending on if it's a first offense or

21  second offense, would decide where the -- if it was an

22  entry level for a particular category and then that would

23  be written on a sheet, sent over to the Fire Chief, so

24  that he would be able to see that -- that would probably

25  sit on top of the synopsis, so the Fire Chief could see

Page 31

1  how it ties over to the Behavior Manual and also review

2  the synopsis from OIG.

3    Q.  And would -- Was that Staff Services'

4  recommendation regarding discipline or was Staff Services

5  making the decision at that point, if you know?

6    A.  So from what I can recall, it wasn't so much of

7  a recommendation.  It was more of tying the actual

8  sustained charge from OIG to the Behavior Manual, making

9  the connection and advising that that's where it most

10  likely fit in the Behavior Manual.

11    It's just to try to remain consistent

12  across all cases.

13    Q.  And how did the practice -- Well, how did the

14  practice differ when the investigatory findings went to

15  the Fire Chief first?

16    A.  I don't know that they differed much.

17    Well, what I mean when -- when they go to

18  him first is if -- maybe they were delivered directly to

19  the Fire Chief, and in that sense, the Fire Chief would

20  just send it back to Staff Services and then the same

21  process would -- would occur, making its way back to the

22  Fire Chief.

23    And that -- and it's probably a rare

24  instance that that happens.

25    Q.  Was there any sort of -- I may have asked you

Page 32

1  this before, was -- but was there any sort of criteria by

2  which investigations would either go to Staff Services or

3  the Fire Chief?

4    A.  No.  The only thing I can think of is, if it was

5  some type of a high priority case, it may have made its

6  way directly to the Fire Chief, is -- is all I can

7  remember.

8    Q.  Was the Fire Chief, then, the ultimate

9  decision-maker, in terms of any sort of discipline that

10  would -- would be adopted in response to an OIG

11  investigation?

12    A.  Yes.

13    Q.  Do you know if the City's Legal Department had

14  any role in this process?

15    A.  Yes.  Back in -- I guess in 2009, Staff

16  Services -- there wasn't a City Attorney assigned to the

17  Houston Fire Department that would -- would -- would

18  review letters, disciplinary letters, after the Fire Chief

19  had decided on the discipline, maybe even typed those

20  letters as well.

21    Q.  So that person would review the Fire Chief's

22  determination.  Is that --

23    A.  I -- I believe so.

24    Q.  Is that fair?

25    A.  I don't -- I don't know if they actually read

LEXITAS

Page 33

1 the entire case prior to it going to the Fire Chief or if
2 they reviewed it after it went to the Fire Chief, so that
3 their letter was -- was appropriate.
4     Q.   Were there any other City agencies involved in
5 the process other than Staff Services, OIG and the Legal
6 Department, that you're aware of?
7     A.   I don't think so.  I think that's all of 'em,
8 but I'm not quite sure.
9     Q.   Was there any specific procedure, policy or
10 procedures, which reduced the Fire Chief's role in
11 reviewing OIG investigations and findings to writing?
12    A.   Reduce the Fire Chief's role?  I -- I -- I don't
13 understand that --
14    Q.   Well, you described --
15    A.   -- part of your question.
16    Q.   Sure.  Let me try to rephrase it.
17         You described the Fire Chief's role in
18 receiving the -- the cover sheet from Staff Services --
19    A.   Right.
20    Q.   -- and then making the final determination and
21 discipline --
22    A.   Right.
23    Q.   -- earlier.
24         Was there any sort of specific -- Was there
25 any sort of written policy or procedures which laid out

Page 34

1 that process that you described for us?
2     A.   No, sir.
3     Q.   Did -- As part of its review, did OIG provide
4 any recommendations for the Fire Department, as to any
5 non-disciplinary corrective measures to be taken following
6 its investigation?
7         MS. SULLIVAN:  Objection.  Vague as to
8 time.
9     Q.   (BY MR. MONTEIRO)  And, again, we're focused on
10 2009 to 2010.
11    A.   And I'm -- and I'm glad you brought up the
12 timing, 'cause now we do receive that type of information
13 from OIG.
14         I thought that, if there was an issue, even
15 back in '09 from OIG, if there was a concern, that they
16 would bring it to our attention.  I just can't recall if
17 that was part of their procedure, to include that.
18         I just -- I believe that there were a few
19 cases where they would make a recommendation or say, "Hey,
20 we may need to look into this," but I don't remember
21 exactly of a particular case.
22    Q.   Okay.  So can -- can -- Do you know of any --
23 any examples of non-disciplinary corrective measures that
24 may have been ever recommended by OIG?
25    A.   I can't think of one particularly.  There could

Page 35

1 be issues where there was counseling recommended or even a
2 policy change.
3         It's just -- I don't think it was formal,
4 it was defined anywhere, but I do remember there were some
5 that would give some type of recommendation.
6     Q.   Who would know more about that process?
7     A.   I think we would have -- To find that out, we
8 would have to go back and look at cases from that era,
9 from that time, to see if any of the recommendations or
10 conclusions included some of -- some of that information.
11    Q.   Was there -- And -- and you said it was not
12 formal, so I assume there was no specific written policy
13 or procedure which provided OIG with that authority.
14         Is that --
15    A.   Right.
16    Q.   -- fair?
17    A.   Yes, that's fair.
18    Q.   And then I think you differentiated between what
19 the current policy is regarding OIG providing
20 recommendations as to non-disciplinary corrective
21 measures.
22         Can you describe what the current procedure
23 is?
24    A.   The policy or procedure or -- or practice?
25         I -- I don't know that there's a policy

Page 36

1 that tells OIG to do that.  I just know that, in the
2 conclusions and the recommendations that we're receiving
3 now from OIG, they include possible counseling scenarios,
4 possible policy changes or training deficiencies and they
5 do make those recommendations with each case.
6     Q.   And that's -- It sounds like that's a practice
7 but not necessarily a formal policy.
8     A.   I --
9     Q.   Is that fair?
10    A.   It's fair.
11         I -- I can't speak to OIG, if they have it
12 in writing in -- in their area, but we don't have anything
13 in -- in ours that puts that authority on OIG.
14    Q.   And, again, that would be found in the standard
15 operating procedures, most likely?
16    A.   Yes, sir.
17    Q.   When was that -- Is there a specific time
18 period, that you can recall, that -- that that was --
19 that -- that it was implemented on a more formal basis?
20    A.   I would -- I would say it was in the transition
21 where OIG was -- was taken over or was handled, actually
22 supervised by an attorney.
23         I think that was in 2010.  The different
24 divisions that were assigned to OIG at HPD were sent back
25 to their respective departments.



Page 37

1    For example, the arson investigators that
2 were assigned there, to handle the criminal cases, were
3 sent back to the department, and that's where Staff
4 Services began investigating criminal cases.
5    Q.  Okay.  So, earlier, you described the Fire
6 Chief's role in receiving results of OIG investigations.
7    And did that differ, whether the complaint
8 was a discrimination complaint versus a criminal
9 complaint?
10   A.  No.
11   Q.  The procedure was the same?
12   A.  Yes.  It -- Other than what we spoke on and --
13 just every now and then a case may make it there.
14    But, like I think, that was just more of a
15 delivery more so than a policy.
16   Q.  And then the Fire Chief being the ultimate
17 decision-maker, in terms of discipline.
18    Again, that -- that doesn't differ based on
19 the complaint allegations.  Is that correct?
20   A.  Are you speaking in terms of -- of where it was
21 delivered, would that make a difference on whether the
22 Fire Chief decided over that particular case?
23    Whether it was delivered to him or to Staff
24 Services, he was still the final say in discipline.
25   Q.  And that would go across all sorts of

Page 38

1 complaints, discrimination, criminal --
2    A.  Yes.
3    Q.  Okay.  There's no difference -- It's not
4 different for a criminal complaint versus a discrimination
5 complaint?
6    A.  No.  If we're talking in terms of when the
7 investigation is completed and presented to the Fire
8 Chief, then, yes, there wouldn't be a difference.  He
9 would --
10   Q.  You mentioned earlier a sustained complaint.
11    What -- what is a sustained complaint?
12   A.  So a sustained complaint is a complaint where an
13 investigation occurred and there was enough evidence to
14 prove the allegation of -- Well, whatever the allegation
15 was.
16   Q.  And, again, that's a determination that the
17 Office of Inspector General was making with respect to
18 discrimination complaints back in 2009 and 2010?
19   A.  Yes.
20   Q.  And then what does "not sustained" mean?
21   A.  So "not sustained" means that there wasn't
22 enough evidence to either prove or disprove the
23 allegation.
24   Q.  Are there other outcomes besides sustained and
25 not sustained, that you're aware of?

Page 39

1    A.  Yes.
2    Q.  What are the other outcomes?
3    And, again, this is back in 2009-2010.
4    A.  Okay.  There was a exonerated.  There was also
5 unfounded.  I believe there was a non-jurisdictional and
6 an information only.
7    Q.  And are these -- are these various dispositions
8 contained within any sorts of policies or procedures, that
9 you're aware of?
10   A.  I believe they're in OIG's policies.
11   Q.  The standard operating procedures?
12   A.  Yes, sir.
13   Q.  What does "information only" mean?
14   A.  Sometimes we will -- we'll get phone calls.
15    Say, for example, someone calls in and
16 makes an allegation but gives us no information on -- on a
17 particular day, time, member.
18    So all we have is an allegation on
19 something and no additional information, not even enough
20 information to contact the complainant, to assist them
21 with filing a complaint; and so those would be listed as
22 information only.
23   Q.  Okay.
24   A.  I guess it's just to keep a record of the -- the
25 phone call that was -- that was made.

Page 40

1    Q.  And "exonerated," what does that mean?
2    A.  So "exonerated" is that the act occurred but it
3 was proper.  It was no violation.
4    Q.  And then "unfounded"?
5    A.  I believe "unfounded" -- I'd have to look at it
6 and review it, but I believe "unfounded" is that the -- no
7 violation occurred.  There was -- there was no rule
8 violation that was -- that occurred.
9    Q.  And when you say "rule violation," what do you
10 mean by that?
11   A.  So any of our rules and regulations, our
12 policies in the Fire Department, if someone alleges
13 something that doesn't relate to one of those rules.
14   Q.  Under what dispositions could the Fire
15 Department take disciplinary action?
16   A.  Sustained.
17   Q.  No other dispositions.  Is that right?
18   A.  Not that we -- not that discipline could be
19 issued.
20   Q.  Okay.  Apart from -- I'm sorry.  Let's step back
21 for a minute.
22    So that was the -- Was that the purpose of
23 the Fire Chief's review of the investigation, to determine
24 whether discipline should be implemented?
25   A.  I'm not sure if it's if discipline should be



Page 41

1 implemented but what -- at what level.

2        So if it -- if the investigation came back
3 sustained, it's -- it's pretty obvious that if --
4 depending on the severity, there would be discipline, but
5 the Fire Chief would decide which -- what amount,
6 basically.

7    Q.   And in terms of the other dispositions that --
8 that we mentioned, are those sent from -- Is the procedure
9 by which the Fire Department receives those findings the
10 same as what you described earlier?

11    A.   Which part did I describe?

12    Q.   Sorry.  Let me --

13    A.   So -- so if the -- the letter from OIG, the
14 conclusion, would -- would list the potential alleged
15 violations and next to that, they would infer a
16 determination, whether it was sustained, not sustained,
17 exonerated, unfounded.

18        So the same paperwork, the same synopsis,
19 would have those types of -- of conclusions or -- or
20 results in the letter.

21    Q.   Would the Fire Chief receive not-sustained
22 complaints?

23    A.   Yes.

24    Q.   And exonerated complaints?

25    A.   Yes.

Page 42

1    Q.   So all complaints would be sent from OIG to
2 Staff Services to the Fire Chief?

3    A.   Yes.

4    Q.   Apart from reviewing the findings to determine
5 if disciplinary action should be taken, did the Fire
6 Department review the findings to determine if any
7 policies or procedures needed to be changed?

8    A.   I can't recall that the Department itself would
9 do it.  Like I said, it would be more of a -- of a
10 city-wide approach, where if OIG told us, "Hey, you know,
11 we have an issue here.  You guys need to look into it,"
12 then we would look into it.

13        When we received a conclusion from OIG, we
14 considered that a complete report, a complete
15 investigation that covered everything.  And at that point
16 what would -- remained was assigning a category to any
17 sustained discipline and then forwarding that to the Fire
18 Chief.

19        I don't remember a review of the entire
20 thing, the entire document, to sort of reinvestigate.  It
21 was considered a complete package.

22    Q.   Okay.  Do you know if that would -- if -- Do you
23 know if -- Let me strike that.

24        Were the -- were the OIG findings reviewed
25 to determine if any additional training should be

Page 43

1 undertaken?

2    A.   They were reviewed and read, like I said, and if
3 there was something -- if there was something in there
4 about some needed training, we would do it, but I don't
5 know that it was read for the purposes of -- of
6 determining if any additional training was required.

7    Q.   So if -- if OIG made that recommendation or
8 flagged it --

9    A.   Right.

10    Q.   -- then -- then the Fire Department may consider
11 that?

12    A.   Yes.

13    Q.   But if OIG did not flag it, then that wasn't
14 within the scope of review.  Is that fair?

15    A.   Yes.

16    Q.   Okay.

17        Were the findings -- were the OIG findings
18 reviewed to determine if other non-disciplinary corrective
19 measures should be implemented?

20        MS. SULLIVAN:  Objection.  Vague.

21        Go ahead and answer.

22    A.   So I -- I -- I'm speaking in terms of '09 and
23 I'm trying to separate it from how it is today, but in
24 '09, it's possible that the Fire Chief looked at these and
25 decided, "Hey, we need to -- we need to train in this

Page 44

1 area" or, "We need to counsel this member," which is kinda
2 how we do it now with the Fire Chief.

3        I just don't recall exactly how it went
4 down, but nothing limited the Fire Chief from reviewing
5 the synopsis and saying, you know, "We need to -- to
6 address this particular issue."

7    Q.   (BY MR. MONTEIRO) Okay.

8        MS. SULLIVAN:  Do you need a break?

9        THE WITNESS:  No.  I'm okay.

10    Q.   (BY MR. MONTEIRO) So outside of the Fire Chief's
11 review, are you aware of anyone else within the Fire
12 Department who was tasked with reviewing OIG's findings?

13    A.   Well, I know that the staff at -- in Staff
14 Services would -- would read it and apply the -- the
15 categories.

16        I don't know if that's considered a -- a
17 review that you're speaking of, but, yes --

18    Q.   Okay.

19    A.   -- they did read the synopsis and provide that
20 comparison or -- to the Behavior Manual.

21    Q.   And anyone else?

22    A.   Not that -- not that I can recall that had to
23 see it in this particular -- unless it was assigned to one
24 of our investigators for any type of follow-up, but that
25 hardly ever occurred.

Page 45

1    Q.   Okay.

2    A.   I'm sorry.  That didn't occur in '09, because we

3  didn't have investigators in Staff Services in '09.

4    Q.   And what was the Fire Department's practice,

5  then, for communicating the results of OIG investigations

6  to the individuals involved within the Fire Department?

7    A.   So at the conclusion of the investigation, a

8  closure letter was sent to the -- the complainant and the

9  respondent.

10        That's the current practice, and I believe

11  it was also the practice in -- in '09.

12   Q.   Was anyone else notified?

13   A.   Not -- I -- I don't believe so.  I'm not sure.

14  I think they were the only two that were notified.

15   Q.   So were they sent -- Was the -- Did the

16  complainant and respondent receive the same letter or was

17  it a different letter?

18   A.   I believe it was the same letter, addressed to

19  them separately because it was pretty much a one -- one

20  sentence or two sentences just stating whether the

21  complaint -- what -- the conclusion of the complaint was,

22  whether it was sustained or -- or not.

23   Q.   And if the Fire Chief took some sort of

24  disciplinary action against the respondent, how would that

25  individual be notified?

Page 46

1    A.   That's the only letter they would receive,

2  whether it was sustained or not.

3        The -- the actual discipline was not

4  discussed or shared with anyone.  It's just a matter of

5  how it -- the case was closed.

6    Q.   Okay.  But how -- Well, then, how would the

7  respondent be aware of any discipline taken against them?

8    A.   So the respondent -- If there was discipline,

9  the respondent would be brought in to -- to the office to

10  meet the Fire Chief, if -- I guess depending on days, they

11  could also meet with an Assistant Chief; and at that

12  point, the member would be advised of any discipline and

13  be provided a -- a letter, stating that discipline.

14   Q.   That would come from the Fire Chief's office or

15  the Assistant Fire Chief or someone within --

16   A.   Right.  So I believe that the City Attorney

17  would draft the letter, which was signed by the Fire

18  Chief.

19        I believe he's the only one that signed the

20  letters, but they could be presented by Assistant Chiefs

21  to the member.

22   Q.   Okay.  Would the respondent's chain of command

23  be made aware of the outcome of the investigation and any

24  discipline taken against the respondent?

25   A.   Typically, they would not be informed, but if

Page 47

1  the member -- 'cause there -- there were options for

2  members to use benefit time in lieu of suspension.  In

3  those cases, the benefit time would be burned and there

4  would be no need to notify his chain -- his or her chain.

5        But if the member opted to take days off,

6  then a memo would have to be sent out through his chain,

7  explaining that, from this day to this day, this member is

8  not going to be at work because of a -- of a suspension;

9  but it didn't go into detail of what occurred.

10   Q.   Okay.

11   A.   I don't even think they told them whether it was

12  sustained or not, but I guess you could assume that it was

13  sustained, if they're going to be off for a certain amount

14  of days.

15   Q.   And how about the complainant's chain of

16  command?

17        Would -- would the complainant's chain of

18  command be made aware of any outcomes?

19   A.   I can't think of -- I can't think of a scenario

20  where the complainant's chain of command would be notified

21  of the results.

22        That's typically the complainant that would

23  be notified directly.

24   Q.   Would the complainant be told of any

25  disciplinary action taken, based on the sustained

Page 48

1  complaint?  Are you asking if the -- the -- if the

2   A.   Are you asking if the -- the -- if the

3  complainant will be told the number of days, for example,

4  on -- on a -- that was served by the respondent?

5    Q.   Just more generally.

6        Would the complainant be notified that

7  disciplinary action had been taken against the respondent,

8  in response to the complaint?

9    A.   No.  I believe the letters just stated whether

10  it was sustained or not.

11   Q.   Was there any sort of written policy or

12  procedure which laid out how the Fire Department

13  communicated the results of the OIG investigations, within

14  the HFD?

15   A.   I'm sorry.  Do you mean how we communicated to

16  the respondent and the complainant?

17   Q.   Yeah.  Just kind of what we've just been

18  discussing.

19        Was there any sort of written --

20   A.   No.

21   Q.   -- policy or procedure?

22   A.   No.  I believe it was covered in -- in the --

23  the Texas Local Government Code, that we have to notify.

24        I'd have to look into that, but I -- It

25  wasn't a written policy that says we have to send this

LEXITAS

Page 49

1 particular letter out.

2        Q.   Okay.  And what we've just been -- The process

3 by which the results of OIG investigations would be

4 communicated, has that stayed consistent or the same

5 between 2009 and current?

6        A.   Yes.  The -- the portion of the letter that's

7 re- -- that's received, that just states whether it's

8 sustained or not, that's still performed.

9        Q.   Okay.  And in terms of who's notified of -- in

10 terms of who's notified and who's not notified, is that --

11 is that the same as well?

12        A.   Yes.

13        Q.   Okay.

14              MR. MONTEIRO:  Does anyone need a short

15 break?

16              MS. SULLIVAN:  Yeah.  We can take it now.

17              MR. MONTEIRO:  Okay.  Can we go off the

18 record.

19          (Recess from 10:37:41 a.m. to 10:48:06

20          a.m.)

21          (Exhibit 2 marked)

22        Q.   (BY MR. MONTEIRO) Chief Martinez, I'm showing

23 you what's been marked as Deposition Exhibit 2 to your

24 exhibit [sic].

25              If you could take a minute and review it

Page 50

1 and let me know when you've had a chance to complete that.

2          (Witness reviewing document)

3              THE WITNESS:  Okay.

4        Q.   (BY MR. MONTEIRO) Have you had a chance to

5 review Exhibit 2?

6        A.   Yes, sir.

7        Q.   And have you seen Exhibit 2 before?

8        A.   I believe so.  The verbiage all, you know, looks

9 very familiar, with breaking down each case and going

10 through the -- the bullet points, yes.

11        Q.   Okay.  And then there are -- and this -- I'll

12 represent to you that this is the City of Houston's First

13 Amended Objections and Responses to the Plaintiffs'

14 Amended Notice of Federal Rule of Civil

15 Procedure 30(b)(6), deposition to Defendant, City of

16 Houston, and in this document, the City has identified

17 who -- who will be testifying on its behalf in response to

18 the various topics.

19              Do you see your name there in certain

20 subtopics?

21        A.   Yes.

22        Q.   Okay.  Okay.  So if we can go to Matter 1(a),

23 which is on Page 4 of Exhibit 2, and it says:

24 "Defendant's policies, procedures, practices" -- I'm sorry

25 -- "Defendant's policies, procedures and practices

Page 51

1 governing the review of OIG 09-424's findings and

2 investigative synopsis."

3        A.   Yes.

4        Q.   And the response says that the City's identified

5 you and then it says -- I wanted to ask you about one

6 question.

7              It says:  "The person with the most

8 knowledge of this topic is a former employee whom the

9 Defendant does not have control over."

10              Do you know -- Do you have any information

11 regarding that sentence?

12        A.   No, I don't, unless it's someone that was

13 assigned to Staff Services in -- in '08 or '09, prior

14 to -- to my time there, is all --

15        Q.   Okay.

16        A.   -- I can imagine.

17        Q.   Okay.  In connection with your preparation for

18 this deposition, did you become aware of OIG's findings

19 with respect to OIG 09-424?

20        A.   I -- I did.

21        Q.   And how did you become aware of OIG's findings?

22        A.   I reviewed the -- the investigative synopsis

23 that was attached to that case.

24              MR. MONTEIRO:  Can you mark that as

25 Exhibit 3, please.

Page 52

1              THE REPORTER:  Uh-hm.

2          (Exhibit 3 marked)

3        Q.   (BY MR. MONTEIRO) I'm showing you -- Chief, I'm

4 showing you what's been marked as Deposition Exhibit 3.

5 For identification purposes, it has a Bates number of

6 HOU5843, which is in the bottom right-hand corner.

7              Can you identify this document?

8        A.   It appears it's a document that was sent from

9 OIG to Chief Boriskie, who was the Fire Chief at the time.

10        Q.   And did you review this document in preparation

11 for your deposition?

12        A.   Yes.

13        Q.   Is this the transmittal letter from OIG to the

14 Fire Chief, regarding the findings related to

15 OIG No. 2009-424?

16        A.   Yes.

17        Q.   Does this reflect the notification from OIG to

18 HFD, regarding its findings relating to OIG

19 Complaint 2009-424?

20        A.   Yes, it appears to -- to do that.

21        Q.   And Exhibit 3 indicates that -- You know that

22 Jane Draycott made a complaint.  Is that correct?

23        A.   Yes, that there was an investigation conducted

24 regarding a complaint filed by Draycott, yes.

25        Q.   And Exhibit 3 reflects that two of

Page 53

1 Ms. Draycott's allegations were sustained.  Is that
2 correct?
3     A.  Yes.
4     Q.  OIG sustained the allegation that the cold water
5 had been turned off in the women's shower.  Is that
6 correct?
7     A.  Yes.
8     Q.  And OIG sustained the allegation that the
9 speakers were turned off in the women's dorm.  Is that
10 correct?
11     A.  Yes.
12     Q.  And the other allegations were not sustained?
13     A.  That's correct.
14     Q.  The last paragraph of Exhibit 3 indicates that
15 OIG's also providing a copy of its investigative synopsis
16 to the Fire Chief.  Is that correct?
17     A.  Yes.
18     Q.  The first sentence says that the Employee
19 Relations Unit of the Office of Inspector General has
20 conducted an investigation into the complaint?
21     A.  Yes, it does.
22     Q.  What is the Employee Relations Unit, or what was
23 the Employee Relations Unit back in 2010?
24     A.  So the Employee Relations Unit investigated
25 cases that alleged some type of a discrimination or

Page 54

1 retaliation.
2         Those types of complaints were assigned, I
3 believe by OIG, to the Employee Relations Unit.
4     Q.  Was the Employee Relations Unit housed within
5 OIG?
6     A.  Yes.
7     Q.  And who -- who was -- If you know, who was in
8 charge of the Employee Relations Unit back in 2010?
9         MS. SULLIVAN:  Objection.  Vague.
10         THE WITNESS:  I don't -- I don't remember
11 who the -- the actual supervisor's -- what her name was.
12 I believe it was a female.  I just don't remember her
13 name.
14         MR. MONTEIRO:  Can we mark this as
15 Exhibit 4, please.
16         (Exhibit 4 marked)
17     Q.  (BY MR. MONTEIRO) I'm now showing you what's
18 been marked as Deposition Exhibit 4, and for
19 identification purposes, it's Bates numbered HOU5852
20 through 5865.
21     A.  Yes.
22     Q.  Have -- have you -- Can you identify what this
23 document is?
24     A.  This is the investigative synopsis from OIG --
25 oh, I'm sorry -- I guess it's from Sandra Robinson to the

Page 55

1 Inspector General, Mr. Buenik.
2     Q.  And this relates to Complaint 2009-424?
3     A.  Yes.
4     Q.  Did you review this synopsis in preparation for
5 your deposition?
6     A.  Yes.
7     Q.  So Exhibit 3 reflected that the -- there was a
8 transmittal letter as well as an investigative synopsis,
9 and Exhibit 4 is the investigative synopsis.  Is that
10 correct?
11     A.  Yes.
12     Q.  Were there any other documents sent from OIG to
13 the Fire Department, in connection with this complaint?
14     A.  I'm not sure if -- if I can answer that, if
15 any -- if OIG sent anything else to the Fire Department.
16         I'm not sure if they did.
17     Q.  Did you -- In preparing for this deposition,
18 did -- were there any other communications that you were
19 made aware of between OIG and the Fire Department?
20     A.  Not that I can recall.
21     Q.  Earlier, you described the Fire Department's
22 general policies regarding the receipt and review of OIG
23 investigations.  Right?
24     A.  Yes.
25     Q.  Okay.

Page 56

1         Were those -- Were the same policies,
2 procedures and practices for review of those findings in
3 place when the Fire Department received OIG's findings and
4 investigative synopsis into 09-424?
5     A.  Yes.
6     Q.  And what was the purpose of the Fire
7 Department's review of 09-424?
8     A.  The Fire Department's review was, again, to --
9 to assign any discipline or particular category from the
10 Behavior Manual to any sustained complaints on any of the
11 Fire Department's members.
12     Q.  And was the Fire Department reviewing the OIG
13 investigative results on behalf of the City?
14         MS. SULLIVAN:  Objection.  Vague.
15         Go ahead.
16     A.  I don't know that they were -- they were
17 reviewing them on behalf of the City.  I believe the --
18 the task to assign category is, as part of being a City
19 employee.
20         So the piece that the Fire Department did,
21 which was assigning the category and the discipline,
22 that's -- that was done --
23     Q.  (BY MR. MONTEIRO) Uh-huh.
24     A.  -- as -- as part of the -- I don't know if it
25 was specifically done for the City.

LEXITAS

Page 57

1    Q.  Okay.  Do you know if there were any other City

2  agencies involved within the review of OIG 2009-424?

3    **A.  So I know that in -- in OIG, it is reviewed**

4  **by -- by multiple supervisors.  It goes from the**

5  **investigator to the -- to the supervisor, to a Lieutenant**

6  **and to a Captain assigned to OIG, and then it goes to OIG.**

7    **In every step it's reviewed and potentially**

8  **sent back to the lower level, for additional work, if --**

9  **if need be.**

10   Q.  But that's all within OIG.  Correct?

11   **A.  Correct.**

12   Q.  So do you know if there's any other City

13  agencies -- Were there any other City agencies involved in

14  the review of OIG's findings related to 2009-424?

15   **A.  If anyone, it would be the -- the City Attorney**

16  **that was assigned there with the Fire Department,**

17  **'cause -- I'm not sure if they were assigned to Fire or if**

18  **they were assigned to the City Legal Department and then**

19  **just assigned, work location being with the Fire**

20  **Department.**

21   **So, then, that would be City Legal as well.**

22   Q.  Okay.

23   MS. SULLIVAN:  Just so we're clear, this is

24  Assistant City Attorney, not the --

25   MR. MONTEIRO:  Understood.

Page 58

1    MS. SULLIVAN:  -- not the guy in the corner

2  office.

3    MR. MONTEIRO:  Right.

4    Q.  (BY MR. MONTEIRO) And you've mentioned that

5  person a few times.

6    Can you identify who that person was back

7  in the time period that we've been talking about?

8    **A.  I want to say I think it was someone named**

9  **Tanja, was the first name.**

10   Q.  And then, if we can go back to Exhibit 2, and

11  I'm looking at Page 4 again, where there's a

12  subtopic 1(b).

13   **A.  Yes.**

14   Q.  Which is Defendant's efforts to review OIG's

15  findings and investigative synopsis.

16   And -- and, again, you've been designated

17  as the person to respond to questions related to that

18  topic?

19   **A.  Okay.**

20   Q.  Did the Fire Department review -- or I'm sorry.

21   Did the Fire Department receive OIG's

22  results of the investigation into Ms. Draycott's

23  complaints that are reflected in Exhibits 3 and 4?

24   **A.  Yes, I believe so.**

25   Q.  Who in the Fire Department received Exhibits 3

Page 59

1  and 4?

2    **A.  Well, I believe they would come to Staff**

3  **Services, but I don't know if there's a particular name of**

4  **an individual who had -- who had received those.**

5    Q.  And Exhibit 3 is addressed to Phil Boriskie,

6  who's the Fire Chief.  Correct?

7    **A.  Yes.**

8    Q.  Do you know if Chief Boriskie received Exhibit 3

9  and Exhibit 4?

10   **A.  Well, like I said, I don't have personal**

11  **knowledge of -- of maybe handing them to him, but common**

12  **practice would have been that, yes, he did receive both 3**

13  **and 4.**

14   **It's just that 4 isn't addressed to him,**

15  **but you can see where it's attached.  It's supposed to be**

16  **attached to 3.**

17   Q.  And did you review Chief Boriskie's deposition,

18  regarding whether or not he received Exhibits 3 and 4?

19   **A.  I did review the deposition.  I don't remember**

20  **him saying in the deposition if he received 3 and 4.**

21   Q.  Okay.

22   **A.  I'd have to review it.**

23   Q.  And what was Staff Services' review process when

24  it received Exhibits 3 and 4?

25   **A.  It -- it was the same as -- as we spoke earlier,**

Page 60

1  where they would, you know, read the synopsis, go down to

2  the -- what do they call it here -- to the Recommendations

3  section and if there were any sustained complaints, they

4  would create a -- a -- a form that would go to the Fire

5  Chief that listed the sustained complaints by OIG, with

6  the category and number of days that would be recommended

7  for that particular member, if, for example, they didn't

8  have any previous discipline or anything that could change

9  through progression.

10   And that's the type of review that was --

11  that was made and sent to the Fire Chief.

12   Q.  Okay.  And I just want to be clear.

13   You're speaking, generally, about what

14  would have happened.  Correct?

15   **A.  Right.**

16   Q.  Do you have any -- or did you review any

17  specific information, to determine whether that general

18  practice was followed with respect to Exhibits 3 and 4?

19   **A.  Okay.  I'm sorry.  That was kind of a long**

20  **question.**

21   Q.  Sure.  Let me -- I can try to rephrase it.

22   What -- what you've just testified to was

23  what the general practice was back in 2009-2010.  Correct?

24   **A.  Yes.**

25   Q.  Did you review any documents or speak with



Page 61

1 anyone in which you were able to confirm that that actual

2 process was followed with respect to Exhibits 3 and 4?

3     A.  No, I didn't.

4     Q.  Did you do anything to investigate whether that

5 process was followed with respect to Exhibits 3 and 4?

6     A.  Currently investigate?  Did I investigate

7 something currently?

8     Q.  No.

9          In -- in your role as the designated City's

10 representative to answer questions regarding this, did you

11 do anything to attempt to determine whether or not the

12 process that you've described was actually followed with

13 respect to Exhibits 3 and 4?

14     A.  No.  Other than reading these exhibits, no, sir.

15     Q.  Did Staff Services review Exhibits 3 and 4, to

16 determine if any non-disciplinary corrective action should

17 be taken?

18     A.  Not -- not that I can recall.  They reviewed it

19 but I don't know that they reviewed it to that extent to

20 determine that.

21     Q.  Did the Fire Department review Exhibits 3 and 4

22 to determine if any policies or procedures should be

23 changed?

24     A.  No.  Any immediate -- any immediate changes -- I

25 can't recall of any immediate changes that occurred right

Page 62

1 after the -- this complaint was closed.

2     Q.  And I think you answered this before, but HFD

3 wasn't reviewing OIG's findings to determine whether or

4 not it agreed with those findings.  Correct?

5     A.  Correct.  We weren't re-investigating the

6 findings.

7     Q.  So HFD couldn't tell OIG it didn't agree with

8 something?

9     A.  Not at -- not at Staff Services level.  I'm --

10 I'm not sure if the Fire Chief would -- would have that

11 conversation with OIG or not.

12     Q.  So were the findings with respect to

13 OIG 2009-424 accepted by the Fire Department?

14          MS. SULLIVAN:  Objection.  Vague.

15     A.  They were accepted by -- Yes, it seems that they

16 were accepted by the Fire Department.

17     Q.  (BY MR. MONTEIRO) And the recommendations which

18 are reflected in Exhibit 4, were those recommendations

19 accepted by the Fire Department?

20          MS. SULLIVAN:  Objection.  Vague.

21          Go ahead and answer.

22          THE WITNESS:  Yes.

23     Q.  (BY MR. MONTEIRO) So here, you -- In Exhibit 4,

24 you have -- It appears to be a sustained, a number of

25 sustained complaints against an unknown respondent.

Page 63

1 Correct?

2     A.  Yes, sir.

3     Q.  What is the -- what is the process or procedure

4 where you have an unknown respondent?

5          MS. SULLIVAN:  Objection.  Vague.

6          Go ahead and answer.

7     A.  I believe we would -- We would still, you know,

8 notify the Fire Chief, let him know of what the

9 recommendations were from OIG.

10          But being a lack of -- of a named member,

11 we couldn't move forward with the -- the disciplinary

12 process to one of our members -- towards one of our

13 members.

14     Q.  (BY MR. MONTEIRO) Did the Fire Department make

15 any changes to any policies, procedures or practices at

16 Station 54 as a result of the OIG findings reflected in

17 Exhibits 3 and 4?

18     A.  I'm sorry.  Did you say "changes" or "training"?

19 I'm -- I -- I --

20     Q.  Changes to any policies.  Let me restate it, so

21 that the court reporter can get it clear.

22          Did the Fire Department make any changes to

23 any policies, procedures or practices at Fire Station 54,

24 as a result of the OIG findings reflected in Exhibits 3

25 and 4?

Page 64

1     A.  I don't have direct knowledge of -- of any

2 changes.

3          I believe some -- a bulletin may have gone

4 out to -- to those at the fire station, but, no, not a

5 specific policy created for Station 54, or a change.

6     Q.  And what is the bulletin that you're

7 referencing?

8     A.  So if -- if there was a bulletin sent out, it

9 would be to cover certain areas.

10          I'm not sure if that happened in this case,

11 but if -- if a -- a bulletin would be sent out for any --

12 any temporary change.  Like I said, I don't -- I don't

13 recall one, exactly, in this case.

14     Q.  Did you see a bulletin in connection with your

15 preparation for this deposition?

16     A.  No, sir.

17     Q.  So are you just -- What is the basis for your

18 testimony that a bulletin may have been sent out?

19     A.  I guess I'm trying to think back of when I was

20 there.

21          I just wouldn't have had direct knowledge

22 of it.  So if -- For example, if there was a change to be

23 made at the station or a temporary -- or a training that

24 was about to happen in a particular area, then a bulletin

25 would be sent out, explaining that that training would



Page 65

1  occur, but not so much of a policy change.

2     Q.   Okay.

3     Did the Fire Department assess any

4  discipline to anyone in response to OIG 09-424's findings

5  and synopsis which are reflected in Exhibits 3 and 4?

6     A.   No.

7     Q.   Did the Fire Department take any other

8  non-disciplinary corrective action in response to OIG's --

9  OIG 09-424's findings and synopsis reflected in Exhibits 3

10  and 4?

11     MS. SULLIVAN:  Objection.  Vague.

12     Go ahead and answer.

13     A.   No, I can't recall that.

14     Q.   (BY MR. MONTEIRO) Did the Fire Department notify

15  anyone at Station 54 about OIG's findings reflected in

16  Exhibits 3 and 4?

17     A.   I would imagine that they would have to notify

18  the complainant, and so if Ms. Draycott was a complainant,

19  she would have -- at the conclusion of the case, would

20  have received that closure letter that we spoke of

21  earlier.

22     Q.   Okay.  Anyone else?

23     A.   No.  There wasn't any respondents' names, so

24  there wouldn't be anyone to send the closure letter to --

25     Q.   Okay.

Page 66

1     A.   -- in that case.

2     Q.   And I think you testified about this before, but

3  it wouldn't be the normal practice for Ms. Draycott's --

4  anyone within Ms. Draycott's chain of command to receive

5  notification of these findings.  Is that correct?

6     A.   That's correct.

7     Q.   In connection with your preparation for this

8  deposition, did you learn that 09-424 involved an

9  allegation by Ms. Draycott, that she was being subjected

10  to gender discrimination at Station 54?

11     A.   I don't know if she specifically stated --

12  stated that in the allegation, but I -- I do get that

13  that's the gist of the complaint, at -- at the end of it.

14     Q.   So the City understood that Ms. Draycott was

15  alleging that the things that were occurring at Station 54

16  were -- or to her were because of her gender.  Is that

17  correct?

18     A.   Are we talking in -- at the beginning of the

19  investigation or at the con- -- at the conclusion of?

20     Q.   Uhm --

21     A.   So I'd -- I'd have to look at the actual

22  complaint that she filed to see if she alleged that that's

23  what it was or if it was just the -- the things that were

24  broken down by OIG.

25     Q.   Okay.

Page 67

1     Let's mark this as -- Are we up to 5?

2     THE REPORTER:  Yes.

3     MS. SULLIVAN:  Thank you.

4     (Exhibit 5 marked)

5     Q.   (BY MR. MONTEIRO) Chief, I'm showing you what's

6  been marked as Exhibit 5, which bears the Bates numbers

7  HOU6027 through HOU6030.

8     A.   Yes.

9     (Witness reviewing exhibit)

10     Q.   (BY MR. MONTEIRO) Just let me know when you've

11  had a chance to review Exhibit 5, Chief.

12     A.   Yes, sir.

13     (Witness reviewing exhibit)

14     THE WITNESS:  Okay.

15     Q.   (BY MR. MONTEIRO) Have you had a chance to

16  review Exhibit 5?

17     A.   Yes.

18     Q.   Okay.  And did you review Exhibit 5 prior to

19  today?

20     A.   I -- I may have read it, if it was part of one

21  of the cases that was in there.  It was -- it was a lot of

22  information to read over, but it is possible that I read

23  this, yes.

24     Q.   Okay.  And I'm going to represent to you that

25  this is Ms. Draycott's sworn statement from August 19th of

Page 68

1  2009, which was produced by the City in connection with

2  this litigation, and it relates to the complaint we've

3  been talking about, 09-424.

4     A.   Yes.

5     Q.   And I wanted to direct your attention to the

6  first page, and Ms. Draycott says, at the -- the -- the

7  last paragraph on Page 1 says --

8     A.   Uh-hm.

9     Q.   -- "Since I've been assigned to Aircraft Rescue

10  Firefighting or at Fire Station 54, A shift, I've

11  experienced numerous problems, which I believe is due to

12  my gender."

13     A.   Okay.

14     Q.   Did I read that correct?

15     A.   Yes, sir.

16     Q.   So at least as of August 19th of 2009, the City

17  understood that Ms. Draycott was alleging that the things

18  that were occurring at Station 54 -- at 54, she believed

19  were happening to her because of her gender.  Is that

20  correct?

21     A.   Yes, sir.

22     Q.   And when OIG sent its findings and

23  recommendations to the Fire Department, it sustained two

24  of those allegations.  Correct?

25     A.   Yes.

Page 69

1    Q.  And that's reflected in both Exhibits 3 and
2  Exhibit 4?
3    A.  Yes.
4    Q.  Okay.  If we look at the last page of Exhibit 4,
5  the synopsis, under the Recommendations section --
6    A.  Yes.
7    Q.  -- Exhibit 4 reflects that OIG determined that
8  the sustained actions violated HFD Rule 7.06 and
9  Rule 8.06.  Is that correct?
10    A.  Yes.
11    Q.  Do you know what Rules 7.06 and 8.06 cover?
12    A.  Not off memory.  If I can review the Behavior
13  Manual, I could probably --
14    Q.  Would that also be in the rules and regulations?
15    A.  Yes.
16    Q.  Okay.
17          THE REPORTER:  No. 6.
18          MR. MONTEIRO:  6?
19          THE REPORTER:  Yes.
20          MS. SULLIVAN:  Thank you.
21          (Exhibit 6 marked)
22    Q.  (BY MR. MONTEIRO) Chief, you know, I've -- I've
23  provided you with what's been marked as Deposition
24  Exhibit 6 for identification purposes.  It's marked as
25  HOU2772 through 2786.

Page 70

1          Have you seen this document before?
2    A.  Yes.
3    Q.  What is it?
4    A.  It's the rules and regulations for the Houston
5  Fire Department and it's dated 2005.
6    Q.  Okay.  And would these have been the operative
7  rules and regulations in December of 2009?
8    A.  Yes, I believe so.
9          MR. MONTEIRO:  And just for clarification
10  purposes, this is through section 8 --
11          MS. SULLIVAN:  Right.
12          MR. MONTEIRO:  -- of the rules and regs.
13          That's that copy that we have?
14          MS. SULLIVAN:  Yes.
15          MR. MONTEIRO:  Okay.
16          MS. SULLIVAN:  And my copy is skipping
17  pages, like the other one.
18          MR. MONTEIRO:  Okay.
19          MS. SULLIVAN:  But the relevant sections
20  are actually in this packet.
21          MR. MONTEIRO:  Got lucky.
22          Do you have a complete copy, too?
23          THE WITNESS:  I think so.  It has even
24  pages.
25          MS. SULLIVAN:  Yeah, like mine.

Page 71

1    Q.  (BY MR. MONTEIRO) So if we look at Section 7.06,
2  which is on Page 9, it's entitled "Conduct and Behavior"
3  and it says:  "Members, whether on or off duty, shall be
4  governed by the ordinary and reasonable rules of good
5  conduct and behavior of law-abiding citizens.  They shall
6  not commit any act tending to bring reproach or discredit
7  upon themselves or the Department."
8          Did I read that correctly?
9    A.  Yes.
10    Q.  And then Rule 8.06, which is on Page 15, is
11  called -- entitled "Respect for Fellow Members" and,
12  again, it says, quote:  "Members shall treat other members
13  of the Department with respect and response due to them as
14  fellow members.  They shall be courteous, civil and
15  respectful of their superior officers and associates and
16  shall not use threatening or insulting language, whether
17  on or off duty.  Respect to superior officers shall not be
18  confined to duty but shall be extended on all occasions.
19  In addressing or referring to a superior officer, the
20  proper title shall be used and must never be omitted,
21  altered or abbreviated."
22          Did I read that correctly?
23    A.  Yes, sir.
24    Q.  Now, how did the Office of Inspector General
25  determine that the two rules and regulations that I just

Page 72

1  read had been violated by the conduct that was sustained?
2          MS. SULLIVAN:  Objection.  Foundation.
3    Q.  (BY MR. MONTEIRO) Let me back up.
4          Do you know how the Office of Inspector
5  General determined that the two rules that I've just read
6  had been violated by the -- by the conduct that had been
7  sustained?
8    A.  Other than -- other than what they provided in
9  the synopsis for the particular sections, where it says
10  "sustained," I wouldn't know the -- the process of why and
11  how they came to that conclusion, other than what they've
12  provided in the -- in that section.
13    Q.  Do you know if OIG made any other findings with
14  respect to Ms. Draycott's complaint, that are not
15  contained within Exhibits 3 and 4?
16    A.  I'm not aware of any other findings outside of
17  these two documents.
18    Q.  Did OIG make any findings as to whether or not
19  Ms. Draycott had been subjected to gender discrimination?
20    A.  I didn't -- I didn't see -- I didn't see it
21  specifically worded that way, unless I missed it, that it
22  was directly related to gender.
23    Q.  And your -- you're referring to --
24    A.  Referring to the -- the sustained charges in the
25  synopsis.

Page 73

1    Q.  Okay.  And you can take a look, if you need to,
2  again.
3    **A.  Okay.  I'm just going to look at the sustained**
4  **one.**
5    Q.  Sure.  That's fine.  Just let me know when
6  you've had a chance to review that.
7       (Witness reviewing document)
8       **THE WITNESS:  Okay.**
9    Q.  (BY MR. MONTEIRO)  Have you had a chance to
10  review Exhibit 4?
11    **A.  Yes.  It's Exhibit 4.**
12    Q.  Sorry.  There's a lot of documents.
13       So the question I think I asked you was
14  whether OIG made any findings as to whether Ms. Draycott
15  had been subjected to gender discrimination and you said
16  you wanted to review Exhibit 4.
17    **A.  Right.  So when I reviewed the two sustained**
18  **charges, they -- they do sustain on an unknown person for,**
19  **one, turning the cold water off and the other for the**
20  **speakers.**
21       **But in -- in those sections, I didn't see**
22  **that it was related to gender, that it was specifically**
23  **because of her gender that these two things occurred.**
24    Q.  Okay.  So the answer to my question is?
25    **A.  No.**

Page 74

1    Q.  No.  Okay.
2       And did the Fire Department review
3  Exhibits 3 and 4 to determine whether Ms. Draycott had
4  been subjected to gender discrimination?
5    **A.  I don't know that a specific review was done**
6  **to -- to match that up.**
7    Q.  Did you see any -- In preparation -- In
8  preparing for your deposition, you did not learn that that
9  had been done.  Is that fair?
10    **A.  That's correct.**
11    Q.  So the -- so the Fire Department -- In 2009 and
12  2010, the Fire Department had a complaint policy which
13  instructed employees such as Ms. Draycott to file their
14  discrimination complaints with the Office of Inspector
15  General.  Is that correct?
16    **A.  That sounds right, yes.**
17    Q.  Okay.  And the City --
18    **A.  Excuse me.**
19    Q.  That's okay.
20       The City had placed OIG in charge of
21  investigating those types of complaints?
22    **A.  Yes.**
23    Q.  And if -- if OIG -- OIG would determine whether
24  or not those complaints could be sustained?
25    **A.  Yes.**

Page 75

1    Q.  And if OIG sustains a complaint, it would make a
2  recommendation as to which of the Fire Department's rules
3  and regulations had been violated.  Is that correct?
4    **A.  Yes.**
5    Q.  But OIG doesn't make any determination as to
6  whether or not discrimination occurs?
7    **A.  I'm not sure, but I think that if the ERU Unit would**
8  **have had it, they may have made that decision or would**
9  **have told us that that occurred.**
10       **So we anticipated that if -- if there was**
11  **some type of discrimination, that OIG would -- would let**
12  **us know, specially if it was investigated by ERU, who --**
13  **who, I imagine, was specifically trained to deal with**
14  **those types of investigations.**
15    Q.  And -- Well, does Exhibit 4 reflect that the
16  ER -- ERU Unit made any determinations as to whether or
17  not what happened to Ms. Draycott was gender
18  discrimination?
19    **A.  Right.**
20       **Like I said earlier, on the sustained**
21  **complaints, I saw that they -- they listed 7.06 and 8.06,**
22  **but I couldn't -- I didn't see anywhere where it**
23  **specifically stated it was related to gender**
24  **discrimination.**
25    Q.  Okay.  And it said that it was not -- Did --

Page 76

1  Does Exhibit 4 reflect that ERU made the determination
2  that it was not related to gender discrimination?
3    **A.  No, sir.**
4    Q.  Does it make it -- It's silent as to whether or
5  not gender discrimination occurred.  Is that correct?
6    **A.  Yes, sir, that's correct.**
7    Q.  So what -- How was -- What was Ms. Draycott
8  notified with respect to the outcome of exhibit -- of this
9  investigation?
10    **A.  So, again, I -- I don't want to speak in general**
11  **terms, but she would have been sent a closure letter.**
12       **I don't have personal knowledge of seeing**
13  **that letter, but she would have been sent the letter that**
14  **would have included these allegations and the outcomes of**
15  **each allegation.**
16    Q.  But it wouldn't -- It wouldn't tell her whether
17  or not there had been any determination whether she had
18  been discriminated against.  Is that fair?
19    **A.  Yes, sir, that's fair.**
20    Q.  And does this -- Is that the -- Is that still
21  the current procedure?
22    **A.  As far as -- I'm sorry.  Which part?**
23    Q.  So we've talked about how OIG identifies a rule
24  or regulation.
25       When it sustains a complaint, it identifies



Page 77

1  a rule or regulation that's been violated.  Right?

2      **A.  Yes, sir.**

3      Q.  Is that the current procedure?

4      **A.  So the -- the current procedure, when OIG**

5  **investigates these now, they also list City violations,**

6  **for example, 1-50, any other violations, and if there is**

7  **discrimination, they -- they'll let us know.**

8          **They also send a closure memo, I believe,**

9  **to the complainant.  That one, I'm not familiar if they**

10 **say, "Yes, we found discrimination."**

11         **But also now in our rules and regulations,**

12 **I believe we have 601 and 602 that relate back to 1-50**

13 **from the City, and so if -- if the person receives -- or**

14 **the complainant receives a letter from us, it would have**

15 **those listed as whether they were sustained or not.**

16     Q.  And you -- you mentioned 1-50 a couple of times.

17         Remind me what that -- That's an Executive

18 Order.  Is that correct?

19     **A.  Yes, that's one of the City's Executive Orders.**

20     Q.  Okay.  And that is basically like an

21 anti-discrimination Executive Order or --

22     **A.  Yes.**

23     Q.  -- something along those lines?

24     **A.  I don't know the exact title, but, yes, that's**

25 **what it covers.**

Page 78

1      Q.  That's the topic area?

2      **A.  Yes, sir.**

3      Q.  So I know you said earlier that, because

4  Exhibit 4 involved an unknown respondent, there was no

5  discipline recommended.  Right?

6      **A.  Yes.**

7      Q.  Okay.  Could the Fire Department have issued

8  some sort of bulletin, reminding them of proper conduct,

9  in response to OIG's findings?

10         MS. SULLIVAN:  Objection.  Vague.

11         Go ahead and answer.

12     **A.  I believe, yes, that's possible.**

13     Q.  (BY MR. MONTEIRO) And that because this conduct

14 took place at Station 54, that could have been at

15 Station 54?

16     **A.  The bulletin?**

17     Q.  A bulletin could have been issued to the staff

18 at Station 54, reminding them of proper conduct?

19     **A.  Yes, that could have -- that could have**

20 **happened.**

21     Q.  But -- And you're not aware of that occurring --

22     **A.  No, I'm not.**

23     Q.  -- correct?

24         Okay, Chief, going back to Exhibit 2, I

25 want to talk about -- move on and shift to Topic 2, which

Page 79

1  relates to OIG 09-407.

2          (Witness reviewing document)

3      Q.  (BY MR. MONTEIRO) And my understanding is that

4  you've been designated for Topics 2(a).  Is that correct?

5      **A.  Yes.**

6      Q.  And 2(b)?

7      **A.  Yes.**

8      Q.  And 2(d)?

9      **A.  Yes.**

10     Q.  2(g)?

11     **A.  (g)?  I'm sorry?**

12     Q.  Yes.

13     **A.  Yes.**

14     Q.  And 2(h)?

15     **A.  Yes.**

16     Q.  And 2(i)?

17     **A.  Yes.**

18     Q.  And I asked you this question in regard to the

19 other investigation.

20         Do you have any personal knowledge of any

21 of these subtopics?

22     **A.  No.**

23     Q.  You were not personally involved in your

24 capacity as an investigator or Senior Investigator with

25 regard to any of those subtopics.  Is that correct?

Page 80

1      **A.  It is, but I may have been assigned in the area.**

2  **So I need to know exactly the timeline of when this -- You**

3  **know, I was -- may have been assigned to Staff Services at**

4  **the time.  I'm just not sure.**

5      Q.  Okay.

6      **A.  But I don't recall any personal knowledge of**

7  **receiving it.**

8      Q.  So -- And does your knowledge about the

9  subtopics exist only to the extent that you spent time

10 preparing to be deposed as the City's representative on

11 these subtopics?

12     **A.  Yes.**

13     Q.  And if we look at Matter 2(a), which is

14 Defendant's policies, procedures and practices governing

15 the review of 09-407's findings and investigative

16 synopsis, in connection with your preparation, did you

17 become aware of OIG's findings with respect to 09-407?

18     **A.  Yes.**

19         MR. MONTEIRO:  Is that 7?

20         THE REPORTER:  7.

21         MR. MONTEIRO:  Here you go.

22         MS. SULLIVAN:  Thank you.

23         (Exhibit 7 marked)

24     Q.  (BY MR. MONTEIRO) I'm showing you what's been

25 marked as Deposition Exhibit 7.  For identification

Page 81

1  purposes, it has a Bates number of HOU5460 through 5461.

2    **A.  Okay.  I have 62 as well.**

3    Q.  I'm sorry.  I misspoke.  It was supposed to be

4  5460 through 5462.

5    **A.  Yes.**

6    Q.  Okay.  And have you seen the documents in

7  Exhibit 7 before?

8    **A.  I believe they were in the -- in the information**

9  **I reviewed.**

10    Q.  Okay.  And the first -- the first page in the

11  exhibit, is that the transmittal letter from OIG to Fire

12  Chief Flanagan regarding the findings related to OIG

13  Complaint 2009-407?

14    **A.  Yes.**

15    Q.  And that reflects the notification from OIG to

16  HFD, regarding its findings related to this investigation?

17    **A.  Yes, it -- yes, it does.**

18    Q.  The second page is notice from the Inspector

19  General to Ms. Draycott regarding her complaint.  Is that

20  correct?

21    **A.  Yes.**

22    Q.  And it reflects the allegation of criminal

23  activity/criminal mischief, as being sustained against an

24  unknown person or persons.  Is that correct?

25    **A.  Yes.**

Page 82

1    Q.  And the letter to Ms. Draycott reflects that she

2  reported the markings discovered in the women's dormitory

3  at Station 54.  Is that correct?

4    **A.  Are you speaking of 461 still?**

5    Q.  Yes, 5461.

6    **A.  I'm sorry.  The question again?**

7    Q.  The question was the letter to Ms. Draycott

8  reflects that Ms. Draycott reported the markings

9  discovered in the women's dormitory at Fire Station 54.

10  Is that correct?

11    **A.  Yes, yes, it is.**

12    Q.  And did the City understand that Ms. Draycott

13  was complaining about the racial and gender slurs that she

14  found in the women's dormitory in July of 2009?

15    **A.  Yes.**

16    Q.  And, again, it looks like this complaint was

17  sustained against an unknown person or persons?

18    **A.  Yes.**

19    Q.  And if you go back to the first page, the OIG is

20  also transmitting a copy of the investigative synopsis --

21    **A.  Yes.**

22    Q.  -- to the Fire Department?

23    **A.  I'm sorry.  Yes.**

24    Q.  What is the -- In 5461, which is a letter to

25  Ms. Draycott, what's the criminal activity/criminal

Page 83

1  mischief reference?

2    **A.  I believe that's addressing the -- the -- the**

3  **slurs or whatever was written on -- on the wall.**

4    Q.  Okay.  And this was a -- Am I correct that this

5  was a criminal investigation?

6    **A.  I believe that's how OIG ran it, as a criminal**

7  **investigation.**

8    Q.  Do you know why that was determined?

9        MS. SULLIVAN:  Objection.  Foundation.

10        Go ahead.

11    **A.  Not exactly, but if -- if -- I believe if law**

12  **enforcement responds to -- to any type of criminal**

13  **mischief, they probably just continued it as a criminal**

14  **investigation.**

15        MR. MONTEIRO:  Can you mark that

16  (indicating) as 8?

17        THE REPORTER:  8.

18        MS. SULLIVAN:  Thank you.

19        (Exhibit 8 marked)

20    Q.  (BY MR. MONTEIRO) Chief, I'm showing you what's

21  been marked as Exhibit 8, and for identification purposes,

22  it's HOU1472 through 1495.

23    **A.  Yes.**

24    Q.  Can you identify what this document is?

25    **A.  The cover letter here seems it's a**

Page 84

1  **correspondence from the Captain and Office of Inspector**

2  **General to the Legal Department.  It speaks about a**

3  **request for an investigative report to include some**

4  **analysis from the FBI.**

5        **So I'm assuming that it just -- it includes**

6  **the -- the summary of the investigation, with that**

7  **addition.**

8    Q.  Okay.  And then if you go to the second page, is

9  that the communication from -- or is that the OIG

10  communication related to the investigative synopsis into

11  2009-407?

12    **A.  I'm not sure if this is a synopsis.  It's a**

13  **summary from the Lieutenant to the Inspector General in**

14  **OIG.**

15    Q.  Do you know if this is what was provided to

16  Chief Flanagan, which is noted in Exhibit 7?

17    **A.  Let me see.**

18    Q.  The cover letter.

19    **A.  Let me look.**

20    Q.  Okay.

21        (Witness reviewing exhibit)

22        **THE WITNESS:  Yes, if we assume that the --**

23  **the summary is the synopsis.**

24        **I -- I don't have direct knowledge of**

25  **handing it to him, but if that's what they're speaking of,**



Page 85

1  then this would be the document.

2      Q.   (BY MR. MONTEIRO) Okay.  And we've talked

3  earlier about the Fire Department's policies regarding the

4  receipt and review of OIG investigations.

5           Were the same policies, procedures and

6  practices for the review of OIG findings in place when the

7  Fire Department received OIG's findings and synopsis into

8  09-407?

9      A.   Yes.

10     Q.   And this investigation involved a criminal

11  allegation.  Right?

12     A.   Yes.

13     Q.   Were the policies for HFD's review any different

14  than what you described for me earlier?

15     A.   No.  The review was the same for criminal.

16     Q.   Apart from the Fire Department, do you know if

17  any other department or agency within the City reviewed

18  the results of 09-407?

19     A.   I believe City Legal was involved at that point.

20     Q.   And that -- Exhibit 8 is sent to Susan Taylor,

21  who's the Deputy City Attorney?

22     A.   Yes, it is.

23     Q.   Is that correct?

24     A.   Yes.

25     Q.   Do you know why Susan Taylor received a copy of

Page 86

1  Exhibit 8?

2      A.   No, I didn't.

3      Q.   Do you know if that was the procedure in place

4  at the time?

5      A.   No, I'm not familiar if that was the procedure

6  at OIG to send that to an attorney.

7      Q.   Apart from City Legal, were there any other

8  agencies that reviewed the results of 09-407?

9      A.   I'm not -- I'm not aware of any other division

10  or organization.

11     Q.   And if you look at the front of Exhibit 8,

12  there's a stamp which says:  "Review FYI and Return For

13  File, No Action Required," and then there's a date and it

14  looks like Susan Taylor's signature.

15           Do you know what that means?

16     A.   No, I'm not familiar with that process.

17           I mean, I -- I see that she's acknowledging

18  something here.  I'm -- I'm not -- I'm not familiar with

19  the process of reviewing and returning for file.

20     Q.   Do you know what the scope of Ms. Taylor's

21  review was?

22     A.   No, sir, I'm not familiar with Ms. Taylor and

23  what her responsibilities were.

24     Q.   Did you ask anyone from the Legal Department

25  about the scope of Ms. Taylor's review of Exhibit 8, in

Page 87

1  preparing for your deposition?

2      A.   No, sir.

3      Q.   So who, in the Fire Department, would have

4  received OIG's results related to 2009-407?

5      A.   It would have been Staff Services.

6      Q.   And do you know if that occurred with --

7  specifically with respect to this investigation?

8      A.   No.  I'd only be assuming that that occurred.

9      Q.   Do you know if Chief Flanagan reviewed

10  Exhibit 8?

11     A.   No.  I would assume that during -- with general

12  practice, he would have, but I don't know if he -- if he

13  did.

14     Q.   And, again, would the scope of Staff Services or

15  Chief Flanagan's review of Exhibit 8 be related to the

16  level of discipline that -- that was going to be assessed

17  in response to the findings?

18     A.   I missed the end of that question.

19     Q.   Sure.

20           Would the scope of either Staff Services or

21  Chief Flanagan's review of Exhibit 8 relate to the level

22  of discipline that would be imposed in response to the

23  findings?

24     A.   That would if -- I believe if we had a name, but

25  since there was no name, I don't know that that process

Page 88

1  was done.

2      Q.   Okay.  And that's because it was anonymous or --

3      A.   Or it was -- I'm sorry.  No.  It was an

4  unknown --

5      Q.   -- unknown employee?  Is that what it was

6  called?

7      A.   Yes.

8      Q.   Okay.  Was there any other review of Exhibit 8

9  by the Fire Department, other than determining the level

10  of discipline that should be imposed?

11           MS. SULLIVAN:  Objection.  Vague.

12           Go ahead.

13     A.   Not that I recall.

14     Q.   (BY MR. MONTEIRO) And were the findings by OIG

15  accepted by the Fire Department?

16     A.   Yes.

17     Q.   Were the recommendations by OIG accepted by the

18  Fire Department?

19           MS. SULLIVAN:  Objection.  Vague.

20           Go ahead.

21     A.   The recommendations here listed, yes.

22     Q.   (BY MR. MONTEIRO) The Fire Department didn't

23  challenge any of those findings or recommendations.  Is

24  that correct?

25     A.   Correct.

Page 89

1   Q.  Did the City make any changes to any policies,
2  procedures or practices at Station 54 as a result of the
3  findings reflected in Exhibit 8?
4   **A.  And we're talking immediately after these cases**
5  **were closed?**
6   Q.  Just as a result of the findings.
7      So it could be immediately, it could be --
8   **A.  I don't --**
9   Q.  -- sometime down the road.  I don't know.
10      MS. SULLIVAN:  Objection.  Vague.
11      Go ahead.
12   **A.  I'm not aware of any particular policies that**
13  **were changed that were -- especially that were specific to**
14  **Station 54.**
15   Q.  (BY MR. MONTEIRO) How about any practices?
16      MR. MONTEIRO:  Same objection.
17   **A.  Like I said earlier, unless a -- unless a**
18  **bulletin was sent out explaining any type of changes, that**
19  **it wouldn't -- not that I can recall, any policy changes**
20  **or practices at -- at that time.**
21   Q.  (BY MR. MONTEIRO) Okay.  And you didn't
22  identify -- you didn't review any bulletin in -- while you
23  were preparing for your deposition, that was sent out in
24  response to Exhibit 8.  Is that correct?
25   **A.  Correct.**

Page 90

1   Q.  And were there any changes to the policies,
2  procedures or practices at Station 54 at any point?
3      MS. SULLIVAN:  Objection.  Vague.
4   Q.  (BY MR. MONTEIRO) I'm just trying to get
5  clarification, 'cause you said -- When you answered my
6  last question, you said -- I think you quoted -- you said
7  at that time, you weren't aware of any changes --
8   **A.  Right.**
9   Q.  -- any changes to any policies, procedures or
10  practices.
11      So I'm just wondering, are you aware of any
12  changes at Station 54 that happened, not necessarily in
13  response to Exhibit 8?
14   **A.  Right.  No, I know that, as a department,**
15  **over time we have made changes and new training and policy**
16  **changes and things like that and it wouldn't be a standard**
17  **practice to create a policy specifically for one station.**
18  **It would be to cover the -- the entire department.**
19  **   So since then to now, I have noticed**
20  **changes in training and policy changes from then 'til**
21  **now --**
22   Q.  Okay.
23   **A.  -- that would affect every station, including**
24  **Station 54.**
25   Q.  Including 54.  Good.  Okay.

Page 91

1      But there weren't any specific changes to
2  any practices at Station 54 as a result of Exhibit 8?
3   **A.  Right.**
4   Q.  Okay.
5   **A.  Not that I can recall, no, sir.**
6   Q.  And did the Fire Department assess any
7  discipline to anyone in response to OIG 09-407's findings
8  and synopsis?
9   **A.  No.**
10   Q.  Did the fire Department take any other
11  non-disciplinary corrective action in response to
12  OIG 09-407's findings and synopsis?
13      MS. SULLIVAN:  Objection.  Vague.
14      Go ahead.
15   **A.  Not that I recall.**
16   Q.  (BY MR. MONTEIRO) Apart from Ms. Draycott, would
17  anyone -- was anyone at Station 54 notified about the
18  findings into 2009-407?
19   **A.  No, sir, unless someone else was listed as a**
20  **complainant.  I'm not sure if Ms. Keyes was listed, and if**
21  **she was, then she would have received the same letter.**
22   Q.  Okay.
23      But in terms of anyone within Ms. Draycott
24  or Ms. Keyes' chain of command, they wouldn't -- they
25  would not have been notified of this, about the findings.

Page 92

1  Is that correct?
2   **A.  Correct.**
3   Q.  Is anyone besides the Fire Chief notified of the
4  findings?
5   **A.  Like I said earlier, only if -- if there is a**
6  **need to know, if they're going to be suspended for a**
7  **certain amount of time, but I can't recall a situation**
8  **where anyone else needs to know other than the -- the**
9  **member and the Fire Chief.**
10   Q.  Does the Fire Chief ever delegate, you know, the
11  authority to a Assistant Fire Chief or --
12   **A.  He can delegate the authority to maybe issue the**
13  **discipline, but I don't believe he delegates determining**
14  **discipline.**
15   Q.  Okay.  So Exhibit 8 reflects that OIG sustained
16  the complaints as criminal activity and criminal mischief.
17  Is that correct?
18   **A.  Yes.**
19   Q.  And did -- Are you aware of whether OIG made any
20  other findings regarding the complaints?
21   **A.  Not that I'm aware of.**
22   Q.  The findings are self-contained in Exhibit 8.
23  Is that correct?
24   **A.  Yes, I believe so.**
25   Q.  Did OIG make any findings as to whether



Page 93

1 Ms. Draycott or Ms. Keyes had been subjected to gender

2 discrimination?

3   **A.  No.**

4   Q.  Did the Fire Department make any determination

5 whether Ms. Draycott or Ms. Keyes had been subjected to

6 gender discrimination?

7   **A.  No.**

8   Q.  Did the Fire Department make -- Did the Fire --

9 Let me step back for a minute.

10       Did the Fire Department review Deposition

11 Exhibit 8 to determine whether or not Ms. Draycott or

12 Ms. Keyes had been subjected to gender discrimination?

13  **A.  No.  The review didn't specifically cover that,**

14 **whether that -- that occurred.**

15  Q.  Did the Fire Department review Exhibit 8 to

16 determine whether Ms. Draycott or Ms. Keyes had been

17 subjected to a hostile work environment due to their

18 gender?

19  **A.  And, again, the -- the review didn't cover that.**

20 **We -- we relied more on -- on the people with that**

21 **training, for example, ERU, to -- to let us know if there**

22 **was any type of issue with retaliation, discrimination,**

23 **those kinds of things.**

24      **So the idea wasn't to review it, to look**

25 **for those things.  We were just expecting that from ERU.**

Page 94

1   Q.  But this came from -- Did this -- Did Exhibit 8

2 come from -- and was that investigated by ERU?

3   **A.  I -- Oh.  You know, I could have been talking**

4 **about 424.  I'm sorry.**

5   Q.  That's okay.

6   **A.  I'm sorry.**

7   Q.  So with respect to 2009-407 --

8   **A.  No.  With -- with respect to this one, then we**

9 **would have then relied on OIG to let us know about that.**

10 **It wasn't to re-investigate.**

11     **So that review didn't include that de- --**

12 **that amount of detail.**

13  Q.  Okay.  We're going to move on to Topic 3.

14      Keep marking this, uhm -- So if you go back

15 to Exhibit 2, under Topic 3, if you can review that and

16 let me know when you've had a chance to review, complete

17 that review.

18      (Witness reviewing document)

19      **THE WITNESS:  Okay.**

20  Q.  (BY MR. MONTEIRO) So my understanding is that,

21 with respect to Topic 3, you've been designated to answer

22 questions regarding 3(a).  Is that correct?

23  **A.  Yes.**

24  Q.  3(b)?

25  **A.  Yes.**

Page 95

1   Q.  3(d)?

2   **A.  Yes.**

3   Q.  And 3(f)?

4   **A.  Sorry, (f)?**

5   Q.  (f), yes.

6   **A.  Yes.**

7   Q.  And 3(g)?

8   **A.  Yes.**

9   Q.  Is that correct?

10  **A.  Yes.**

11  Q.  Okay.  And do you have any personal knowledge of

12 any of these subtopics?

13  **A.  No, sir.**

14  Q.  You were not personally involved in your

15 professional capacity with regard to any of the subtopics.

16 Is that correct?

17  **A.  Correct.**

18  Q.  And your knowledge exists only to the extent

19 that you spent time preparing to depose -- preparing to be

20 deposed about these subtopics?

21  Q.  Okay.  What did you do in order to prepare to

22 answer the subtopics that we've just identified with

23 respect to Topic 3?

24

25  **A.  I reviewed the -- the synopsis for 311 and the**

Page 96

1 policy, the complaint policy.

2   Q.  Did you speak with anyone?

3   **A.  No.**

4   Q.  Okay.

5       MR. MONTEIRO:  This is going to be No. 9?

6       MR. RUIZ:  No. 10.

7       MR. MONTEIRO:  10?

8       THE REPORTER:  9.

9       (Exhibit 9 marked)

10  Q.  (BY MR. MONTEIRO) I'm showing you what's been

11 marked as Deposition Exhibit 9.

12      For identification purposes, it has a Bates

13 number of HOU5671 through 5705.

14  **A.  Yes.**

15  Q.  Is this the document that you reviewed to

16 prepare for your deposition today?

17  **A.  Yes.  It looks familiar.**

18  Q.  Okay.  Were there any other documents related to

19 OIG 10-311 that you reviewed, to prepare for your

20 deposition?

21  **A.  No.**

22  Q.  You've previously described for us the Fire

23 Department's general policies regarding the receipt of OIG

24 investigations.  Correct?

25

Page 97

1    Q.  And would those policies -- or HFD's review of
2  those -- of the findings related to 10-311 have been any
3  different?
4    A.  No.  They would have been the same.
5    Q.  Okay.  Apart from the Fire Department, did any
6  other department or agency within the City review the
7  results of OIG 10-311?
8    A.  Not that I see here, unless Legal reviewed it.
9  But this one didn't have the same cover sheet as the last
10  one.
11    Q.  And do you know why?
12    A.  Oh, I'm sorry.
13    Q.  Sorry.  Do you know -- Do you know why the cover
14  sheet is different on Exhibit 9 than the previous two that
15  we've looked at?
16    A.  Well --
17        MS. SULLIVAN:  Objection.  Foundation.
18    A.  I -- I didn't mean cover sheet.  I meant the --
19  the letter.  The previous case had the letter to the
20  attorney.  I don't know why it's not part of this case.
21    Q.  (BY MR. MONTEIRO)  Okay.
22        Now, if you look at HOU5676, which is a
23  interoffice correspondence, it appears to be from
24  Lieutenant R. David to Captain D. E. Watkins.
25        Is that correct?

Page 98

1    A.  Yes.
2    Q.  When -- when we looked at the other two
3  investigations earlier, there was actual correspondence
4  from OIG to the Fire Chief -- Fire Chief, which kind of
5  documented the handoff of the materials from OIG to HFD.
6  Correct?
7    A.  Yes.
8    Q.  Have you seen any such similar correspondence
9  with respect to this investigation?
10    A.  I have not.
11    Q.  Are you aware of whether any such similar
12  correspondence exists --
13    A.  I'm not --
14    Q.  -- with respect to this investigation?
15    A.  I'm not aware of that.
16    Q.  Have you seen any -- any documentation that
17  OIG's investigation into 10-311 was communicated to the
18  Fire Department?
19    A.  No.
20    Q.  Have you spoken to anyone who's confirmed that
21  OIG's investigation into 10-311 was provided to the Fire
22  Department?
23    A.  No.
24    Q.  Do you know who in the Fire Department received
25  OIG's -- the results of OIG's investigation into 10-311?

Page 99

1    A.  I know it would have been Staff Services, but I
2  don't have direct knowledge of them receiving it.
3    Q.  Okay.  Did you ask Chief Flanagan whether he
4  received Exhibit 9?
5    A.  No.
6    Q.  Do you know if the City made any changes to any
7  of its policies, procedures or practice at Station 54 as a
8  result of the OIG findings reflected in Exhibit 9?
9    A.  No, I'm not aware of that.
10    Q.  Do you know if the City reviewed OIG 10-311, to
11  determine if any of -- any policies, procedures or
12  practices needed to be modified?
13    A.  No.  I believe that would have come from OIG.
14  They would have gone over this -- this summary but not to
15  the extent of changing policy at that point.
16    Q.  And if it came from OIG, it would be reflected
17  somewhere in Exhibit 9.  Is that fair?
18    A.  Yes.
19    Q.  Did the Fire Department assess any discipline to
20  anyone in response to OIG 10-311's findings and synopsis?
21    A.  No.  I didn't see any disciplinary paperwork.
22    Q.  And -- and what did you review with respect to
23  that topic?
24    A.  Oh, I just reviewed this -- this case file and I
25  didn't have any -- What I'm saying is I didn't have any

Page 100

1  additional information that showed that discipline was --
2  was issued.
3    Q.  And if we look at the final two pages of
4  Exhibit 9, which is 5704 and 5705, unlike the prior two
5  complaints that we've reviewed here, it looks like OIG has
6  identified an employee who its -- has sustained a
7  complaint against.  Is that correct?
8    A.  Yes, sir.
9    Q.  And that's Chief Boriskie?
10    A.  Yes, sir.
11    Q.  And do you know what the process by -- Do you
12  know what the process would have been by which any
13  discipline would have been imposed against Chief Boriskie
14  in July of 2010?
15    A.  He would have -- The process would have been the
16  same, where the violation would have been compared to the
17  Behavior Manual to determine a category and then to
18  determine the number of days and that being presented to
19  the -- I guess the current Fire Chief, to assess that
20  discipline or make his decision on what discipline to
21  assess.
22    Q.  And do you know if that process was undertaken
23  with respect to this complaint?
24    A.  I don't have direct knowledge that that occurred
25  with this complaint.



Page 101

1   Q.  And the current Fire Chief in -- When this --
2   when these results came out in March of 2010, would that
3   have been -- I'm sorry -- July of 2010, would that have
4   been Chief Flanagan?
5   A.  Yes.
6   Q.  And apart from Chief Boriskie, do you know if --
7   do you know if any other -- if OIG made any other
8   recommendations as to any other employees who had violated
9   the Fire Department's rules and regulations in connection
10  with this investigation?
11  A.  I'm not sure.  I'd have to review it again to
12  see if they list anyone else in the summary.
13       But in the -- in the Recommendations
14  section -- or at least where the employee's listed, he's
15  the only one listed.  But I'd have to -- I'd have to read
16  through the case again to see if -- It would have not been
17  normal for them to sustain in the text and not sustain
18  in -- in the end, in the Recommendation.
19       So I would have to look and see if they
20  sustained anyone else in the text.
21  Q.  Okay.  But the -- the basis for your knowledge
22  would just be reviewing Exhibit 9.  Is that correct?
23  A.  Yes.
24  Q.  There's no other source that you would go to, to
25  determine that?

Page 102

1   A.  Correct.
2   Q.  Did the Fire Department take any other
3   non-disciplinary corrective action in response to
4   OIG 10-311's findings and synopsis?
5       MS. SULLIVAN:  Objection.  Vague.
6       Go ahead and answer.
7   A.  No.
8   Q.  (BY MR. MONTEIRO) Did the Fire Department notify
9   anyone at Station 54 about its findings?
10  A.  In this case, I guess they would have notified
11  Ms. -- Ms. Draycott.  She was the -- the complainant on
12  record, so she would have probably received the closure
13  letter, stating the results.
14  Q.  And did -- did you -- In preparing for your
15  deposition, did you actually see that she was ever
16  notified about these findings?
17  A.  No.
18  Q.  She should have -- she should have been
19  notified.  Is that correct?
20  A.  Yes.  She should have received a -- a closure
21  letter.
22  Q.  And because Chief Boriskie was the respondent --
23  or, sorry -- because Chief Boriskie was identified as the
24  employee who had a complaint sustained against him, he
25  would have been notified as well.  Is that correct?

Page 103

1   A.  Yes, and he -- the respondent was -- Correct, I
2   think.
3   Q.  The respondent's the right name?
4   A.  Yes.
5   Q.  Okay.  Did you see any evidence that
6   Chief Boriskie was notified about these findings?
7   A.  I did not see that.
8   Q.  In connection with your preparation for this
9   deposition, did you learn that 10-311 involved an
10  allegation by Ms. Draycott that she had been subjected to
11  retaliation?
12  A.  Yes.
13  Q.  And so the City understood that what
14  Ms. Draycott was alleging, that what happened to her
15  during the roll call was in retaliation for her complaints
16  of discrimination.  Is that correct?
17       (Witness reviewing document)
18  A.  I'm just reviewing the summary that --
19  Q.  (BY MR. MONTEIRO) Sure.  Go ahead.
20       (Witness reviewing document)
21  A.  Without -- without reading through the entire
22  document to see if the word "retaliated" is in there,
23  I'd -- it -- I would imagine the City could assume that
24  she meant that she was being retaliated by the actions --
25  Q.  (BY MR. MONTEIRO) Okay.

Page 104

1   A.  -- that were in the initial complaint.
2   Q.  Let's do what we did the last time.  I can show
3   you her complaint and maybe that will help clarify.
4       THE REPORTER:  No. 10.
5       (Exhibit 10 marked)
6   Q.  (BY MR. MONTEIRO) I'm showing you what's been
7   marked as Exhibit 10, which is -- bears -- the Bates
8   number is HOU5759 through 5762.
9   A.  Okay.
10  Q.  And I'll represent to you that this is a copy of
11  Ms. Draycott's complaint related to OIG 10-311 --
12  A.  Yes.
13  Q.  -- and has been produced by the City during this
14  litigation.
15  A.  Yes.
16  Q.  I'm going to direct you to Page 3 of 4, to the
17  third paragraph from the bottom.
18  A.  Okay.
19  Q.  And here, Ms. Draycott says, quote:  "I believe
20  I was prevented from going back to work with the Fire
21  Department and specifically from returning to work at
22  Station 54 because I complained of discrimination under
23  Title VII and complained specifically to the Office of
24  Inspector General of illegal activity and because I spoke
25  publicly in opposition to what I regarded as



Page 105

1 discriminatory and retaliatory activities at the Fire
2 Department," unquote.
3      Did I read that correctly?
4   **A.  Yes, you did.**
5   Q.  So as of at least April 21st of 2010, the City
6 understood that Ms. Draycott -- that Ms. Draycott was
7 alleging that what happened to her during the roll call on
8 January 13th of 2010, she was alleging that was in
9 retaliation for her complaints of discrimination.  Is that
10 correct?
11  **A.  Yes.**
12  Q.  And as we discussed, when OIG -- OIG's findings,
13 they sustained Ms. Draycott's complaint.  Correct?
14  **A.  Yes.**
15  Q.  And the final page of the investigative summary
16 reflects that OIG determined that the sustained actions
17 violated Rule 7.02.  Correct?
18  **A.  Yes.**
19  Q.  And the language of 7.02 is quoted in the
20 findings?
21  **A.  Yes, it -- Let's see.  Yes.**
22  Q.  And does that language speak to retaliation, in
23 your mind?
24  **A.  To enforce rules and regulations, not as it**
25  **stands, that one sentence.**

Page 106

1   Q.  Do you know how OIG came to the determination
2 that Rule 7.02 was violated by Chief Boriskie's conduct?
3      MS. SULLIVAN:  You can answer the question.
4   **A.  No, I'm not sure how they came to that**
5  **conclusion.**
6   **I was just going to reference 7.02 to see**
7  **if I could make the connection, but I don't have direct**
8  **knowledge of why they picked that particular violation.**
9   Q.  (BY MR. MONTEIRO)  Do you know if OIG made any
10 other findings as to Ms. Draycott's complaint?
11  **A.  No, I don't see any other findings in this**
12 **synopsis from OIG.**
13  Q.  Do you know if OIG made a finding as to whether
14 or not Ms. Draycott had been subjected to retaliation?
15  **A.  No, I don't know if they specifically closed it**
16 **that way.**
17  Q.  I mean, do you see any reference to retaliation
18 with respect to its -- the findings that are in Exhibit 9?
19  **A.  Right now, no, I don't, not in the Sustained**
20 **section, or the Recommendation section.  I'm sorry.**
21  Q.  And did the Fire Department review Exhibit 9 to
22 determine whether or not Ms. Draycott had been subjected
23 to retaliation?
24  **A.  No.**
25  **I -- I believe that the Fire Department**

Page 107

1 **relied on the OIG investigation to show that and just that**
2 **detail of review was not performed.**
3      MR. MONTEIRO:  Can we go off the record.
4      (Recess from 12:23:47 p.m. to 12:37:23
5      p.m.)
6   Q.  (BY MR. MONTEIRO)  Chief Martinez, I just have a
7 couple of follow-up questions from our conversation about
8 OIG 10-311 --
9   **A.  Okay.**
10  Q.  -- which is Exhibit 9.
11      Did you review Chief Boriskie's personnel
12 file to determine whether the Fire Department never took
13 any action against him with respect -- or as a result of
14 the findings that are contained within Exhibit 9?
15  **A.  No.**
16  Q.  And did you have access to the -- You could have
17 had access to his personnel file.  Is that right?
18  **A.  Currently or back in --**
19  Q.  Currently.
20  **A.  Yes.**
21  Q.  The Fire Department still has Chief Boriskie's
22 personnel file?
23  **A.  Yes.  We're supposed to still have those files.**
24  Q.  And then did you review any personnel files of
25 any of the individuals who are listed in Exhibit 9 to see

Page 108

1 whether any disciplinary action was taken against them
2 with respect to Exhibit 9?
3   **A.  No, sir.**
4   Q.  And does the Fire Department still have those
5 personnel files?
6   **A.  I believe so.**
7   **It's more of an HR issue, so I believe we**
8  **still have retired members' files, but it's possible that**
9  **they move those somewhere, but I am not familiar with that**
10 **process; but active members, I know, yes, we have access**
11 **to those files.**
12  Q.  Okay.  If we can move on to topic 5, which is
13 Exhibit 2.  All right.
14      And I'm looking at Page 20 of Exhibit 2,
15 and the topic is HFD complaint policy dissemination and
16 training, and am I correct that, for subtopics (a) and
17 (b), you have been designated to testify about the
18 dissemination and implementation of the complaint
19 policies --
20  **A.  Yes.**
21  Q.  -- that's been identified?
22      (Exhibit 11 marked)
23      MS. SULLIVAN:  Is that 11?
24  Q.  (BY MR. MONTEIRO)  I'm showing you what's been
25 marked as Deposition Exhibit 11.  It is marked HOU2821

Page 109

1  through HOU2826.

2     A.   Yes.

3     Q.   Do you have any personal knowledge regarding the

4  dissemination and implementation of the complaint policy

5  that's been marked as Exhibit 11?

6     A.   Personal knowledge, no, except maybe receiving

7  it back in '05, wherever I was assigned.

8     Q.   And so your knowledge exists only to the extent

9  that you spent time preparing to be deposed about these

10 subtopics.  Is that correct?

11    A.   Yes.

12    Q.   And what did you do in order to prepare to

13 answer -- prepare to answer the subtopics that you --

14 these subtopics that you've been identified?

15    A.   I just read over the complaint policy and

16 attempted to determine when we -- when we went to an

17 online system of storing our -- our guidelines, just to

18 try and determine the date.

19    Q.   And were you able to determine that?

20    A.   I believe it was around 2010, is when we started

21 storing our policies on what we call the desktop, but

22 where it's available to every member.

23    Q.   Okay.  So Exhibit 11 is dated August 1st of

24 2005.

25         Does that mean that the policy was issued

Page 110

1  on or about August 1st of 2005?

2     A.   Yes.

3     Q.   And when it became effective on August 1st of

4  2005, how was it disseminated to the HFD members?

5     A.   I believe in '05, we were already on the email

6  system and if we were, then it would be emailed to -- to

7  all the fire stations to print out and include in their

8  binders at the station, where all the policies are stored

9  and read and reviewed by the members.

10    Q.   Okay.

11         And did you see -- did you identify any

12 documentation that that -- that that was actually done

13 with respect to Exhibit 11 back in 2005?

14    A.   No.

15    Q.   And when you say it would have been emailed to

16 all of the fire stations, what are you -- how would that

17 have happened?

18    A.   So, early on, and I'm not sure on the exact

19 date, but early on when we first started having computers

20 and the fire stations having email addresses, it started

21 off with emails to the station.

22         We came upon some issues with log-ons and

23 confidentiality.  Then everyone was now issued their own

24 log-on.  So, prior to those personal log-ons, the station

25 Captain could open up the computer, answer the station

Page 111

1  emails to see that that complaint -- a new complaint or a

2  new policy has been sent and is therefore told to print it

3  and store it in the binders that were provided.

4     Q.   Okay.  And that would have been the -- I have

5  heard the terms "Junior Captain" and "Senior Captain".

6     A.   Right.

7     Q.   Do you know which Captain would have had access

8  to the fire station's email?

9     A.   Both of them would have had access.  I think

10 maybe even more people at the station would have had

11 access to the station's email address or the station's

12 log-on, which -- like I said, which is why we went to a

13 personal log-on.

14    Q.   Do you know when that was changed, by the way?

15    A.   No, I don't.

16         Like I said earlier, I know -- I don't know

17 if, in '05, if everyone had their own log-on yet.

18    Q.   Okay.  So the -- the policy would have been

19 printed out and placed in a fire station binder.  Is that

20 correct?

21    A.   Yes, from what I can recognize.

22    Q.   Do you know if hard copies of the policy would

23 have been distributed to all of the members at the

24 station?

25    A.   No, sir.

Page 112

1         It would have been the hard copy placed in

2  the folder and members were to initial that they had --

3  had read it, but not provided a copy to each personal

4  member.

5     Q.   Okay.  And do you know if that actually occurred

6  in 2005?

7     A.   No, I'm not sure.

8         The only document that I remember every

9  member receiving was a -- was a specific binder with rules

10 and regulations, but I don't remember the date of when

11 that happened.  I just remember having the binder.

12    Q.   In your personal capacity?

13    A.   Yes.

14    Q.   Okay.  As an investigator or whatever it was

15 at --

16    A.   Yes, if I was --

17    Q.   -- that time?

18    A.   -- in Arson, yes, sir.

19    Q.   Okay.  And did you make any effort to review the

20 Fire Department's emails to determine whether or not the

21 complaint policy from 2005 was distributed to all the fire

22 stations?

23    A.   No, not -- An attempt to go back and find the

24 email, you mean?

25    Q.   Yes, sir.

Page 113

1    A.   No, sir.

2    Q.   Did you make -- Did you conduct any other

3  efforts to determine whether or not the 2005 complaint

4  policy was emailed to all the fire stations to be printed

5  out and placed in the binder?

6    A.   No, sir.

7    Q.   You say that the members were required to

8  initial the policy.

9        Can you -- can you tell me more about that?

10    A.   All right.  So what I remember from that time,

11  say, the list would come out, the new guideline or policy

12  would be placed in the binder, and then that morning at

13  roll call or anything at the station, the Captains would

14  tell members they needed to review this policy and initial

15  it.

16        And because there are four shifts, the

17  Captains would write an "A", a "B", a "C" and a "D", and

18  under each particular shift, every member would just

19  initial on the cover sheet of that policy, that they had

20  reviewed it.

21    Q.   Okay.  And that was -- Now, there, you're

22  talking -- or when you're talking about this, you're

23  talking about your personal experience.  Right?

24    A.   Right --

25    Q.   Okay.

Page 114

1    A.   -- right, because I can't determine when we went

2  to the email system.

3    Q.   Right.

4    A.   That's prior to the email system -- or I'm

5  sorry -- prior to the availability online, it was that

6  system that I recall.

7    Q.   Okay.  And were you able to determine -- were

8  you able to determine whether or not the complaint policy

9  was -- whether the Captain at Station 54 printed out the

10  complaint policy and told all of the members on all four

11  shifts to review it and sign it?

12    A.   No.

13    Q.   You said the members were required to initial

14  the policy.  Were they required to read the policy?

15    A.   Well, I believe that, when it came through, that

16  that was -- that was the intent.

17        I mean, I imagine at roll call, the Captain

18  said, "Here, you guys or you girls need to read this

19  policy and initial that you read it."

20        I don't believe it was they just, "Initial

21  this, that I showed it to you," but I don't know that it

22  was specifically said.

23    Q.   Okay.

24        So other than when it was -- when the

25  policy first came out, when it was initially disseminated,

Page 115

1  would policies have been re-disseminated to employees at

2  any point while -- while they were still in place?

3    A.   So if -- Say, for example, the complaint policy,

4  if it was updated after we had the desktop, for example,

5  then the updated version would be placed on the desktop

6  and an email or some type of memo would have been sent out

7  to the members, saying:  "Review the new complaint policy.

8  You can find it at the desktop," and things like that.

9    Q.   Okay.  So when -- when the policy's updated,

10  then it's re-disseminated.  Is that correct?

11    A.   Correct.

12        When they put a new date here, it's

13  supposed to give access to everyone.  It's updated in the

14  desktop, the new one's placed in there, and then they are

15  sent something out to let them know that it's been

16  updated.

17    Q.   So if there is a number of years between, you

18  know, between the policy being updated, say, five years or

19  so, would the original policy be re-disseminated at any

20  point?

21    A.   The only scenario I can think that that would

22  happen is in training, any training courses, or if the --

23  The station is also allowed to do their own training, so

24  if the Captains decided to cover this particular policy in

25  one day, maybe in that sense.  But as a whole, for the

Page 116

1  entire department to send it out again, even though it

2  hasn't been updated, it's not likely.

3    Q.   What about if you have, like, a new employee,

4  you know, who comes to the fire station some -- sometime

5  after the policy's been issued?  How would that employee

6  learn of the policy?

7    A.   So in -- I'm not real familiar with it because I

8  wasn't part of the training, but in the phase -- in the --

9  there is phase testing when you're first hired in the

10  department and you go through three different phases, and

11  in those phases, there is certain guidelines that are

12  required for you to read in those phases.

13        So this probably would have -- I mean, it

14  more than likely would have been in one of those phases,

15  but I -- I don't know for a fact, and Captains, of course,

16  with new employees would cover certain guidelines per day,

17  and that's how they would have probably have read the

18  complaint guideline.

19    Q.   Okay.

20        MR. MONTEIRO:  Can you mark that?  It's 12?

21        THE REPORTER:  Yes.

22        (Exhibit 12 marked)

23    Q.   (BY MR. MONTEIRO) Chief, I'm showing you what's

24  been marked as Exhibit 12, which is Bates Nos. HOU2831

25  through 2834.

LEXITAS

Page 117

1   A. Yes.

2   Q. And this is the complaint policy with the date

3 of August 1st, 2018.

4       Have you seen this policy before?

5   A. Yes.

6   Q. And did you review this in preparing for your

7 deposition?

8   A. Yes.

9   Q. The date on the bottom says August 1st, 2018.

10      Does that mean that this policy was issued

11 on or about August 1st of 2018?

12  A. Yes.

13  Q. And when it became effective in 2018, how was it

14 disseminated to HFD members?

15  A. Well, one, it would have been placed again in

16 the desktop by replacing the previous version, and

17 although I didn't see it, there would have been some type

18 of memo or something going out saying that there is a new

19 policy.

20      It could have been grouped with other

21 policies saying, "We have updated our policies.  Log on to

22 the desktop and review."

23  Q. Okay.

24  A. But I didn't see that.

25  Q. Okay.  So let's first talk about the desktop.

Page 118

1   A. Okay.

2   Q. Tell me -- tell me what the desktop is.

3   A. So the desktop is -- is a site, basically,

4 that's on the intranet, only allowed -- only accessible

5 from the Houston Fire Department computer or City

6 computer, and members go to the desktop whenever they need

7 to locate anything in particular; if they need to review

8 old guidelines, policies, current guidelines -- I'm

9 sorry -- current guidelines.  So every single policy is

10 listed in the desktop under different folders, and so

11 everyone now has access to that, to log on and -- and

12 review.

13  Q. And when was that?  Do you know when the switch,

14 when that was implemented?

15  A. I believe it was 2010.

16  Q. Okay.  So it sounds like it's an electronic

17 version of -- of the binders that -- that the fire

18 stations used to have.

19  A. Yes.

20  Q. Is that fair?

21  A. Yes, that's a fair assessment.

22  Q. Okay.

23      And then you said a memo.  You said

24 there -- there would have been a memo, but you didn't see

25 a memo.  Tell me about that.

Page 119

1   A. So, normally, there would have been a memorandum

2 coming from the Fire Chief's office or -- or depending on

3 what area updated it.

4       For example, if Emergency Operations

5 updated certain guidelines, it would come from that area

6 and it would just advise everyone that we have updated

7 some guidelines and they need to go and refresh their

8 memory or re-read the policies.  I don't know exactly how

9 it was worded, but just a heads-up.

10  Q. So it would have been a memo from the -- in --

11 Well, in the case of a revision to the complaint policy,

12 would that have come from the Fire Chief?

13  A. They all go -- All the memos go through the Fire

14 Chief's office, so it would have possibly been from the

15 Professional Standards Command or Staff Services going

16 through the Fire Chief, unless it was part of a -- a time

17 where multiple guidelines were reviewed; then it would

18 have maybe been a general memo saying the -- the following

19 guidelines reviewed, or some of our guidelines have been

20 reviewed, log on and read -- read the updates, updated

21 version.

22  Q. And who was the Fire Chief in August of 2018?

23  A. That's going to be Samuel Pena.

24  Q. And is he the current Fire Chief?

25  A. Yes.

Page 120

1   Q. Did you make an effort to speak with either

2 Chief Pena or anyone in his administration about how --

3 specifically how -- whether or not a memo was sent out?

4   A. No, I did not.

5   Q. And is there any -- with respect to the 2005

6 notice we talked about, you talked about kind of like an

7 initialing system.

8       Is there some sort of electronic

9 confirmation that the firefighters have read and reviewed

10 the policy that happens electronically, currently --

11  A. No.

12  Q. -- or --

13  A. I believe when -- when everyone first received

14 all their initial log-ons, the system -- or actually --

15 I'm sorry -- the desktop.  Where you would see the policy

16 on the desktop, there was a feature to click on to do an

17 electronic signature, but I don't know that they ever had

18 that working properly.

19  Q. Okay.

20  A. So it's there, but I don't know that it's

21 working properly.

22  Q. You mentioned that the desktop was initiated

23 sometime in 2010.

24      Do you know if the earlier version of the

25 policy that we have been looking at in Exhibit 11, was

LEXITAS

Page 121

1  that placed on the desktop?

2       **A.   And so in -- in 2010, when the desktop was**

3  **created, I think they pulled all the guidelines that we**

4  **had and put them on there.**

5           **I don't know if they sent something out**

6  **saying they are now available online or not, but that**

7  **would have been the policy that was there until it was**

8  **updated.  So they would have put everything we had**

9  **currently into the desktop at the time with its current**

10 **date.**

11      Q.   Okay.  And do you know if that happened --

12      **A.   I believe --**

13      Q.   -- with respect to the complaint policy?

14      **A.   I believe it happened because I, you know,**

15 **logged onto desktop to see the policy before, but before**

16 **20 -- You know, before 2018.  So I have seen it there, so**

17 **I know it was there.  I just don't know when it was**

18 **initiated.**

19      Q.   Okay.

20           So on the desktop, when the policy is --

21 When a policy's replaced, do they remove the earlier

22 version and put the updated one or -- or do they leave

23 different versions of the policy up?  Do you know how that

24 works?

25      **A.   Right.  So they -- They only have the most**

Page 122

1  **current version on there.**

2       Q.   Okay.

3       **A.   I believe IT stores previous versions in a**

4  **separate folder that's not accessible to members.**

5       Q.   So when you logged on, you said you logged on

6  and remember seeing a policy.

7           When -- when did that occur?

8       **A.   I don't know the specific date, but let's say if**

9  **I was in Arson in 2012, then I would log on.  I would**

10 **review the policy and see that it was there.**

11      Q.   Okay.

12      **A.   And because it wasn't updated until 2018, I'm**

13 **assuming it was the '05 version that I was reading in**

14 **2012.**

15           MR. MONTEIRO:  Okay.  Those are all the

16 questions I have for you.  So I think either Mr. Ahmad or

17 Mr. Capodice may have a few follow-ups.

18           **THE WITNESS:  Okay.**

19           MR. MONTEIRO:  Thank you very much.

20           **THE WITNESS:  Thank you.**

21           MR. AHMAD:  I do have some questions.  I

22 shouldn't be too long.

23               EXAMINATION

24 BY MR. AHMAD:

25      Q.   Chief Martinez, you understand that you are here

Page 123

1  to testify on behalf of the City of Houston.  Correct?

2       **A.   Yes, yes, sir.**

3       Q.   All right.

4           And some of the information that you have

5  is based on personal knowledge and some of the information

6  that you have is based on reviewing documents and

7  reviewing information.  Correct?

8       **A.   Yes, sir.**

9       Q.   In -- in your position as the representative for

10 the City of Houston, you could request any documents that

11 you felt you needed to prepare yourself to speak on the

12 topics today.  Right?

13      **A.   Yes, sir.**

14      Q.   In reviewing the information in preparation for

15 your testimony today, did you see anything that went on

16 that concerned you as the representative for the City of

17 Houston?

18           MS. SULLIVAN:  Objection.  Improper

19 opinion, vague and outside the scope of the 30(b)(6)

20 designation.

21      **A.   It -- I guess in what term, I guess?  Could you**

22 **repeat the question?**

23           **I mean, just in total?  In general?**

24      Q.   (BY MR. AHMAD) Yes, sir.

25           Anything in preparation for your testimony

Page 124

1  on the topics today, did you see anything that went on

2  that concerned you as the representative for the City of

3  Houston?

4           MS. SULLIVAN:  Same objection.

5           It's vague.  What?  I mean, we have got

6  certain topics and I'm going to ask you, Counselor, to

7  speak to those specific topics.

8       Q.   (BY MR. AHMAD) You can answer, sir.

9       **A.   Nothing that I saw that was glaring unless I --**

10 **unless you have a specific question that I can address.**

11           **I mean, I'm not quite sure of your**

12 **question, you know.**

13      Q.   Well, you understand that you were designated to

14 speak on a number of topics today.  Right?

15      **A.   Yes, sir.**

16      Q.   Okay.  And with respect to those topics,

17 anything that you saw that went on that concerns you?

18           MS. SULLIVAN:  Objection.  Same objection,

19 improper opinion, vague, compound.

20      **A.   I'm sorry.  I don't know how to answer that**

21 **question.**

22           **I mean, I didn't see anything glaring that**

23 **stood out.  Other than that, I don't know how to answer**

24 **the question.**

25      Q.   (BY MR. AHMAD) Okay.  All right.



Page 125

1        So with respect to the OIG investigation
2  10-311, we saw that it was sustained against
3  Chief Boriskie.  Right?
4      A.  Yes, sir.
5      Q.  Okay.  And you talked earlier in your deposition
6  about what that means, sustained, and so refresh my
7  memory.
8        What does that mean, if -- if an allegation
9  is sustained?
10     A.  So sustained meant that there was enough
11  evidence to prove that the allegation occurred, or the
12  misconduct occurred.
13     Q.  Okay.  And with respect to the allegation in
14  10-311, it was sustained against Chief Boriskie.  Right?
15     A.  Yes.
16     Q.  All right.
17        But there was no disciplinary action taken
18  against Chief Boriskie.  Right?
19     A.  Correct.
20     Q.  That's not concerning to you?
21        MS. SULLIVAN:  Objection.  Improper
22  opinion.
23     A.  What -- what may be concerning is that I don't
24  have any paperwork to see what happened.
25        That would have been -- that would have

Page 126

1  been proper to have, some type of documentation saying
2  what happened after this.  That's the only concern I have.
3      Q.  (BY MR. AHMAD) Yes, sir.  But you could have
4  requested to see that documentation?
5      A.  Yes, I could have.
6      Q.  Okay.  But you didn't?
7      A.  I didn't make that particular request on this
8  case.
9      Q.  Why not?
10     A.  At the time, it didn't -- it didn't come to me.
11        I mean, sitting here now, I would go back
12  and pull up the file and look for it and see if there is
13  any additional paperwork.  I just read what was -- was
14  provided and that's what I reviewed.  Like I said,
15  standing here now, I would -- I would go back and look and
16  see if there is anything else.
17     Q.  Because that does sound concerning, that an
18  allegation is sustained against Chief Boriskie, but there
19  was no disciplinary action.  Hearing that, that's
20  concerning.  Isn't it?
21        MS. SULLIVAN:  Objection.  Improper
22  opinion, vague.
23     A.  And so as this chief over professional
24  standards, when I see sustained, I expect to see paperwork
25  to follow that, and that's what's concerning to me, is I

Page 127

1  didn't see any paperwork following that.
2      Q.  (BY MR. AHMAD) And that would be, in either
3  case, whether there is disciplinary action taken or no
4  disciplinary action taken, you would expect to see some
5  documentation justifying the reason for that.  Right?
6      A.  Right.
7      Q.  Okay.
8        In -- And within your review of the
9  documentation with respect to 10-311, you also saw that
10  there were multiple parties named in the complaint.
11  Right?
12     A.  I'm sorry.  What do you mean by named in the
13  complaint, as far as --
14     Q.  Well, the investigation 10-311, that
15  investigation started as a result of a complaint by
16  Ms. Draycott.  Right?
17     A.  Yes.
18     Q.  And when Ms. Draycott raised her complaint, she
19  was complaining about a number of individuals, including
20  but not limited to Chief Boriskie.  Right?
21     A.  Yes.
22     Q.  Do you know if there were any findings made with
23  respect to any individual other than Chief Boriskie?
24     A.  No, I don't know that.
25     Q.  Do you know why?

Page 128

1      A.  No, I don't know why OIG didn't list that.
2      Q.  Okay.  And if I wanted to know why, I should ask
3  OIG?
4      A.  I mean, yes, if you want to know why they
5  weren't listed as -- as respondents here.
6      Q.  Okay.
7        And with respect to any of these other
8  named individuals, other than Chief Boriskie, you know of
9  no disciplinary action taken against anybody else either.
10  Correct?
11     A.  Correct.
12        MS. SULLIVAN:  Objection.  Vague.
13     Q.  (BY MR. AHMAD) I believe that you testified
14  earlier that, in response to the investigation that was
15  10-311, there were no policy revisions made pertaining to
16  the practices at Station 54.  Right?
17        MS. SULLIVAN:  Objection.  Improper --
18  Evidence not in the record, but go ahead and answer.
19     A.  Right, I'm not aware of any policy changes that
20  occurred for Station 54.
21     Q.  (BY MR. AHMAD) Okay.  And I just want to make
22  sure that I'm clear.
23        Let's not limit it to Station 54.  With
24  respect to the result of the investigation 10-311, there
25  were no policy changes made for the Houston Fire

Page 129

1  Department or City of Houston at all, at least as far as

2  you know.  Right?

3       MS. SULLIVAN:  Objection.  Misstates the

4  facts and evidence.  Go ahead.

5  **A.  Wait.  Are we asking immediately after the**

6  **conclusion or up until today?**

7  Q.  (BY MR. AHMAD) I guess through today.

8       There were -- there were no changes made as

9  a result of the investigation 10-311.  Right?

10  **A.  I don't know that I can testify that no changes**

11  **were made in the Fire Department up until now in regard to**

12  **policies, training issues.**

13       **I don't know if any of those changes -- I'm**

14  **sure some changes were made from then until now, but if**

15  **you say -- If you want to tie it specifically to this**

16  **case, then I can't say that that's what -- I can't tie it**

17  **specifically to this case.**

18  Q.  Okay.  Well, let me make sure I understand

19  exactly what you're saying.

20       You know of no policy changes that were

21  made as a result of the investigation 10-311.  Right, sir?

22  **A.  Right.  I don't know that a specific change was**

23  **made because of this case.**

24  Q.  Yes, sir.  There may have been changes made, but

25  it would have been irrespective of the investigation

Page 130

1  10-311.  Is that fair?

2       MS. SULLIVAN:  Objection.  Form of the

3  question, but go ahead.

4  **A.  Could you ask it again?**

5  Q.  (BY MR. AHMAD) Yes, sir.

6       Any changes that were made since the

7  investigation 10-311 was concluded, those changes were --

8  may have been made, but they were not as a result of

9  10-311.  Is that fair?

10  **A.  Yes.**

11  Q.  Okay.  All right.

12       Do you have Exhibit 7 in front of you, sir?

13  **A.  Yes.**

14  Q.  Okay.  And Exhibit 7 references some markings

15  that were made in the women's dormitory area at Station

16  54.  Correct?

17  **A.  Yes.**

18  Q.  Do you know specifically what was the incident

19  or what those markings were?

20  **A.  When I reviewed the case file, I did see -- see**

21  **those.**

22  Q.  Okay.

23  **A.  I would have to look at it again to tell you**

24  **exactly what they were, but, yes, I have seen them.**

25  Q.  Okay.  Do you know what made the investigation

Page 131

1  criminal?

2  **A.  Not --**

3       MS. SULLIVAN:  Objection.  Foundation.

4       Go ahead and answer.

5  **A.  Not personal knowledge.**

6       **I mean, "criminal mischief" is kind of**

7  **broad, but if they damage City property by making those**

8  **markings on the wall is my assumption of why it went to**

9  **criminal mischief.**

10  Q.  (BY MR. AHMAD) All right.  And, looking at

11  Exhibit 7, the second page, it looks like the allegations

12  that Ms. Draycott made, they were sustained against

13  unknown persons.  Right?

14  **A.  Yes.**

15  Q.  So there -- As I understand it, there was the --

16  the City found that there was a crime committed against

17  Ms. Draycott.  They just don't know who did it.  Right?

18  **A.  Correct.**

19  Q.  And I believe you talked a little bit earlier

20  about what -- that situation, when an allegation is

21  sustained against unnamed individuals, the first thing

22  that happens is the Chief is notified.  Right?

23  **A.  Yes.**

24  Q.  Okay.  But -- but nothing else occurred, other

25  than the Chief is notified, when it's sustained against

Page 132

1  unknown person?

2  **A.  Right.**

3       **From what I recall, when that happens,**

4  **there's -- there's no one to issue discipline to, so**

5  **that's where it stops.**

6  Q.  Okay.

7       It's fair to say that whoever committed the

8  crime against Ms. Draycott, that person or persons, they

9  may very well still be employed by the Fire Department.

10  Is that fair?

11       MS. SULLIVAN:  Objection.  Calls for

12  speculation.

13  **A.  Right.  If -- if --**

14       MS. SULLIVAN:  You can go ahead and answer.

15  Q.  (BY MR. AHMAD) You can answer.

16  **A.  So if -- if this is the correct case and I'll**

17  **have to review it again, if they were able to eliminate**

18  **outside people, then, yes, maybe.  But I'm not sure if**

19  **they were able to eliminate everyone.**

20  Q.  Yes, sir.  No.  I understand what you're saying.

21  Let me make sure that I'm clear.

22       I'm not saying that, definitely, the person

23  who committed this crime is working for the Houston Fire

24  Department, but it's certainly possible they may be

25  working for the Houston Fire Department still.  Right?



Page 133

1    MS. SULLIVAN:  Objection.  Calls for

2    speculation.

3    Q.   (BY MR. AHMAD)  Is that right?

4         MS. SULLIVAN:  Go ahead and answer.

5    **A.   Yes.**

6    Q.   (BY MR. AHMAD)  Now, even though the City may

7    not have discovered who actually committed the crime,

8    there are actions that can be taken to prevent that

9    conduct in the future.  Would you agree, sir?

10   **A.   Yes.**

11   Q.   Okay.  And, from your perspective, what kinds of

12   actions could be taken to prevent that conduct in the

13   future?

14   **A.   I think it would have to be a general approach**

15   **because we wouldn't know who to speak to, so there**

16   **couldn't be any type of counseling, but there could**

17   **definitely be some training, meetings and things like**

18   **that, to discuss what's accepted behavior in the station.**

19   Q.   All right.

20        And you testified earlier about the

21   documents.  There are documents that you could have asked

22   to see, a personnel file -- personnel files, things of

23   that nature.  Right, sir?

24   **A.   Yes, sir.**

25   Q.   If you wanted to see those documents, who would

Page 134

1    you request those from or, in other words, who maintains

2    those documents to request them from?

3    **A.   So if we're talking about personnel files, what**

4    **we spoke of earlier, that would be in HR, but we have**

5    **access to review those from the Professional Standards**

6    **Office.**

7         **The investigative files are professional**

8    **standards files that include disciplinary letters,**

9    **summaries from OIG, and in that investigative file is**

10   **where we would research to see if there was any additional**

11   **paperwork added to the file, after OIG completed it; and**

12   **everyone in the Professional Standards Office has access**

13   **to those, but only those files.**

14   Q.   Okay.  All right.

15        MR. AHMAD:  I may be done, but let me just

16   consult with my co-counsel real quick.

17        **THE WITNESS:  Sure.**

18        MR. AHMAD:  So let's go off the record.

19        (Recess from 01:17:14 p.m. to 01:21:03

20        p.m.)

21   Q.   (BY MR. AHMAD)  All right.

22        Chief, and I believe you testified earlier,

23   but I just want to confirm, with respect to either OIG

24   Investigation 09-407, 09-424 or 10-311, you have not seen

25   any training bulletins that were circulated as a result of

Page 135

1    any of those investigations.  Right, sir?

2         MS. SULLIVAN:  Objection.

3         Outside the scope of his designation.  He's

4    not for training.

5    Q.   (BY MR. AHMAD)  Okay.  But you haven't seen any

6    bulletins, training or otherwise, that were circulated as

7    a result these investigations.  Right, sir?

8    **A.   I can't recall that I have never seen one.**

9         MS. SULLIVAN:  Same objection.  But you can

10   go ahead and answer.

11   **A.   I can't recall that I have never seen one.**

12        **I can -- I can't recall seeing one, but**

13   **it's possible that from, when this occurred back in '09 to**

14   **now, that there was a bulletin, but I just -- I can't**

15   **answer specifically, no, that I haven't.**

16   Q.   (BY MR. AHMAD)  Okay.

17        But in preparation for your testimony

18   today, you don't recall seeing any bulletins that were

19   circulated.  Right, sir?

20        MS. SULLIVAN:  Objection.  Same.

21        This is outside the scope of his 30(b)(6)

22   designation.  He's not for training.  We designated Wanda

23   Andrews for training, so I'm going to instruct him not to

24   answer because that's outside of the scope.

25        MR. AHMAD:  Okay.  I'll pass the witness.

Page 136

1         MS. SULLIVAN:  Chief Martinez, one quick

2    follow-up.

3         EXAMINATION

4    BY MS. SULLIVAN:

5    Q.   You're familiar with the City of Houston Fire

6    Department's promotional process.  Correct?

7    **A.   Yes.**

8    Q.   Okay.  And how many times have you sat through

9    that process?

10   **A.   Five times.**

11   Q.   Okay.  And what materials are used for purposes

12   of preparing -- a member would prepare for a promotional

13   process?

14   **A.   So a book committee is formed and they pick**

15   **text-- -- textbooks that relate to the particular job that**

16   **they're going to do, and then toward the end, they review**

17   **our policies and guidelines and determine which ones will**

18   **be included in the test as study material as well.**

19   Q.   Okay.

20        And so the -- the promotional process is

21   another opportunity for a member to have a policy put in

22   front of them.  Is that correct?

23   **A.   Yes.**

24   Q.   Okay.  And in preparation for your deposition

25   today, do you recall reviewing any promotional examination

Page 137

1  notices that indicated that the complaint guidelines were
2  included?
3      **A.  I didn't look up any specifically this week, but**
4  **I know that, on the exams I have taken, I have had the**
5  **complaint guideline on those tests.**
6          MS. SULLIVAN:  Pass the witness.
7          FURTHER EXAMINATION
8  BY MR. MONTEIRO:
9      Q.  Not all HFD members would go -- necessarily go
10  through the promotional process.  Correct?
11     **A.  That's correct.**
12     Q.  They only go through the promotional process if
13  they seek promotion?
14     **A.  Yes, sir.**
15         MR. MONTEIRO:  Nothing else from me.
16         MR. AHMAD:  That's all I have.
17         MS. SULLIVAN:  Thank you.
18         MR. AHMAD:  Thank you.
19         MR. MONTEIRO:  He would like to read and
20  sign.
21         (Deposition concluded at 01:25:01 p.m.)
22
23
24
25

Page 139

1      I, ASST. FIRE CHIEF ALFREDO MARTINEZ, have read the
2  foregoing deposition and hereby affix my signature that
3  same is true and correct, except as noted herein.
4
5          _____
6          ASST. FIRE CHIEF ALFREDO MARTINEZ
7
8  THE STATE OF _____)
9  COUNTY OF _____)
10     Before me, _____, on this day
11  personally appeared ASST. FIRE CHIEF ALFREDO MARTINEZ,
12  known to me (or proved to me under oath or through
13  _____)(description of identity card or other
14  document) to be the person whose name is subscribed to the
15  foregoing instrument and acknowledged to me that they
16  executed the same for the purposes and consideration
17  therein expressed.
18     Given under my hand and seal of office on this
19  _____ day of _____, 2019.
20
21          _____
22          NOTARY PUBLIC IN AND FOR
         THE STATE OF _____
23
24  My Commission expires:  _____
25

Page 138

1          CHANGES AND SIGNATURE
2  ORAL DEPOSITION OF ASST. FIRE CHIEF ALFREDO MARTINEZ
3              AUGUST 12, 2019
4  PAGE LINE  CHANGE              REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 140

1  STATE OF TEXAS
2  COUNTY OF HARRIS
3      I, JAMES M.PLAIR, a Certified Shorthand Reporter in
4  and for the State of Texas, do hereby certify that,
5  pursuant to the notice issued and the agreement
6  hereinbefore set forth, there came before me on the _____
7  day of _____, A. D., 2019, at 9:36 a.m.,
8  at the offices of CITY OF HOUSTON LEGAL DEPARTMENT, 900
9  Bagby, Third Floor, Houston, Texas 77002, the following
10  named person, to-wit:  ASST. FIRE CHIEF ALFREDO MARTINEZ,
11  who was by me duly cautioned and sworn to testify the
12  truth, the whole truth, and nothing but the truth of his
13  knowledge touching and concerning the matters in
14  controversy in this cause; and that he was thereupon
15  carefully examined upon his oath and his examination
16  reduced to typewriting under my supervision; that the
17  deposition is a true record of the testimony given by the
18  witness; that the witness has requested a review pursuant
19  to Rule 30(e)(2), same to be sworn to, and subscribed, by
20  said witness before any Notary Public, pursuant to the
21  agreement of the parties.
22      I further certify that I am neither attorney nor
23  counsel for, nor related to or employed by, any of the
24  parties to the action in which this deposition is taken;
25  and further that I am not a relative or employee of any

Page 141

```
1   attorney or counsel employed by the parties hereto, or
2   financially interested in the action.
3       I further certify that the amount of time used by
4   each counsel at the time of the deposition is as follows:
5
        Mr. Jeremy P. Monteiro      -(03:13:07)
6           Attorney for PLAINTIFF UNITED STATES OF AMERICA
        Ms. Deidra N. Sullivan      -(00:01:13)
7           Attorney for DEFENDANT CITY OF HOUSTON
        Ms. Elizabeth F. Karpati    -(00:00:00)
8           Attorney for PLAINTIFF UNITED STATES OF AMERICA
        Mr. S. Nasim Ahmad          -(00:16:33)
9           Attorney for PLAINTIFFS-INTERVENORS JANE DRAYCOTT
            AND PAULA KEYES
10
11      GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the
12  9th day of September, A.D., 2019.
13
14
15
16
17              JAMES M. PLAIR, CSR
                Texas CSR 4409
18              Expiration:  12-31-2019
                Lexitas - Firm Registration No. 95
19              13101 Northwest Freeway, Suite 210
                Houston, Texas 77040
20              281-469-5580
21
22
23
24
25
```

*James Plair*

LEXITAS

## Exhibits

**Martinez Exh 001**  3:14 23:10,11, 14,19

**Martinez Exh 002**  3:16 49:21,23 50:5,7,23 58:10 78:24 94:15 108:13, 14

**Martinez Exh 003**  3:21 51:25 52:2,4,21,25 53:14 55:7 59:5,8

**Martinez Exh 004**  3:23 54:15,16, 18 55:9 59:9 62:18,23 69:2,4,7 73:10, 11,16 75:15 76:1 78:4

**Martinez Exh 005**  4:3 67:4,6,11, 16,18

**Martinez Exh 006**  4:4 69:21,24

**Martinez Exh 007**  4:6 80:23,25 81:7 84:16 130:12,14 131:11

**Martinez Exh 008**  4:9 83:19,21 85:20 86:1,11,25 87:10,15,21 88:8 89:3,24 90:13 91:2 92:15,22 93:11,15 94:1

**Martinez Exh 009**  4:12 96:9,11 97:14 99:4,8,17 100:4 101:22 106:18, 21 107:10,14,25 108:2

**Martinez Exh 010**  4:14 104:5,7

**Martinez Exh 011**  4:15 108:22,25 109:5,23 110:13 120:25

**Martinez Exh 012**  4:18 116:22,24

## (

**(a)**  108:16

**(b)**  108:17

**(f)**  95:4,5

**(g)**  79:11

**(i)**  25:25

## 0

**01-13-10**  3:22,24

**01:17:14**  134:19

**01:21:03**  134:19

**01:25:01**  137:21

**03-30-10**  4:7,10

**05**  109:7 110:5 111:17 122:13

**08**  51:13

**08-01-05**  4:5,15

**08-01-2018**  4:18

**09**  26:25 34:15 43:22,24 45:2,3,11 51:13 135:13

**09-407**  4:8 79:1 80:17 85:8,18 86:8 134:24

**09-407's**  80:15 91:7,12

**09-424**  51:19 56:4,7 66:8 68:3 134:24

**09-424's**  51:1 65:4,9

## 1

**1**  3:14 23:10,11,14,19 25:22 68:7

**1(a)**  25:25 26:5 50:22

**1(b)**  26:8 58:12

**1(d)**  26:10

**1(g)**  26:12

**1(h)**  26:14

**1(i)**  26:16

**1-50**  77:6,12,16

**1.01**  4:5,16,18

**10**  4:14 96:6,7 104:4,5,7

**10-311**  4:12 96:19 97:2,7 98:17,21, 25 99:10 103:9 104:11 107:8 125:2, 14 127:9,14 128:15,24 129:9,21 130:1,7,9 134:24

**10-311's**  99:20 102:4

**1000**  2:12

**104**  4:14

**108**  4:15

**10:37:41**  49:19

**10:48:06**  49:19

**11**  4:15 108:22,23,25 109:5,23 110:13 120:25

**116**  4:18

**12**  1:17,21 4:18 116:20,22,24

**122**  3:6

**12:23:47**  107:4

**12:37:23**  107:4

**13**  18:22 19:2

**136**  3:7

**137**  3:8

**138**  3:9

**13th**  105:8

**140**  3:10

**1495**  4:11 83:22

**15**  71:10

**1801**  5:13,14

**19th**  67:25 68:16

**1:25**  1:21

**1st**  109:23 110:1,3 117:3,9,11

## 2

**2**  3:16 24:4 49:21,23 50:5,7,23 58:10 78:24,25 94:15 108:13,14

**2(a)**  79:4 80:13

**2(b)**  79:6

**2(d)**  79:8

**2(g)**  79:10

**2(h)**  79:14

**2(i)**  79:16

**20**  108:14 121:16

**2000**  23:5

**2002**  21:8 23:5

**2005**  70:5 109:24 110:1,4,13 112:6, 21 113:3 120:5

**2006**  21:10

**2009**  11:6 14:6 28:3,6 32:15 34:10 38:18 49:5 68:1,16 70:7 74:11 82:14

**2009-0424**  3:22,25

**2009-2010**  11:10,23 39:3 60:23

**2009-407**  4:10 81:13 84:11 87:4 91:18 94:7

**2009-424**  52:15,19 55:2 57:2,14 62:13

**2010**  28:3,6 34:10 36:23 38:18 53:23 54:8 74:12 100:14 101:2,3 105:5,8 109:20 118:15 120:23 121:2

**2012**  122:9,14

**2018**  16:1 117:3,9,11,13 119:22 121:16 122:12

**2019**  1:17,21

**202.514.1005** 2:7

**20530-0001** 2:6

**21st** 105:5

**23** 3:14

**2300** 2:12

**24900** 2:24

**2786** 4:5 69:25

**2826** 4:16

**2834** 4:19 116:25

---

### 3

**3** 3:21 24:6 51:25 52:2,4,21,25 53:14
55:7 58:23,25 59:5,8,12,16,18,20,24
60:18 61:2,5,13,15,21 63:17,24 65:5,
9,16 69:1 72:15 74:3 94:13,15,21
95:24 104:16

**3(a)** 94:22

**3(b)** 94:24

**3(d)** 95:1

**3(f)** 95:3

**3(g)** 95:7

**30(b)(6)** 3:12 4:2 50:15 123:19
135:21

**300** 2:24

**311** 95:25

---

### 4

**4** 3:23 25:20 50:23 54:15,16,18 55:9
58:11,23 59:1,9,13,14,18,20,24 60:18
61:2,5,13,15,21 62:18,23 63:17,25
65:5,10,16 69:2,4,7 72:15 73:10,11,
16 74:3 75:15 76:1 78:4 104:16

**407** 11:21

**407946** 1:25

**424** 11:19 25:22 94:4

**461** 82:4

**49** 3:16

**4:18-CV-00644** 1:4

---

### 5

**5** 3:5 4:3 67:1,4,6,11,16,18 108:12

**52** 3:21

**54** 3:23 63:16,23 64:5 65:15 66:10,15
68:10,18 78:14,15,18 82:3,9 89:2,14
90:2,12,24,25 91:2,17 99:7 102:9
104:22 114:9 128:16,20,23 130:16

**5460** 81:4

**5461** 81:1 82:5,24

**5462** 4:8 81:4

**5704** 100:4

**5705** 4:13 96:13 100:4

**5762** 4:14 104:8

**5865** 3:25 54:20

---

### 6

**6** 4:4 69:17,18,21,24

**6.06** 4:16,18

**601** 77:12

**602** 77:12

**6030** 4:3

**62** 81:2

**67** 4:3

**69** 4:4

---

### 7

**7** 4:6 80:19,20,23,25 81:7 84:16
130:12,14 131:11

**7.02** 105:17,19 106:2,6

**7.06** 69:8,11 71:1 75:21

**713.567.9767** 2:13

**77002** 1:23 2:12 5:13

**77002-2527** 2:18

**77386** 2:24

---

### 8

**8** 4:9 70:10 83:16,17,19,21 85:20
86:1,11,25 87:10,15,21 88:8 89:3,24
90:13 91:2 92:15,22 93:11,15 94:1

**8.06** 69:9,11 71:10 75:21

**8.10** 4:5

**80** 4:6

**83** 4:9

**832.393.6259** 2:19

**832.767.3207** 2:25

---

### 9

**9** 4:12 71:2 96:5,8,9,11 97:14 99:4,8,
17 100:4 101:22 106:18,21 107:10,
14,25 108:2

**900** 1:22

**96** 4:12

**9:36** 1:21

---

### A

**a.m.** 1:21 49:19,20

**abbreviated** 71:21

**above-styled** 1:20

**accept** 28:14

**accepted** 28:18 62:13,15,16,19
88:15,17 133:18

**accepting** 30:3

**access** 107:16,17 108:10 111:7,9,
11 115:13 118:11 134:5,12

**accessible** 118:4 122:4

**accident** 14:20

**accommodate** 7:5

**acknowledging** 86:17

**acronym** 23:7

**act** 17:19 40:2 71:6

**action** 1:3 40:15 42:5 45:24 47:25
48:7 61:16 65:8 86:13 91:11 102:3
107:13 108:1 125:17 126:19 127:3,4
128:9

**actions** 27:7,17 69:8 103:24 105:16
133:8,12

**active** 27:6 108:10

**activities** 105:1

**activity** 92:16 104:24

**activity/criminal** 81:23 82:25

**actual** 14:1 31:7 46:3 54:11 61:1
66:21 98:3

**add** 7:6

**added** 134:11

**addition** 84:7

**additional** 39:19 42:25 43:6 57:8
100:1 126:13 134:10

LEXITAS

**address** 5:12 44:6 111:11 124:10

**addressed** 45:18 59:5,14

**addresses** 110:20

**addressing** 71:19 83:2

**Admin** 19:3

**administration** 5:15 120:2

**administrative** 10:25 16:8 20:2 22:2,6

**adopted** 32:10

**advise** 119:6

**advised** 46:12

**advising** 31:9

**affect** 90:23

**Affidavit** 4:14

**agencies** 33:4 57:2,13 86:8

**agency** 85:17 97:6

**agree** 62:7 133:9

**agreed** 7:21 62:4

**ahead** 12:12 16:16 18:8 43:21 56:15 62:21 63:6 65:12 78:11 83:10 88:12, 20 89:11 91:14 102:6 103:19 128:18 129:4 130:3 131:4 132:14 133:4 135:10

**Ahmad** 2:22,23 3:6 25:11,15,18 122:16,21,24 123:24 124:8,25 126:3 127:2 128:13,21 129:7 130:5 131:10 132:15 133:3,6 134:15,18,21 135:5, 16,25 137:16,18

**Air** 23:6

**Aircraft** 68:9

**airport** 23:7,8

**Alfredo** 1:16,19 3:4 5:1,9

**allegation** 38:14,23 39:16,18 53:4, 8 66:9,12 76:15 81:22 85:11 103:10 125:8,11,13 126:18 131:20

**allegations** 17:15,21 37:19 53:1,12 68:24 76:14 131:11

**alleged** 17:19 41:14 53:25 66:22

**alleges** 15:2 40:12

**alleging** 17:14 28:11 66:15 68:17 103:14 105:7,8

**Allison** 8:21,22

**allowed** 115:23 118:4

**altered** 71:21

**Amended** 3:14,16,17,19 50:13,14

**AMERICA** 1:3 2:2

**amount** 41:5 47:13 92:7 94:12

**analysis** 84:4

**Andrews** 135:23

**anonymous** 88:2

**anti-discrimination** 77:21

**anticipated** 75:10

**anticipating** 12:24

**APPEARANCES** 2:1

**appears** 52:8,20 62:24 97:23

**apply** 44:14

**approach** 42:10 133:14

**approve** 22:20

**approximately** 8:5 19:5

**April** 105:5

**area** 14:19,21 19:14 36:12 44:1 64:24 78:1 80:1 119:3,5 130:15

**areas** 16:11 64:9

**arose** 19:14

**arson** 19:7,13,16,17,20,25 20:6,12, 17,21,24 21:3,5,6,12,16,22 22:15,17, 19 23:1 37:1 112:18 122:9

**asks** 18:14

**asserted** 13:25

**assess** 65:3 91:6 99:19 100:19,21

**assessed** 87:16

**assessment** 14:21 118:21

**assign** 56:9,18

**assigned** 11:11 12:2 16:22,23 18:22 19:25 20:4,14 21:12 22:13 30:19 32:16 36:24 37:2 44:23 51:13 54:2 57:6,16,17,18,19 68:9 80:1,3 109:7

**assigning** 42:16 56:21

**assist** 13:11 39:20

**Assistant** 14:12,13,18 18:23 19:4 46:11,15,20 57:24 92:11

**Assistive** 14:13

**associates** 71:15

**ASST** 1:16,19 3:4 5:1

**assume** 35:12 47:12 84:22 87:11 103:23

**assuming** 84:5 87:8 122:13

**assumption** 131:8

**attached** 1:24 51:23 59:15,16

**attempt** 61:11 112:23

**attempted** 10:6 109:16

**attended** 22:1

**attention** 24:4 34:16 68:5

**attorney** 6:25 22:5 32:16 36:22 46:16 57:15,24 85:21 86:6 97:20

**ATTORNEY'S** 2:11

**attorneys** 8:13,17

**August** 1:17,20 8:8,16 67:25 68:16 109:23 110:1,3 117:3,9,11 119:22

**authority** 35:13 36:13 92:11,12

**availability** 114:5

**Avenue** 2:5

**aware** 13:14,16,24 28:2 29:16 33:6 38:25 39:9 44:11 46:7,23 47:18 51:18,21 55:19 72:16 78:21 80:17 86:9 89:12 90:7,11 92:19,21 98:11,15 99:9 128:19

**AWOL** 16:18

### B

**back** 8:24 11:9,23 14:6 18:3,18 25:2 28:22 31:20,21 32:15 34:15 35:8 36:24 37:3 38:18 39:3 40:20 41:2 53:23 54:8 57:8 58:6,10 60:23 64:19 72:3 77:12 78:24 82:19 93:9 94:14 104:20 107:18 109:7 110:13 112:23 126:11,15 135:13

**background** 20:6 27:25

**Bagby** 1:22 2:17

**balance** 22:19

**based** 37:18 47:25 123:5,6

**basically** 24:3 41:6 77:20 118:3

**basis** 36:19 64:17 101:21

**Bates** 52:5 54:19 67:6 81:1 96:12 104:7 116:24

**bears** 67:6 104:7

**began** 37:4

**beginning** 16:1 66:18

**behalf** 7:19 50:17 56:13,17 123:1

Case 4:18-cv-00644   Document 64-3   Filed on 11/18/19 in TXSD   Page 42 of 55
Alfredo Martinez
30(b)(6)                                                                    s Index: behavior..communication

**behavior** 10:23 30:19 31:1,8,10 44:20 56:16 69:12 71:2,5 100:17 133:18

**believed** 68:18

**benefit** 47:2,3

**Bilingual** 14:20,21

**binder** 111:19 112:9,11 113:5,12

**binders** 110:8 111:3 118:17

**bit** 14:7 131:19

**bleeds** 21:20

**body** 6:15

**book** 136:14

**Boriskie** 9:24 52:9 59:5,8 100:9,13 101:6 102:22,23 103:6 125:3,14,18 126:18 127:20,23 128:8

**Boriskie's** 59:17 106:2 107:11,21

**bottom** 52:6 104:17 117:9

**break** 7:4,8 24:14 44:8 49:15

**breaking** 50:9

**briefly** 14:4

**bring** 34:16 71:6

**broad** 131:7

**broken** 66:24

**brought** 17:5 34:11 46:9

**budget** 19:15

**Buenik** 55:1

**bullet** 50:10

**bulletin** 64:3,6,8,11,14,18,24 78:8, 16,17 89:18,22 135:14

**bulletins** 134:25 135:6,18

**bureau** 19:7,16,17,23 20:12,17,21, 24 21:3,5,7,22 22:17 23:1

**burned** 47:3

**business** 5:11,14

**bypass** 11:14

---

## C

**calendar** 8:10

**call** 39:25 60:2 103:15 105:7 109:21 113:13 114:17

**called** 11:1 25:21 71:11 88:6

**calls** 39:14,15 132:11 133:1

**capacity** 22:17 79:24 95:15 112:12

**Capodice** 2:23 122:17

**Captain** 18:24,25 57:6 84:1 97:24 110:25 111:5,7 114:9,17

**Captains** 113:13,17 115:24 116:15

**case** 4:10 9:16 13:15,22 18:3 29:19 30:15 32:5 33:1 34:21 36:5 37:13,22 46:5 50:9 51:23 64:10,13 65:19 66:1 97:19,20 99:24 101:16 102:10 119:11 126:8 127:3 129:16,17,23 130:20 132:16

**cases** 10:14,15,16 11:13 18:3,18 27:1 31:12 34:19 35:8 37:2,4 47:3 53:25 67:21 89:4

**categories** 44:15

**category** 30:20,22 42:16 56:9,18,21 60:6 100:17

**caveat** 7:6

**Certificate** 3:10

**Certified** 1:21

**chain** 46:22 47:4,6,15,17,20 66:4 91:24

**challenge** 88:23

**chance** 23:16,18 26:1 50:1,4 67:11, 15 73:6,9 94:16

**change** 15:23 16:4,12,14 17:1 35:2 60:8 64:5,12,22 65:1 129:22

**changed** 15:24 16:2 42:7 61:23 89:13 111:14

**changing** 99:15

**charge** 30:18 31:8 54:8 74:20

**charges** 72:24 73:18

**chief** 1:16,19 3:4 5:1 8:15,18,20 9:9, 10 11:14,16 12:10,14,17 14:12,14,18 16:3 18:23 19:4,7,13,19 20:11,13,14, 23 22:5 29:23 30:23,25 31:15,19,22 32:3,6,8,18 33:1,2 37:16,22 38:8 41:5,21 42:2,18 43:24 44:2,4 45:23 46:10,11,15,18 49:22 52:3,9,14 53:16 59:6,8,17 60:5,11 62:10 63:8 67:5,11 69:22 78:24 81:12 83:20 84:18 87:9, 15,21 92:3,9,10,11 98:4 99:3 100:9, 13,19 101:1,4,6 102:22,23 103:6 106:2 107:6,11,21 116:23 119:12,16, 22,24 120:2 122:25 125:3,14,18 126:18,23 127:20,23 128:8 131:22,25 134:22 136:1

**Chief's** 32:21 33:10,12,17 37:6

**40:23 44:10 46:14 119:2,14**

**Chiefs** 16:18 46:20

**circulated** 134:25 135:6,19

**citizens** 71:5

**City** 1:6,11,15,19,22 2:15,17 3:15,16, 18,21,23 4:6,9 7:18,19 14:8 32:16 33:4 46:16 50:12,15,16 56:13,17,18, 25 57:1,12,13,15,18,21,24 66:14 68:1,16 74:17,20 77:5,13 82:12 85:17,19,21 86:7 89:1 97:6 99:6,10 103:13,23 104:13 105:5 118:5 123:1, 10,16 124:2 129:1 131:7,16 133:6 136:5

**City's** 6:25 7:21,24 32:13 51:4 61:9 77:19 80:10

**city-wide** 42:10

**CIV** 1:15,19 3:14,17,20

**civil** 1:3,23 2:5 50:14 71:14

**claims** 13:24 14:1

**clarification** 70:9 90:5

**clarify** 104:3

**clarity** 29:4

**clean** 6:7

**clear** 57:23 60:12 63:21 128:22 132:21

**click** 120:16

**closed** 46:5 62:1 89:5 106:15

**closure** 45:8 65:20,24 76:11 77:8 102:12,20

**co-counsel** 134:16

**Code** 10:25 48:23

**Cohen** 8:14

**cold** 53:4 73:19

**command** 46:22 47:16,18,20 66:4 91:24 119:15

**commit** 71:6

**committed** 131:16 132:7,23 133:7

**committee** 136:14

**committing** 17:19

**common** 59:11

**communicated** 48:13,15 49:4 98:17

**communicating** 45:5

**communication** 84:9,10



**communications** 55:18

**compared** 30:19 100:16

**comparison** 44:20

**complainant** 39:20 45:8,16 47:22, 24 48:3,6,16 65:18 77:9,14 91:20 102:11

**complainant's** 47:15,17,20

**complained** 104:22,23

**complaining** 82:13 127:19

**complaint** 3:22,24 4:7,12 10:13 15:1,2 17:8,21 18:13 27:8 28:2,5,8 29:8 37:7,8,9,19 38:4,5,10,11,12 39:21 45:21 48:1,8 52:19,22,24 53:20 55:2,13 62:1 66:13,22 68:2 72:14 74:12 75:1 76:25 81:13,19 82:16 96:1 100:7,23,25 102:24 104:1,3,11 105:13 106:10 108:15,18 109:4,15 111:1 112:21 113:3 114:8,10 115:3,7 116:18 117:2 119:11 121:13 127:10, 13,15,18 137:1,5

**complaints** 4:15,18 14:19,23,25 15:5 17:10,14 22:22 27:13 28:7,11, 20,25 38:1,18 41:22,24 42:1 54:2 56:10 58:23 60:3,5 62:25 74:14,21,24 75:21 92:16,20 100:5 103:15 105:9

**complete** 25:7 42:14,21 50:1 70:22 94:16

**completed** 38:7 134:11

**compound** 124:19

**computer** 110:25 118:5,6

**computerized** 1:22

**computers** 110:19

**con-** 66:19

**concern** 16:20 34:15 126:2

**concerned** 123:16 124:2

**concerns** 124:17

**concluded** 130:7 137:21

**conclusion** 30:17 41:14 42:13 45:7,21 65:19 66:19 72:11 106:5 129:6

**conclusions** 35:10 36:2 41:19

**conduct** 71:2,5 72:1,6 78:8,13,18 106:2 113:2 133:9,12

**conducted** 52:23 53:20

**Confidential** 4:12

**confidentiality** 110:23

**confined** 71:18

**confirm** 11:15 61:1 134:23

**confirmation** 120:9

**confirmed** 98:20

**connection** 8:11 9:2 17:1 31:9 51:17 55:13 64:14 66:7 68:1 80:16 101:9 103:8 106:7

**considered** 42:14,21 44:16

**consistent** 31:11 49:4

**consult** 134:16

**Cont'd** 4:1

**contact** 39:20

**contained** 39:8 72:15 107:14

**continued** 83:13

**control** 51:9

**conversation** 9:12 62:11 107:7

**conversations** 9:10

**Coordinator** 18:25

**copies** 111:22

**copy** 24:15 53:15 70:13,16,22 82:20 85:25 104:10 112:1,3

**corner** 52:6 58:1

**correct** 11:24 12:7 14:9 22:20 26:6 28:10 37:19 52:22 53:2,6,10,13,16 55:10 57:10,11 59:6 60:14,23 62:4,5 63:1 66:5,6,17 68:14,20,24 69:9 74:10,15 75:3 76:5,6 77:18 78:23 79:4,25 81:20,24 82:3,10 83:4 85:23 88:24,25 89:24,25 92:1,2,17,23 94:22 95:9,16,17 96:24 97:25 98:6 100:7 101:22 102:1,19,25 103:1,16 105:10, 13,17 108:16 109:10 111:20 115:10, 11 123:1,7 125:19 128:10,11 130:16 131:18 132:16 136:6,22 137:10,11

**corrective** 34:5,23 35:20 43:18 61:16 65:8 91:11 102:3

**correctly** 71:8,22 105:3

**correspondence** 3:22,24 4:7,10 84:1 97:23 98:3,8,12

**counsel** 44:1

**counseling** 35:1 36:3 133:16

**Counselor** 124:6

**country** 16:10

**couple** 5:21 77:16 107:7

**courses** 115:22

**court** 1:1 6:9,15 63:21

**courteous** 71:14

**cover** 14:19 33:18 64:9 69:11 83:25 84:18 90:18 93:13,19 97:9,13,18 113:19 115:24 116:16

**covered** 16:6 17:8 24:3 42:15 48:22

**covers** 77:25

**create** 60:4 90:17

**created** 64:5 121:3

**crime** 131:16 132:8,23 133:7

**criminal** 17:15,21 28:12 37:2,4,8 38:1,4 81:22 82:25 83:5,6,12,13 85:10,15 92:16 131:1,6,9

**criteria** 18:5,10 32:1

**current** 14:16 15:18 18:21 35:19,22 45:10 49:5 76:21 77:3,4 100:19 101:1 118:8,9 119:24 121:9 122:1

**Curt** 22:4

---

**D**

**D.C.** 2:6

**damage** 131:7

**date** 8:9 86:13 109:18 110:19 112:10 115:12 117:2,9 121:10 122:8

**dated** 3:22,24 4:3,7,10,14 70:5 109:23

**David** 97:24

**day** 39:17 47:7 115:25 116:16

**days** 46:10 47:5,14 48:3 60:6 100:18

**de-** 94:11

**deadlines** 16:21

**deal** 75:13

**December** 70:7

**decide** 18:2 30:21 41:5

**decided** 32:19 37:22 43:25 115:24

**decision** 29:9 31:5 75:8 100:20

**decision-maker** 32:9 37:17

**Defendant** 1:6,11 2:15 3:15,16,18 50:15 51:9

**Defendant's** 50:24,25 58:14 80:14

**deficiencies** 36:4

**defined** 35:4



**Deidra** 2:16 24:24 25:5

**Deidra.sullivan@houstontx. gov** 2:19

**delegate** 92:10,12

**delegates** 92:13

**delivered** 31:18 37:21,23

**delivery** 37:15

**department** 1:22 2:4,11,17 5:15 8:24 9:4 29:12,16 32:13,17 33:6 34:4 37:3 40:12,15 41:9 42:6,8 43:10 44:12 45:6 48:12 55:13,15,19 56:3, 12,20 57:16,18,20 58:20,21,25 61:21 62:13,16,19 63:14,22 65:3,7,14 68:23 70:5 71:7,13 74:2,11,12 78:7 82:22 84:2 85:7,16,17 86:24 87:3 88:9,15, 18,22 90:14,18 91:6,10 93:4,8,10,15 97:5,6 98:18,22,24 99:19 102:2,8 104:21 105:2 106:21,25 107:12,21 108:4 116:1,10 118:5 129:1,11 132:9, 24,25

**Department's** 45:4 55:21 56:7,8, 11 75:2 85:3 96:23 101:9 112:20 136:6

**departments** 22:6 36:25

**depending** 30:20 41:4 46:10 119:2

**depose** 95:19

**deposed** 24:2 27:22 80:10 95:20 109:9

**deposition** 1:15,19 3:14,17,20 5:16,18 7:22 8:1 9:3,11,14,17,19,20, 22,25 10:5,10,20 13:7,11,12 23:14 49:23 50:15 51:18 52:4,11 54:18 55:5,17 59:17,19,20 64:15 66:8 69:23 74:8 80:25 87:1 89:23 93:10 96:11, 16,20 102:15 103:9 108:25 117:7 125:5 136:24 137:21

**depositions** 9:16,22

**Deputy** 19:7,19 20:11 85:21

**describe** 35:22 41:11

**DESCRIPTION** 3:12 4:2

**designated** 7:18 26:5 58:16 61:9 79:4 94:21 108:17 124:13 135:22

**designation** 123:20 135:3,22

**desktop** 109:21 115:4,5,8,14 117:16,22,25 118:2,3,6,10 120:15,16, 22 121:1,2,9,15,20

**detail** 47:9 94:12 107:2

**determination** 18:11 29:7 32:22 33:20 38:16 41:16 75:5 76:1,17 93:4

106:1

**determinations** 29:14 75:16

**determine** 18:6,16 40:23 42:4,6,25 43:18 60:17 61:11,16,20,22 62:3 71:25 74:3,23 93:11,16 99:11 100:17, 18 101:25 106:22 107:12 109:16,18, 19 112:20 113:3 114:1,7,8 136:17

**determined** 69:7 72:5 83:8 105:16

**determining** 43:6 88:9 92:13

**differ** 31:14 37:7,18

**differed** 31:16

**difference** 37:21 38:3,8

**differentiated** 35:18

**direct** 64:1,21 68:5 84:24 99:2 100:24 104:16 106:7

**directing** 24:4

**directly** 9:12 11:14 12:6,9 31:18 32:6 47:23 72:22

**disciplinary** 32:18 40:15 42:5 45:24 47:25 48:7 63:11 99:21 108:1 125:17 126:19 127:3,4 128:9 134:8

**discipline** 22:2 31:4 32:9,19 33:21 37:17,24 40:18,24,25 41:4 42:17 46:3,7,8,12,13,24 56:9,21 60:8 65:4 78:5 87:16,22 88:10 91:7 92:13,14 99:19 100:1,13,20 132:4

**discovered** 82:2,9 133:7

**discredit** 71:6

**discriminated** 76:18

**discrimination** 15:2 17:10,18,22 18:15 22:23 28:7,12 37:8 38:1,4,18 53:25 66:10 72:19 73:15 74:4,14 75:6,11,18,24 76:2,5 77:7,10 93:2,6, 12,22 103:16 104:22 105:9

**discriminatory** 105:1

**discuss** 133:18

**discussed** 16:4 46:4 105:12

**discussing** 48:18

**dispositions** 39:7 40:14,17 41:7

**disprove** 38:22

**disseminated** 110:4 114:25 117:14

**dissemination** 108:15,18 109:4

**distributed** 111:23 112:21

**District** 1:1 16:18 22:5

**division** 1:2 2:5 19:13,15 21:17 86:9

**divisions** 16:8,9 36:24

**document** 14:2 23:17,21,24 26:2 42:20 50:2,16 52:7,8,10 54:23 70:1 73:7 79:2 83:24 85:1 94:18 96:15 103:17,20,22 112:8

**documentation** 98:16 110:12 126:1,4 127:5,9

**documented** 98:5

**documents** 10:9,12,19,21 11:4 13:6,10 55:12 60:25 72:17 73:12 81:6 96:18 123:6,10 133:21,25 134:2

**dorm** 53:9

**dormitory** 82:2,9,14 130:15

**draft** 46:17

**Draycott** 1:8 2:21 3:24 4:3,7,12,14 10:17 11:3 13:22 52:22,24 65:18 66:9,14 68:6,17 72:19 73:14 74:3,13 75:17 76:7 81:19 82:1,7,8,12,25 91:16,23 93:1,5,11,16 102:11 103:10, 14 104:19 105:6 106:14,22 127:16,18 131:12,17 132:8

**Draycott's** 53:1 58:22 66:3,4 67:25 72:14 104:11 105:13 106:10

**due** 68:11 71:13 93:17

**duly** 1:20 5:2

**duties** 14:16 19:10

**duty** 71:3,17,18

**Dwain** 2:23

**E**

**earlier** 17:11 27:2,12 29:22 33:23 37:5 38:10 41:10 55:21 59:25 65:21 75:20 78:3 85:3,14 89:17 92:5 98:3 111:16 120:24 121:21 125:5 128:14 131:19 133:20 134:4,22

**early** 8:8 110:18,19

**effective** 110:3 117:13

**effort** 112:19 120:1

**efforts** 58:14 113:3

**electronic** 118:16 120:8,17

**electronically** 120:10

**eliminate** 132:17,19

**Elizabeth** 2:10

**Elizabeth.karpati@usdoj.gov**
2:13

**em** 10:6,8 11:11 22:3 33:7

**email** 2:7,8,13,14,19,25 110:5,20
111:8,11 112:24 114:2,4 115:6

**emailed** 110:6,15 113:4

**emails** 110:21 111:1 112:20

**Emergency** 119:4

**employed** 14:8 132:9

**employee** 51:8 53:18,22,23,24
54:3,4,8 56:19 88:5 100:6 102:24
116:3,5

**employee's** 101:14

**employees** 74:13 101:8 115:1
116:16

**employment** 2:5 14:5,7

**Ena** 3:24 4:3

**end** 66:13 87:18 101:18 136:16

**enforce** 105:24

**enforcement** 83:12

**Engineer** 23:4

**ensure** 6:7

**entire** 10:3 11:8 13:17 18:12 29:19
33:1 42:19,20 90:18 103:21 116:1

**entitled** 71:2,11

**entry** 30:22

**environment** 93:17

**ER** 75:16

**era** 35:8

**ERU** 75:7,12,16 76:1 93:21,25 94:2

**evidence** 38:13,22 103:5 125:11
128:18 129:4

**exact** 8:9 24:2 77:24 110:18

**examination** 3:5,6,7,8 5:4 122:23
136:3,25 137:7

**examined** 5:2

**examples** 34:23

**exams** 137:4

**Excuse** 74:18

**Executive** 77:17,19,21

**exhibit** 3:14,16,21,23 4:3,4,6,9,12,
14,15,18 23:10,11,14,19 49:21,23,24
50:5,7,23 51:25 52:2,4,21,25 53:14
54:15,16,18 55:7,9 58:10 59:5,8,9

62:18,23 67:4,6,9,11,13,16,18 69:2,4,
7,21,24 73:10,11,16 75:15 76:1,8
78:4,24 80:23,25 81:7,11 83:19,21
84:16,21 85:20 86:1,11,25 87:10,15,
21 88:8 89:3,24 90:13 91:2 92:15,22
93:11,15 94:1,15 96:9,11 97:14 99:4,
8,17 100:4 101:22 104:5,7 106:18,21
107:10,14,25 108:2,13,14,22,25
109:5,23 110:13 116:22,24 120:25
130:12,14 131:11

**exhibits** 3:11 4:1 58:23,25 59:18,24
60:18 61:2,5,13,14,15,21 63:17,24
65:5,9,16 69:1 72:15 74:3

**exist** 27:20 80:9

**existed** 28:3

**exists** 95:18 98:12 109:8

**exonerated** 39:4 40:1,2 41:17,24

**expect** 126:24 127:4

**expecting** 93:25

**experience** 113:23

**experienced** 68:11

**explained** 30:8

**explaining** 47:7 64:25 89:18

**extended** 71:18

**extent** 27:21 61:19 80:9 95:18 99:15
109:8

---

**F**

**fact** 116:15

**facts** 129:4

**fair** 27:9 32:24 35:16,17 36:9,10
43:14 74:9 76:18,19 99:17 118:20,21
130:1,9 132:7,10

**familiar** 50:9 77:9 86:5,16,18,22
96:17 108:9 116:7 136:5

**Fax** 2:7,19

**FBI** 84:4

**feature** 120:16

**Fed** 1:15,19 3:14,17,20

**Federal** 1:23 50:14

**fellow** 71:11,14

**felt** 123:11

**female** 54:12

**file** 4:12 74:13 86:13,19 99:24
107:12,17,22 126:12 130:20 133:22

134:9,11

**filed** 52:24 66:22

**files** 107:23,24 108:5,8,11 133:22
134:3,7,8,13

**filing** 39:21

**final** 18:17 33:20 37:24 100:3 105:15

**find** 22:10 35:7 112:23 115:8

**finding** 28:25 29:4,5 106:13

**findings** 29:12,17 31:14 33:11 41:9
42:4,6,24 43:17 44:12 51:1,18,21
52:14,18 56:2,3 57:14 58:15 62:3,4,6,
12 63:16,24 65:4,9,15 66:5 68:22
72:13,16,18 73:14 78:9 80:15,17
81:12,16 85:6,7 87:17,23 88:14,23
89:3,6 91:7,12,18,25 92:4,20,22,25
97:2 99:8,20 102:4,9,16 103:6
105:12,20 106:10,11,18 107:14
127:22

**fine** 73:5

**finish** 6:8 12:21 13:2

**fire** 1:16,19 3:4 5:1,15 8:23 9:3
11:14,16 12:10,14,17 16:3 19:21 22:5
29:12,16,23 30:23,25 31:15,19,22
32:3,6,8,17,18,21 33:1,2,10,12,17
34:4 37:5,16,22 38:7 40:12,14,23
41:5,9,21 42:2,5,17 43:10,24 44:2,4,
10,11 45:4,6,23 46:10,14,15,17 48:12
52:9,14 53:16 55:13,15,19,21 56:3,6,
8,11,12,20 57:16,17,19 58:20,21,25
59:6 60:4,11 61:21 62:10,13,16,19
63:8,14,22,23 64:4 65:3,7,14 68:10,
23 70:5 74:2,11,12 75:2 78:7 81:11
82:9,22 85:3,7,16 87:3 88:9,15,18,22
91:6,10 92:3,9,10,11 93:4,8,10,15
96:22 97:5 98:4,18,21,24 99:19
100:19 101:1,9 102:2,8 104:20 105:1
106:21,25 107:12,21 108:4 110:7,16,
20 111:8,19 112:20,21 113:4 116:4
118:5,17 119:2,12,13,16,22,24
128:25 129:11 132:9,23,25 136:5

**firefighters** 120:9

**Firefighting** 68:10

**fires** 19:21

**fit** 31:10

**flag** 43:13

**flagged** 43:8

**Flanagan** 9:24 81:12 84:16 87:9
99:3 101:4

**Flanagan's** 87:15,21

**Floor** 1:23 2:17



Case 4:18-cv-00644   Document 64-3   Filed on 11/18/19 in TXSD   Page 46 of 55
Alfredo Martinez
30(b)(6)                                                                    's Index: focused..Houston's

**focused** 34:9

**folder** 112:2 122:4

**folders** 118:10

**follow** 126:25

**follow-up** 44:24 107:7 136:2

**follow-ups** 122:17

**forgetting** 23:7

**form** 60:4 130:2

**formal** 35:3,12 36:7,19

**formed** 136:14

**forward** 28:1 63:11

**forwarding** 42:17

**found** 36:14 77:10 82:14 131:16

**Foundation** 18:7 72:2 83:9 97:17
131:3

**fraud** 15:3

**front** 86:11 130:12 136:22

**fully** 7:15

**functions** 19:18

**future** 133:9,13

**FYI** 86:12

### G

**gender** 66:10,16 68:12,19 72:19,22
73:15,22,23 74:4 75:17,23 76:2,5
82:13 93:1,6,12,18

**general** 9:7,13 12:5,9 15:5 16:5
17:13 21:19 28:11 38:17 53:19 55:1,
22 60:17,23 71:24 72:5 74:15 76:10
81:19 84:2,13 87:11 96:23 104:24
119:18 123:23 133:14

**generally** 48:5 60:13

**girls** 114:18

**gist** 66:13

**give** 35:5 115:13

**glad** 34:11

**glaring** 124:9,22

**good** 5:6 71:4 90:25

**governed** 71:4

**governing** 51:1 80:14

**Government** 48:23

**Gregory** 2:23

**grievance** 17:5 18:25

**grievances** 14:20 17:3

**grieve** 17:6

**grouped** 117:20

**guess** 22:7 27:10 29:4 32:15 39:24
46:10 47:12 54:25 64:19 100:19
102:10 123:21 129:7

**guideline** 113:11 116:18 137:5

**guidelines** 109:17 116:11,16
118:8,9 119:5,7,17,19 121:3 136:17
137:1

**guy** 58:1

**guys** 42:11 114:18

### H

**handing** 59:11 84:25

**handle** 15:6 16:18 17:4 19:13 37:2

**handled** 36:21

**handling** 21:20

**handoff** 98:5

**happen** 64:24 115:22

**happened** 60:14 64:10 75:17 78:20
90:12 103:14 105:7 110:17 112:11
121:11,14 125:24 126:2

**happening** 68:19

**harassment** 18:15

**hard** 111:22 112:1

**head** 6:14,15

**heading** 25:21

**heads-up** 119:9

**hear** 6:3

**heard** 111:5

**Hearing** 126:19

**Hector** 2:4

**Hector.ruiz@usdoj.gov** 2:8

**held** 8:7

**helped** 9:11 10:4

**hereto** 1:24

**Hey** 34:19 42:10 43:25

**HFD** 4:4,15,18 23:1 28:5,6 48:14
52:18 62:2,7 69:8 81:16 98:5 108:15

110:4 117:14 137:9

**HFD's** 28:2 85:13 97:1

**high** 32:5

**hired** 21:13 116:9

**history** 14:5,7 15:12

**hold** 15:13 18:6 19:6,8 20:12 21:1,4
23:1

**hostile** 93:17

**HOU00001472** 4:11

**HOU00002772** 4:5

**HOU00002821** 4:16

**HOU00002831** 4:19

**HOU00005460** 4:8

**HOU00005671** 4:12

**HOU00005759** 4:14

**HOU00005843** 3:22

**HOU00005852** 3:25

**HOU00006027** 4:3

**HOU1472** 83:22

**HOU2772** 69:25

**HOU2821** 108:25

**HOU2826** 109:1

**HOU2831** 116:24

**HOU5460** 81:1

**HOU5671** 96:13

**HOU5676** 97:22

**HOU5759** 104:8

**HOU5843** 52:6

**HOU5852** 54:19

**HOU6027** 67:7

**HOU6030** 67:7

**hour** 8:5

**hour-and-a-half** 8:6

**hours** 8:6

**housed** 54:4

**Houston** 1:2,6,11,15,19,22,23 2:12,
15,17,18 3:15,18,21,23 4:6,9 5:13,15
14:9 32:17 50:16 70:4 118:5 123:1,
10,17 124:3 128:25 129:1 132:23,25
136:5

**Houston's** 3:16,18 50:12



**HPD**  36:24

**HR**  108:7 134:4

**I**

**idea**  93:24

**identification**  52:5 54:19 69:24
80:25 83:21 96:12

**identified**  50:16 51:4 95:23 100:6
102:23 108:21 109:14

**identifies**  76:23,25

**identify**  10:12 15:20 52:7 54:22
58:6 83:24 89:22 110:11

**II**  2:23

**illegal**  104:24

**imagine**  15:24 51:16 65:17 75:13
103:23 114:17

**immediately**  89:4,7 129:5

**implementation**  108:18 109:4

**implemented**  36:19 40:24 41:1
43:19 118:14

**imposed**  87:22 88:10 100:13

**improper**  123:18 124:19 125:21
126:21 128:17

**incident**  130:18

**include**  34:17 36:3 84:3 94:11
110:7 134:8

**included**  35:10 76:14 136:18 137:2

**includes**  84:5

**including**  90:23,25 127:19

**INDEX**  3:1

**indicating**  83:16

**individual**  45:25 59:4 127:23

**individuals**  45:6 107:25 127:19
128:8 131:21

**infer**  41:15

**information**  24:3 26:20 34:12
35:10 39:6,13,16,19,20,22 51:10
60:17 67:22 81:8 100:1 123:4,5,7,14

**informed**  46:25

**initial**  104:1 112:2 113:8,14,19
114:13,19,20 120:14

**initialing**  120:7

**initially**  114:25

**initiated**  120:22 121:18

**Inspector**  9:7 12:5,9 15:4 17:13
28:10 38:17 53:19 55:1 71:24 72:4
74:14 81:18 84:1,13 104:24

**instance**  1:20 31:24

**instruct**  135:23

**instructed**  74:13

**instructs**  6:25

**insulting**  71:16

**intent**  114:16

**interested**  22:11

**interoffice**  3:21,23 4:6,9 97:23

**interrogation**  21:17 22:12

**interview**  21:18 22:12

**intranet**  118:4

**investigate**  17:10,12,16 19:20,21
61:4,6

**investigated**  53:24 75:12 94:2

**investigates**  77:5

**investigating**  16:9 20:1 22:22
28:19 37:4 74:21

**investigation**  4:10 15:4 18:4 20:7
21:21 22:6 27:18 32:11 34:6 38:7,13
40:23 41:2 42:15 45:7 46:23 52:23
53:20 58:22 66:19 76:9 79:19 81:16
83:5,7,14 84:6 85:10 87:7 98:9,14,17,
21,25 101:10 107:1 125:1 127:14,15
128:14,24 129:9,21,25 130:7,25
134:24

**investigations**  10:16 11:10 16:17,
23 19:22 20:2 22:2 27:3 32:2 33:11
37:6 45:5 48:13 49:3 55:23 75:14
85:4 96:24 98:3 135:1,7

**investigative**  16:8 51:2,22 53:15
54:24 55:8,9 56:4,13 58:15 80:15
82:20 84:3,10 105:15 134:7,9

**investigator**  12:2 18:23,24 19:1
20:13,14,24 21:2,5,6 22:4,10,20,25
57:5 79:24 112:14

**investigators**  16:23 19:1,24 20:1,5
21:12 37:1 44:24 45:3

**investigatory**  19:18 21:15 31:14

**involve**  17:21

**involved**  11:9 19:15 27:1,7,17 33:4
45:6 57:2,13 66:8 78:4 79:23 85:10,
19 95:14 103:9

**irrespective**  129:25

**issue**  34:14 42:11 44:6 92:12 93:22
108:7 132:4

**issued**  40:19 78:7,17 100:2 109:25
110:23 116:5 117:10

**issues**  19:14 35:1 110:22 129:12

**items**  15:3

**J**

**JAMES**  1:21

**Jane**  1:8 2:21 3:24 4:3,12,14 10:17
52:22

**January**  105:8

**Jeremy**  2:3

**Jeremy.monteiro@usdoj.gov**
2:7

**job**  1:25 136:15

**July**  8:8 82:14 100:14 101:3

**jump**  27:24

**Junior**  111:5

**JUSTICE**  2:4,11

**justifying**  127:5

**K**

**Karpati**  2:10

**Keith**  2:10

**Keith.wyatt@usdoj.gov**  2:14

**Keyes**  1:8 2:21 4:8 91:20 93:1,5,12,
16

**Keyes'**  13:22 91:24

**kind**  14:23 48:17 60:19 98:4 120:6
131:6

**kinda**  44:1

**kinds**  93:23 133:11

**knowledge**  26:20,25 27:20 51:8
59:11 64:1,21 76:12 79:20 80:6,8
84:24 95:11,18 99:2 100:24 101:21
106:8 109:3,6,8 123:5 131:5

**L**

**lack**  63:10

**laid**  13:4 29:25 33:25 48:12

**language**  6:15 71:16 105:19,22



**law** 83:11

**law-abiding** 71:5

**lawsuit** 13:14,17,22,25

**learn** 66:8 74:8 103:9 116:6

**leave** 121:22

**Legal** 1:22 2:17 32:13 33:5 57:18,21 84:2 85:19 86:7,24 97:8

**lengthy** 10:7

**letter** 33:3 41:13,20 45:8,16,17,18 46:1,13,17 49:1,6 52:13 55:8 65:20, 24 76:11,13 77:14 81:11 82:1,7,24 83:25 84:18 91:21 97:19 102:13,21

**letters** 32:18,20 46:20 48:9 134:8

**level** 30:22 41:1 57:8 62:9 87:16,21 88:9

**lieu** 47:2

**Lieutenant** 57:5 84:13 97:24

**limit** 128:23

**limited** 44:4 127:20

**lines** 77:23

**list** 41:14 77:5 101:12 113:11 128:1

**listed** 39:21 60:5 75:21 77:15 88:21 91:19,20 101:14,15 107:25 118:10 128:5

**litigation** 2:5 68:2 104:14

**Local** 48:23

**locate** 118:7

**location** 57:19

**log** 117:21 118:11 119:20 122:9

**log-on** 110:24 111:12,13,17

**log-ons** 110:22,24 120:14

**logged** 121:15 122:5

**long** 8:3 11:7 14:13 17:17 19:8 20:23 60:19 122:22

**looked** 10:13 43:24 97:15 98:2

**lot** 67:21 73:12

**Louisiana** 2:12

**lower** 57:8

**lucky** 70:21

---

**M**

**M-A-R-T-I-N-E-Z** 5:9

**machine** 1:22

**made** 29:9 32:5 39:25 43:7 46:23 47:18 52:22 55:19 60:11 64:23 72:13 73:14 75:8,16 76:1 90:15 92:19 99:6 101:7 106:9,13 127:22 128:15,25 129:8,11,14,21,23,24 130:6,8,15,25 131:12

**maintains** 134:1

**make** 6:21 12:13,17 13:1 18:11 29:16 34:19 36:5 37:13,21 63:14,22 72:18 75:1,5 76:4 89:1 92:25 93:4,8 100:20 106:7 112:19 113:2 120:1 126:7 128:21 129:18 132:21

**makes** 39:16

**makeup** 18:21

**making** 28:25 29:7 31:5,8,21 33:20 38:17 131:7

**Manual** 10:23 30:19 31:1,8,10 44:20 56:10 69:13 100:17

**March** 101:2

**mark** 23:9 51:24 54:14 67:1 83:15 116:20

**marked** 3:11 4:1 23:11,12,13 49:21, 23 52:2,4 54:16,18 67:4,6 69:21,23, 24 80:23,25 83:19,21 96:9,11 104:5,7 108:22,25 109:5 116:22,24

**marking** 94:14

**markings** 82:2,8 130:14,19 131:8

**Martinez** 1:16,19 3:4 5:1,9 49:22 107:6 122:25 136:1

**match** 74:6

**material** 136:18

**materials** 98:5 136:11

**matter** 46:4 50:22 80:13

**Matters** 25:21

**Mcleod** 8:15,18 9:9

**means** 7:12 38:21 86:15 125:6

**meant** 16:5 97:18 103:24 125:10

**measures** 34:5,23 35:21 43:19

**meet** 8:11 46:10,11

**meeting** 8:5,13,15,16 9:9

**meetings** 8:4,7 16:3 27:1 133:17

**member** 17:5 30:18 39:17 44:1 46:12,21 47:1,5,7 60:7 63:10 92:9 109:22 112:4,9 113:18 136:12,21

**members** 16:6 17:19 18:22 28:6 47:2 56:11 63:12,13 71:3,11,12,14 108:10 110:4,9 111:23 112:2 113:7, 14 114:10,13 115:7 117:14 118:6 122:4 137:9

**members'** 108:8

**memo** 47:6 77:8 115:6 117:18 118:23,24,25 119:10,18 120:3

**memorandum** 119:1

**memory** 12:4 69:12 119:8 125:7

**memos** 119:13

**mentioned** 30:10 38:10 41:8 58:4 77:16 120:22

**Michelle** 8:18

**mind** 22:16 105:23

**mine** 25:12 70:25

**minor** 16:18

**minute** 8:25 28:23 40:21 49:25 93:9

**mischief** 81:23 83:1,13 92:16 131:6,9

**misconduct** 125:12

**missed** 72:21 87:18

**missing** 24:8,9

**misspoke** 81:3

**Misstates** 129:3

**modified** 99:12

**Monday** 1:20 20:16

**Monteiro** 2:3 3:5,8 5:5 12:23 15:16 16:25 18:9 23:9,12,18 24:8,11,14,15 25:10,19 26:4 29:6 34:9 44:7,10 49:14,17,22 50:4 51:24 52:3 54:14,17 56:23 57:25 58:3,4 62:17,23 63:14 65:14 67:5,10,15 69:18,22 70:9,12, 15,18,21 71:1 72:3 73:9 78:13 79:3 80:19,21,24 83:15,20 85:2 88:14,22 89:15,16,21 90:4 91:16 94:20 96:5,7, 10 97:21 102:8 103:19,25 104:6 106:9 107:3,6 108:24 116:20,23 122:15,19 137:8,15,19

**months** 15:25 19:9

**morning** 5:6 113:12

**move** 63:11 78:25 94:13 108:9,12

**multiple** 57:4 119:17 127:10

**multitude** 17:6

## N

**N.W.** 2:5

**NAHMAD@CLINE-AHMAD. COM** 2:25

**named** 30:18 58:8 63:10 127:10,12 128:8

**names** 16:7 65:23

**Nasim** 2:22

**nature** 133:23

**necessarily** 36:7 90:12 137:9

**needed** 22:18 42:7 43:4 99:12 113:14 123:11

**night** 20:15

**nights** 20:16

**nodding** 6:14

**non-disciplinary** 34:5,23 35:20 43:18 61:16 63:8 91:11 102:3

**non-jurisdictional** 39:5

**normal** 6:20 66:3 101:17

**Nos** 116:24

**not-sustained** 41:21

**noted** 84:16

**notice** 3:14,17,20 50:14 81:18 120:6

**noticed** 90:19

**notices** 137:1

**notification** 52:17 66:5 81:15

**notified** 45:12,14,25 47:20,23 48:6 49:9,10 76:8 91:17,25 92:3 102:10, 16,19,25 103:6 131:22,25

**notify** 47:4 48:23 63:8 65:14,17 102:8

**notifying** 29:12

**number** 48:3 52:5 60:6 62:24 81:1 96:13 100:18 104:8 115:17 124:14 127:19

**numbered** 1:20 54:19

**numbers** 67:6

**numerous** 68:11

## O

**oath** 7:11

**objection** 16:15 18:7 29:1 34:7 43:20 54:9 56:14 62:14,20 63:5 65:11 72:2 78:10 83:9 88:11,19 89:10,16 90:3 91:13 97:17 102:5 123:18 124:4, 18 125:21 126:21 128:12,17 129:3 130:2 131:3 132:11 133:1 135:2,9,20

**Objections** 3:16,19 50:13

**obvious** 41:3

**occasions** 71:18

**occur** 31:21 45:2 65:1 122:7

**occurred** 38:13 40:2,7,8 44:25 47:9 61:25 73:23 75:9 76:5 87:6,8 93:14 100:24 112:5 125:11,12 128:20 131:24 135:13

**occurring** 66:15 68:18 78:21

**occurs** 75:6

**offense** 30:20,21

**office** 2:11 9:6 12:5,8,13 14:19,23 15:4,8,9,17 16:24 17:4,9,12,17,25 18:4 20:4 21:14,25 22:14 28:10 30:16 38:17 46:9,14 53:19 58:2 71:24 72:4 74:14 84:1 104:23 119:2,14 134:6,12

**officer** 71:19

**officers** 71:15,17

**OI** 29:11

**OI-** 18:5

**OIG** 3:22,24 4:8,10,12 10:14,15 11:13 15:4 18:2,5,11 25:22 27:14 28:19,22,24 29:6,11,16,21 30:2,4,5, 15 31:2,8 32:10 33:5,11 34:3,13,15, 24 35:13,19 36:1,3,11,13,21,24 37:6 41:13 42:1,10,13,24 43:7,13,17 45:5 48:13 49:3 51:1,19 52:9,13,15,17,18 53:4,8 54:3,5,24 55:12,15,19,22 56:12 57:2,3,6,10 60:5 62:7,11,13 63:9,16,24 65:4,9 66:24 68:22 69:7 72:13,18 73:14 74:20,23 75:1,5,11 76:23 77:4 79:1 81:11,12,15 82:19 83:6 84:9,14 85:4,6 86:6 88:14,17 91:7,12 92:15,19,25 94:9 96:19,23 97:7 98:4,5 99:8,10,13,16,20 100:5 101:7 102:4 104:11 105:12,16 106:1, 9,12,13 107:1,8 125:1 128:1,3 134:9, 11,23

**OIG's** 30:10 39:10 44:12 51:18,21 53:15 56:3 57:14 58:14,21 62:3 65:8, 15 78:9 80:17 85:7 87:4 98:17,21,25 105:12

**omitted** 71:20

**one's** 115:14

**online** 109:17 114:5 121:6

**open** 110:25

**operating** 30:11 36:15 39:11

**Operations** 119:4

**operative** 70:6

**Operator** 23:4

**opinion** 123:19 124:19 125:22 126:22

**opportunity** 136:21

**opposition** 104:25

**opted** 16:11 47:5

**options** 47:1

**order** 6:7 77:18,21 95:22 109:12

**Orders** 77:19

**ordinary** 71:4

**organization** 86:10

**original** 115:19

**outcome** 46:23 76:8

**outcomes** 38:24 39:2 47:18 76:14

**oversee** 20:6

**oversight** 14:24 19:16

**overtime** 22:17

## P

**P.30(b)(6)** 1:15,19 3:14,17,20

**P.L.L.C.** 2:23

**p.m.** 1:21 107:4,5 134:19,20 137:21

**package** 42:21

**packet** 70:20

**pages** 24:10 70:17,24 100:3

**paperwork** 13:18 41:18 99:21 125:24 126:13,24 127:1 134:11

**paragraph** 53:14 68:7 104:17

**part** 7:24 10:7 18:13 29:23 33:15 34:3,17 41:11 56:18,24 67:20 76:22 97:20 116:8 119:16

**parties** 127:10

**parts** 10:4

**pass** 135:25 137:6

**passed** 16:21



**PAULA** 1:8 2:21

**pay** 14:21 17:7

**Pena** 119:23 120:2

**pending** 7:7

**Pennsylvania** 2:5

**people** 24:1 93:20 111:10 132:18

**performed** 49:8 107:2

**period** 20:15 28:13 36:18 58:7

**person** 32:21 51:7 58:5,6,17 73:18
77:13 81:24 82:17 132:1,8,22

**personal** 26:20,25 59:10 76:12
79:20 80:6 95:11 109:3,6 110:24
111:13 112:3,12 113:23 123:5 131:5

**personally** 27:16 79:23 95:14

**personnel** 107:11,17,22,24 108:5
133:22 134:3

**persons** 81:24 82:17 131:13 132:8

**perspective** 133:11

**pertaining** 128:15

**phase** 116:8,9

**phases** 116:10,11,12,14

**Phil** 9:24 59:5

**phone** 39:14,25

**pick** 136:14

**picked** 106:8

**piece** 56:20

**Pitkin** 2:24

**place** 28:5,9 56:3 78:14 85:6 86:3
115:2

**Plaintiff** 1:4,20 2:2

**Plaintiff's** 3:14,17,19

**Plaintiff-intervenors** 1:9

**Plaintiffs'** 50:13

**PLAINTIFFS-INTERVENORS**
2:21

**PLAIR** 1:21

**point** 20:3 31:5 42:15 46:12 85:19
90:2 99:15 115:2,20

**points** 50:10

**Police** 19:13

**policies** 4:4,15,18 10:13 28:2 30:5,
10 39:8,10 40:12 42:7 50:24,25 55:22
56:1 61:22 63:15,20,23 80:14 85:3,5,

13 89:1,12 90:1,9 96:23 97:1 99:7,11
108:19 109:21 110:8 115:1 117:21
118:8 119:8 129:12 136:17

**policy** 12:18 13:3 28:5,8 29:25 30:2,
8 33:9,25 35:2,12,19,24,25 36:4,7
37:15 48:11,21,25 64:5 65:1 74:12
89:19 90:15,17,20 96:1 99:15 108:15
109:4,15,25 111:2,18,22 112:21
113:4,8,11,14,19 114:8,10,14,19,25
115:3,7,18,19,24 116:6 117:2,4,10,19
118:9 119:11 120:10,15,25 121:7,13,
15,20,23 122:6,10 128:15,19,25
129:20 136:21

**policy's** 115:9 116:5 121:21

**portion** 49:6

**position** 12:1 19:6,8 20:12 21:1,4
123:9

**positions** 23:1

**possibly** 119:14

**potential** 41:14

**potentially** 57:7

**practice** 30:9,13 31:13,14 35:24
36:6 45:4,10,11 59:12 60:18,23 66:3
87:12 90:17 99:7

**practices** 50:24,25 56:2 63:15,23
80:14 85:6 89:2,15,20 90:2,10 91:2
99:12 128:16

**preparation** 8:12 51:17 52:10 55:4
64:15 66:7 74:7 80:16 103:8 123:14,
25 135:17 136:24

**prepare** 9:11,16,20 10:5,9,20 13:7,
11 95:22 96:16,19 109:12,13 123:11
136:12

**preparing** 7:25 9:2 13:11 27:21
55:17 74:8 80:10 87:1 89:23 95:19
102:14 109:9 117:6 136:12

**presented** 38:7 46:20 100:18

**pretty** 19:12 41:3 45:19

**prevent** 133:8,12

**prevented** 104:20

**prevents** 7:14

**previous** 10:13 60:8 97:14,19
117:16 122:3

**previously** 96:22

**print** 110:7 111:2

**printed** 111:19 113:4 114:9

**prior** 15:18 19:4 20:11 21:1,4 22:25
26:19 33:1 51:13 67:18 100:4 110:24

114:4,5

**priority** 32:5

**problems** 68:11

**procedure** 1:23 10:25 12:18 13:3
17:24 30:1 33:9 34:17 35:13,22,24
37:11 41:8 48:12,21 50:15 63:3 76:21
77:3,4 86:3,5

**procedures** 28:3 30:11 33:10,25
36:15 39:8,11 42:7 50:24,25 56:2
61:22 63:15,23 80:14 85:5 89:2 90:2,
9 99:7,11

**proceed** 5:22

**proceeding** 28:1

**process** 13:4 18:12,13 31:21 32:14
33:5 34:1 35:6 49:2 59:23 61:2,5,12
63:3,12 72:10 86:16,19 87:25 100:11,
12,15,22 108:10 136:6,9,13,20
137:10,12

**produced** 1:19 68:1 104:13

**professional** 14:18 15:8,9,17 16:9,
24 17:4,9,17 18:4 19:5,25 20:4 21:13,
24 22:14 95:15 119:15 126:23 134:5,
7,12

**progression** 60:9

**promotion** 137:13

**promotional** 136:6,12,20,25
137:10,12

**prompt** 6:20

**proper** 40:3 71:20 78:8,18 126:1

**properly** 120:18,21

**property** 131:7

**prove** 38:14,22 125:11

**provide** 5:11 34:3 44:19

**provided** 35:13 46:13 69:23 72:8,
12 84:15 98:21 111:3 112:3 126:14

**providing** 35:19 53:15

**provisions** 1:23

**public** 16:5

**publicly** 104:25

**pull** 126:12

**pulled** 121:3

**purpose** 40:22 56:6

**purposes** 7:22 43:5 52:5 54:19
69:24 70:10 81:1 83:21 96:12 136:11

**pursuant** 1:23



**put** 115:12 121:4,8,22 136:21

**puts** 36:13

---

**Q**

**question** 6:3,4,8,21 7:1,7,8 12:21 15:15 18:1 27:16 33:15 51:6 60:20 73:13,24 79:18 82:6,7 87:18 90:6 106:3 123:22 124:10,12,21,24 130:3

**questions** 5:24 6:13 7:1,19 13:1 18:14 27:25 58:17 61:10 94:22 107:7 122:16,21

**quick** 134:16 136:1

**quote** 71:12 104:19

**quoted** 90:6 105:19

---

**R**

**RAA** 23:6

**racial** 82:13

**raised** 127:18

**ran** 83:6

**rare** 31:23

**re-** 49:7

**re-disseminated** 115:1,10,19

**re-investigate** 94:10

**re-investigating** 62:5

**re-read** 119:8

**read** 10:3,6,14 11:7 13:17,21,22 30:16 32:25 43:2,5 44:14,19 60:1 67:20,22 68:14 71:8,22 72:1,5 101:15 105:3 109:15 110:9 112:3 114:14,18, 19 116:12,17 119:20 120:9 126:13 137:19

**reading** 13:23 61:14 103:21 122:13

**real** 116:7 134:16

**reason** 7:14 127:5

**reasonable** 71:4

**reasons** 17:7

**recall** 10:21 13:23 17:1,2 26:25 27:4,19 29:19 31:6 34:16 36:18 42:8 44:3,22 55:20 61:18,25 64:13 65:13 80:6 88:13 89:19 91:5,15 92:7 114:6 132:3 135:8,11,12,18 136:25

**receipt** 27:18 55:22 85:4 96:23

**receive** 15:1 17:9,11 21:14,17,25

22:8,21 23:23 34:12 41:21 45:16 46:1 58:21 59:12 66:4

**received** 11:12 23:13,25 27:3 30:9, 15 42:13 49:7 56:3 58:25 59:4,8,18, 20,24 65:20 85:7,25 87:4 91:21 98:24 99:4 102:12,20 120:13

**receives** 41:9 77:13,14

**receiving** 14:25 28:11 33:18 36:2 37:6 80:7 99:2 109:6 112:9

**recess** 49:19 107:4 134:19

**recognize** 111:21

**recollection** 12:4

**recommendation** 31:4,7 34:19 35:5 43:7 75:2 101:18 106:20

**recommendations** 34:4 35:9,20 36:2,5 60:2 62:17,18 63:9 68:23 69:5 88:17,21,23 101:8,13

**recommended** 34:24 35:1 60:6 78:5

**record** 1:23 5:8 39:24 49:18 102:12 107:3 128:18 134:18

**Reduce** 33:12

**reduced** 33:10

**refer** 15:3 17:12 18:1 28:15

**reference** 83:1 106:6,17

**referenced** 30:14

**references** 130:14

**referencing** 64:7

**referring** 24:21 30:11 71:19 72:23, 24

**reflect** 52:17 75:15 76:1

**reflected** 55:7 58:23 62:18 63:16,24 65:5,9,15 69:1 89:3 99:8,16

**reflects** 52:25 69:7 81:15,22 82:1,8 92:15 105:16

**refresh** 119:7 125:6

**regard** 79:18,25 95:15 129:11

**regarded** 104:25

**regs** 70:12

**regulation** 76:24 77:1

**regulations** 4:4 40:11 69:14 70:4,7 71:25 75:3 77:11 101:9 105:24 112:10

**reinvestigate** 42:20

**relate** 40:13 77:12 87:21 136:15

**related** 10:17 11:2 22:15,22 52:14 54:14 58:17 72:22 73:22 75:23 76:2 81:12,16 84:10 87:4,15 96:18 97:2 104:11

**relates** 18:14 55:2 68:2 79:1

**relating** 52:18

**Relations** 53:19,22,23,24 54:3,4,8

**relevant** 70:19

**relied** 93:20 94:9 107:1

**remain** 31:11

**remained** 42:16

**remaining** 15:5

**remember** 8:9 12:20 32:7 34:20 35:4 42:19 54:10,12 59:19 112:8,10, 11 113:10 122:6

**Remind** 77:17

**reminders** 5:22

**reminding** 78:8,18

**remove** 121:21

**removed** 16:22

**repeat** 123:22

**rephrase** 18:9 33:16 60:21

**replaced** 121:21

**replacing** 117:16

**report** 28:6 29:21 42:14 84:3

**reported** 1:22 82:2,8

**reporter** 1:21 6:9,15 52:1 63:21 67:2 69:17,19 80:20 83:17 96:8 104:4 116:21

**Reporter's** 3:10

**represent** 50:12 67:24 104:10

**representative** 7:18,22,25 61:10 80:10 123:9,16 124:2

**REPRESENTING** 2:2,15,21

**reproach** 71:6

**request** 22:9,14 84:3 123:10 126:7 134:1,2

**requested** 126:4

**required** 43:6 86:13 113:7 114:13, 14 116:12

**Rescue** 68:9

**research** 16:7 134:10



Case 4:18-cv-00644   Document 64-3   Filed on 11/18/19 in TXSD   Page 52 of 55
Alfredo Martinez
30(b)(6)                                                    s Index: respect..significant

**respect** 38:17 51:19 60:18 61:2,5,
13 62:12 71:11,13,17 72:14 76:8
80:17 87:7 94:7,8,21 95:24 98:9,14
99:22 100:23 106:18 107:13 108:2
110:13 120:5 121:13 124:16 125:1,13
127:9,23 128:7,24 134:23

**respectful** 71:15

**respective** 36:25

**respond** 6:19 58:17

**respondent** 45:9,16,24 46:7,8,9,24
48:4,7,16 62:25 63:4 78:4 102:22
103:1

**respondent's** 46:22 103:3

**respondents** 128:5

**respondents'** 65:23

**responds** 83:12

**response** 6:22 27:8,18 32:10 48:8
50:17 51:4 65:4,8 71:13 78:9 87:17,
22 89:24 90:13 91:7,11 99:20 102:3
128:14

**Responses** 3:16,19 50:13

**responsibilities** 14:17 19:10
86:23

**responsible** 28:11,19,22,24 29:7,
11

**restate** 5:24 6:4 63:20

**result** 63:16,24 89:2,6 91:2 99:8
107:13 127:15 128:24 129:9,21 130:8
134:25 135:7

**results** 37:6 41:20 45:5 47:21 48:13
49:3 56:13 58:22 85:18 86:8 87:4
97:7 98:25 101:2 102:13

**retaliated** 103:22,24

**retaliation** 15:3 18:15 54:1 93:22
103:11,15 105:9,22 106:14,17,23

**retaliatory** 105:1

**retired** 108:8

**return** 18:3 86:12

**returning** 86:19 104:21

**review** 9:19,23 10:9,21 14:2 18:2
23:16,19 25:25 26:1 31:1 32:18,21
34:3 40:6,23 42:6,19 43:14 44:11,17
49:25 50:5 51:1 52:10 55:4,22 56:2,7,
8 57:2,14 58:14,20 59:17,19,22,23
60:10,16,25 61:15,21 67:11,16,18
69:12 73:6,10,16 74:2,5 80:15 85:4,6,
13,15 86:12,21,25 87:15,21 88:8
89:22 93:10,13,15,19,24 94:11,15,16,
17 97:1,6 99:22 101:11 106:21 107:2,

11,24 112:19 113:14 114:11 115:7
117:6,22 118:7,12 120:17 127:8
132:17 134:5 136:16

**reviewed** 10:1,4,19 11:2,3 13:6,10
33:2 42:24 43:2,18 51:22 57:3,7
61:18,19 73:17 81:9 85:17 86:8 87:9
95:25 96:15,19 97:8 99:10,24 100:5
110:9 113:20 119:17,19,20 120:9
126:14 130:20

**reviewing** 23:17 26:2 33:11 42:4
44:4,12 50:2 56:12,17 62:3 67:9,13
73:7 79:2 84:21 86:19 94:18 101:22
103:17,18,20 123:6,7,14 136:25

**reviews** 14:20

**revision** 119:11

**revisions** 128:15

**Rick** 9:24

**right-hand** 52:6

**RIGHTS** 2:5

**road** 2:24 89:9

**Robinson** 54:25

**role** 7:24 19:11,12 32:14 33:10,12,17
37:6 61:9

**roll** 103:15 105:7 113:13 114:17

**room** 9:13

**Ruiz** 2:4 25:1,5,7,14 96:6

**rule** 40:7,9 50:14 69:8,9 71:10 76:23
77:1 105:17 106:2

**rules** 1:23 4:4 15:6 22:7 40:11,13
69:11,14 70:4,7,12 71:4,25 72:5 75:2
77:11 101:9 105:24 112:9

---

**S**

**Samuel** 119:23

**Sandra** 54:25

**sat** 136:8

**scenario** 47:19 115:21

**scenarios** 36:3

**scenes** 19:21

**scope** 43:14 86:20,25 87:14,20
123:19 135:3,21,24

**sec-** 25:22

**section** 14:22 25:22 30:17 60:3
69:5 70:10 71:1 72:12 101:14 106:20

**sections** 4:5,16,18 70:19 72:9

73:21

**seek** 137:13

**self-contained** 92:22

**send** 12:6,9 16:17 18:18 29:19,21
31:20 48:25 65:24 77:8 86:6 116:1

**Senior** 12:2 18:24 21:2 79:24 111:5

**sense** 21:21 31:19 115:25

**sentence** 45:20 51:11 53:18 105:25

**sentences** 45:20

**separate** 43:23 122:4

**separated** 20:3

**separately** 45:19

**served** 48:4

**Services** 11:6,12,14,24 12:3,6 14:6
15:21,22 16:4 26:24 27:3,7,8,13,17
28:15 29:23,24 30:3,7,16 31:4,20
32:2,16 33:5,18 37:4,24 42:2 44:14
45:3 51:13 59:3 61:15 62:9 80:3 87:5,
14,20 99:1 119:15

**Services'** 30:13 31:3 59:23

**set** 30:5

**setting** 6:20

**severity** 41:4

**shaking** 6:14

**shared** 46:4

**sheet** 18:13,16 30:23 33:18 97:9,14,
18 113:19

**shift** 20:16 68:10 78:25 113:18

**shifts** 113:16 114:11

**short** 8:4 49:14

**Shorthand** 1:21

**show** 24:15 104:2 107:1

**showed** 100:1 114:21

**shower** 53:5

**showing** 49:22 52:3,4 54:17 67:5
80:24 83:20 96:10 104:6 108:24
116:23

**sic** 49:24

**sign** 114:11 137:20

**signature** 3:9 86:14 120:17

**signed** 46:17,19

**significant** 16:25



**silent** 76:4

**similar** 98:8,11

**single** 118:9

**sir** 5:6 7:13 8:19 9:8,18 10:2,18
13:23 22:24 23:20 24:22 34:2 36:16
39:12 50:6 61:14 63:2 64:16 67:12
68:15,21 71:23 76:3,6,19 77:2 78:2
86:22 87:2 91:5,19 95:13 100:8,10
108:3 111:25 112:18,25 113:1,6
123:2,8,13,24 124:8,15 125:4 126:3
129:21,24 130:5,12 132:20 133:9,23,
24 135:1,7,19 137:14

**sit** 30:25

**site** 118:3

**sitting** 126:11

**situation** 17:20 92:7 131:20

**skills** 21:18 22:12

**skipping** 70:16

**slurs** 82:13 83:3

**Smith** 5:13,14

**sort** 19:17 21:14 22:21 31:25 32:1,9
33:24,25 42:20 45:23 48:11,19 78:8
120:8

**sorts** 19:22 37:25 39:8

**sound** 126:17

**sounds** 36:6 74:16 118:16

**source** 101:24

**SOUTHERN** 1:1

**speak** 8:23 9:3,6,15 36:11 60:25
76:10 96:2 105:22 120:1 123:11
124:7,14 133:15

**speakers** 53:9 73:20

**speaking** 9:13 11:18 37:20 43:22
44:17 60:13 82:4 84:25

**speaks** 84:2

**Specialist** 19:3

**specialized** 21:25 22:21

**specially** 75:12

**specific** 10:4 12:18 13:3 18:5,10,14
29:25 33:9,24 35:12 36:17 60:17 64:5
74:5 89:13 91:1 112:9 122:8 124:7,10
129:22

**specifically** 27:4 56:25 66:11
72:21 73:22 75:13,23 87:7 90:17
93:13 104:21,23 106:15 114:22 120:3
129:15,17 130:18 135:15 137:3

**speculation** 132:12 133:2

**spell** 5:7

**spend** 7:25 8:3

**spent** 27:21 80:9 95:19 109:9

**spoke** 37:12 59:25 65:20 104:24
134:4

**spoken** 98:20

**staff** 11:6,11,14,23 12:2,6 14:5
15:21,22 16:4 18:21 26:24 27:2,7,13,
17 28:15 29:22,24 30:3,7,13,15 31:3,
4,20 32:2,15 33:5,18 37:3,23 42:2
44:13 45:3 51:13 59:2,23 61:15 62:9
78:17 80:3 87:5,14,20 99:1 119:15

**stamp** 86:12

**standard** 30:11 36:14 39:11 90:16

**standards** 14:19 15:8,9,17 16:9,24
17:4,9,17 18:4 19:5,25 20:4 21:14,24
22:14 119:15 126:24 134:5,8,12

**standing** 126:15

**stands** 105:25

**start** 18:19 30:4

**started** 14:4 21:8 109:20 110:19,20
127:15

**starts** 25:22

**state** 1:21 5:7,24 6:3 7:4

**stated** 1:23 48:9 66:11,12 75:23

**statement** 4:3 67:25

**states** 1:1,3 2:2,4,11 13:14 49:7

**stating** 45:20 46:13 102:13

**station** 23:7 63:16,23 64:4,5,23
65:15 66:10,15 68:10,18 78:14,15,18
82:3,9 89:2,14 90:2,12,17,23,24 91:2,
17 99:7 102:9 104:22 110:8,21,24,25
111:10,19,24 113:13 114:9 115:23
116:4 128:16,20,23 130:15 133:18

**station's** 111:8,11

**stations** 110:7,16,20 112:22 113:4
118:18

**stayed** 49:4

**Stein** 8:15 9:10

**Stein's** 8:20

**stenotype** 1:22

**step** 28:22 40:20 57:7 93:9

**stood** 124:23

**stops** 132:5

**store** 111:3

**stored** 110:8

**stores** 122:3

**storing** 109:17,21

**straight** 11:15,16

**Street** 2:12,17 5:13,14

**strike** 42:23

**study** 136:18

**subjected** 66:9 72:19 73:15 74:4
93:1,5,12,17 103:10 106:14,22

**substitute** 24:12

**subtopic** 58:12

**subtopics** 26:21 27:20,22,24 50:20
79:21,25 80:9,11 95:12,15,20,23
108:16 109:10,13,14

**Suite** 2:12,24

**Sullivan** 2:16 3:7 8:14 12:21 15:13
16:15 18:7 24:7,9,13,25 25:4,6,12
29:1 34:7 43:20 44:8 49:16 54:9
56:14 57:23 58:1 62:14,20 63:5 65:11
67:3 69:20 70:11,14,16,19,25 72:2
78:10 80:22 83:9,18 88:11,19 89:10
90:3 91:13 97:17 102:5 106:3 108:23
123:18 124:4,18 125:21 126:21
128:12,17 129:3 130:2 131:3 132:11,
14 133:1,4 135:2,9,20 136:1,4 137:6,
17

**summaries** 134:9

**summary** 4:11 84:6,13,23 99:14
101:12 103:18 105:15

**Sunday** 20:16

**superior** 71:15,17,19

**supervised** 36:22

**supervisor** 12:3 57:5

**supervisor's** 54:11

**supervisors** 57:4

**Supplemental** 3:19

**supposed** 59:15 81:3 107:23
115:13

**Susan** 85:20,25 86:14

**suspended** 92:6

**suspension** 47:2,8

**sustain** 29:10 73:18 101:17

**sustained** 30:18 31:8 38:10,11,12,
20,21,24,25 40:16 41:3,16 42:17
45:22 46:2 47:12,13,25 48:10 49:8
53:1,4,8,12 56:10 60:3,5 62:24,25
68:23 69:8 72:1,7,10,24 73:3,17
74:24 75:20 77:15 81:23 82:17 92:15
100:6 101:20 102:24 105:13,16
106:19 125:2,6,9,10,14 126:18,24
131:12,21,25

**sustains** 75:1 76:25

**switch** 118:13

**sworn** 1:20 4:14 5:2 67:25

**synopses** 11:2 12:6,9

**synopsis** 10:14,15 11:12 29:18,20
30:16,25 31:2 41:18 44:5,19 51:2,22
53:15 54:24 55:4,8,9 56:4 58:15 60:1
65:5,9 69:5 72:9,25 80:16 82:20
84:10,12,23 85:7 91:8,12 95:25 99:20
102:4 106:12

**system** 109:17 110:6 114:2,4,6
120:7,14

---

**T**

**talk** 14:4 78:25 117:25

**talked** 76:23 85:2 120:6 125:5
131:19

**talking** 38:6 58:7 66:18 68:3 89:4
94:3 113:22,23 134:3

**Tanja** 58:9

**task** 56:18

**tasked** 44:12

**taught** 22:3

**Taylor** 85:20,25 86:22

**Taylor's** 86:14,20,25

**teaches** 22:5

**techniques** 22:6

**Telephone** 2:6,13,18,25

**tells** 36:1

**temporary** 64:12,23

**ten** 5:20

**tending** 71:6

**term** 123:21

**terms** 32:9 37:17,20 38:6 41:7 43:22
49:9,10 76:11 91:23 111:5

**test** 136:18

**testified** 5:2 60:22 66:2 128:13
133:20 134:22

**testify** 26:5 108:17 123:1 129:10

**testifying** 7:12,15 50:17

**testimony** 3:4 64:18 123:15,25
135:17

**testing** 116:9

**tests** 137:5

**Texas** 1:1,22,23 2:12,18,24 5:13
48:23

**text** 101:17,20

**text-** 136:15

**textbooks** 136:15

**thing** 11:8 24:6 32:4 42:20 131:21

**things** 16:19,21 17:6 66:15,23 68:17
73:23 90:16 93:23,25 115:8 133:17,
22

**thought** 15:14 34:14

**threatening** 71:16

**tie** 129:15,16

**tied** 17:17,18

**ties** 31:1

**til** 90:20

**time** 5:18 7:25 11:3,7 12:1 19:18
20:15 27:21 28:12 34:8 35:9 36:17
39:17 47:2,3 51:14 52:9 58:7 80:4,9
86:4 89:20 90:7,15 92:7 95:19 104:2
109:9 112:17 113:10 119:16 121:9
126:10

**timeline** 80:2

**times** 12:5,8 58:5 77:16 136:8,10

**timing** 34:12

**title** 14:11 71:20 77:24 104:23

**today** 5:22 7:1,15,19,25 13:19 43:23
67:19 96:16 123:12,15 124:1,14
129:6,7 135:18 136:25

**today's** 7:22 9:2,11,16,20 10:5,10,
20 13:7,11

**told** 27:12 42:10 47:11,24 48:3 75:9
111:2 114:10

**top** 30:25

**topic** 51:8 58:18 78:1,25 94:13,15,
21 95:24 99:23 108:12,15

**topics** 26:5 50:18 79:4 123:12
124:1,6,7,14,16

**total** 123:23

**totally** 6:20

**totals** 19:2

**train** 43:25

**trained** 21:21 75:13

**training** 19:15 21:15,17,19,25 22:1,
8,10,14,18,20,22 36:4 42:25 43:4,6
63:18 64:23,25 90:15,20 93:21
108:16 115:22,23 116:8 129:12
133:17 134:25 135:4,6,22,23

**transcript** 6:7

**transcripts** 9:20,25 10:3

**transfers** 17:7

**transition** 36:20

**transmittal** 52:13 55:8 81:11

**transmitting** 82:20

**treat** 71:12

**truthfully** 7:12,15

**Tuesday** 20:16

**turn** 25:20

**turned** 53:5,9

**turning** 73:19

**tying** 31:7

**type** 6:20 15:1 17:18 21:20 32:5
34:12 35:5 44:24 53:25 60:10 75:11
83:12 89:18 93:22 115:6 117:17
126:1 133:16

**typed** 32:19

**types** 17:3 28:20 41:19 54:2 74:21
75:14

**typically** 46:25 47:22

---

**U**

**U.S.** 2:11

**Uh-hm** 17:23 52:1 68:8

**Uh-huh** 56:23

**uhm** 66:20 94:14

**ultimate** 32:8 37:16

**understand** 5:22,23 6:1,5,11,17,23
7:2,11,17 33:13 82:12 122:25 124:13
129:18 131:15 132:20

**understanding** 26:4 79:3 94:20



**understood**  16:6 57:25 66:14
68:17 103:13 105:6

**undertaken**  43:1 100:22

**unfounded**  39:5 40:4,5,6 41:17

**Unit**  53:19,22,23,24 54:3,4,8 75:7,16

**United**  1:1,3 2:2,4,11 13:14

**unknown**  62:25 63:4 73:18 78:4
81:24 82:17 88:4,5 131:13 132:1

**unlike**  100:4

**unnamed**  131:21

**unquote**  105:2

**updated**  115:4,5,9,13,16,18 116:2
117:21 119:3,5,6,20 121:8,22 122:12

**updates**  119:20

V

**vague**  16:15 29:1 34:7 43:20 54:9
56:14 62:14,20 63:5 65:11 78:10
88:11,19 89:10 90:3 91:13 102:5
123:19 124:5,19 126:22 128:12

**Varone**  22:4

**verbal**  6:22

**verbally**  6:13

**verbiage**  50:8

**versa**  12:14

**version**  115:5 117:16 118:17
119:21 120:24 121:22 122:1,13

**versions**  121:23 122:3

**versus**  37:8 38:4

**vice**  12:14

**VII**  104:23

**violated**  69:8 72:1,6 75:3 77:1
101:8 105:17 106:2

**violation**  40:3,7,8,9 100:16 106:8

**violations**  15:6 16:18,19 28:12
29:10 41:15 77:5,6

W

**wait**  6:8 129:5

**wall**  83:3 131:8

**Wanda**  135:22

**wanted**  51:5 68:5 73:16 128:2
133:25

**Washington**  2:6

**water**  53:4 73:19

**Watkins**  97:24

**week**  137:3

**women's**  53:5,9 82:2,9,14 130:15

**wondering**  90:11

**Woodlands**  2:24

**word**  103:22

**worded**  72:21 119:9

**words**  134:1

**work**  14:5 21:15 22:16 47:8 57:8,19
93:17 104:20,21

**worked**  11:23 23:6,8 27:13

**working**  20:11 120:18,21 132:23,25

**works**  121:24

**write**  113:17

**writing**  33:11 36:12

**written**  29:25 30:8,10,23 33:25
35:12 48:11,19,25 83:3

**wrong**  25:16

**Wyatt**  2:10 24:24 25:2,9,17

Y

**year**  15:24

**years**  5:20 14:15 19:5 20:25 21:3
115:17,18

