# EXHIBIT DDD

# David Watkins Deposition

Page 1

```
 1              UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION

 3   UNITED STATES OF        :

     AMERICA                 :

 4                           :

     VS.                     : CIVIL ACTION NO. 4:18-CV-00644

 5                           :

     CITY OF HOUSTON         :

 6   _____

 7   JANE DRAYCOTT AND       :

     PAULA KEYES             :

 8                           :

     VS.                     :

 9                           :

     CITY OF HOUSTON         :

10

11

12

13

14              ORAL DEPOSITION OF

15              DAVID EVANS WATKINS

16

17

18

19

20

21

22

23   September 19, 2019              Houston, Texas

24

25      REPORTED BY:  Craig Michael Bechtel
```

Page 2

```
 1              I N D E X

 2                                        PAGE

 3   Appearances.....................................   3

 4   Stipulations....................................   4

 5   Testimony of DAVID EVANS WATKINS

 6   EXAMINATION

 7     By Mr. Ruiz ...............................   5

 8   Correction and Signature Page..................  144

 9   Reporter's Certificate Page....................  146

10

11              EXHIBIT INDEX

12

13                                        PAGE

14   Exhibit No. 1................................   27

     Exhibit No. 2................................   49

15   Exhibit No. 3................................   54

     Exhibit No. 4................................   64

16   Exhibit No. 5................................   81

     Exhibit No. 6................................   85

17   Exhibit No. 7................................   98

     Exhibit No. 8................................  102

18   Exhibit No. 9................................  111

     Exhibit No. 10...............................  114

19   Exhibit No. 11...............................  117

     Exhibit No. 12...............................  121

20

21

22

23

24

25
```

Page 3

```
 1   A P P E A R A N C E S
     COUNSEL FOR PLAINTIFF UNITED STATES OF AMERICA:
 2     Mr. Hector F. Ruiz, Jr.
       Mr. Jeremy P. Monteiro
 3     U.S. Department of Justice
       Civil Rights Division
 4     601 D Street, NW, Room 4500
       Washington, DC 20004
       hector.ruiz@usdoj.gov
 5     jeremy.monteiro@usdoj.gov

 6           and

 7
       Ms. Elizabeth F. Karpati
 8     Mr. Keith Edward Wyatt
       U.S. Department of Justice
 9     Southern District of Texas
       1000 Louisiana, Suite 2300
10     Houston, Texas 77002
       713-567-9767
11     elizabeth.karpati@usdoj.gov
       keith.wyatt@usdoj.gov
12
       COUNSEL FOR PLAINTIFFS JANE DRAYCOTT AND PAULA KEYES:
13     Mr. Nasim Ahmad
       (VIA TELEPHONE)
14     Ahmad & Capodice
       24900 Pitkin, Suite 300
15     The Woodlands, Texas 77386
       832-767-3207
16     nahmad@ahmad-capodice.com
17   COUNSEL FOR DEFENDANT:
       Ms. Marjorie L. Cohen
18     City of Houston Legal Department
       900 Bagby, 3rd Floor
19     Houston, Texas 77002
       832-393-6457
20     marjorie.cohen@houstontx.gov
21
22
23
24
25
```

Page 4

```
 1      THE ORAL DEPOSITION OF DAVID EVANS WATKINS was

 2   taken by PLAINTIFF UNITED STATES OF AMERICA before Craig

 3   Michael Bechtel, a Certified Shorthand Reporter in and

 4   for the State of Texas, in the offices of the City of

 5   Houston Legal Department, 900 Bagby, 3rd Floor, Houston,

 6   Texas, between the hours of 9:21 a.m. and 2:44 p.m., on

 7   September 19, 2019, pursuant to Notice and the Federal

 8   Rules of Civil Procedure and the following stipulations

 9   and waiver of counsel:

10

11          IT IS STIPULATED AND AGREED by and between

12   counsel for the respective parties hereto that all

13   objections are reserved until the time of trial, except

14   those as to the form of the question and/or

15   responsiveness of the answer; that the Federal read-in

16   is waived.

17

18

19

20

21

22

23

24

25
```

Page 5

1           DAVID EVANS WATKINS,
2  having been first duly sworn, testified as follows:
3           EXAMINATION
4  BY MR. RUIZ:
5      Q.  Good morning, sir.  My name is Hector Ruiz.
6  I am an attorney with the Department of Justice.  I am
7  in the civil rights division from Washington, D.C.
8           To my left is my colleague, Jeremy
9  Monteiro.  He is also with the civil rights division of
10  the Department of Justice.
11          We are here today in the case of the
12  United States versus the City of Houston, Texas, okay?
13          On the phone is Nasim Ahmad.  He
14  represents Jane Draycott in her personal capacity, and
15  Ms. Draycott has filed a plaintiff intervention in this
16  matter, okay?
17          Do you understand that you are here to
18  be deposed with respect to the cases that I have just
19  described?
20      A.  Yes.
21      Q.  Would you please state and spell your name?
22      A.  My name is a David Evans Watkins.
23  D-a-v-i-d; E-v-a-n-s; Watkins, W-a-t-k-i-n-s.
24      Q.  Thank you.  Is it okay if I refer to you as
25  captain Watkins?

Page 6

1      A.  Yes, that's fine.
2      Q.  Captain was the last rank you held with the
3  Houston Police Department?
4      A.  That is correct.
5      Q.  Thank you very much.  Sir, I am -- sometimes
6  we ask where a person resides, lives, but since you are
7  a Houston police officer, I am not going to ask for
8  that on the record.
9           You were served a subpoena that was --
10      A.  Yes, I was.
11      Q.  -- a delivered subpoena.  Was that at your
12  home it was delivered?
13      A.  Yes, it was.
14      Q.  The address on your subpoena, was that your
15  correct home address?
16      A.  That is correct.
17      Q.  Thank you.  I am going to go over some --
18  before I continue, I am going to let you know who
19  entered the room, okay?
20      A.  Thank you.
21      Q.  To my left is Keith Wyatt.  He is an
22  assistant United States attorney here in Houston with
23  the --
24      A.  Keith Wyatt?
25          MR. WYATT:  K-e-i-t-h, W-y-a-t-t.

Page 7

1          THE WITNESS:  Thank you.
2          MS. KARPATI:  I am Elizabeth Karpati
3  with the U.S. attorney's office.
4          THE WITNESS:  Can you spell your last
5  name for me?
6          MS. KARPATI:  K-a-r-p-a-t-i.
7          THE WITNESS:  Thank you.
8          MS. KARPATI:  First name, Elizabeth.
9  BY MR. RUIZ:
10      Q.  Captain Watkins, have you ever had your
11  deposition taken before?
12      A.  Yes.
13      Q.  When was the last time?
14      A.  Probably -- I am just estimating.
15      Q.  Approximation is fine, sir.
16      A.  2014.
17      Q.  The deposition, would it have been in
18  connection with your work with the Houston Police
19  Department?
20      A.  Yes.
21      Q.  In 2014 were you assigned to the office of
22  inspector general?
23      A.  No.
24      Q.  You were working in a different division at
25  that time?

Page 8

1      A.  That's correct.  That was in relation to the
2  crime lab recovery project, which I was also assigned
3  to.
4      Q.  I am going to cover some rules for today's
5  deposition, and it's just so that the court reporter
6  here can get a clean record of what you and I discuss,
7  okay?
8      A.  Okay.
9      Q.  If you don't understand a question, please
10  let me know, and I will either have the court reporter
11  read back the question or I will rephrase the question.
12          If you don't hear my question, please
13  say so.  I will either have the court reporter read the
14  question back or I will restate it.
15          If -- to ensure a clean transcript,
16  please wait until I finish my question.  I will do my
17  best to let you complete your answer before I start my
18  next question.  And that's to ensure that the court
19  reporter gets a clean transcript.
20          Do you understand that?
21      A.  Yes.
22      Q.  Unless the City attorney instructs you not
23  to answer a question, you should answer the question.
24  Do you understand that?
25      A.  Yes.

Page 9

1    Q.  If you need a break, please let me know.
2  All I ask is that if there is a question pending, that
3  the question be answered before we take a break.  Is
4  that fair?
5    **A.  Yes.**
6    Q.  Captain Watkins, is there anything that
7  prevents you from testifying completely today,
8  completely -- let me rephrase -- testifying fully and
9  truthfully today?
10   **A.  No.**
11   Q.  Are you represented today by counsel?
12   **A.  Yes.**
13   Q.  Who are you represented by?
14   **A.  Marjorie.**
15   Q.  What have you done to prepare for this
16  deposition?
17   **A.  I reviewed cases for OIG case 09-407 and I**
18  **think it's 09-424.**
19   Q.  When you say you reviewed cases 09-407 and
20  09-424, are those investigations that were conducted by
21  the Houston Police Department's office of inspector
22  general?
23   **A.  That's correct.**
24   Q.  What do you mean you reviewed the cases?
25   **A.  I read the case file that was photocopied**

Page 10

1  **for me for my review.**
2    Q.  What is included in a case file?
3    **A.  The investigative synopsis, the**
4  **investigation itself, and any exhibits that are**
5  **attached to that investigation.**
6    Q.  The investigative synopsis.  You said the
7  investigative exhibits?  I am sorry.  Is that what you
8  said?
9    **A.  The investigation itself.**
10   Q.  The investigation itself?
11   **A.  The exhibits.  I would add the record of**
12  **complaint that initiates the investigation.**
13   Q.  Does it also include an investigative
14  report?
15   **A.  Yes, that's what the investigation is.  It's**
16  **an investigation report, yes.**
17   Q.  Thank you.  There is an investigative
18  report, investigative synopsis, the investigation
19  itself, exhibits that are relevant to the
20  investigation, and the record of complaint?
21   **A.  That's correct.**
22   Q.  Is there anything else in the case file that
23  you reviewed?
24   **A.  Inspector general standard operating**
25  **procedure manual.**

Page 11

1    Q.  I am sorry, sir.  So where did you review
2  this material?
3    **A.  I reviewed it Thursday and Friday -- let's**
4  **see.  Thursday and Friday of last week, so that would**
5  **be the -- I don't recall the date.  It would be -- I**
6  **would have to look it up on the calendar.**
7    Q.  I understand.  It was last Thursday and last
8  Friday?
9    **A.  That's correct.**
10   Q.  You said the material was photocopied for
11  you?
12   **A.  Yes.**
13   Q.  Who photocopied the material for you?
14   **A.  I received it from the City legal**
15  **department.**
16   Q.  Was there a specific person you received it
17  from?
18   **A.  I received it from someone by the name of**
19  **Shirley Jones, who works for Deidra Sullivan.**
20   Q.  Was it delivered to you, sir?
21   **A.  Yes.**
22   Q.  At your home?
23   **A.  No.  It was here.**
24   Q.  Here.  You came to pick it up?
25   **A.  Yes.**

Page 12

1    Q.  When you came to pick it up, did you meet
2  with anybody?
3    **A.  Deidra Sullivan.**
4    Q.  How long did you meet with Ms. Sullivan for?
5    **A.  I don't recall.  Probably a little over an**
6  **hour.**
7    Q.  Other than the materials that you have
8  described to me, is there any other material that you
9  were provided by the City before this deposition?
10   **A.  No.**
11   Q.  Other than reviewing the case file, sir, is
12  there anything else you have done to prepare for
13  today's deposition?
14   **A.  No.**
15   Q.  So in reviewing the material that you have
16  described today, did you take notes?
17   **A.  No.**
18   Q.  Did you apply any kind of Post-It notes to
19  the materials that you reviewed?
20   **A.  Yes.**
21   Q.  Did you bring those materials with you
22  today?
23   **A.  Yes.**
24   Q.  Where are those materials now?
25   **A.  I returned them to the legal department.**

Page 13

1      Q.   Did those materials help you prepare for
2  today's deposition?
3      **A.   Did the material itself?**
4      Q.   Yes, sir.
5      **A.   It helped refresh my memory.**
6      Q.   Fair enough.  Why did you put Post-It notes
7  on different materials?
8      **A.   I am getting older, and I tend to forget**
9  **things.  It's always good to make a reference.**
10         **As I run through the material the first**
11  **time, I then put a Post-It note so I can go back and**
12  **take a second look.**
13     Q.   Those materials, you brought them with you
14  today.  Is that correct?
15     **A.   Yes.**
16     Q.   And who did you give them to?
17     **A.   I gave them to Marjorie.**
18         MR. RUIZ:  I would like to take a look
19  at those material right now.
20         MS. COHEN:  Okay.
21         MR. RUIZ:  Including the Post-It notes
22  that he had put in there for his reference.
23         MS. COHEN:  You will have to go off the
24  record.
25         MR. RUIZ:  Go off the record.

Page 14

1          (Recess from 9:31 to 9:36 a.m.)
2  BY MR. RUIZ:
3      Q.   Captain Watkins, just for the record, before
4  we took a break, I had asked to review the materials
5  that you were provided.  You brought back -- what was
6  brought back to the conference room, the deposition,
7  was a binder of materials with some Post-It notes on
8  it.
9          Is this the binder of materials that
10  you were referring to?
11     **A.   Yes.**
12     Q.   I am sorry.  I have to make a record.
13     **A.   No, no.**
14     Q.   Is there anything else that you reviewed
15  that is not on this binder?
16     **A.   No.**
17     Q.   I reviewed it briefly, and many of the
18  documents in there have highlights --
19     **A.   Yeah.**
20     Q.   -- have highlighted material.  Did you
21  highlight that material?
22     **A.   Yes.**
23     Q.   And the Post-It notes that are alongside
24  each of the -- or several of the pages, those are
25  Post-It notes that were placed there by you?

Page 15

1      **A.   Yes.**
2      Q.   Thank you.  Now, I am going to ask you some
3  questions relating to the representation that you
4  stated -- or the -- about the City representing you,
5  specifically the person to your right, Marjorie, okay?
6          When did the City start representing
7  you?
8      **A.   Well, I would assume the City started**
9  **representing me back when I was employed by the City.**
10     Q.   You are no longer employed with the City.
11  Is that correct?
12     **A.   Yes.**
13     Q.   When did your employment with the City
14  conclude?
15     **A.   I retired on -- in August 2016.  I am on**
16  **what's called phase down, which is a term for -- I**
17  **still receive pay from the City until that exhausts my**
18  **leave bank, which will end in about three years.**
19     Q.   Do you have a written agreement with the
20  City regarding representation?
21     **A.   No.**
22     Q.   Do you know if the -- the attorney to your
23  right is representing the City or you personally?
24     **A.   I am guessing the City first and then --**
25         MS. COHEN:  We represent all managerial

Page 16

1  employees of the City, which he was.
2          MR. RUIZ:  Even after their employment
3  has ended with the City, you still represent, even
4  though they are no longer employed by the City?
5          MS. COHEN:  Yes, for -- for actions
6  that occurred during their employment.
7          MR. RUIZ:  So for -- I need to
8  understand what you are saying here.
9          So for actions taken within -- during
10  their employment, you represent them.
11         MS. COHEN:  Correct.
12         MR. RUIZ:  For anything outside of
13  their employment or after their employment ended, you
14  don't represent them.
15         MS. COHEN:  If the captain got into a
16  car wreck this afternoon, we would not represent him --
17  actually since he is on phase down, I'm not sure how
18  that works.
19         **THE WITNESS:  I will try not to get in**
20  **one.**
21         MS. COHEN:  Because he wasn't on City
22  business.
23  BY MR. RUIZ:
24     Q.   Thank you, captain Watkins.  Other than with
25  the attorneys for the City, did you have conversations

Page 17

1  with anybody else about your deposition today?

2  **A. No.**

3  Q. How about the materials that you reviewed?

4  **A. No.**

5  Q. Sir, what is the highest level of education

6  you received?

7  **A. High school education.**

8  Q. We just covered the ending of your

9  employment with the Houston Police Department. You

10 went into phase down in 2016. Is that correct?

11 **A. Yeah.**

12 Q. And I am sorry. Will you please explain

13 what phase down means?

14 **A. Well, very simply, it means if you have --**

15 **if you do a bank of time that you are allowed to**

16 **accrue, you have the opportunity to continue to be paid**

17 **for that, right? On -- depending on -- there are**

18 **several options. And you are allowed to be paid for**

19 **that over a period of time until that time is**

20 **exhausted.**

21 Q. Do you still receive employee benefits other

22 than pay?

23 **A. I receive employee active duty insurance,**

24 **and that is it.**

25 Q. That's it, okay. What rank -- when you went

Page 18

1  into phase down, what rank did you hold?

2  **A. Captain.**

3  Q. Captain. And how long were you a captain --

4  you know what? Let me rephrase that.

5         Do you remember when you first attained

6  the rank of captain?

7  **A. That's what I am thinking. Excuse me.**

8  **March of 1995.**

9  Q. While holding the rank of captain, do you

10 remember when you were assigned to work in the HPD's

11 OIG division?

12 **A. Approximately May of 2009.**

13 Q. How long did you work in that division?

14 **A. It was transferred to the legal department**

15 **sometime mid 2010, so approximately a year.**

16 Q. You worked in OIG for approximately a year?

17 **A. Correct.**

18 Q. And while you were in OIG, other than

19 captain, what was a position you held?

20 **A. Other than OIG?**

21 Q. Yeah.

22 **A. As a commander, as a captain.**

23 Q. What was your position in OIG?

24 **A. For -- the position itself is division --**

25 **division commander.**

Page 19

1  Q. Division commander. And is that the

2  position you held when you first went to OIG in

3  May 2009?

4  **A. Yes.**

5  Q. Is that the position you held throughout

6  your tenure?

7  **A. Yes.**

8  Q. Through mid 2010?

9  **A. Yes.**

10 Q. As division commander, who did you report

11 to?

12 **A. The -- an assistant chief in the Houston**

13 **Police Department.**

14 Q. Who was that, sir?

15 **A. George Buenik.**

16 Q. Did assistant chief Buenik have -- I

17 understand that he was assistant chief.

18       Did he also have another -- did he have

19 another position name in OIG?

20 **A. The OIG chain, he was referred to as**

21 **inspector general.**

22 Q. He was the inspector general of the office

23 of inspector general?

24 **A. Yes.**

25 Q. Okay. What were your duties as division

Page 20

1  commander?

2  **A. To manage the investigator process of that**

3  **division.**

4  Q. Were there any other duties that you had,

5  sir?

6  **A. I was still involved with the crime lab**

7  **recovery project during that time, and I served on**

8  **several committees for the police department.**

9  Q. In managing the investigative process for

10 the division, who did you manage?

11 **A. Primarily the section managers for the**

12 **different sections.**

13 Q. Is there anybody else that you managed, sir?

14 **A. Directly, no.**

15 Q. What sections were in OIG that you --

16 **A. The criminal investigations unit called CIU;**

17 the special investigations unit called SIU; the fire

18 department investigations unit, which was HFD; and the

19 employee relations unit, ERU.

20 Q. What types of matters did the employee

21 relations unit work on?

22 **A. Primarily matters involving discrimination**

23 **complaints, but other administrative complaints, as**

24 **well, were placed -- misconduct of an administrative**

25 **nature.**

Page 21

1    Q.   Do you remember who was the section manager
2  that you managed for ERU?
3    A.   Sandra Robinson.
4    Q.   And who -- did Sandra Robinson have any
5  managerial responsibilities for members of ERU?
6    A.   Yes, she managed the day-to-day
7  responsibilities of that section.
8    Q.   Were there persons that she managed
9  directly?
10   A.   Yes.
11   Q.   Were those persons investigators?
12   A.   Yes.
13   Q.   Now, the investigators that she managed,
14  were they assigned to investigate complaints of
15  employment discrimination?
16   A.   They would have been, yes.
17   Q.   Okay.  The investigators in ERU, would they
18  have been civilian investigators?
19   A.   Yes.  I believe they would have all been
20  civilian, but I don't recall specifically.  There may
21  have been occasion that I would have moved somebody in,
22  but I don't remember.
23   Q.   For the criminal investigative unit, who was
24  the section manager of that unit?
25   A.   Richard David, lieutenant.

Page 22

1          I should say division manager was the
2  title for Sandra Robinson, if I could back up on that.
3    Q.   Yes, sir.  Let me make sure I am clear.
4          So Sandra Robinson was the division
5  manager for the employee relations unit?
6    A.   That's correct.
7    Q.   Thank you.  Richard David?
8    A.   Lieutenant for the criminal investigations
9  unit.
10   Q.   Thank you, sir.  Lieutenant Richard David
11  was the section manager for the criminal investigative
12  unit?
13   A.   Yes.
14   Q.   What type of matters did the criminal
15  investigative unit investigate?
16   A.   As the name would imply, anything of a
17  criminal nature, misconduct of a City employee.
18   Q.   So for the criminal investigative unit, if
19  they were investigating a matter, a crime as you
20  suggested, does it have to involve a City of Houston
21  employee?
22   A.   Yes.
23   Q.   Right.  So I mean, if -- just because it's a
24  crime doesn't mean it goes to criminal investigative
25  unit.  The crime had to have somehow involved a City of

Page 23

1  Houston employee?
2    A.   That's correct, misconduct of a City of
3  Houston employee, work related.
4    Q.   For the special investigative unit, sir, who
5  was the section manager in that unit?
6    A.   Tom -- lieutenant Tom Hartnett,
7  H-a-r-t-n-e-t-t.
8    Q.   And what types of matters did that unit
9  address?
10   A.   He handled the administrative section, but
11  the special investigations unit handled matters of
12  fiscal misconduct, potential fiscal misconduct, and
13  procurement issues.
14   Q.   Let me back up to the criminal investigative
15  unit.
16          Who did lieutenant Richard David
17  supervise?
18   A.   Classified personnel sergeants directly, but
19  indirectly, officers, as well.
20   Q.   Were there investigators assigned to the
21  criminal investigative unit?
22   A.   Yes.
23   Q.   And were those investigators sworn
24  personnel?
25   A.   Yes.

Page 24

1    Q.   And --
2    A.   Classified and sworn interchangeably.
3    Q.   When you say classified personnel, you mean
4  sworn personnel?
5    A.   That's correct, so there is no mistake.
6    Q.   Thank you very much.  The investigators in
7  the special investigative unit, were those also sworn
8  personnel?
9    A.   In which unit?
10   Q.   The special investigations unit.
11   A.   Except for the administrative section, there
12  would have been civilian clerical personnel.
13   Q.   I believe the last section that you
14  mentioned was the fire department investigative unit?
15   A.   Yes.
16   Q.   Who was the section manager of that unit?
17   A.   Stan -- forgive me.  I would have to review
18  an org chart.  Actually, we are getting to the point
19  where I would need to see an org chart from that time.
20  This is testing my memory, because I have managed so
21  many people over the years.
22   Q.   Let me ask you this.
23          For the fire department investigative
24  unit, were the investigators sworn personnel?
25   A.   They were arson investigators, but they also



Page 25

1  are sworn personnel.

2      Q.   But those investigators have been from the

3  fire department?

4      **A.   They would have been -- yes.  They work for**

5  **the fire department through the arson unit.**

6      Q.   How do investigators get selected to work in

7  the employee relations unit?

8      **A.   Well, since I was assigned there, there was**

9  **no change in personnel, because of the inability to --**

10 **the City was under a civilian hiring freeze, I believe,**

11 **at the time.  It was around that time, so no personnel**

12 **changes.  So when I came into the division, they were**

13 **already there.**

14     Q.   Okay.  And you don't know how they were

15 selected to be there?

16     **A.   I think some came when the unit was**

17 **transferred from the affirmative action of the City.  I**

18 **don't know who was a part of that then.**

19     Q.   Okay.  And for the criminal investigative

20 unit, how are investigators selected to be part of that

21 unit?

22     **A.   They were interviewed.**

23     Q.   Who would interview?

24     **A.   I am trying to think if I was there, if**

25 **anyone actually came into the division.  I was only**

Page 26

1  there a limited time.  I don't recall that we actually

2  interviewed anyone for criminal investigations while I

3  was there.  I think everyone was in place until we

4  disbanded.

5      Q.   Thank you very much.  Sir, today I am going

6  to ask you about three investigations conducted by OIG.

7  Two of the investigations I am going to ask you about

8  today are investigations that are referenced in the

9  binder that you brought today, the OIG

10 investigation 09-0424 and 09-0407.  There is a third

11 that I am going to ask you about, 09-311.

12     **A.   Okay.**

13     Q.   Okay.  A lot of the questions I may -- I ask

14 are probably going to seem very basic, you know, and

15 you are going to probably wonder why I am asking that.

16         And the reason is because I am -- this

17 is all being taken down by the court reporter, and I am

18 trying to create a record, okay?

19     **A.   Okay.**

20     Q.   Let me begin with:  Do you know who Jane

21 Draycott is?

22     **A.   Yes.**

23     Q.   How do you know her?

24     **A.   Through the -- through the record of**

25 **complaint and the investigation.**

Page 27

1      Q.   When you say the record of complaint and the

2  investigation, are you referring to the record of

3  complaint that the OIG has for either 09-0424 or

4  OIG 09-0407?

5      **A.   Right, as those relate to Jane Draycott,**

6  **yes.**

7      Q.   Thank you.  Have you ever met Jane Draycott?

8      **A.   Not that I recall.**

9      Q.   Do you know her in any other capacity other

10 than through these investigations?

11     **A.   No.**

12         (Exhibit 1 marked.)

13     Q.   Sir, I want to hand you what is going to be

14 marked as exhibit 1.  We are going to call it Watkins

15 exhibit 1.  Sir, exhibit 1 is Bates stamped

16 HOU 00005866.  It runs through HOU 00005869.  If you

17 flip to the second page, top of the page says City of

18 Houston office of inspector general, record of

19 complaint, OIG No. 2009-0424.

20         Could you please review this document,

21 sir, and let me know when you are ready for me to ask

22 you questions.

23     **A.   Okay.**

24     Q.   Sir, what is this document?

25     **A.   It's the record of complaint when an**

Page 28

1  employee makes an allegation against an as we call

2  them, respondent.

3      Q.   Is this the record of complaint for

4  OIG 09-0424?

5      **A.   It would appear to be, yeah.**

6      Q.   This is a record of the complaint submitted

7  by Jane Draycott?

8      **A.   It would appear so, yeah.**

9      Q.   What purpose does a record of complaint

10 serve?

11     **A.   Serves to document when a record of**

12 **complaint -- when a complaint is registered with the**

13 **office of inspector general.**

14     Q.   Is it just there to document when a

15 complaint is submitted?

16     **A.   It also gives the summary of what the record**

17 **of complaint is about.**

18     Q.   So it describes when a complaint was

19 submitted and provides a summary of what the complaint

20 is about.  Is that correct?

21     **A.   As well as a respondent, if there is one,**

22 **and the information about the employee that filed the**

23 **complaint.**

24     Q.   Well, what happens after this record is

25 made?

Page 29

1    A.  It's reviewed by the administrative section
2  and assigned to an investigative section.
3    Q.  So once this record of complaint is made,
4  it's reviewed by the administrative section and then
5  assigned to one of those investigative units that we
6  discussed earlier?
7    A.  Correct.
8    Q.  Thank you very much.  Now, is it assigned to
9  one of those investigative units so that the complaint
10 can actually be investigated?
11   A.  Yes.
12   Q.  Now, I want you to look at the page Bates
13 stamp HOU 00005857 towards the bottom.  There is a
14 notation that says type of complaint.
15   A.  Yes.
16   Q.  In there, there are some different options.
17 Some say no; some say yes -- or two say yes.  Do you
18 see that, sir?
19   A.  Yes.
20   Q.  What do the yes -- the two answers for yes
21 mean?
22   A.  That it was assigned to employee relations
23 unit and that there was a discrimination case involved.
24   Q.  Okay.  Now, for those issues where it says
25 no, what do the noes mean?

Page 30

1    A.  It was not a whistleblower case.
2    Q.  Okay.  Does that mean that when the -- when
3  the person submitted the complaint, that they
4  determined that it was a discrimination complaint or
5  that the administrator who received the complaint --
6    A.  I am sorry.  Would you repeat that?
7    Q.  Yeah.  Let me slow down.
8        Now, when you were describing what the
9  word yes meant, you said instead it's a discrimination
10 complaint.
11       Who decides whether or not the
12 complaint submitted is a discrimination complaint?
13   A.  Well, it would probably be, depending on the
14 circumstances -- if it's not very clear in the
15 statement, which it normally is, then it would have
16 been decided by either the administrative sergeant or
17 the administrative lieutenant.  Generally it's stated
18 in the record -- the document that shows what the
19 record of complaint is about.
20   Q.  So typically you would expect the
21 complainant to state that they think they are being
22 discriminated against.  Is that what -- your policy?
23   A.  Yes, I would assume so, because the document
24 is looking -- is checked yes.
25   Q.  But if it's not clear from that complaint

Page 31

1  and statement, the administrator -- the administrator
2  may assign it to the -- to the employee relations unit
3  as a discrimination complaint.  Is that correct?
4    A.  Repeat that one.
5    Q.  If it's not clear from the complainant's
6  statement that it's a discrimination complaint, the
7  administrative section or the administrator may still
8  assign it to the employee relations unit as a
9  discrimination investigation.  Is that correct?
10   A.  If it's not clear.
11   Q.  From the complainant's statement?
12   A.  If it falls short of a discrimination
13 complaint, but it might be involved in supervisory -- I
14 mean, in employee misconduct of some sort,
15 administrative wise?
16   Q.  Yes, sir.
17   A.  In that case, yes.
18   Q.  Beneath that section the document states
19 this compliant involves the following types of
20 discrimination.
21       Should that read this complaint?
22   A.  No.  It says this compliant.
23   Q.  Should it be this complaint?
24   A.  Yes, it probably should be.
25   Q.  And what type of discrimination is involved

Page 32

1  in this record of complaint?
2    A.  It would be a title 7 discrimination.
3    Q.  What's --
4    A.  Checkmark for sex.
5    Q.  Checkmark for sex?
6    A.  Yes.
7    Q.  Or?
8    A.  Gender discrimination, yeah.
9    Q.  Okay.  So is it fair to say that when --
10 according to the record of complaint, the OIG had
11 received or interpreted Ms. Draycott's complaint to be
12 a discrimination complaint based on sex?
13   A.  Based on gender discrimination.
14   Q.  If that's what you believe it was or that's
15 what you believe this document represents, that's fine.
16   A.  Yes.  I would say so, yes.
17   Q.  So you would say it is -- the OIG received
18 your complaint and classified it as a discrimination
19 complaint based on gender?
20   A.  Yes.
21   Q.  Okay.  Now, once it does that, what should
22 it investigate?
23       MS. COHEN:  Objection; vague.
24 BY MR. RUIZ:
25   Q.  I am sorry.  Once it determines that the



Page 33

1  complaint received by Jane Draycott is a discrimination
2  complaint based on gender, what should OIG investigate?
3      A.  It depends whether there is any
4  investigation by the EEOC or not, in which case, I
5  believe in this one, it was.
6      Q.  If there was an investigation by the EEOC,
7  what does OIG do?
8      A.  Investigate the specific allegations that
9  are in the record of complaint.
10     Q.  Okay.  If there was not an investigation by
11 the EEOC, what would OIG do with Jane Draycott's
12 complaint?
13     A.  It would still investigate the specific
14 allegations.
15     Q.  Would it make a finding with respect -- is
16 it -- what is it investigating the allegations for?
17     A.  I am sorry?
18     Q.  What's the purpose of it investigating the
19 allegations?
20     A.  Well, the allegations in 0424 were specific.
21 They were -- if I recall correctly, an issue with
22 shower debris, uncleanliness, radio speaker.  They were
23 very specific allegations that were occurring.
24     Q.  Okay.  But is there a reason that they are
25 conducting the investigation?  What are they trying to

Page 34

1  determine?
2      A.  If those specific allegations did in fact
3  occur.
4      Q.  Is OIG trying to evaluate whether or not she
5  was actually submitted to sex or discrimination based
6  on gender?
7      A.  Yes, probably so, yes.
8      Q.  Sir, as the division commander of OIG, do
9  you not know if they would try to actually address the
10 question of whether or not she was subjected to gender
11 discrimination if in fact --
12     A.  Knowing --
13     Q.  Let me finish my question.
14         -- if in fact if OIG found that her
15 complaint was actually about gender discrimination?
16     A.  It would have to establish that it was about
17 a gender discrimination first.
18     Q.  What do you mean by that?
19     A.  It may have been an allegation that was
20 stated in the investigation.  The investigation had
21 specific points that it needed to investigate, and the
22 gender discrimination was being investigated by the
23 EEOC.  So it was already being investigated.
24     Q.  So if the EEOC is investigating the matter,
25 are you telling me that OIG won't actually try to reach

Page 35

1  the answer of whether or not --
2      A.  At that point --
3      Q.  Let me finish my question.
4         -- whether or not Jane Draycott was
5  discriminated against based on her gender?
6      A.  I am sorry.  Say that one more time for me.
7      Q.  Are you telling me that if the EEOC was
8  investigating the matter, the OIG won't actually try to
9  reach a determination as to whether or not Jane
10 Draycott was being discriminated against based on her
11 gender?
12     A.  We would allow EEOC to conduct their
13 investigation, and we would focus on the specific
14 allegations.
15     Q.  So is that -- what I asked:  Is that
16 correct --
17     A.  What I stated --
18     Q.  No.  What I asked:  Is that correct that OIG
19 wouldn't actually try to directly address the
20 issue or --
21     A.  I am sorry.  I am not going to respond to
22 that absolutely.  I would refer that to someone else.
23         But in my knowledge, as I recall, the
24 EEOC would make that investigation, and we would look
25 at the specific allegations.

Page 36

1      Q.  When you say you are not going to address
2  that allegation or that question directly, is it -- why
3  won't you?
4      A.  No.  I did address it.  What I said was I
5  won't address it as an absolute.  I can't address it as
6  an absolute, because I just simply don't remember.
7      Q.  Okay, thank you.  Now, would you please turn
8  to page HOU 0005868 in exhibit 1?
9      A.  Okay.
10     Q.  Now, we were just discussing what OIG would
11 investigate and try to determine if the EEOC was also
12 investigating the matter, okay?  I want to go through
13 the different sentences here, and let me know what OIG
14 would actually investigate and try to address, okay?
15     Q.  The first sentence is:  The complainant
16 states since being assigned to ARFF, fire station 54A,
17 she has experienced numerous problems because of her
18 gender, okay?
19         Is that an allegation that the OIG
20 would address if the EEOC was also investigating the
21 matter?
22     A.  We need to look at more than just the fact
23 that that is stated in the complaint.  We need to look
24 at the circumstances behind that.
25     Q.  Okay.  So you would want to know why is she



Page 37

1 alleging that?

2 **A. That's right. At that point it could be,**

3 **but we want to establish why does she believe that.**

4 Q. Okay.

5 **A. We need more information.**

6 Q. Okay. So the next sentence says -- states:

7 The complainant states that captain Erich Henschel

8 began to document incidents since April 2009.

9 Is that something that would help OIG

10 determine whether or not they would investigate what

11 she alleges in her -- what she states in her first

12 sentence, that she has experienced numerous problems

13 because of her gender?

14 **A. Would it establish it's because of her**

15 **gender?**

16 Q. No. Would it establish to investigate --

17 you said you needed surrounding circumstances in order

18 to determine what you can investigate. Is that

19 correct?

20 **A. You will have to restate that. I am sorry.**

21 Q. Tell you what, instead of taking this piece

22 by piece, go ahead and review the paragraph under this

23 complaint is based on the following circumstances.

24 **A. Okay.**

25 Q. After reviewing the paragraph beginning with

Page 38

1 the complainant states that since being assigned to

2 ARRF, she experienced numerous problems because of

3 gender, is this something that the office of inspector

4 general should investigate?

5 **A. Once again, we will look at the specific**

6 **allegations that are made and make a determination from**

7 **that.**

8 Q. So is there another document that you have

9 to look at in order to determine what the investigation

10 would entail?

11 **A. Well, for example, let's take the first one,**

12 **urinated all over the toilet seats.**

13 **We would need to interview anyone that**

14 **was associated with the fire department that could**

15 **substantiate that and then reach a conclusion based on**

16 **that. That in and of itself doesn't target Jane**

17 **Draycott. That in and of itself could be men using the**

18 **women's restroom. It could be women using the women's**

19 **restroom and not been hygienically sound, shall we say?**

20 Q. So it's something you would have to

21 investigate?

22 **A. That's right.**

23 Q. Okay. And sir, I have a question about

24 the -- the issue -- I am sorry -- the process you were

25 discussing where the OIG actually won't make a

Page 39

1 determination as to discrimination if the EEOC is also

2 investigating that process.

3 Is there a written policy that states

4 the OIG won't do that?

5 **A. The policy in the standard operating**

6 **procedure when it discusses -- it asks our role is to**

7 **make notification of shielding to the department head,**

8 **not to actually shield the department, but to shield**

9 **them if necessary. And then once that's determined,**

10 **then to make an investigation of the allegations that**

11 **are stated in the complaint.**

12 Q. Do the SOPs address whether or not or

13 address the issue that you raised -- they wouldn't make

14 a discrimination finding if the EEOC was also

15 addressing --

16 **A. I would have to review that, but -- I would**

17 **have to review that. There may be one that speaks to**

18 **that. I don't know.**

19 Q. You don't know?

20 **A. No.**

21 Q. You just know sitting in your chair -- in

22 the chair today, you just know that's what you did?

23 **A. That's what I recall.**

24 Q. Okay.

25 **A. Keep in mind, ten years.**

Page 40

1 Q. Yeah. For Ms. Draycott's complaint,

2 09-0424, who has a role in investigating that

3 complaint?

4 **A. 0424 was investigated by investigator**

5 **Gonzales, I believe. Correct me if I'm wrong. I would**

6 **have to -- I would have to take a look at the**

7 **investigation, Raymond, investigator Raymond.**

8 Q. Okay. I think you are right by saying

9 Raymond Gonzales.

10 Do you remember if Mr. Gonzales was

11 sworn personnel?

12 **A. I think he may have been a retiree, but I**

13 **don't recall.**

14 Q. Do you know if there was more than one

15 investigator on the matter?

16 **A. He may have called others in. I don't know**

17 **specifically.**

18 Q. Okay.

19 **A. I know he would have consulted with the**

20 **investigator on other cases since they were running at**

21 **the same time.**

22 Q. I am sorry. When you say the cases were

23 running at the same time, are you talking about --

24 **A. 0407 and 0424.**

25 Q. Those investigations were proceeding at the



1  same time.  Is that what you are saying?

2      **A.  I believe so, yeah.**

3      Q.  Okay.  Other than Mr. Gonzales, who else has

4  a role in investigating, let's say, complaint 0424?

5      **A.  Who else would have had a role?**

6      Q.  Yes, sir.

7      **A.  Anyone could have assisted Raymond in the**

8  **investigation that was assigned to the ERU.  I would**

9  **have to review all the statements that were taken and**

10 **who signed various documents to make that**

11 **determination.  I did not do that prior to this**

12 **hearing.**

13     Q.  So did you have any role in investigating

14 09-0424?

15     **A.  Not day-to-day, no.**

16     Q.  When the investigation is complete, did you

17 review their work?

18     **A.  Yes.**

19     Q.  Let me slow it down.

20         When the investigation was complete,

21 did you review Raymond Gonzales' work?

22     **A.  Yes.**

23     Q.  Is that part of your duties?

24     **A.  Yes.**

25     Q.  What did you review it for?

1      **A.  For completeness, accuracy, thoroughness.**

2  **If I believed the investigation needed to go anywhere**

3  **else, I would have made notation of that, as well.**

4      Q.  Now, if this was a gender discrimination

5  complaint, would you also have looked to make sure that

6  the issue of -- whether gender discrimination was

7  addressed in --

8      **A.  I would have had a discussion with Sandra**

9  **Robinson.**

10     Q.  Let me finish my question.

11     **A.  I thought you were finished.**

12     Q.  Thank you.

13         Would you have expected to see whether

14 or not the issue of gender discrimination had been

15 addressed?

16     **A.  I would have had a discussion with Sandra**

17 **Robinson.**

18     Q.  Earlier you mentioned Sandra Robinson.  I

19 believe you said she was the section manager of ERU?

20     **A.  Correct.**

21     Q.  Okay.  Why would you have discussed the

22 matter with Sandra Robinson?

23     **A.  She is my direct report.**

24     Q.  Would Raymond Gonzales have submitted the

25 report to Ms. Robinson?

1      **A.  Yes.**

2      Q.  Okay, thank you.  What would you have talked

3  to Ms. Robinson about?

4      **A.  Any concerns that I would have had in the**

5  **investigation.**

6      Q.  Now, at the conclusion of investigation

7  09-0424, would you expect OIG to conclude one way or

8  another whether Jane Draycott was being discriminated

9  against due to her gender?

10     **A.  I don't believe any of the allegations that**

11 **she made would have been specifically targeted toward**

12 **Jane Draycott, if I recall.**

13     Q.  I am not asking if you should have concluded

14 that she wasn't.  I am just saying at the conclusion of

15 an investigation of 0424 where she alleged that things

16 were being done to her because of her gender, would you

17 have expected OIG to conclude one way or another on

18 that issue that her complaint raised?

19     **A.  Are you asking -- okay.  Rephrase the**

20 **question.  Let me make sure I get this right.**

21     Q.  Sure.  At the conclusion of OIG's

22 investigation into 09-0424, would you expect OIG to

23 conclude one way or the other as to whether Jane

24 Draycott was being discriminated against due to her

25 gender?

1      **A.  I can answer that the investigation did not**

2  **determine -- would not have determined that.**

3      Q.  It would not have determined that.  So I

4  mean, why would it not have determined that?

5      **A.  Because to my recollection, none of these**

6  **specific allegations specifically targeted Jane**

7  **Draycott.  And I believe -- well, let me go ahead and**

8  **let you go.**

9      Q.  So in this instance you are saying the --

10 are you saying that the OIG concluded that she wasn't

11 being discriminated --

12     **A.  No, sir, that's not what I said.**

13     Q.  Tell us what you said.

14     **A.  I said had that determination been made, it**

15 **would have been inconclusive at best in the case of**

16 **0424.**

17     Q.  Let me make sure I understand.

18         What I am -- I am trying to get at is

19 at the conclusion of the investigation for 0424, would

20 OIG say, yes, we found she is being discriminated

21 against based on her gender, or would they say, no, we

22 did not find she was being subjected to gender

23 discrimination?

24     **A.  I believe the casework speaks for itself.**

25 **It's not indicated in the case summary.  So I would**



Page 45

1  give you the answer no.

2      Q.  No, they would not make that --

3      A.  They did not at that time, that's correct.

4  Now, I can speculate, but I can't give you a definitive

5  answer.

6      Q.  Is that type of statement supposed to be

7  included in either the investigative report or the

8  investigative summary?

9      A.  I am not sure how to answer that.  Could you

10  give me something else?

11     Q.  Sure.  She is complaining about gender

12  discrimination, and that's the larger question in this

13  investigation, right?  I mean -- is that fair?

14     A.  Gender discrimination would be the larger

15  question if the investigation of the allegation

16  supported that.

17     Q.  But that's what she is alleging; is that

18  fair, that she was being discriminated due to her

19  gender?  That's what she is alleging, right?

20     A.  That's the first statement in her complaint.

21     Q.  The other statements about urine being found

22  on the seat, those are facts she is alleging in support

23  of that larger --

24     A.  That's correct.

25     Q.  Is that right?

Page 46

1      A.  That's correct.

2      Q.  At the end of the day, with this OIG 0424,

3  are they going to actually answer that larger question:

4  We found you were being discriminated against based on

5  gender, or we did not find that you were being

6  discriminated against based on gender?

7      A.  I understand what you are saying.

8      Q.  I am not asking whether they found it or

9  not.  I am just saying when a person submits a

10  complaint of gender discrimination --

11     A.  It was not referenced in this investigation.

12         Could it have been?  I suppose.

13         Would it have changed the outcome of

14  the investigation?  No.

15     Q.  It could have been referenced.  Why wasn't

16  it?

17     A.  Again --

18         MS. COHEN:  Objection; calls for

19  speculation, asked and answered.

20     A.  I don't recall the conversation that I had

21  with Sandra Robinson, but I am -- again, I would have

22  to just guess --

23         MS. COHEN:  Don't guess.

24     A.  -- that it's -- we still had this EEOC

25  complaint ongoing.  That was being investigated

Page 47

1  already.  So we were addressing the specific

2  allegations.

3  BY MR. RUIZ:

4      Q.  Do you know of any other reason other than

5  an ongoing EEOC investigation why the OIG's office

6  would not directly address that larger question?

7      A.  Have referenced that?

8      Q.  Correct.

9      A.  At least at some point?

10     Q.  No.  Just in either its investigative

11  summary or investigative report, is there any reason

12  other than the EEOC's ongoing investigation?

13     A.  It was referenced throughout, I believe, in

14  every statement that was provided by Mr. Raymond

15  Gonzales that is indicated in every piece of

16  paperwork that was put forward.  So it's not like it

17  wasn't being disclosed at every point of the process.

18     Q.  Okay.  We are going to go ahead and go

19  through that process and see if that's accurate.

20     A.  Okay.

21         MS. COHEN:  Can we take a short break?

22         MR. RUIZ:  Absolutely.

23         (Recess from 10:23 to 10:35 a.m.)

24  BY MR. RUIZ:

25     Q.  Captain Watkins, earlier -- earlier we were

Page 48

1  discussing what you did in preparation for this

2  deposition.  Do you recall that?

3      A.  Yes.

4      Q.  And you told me that you spent an hour with

5  Ms. Sullivan.  Do you remember that?

6      A.  Yes.

7      Q.  Also, earlier when I was going over the

8  deposition rules, I told you that if I asked you a

9  question, you should answer unless your -- unless the

10  attorney for the City objects and instructs you not to

11  answer.  Do you remember that?

12     A.  Okay, yes.

13     Q.  You are no longer an employee with the City

14  of Houston.  Is that correct?

15     A.  That's correct.  I am retired.

16     Q.  Okay.  During your discussions with

17  Ms. Sullivan, what did you talk about?

18         MS. COHEN:  I am going to object to

19  that based on the attorney-client privilege and work

20  product privilege, and I am going to instruct the

21  witness not to respond.

22  BY MR. RUIZ:

23     Q.  We don't believe the privilege exists

24  because you are a former employee, okay?

25         Are you going to follow Ms. Cohen's



Page 49

1  instruction?
2           MS. COHEN:  I am going to interject
3  that I do believe that the privilege exists, because
4  you were a managerial employee at the time of the
5  events at issue.  Under that respect, I am going to
6  instruct you not to respond.
7  BY MR. RUIZ:
8     Q.  Are you going to follow that instruction?
9     A.  Yes.
10    Q.  Thank you.
11          MS. COHEN:  Did you have a concern
12  about getting back?
13          MR. RUIZ:  Let's go off the record.
14          (Recess from 10:37 to 10:41 a.m.)
15          (Exhibit 2 marked.)
16  BY MR. RUIZ:
17    Q.  We are back on the record.  Sir, I am going
18  to hand you what I am marking as Watkins exhibit 2,
19  sir.
20    A.  Are we through with 1?
21    Q.  Just keep it there.
22          MS. COHEN:  The court reporter will
23  take it.
24  BY MR. RUIZ:
25    Q.  You won't be keeping it.

Page 50

1           Watkins exhibit 2 is Bates stamped
2  HOU 00005983.  The top is marked confidential.  It says
3  from the desk of DP McCoy, sergeant, office of
4  inspector general.  It's dated Wednesday, July 22nd,
5  2009, and it's addressed to DE Watkins, captain, office
6  of inspector general.
7           Would you please review this document,
8  and I am going to ask you a few questions about its
9  contents.
10    A.  Okay.
11          Okay.
12    Q.  Captain Watkins, what is this document?
13    A.  This is a desk memo from my investigative
14  sergeant in case 0407 to me outlining some additional
15  information that he had when he was interviewing
16  captain Erich Henschel.
17    Q.  Who is sergeant DP McCoy?
18    A.  He is an investigative sergeant -- or he was
19  an investigative sergeant with the criminal
20  investigations unit.
21    Q.  You said he was assigned 09-0407
22  investigation.  That's the investigation into the
23  discovery of the slurs in the women's dorm station 54?
24    A.  Yes.
25    Q.  Is that correct?

Page 51

1     A.  Yes.
2     Q.  But in this desk memo he is sending you
3  information with respect to a different matter.  Is
4  that fair to say?
5     A.  Yes.
6     Q.  He is sending you information with respect
7  to the OIG's investigation into the discrimination
8  claim that Jane Draycott submitted?
9     A.  Yes.  The 0424.
10    Q.  Does he have any role specific to 09 -- did
11  sergeant McCoy have any role with respect to
12  investigating 09-0424?
13    A.  Not unless he was asked by the investigator
14  of 09-0424.
15    Q.  Do you know why Mr. McCoy sent you this
16  update on July 22nd, 2009?
17    A.  As an informational memo thinking that it
18  might have been new information uncovered.
19    Q.  How often would investigators send you
20  informational memos detailing information that was
21  recently uncovered?
22    A.  That's a very difficult question to answer.
23    Q.  Let me ask it like this.
24          Did this kind of informational memo
25  come by your desk relatively often?

Page 52

1     A.  It is not unusual.
2     Q.  Not unusual.  Would Mr. McCoy also update
3  you verbally on information that he has discovered in
4  connection with his investigation?
5     A.  On occasion.
6     Q.  When you received desk memos from
7  investigators updating you on information uncovered
8  during your investigation, what would you do with the
9  desk memos?
10    A.  Depending on what the desk memo was about, I
11  would either forward it to another investigator, or in
12  most cases it's just information pertaining to an
13  ongoing investigation, which this was.  It just was
14  under separate -- a separate investigator.  So he was
15  just making me aware of that.
16    Q.  Is information that's relayed to you as part
17  of an investigation kept as part of the case file?
18    A.  A memo such as this?
19    Q.  Yes, sir.  When you say this, you mean
20  exhibit 2, right?
21    A.  I am sorry.  Exhibit 2.  Normally it would
22  be in the case file, but not always.  This would
23  probably have ended up in the case file of 0424 and not
24  0407.
25    Q.  I believe earlier you stated that the

LEXITAS

Page 53

1  investigation into 0424 and 0407 were going on about
2  the same time.  Is that right?
3      A.  Roughly.
4      Q.  Roughly.  And this is -- I guess this
5  supports your statement.  It looks like sergeant McCoy
6  was investigating 0407.  Is that correct?
7      A.  Yes.
8      Q.  But he is providing you information on the
9  ongoing investigation in 0424?
10     A.  Correct.
11     Q.  Okay.  I asked you if sergeant McCoy would
12  update you verbally on the status of investigations.
13  Did he update you verbally on the status of his
14  investigation into 0407?
15     A.  I don't recall.
16     Q.  Did you ever have a -- conversations with
17  him about his investigation into the discovery of the
18  slurs in the women's dorm at station 54?
19     A.  We would have had discussions about that.
20     Q.  What do you remember him telling you about
21  his -- his investigation into the discovery of the
22  slurs?
23     A.  I don't recall.
24     Q.  You don't recall any conversations with
25  sergeant McCoy regarding -- regarding his investigation

Page 54

1  into the discovery of the slurs in the women's dorm at
2  station 54?
3      A.  We would have had an initial conversation on
4  the day that it actually occurred and what the
5  investigators found, what was the preliminary
6  investigation starting to reveal.
7      Q.  Do you remember the contents of those
8  conversations?
9      A.  No.
10     Q.  Do you remember any generalities about the
11  content of those conversations regarding his
12  investigation into 0407?
13     A.  Not specifically.  It's been too long.
14         (Exhibit 3 marked.)
15     Q.  I am going to hand you what is going to be
16  Watkins exhibit 3.  Exhibit 3 is Bates stamped
17  HOU 00006054.  The top of it says confidential, City of
18  Houston interoffice correspondence, and it is dated
19  July 31, 2009.
20         Captain Watkins, will you please review
21  the document?  I am going to ask you some questions
22  about its contents.  Please let me know when you are
23  ready to proceed.
24     A.  All right.
25     Q.  Now, captain Watkins, looking at this

Page 55

1  document, what is this document?
2      A.  This is a notification to the fire chief
3  that an allegation was made against an unknown employee
4  for gender discrimination.
5      Q.  I recognize that you didn't sign this, but
6  do you recognize the person that initialed it above
7  your name?
8      A.  Yes.
9      Q.  Who is that person?
10     A.  That's lieutenant Richard David.
11     Q.  That was the section manager over the
12  criminal investigative unit.  Is that correct?
13     A.  That's correct.
14     Q.  And was he the acting captain in your office
15  at the time?
16     A.  Based on this document, I would say yes.
17     Q.  You have no reason to believe he wasn't
18  active captain?
19     A.  I have no reason to doubt it.  That's
20  correct.
21     Q.  And was Richard David, acting captain and
22  lieutenant -- was he authorized to send this document
23  with your signature on it --
24     A.  Yes.
25     Q.  -- signature block?

Page 56

1      A.  Yes.
2      Q.  Just to make sure I understand the purpose
3  of this document, what was your office informing Phil
4  Boriskie was being investigated?
5      A.  After he received a complaint from Ena --
6  firefighter Draycott that she had filed a gender
7  discrimination complaint against -- at that point it
8  was an unknown employee in the fire department.
9      Q.  Phil Boriskie is being told that Jane
10  Draycott filed a gender discrimination complaint?
11     A.  Yes.
12     Q.  Do you know why this was sent to him?
13     A.  It's just a notification letter that we send
14  in cases such as when -- I would have to review the
15  standard operating procedure in which cases -- it's a
16  routine letter.
17     Q.  Thank you very much.  It's routine for -- is
18  it routine -- is the letter a routine letter that's
19  sent out to a department head --
20     A.  Yes.
21     Q.  -- when a discrimination complaint is being
22  investigated relevant to his unit?
23     A.  In this case, yes.
24     Q.  Thank you.  Now, the letter references
25  retaliation.  Do you see that?



Page 57

1    A.   (Witness moves head up and down.)

2    Q.   It says -- the letter states in the second

3    paragraph:  In filing a complaint, an employee is

4    protected from retaliatory acts by federal laws, state

5    laws, and City rules and regulations.

6         Do you see that, sir?

7    A.   Yes.

8    Q.   Did I read that correctly?

9    A.   Yes.

10   Q.   Okay.  As a captain in OIG and as the -- I

11   believe you were the unit commander?

12   A.   Myself?

13   Q.   Yes, sir.

14   A.   No.  Division commander.

15   Q.   Division commander.  Did your job require

16   that you understand federal law prohibiting retaliation

17   against persons who submit complaints of employment

18   discrimination?

19   A.   Yes.

20   Q.   And retaliation complaints from employees

21   are issues that OIG regularly investigated while you

22   were in OIG?

23   A.   Yes.

24   Q.   Did you have training on what constituted

25   unlawful retaliation?

Page 58

1    A.   Training would have occurred through the

2    department, HPD.  I would have to review those training

3    records, because I don't recall specifically.

4    Q.   The training that you do recall, is it

5    training that you believe is administered to everybody?

6    A.   Yes.

7    Q.   Do you recall receiving any training

8    specifically because you were going to be the commander

9    of the division?

10   A.   No.

11   Q.   No, okay.  I am sorry.  Let me rephrase

12   that.

13        Did you receive any training

14   specifically because you were the commander of the

15   division with respect to unlawful retaliation?

16   A.   No.

17   Q.   Have you ever investigated complaints of

18   retaliation?

19   A.   No.

20   Q.   Why is chief Boriskie directed -- I am

21   sorry.

22        Let me go ahead and restart that

23   question.

24        The last paragraph of exhibit 3 directs

25   chief Boriskie to contact Sandra Robinson if he

Page 59

1    requires additional information.  Do you see that?

2    A.   Yes.

3    Q.   Why is chief Boriskie directed to contact

4    Sandra Robinson if he has -- if he needs additional

5    information?

6    A.   Because the managers of the sections are

7    familiar with any of the day-to-day operations of any

8    investigation.  So they would be able to respond to a

9    department head quicker, in some cases, than I would.

10   Q.   He is not.  Mr. Rodriguez is actually the

11   person that is conducting the investigation into 0424,

12   right?

13   A.   Gonzales.

14   Q.   Gonzales.  Is that correct?

15   A.   Yes.

16   Q.   Is there a reason he is being directed to

17   Ms. Robinson and not Mr. Gonzales?

18   A.   Because Ms. Robinson would be familiar with

19   the investigation, presumably, because managers keep

20   track of their employees on a daily basis.

21   Q.   She is the manager of the ERU?

22   A.   Yes.

23   Q.   That's the division that is investigating --

24   A.   04 --

25   Q.   That's the division that is investigating

Page 60

1    0424?

2    A.   Yes.

3    Q.   Thank you very much.  I do appreciate your

4    willingness to --

5    A.   I am trying to fill in.

6    Q.   I appreciate your willingness to do so, but

7    for the record, let me finish the question.

8    A.   Yes, sir.

9    Q.   At this point I believe there are at least

10   three people that are collecting information in some

11   way for 0424.  Is that correct?  Sergeant McCoy, who --

12   A.   That's --

13   Q.   Let me answer -- ask the question.

14        There is sergeant McCoy, who sent you a

15   memo regarding 0424.  Is that correct?

16   A.   That doesn't mean he is investigating the

17   case.

18   Q.   Correct, but he collected information with

19   respect to it and sent it to you.  Is that correct?

20   A.   That's correct.

21   Q.   There is Mr. Gonzales, who is the

22   investigator in 0424?

23   A.   Correct.

24   Q.   And now there is Ms. Robinson, who you

25   testified that as a section manager she should be aware

Page 61

1  of what Mr. Gonzales is investigating with respect to
2  that case.  Is that correct?
3      A.  Yes.
4          MS. COHEN:  As an update, there is a
5  flash flood warning until 1:30.
6          MR. RUIZ:  Should we go off the record
7  for a second?
8          (Recess from 10:59 to 11:00 a.m.)
9  BY MR. RUIZ:
10     Q.  Jane Draycott's complaint was that she was
11 being subjected to discrimination at station 54.  Do
12 you recall that from her -- from the record of
13 complaint?
14     A.  Yes.
15     Q.  The slurs incident occurred at the same
16 station.  Is that right, sir?
17     A.  Yes, it did.
18     Q.  Now, is it fair to say that the
19 investigation into gender discrimination and the
20 investigation into the slurs was going to involve
21 interviewing some of the same witnesses?
22     A.  It would, yes.
23     Q.  And at the time the investigations were
24 ongoing, did you recognize that a witness may be
25 interviewed twice, once for OIG 0424 and once for 0407?

Page 62

1      A.  I am speculating.  I am sure I would have
2  recognized that.  I don't know specifically.  Too much
3  time has elapsed.
4      Q.  Do you know if your office took any steps to
5  let OIG investigators assigned to the two
6  investigations aware that they would possibly be
7  collecting information from the same witnesses?
8      A.  The investigators may communicate with each
9  other, but I wouldn't know that.  They would -- but
10 it's -- it's investigators in any investigation, as you
11 are aware, that would -- there is always cross talk.
12 So I would assume that this case would be no different,
13 but I don't know specifically.
14     Q.  Thank you.  You don't know specifically
15 whether or not --
16     A.  They communicated about interviewing the
17 same witnesses.
18     Q.  Are you aware of any affirmative efforts
19 that your office took to make sure that the
20 investigators on the two matters were connected on what
21 information they were collecting?
22     A.  I would say that was unnecessary because
23 exhibit 2 shows that there was communication.
24     Q.  Exhibit 2, you are referring to --
25     A.  So investigator McCoy, in referencing 0424,

Page 63

1  automatically knew that there was -- that obviously
2  there was another investigation ongoing.  So --
3      Q.  Can you describe to me how his desk memo to
4  you demonstrates communication with the investigator on
5  0424?
6      A.  I would have to review the investigative
7  case file on 0424, but I believe it's part of the case
8  file --
9      Q.  If it's --
10     A.  -- as an exhibit.
11     Q.  Is that your only understanding, is that
12 this should be part of the case file for 0424?
13     A.  I don't know that it is.  I believe that it
14 is.
15     Q.  Are you aware of any other evidence that
16 demonstrates that the investigators on 0424 and 0407
17 were sharing information with each other?
18     A.  I don't know specifically of the
19 conversations that took place.
20     Q.  Do you know that they were sharing
21 information with each other?
22     A.  Do I know?  I can't say one way or the
23 other.
24     Q.  Should they have been sharing information
25 with each other?

Page 64

1      A.  Common sense would prevail, yeah, to say
2  yes, but I don't know specifically again.
3          (Exhibit 4 marked.)
4      Q.  Sir, I am going to mark what is exhibit 4,
5  Watkins exhibit 4.  Now, Watkins exhibit 4 is Bates
6  stamped HOU 00005870, and it runs through HOU 00005960.
7  When I flip to the page Bates stamped 5871 at the
8  bottom, it states that this document is -- it's from
9  the City of Houston, interoffice correspondence.  It's
10 from Raymond Gonzales, senior investigator.  The title
11 of the document is investigative report.  It's dated
12 December 15th, 2009, and the subject is complaint of
13 Ena Jane Draycott, OIG 09-424.
14         Would you please take a moment to
15 review this document?  I am going to ask you some
16 questions about it.
17     A.  Given that it's a 90-page document, I will
18 say that I can review it as we go along as you ask a
19 question, if that's okay.
20     Q.  In the materials that you reviewed, did you
21 review the investigative report for 09-0424?
22     A.  This document was a part of that, yes.
23     Q.  So you reviewed this document in the last
24 week.  Is that correct?
25     A.  Approximately a week, yeah.



Page 65

1    Q.  It was given to you -- a copy of this was
2  given to you by the City either last Thursday or last
3  Friday?
4    **A.  I believe that the document was given to me**
5  **on Tuesday.**
6    Q.  It was on Tuesday?
7    **A.  Yes.**
8    Q.  Then you reviewed them last Thursday or last
9  Friday?
10   **A.  Yes.**
11   Q.  And the copy of this document would be in
12  the materials that I asked you to provide -- or asked
13  that you provide this morning?
14   **A.  Yes.**
15   Q.  You have reviewed this document before?
16   **A.  Yes.**
17   Q.  Okay, thank you.  Do you recognize it, sir?
18   **A.  Yes.**
19   Q.  Okay.  What is it?
20   **A.  This is the investigative report for**
21  **complaint 09-0424.**
22   Q.  Now, Raymond Gonzales, I understand, is the
23  investigator assigned to 0424?
24   **A.  Correct.**
25   Q.  Who is he sending this to?

Page 66

1    **A.  He is sending this ultimately to George**
2  **Buenik, the inspector general.**
3    Q.  Does it go directly to the inspector
4  general?
5    **A.  No.  There are two levels of review.  His**
6  **manager, direct report, which is Sandra Robinson, who**
7  **we spoke of earlier, and then myself.**
8    Q.  Sir, when -- would you please look at the
9  last page of the -- of the exhibit.  It's Bates stamped
10  HOU 0005690?
11   **A.  5960.**
12   Q.  Thank you.  5960.
13   **A.  Just checking.**
14   Q.  Thank you.  Sir, do you recognize the
15  signatures on this page?
16   **A.  Yes.**
17   Q.  Do you recognize any of those signatures as
18  being yours?
19   **A.  Yes.**
20   Q.  Which one do you recognize as being yours?
21   **A.  One of the -- most illegible on the far**
22  **left index, the upper left signature.**
23   Q.  What I am going to do is I am going to hand
24  you my pen, okay?  I want you to circle on the exhibit
25  which -- which signature is yours.

Page 67

1    **A.  (Witness complies.)**
2    Q.  Now, I want you to go ahead and put the date
3  by that -- by that circle.
4      MS. COHEN:  Today's date?
5      MR. RUIZ:  Today's date.
6    **A.  Next to the circle?**
7  BY MR. RUIZ:
8    Q.  Correct.  Just so we can have record that
9  you identified that as your signature on this date.
10  You can keep that with that.
11      Now, the initials below the signature
12  that you circled, do you recognize those?
13   **A.  Yes.**
14   Q.  Whose initials are those?
15   **A.  Those are chief Buenik's.**
16   Q.  Chief Buenik's, okay, thank you.  What does
17  your signature on this document represent?
18   **A.  That I have reviewed the document.**
19   Q.  Does it mean that you have approved the
20  document?
21   **A.  It would also mean that, yes.**
22   Q.  And that you agree with it, sir?
23   **A.  Yes.**
24   Q.  Now, if -- you said that there were two
25  levels of review between investigator Gonzales and

Page 68

1  inspector general Buenik.  Is that correct?
2    **A.  Yes.**
3    Q.  You said there was Ms. Robinson and then
4  yourself?
5    **A.  Yes.**
6    Q.  Did the document have to be reviewed,
7  approved, and agreed with by Ms. Robinson before it
8  went to your -- for your review?
9    **A.  Yes.**
10   Q.  Okay.  So you and Ms. Robinson don't receive
11  the document at the same time.  She has to review and
12  approve it first?
13   **A.  Yes.**
14   Q.  After she does so, it goes to you?
15   **A.  Yes.**
16   Q.  After you review it, sir -- you approve it
17  and agree with it -- then what happens to it?
18   **A.  It goes to chief Buenik for final approval.**
19   Q.  Now, I understand that there is another type
20  of document that's generated associated with an
21  investigation other than an investigative report.  I
22  understand there is also something called an
23  investigative synopsis?
24   **A.  Correct.**
25   Q.  Is that also called an investigative

Page 69

1  summary?

2  **A.   Correct.**

3  Q.   Now, what I want to know is if that same

4  level or process of review applies to the investigative

5  summary?

6  **A.   Yes.**

7  Q.   Now, let me make sure.

8  The investigative summary for ERU, that

9  wouldn't actually involve the investigator.  Is that

10  correct?

11  **A.   I am sorry.  Say that one more time.**

12  Q.   The investigative summary, that's actually

13  not drafted by the investigator, right?

14  **A.   Let me rephrase that in my -- historically**

15  **sometimes investigation summaries are drafted by the**

16  **investigator.  It's uncommon, but it does occur.  So I**

17  **cannot say it's always done that way.**

18  Q.   No problem.  I was trying to maybe save us

19  some time.  We will go through that document later.

20  **A.   I wish, but I can't say.**

21  Q.   I understand, no problem.  Now,

22  Mr. Gonzales, he was the investigator investigating

23  Jane Draycott's discrimination complaint into gender

24  discrimination, correct?

25  **A.   Yes.**

Page 70

1  Q.   Now, does the investigative report outline

2  the steps that he took?

3  **A.   Yes.**

4  Q.   If he took any other steps or if he took

5  steps to investigate that matter, 0424, should that be

6  documented in the investigative report?

7  **A.   Yes, it should.**

8  Q.   Now, is investigator Gonzales' role simply

9  to collect facts?

10  **A.   Factfinder.**

11  Q.   Factfinder.  Is he supposed to make a

12  determination as to whether or not Jane was

13  discriminated based on gender?

14  **A.   No.**

15  Q.   That's not his role?

16  **A.   Correct.**

17  Q.   Is that correct?

18  **A.   Correct.**

19  Q.   Would you please look at the page Bates

20  stamped HOU 00005885.  Now, halfway down the page, in

21  italics, there is a paragraph that begins with, quote,

22  on November 3rd, 2009, Mr. Bullard submitted a sworn

23  statement to senior investigator Raymond Gonzales of

24  the office of inspector general.  The statement is

25  reprinted below verbatim from the original statement.

Page 71

1  Q.   Do you see that?

2  **A.   Yes.**

3  Q.   I want to ask you about this page through --

4  midway through 5887, okay?  I am just going to ask you

5  a few questions about that.

6  **A.   Okay.**

7  Q.   Now, there is some bolded type and type that

8  is not bolded.

9  Do you see that?

10  **A.   Yes.**

11  Q.   What is in bold?

12  **A.   Beginning with the on November 3rd, 2009?**

13  Q.   No.  Below that paragraph, there are bolded

14  statements and there are statements not in bold, just a

15  regular type, okay?

16  **A.   Okay.**

17  Q.   The bolded statements, other than the word

18  relationship -- let's start with the bolded statement

19  have you ever been in the women's restroom?

20  **A.   Okay.**

21  Q.   What is that bolded statement?

22  **A.   That is the question that's provided to**

23  **the -- in this case, firefighter Bullard.**

24  Q.   So that's the question that investigator

25  Gonzales would pose to the person providing the

Page 72

1  statement?

2  **A.   Yes.**

3  Q.   Is that correct?

4  **A.   Yes.**

5  Q.   Okay.  And the nonbolded information below

6  each bolded statement, is that what the firefighter's

7  response was?

8  **A.   Yes.**

9  Q.   Okay.  Now, I want to direct you to the --

10  the last question -- I am sorry -- the first two

11  questions on page 5886.

12  **A.   Okay.**

13  Q.   The first question is:  Have you urinated on

14  the women's restroom wall, floor, toilet seat, sink,

15  and mirror at fire station 54?

16  Do you see that question, sir?

17  **A.   Yes.**

18  Q.   Did I read that correctly?

19  **A.   Yes.**

20  Q.   The next bolded question is:  Do you have

21  knowledge of any male firefighter urinating on the

22  women's restroom wall, floor, toilet seat, sink, and

23  mirror at fire station 54?

24  Do you see that?

25  **A.   Yes.**

LEXITAS

Page 73

1    Q.  Do you see any other questions relating to
2  males urinating in the women's restroom at station 54?
3    **A.  The previous question asks if any male**
4  **firefighter being in women's restroom or women's dorm.**
5      **The answer, used the dorm.**
6    Q.  You are referring to the previous question
7  on page 5885?
8    **A.  Right.  They are asking about the restroom**
9  **in that question, as well.**
10   Q.  Okay.  So other than those three questions,
11  do you see any other questions regarding males using
12  the women's restroom at station 54?
13   **A.  Yes.  We back up and the question prior to**
14  **that, have you ever been in the women's restroom or**
15  **women's dorm for any reason.**
16   Q.  All right.  With respect to persons
17  urinating on the restroom wall, floor, toilet seat, and
18  sink, do you see any other questions other than the
19  first two on page 5886?
20   **A.  I believe that's all.**
21   Q.  Okay.  So he just kind of point blank asks
22  persons if they did it, right?
23   **A.  Yes.**
24   Q.  Is that what he is -- the extent of his
25  investigation as to -- discovering whether a person or

Page 74

1  male actually urinated on stuff?
2    **A.  Is to ask that question did you or did you**
3  **not do that --**
4    Q.  Correct.
5    **A.  -- or did you or did you not see someone**
6  **that did --**
7    Q.  Correct.
8    **A.  Yes.**
9    Q.  That's the extent of what he is required to
10  do to investigate that claim?
11   **A.  Yes.**
12   Q.  Okay.  Do you know if he did anything other
13  than ask persons point blank whether the person had
14  urinated on the women's restroom wall, floor, seat --
15  toilet seat, sink, and mirror at fire station 54?
16   **A.  I do not know.**
17   Q.  Does Mr. Gonzales need to assess a witness'
18  credibility?
19   **A.  No.  In this case, no.**
20   Q.  What cases would he have to assess a
21  witness' credibility?
22   **A.  In this case he needed -- he is required to**
23  **interview all firefighters that would have been**
24  **associated with that particular station.  So all**
25  **firefighters would have been interviewed.**

Page 75

1    Q.  I know.  I asked if he was supposed to
2  assess a witness' credibility.  You said not in this
3  case.
4      I am asking in what cases would he?
5    **A.  If -- I am trying to think of an example.**
6  **Perhaps if we identified a pattern of misconduct, that**
7  **would question -- that would bring a credibility issue**
8  **to the -- to that particular firefighter as an example.**
9  **Not specifically to this, but as an example of such.**
10   Q.  But in this particular case, he wasn't
11  required to assess a witness' credibility?
12   **A.  I do not know if he -- I do not know.**
13   Q.  Okay.  If he doesn't believe a witness, what
14  is he supposed to do?
15   **A.  Well, we are limited because of chapter 143**
16  **in how we investigate sworn personnel, firefighters.**
17  **So unless there is a pattern that we can establish,**
18  **then there is not much else we can do unless there is**
19  **something that specifically targets that person.**
20  **Now....**
21   Q.  In this particular situation when the
22  complaint involved firefighters, when he asked, you
23  know, did you do it point blank, I mean, he just has to
24  accept the no?
25   **A.  Unless there is reason to doubt that that**

Page 76

1  **employee is dishonest, they are required to speak**
2  **truthfully.  So there would be no reason to doubt that.**
3    Q.  So how long have you been with the -- how
4  long were you with the police department, sir?
5    **A.  40 years.**
6    Q.  40 years.  In that time, you believe that
7  everybody that you worked with or interviewed or
8  investigated spoke truthfully?
9      MS. COHEN:  Objection; overbroad.
10   **A.  Not everyone is truthful.**
11  BY MR. RUIZ:
12   Q.  Agreed.  So in this situation, what other
13  tool does Mr. Gonzales have other than asking a person
14  point blank did you do what she says, or did you
15  urinate in the women's restroom as she is alleging you
16  did?
17   **A.  That would be the initial line of**
18  **questioning.  You gather the responses from all the**
19  **firefighters.  You review those responses and see that**
20  **they are consistent or if there is any inconsistencies.**
21  **And then you -- if the investigation**
22  **warrants -- for example, if somebody said -- I am**
23  **giving an example -- yes, firefighter A, I have seen**
24  **him numerous times in the women's restroom and it was**
25  **one of the dates that was targeted by Ms. Draycott,**



Page 77

1  then we would establish that as lack of credibility.

2       That did not occur in this case, I

3  believe.

4       Q.  When you -- did you review -- you did review

5  this report?

6       A.  Yes.

7       Q.  And you approved of it, correct, approved of

8  the investigation?

9       A.  At the time, yes.

10      Q.  Now, did you think that -- when you reviewed

11  the questions that were being asked by Mr. Gonzales,

12  did you think those were effective questions to ask a

13  person?

14      A.  Effective?  Effective?

15      Q.  Correct.  That it's an effective technique

16  to ask a person point blank have you urinated on the

17  walls -- restroom wall, floor, toilet seat, sink, and

18  mirror at the fire station?

19      A.  Yes, if you are dealing with honest

20  employees, yes.

21      Q.  You think that a person would admit to that?

22      A.  No.  A person that's dishonest would not

23  admit to that, but other statements from other

24  personnel would lead us to that -- we would hope that

25  would lead us to that employee that was being

Page 78

1  dishonest.

2       Q.  So you wouldn't expect an employee to admit

3  to it, but you would expect other employees to provide

4  information about another employee?  Is that what you

5  are saying?

6       A.  An employee may very well admit to it.  Just

7  in this particular case, other than admitting to going

8  to the restroom, that's as far as it went.

9       Q.  Other than the questions that are listed on

10  this page, do you know of any other investigative tools

11  that Mr. Gonzales used to investigate 0424?

12      A.  I do not know.

13      Q.  Now, earlier we talked about the larger

14  question in 0424.  You know, the sub questions were,

15  you know, were men urinating in the women's restroom,

16  and if you recall, the larger question was, was this --

17  were the things happening to her because of her gender.

18  Is that fair?  Do you recall that conversation between

19  you and I?

20      A.  Yes.

21      Q.  Now, is Mr. Gonzales responsible for

22  answering that larger question was she being

23  discriminated against based on her gender?

24      A.  He is responsible for investigating the

25  specific allegations that were made.

Page 79

1       Q.  But not for answering the ultimate larger

2  question?

3       A.  That's correct.

4       Q.  Okay.  Now, if he is not responsible for

5  answering that question, who is?

6       A.  Again, the discussion was that aspect of the

7  investigation was being investigated by the EEOC.  So

8  ultimately, they would make that determination.

9       Q.  Your understanding is nobody at OIG was

10  going to answer that larger question?

11      A.  I am saying that in the investigative

12  report, that question, as you phrased it, was not

13  answered -- let me finish -- in the investigative

14  summary.

15      Q.  Is it answered somewhere else?

16      A.  No.  But what I am saying is I want to be

17  specific as to where -- if you wanted to turn to a

18  particular page, you could say that's where it would

19  have been.

20      Q.  If it were answered, it would be in the

21  investigative summary.

22          To be fair, you -- we would never find

23  it in the investigative report.  Is that right?

24      A.  No, but it would be -- again, it was not

25  hidden.  Every document, most documents contain that

Page 80

1  element, so it was based on gender discrimination.

2       Q.  I just want to make sure I am clear, captain

3  Watkins.

4          In investigation OIG 09-0424, the

5  larger question as to whether or not Jane Draycott was

6  being discriminated against because of her gender --

7  discriminated against because of her gender won't be in

8  the investigative summary because it was being

9  investigated by the EEOC?

10      A.  I am saying that in this case it was not in

11  the investigative summary.

12      Q.  Okay.  And I want to know why.

13      A.  You asked me why.  I said specifically that,

14  you know, I know the EEOC is investigating that

15  particular aspect of the complaint.

16      Q.  And is that the reason why it's not

17  mentioned or --

18      A.  I am saying that could be the reason why.

19      Q.  That could be the reason why, but do you

20  know the reason why it's not addressed?

21      A.  I am saying that I don't -- it's not there,

22  and all I can -- all I can testify to is what's

23  actually in the document.

24      Q.  Captain Watkins, I know it's not there.  I

25  am trying to figure out why it's not there.  If you



Page 81

1   don't know why it's not there, that's fine.  But if
2   it's because it's being investigated by the EEOC, fine.
3   Tell me that.  If you don't know why --
4       **A.   I have already told you that.**
5       Q.   You are saying it could be because of that.
6   I want to know if you know that that's why it's not
7   addressed in there?
8       **A.   I don't know specifically, because I don't**
9   **recall the conversations.  I am speculating as to --**
10  **since it's been ten years, I am speculating in this**
11  **particular case why it didn't happen to be listed in**
12  **the summary that you are trying to get me to go to.**
13  **And I simply can't do that because I don't remember.**
14      MR. RUIZ:  Let's take a five-minute
15  break.
16      (Recess from 11:29 to 11:36 a.m.)
17      (Exhibit 5 marked.)
18  BY MR. RUIZ:
19      Q.   We are back on the record.  Sir, I am going
20  to hand you what is going to be exhibit 5, Watkins
21  exhibit 5.  Now, exhibit 5 is Bates stamped
22  HOU 00005851, and it runs through HOU 00005865.  If you
23  flip the first page over, it's titled confidential at
24  the top, City of Houston, interoffice correspondence.
25  It's dated December 21st, 2009.  And the subject is

Page 82

1   complaint of Ena Jane Draycott, OIG 09-0424.  It's
2   bolded before the first paragraph investigative
3   synopsis.
4       Would you please review this document,
5   sir?  I am going to ask you some questions about its
6   contents.
7       **A.   This document, I reviewed this document.**
8       Q.   When did you review this document, sir?
9       **A.   This would have been reviewed last Thursday**
10  **or Friday -- Thursday or Friday of last week.**
11      Q.   A copy of this was provided to you by the
12  City?
13      **A.   That's correct.**
14      Q.   Okay.  Now, who authored this document?
15      **A.   I am sorry?**
16      Q.   Who authored this document?
17      **A.   That would have been Sandra W. Robinson, the**
18  **division manager of OIG ERU.**
19      Q.   ERU?  And is this the investigative synopsis
20  that you and I have discussed earlier?
21      **A.   Yes.**
22      Q.   Can you describe to me what is in an
23  investigative synopsis?
24      **A.   It's a summary of the investigative report**
25  **and then a section at the end for -- for -- a**

Page 83

1   **conclusion to have been drawn for a disposition of the**
2   **specific allegations.**
3       Q.   So there is essentially two parts.  It's a
4   summary of the facts contained in the investigative
5   report?
6       **A.   Yes.**
7       Q.   And at the end I believe you said there
8   would be a section on conclusions and recommendations?
9       **A.   Yes.**
10      Q.   Is that correct?
11      **A.   Yes.**
12      Q.   Okay.  Now, we have been discussing whether
13  or not the larger question of whether Ms. Draycott was
14  being subjected to discrimination based on her gender
15  had been addressed.  Do you remember us talking about
16  that?
17      **A.   Yes.**
18      Q.   Okay.  Now, my understanding from our
19  conversations is that that larger question is not
20  addressed in this investigative synopsis.  Is that
21  correct?
22      **A.   That's correct.**
23      Q.   And my understanding from our conversations
24  is that you believe that could be because there was an
25  ongoing investigation by the EEOC?

Page 84

1       **A.   Yes.**
2       Q.   Now, if there wasn't an ongoing
3   investigation by the EEOC into the same matter, would
4   you expect that larger question to be addressed in the
5   investigative synopsis?
6       **A.   It may very well have been.**
7       Q.   Would you -- while you were in command at
8   OIG, would you expect that larger question to be
9   addressed when an investigator submitted an
10  investigative synopsis to you?
11      **A.   Too much time has gone by to answer that**
12  **definitively.**
13      Q.   Okay.  Sir, would you please flip to
14  page 5865?  It's the last page in the document, sir.
15  Do you recognize your signature on that document?
16      **A.   Yes.**
17      Q.   Okay.  What does your signature on this
18  document represent?
19      **A.   That it had been reviewed and approved.**
20      Q.   Does it also mean that you agreed with its
21  contents?
22      **A.   Yes.**
23      Q.   Do you recall discussing -- okay.  Let me
24  understand.
25      Going back to the first page of the



Page 85

1 synopsis where it illustrates that the document is from
2 Ms. Robinson, ultimately to the inspector general
3 Buenik and to you, sir, is there a level of review
4 between Sandra Robinson and director Buenik before it
5 arrives on director Buenik's desk?
6     **A.   That would be myself.**
7     Q.   So do you review and approve the document
8 before it's provided to the inspector general:
9 Mr. Buenik?
10     **A.   Yes.**
11     Q.   Okay.  Do you recall having any
12 conversations with Ms. Robinson about the investigative
13 synopsis she provided to you?
14     **A.   It's been too much time.  I can't remember.**
15         (Exhibit 6 marked.)
16     Q.   I am going to hand you what is going to be
17 marked as Watkins exhibit 6.  Watkins exhibit 6 is
18 Bates stamped HOU 00005844.  The top of it says it
19 confidential, City of Houston.  It's dated
20 January 13th, 2010, and the subject of the document
21 re: line is OIG 2009-0424.
22         Would you please review the document,
23 and let me know when you are ready for me to answer --
24 ask some questions about its contents?
25     **A.   I have reviewed the document.**

Page 86

1     Q.   When you say you reviewed the document, did
2 you just review it today, or was it part of the -- was
3 it one of the documents --
4     **A.   Yes.  Part of the documents that were --**
5     Q.   Is it one of the documents that the City
6 provided for you to review?
7     **A.   Yes.**
8     Q.   And this document, it relates to
9 investigation 0424.  Is that correct?
10     **A.   That's correct.**
11     Q.   Now, is this document -- what is this
12 document?
13     **A.   This is a final disposition letter sent to**
14 **complainant -- in this case, firefighter Draycott -- of**
15 **the results of the investigation of OIG 209-0424.**
16     Q.   So you say it was a final disposition
17 letter.  Is that what you called it?
18     **A.   Yes.  It probably is referred to by other**
19 **names.**
20     Q.   All right.  And is it a letter that's
21 generated at the conclusion of the investigation of
22 09-0424?
23     **A.   Yes.**
24     Q.   And it is sent to the complainant.  Is that
25 correct?

Page 87

1     **A.   Correct.**
2     Q.   Now, does the letter to Ms. Draycott address
3 that larger question of gender discrimination that we
4 have been discussing?
5     **A.   No.**
6     Q.   Do you know why this letter does not address
7 that larger question of gender discrimination that we
8 have been discussing?
9         MS. COHEN:  Objection; calls for
10 speculation.
11     **A.   I don't recall.**
12 BY MR. RUIZ:
13     Q.   Do you know if Ms. Draycott was ever
14 informed whether or not the City found -- whether or
15 not she was being subjected to gender discrimination?
16     **A.   I do not know.**
17     Q.   You do not know, okay.  Captain Watkins, are
18 there any other investigative techniques that could
19 have been used in investigation 0424 to find out who
20 was responsible for the conduct Jane Draycott
21 complained of?
22         MS. COHEN:  Objection; overbroad, calls
23 for speculation.
24     **A.   I would have to go back and review the**
25 **investigation to say -- to answer that question with**

Page 88

1 **some level of confidence.**
2 BY MR. RUIZ:
3     Q.   Well, let's look at the investigative
4 report, okay?  The investigative report is exhibit 4.
5 That should be in front of you.
6         And you testified that if a process was
7 used to investigate it, it should be described in the
8 investigative report.  Is that correct?
9     **A.   Yes.**
10     Q.   Okay.  Now, did Mr. Gonzales do anything
11 other than interview witnesses and take witness
12 statements in investigating 0424?
13     **A.   Yes, he did.**
14     Q.   What else did he do other than take witness
15 statements?
16     **A.   Exhibit 46, he collected work orders from**
17 **the cold water incident.  He collected the other**
18 **incident, the daily work roster, daily work --**
19 **exhibit 48, work orders for fire station 54; hot water**
20 **not working, exhibit 49; alarm system work orders by --**
21 **status, work orders; work orders 52 through --**
22 **through 52; other e-mails that were collected in**
23 **exhibit 53.  There was the document I referenced a**
24 **little while ago, the sergeant McCoy memo that he did**
25 **in fact reference in exhibit 54; and then copies of**



Page 89

1 correspondence that -- the EEOC complaint and various
2 other pieces of correspondence.
3        I don't think you need me to list them
4 here.
5    Q.   So he interviewed witnesses.  He collected
6 statements and then collected some other documents that
7 he thought were relevant to the investigation?
8    A.   That's correct.
9    Q.   Do you know of any other investigative
10 techniques that he could have used?
11    A.   In this particular case?  Since we are
12 reporting after the fact, no.
13    Q.   Could evidence have been collected at the
14 time?
15    A.   Depends on the circumstances.
16    Q.   Okay.  If there were other investigative
17 techniques that were used, they should be in this
18 report.  Is that correct?
19    A.   If there were.
20    Q.   Correct, right?
21    A.   Yes.
22    Q.   If he did something, it should be in this
23 report, right?
24    A.   Yes.
25        MR. RUIZ:  Okay.  Thank you very much.

Page 90

1 I am at a really good stopping place for lunch.  Go off
2 the record.
3        (Recess from 11:50 a.m. to 12:37 p.m.)
4 BY MR. RUIZ:
5    Q.   We are going to go back on the record.
6        Captain Watkins, we are back from our
7 break.  Do you understand that you are still under
8 oath?
9    A.   Yes.
10    Q.   Thank you.  Sir, when we left off, we were
11 looking at exhibit 5, the investigative synopsis for
12 09-0424.  Would you please look at it, sir?
13    A.   All right.
14    Q.   Now, on the last two pages, there is some
15 different recommendations that are made by the author,
16 Sandra Robinson.  Do you see those?
17    A.   Yes.
18    Q.   OIG, if there was recommendations that were
19 being made, the recommendations to take actions, it's
20 not OIG that actually would take that action.  Is that
21 correct?
22    A.   Are you talking about disciplinary action?
23 That's correct.
24    Q.   That is correct.  What division does this
25 document go to?

Page 91

1    A.   Once it's signed off by the inspector
2 general.
3    Q.   Yes, sir.
4    A.   Then it would go to City legal and to the
5 department head.
6    Q.   In this case, being that it was with the
7 Houston Fire Department, it would have gone to chief
8 Boriskie?
9    A.   That's correct.
10    Q.   Would it have also gone to an office called
11 staff services?  Is that correct?
12    A.   Well, it would have gone to chief Boriskie.
13 Now, who actually receives it and opens it and time
14 stamps it.  I don't know.
15    Q.   But the OIG would not have had any
16 responsibility for taking any disciplinary actions?
17    A.   That's right.
18    Q.   Thank you very much.  I am done with that
19 exhibit.
20        Sir, I want to move on to another
21 investigation that we have been discussing, focus on
22 that incident now and that investigation.  It's
23 investigation 09-0407.  It is the incident involving
24 the discovery of the slurs at -- in the women's dorm at
25 station 54.  Do you understand that?

Page 92

1    A.   Yes.
2    Q.   Okay.  Do you recall that incident
3 occurring, sir?
4    A.   Yes.
5    Q.   And OIG investigated that incident.  Is that
6 correct?
7    A.   Yes.
8    Q.   Did OIG approach that session as an
9 employment discrimination case or as a criminal case?
10    A.   Criminal case.
11    Q.   Could it also have been approached as an
12 employment discrimination case?
13    A.   Not at the time of the occurrence.
14    Q.   Not at the time of occurrence.  Why not?
15    A.   Because we were -- at the time we wanted to
16 ascertain if it was a graffiti-related incident or if
17 it was something other than that.
18    Q.   I want to see -- ask you about the beginning
19 of the investigation, okay?
20        When the -- after the slurs were
21 discovered and OIG initiated an investigation, what
22 division or section was the investigation assigned to?
23    A.   Still the criminal investigations.
24    Q.   Criminal -- the criminal investigation unit?
25    A.   That's correct.



Page 93

1    Q.  I believe that one is -- the section manager
2  of that one is lieutenant David?
3    A.  David, correct.
4    Q.  What do you remember about the beginning of
5  the investigation?
6    **A.  In terms of how the call came through or in**
7  **terms of how we responded or --**
8    Q.  Let's start with how the call came through.
9  What do you remember about that?
10   **A.  Call came through from someone from the fire**
11 **department.  We received it in our office.  I don't**
12 **recall the time.  It was somewhere between 6:30 and --**
13 **a.m. somewhere around that time on July 7th, I believe.**
14       **Lieutenant David contacted me.**
15       **We sent two investigators and called**
16 **for them to send a crime scene unit, based on the fact**
17 **that it came in as a discrimination -- not a**
18 **discrimination -- excuse me -- very big -- there is**
19 **some sort of graffiti-type call in one of the fire**
20 **stations.  It was on Intercontinental premises, which**
21 **is, as you know, more secure than most of the other**
22 **fire stations.**
23   Q.  Do you know if sergeant McCoy was one of the
24 investigators that was sent to the fire station that
25 day?

Page 94

1    **A.  Correct, yes, yes.**
2    Q.  Sergeant McCoy was sent to the fire station
3  that day?
4    **A.  Yes.**
5    Q.  Is there any particular reason that sergeant
6  McCoy was assigned to the investigation?
7    **A.  He was probably next up on the callout list,**
8  **but I could be mistaken.**
9    Q.  What is the callout list?
10   **A.  That is the individuals who are assigned to**
11 **respond to calls after hours, and that rotates among**
12 **investigators as need be.**
13   Q.  So there is a list, and if something comes
14 up and you are next on the list, you are just assigned
15 to that investigation?
16   **A.  That is correct.**
17   Q.  Thank you.  You mentioned that there were
18 two investigators that were sent out to the station
19 that day?
20   **A.  Yes.**
21   Q.  Other than sergeant McCoy, do you know who
22 else was sent?
23   **A.  Sergeant Ronnie Perret or Ronald Perret,**
24 **P-e-r-r-e-t -- maybe double T.  I'm not sure.**
25   Q.  What is your understanding of how sergeant

Page 95

1  Perret was assigned to go out to station 54?
2    **A.  It would have been along the same lines that**
3  **we knew that an incident such as that -- we would have**
4  **to obtain statements from anybody that was currently**
5  **there before anybody could go.  We needed that --**
6  **enough investigative muscle to make sure that could**
7  **happen in a relatively -- relatively fast time period.**
8    Q.  Trying to staff it appropriately given what
9  it was.  Is that what it was?
10   **A.  Yes.**
11   Q.  Okay.  Now, going forward after the
12 beginning of the investigation, was it sergeant McCoy
13 or sergeant Perret that was -- did both remain
14 assigned to investigate the case?
15   **A.  Cases become assigned to lead investigators.**
16 **Once the initial callout is completed, that would have**
17 **been assigned to sergeant McCoy as the lead**
18 **investigator.**
19   Q.  Would sergeant -- was it sergeant Perret?
20 Was that his rank, sergeant, as well?
21   **A.  Yes.**
22   Q.  What is sergeant Parrett's first name?
23   **A.  Ronald.**
24   Q.  And sergeant McCoy, what is his first name?
25   **A.  David.**

Page 96

1    Q.  Would sergeant Perret have remained on the
2  investigation as an investigator?
3    **A.  Sergeant Perret would have remained as an**
4  **investigator as needed, but again, the lead**
5  **investigator is -- is that, the -- it's assigned to a**
6  **singular individual that's responsible.**
7    Q.  Do you remember if sergeant McCoy provided
8  you verbal updates with respect to 0407?
9    **A.  It's been a very long time, but that was a**
10 **very serious investigation.  So we discussed that all**
11 **the time, and it was between myself and sergeant McCoy,**
12 **myself and lieutenant David, myself and other members**
13 **of the department.**
14   Q.  Why did you say it was a very important
15 investigation?
16   **A.  Because of the seriousness of the**
17 **allegation.**
18   Q.  I am sorry.  Just so I understand, when you
19 say the allegation, what is the allegation you were
20 referring to?
21   **A.  Well, the criminal mischief, based on the**
22 **language that was used in the criminal mischief.**
23   Q.  Was it -- is it the nature of the crime that
24 makes it so important?
25   **A.  Yes, yes.**



Page 97

1    Q.  Okay.  Now, you said discuss it all the time
2  with sergeant McCoy and lieutenant David.  Is that
3  correct?
4    **A.  Yes, often.**
5    Q.  Would you offer guidance on investigatory
6  tools that should be employed in the investigation?
7    **A.  As need be, yes.**
8    Q.  Do you remember giving them any direction
9  with respect to their investigation?
10   **A.  Specifically, no.**
11   Q.  The purpose of your conversations with
12 lieutenant McCoy -- I am sorry -- sergeant McCoy, was
13 it to provide him direction or for you to obtain
14 information?
15   **A.  It was to provide me with information as to**
16 **how the investigation was proceeding.**
17   Q.  So in the conversations between you and
18 sergeant McCoy, it would have been him updating you on
19 the progress in the investigation?
20   **A.  Yes.**
21   Q.  Okay.  And with respect to conversations in
22 which lieutenant David were involved, was it for you to
23 provide him with direction or for him to provide you
24 with information with respect to how the information
25 was -- how the investigation was proceeding?

Page 98

1    **A.  Well, part of my responsibility would be to**
2  **provide direction if need be.  I don't recall in this**
3  **case if that was necessary.  I don't remember.**
4    Q.  But with respect to sergeant McCoy, you
5  remember it was primarily for him to provide you with
6  information?
7    **A.  Yes.**
8      (Exhibit 7 marked.)
9    Q.  Captain Watkins, I am handing you what is
10 going to be marked as exhibit 7.  Now, exhibit 7 is
11 Bates marked HOU 00000729, and it runs through
12 HOU 0000773.  It's dated November 19th, 2009.  It's --
13 the top says confidential, City of Houston, and the
14 title of the document is investigative report.
15    Please take a moment to review the
16 document.  I am going to ask you about its contents.
17   **A.  Well, I have reviewed this document**
18 **previously.  A lot of the pages are illegible on this**
19 **copy.**
20   Q.  Let me get you a legible copy.  You may want
21 to switch out the sticker.
22   **A.  Yes, I have reviewed this document.**
23   Q.  Sir, is this one of the documents that the
24 City provided you for review last week?
25   **A.  Yes.**

Page 99

1    Q.  And is it the investigative report for
2  investigation OIG 2009-0407?
3    **A.  Correct.**
4    Q.  And is this sergeant McCoy's written work
5  product?
6    **A.  Yes.**
7    Q.  Will you please tell me what the
8  investigative report for 09-0407 describes?
9    **A.  It describes the steps taken in the**
10 **investigation, any evidence that may have been**
11 **collected, any exhibits that may have been collected in**
12 **the form of documents, and then any investigative notes**
13 **that were pertinent to the investigation.**
14   Q.  So is this essentially a summary of the
15 evidence that was collected with respect to that
16 investigation?
17   **A.  It would be a list of the evidence that was**
18 **collected, yes.**
19   Q.  If there was evidence collected that was
20 important to the investigation OIG 0407, would that
21 evidence be described in this document?
22   **A.  It would be documented here, yeah.**
23   Q.  If sergeant McCoy found evidence important
24 to OIG investigation 09-0407, am I correct that the
25 evidence would be referenced in the investigative

Page 100

1  report?
2    **A.  It should be, correct.**
3    Q.  Now, does the report also describe the
4  processes used by the Houston Police Department to
5  summarize the evidence described in the report?
6    **A.  Yes.**
7    Q.  I believe if you reviewed the document, one
8  of the processes described was statements taken from
9  firefighters?
10   **A.  Correct.**
11   Q.  Were handwriting samples collected from
12 firefighters present during a set time frame?
13   **A.  Yes.**
14   Q.  Was one of the processes used in
15 investigating the matter submitting handwriting
16 analysis material to the FBI?
17   **A.  Yes.**
18   Q.  Were polygraphs administered to more than a
19 dozen firefighters?
20   **A.  Yes.**
21   Q.  Were gate entry times for different
22 firefighters collected and reviewed by the office of
23 inspector general?
24   **A.  Yes.**
25   Q.  Do you know of any other investigative tools



Page 101

1  that were used in OIG 09-0407?

2  **A.  You did cover the polygraph?**

3  Q.  Yes, sir.

4  **A.  I don't know the exact number of people who**

5  **were polygraphed.**

6  Q.  That's fine.  But do you know of any other

7  investigative tools other than the ones I have just

8  asked about that were used?

9  **A.  There may have been others.**

10  Q.  There may have been others?

11  **A.  Yeah.**

12  Q.  Okay.

13  **A.  Well, in fact, I just thought of one, crime**

14  **scene unit was called to the scene.  And officer**

15  **Verbitskey.  I think I mentioned that earlier that we**

16  **had called for a crime scene unit.**

17  Q.  You did, sir.  I am sorry I didn't recall

18  that.

19  I didn't catch the pronunciation --

20  **A.  Verbitskey.**

21  Q.  Verbitskey?

22  **A.  Yes, V-e-r-b-i-t-s-k-e-y, on 0000729.**

23  Q.  Thank you very much.

24  **A.  Lorenzo.**

25  Q.  So sir, do you feel that there was a

Page 102

1  complete investigation that was conducted by OIG with

2  respect to 09-0407?

3  **A.  Yes.**

4  Q.  Is there any investigative tool that you

5  think should have been used that was not?

6  **A.  I am not aware of any.**

7  Q.  I am going to hand you what is going to be

8  marked as exhibit 8.  Would you please review

9  exhibit 8?  It is Bates stamped HOU 00001496 through

10  HOU 00001540.  It's dated March 23rd -- I am looking at

11  the wrong exhibit.

12  **A.  It's all right.  My phone went off.**

13  **What was the last number?  0001541?**

14  Q.  I think I gave you the wrong exhibit.  I

15  apologize.  That's exhibit 7.

16  I gave you a copy of another

17  investigative report and marked it with a different

18  exhibit.  I apologize.

19  So what I am doing is I am taking back

20  what I gave to you, okay?

21  MS. COHEN:  You realize these are two

22  different dates, right?  They are not the same report.

23  (Exhibit 8 marked.)

24  MR. RUIZ:  I have re-marked exhibit 8,

25  okay?  I am handing it to you, sir.

Page 103

1  BY MR. RUIZ:

2  Q.  Now, exhibit 8, sir, it's Bates stamped

3  HOU 00001472, and it runs through HOU 0001494.

4  **A.  1495?**

5  Q.  Thank you, 1495, sir.  It's dated

6  March 30th, 2010.  The subject is OIG 2009407.  That's

7  the front page, okay.

8  Now, if you flip to the second page,

9  which is Bates stamped HOU 0001473, it's dated

10  March 23, 2010.  The subject is complaint of Ena Jane

11  Draycott and PD Keyes, OIG 09-0407.  The title of the

12  document is investigative summary.

13  Do you see that, sir?

14  **A.  Yes.**

15  Q.  Would you please take a moment to review the

16  document?  I am going to ask you some questions about

17  it.

18  **A.  I have reviewed this document previously.**

19  Q.  Is -- is this one of the documents that the

20  City provided to you last week for your review?

21  **A.  Yes.**

22  Q.  Before the City had provided it to you for

23  your review, had you seen it before?

24  **A.  This?**

25  Q.  Have you seen exhibit 8 before the City

Page 104

1  provided it to you?

2  **A.  Well, I would assume so.  My signature is on**

3  **the first page.**

4  Q.  Okay.  Now, is this the investigative

5  summary for investigation 09-0407?

6  **A.  It's a -- I believe it's an update once the**

7  **FBI handwriting analysis was received.**

8  Q.  When you say it was an update, was there an

9  earlier version?

10  **A.  Yes, the initial version where the**

11  **handwriting analysis was reviewed by the Department of**

12  **Public Safety only.**

13  Q.  Would there be anything in this -- so does

14  this document include more information than the

15  previous summary or less?

16  **A.  It includes more.  It includes the FBI**

17  **handwriting analysis.**

18  Q.  Was that information relating to the FBI

19  analysis just added to the previous document?

20  **A.  That's correct, as an addendum, yes.**

21  Q.  Okay.  Now, what is the purpose of this

22  investigative summary?

23  **A.  Exhibit 8?**

24  Q.  No.  Just -- exhibit 8, yes, sir.  What is

25  the purpose of this investigative summary?



Page 105

1      A.  Purpose is to summarize the investigation
2   and to reach conclusions and recommendations as to the
3   final outcome and disposition.
4      Q.  Now, looking at Bates No. HOU 00001473, the
5   second page of the document, I just want to go through
6   the review process for this document, okay?  Was it
7   drafted by lieutenant David?
8      A.  I don't know specifically.  I would assume
9   so.  It was turned in by lieutenant David, but I don't
10  know specifically if he drafted the entire document
11  himself.
12     Q.  Okay.  It's from lieutenant David.  Before
13  it goes to inspector general Buenik, does it go to you?
14     A.  Yes, it does.
15     Q.  Do you read, review, and approve it before
16  it goes to the inspector general?
17     A.  Yes, I do.
18     Q.  So when it goes to the inspector general,
19  you have already read, reviewed, and approved whatever
20  is in this document?
21     A.  Yes.
22     Q.  Okay, thank you.  The investigative summary,
23  does it differ -- the investigative summary for 09-407,
24  does it differ from the investigative report in that
25  it -- the investigative summary also includes

Page 106

1   conclusions and recommendations?
2      A.  Would you mind repeating that?
3      Q.  Sure.  There is -- we have covered the
4   investigative report for 09-407?
5      A.  Yes.
6      Q.  Now we are looking at the investigative
7   summary for 09-407?
8      A.  Yes.
9      Q.  I want to understand the difference between
10  the two.  My understanding is the investigative report
11  details evidence that was collected.  Is that fair?
12     A.  Yes.
13     Q.  Okay.  And in addition to summarizing some
14  evidence, the investigative summary also puts forth
15  some conclusions and recommendations?
16     A.  Yes.
17     Q.  Is that fair?
18     A.  Yes, conclusion and recommendations.
19     Q.  Now, if there was evidence that was
20  collected by OIG that was important to the
21  investigation of 407, would that be described in this
22  document in the investigative summary?
23     A.  Yes.
24     Q.  Okay.  If you knew of evidence important to
25  OIG investigation 0407, am I correct that that evidence

Page 107

1   would be referenced in the investigative summary?
2      A.  It should be, correct.
3      Q.  Now, after all the steps that are taken, you
4   know, in the investigation -- we covered those
5   different investigative tools -- does the investigative
6   report and the investigative summary identify the
7   individual responsible for the slurs found on the walls
8   of the women's dorm at station 54?
9      A.  No, it does not.
10     Q.  Now, based on the investigation, can you say
11  who is responsible for the slurs found on the walls of
12  the women' dorm in station 54?
13     A.  No.
14     Q.  Did that investigation 0407 even conclude
15  that even one person is responsible for the slurs found
16  on the walls of the women' dorm on station 54?
17     A.  No, it did not.
18     Q.  Did the OIG establish that it was actually a
19  firefighter who was responsible for the slurs found on
20  the walls at the women's dorm at station 54?
21     A.  The conclusion was drawn because the access
22  in the fire station between -- there was an
23  exterminator that came in that provided a statement
24  that said that had that occurred the day before -- at
25  12:53, I believe was the time -- that it would not have

Page 108

1   gone unnoticed.
2      So we knew from that point forward that
3   we had a document that listed all the people that
4   entered the facility between that time frame and the
5   time it was discovered by firefighter Draycott.
6      So the conclusion would be based on
7   that and could be -- and the fact that a firefighter
8   was the likely suspect of that event.
9      Q.  So they concluded that a firefighter did it,
10  or they concluded that a firefighter was the likely
11  suspect?  I will go ahead and refer you to page
12  HOU 001494, the last paragraph.
13     A.  Appears it is likely is as the document
14  stated.
15     Q.  So --
16     A.  It does not eliminate some other person --
17  that some other person could have entered the facility.
18     Q.  Let me ask that question again.
19      So did the OIG establish that it was
20  actually a firefighter who was responsible for the
21  slurs --
22     A.  No.
23     Q.  -- found on the walls of the women's dorm at
24  station 54?
25     A.  No.



Page 109

1    Q.   Sir, prior to the drafting of the
2  investigative report by sergeant McCoy, prior to its
3  drafting, did you provide chief Boriskie with updates
4  on the status of this investigation?
5    A.   I spoke with chief Boriskie about the
6  initial polygraphs, gaining his permission for us to
7  begin extraordinary circumstances to polygraph the
8  firefighters.
9            There may have been one other
10  additional conversation, but it didn't detail any
11  aspects of the investigation itself.
12            So as far as updates, no, I did not
13  give him general updates.
14    Q.   Did he ask you for updates?
15    A.   Most department directors do.  I can't say
16  that he did, because it's too much time has gone by,
17  and I don't -- I did not notate that.
18    Q.   Did you tell him that the Houston Police
19  Department was close to arresting Jane Draycott in
20  connection with the investigation into the slurs?
21    A.   No.
22    Q.   No, you did not?
23    A.   No.
24    Q.   Was the Houston Police Department close to
25  making an arrest of Jane Draycott in connection with

Page 110

1  the slurs discovered in the restroom or in the women's
2  rest -- in the women's dorm in station 54?
3    A.   No.
4    Q.   Did sergeant McCoy ever tell you that the
5  Houston Police Department was close to arresting Jane
6  in connection with the slurs found in the women's dorm
7  at station 54?
8    A.   Sergeant McCoy would not make that call.
9  The answer to that would be no.
10    MR. RUIZ:   Take just a three-minute
11  break.
12            (Recess from 1:10 to 1:20 p.m.)
13  BY MR. RUIZ:
14    Q.   Earlier I had asked you if sergeant McCoy
15  had asked or told you that he was close to making an
16  arrest.  You said that was not his call to make.  Do
17  you remember that?
18    A.   Yes.
19    Q.   Whose call would it have been to make?
20    A.   It would have been -- ultimately it would
21  have been between the investigative lieutenant,
22  lieutenant David, and myself, based on the evidence
23  that they had that would support -- that would support
24  that conclusion.
25    Q.   I believe you testified that you were not

Page 111

1  close to making an arrest.  Is that correct?
2    A.   That's correct.
3            (Exhibit 9 marked.)
4    Q.   I am going to mark what will be exhibit 9,
5  okay?  Exhibit 9 is also entitled investigative report.
6  It's dated March 23rd, 2010, okay?
7    A.   Okay.
8    Q.   We have looked at one copy or one issue of
9  the investigative report which is dated November 19th,
10  2009, and is exhibit 7.
11            Earlier when you were discussing or
12  describing what's in the investigative report, you
13  referenced that one was updated to include the FBI
14  analysis with respect to handwriting samples that were
15  taken.  Do you remember that?
16    A.   Yes.
17    Q.   So is exhibit 9 the investigative report
18  that includes reference to the FBI's handwriting
19  analysis?
20    A.   Yes.
21    Q.   Other than that -- addition of that
22  handwriting analysis, do you know of any additional
23  information between that and the version dated
24  November 19th, 2009?
25    A.   I can't answer that without reviewing side

Page 112

1  by side.
2    Q.   Okay.  We won't go through that process.
3  Thank you.
4            Sir, looking at exhibit 9, the last
5  page of it, which is HOU 0001541, I understand the
6  investigative report states that no suspect has been
7  established.
8            And looking at exhibit 8 on the last
9  page in summary, last page it says in summary the
10  following is recommended --
11    A.   Which page are you referring to?
12    Q.   HOU 0001494, the second to the last page.
13    A.   Thank you.
14    Q.   And recognizing that the investigative
15  summary states unknown employee or unknown person?
16    A.   Yes.
17    Q.   Now, do you suspect any individual in
18  particular of being responsible for the slurs?
19    A.   No.
20    Q.   Now, did you have conversations with
21  inspector Buenik with respect to this investigation?
22    A.   I feel certain we would have discussed it.
23    Q.   What do you remember from those
24  conversations?
25    A.   I don't remember.  Honestly, ten years,

Page 113

1  again, I don't recall.  I would -- it would have been
2  updates.
3      Q.  Do you remember if you shared with him
4  whether or not there was a suspect?
5      A.  Had we ever developed a suspect, would I
6  have shared that with -- yes.
7      Q.  Do you remember whether you actually ever
8  developed or focused on a suspect?
9      A.  No.
10     Q.  You mean you don't remember, or you just
11 didn't?
12     A.  We just didn't because we never developed a
13 suspect.
14     Q.  Were you ever given any direction by
15 Mr. Buenik -- am I pronouncing his name right?
16     A.  You are.
17     Q.  Were you ever given any direction by
18 assistant chief Buenik in regard to the investigation
19 into the slurs found at station 54?
20     A.  The only recollection that I have -- and of
21 course, it's documented -- there is an exhibit that
22 shows where -- it came from chief Hurt to have the
23 handwriting analysis sent to the FBI.
24         We had already done it verbally, and
25 there was just a copy of a memo to document that verbal

Page 114

1  conversation between the chief and chief Buenik and
2  myself.
3          Other than that, I specifically don't
4  recall any action, direction, no.
5      Q.  Did you ever feel any pressure to identify a
6  suspect?
7      A.  Chief Buenik never pressured me to identify
8  a suspect in any investigation.
9          MR. RUIZ:  Thank you.  Captain Watkins,
10 we are going to take a few minutes.
11         (Recess from 1:27 to 1:31 p.m.)
12         (Exhibit 10 marked.)
13 BY MR. RUIZ:
14     Q.  Captain Watkins, I want to turn now to a
15 different investigation involving Jane Draycott.  Would
16 you please -- I am going to mark what is going to be
17 exhibit 10.  Will you please review this exhibit?  It's
18 Bates numbered HOU 00005713, and it runs through
19 HOU 00005758.  It's dated June 4, 2010.  The subject is
20 complainant Jane Draycott, OIG No. 10-311.  And the
21 title of the document is investigative report.
22     A.  I have given exhibit 10 a cursory review.
23     Q.  Thank you.  And if I am asking you questions
24 and you need to take another moment to review, just
25 please let me know.

Page 115

1      A.  Okay.
2      Q.  Captain Watkins, what is exhibit 10?
3      A.  It is the investigative report by sergeant
4  Cheri Page assigned to the criminal investigations
5  unit, inspector general No. 10-311.
6      Q.  Would you turn to the last page of the
7  exhibit, sir?
8      A.  Would you give me a number?
9      Q.  It's HOU 0005758.  Did I give you a copy
10 that is not legible?
11     A.  Is this the same copy?
12     Q.  That is the same copy, but let me see your
13 copy.
14     A.  Paginated differently?
15     Q.  Yours is two sided; mine is one sided.
16     A.  Okay.
17     Q.  So HOU 0005758, there are different
18 signatures on that page, do you recognize any of them
19 as your own?
20     A.  Yes.
21     Q.  Which one is yours, sir?
22     A.  The lowest signature on the page.
23     Q.  The lowest signature on the page, okay.
24 Your signature is on the investigative report for
25 10-311?

Page 116

1      A.  Correct.
2      Q.  Does that mean you reviewed this report?
3      A.  Yes.
4      Q.  That you approved this report?
5      A.  Yes.
6      Q.  And it means that you agreed with its
7  findings or what is in the report?
8      A.  Yes, yes.
9      Q.  Okay, thank you.  I believe you testified
10 that sergeant Cheri Page --
11     A.  Cheri.
12     Q.  -- drafted the document, sir?
13     A.  Yes.
14     Q.  Who is she, sir?
15     A.  Sergeant assigned to the criminal
16 investigations unit under lieutenant Richard David.
17     Q.  Your understanding is that the investigation
18 for 10-311 was run out of the OIG's criminal
19 investigative unit?
20     A.  Yes.
21     Q.  After this document is reviewed and approved
22 by you, is it then sent to inspector general Buenik?
23     A.  Well, there is an interesting date here that
24 could be a reason why that didn't occur.  OIG was
25 transitioning to the legal department, and I am not

Page 117

1  aware of the time frame.  It's been too many years, but

2  it's possible that during that time frame that George

3  Buenik was no longer in the chain of command, but I

4  don't recall specifically.  I just don't -- I would

5  have to see the time frame.

6          (Exhibit 11 marked.)

7      Q.  Okay, I understand.  Thank you.  What I am

8  going to hand you is exhibit 11, sir.  Now, exhibit 11

9  is Bates stamped HOU 00005671 through HOU 00005705.

10     A.  Okay.

11     Q.  Would you please take a moment to review

12  this document?

13         MS. COHEN:  I think it's fair to

14  anticipate that I know we are going to have to cancel

15  tomorrow's deposition.

16     A.  I have reviewed exhibit 11.

17  BY MR. RUIZ:

18     Q.  Thank you very much.  Sir, prior to me

19  giving you exhibit 11, you had mentioned that you

20  weren't sure about the process or whether or not

21  Mr. Buenik had been the -- been delivered the

22  investigative report because of some changes in the

23  structure of the office at that time.  Do you remember

24  that?

25     A.  Correct.

Page 118

1      Q.  Now, looking at exhibit 11, sir, on page

2  HOU 5676, okay.  I think it would be maybe three, four

3  pages in, sir.  Now, at the top of the page, it doesn't

4  actually show assistant chief Buenik as a recipient.

5  It actually directs this document to you.

6          Looking at this document, the

7  investigative summary, does that refresh your

8  recollection as to it was about that same time there

9  was a restructure with respect to the office of

10  inspector general?

11     A.  Correct.

12     Q.  So with respect to the investigative report,

13  which is exhibit 10, Mr. Buenik may never have actually

14  received this document?

15     A.  Actually it's clear he would not have

16  because of the signature line at the end of the

17  summary, actually then David Feldman, city attorney.

18  So by that point, the transition had taken place.

19     Q.  Okay.  But with respect to the investigative

20  report, exhibit No. 10, he may?

21     A.  He would not have.  10, 10, he would not

22  have, correct, seen exhibit 10, because it would have

23  gone up as a complete package.

24     Q.  And so he would not have seen exhibit 11,

25  either?

Page 119

1      A.  That's correct.

2      Q.  Now, looking at exhibit 11, the last page of

3  the investigative summary for 10-311, okay, do you

4  recognize your signature on that last page?

5      A.  Yes.

6      Q.  Does that represent that you reviewed,

7  agreed, and recommended what's contained in exhibit 11?

8      A.  Yes.

9      Q.  Now, investigation 10-311 is a completely

10  different investigation from 0407, 0424.  Is that

11  correct?

12     A.  That is correct.

13     Q.  And I believe you testified that Cheri Page

14  is with the criminal investigative unit?

15     A.  Cheri Page.

16     Q.  Thank you very much.  I am going to call her

17  sergeant Page.

18     A.  Okay.

19     Q.  Now, being that it was assigned to the

20  criminal investigative unit, was the OIG approaching

21  10-311 as a criminal matter?

22     A.  No.

23     Q.  Why was it assigned to the criminal

24  investigative unit and not the employee relations unit?

25     A.  Well, I don't recall specifically.  The

Page 120

1  criminal investigations unit handles all form of

2  misconduct, not necessarily a criminal case.  We would

3  have sent that for the most seasoned investigator,

4  perhaps.  Cheri Page would qualify as that, someone who

5  would get that done in a relatively short time frame

6  because of the transition period, and we were moving

7  employees in and out at the same time.

8          So all those things were occurring at

9  the same time in OIG.  I don't recall the rationale

10  behind Cheri Page being assigned that case, but it does

11  not indicate it was based on a criminal allegation,

12  because CIU, the name implies criminal investigation,

13  but they also do other allegations of misconduct to

14  City employees.

15     Q.  Was the employee relations unit still

16  functioning?

17     A.  Oh, I am sure it was.  It was in transition

18  over to city legal.

19     Q.  But that unit was still investigating the

20  matter?

21     A.  It was still staffed.  That's correct.

22     Q.  You earlier testified that the employee

23  relations unit investigated matters involving

24  employment discrimination.  Is that right?

25     A.  Yes.



Page 121

1    Q.   As part of Ms. Page's investigation, she was
2  required to obtain a written statement from Jane
3  Draycott.  Is that correct?
4    **A.   She would have been, yes.**
5    Q.   And for this particular investigation,
6  OIG 10-311, what would have been the purpose of
7  sergeant Page obtaining a statement from Jane Draycott?
8    **A.   In order to -- any allegation that's made**
9  **requires a sworn affidavit to move forward.**
10   Q.   And that sworn statement, depending what's
11 in there, that would inform OIG of what it is
12 investigating.  Is that correct?
13   **A.   It certainly should be, yes.**
14        (Exhibit 12 marked.)
15   Q.   Now what I am going to do is I am going to
16 hand you another exhibit.  This is going to be
17 exhibit 12.  Would you please take a moment to review
18 exhibit 12?  It's a sworn affidavit.  It's dated
19 April 21st, 2010.  And it says statement of person
20 under oath, and the first line says before me, the
21 undersigned authority, personally appeared Jane
22 Draycott, who upon being duly sworn, deposed, and
23 stated as follows.
24        I am going to ask you some questions
25 about her sworn statement, sir.

Page 122

1    **A.   Okay.**
2        **Okay.**
3    Q.   You had an opportunity to review exhibit 12?
4    **A.   Yes.**
5    Q.   Will you please look at exhibit 10?  There
6  is a paragraph on the first page that is under the
7  section discovery?
8    **A.   Yes.**
9    Q.   And it describes -- well, just I suppose it
10 describes discovery and the last statement is a sworn
11 statement of allegations was obtained on April 21st,
12 2010, from firefighter Draycott.  Would this have been
13 the statement that --
14   **A.   This would have been what it's referencing,**
15 **correct.**
16   Q.   Now, would you please turn to the statement
17 which is exhibit 12.  I want you to look at page Bates
18 stamped 5761.  The third to the last paragraph states:
19 I believe I was prevented from going back to work with
20 the fire department and specifically from returning to
21 work at station 54 because I complained of
22 discrimination under title 7 and complained
23 specifically to the office of inspector general of
24 illegal activity and because I spoke publicly in
25 opposition to what I regarded as discriminatory and

Page 123

1  retaliatory activities at the fire department.
2        Do you see that, sir?
3    **A.   Yes.**
4    Q.   Did I read that correctly?
5    **A.   Yes.**
6    Q.   What is your understanding of what
7  Ms. Draycott is complaining about in that paragraph?
8    **A.   She is complaining that she was prevented --**
9  **as it says, prevented from -- I will -- I can reread**
10 **what you just read, if you want.  All I am going to say**
11 **is say it in her words.**
12   Q.   Let me ask you this.
13        Does it appear to you that she is
14 complaining of employment discrimination?
15   **A.   Yes.  It states so, that complained of**
16 **discrimination under title 7, which she did with the**
17 **EEOC -- we will get back to that -- and complained**
18 **specifically to the office of inspector general of**
19 **illegal activity, whatever that might be.  It's**
20 **undefined here.**
21   Q.   Does it also appear to you that she is
22 complaining about retaliation for complaining about
23 discrimination?
24   **A.   She is saying she is prevented from**
25 **returning to work and discrimination under title 7.**

Page 124

1    Q.   Does that appear to you that she is
2  complaining about retaliation?
3        MS. COHEN:  Objection; calls for
4  speculation.  The document speaks for itself.
5    **A.   She states discriminatory and retaliatory**
6  **activities.**
7  BY MR. RUIZ:
8    Q.   She also states that she believes she was
9  prevented from going back to work specifically because
10 she complained, right?
11   **A.   She says I believe I was prevented from**
12 **going back to work, correct.**
13   Q.   Does -- as a person who was in charge of
14 OIG, does that not ring of a person complaining of
15 retaliation?
16        MS. COHEN:  Objection; calls for
17 speculation.  The document speaks for itself.
18   **A.   I don't recall what was -- what was**
19 **discussed at the time this complaint came through.  I'm**
20 **not sure I understand the question.**
21 BY MR. RUIZ:
22   Q.   Sir, you were assistant commander of that
23 unit, correct?
24   **A.   Yes.**
25   Q.   OIG?



Page 125

1    A.   Yes.

2    Q.   Part of OIG's responsibility was to

3 investigate complaints of employment discrimination,

4 correct?

5    A.   That is correct.

6    Q.   In that subset of employment discrimination

7 is retaliation for complaining about employment

8 discrimination.  You understand that, right?

9    A.   Yes.

10    Q.   Now, looking at that statement, you can't

11 tell me whether or not you believe she is complaining

12 about retaliation or not?

13    A.   It is in her statement, yes.  So I already

14 acknowledged that, that it's in her statement, yes.

15    Q.   Okay.  So you understand that -- reading

16 that, you understand that she is complaining about

17 retaliation?

18    A.   That's what she is complaining about.

19 That's correct, yes.

20    Q.   Thank you.  There are other allegations

21 Ms. Draycott's statement -- that are in Ms. Draycott's

22 statements.  Did you see those?

23    A.   I am sorry.

24    Q.   There are other allegations she makes in her

25 statement other than that --

Page 126

1    A.   Yes, yes.

2    Q.   -- that one complaint?

3    A.   Yes.

4    Q.   Now, looking at her statement, now, is the

5 larger question whether or not she was being retaliated

6 against?

7        MS. COHEN:  Objection; calls for

8 speculation.  The document speaks for itself.

9    A.   It would be unknown based on the statement

10 alone.

11 BY MR. RUIZ:

12    Q.   So looking at this document, you can't tell

13 me whether or not the larger question that needs to be

14 addressed is whether or not everything she alleges in

15 this document amounts to retaliation for her

16 complaining about discriminatory acts?

17        MS. COHEN:  Same.

18    A.   Everything in this document needs to be

19 investigated.

20 BY MR. RUIZ:

21    Q.   Is the larger question that has to be

22 addressed whether or not everything that she alleges

23 amounts to retaliation for her complaining about

24 discrimination?

25        MS. COHEN:  Objection; vague, calls for

Page 127

1 speculation.  The document speaks for itself.

2        You can answer if you can.

3    A.   The larger question is not the issue.  The

4 issue is whether we investigated the allegations that

5 are put forth, and the answer is yes.

6 BY MR. RUIZ:

7    Q.   The answer to what is yes?

8    A.   That we investigated the allegations that

9 are set forth in this document that you are asking me

10 to review, exhibit 12.

11    Q.   So looking at that statement, you wouldn't

12 believe it was the responsibility of the OIG to

13 investigate whether or not -- or determine whether or

14 not Jane Draycott was being retaliated against for

15 complaining about discrimination?

16    A.   I think the sustained complaint -- let me go

17 back and review.

18        Exhibit 11 cites the fire chief for

19 allowing that misconduct to occur.  There is no higher

20 authority in that meeting.

21    Q.   What are --

22    A.   I believe the investigation adequately

23 addressed that based on the information that we had in

24 this particular complaint.  I don't see the record of

25 complaint, but I do have the sworn statement.

Page 128

1    Q.   Well, what does that mean to you?

2    A.   It means that the complaint was adequately

3 investigated and the appropriate person was cited in

4 that investigation.

5    Q.   With respect to the issue of whether or not

6 she was prevented from returning to work because she

7 had complained about -- she had made a complaint of

8 discrimination, what do those findings mean?

9        MS. COHEN:  Objection; asked and

10 answered.

11    A.   I simply don't remember that.  That was too

12 many years ago.  I do not believe -- I believe that her

13 attorney at the time was involved with the fire

14 department, whether she was or was not able to return

15 to work, but I don't recall specifically that being the

16 case.

17 BY MR. RUIZ:

18    Q.   Well, we will see if we can slow this down

19 and go step by step, okay?

20    A.   Okay.

21    Q.   Will you turn back to the investigative

22 report, sir, for 311, which is exhibit 10?

23    A.   Yes -- no.  The investigative report?

24    Q.   Yes.

25    A.   Okay.



Page 129

1    Q.   Now, is the investigative report for 311
2  just a summary of witness statements collected by
3  sergeant Page in this case?
4    **A.   Yes, yes.  It formed the basis of the**
5  **complaint -- the basis of the investigation was that**
6  **the group meeting, the roll call, her return to work,**
7  **yes.**
8    Q.   Is the investigative report for 311 anything
9  more than just a summary of the witness statements
10  collected by sergeant Page in this matter?
11    **A.   It appears to be that's the case.**
12    Q.   It appears to be more than that or just
13  that?
14    **A.   It appears to be just that.  I could,**
15  **however, be mistaken.  I am just giving it a cursory**
16  **look.**
17    Q.   Let's go ahead and look at it.  We need to
18  find out what the investigative report is.
19    **A.   Give me a couple minutes.**
20    Q.   Yes, sir.
21    **A.   Okay.  There is some physical evidence**
22  **collected, exhibit 25 through 27, but other than that**
23  **it was just a collection of statements.**
24    Q.   Thank you.  Now, is there any recommendation
25  made by sergeant Page in the investigative report?

Page 130

1    **A.   Sergeant Page?  No.**
2    Q.   I have that name correct, right?
3    **A.   Yes.**
4    Q.   Okay.  Do you see any finding or
5  recommendation with respect to Ms. Draycott's
6  allegation that she was prevented from returning to
7  work at station 54 because she complained of
8  discrimination under title 7 in the investigative
9  report?
10    **A.   I did not see that in the investigative**
11  **report.**
12    Q.   So what did sergeant Page investigate?
13    **A.   The roll call incident that occurred on, I**
14  **believe, January the 13th, 2010.**
15    Q.   Is it fair to say that what she investigated
16  was the factual allegations surrounding Jane Draycott's
17  retaliation complaint?
18    **A.   Yes.**
19       MS. COHEN:  Objection.
20  BY MR. RUIZ:
21    Q.   But sergeant Page didn't make a conclusion
22  as to whether she found retaliation or not.  Is that
23  correct?
24    **A.   She did not.**
25    Q.   And she wasn't supposed to.  Is that

Page 131

1  correct?
2    **A.   She would not have.  That's correct.**
3    Q.   Okay.  Did sergeant Page report verbally to
4  you whether she made any other findings that are not
5  included in that investigative report?
6       MS. COHEN:  Objection; mischaracterizes
7  the scope of sergeant Page's duties.
8    **A.   I don't recall.**
9  BY MR. RUIZ:
10    Q.   If there was evidence collected by sergeant
11  Page that was important to investigation OIG O311,
12  would that evidence be described in the investigative
13  report?
14    **A.   It should be, correct.**
15    Q.   If sergeant Page found evidence important to
16  OIG investigation 10-311, am I correct that the
17  evidence would be referenced in the investigative
18  report?
19    **A.   It should be.**
20    Q.   Well, looking at the front page of
21  exhibit 10, the investigative report, sir -- sir, I
22  want to understand the review process here.
23       Sergeant Page, would she have submitted
24  it directly to you or to lieutenant David?
25    **A.   Lieutenant David.**

Page 132

1    Q.   And looking at the last page of exhibit 10,
2  sir, would you look at that last page, above your
3  initials?  Do you recognize those are lieutenant
4  David's initials?
5    **A.   Yes.**
6    Q.   After he reads it and approves it, it gets
7  forwarded to you.  Is that correct?
8    **A.   Yes.**
9    Q.   And then we already talked about that your
10  understanding is that director Buenik did not receive
11  this document?
12    **A.   It's my understanding that is correct.**
13    Q.   Within OIG you would have been the highest
14  ranking official to review and approve the document?
15    **A.   Within OIG, that's correct.**
16    Q.   Now, earlier I asked you why the matter was
17  assigned to sergeant Page.  Do you recall that?
18    **A.   Yes.**
19    Q.   I believe you said it's because she was --
20  she could conduct an expedient investigation.  Is that
21  what you --
22    **A.   I said it could be.  I don't recall**
23  **specifically.**
24    Q.   Do you know if sergeant Page typically
25  investigated employment discrimination matters?



Page 133

1    A.  Routinely?

2    Q.  Yes, sir.

3    A.  Not routinely.

4    Q.  Not routinely.  Those matters were routinely

5  investigated by the employee relations unit.  Is that

6  right?

7    A.  Not exclusively, but yes.

8    Q.  Were they routinely, like in -- would the

9  employee relations unit typically be the unit that

10  investigated employment discrimination matters?

11    A.  Generally speaking, yes.  It's always

12  subject to being assigned to another investigative

13  unit.

14    Q.  Okay.  Are the investigators in the criminal

15  investigative unit provided -- were they at the time --

16  specified training on investigating employment

17  discrimination matters?

18    A.  Not specific to the office of inspector

19  general.  Training such as that would have applied as

20  it is universally in the department.

21        So the answer would be they are all

22  internal affairs investigators, also.  So that would

23  have been a part of their training, as well.

24        So I suppose the long answer to that --

25  or the short answer, rather, would be yes, since that

Page 134

1  would have come across as not only departmental

2  training, but specifically internal affairs training,

3  as well.

4    Q.  Now, that specific internal affairs

5  training, do you know that it actually addresses

6  investigating employment discrimination claims?

7    A.  I can't say when exactly they came through

8  and what it addressed.  I would have to look at

9  training records, and I would have to look at all the

10  documents that are associated with it.  What I am

11  saying is I believe that would be the case.

12    Q.  Thank you.  Sir, looking at exhibit 11, the

13  investigative summary for OIG 10-311, what is the

14  purpose of the investigative summary for OIG 10-311?

15    A.  To summarize the facts in the investigation

16  and then to make recommendations and conclusions.

17    Q.  Now, I recognize that it was -- once it was

18  drafted and written by -- or drafted by lieutenant

19  David, it was then reviewed and approved by you.  Is

20  that correct?

21    A.  And ultimately I would assume the city

22  attorney at that time, David Feldman.

23    Q.  Okay.

24    A.  But I don't know.  I don't recall.

25    Q.  Okay.  Once the OIG had completed its

Page 135

1  component of that investigation and you read and

2  approved the document, where would you have sent it?

3    A.  To the city attorney.

4    Q.  Can you please turn to HOU 00005704?  Is

5  this the recommendations section that you indicated

6  would be part of the investigative summary?

7    A.  Yes.

8    Q.  I am sorry, sir.  You are --

9    A.  I am looking at different pages, but yes,

10  your page is --

11    Q.  I am looking at Bates number --

12    A.  I was looking on your right.  Thank you.

13  You're left handed.  I should have noticed.

14    Q.  That's my outline, what I have on my left.

15    A.  Yes, yes, yes.

16    Q.  Is it the same exhibit you have?

17    A.  Yes, yes.

18    Q.  Now, looking at his recommendation, sir, did

19  you speak to lieutenant David about the recommendations

20  he makes in his investigative summary?

21    A.  Again, I don't know specifically.  Too many

22  years have gone by, but I am sure I did, but I can't

23  state with absolute certainty.

24    Q.  Do you see any recommendation on that page

25  with respect to Ms. Draycott's allegation that she was

Page 136

1  prevented from returning to work at station 54 because

2  she complained of discrimination under title 7?

3        MS. COHEN:  I am going to object based

4  on the rule of optional completeness as there was a

5  separate investigation into that matter.

6    A.  It's not indicated on the page.

7  BY MR. RUIZ:

8    Q.  Do you know of another report that was

9  contained in?

10    A.  I do not know, but I left the inspector

11  general's office this very month.  So I am not -- I

12  don't know.

13        MR. RUIZ:  Take two minutes.

14        (Recess from 2:23 to 2:27 p.m.)

15        MS. COHEN:  They are recommending that

16  people who are parked in that lot move their vehicles.

17  BY MR. RUIZ:

18    Q.  Captain Watkins, I want you to please refer

19  to exhibit 12.

20    A.  Okay.

21    Q.  In your review of exhibit 12, do you see

22  that Jane Draycott -- Jane Draycott is complaining of

23  acts at a roll call at station 54 on January 13, 2010?

24    A.  Correct.

25    Q.  Was there any determination by OIG for the



Page 137

1  acts of which she complained about were retaliatory?
2  **A. Could you restate that question for me?**
3  Q. Was there any determination by OIG whether
4  the acts that -- the acts that Jane Draycott complained
5  about were -- were retaliatory?
6  **A. Did OIG conclude that?**
7  Q. Make that determination?
8  **A. No.**
9  Q. Okay. Either way, whether they were
10 retaliatory or not?
11 **A. Not in this -- not as far as investigation**
12 **10-311.**
13 Q. Thank you. Sir, I want to bring out
14 exhibit 9 one more time, sir. Exhibit 9 is the
15 investigative report for 0407, and I want you to turn
16 to HOU 00001538. On that page it describes, about
17 halfway down the page, some polygraph testing that
18 occurred. I am going to ask you about the paragraph
19 that begins the first, second, third -- fourth
20 paragraph down that begins when the tests were
21 completed, firefighter Keyes showed no deception.
22        I want to ask you about the paragraph.
23 I am going to ask you about that paragraph.
24 **A. Okay.**
25 Q. Are you prepared?

Page 138

1  **A. Yes.**
2  Q. Now, that paragraph reads: When the tests
3  were completed, firefighter Keyes showed no deception,
4  and firefighter Draycott was suspected of using
5  countermeasures.
6        Do you see that, sir?
7  **A. Yes.**
8  Q. The -- what information do you recall about
9  firefighter Draycott being suspected of using
10 countermeasures?
11 **A. It was based on the polygrapher's initial**
12 **report, and the review that was conducted by department**
13 **of credibility, DACA, Department of Credibility and**
14 **Defense Assessment, something like that.**
15 Q. I think it's Credibility Assessment.
16 **A. Thank you.**
17 Q. Now, how did you learn about Jane Draycott
18 being suspected of using countermeasures?
19 **A. It was reported by the polygrapher based on**
20 **the results of the atypical physiology, I believe was**
21 **the way they termed that.**
22 Q. Did the polygrapher report that to you, or
23 was it reported to you through sergeant McCoy?
24 **A. It would have been reported through the --**
25 **through the polygrapher's report, then to sergeant**

Page 139

1  **McCoy, then ultimately to me.**
2  Q. Okay. You would have learned about that
3  through the investigative report. Is that --
4  **A. Had I not already known, I probably already**
5  **was aware of it, but I don't know specifically.**
6  Q. Okay. Now, were the countermeasures she was
7  suspected of using ever identified to you?
8  **A. No.**
9  Q. What does suspected of using countermeasures
10 mean?
11 **A. Well, I would have to refer to a polygrapher**
12 **for that. I mean, I can give my layman's opinion of**
13 **that.**
14 Q. No, no. You don't know --
15 **A. I am not qualified to make that**
16 **determination.**
17 Q. Thank you.
18 **A. That's why we rely on individuals that are,**
19 **you know -- have the training and expertise in that**
20 **area.**
21 Q. Thank you. So notwithstanding the suspected
22 countermeasures that were reported by the polygrapher,
23 you still did not consider her a suspect, right?
24 **A. Not at that point. She is not a suspect.**
25 Q. And she still isn't. Is that correct?

Page 140

1  **A. No. She was never considered a suspect.**
2        MR. RUIZ: Thank you. Just one minute,
3  sir.
4        (Recess from 2:33 to 2:39 p.m.)
5  BY MR. RUIZ:
6  Q. Captain Watkins, I want to ask you a couple
7  more questions about exhibit 11, specifically the last
8  page, which would be Bates number HOU 0005705. I just
9  want to make sure I understand what happened after
10 exhibit 11, which is -- 5705?
11 **A. Sorry. My ears.**
12 Q. I just want to make sure I understand what
13 happened after you read and approved this.
14        I recognize there is a signature block
15 that's empty here, David Feldman, city attorney. After
16 you read and approved it, what do you recall doing with
17 the document?
18 **A. It would have gone to the city attorney's**
19 **office.**
20 Q. Do you recall if the document was sent
21 anywhere else?
22 **A. I don't recall.**
23 Q. Okay.
24 **A. You know, I -- I would have -- I would have**
25 **no reason to think it was sent anywhere else. I just**

Page 141

1  simply don't know.

2       Again, it was a transition period which

3  makes this incredibly difficult to ascertain that, for

4  sure.

5       Q.  Earlier, sir, when you were covering

6  investigation No. 0424, there was a disposition letter

7  that was sent to Jane Draycott on January 13th, 2010?

8       A.  Yes.

9       Q.  I believe it is exhibit 6, sir.

10      Now, during this transition that was

11  going on with OIG, what office would have been

12  responsible for sending Ms. Draycott a case disposition

13  letter like this for OIG 10-311?

14      A.  Who would have prepared this, or who would

15  have sent it?

16      Q.  Okay.  Let's begin with who would have

17  prepared it.

18      A.  It would have been prepared by -- in the

19  case of 0424 by the employee investigations unit

20  manager.

21      Q.  I want to know if one of those case

22  disposition letters was prepared for OIG 311?

23      A.  Oh, if it's not in the case file, I can't

24  respond.  I simply don't know.

25      Q.  You don't know, okay.  You don't know if one

Page 142

1  was sent?

2       A.  I have no -- I have no idea without seeing a

3  document that supports that.

4       Q.  Okay.  Just generally, during that

5  transition, sir, just generally do you know if those

6  case disposition letters were being sent to

7  complainants.

8       A.  I would not know.  This was in the case of

9  311?

10      Q.  Yes, sir, or generally at that time for -- I

11  am trying to figure out -- it sounds like there was

12  some kind of transition during the end of or mid 2010

13  where --

14      A.  Yes, where files were being transferred,

15  responsibilities were being changed.

16      Q.  Were case deposition letters still being

17  sent to complainants?

18      A.  I am unable to answer that with any

19  certainty.  I would like to think so, but....

20      MR. RUIZ:  Thank you.  Sir, thank you

21  so much.  Those are the questions that I had.

22  Depending on what's being asked by Nasim or Ms. Cohen,

23  I may have a couple followups.  But thank you very much

24  for answering the questions.

25      MR. AHMAD:  I do not have any questions

Page 143

1  for you.

2       So Marjorie?

3       MS. COHEN:  We will reserve for trial.

Page 144

1       CORRECTIONS AND SIGNATURE

2  PAGE  LINE  CHANGE        REASON

3  _____

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24      I, DAVID EVANS WATKINS, have read the foregoing

25  deposition and hereby affix my signature that same is



Page 145

```
 1   true and correct, except as noted herein.
 2
                _____
 3              DAVID EVANS WATKINS
 4
 5   THE STATE OF _____ )
 6   COUNTY OF _____ )
 7        Before me, _____, on this
     day personally appeared DAVID EVANS WATKINS, known to me
 8   (or proved to me under oath through _____)
     (description of identity card or other document) to be
 9   the person whose name is subscribed to the foregoing
     instrument and acknowledged to me that they executed the
10   same for the purposes and consideration therein
     expressed.
11
          Given under my hand and seal of office this
12   _____ day of _____, _____.
13
14              _____
                NOTARY PUBLIC IN AND FOR
15              THE STATE OF _____
16
17
18
19
20
21
22
23
24
25
```

Page 146

```
 1            UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  HOUSTON DIVISION
 3   UNITED STATES OF       :
     AMERICA                :
 4                          :
     VS.                    : CIVIL ACTION NO. 4:18-CV-00644
 5                          :
     CITY OF HOUSTON        :
 6   _____
 7   JANE DRAYCOTT AND       :
     PAULA KEYES             :
 8                          :
     VS.                     :
 9                          :
     CITY OF HOUSTON         :
10
11           REPORTER'S CERTIFICATION
12        DEPOSITION OF DAVID EVANS WATKINS
13             September 19, 2019
14
15        I, Craig Michael Bechtel, Certified Shorthand
16   Reporter in and for the State of Texas, hereby certify
17   to the following:
18        That the witness, DAVID EVANS WATKINS, was duly
19   sworn by the officer and that the transcript of the oral
20   deposition is a true record of the testimony given by
21   the witness;
22        That the deposition transcript was submitted on
23   _____ to the witness or to the attorney
24   for the witness for examination, signature and return to
25   me by _____;
```

Page 147

```
 1        That the amount of time used by each party at the
 2   deposition is as follows:
 3        Mr. Hector Ruiz - 03:55
 4        That pursuant to information given to the
 5   deposition officer at the time said testimony was taken,
 6   the following includes counsel for all parties of
 7   record:
 8   COUNSEL FOR PLAINTIFF UNITED STATES OF AMERICA:
     Mr. Hector F. Ruiz, Jr.
 9   Mr. Jeremy P. Monteiro
     U.S. Department of Justice
10   Civil Rights Division
     601 D Street, NW, Room 4500
11   Washington, DC 20004
     hector.ruiz@usdoj.gov
12   jeremy.monteiro@usdoj.gov
13             and
14   Ms. Elizabeth F. Karpati
     Mr. Keith Edward Wyatt
15   U.S. Department of Justice
     Southern District of Texas
16   1000 Louisiana, Suite 2300
     Houston, Texas 77002
17   713-567-9767
     elizabeth.karpati@usdoj.gov
18   keith.wyatt@usdoj.gov
19   COUNSEL FOR PLAINTIFFS JANE DRAYCOTT AND PAULA KEYES:
     Mr. Nasim Ahmad
20   (VIA TELEPHONE)
     Ahmad & Capodice
21   24900 Pitkin, Suite 300
     The Woodlands, Texas 77386
22   832-767-3207
     nahmad@ahmad-capodice.com
23
24
25
```

Page 148

```
 1   COUNSEL FOR DEFENDANT:
     Ms. Marjorie L. Cohen
 2   City of Houston Legal Department
     900 Bagby, 3rd Floor
 3   Houston, Texas 77002
     832-393-6457
 4   marjorie.cohen@houstontx.gov
 5        I further certify that I am neither counsel for,
 6   related to, nor employed by any of the parties or
 7   attorneys in the action in which this proceeding was
 8   taken, and further that I am not financially or
 9   otherwise interested in the outcome of the action.
10        Further certification requirements will be
11   certified to after they have occurred.
12        Certified to by me this 7th day of
13   October, 2019.
14
15
16
17   _____
     Craig Michael Bechtel, Texas CSR 6662
18   Lexitas
     Firm Registration No. 95
19   13101 Northwest Freeway, Suite 210
     Houston, Texas 77040
20   888-893-3767
     Expiration:  10-31-21
21
22
23
24
25
```

## Exhibits

**Watkins Conf Exh 001** 2:14
27:12,14,15 36:8

**Watkins Conf Exh 002** 2:14
49:15,18 50:1 52:20,21 62:23,24

**Watkins Conf Exh 003** 2:15
54:14,16 58:24

**Watkins Conf Exh 004** 2:15
64:3,4,5 88:4

**Watkins Conf Exh 005** 2:16
81:17,20,21 90:11

**Watkins Conf Exh 006** 2:16
85:15,17 141:9

**Watkins Conf Exh 007** 2:17
98:8,10 102:15 111:10

**Watkins Conf Exh 008** 2:17
102:8,9,23,24 103:2,25 104:23,24
112:8

**Watkins Conf Exh 009** 2:18
111:3,4,5,17 112:4 137:14

**Watkins Conf Exh 010** 2:18
114:12,17,22 115:2 118:13,20,22
122:5 128:22 131:21 132:1

**Watkins Conf Exh 011** 2:19
117:6,8,16,19 118:1,24 119:2,7
127:18 134:12 140:7,10

**Watkins Conf Exh 012** 2:19
121:14,17,18 122:3,17 127:10
136:19,21

---

## 0

**00000729** 98:11

**00001472** 103:3

**00001473** 105:4

**00001496** 102:9

**00001538** 137:16

**00001540** 102:10

**00005671** 117:9

**00005704** 135:4

**00005705** 117:9

**00005713** 114:18

**00005758** 114:19

**00005844** 85:18

**00005851** 81:22

**00005857** 29:13

**00005865** 81:22

**00005866** 27:16

**00005869** 27:16

**00005870** 64:6

**00005885** 70:20

**00005960** 64:6

**00005983** 50:2

**00006054** 54:17

**0000729** 101:22

**0000773** 98:12

**0001473** 103:9

**0001494** 103:3 112:12

**0001541** 102:13 112:5

**0005690** 66:10

**0005705** 140:8

**0005758** 115:9,17

**0005868** 36:8

**001494** 108:12

**04** 59:24

**0407** 40:24 50:14 52:24 53:1,6,14
54:12 61:25 63:16 96:8 99:20 106:25
107:14 119:10 137:15

**0424** 33:20 40:4,24 41:4 43:15
44:16,19 46:2 51:9 52:23 53:1,9
59:11 60:1,11,15,22 61:25 62:25
63:5,7,12,16 65:23 70:5 78:11,14
86:9 87:19 88:12 119:10 141:6,19

**09** 51:10

**09-0407** 26:10 27:4 50:21 91:23
99:8,24 101:1 102:2 103:11 104:5

**09-0424** 26:10 27:3 28:4 40:2 41:14
43:7,22 51:12,14 64:21 65:21 80:4
82:1 86:22 90:12

**09-311** 26:11

**09-407** 9:17,19 105:23 106:4,7

**09-424** 9:18,20 64:13

---

## 1

**1** 27:12,14,15 36:8 49:20

**10** 114:12,17,22 115:2 118:13,20,21,
22 122:5 128:22 131:21 132:1

**10-311** 114:20 115:5,25 116:18
119:3,9,21 121:6 131:16 134:13,14
137:12 141:13

**10:23** 47:23

**10:35** 47:23

**10:37** 49:14

**10:41** 49:14

**10:59** 61:8

**11** 117:6,8,16,19 118:1,24 119:2,7
127:18 134:12 140:7,10

**11:00** 61:8

**11:29** 81:16

**11:36** 81:16

**11:50** 90:3

**12** 121:14,17,18 122:3,17 127:10
136:19,21

**12:37** 90:3

**12:53** 107:25

**13** 136:23

**13th** 85:20 130:14 141:7

**143** 75:15

**1495** 103:4,5

**15th** 64:12

**1995** 18:8

**19th** 98:12 111:9,24

**1:10** 110:12

**1:20** 110:12

**1:27** 114:11

**1:30** 61:5

**1:31** 114:11

---

## 2

**2** 49:15,18 50:1 52:20,21 62:23,24

**2009** 18:12 19:3 37:8 50:5 51:16
54:19 64:12 70:22 71:12 81:25 98:12
111:10,24

**2009-0407** 99:2

**2009-0424** 27:19 85:21

**2009407** 103:6

**2010** 18:15 19:8 85:20 103:6,10
111:6 114:19 121:19 122:12 130:14
136:23 141:7 142:12



**2014** 7:16,21

**2016** 15:15 17:10

**209-0424** 86:15

**21** 122:11

**21st** 81:25 121:19

**22nd** 50:4 51:16

**23** 103:10

**23rd** 102:10 111:6

**25** 129:22

**27** 129:22

**2:23** 136:14

**2:27** 136:14

**2:33** 140:4

**2:39** 140:4

---

**3**

**3** 54:14,16 58:24

**30th** 103:6

**31** 54:19

**311** 128:22 129:1,8 141:22 142:9

**3rd** 70:22 71:12

---

**4**

**4** 64:3,4,5 88:4 114:19

**40** 76:5,6

**407** 106:21

**46** 88:16

**48** 88:19

**49** 88:20

---

**5**

**5** 81:17,20,21 90:11

**52** 88:21,22

**53** 88:23

**54** 50:23 53:18 54:2 61:11 72:15,23
73:2,12 74:15 88:19,25 91:25 95:1
107:8,12,16,20 108:24 110:2,7
113:19 122:21 130:7 136:1,23

**54A** 36:16

**5676** 118:2

**5705** 140:10

**5761** 122:18

**5865** 84:14

**5871** 64:7

**5885** 73:7

**5886** 72:11 73:19

**5887** 71:4

**5960** 66:11,12

---

**6**

**6** 85:15,17 141:9

**6:30** 93:12

---

**7**

**7** 32:2 98:8,10 102:15 111:10 122:22
123:16,25 130:8 136:2

**7th** 93:13

---

**8**

**8** 102:8,9,23,24 103:2,25 104:23,24
112:8

---

**9**

**9** 111:3,4,5,17 112:4 137:14

**90-page** 64:17

**9:31** 14:1

**9:36** 14:1

---

**A**

**a.m.** 14:1 47:23 49:14 61:8 81:16
90:3 93:13

**absolute** 36:5,6 135:23

**absolutely** 35:22 47:22

**accept** 75:24

**access** 107:21

**accrue** 17:16

**accuracy** 42:1

**accurate** 47:19

**acknowledged** 125:14

**acting** 55:14,21

**action** 25:17 90:20,22 114:4

**actions** 16:5,9 90:19 91:16

**active** 17:23 55:18

**activities** 123:1 124:6

**activity** 122:24 123:19

**acts** 57:4 126:16 136:23 137:1,4

**add** 10:11

**added** 104:19

**addendum** 104:20

**addition** 106:13 111:21

**additional** 50:14 59:1,4 109:10
111:22

**address** 6:14,15 23:9 34:9 35:19
36:1,4,5,14,20 39:12,13 47:6 87:2,6

**addressed** 42:7,15 50:5 80:20 81:7
83:15,20 84:4,9 126:14,22 127:23
134:8

**addresses** 134:5

**addressing** 39:15 47:1

**adequately** 127:22 128:2

**administered** 58:5 100:18

**administrative** 20:23,24 23:10
24:11 29:1,4 30:16,17 31:7,15

**administrator** 30:5 31:1,7

**admit** 77:21,23 78:2,6

**admitting** 78:7

**affairs** 133:22 134:2,4

**affidavit** 121:9,18

**affirmative** 25:17 62:18

**affix** 144:25

**afternoon** 16:16

**agree** 67:22 68:17

**agreed** 68:7 76:12 84:20 116:6
119:7

**agreement** 15:19

**ahead** 37:22 44:7 47:18 58:22 67:2
108:11 129:17

**Ahmad** 5:13 142:25

**alarm** 88:20

**allegation** 28:1 34:19 36:2,19



Case 4:18-cv-00644   Document 66-3   Filed on 11/18/19 in TXSD   Page 41 of 54
David Evans Watkins
s Index: allegations..calendar

45:15 55:3 96:17,19 120:11 121:8
130:6 135:25

**allegations** 33:8,14,16,19,20,23
34:2 35:14,25 38:6 39:10 43:10 44:6
47:2 78:25 83:2 120:13 122:11
125:20,24 127:4,8 130:16

**alleged** 43:15

**alleges** 37:11 126:14,22

**alleging** 37:1 45:17,19,22 76:15

**allowed** 17:15,18

**allowing** 127:19

**alongside** 14:23

**amounts** 126:15,23

**analysis** 100:16 104:7,11,17,19
111:14,19,22 113:23

**answering** 78:22 79:1,5 142:24

**answers** 29:20

**anticipate** 117:14

**apologize** 102:15,18

**appeared** 121:21

**appears** 108:13 129:11,12,14

**applied** 133:19

**applies** 69:4

**apply** 12:18

**approach** 92:8

**approached** 92:11

**approaching** 119:20

**appropriately** 95:8

**approval** 68:18

**approve** 68:12,16 85:7 105:15
132:14

**approved** 67:19 68:7 77:7 84:19
105:19 116:4,21 134:19 135:2
140:13,16

**approves** 132:6

**approximately** 18:12,15,16 64:25

**Approximation** 7:15

**April** 37:8 121:19 122:11

**area** 139:20

**ARFF** 36:16 38:2

**arrest** 109:25 110:16 111:1

**arresting** 109:19 110:5

**arrives** 85:5

**arson** 24:25 25:5

**ascertain** 92:16 141:3

**asks** 39:6 73:3,21

**aspect** 79:6 80:15

**aspects** 109:11

**assess** 74:17,20 75:2,11

**Assessment** 138:14,15

**assign** 31:2,8

**assigned** 7:21 8:2 18:10 21:14
23:20 25:8 29:2,5,8,22 36:16 38:1
41:8 50:21 62:5 65:23 92:22 94:6,10,
14 95:1,14,15,17 96:5 115:4 116:15
119:19,23 120:10 132:17 133:12

**assistant** 6:22 19:12,16,17 113:18
118:4 124:22

**assisted** 41:7

**assume** 15:8 30:23 62:12 104:2
105:8 134:21

**attached** 10:5

**attained** 18:5

**attorney** 5:6 6:22 8:22 15:22 48:10
118:17 128:13 134:22 135:3 140:15

**attorney's** 7:3 140:18

**attorney-client** 48:19

**attorneys** 16:25

**atypical** 138:20

**August** 15:15

**author** 90:15

**authored** 82:14,16

**authority** 121:21 127:20

**authorized** 55:22

**automatically** 63:1

**aware** 52:15 60:25 62:6,11,18 63:15
102:6 117:1 139:5

## B

**back** 8:11,14 13:11 14:5,6 15:9 22:2
23:14 49:12,17 73:13 81:19 84:25
87:24 90:5,6 102:19 122:19 123:17
124:9,12 127:17 128:21

**bank** 15:18 17:15

**based** 32:12,13,19 33:2 34:5 35:5,
10 37:23 38:15 44:21 46:4,6 48:19

55:16 70:13 78:23 80:1 83:14 93:16
96:21 107:10 108:6 110:22 120:11
126:9 127:23 136:3 138:11,19

**basic** 26:14

**basis** 59:20 129:4,5

**Bates** 27:15 29:12 50:1 54:16 64:5,7
66:9 70:19 81:21 85:18 98:11 102:9
103:2,9 105:4 114:18 117:9 122:17
135:11 140:8

**began** 37:8

**begin** 26:20 109:7 141:16

**beginning** 37:25 71:12 92:18 93:4
95:12

**begins** 70:21 137:19,20

**believed** 42:2

**believes** 124:8

**Beneath** 31:18

**benefits** 17:21

**big** 93:18

**binder** 14:7,9,15 26:9

**blank** 73:21 74:13 75:23 76:14
77:16

**block** 55:25 140:14

**bold** 71:11,14

**bolded** 71:7,8,13,17,18,21 72:6,20
82:2

**Boriskie** 56:4,9 58:20,25 59:3 91:8,
12 109:3,5

**bottom** 29:13 64:8

**break** 9:1,3 14:4 47:21 81:15 90:7
110:11

**briefly** 14:17

**bring** 12:21 75:7 137:13

**brought** 13:13 14:5,6 26:9

**Buenik** 19:15,16 66:2 68:1,18 85:3,
4,9 105:13 112:21 113:15,18 114:1,7
116:22 117:3,21 118:4,13 132:10

**Buenik's** 67:15,16 85:5

**Bullard** 70:22 71:23

**business** 16:22

## C

**calendar** 11:6



Case 4:18-cv-00644   Document 66-3   Filed on 11/18/19 in TXSD   Page 42 of 54
David Evans Watkins
s Index: call..confidential

**call** 27:14 28:1 93:6,8,10,19 110:8, 16,19 119:16 129:6 130:13 136:23

**called** 15:16 20:16,17 40:16 68:22, 25 86:17 91:10 93:15 101:14,16

**callout** 94:7,9 95:16

**calls** 46:18 87:9,22 94:11 124:3,16 126:7,25

**cancel** 117:14

**capacity** 5:14 27:9

**captain** 5:25 6:2 7:10 9:6 14:3 16:15,24 18:2,3,6,9,19,22 37:7 47:25 50:5,12,16 54:20,25 55:14,18,21 57:10 80:2,24 87:17 90:6 98:9 114:9, 14 115:2 136:18 140:6

**car** 16:16

**case** 5:11 9:17,25 10:2,22 12:11 29:23 30:1 31:17 33:4 44:15,25 50:14 52:17,22,23 56:23 60:17 61:2 62:12 63:7,12 71:23 74:19,22 75:3,10 77:2 78:7 80:10 81:11 86:14 89:11 91:6 92:9,10,12 95:14 98:3 120:2,10 128:16 129:3,11 134:11 141:12,19, 21,23 142:6,8,16

**cases** 5:18 9:17,19,24 40:20,22 52:12 56:14,15 59:9 74:20 75:4 95:15

**casework** 44:24

**catch** 101:19

**certainty** 135:23 142:19

**chain** 19:20 117:3

**chair** 39:21,22

**change** 25:9 144:2

**changed** 46:13 142:15

**chapter** 75:15

**charge** 124:13

**chart** 24:18,19

**checked** 30:24

**checking** 66:13

**Checkmark** 32:4,5

**Cheri** 115:4 116:10,11 119:13,15 120:4,10

**chief** 19:12,16,17 55:2 58:20,25 59:3 67:15,16 68:18 91:7,12 109:3,5 113:18,22 114:1,7 118:4 127:18

**circle** 66:24 67:3,6

**circled** 67:12

**circumstances** 30:14 36:24 37:17,23 89:15 109:7

**cited** 128:3

**cites** 127:18

**city** 5:12 8:22 11:14 12:9 15:4,6,8,9, 10,13,17,20,23,24 16:1,3,4,21,25 22:17,20,25 23:2 25:10,17 27:17 48:10,13 54:17 57:5 64:9 65:2 81:24 82:12 85:19 86:5 87:14 91:4 98:13,24 103:20,22,25 118:17 120:14,18 134:21 135:3 140:15,18

**CIU** 20:16 120:12

**civil** 5:7,9

**civilian** 21:18,20 24:12 25:10

**claim** 51:8 74:10

**claims** 134:6

**classified** 23:18 24:2,3 32:18

**clean** 8:6,15,19

**clear** 22:3 30:14,25 31:5,10 80:2 118:15

**clerical** 24:12

**close** 109:19,24 110:5,15 111:1

**Cohen** 13:20,23 15:25 16:5,11,15, 21 32:23 46:18,23 47:21 48:18 49:2, 11,22 61:4 67:4 76:9 87:9,22 102:21 117:13 124:3,16 126:7,17,25 128:9 130:19 131:6 136:3,15 142:22 143:3

**Cohen's** 48:25

**cold** 88:17

**colleague** 5:8

**collect** 70:9

**collected** 60:18 88:16,17,22 89:5,6, 13 99:11,15,18,19 100:11,22 106:11, 20 129:2,10,22 131:10

**collecting** 60:10 62:7,21

**collection** 129:23

**command** 84:7 117:3

**commander** 18:22,25 19:1,10 20:1 34:8 57:11,14,15 58:8,14 124:22

**committees** 20:8

**Common** 64:1

**communicate** 62:8

**communicated** 62:16

**communication** 62:23 63:4

**complainant** 30:21 36:15 37:7 38:1 86:14,24 114:20

**complainant's** 31:5,11

**complainants** 142:7,17

**complained** 87:21 122:21,22 123:15,17 124:10 128:7 130:7 136:2 137:1,4

**complaining** 45:11 123:7,8,14,22 124:2,14 125:7,11,16,18 126:16,23 127:15 136:22

**complaint** 10:12,20 26:25 27:1,3, 19,25 28:3,6,9,12,15,17,18,19,23 29:3,9,14 30:3,4,5,10,12,19,25 31:3, 6,13,21,23 32:1,10,11,12,18,19 33:1, 2,9,12 34:15 36:23 37:23 39:11 40:1, 3 41:4 42:5 43:18 45:20 46:10,25 56:5,7,10,21 57:3 61:10,13 64:12 65:21 69:23 75:22 80:15 82:1 89:1 103:10 124:19 126:2 127:16,24,25 128:2,7 129:5 130:17

**complaints** 20:23 21:14 57:17,20 58:17 125:3

**complete** 8:17 41:16,20 102:1 118:23

**completed** 95:16 134:25 137:21 138:3

**completely** 9:7,8 119:9

**completeness** 42:1 136:4

**compliant** 31:19,22

**complies** 67:1

**component** 135:1

**concern** 49:11

**concerns** 43:4

**conclude** 15:14 43:7,17,23 107:14 137:6

**concluded** 43:13 44:10 108:9,10

**conclusion** 38:15 43:6,14,21 44:19 83:1 86:21 106:18 107:21 108:6 110:24 130:21

**conclusions** 83:8 105:2 106:1,15 134:16

**conduct** 35:12 87:20 132:20

**conducted** 9:20 26:6 102:1 138:12

**conducting** 33:25 59:11

**conference** 14:6

**confidence** 88:1

**confidential** 50:2 54:17 81:23



Case 4:18-cv-00644   Document 66-3   Filed on 11/18/19 in TXSD   Page 43 of 54
David Evans Watkins
s Index: connected..directed

85:19 98:13

**connected** 62:20

**connection** 7:18 52:4 109:20,25 110:6

**considered** 140:1

**consistent** 76:20

**constituted** 57:24

**consulted** 40:19

**contact** 58:25 59:3

**contacted** 93:14

**contained** 83:4 119:7 136:9

**content** 54:11

**contents** 50:6 54:7,22 82:6 84:21 85:24 98:16

**continue** 6:18 17:16

**conversation** 46:20 54:3 78:18 109:10 114:1

**conversations** 16:25 53:16,24 54:8,11 63:19 81:9 83:19,23 85:12 97:11,17,21 112:20,24

**copies** 88:25

**copy** 65:1,11 82:11 98:19,20 102:16 111:8 113:25 115:9,11,12,13

**correct** 6:4,15,16 8:1 9:23 10:21 11:9 13:14 15:11 16:11 17:10 18:17 22:6 23:2 24:5 28:20 29:7 31:3,9 35:16,18 37:19 40:5 42:20 45:3,24 46:1 47:8 48:14,15 50:25 53:6,10 55:12,13,20 59:14 60:11,15,18,19,20, 23 61:2 64:24 65:24 67:8 68:1,24 69:2,10,24 70:16,17,18 72:3 74:4,7 77:7,15 79:3 82:13 83:10,21,22 86:9, 10,25 87:1 88:8 89:8,18,20 90:21,23, 24 91:9,11 92:6,25 93:3 94:1,16 97:3 99:3,24 100:2,10 104:20 106:25 107:2 111:1,2 116:1 117:25 118:11, 22 119:1,11,12 120:21 121:3,12 122:15 124:12,23 125:4,5,19 130:2, 23 131:1,2,14,16 132:7,12,15 134:20 136:24 139:25

**CORRECTIONS** 144:1

**correctly** 33:21 57:8 72:18 123:4

**correspondence** 54:18 64:9 81:24 89:1,2

**counsel** 9:11

**countermeasures** 138:5,10,18 139:6,9,22

**couple** 129:19 140:6 142:23

**court** 8:5,10,13,18 26:17 49:22

**cover** 8:4 101:2

**covered** 17:8 106:3 107:4

**covering** 141:5

**create** 26:18

**credibility** 74:18,21 75:2,7,11 77:1 138:13,15

**crime** 8:2 20:6 22:19,24,25 93:16 96:23 101:13,16

**criminal** 20:16 21:23 22:8,11,14,17, 18,24 23:14,21 25:19 26:2 50:19 55:12 92:9,10,23,24 96:21,22 115:4 116:15,18 119:14,20,21,23 120:1,2, 11,12 133:14

**cross** 62:11

**cursory** 114:22 129:15

### D

**D-A-V-I-D** 5:23

**D.C.** 5:7

**DACA** 138:13

**daily** 59:20 88:18

**date** 11:5 67:2,4,5,9 116:23

**dated** 50:4 54:18 64:11 81:25 85:19 98:12 102:10 103:5,9 111:6,9,23 114:19 121:18

**dates** 76:25 102:22

**David** 5:1,22 21:25 22:7,10 23:16 55:10,21 93:2,3,14 95:25 96:12 97:2, 22 105:7,9,12 110:22 116:16 118:17 131:24,25 134:19,22 135:19 140:15 144:24

**David's** 132:4

**day** 46:2 54:4 93:25 94:3,19 107:24

**day-to-day** 21:6 41:15 59:7

**DE** 50:5

**dealing** 77:19

**debris** 33:22

**December** 64:12 81:25

**deception** 137:21 138:3

**decided** 30:16

**decides** 30:11

**Defense** 138:14

**definitive** 45:4

**definitively** 84:12

**Deidra** 11:19 12:3

**delivered** 6:11,12 11:20 117:21

**demonstrates** 63:4,16

**department** 5:6,10 6:3 7:19 11:15 12:25 17:9 18:14 19:13 20:8,18 24:14,23 25:3,5 38:14 39:7,8 56:8,19 58:2 59:9 76:4 91:5,7 93:11 96:13 100:4 104:11 109:15,19,24 110:5 116:25 122:20 123:1 128:14 133:20 138:12,13

**Department's** 9:21

**departmental** 134:1

**depending** 17:17 30:13 52:10 121:10 142:22

**depends** 33:3 89:15

**deposed** 5:18 121:22

**deposition** 7:11,17 8:5 9:16 12:9, 13 13:2 14:6 17:1 48:2,8 117:15 142:16 144:25

**describe** 63:3 82:22 100:3

**describes** 28:18 99:8,9 122:9,10 137:16

**describing** 30:8 111:12

**desk** 50:3,13 51:2,25 52:6,9,10 63:3 85:5

**detail** 109:10

**detailing** 51:20

**details** 106:11

**determination** 35:9 38:6 39:1 41:11 44:14 70:12 79:8 136:25 137:3, 7 139:16

**determine** 34:1 36:11 37:10,18 38:9 44:2 127:13

**determined** 30:4 39:9 44:2,3,4

**determines** 32:25

**developed** 113:5,8,12

**differ** 105:23,24

**difference** 106:9

**differently** 115:14

**difficult** 51:22 141:3

**direct** 42:23 66:6 72:9

**directed** 58:20 59:3,16



Case 4:18-cv-00644   Document 66-3   Filed on 11/18/19 in TXSD   Page 44 of 54
David Evans Watkins
s Index: direction..event

**direction** 97:8,13,23 98:2 113:14,
17 114:4

**directly** 20:14 21:9 23:18 35:19
36:2 47:6 66:3 131:24

**director** 85:4,5 132:10

**directors** 109:15

**directs** 58:24 118:5

**disbanded** 26:4

**disciplinary** 90:22 91:16

**disclosed** 47:17

**discovered** 52:3 92:21 108:5 110:1

**discovering** 73:25

**discovery** 50:23 53:17,21 54:1
91:24 122:7,10

**discriminated** 30:22 35:5,10 43:8,
24 44:11,20 45:18 46:4,6 70:13 78:23
80:6,7

**discrimination** 20:22 21:15 29:23
30:4,9,12 31:3,6,9,12,20,25 32:2,8,
12,13,18 33:1 34:5,11,15,17,22 39:1,
14 42:4,6,14 44:23 45:12,14 46:10
51:7 55:4 56:7,10,21 57:18 61:11,19
69:23,24 80:1 83:14 87:3,7,15 92:9,
12 93:17,18 120:24 122:22 123:14,
16,23,25 125:3,6,8 126:24 127:15
128:8 130:8 132:25 133:10,17 134:6
136:2

**discriminatory** 122:25 124:5
126:16

**discuss** 8:6 97:1

**discussed** 29:6 42:21 82:20 96:10
112:22 124:19

**discusses** 39:6

**discussing** 36:10 38:25 48:1 83:12
84:23 87:4,8 91:21 111:11

**discussion** 42:8,16 79:6

**discussions** 48:16 53:19

**dishonest** 76:1 77:22 78:1

**disposition** 83:1 86:13,16 105:3
141:6,12,22 142:6

**division** 5:7,9 7:24 18:11,13,24,25
19:1,10,25 20:3,10 22:1,4 25:12,25
34:8 57:14,15 58:9,15 59:23,25 82:18
90:24 92:22

**document** 27:20,24 28:11,14
30:18,23 31:18 32:15 37:8 38:8 50:7,
12 54:21 55:1,16,22 56:3 64:8,11,15,
17,22,23 65:4,11,15 67:17,18,20

68:6,11,20 69:19 79:25 80:23 82:4,7,
8,14,16 84:14,15,18 85:1,7,20,22,25
86:1,8,11,12 88:23 90:25 98:14,16,
17,22 99:21 100:7 103:12,16,18
104:14,19 105:5,6,10,20 106:22
108:3,13 113:25 114:21 116:12,21
117:12 118:5,6,14 124:4,17 126:8,12,
15,18 127:1,9 132:11,14 135:2
140:17,20 142:3

**documented** 70:6 99:22 113:21

**documents** 14:18 41:10 79:25
86:3,4,5 89:6 98:23 99:12 103:19
134:10

**dorm** 50:23 53:18 54:1 73:4,5,15
91:24 107:8,12,16,20 108:23 110:2,6

**double** 94:24

**doubt** 55:19 75:25 76:2

**dozen** 100:19

**DP** 50:3,17

**drafted** 69:13,15 105:7,10 116:12
134:18

**drafting** 109:1,3

**drawn** 83:1 107:21

**Draycott** 5:14,15 26:21 27:5,7 28:7
33:1 35:4,10 38:17 43:8,12,24 44:7
51:8 56:6,10 64:13 76:25 80:5 82:1
83:13 86:14 87:2,13,20 103:11 108:5
109:19,25 114:15,20 121:3,7,22
122:12 123:7 127:14 136:22 137:4
138:4,9,17 141:7,12

**Draycott's** 32:11 33:11 40:1 61:10
69:23 125:21 130:5,16 135:25

**due** 43:9,24 45:18

**duly** 5:2 121:22

**duties** 19:25 20:4 41:23 131:7

**duty** 17:23

---

**E**

---

**e-mails** 88:22

**E-V-A-N-S** 5:23

**earlier** 29:6 42:18 47:25 48:7 52:25
66:7 78:13 82:20 101:15 104:9
110:14 111:11 120:22 132:16 141:5

**ears** 140:11

**education** 17:5,7

**EEOC** 33:4,6,11 34:23,24 35:7,12,
24 36:11,20 39:1,14 46:24 47:5 79:7

80:9,14 81:2 83:25 84:3 89:1 123:17

**EEOC's** 47:12

**effective** 77:12,14,15

**efforts** 62:18

**elapsed** 62:3

**element** 80:1

**eliminate** 108:16

**Elizabeth** 7:2,8

**employed** 15:9,10 16:4 97:6

**employee** 17:21,23 20:19,20 22:5,
17,21 23:1,3 25:7 28:1,22 29:22 31:2,
8,14 48:13,24 49:4 55:3 56:8 57:3
76:1 77:25 78:2,4,6 112:15 119:24
120:15,22 133:5,9 141:19

**employees** 16:1 57:20 59:20 77:20
78:3 120:7,14

**employment** 15:13 16:2,6,10,13
17:9 21:15 57:17 92:9,12 120:24
123:14 125:3,6,7 132:25 133:10,16
134:6

**empty** 140:15

**Ena** 56:5 64:13 82:1 103:10

**end** 15:18 46:2 82:25 83:7 118:16
142:12

**ended** 16:3,13 52:23

**ending** 17:8

**ensure** 8:15,18

**entail** 38:10

**entered** 6:19 108:4,17

**entire** 105:10

**entitled** 111:5

**entry** 100:21

**Erich** 37:7 50:16

**ERU** 20:19 21:2,5,17 41:8 42:19
59:21 69:8 82:18,19

**essentially** 83:3 99:14

**establish** 34:16 37:3,14,16 75:17
77:1 107:18 108:19

**established** 112:7

**estimating** 7:14

**evaluate** 34:4

**Evans** 5:1,22 144:24

**event** 108:8



Case 4:18-cv-00644   Document 66-3   Filed on 11/18/19 in TXSD   Page 45 of 54
David Evans Watkins
s Index: events..give

**events** 49:5

**evidence** 63:15 89:13 99:10,15,17, 19,21,23,25 100:5 106:11,14,19,24, 25 110:22 129:21 131:10,12,15,17

**exact** 101:4

**EXAMINATION** 5:3

**exclusively** 133:7

**excuse** 18:7 93:18

**exhausted** 17:20

**exhausts** 15:17

**exhibit** 27:12,14,15 36:8 49:15,18 50:1 52:20,21 54:14,16 58:24 62:23, 24 63:10 64:3,4,5 66:9,24 81:17,20, 21 85:15,17 88:4,16,19,20,23,25 90:11 91:19 98:8,10 102:8,9,11,14, 15,18,23,24 103:2,25 104:23,24 111:3,4,5,10,17 112:4,8 113:21 114:12,17,22 115:2,7 117:6,8,16,19 118:1,13,20,22,24 119:2,7 121:14,16, 17,18 122:3,5,17 127:10,18 128:22 129:22 131:21 132:1 134:12 135:16 136:19,21 137:14 140:7,10 141:9

**exhibits** 10:4,7,11,19 99:11

**exists** 48:23 49:3

**expect** 30:20 43:7,22 78:2,3 84:4,8

**expected** 42:13 43:17

**expedient** 132:20

**experienced** 36:17 37:12 38:2

**expertise** 139:19

**explain** 17:12

**extent** 73:24 74:9

**exterminator** 107:23

**extraordinary** 109:7

---

**F**

**facility** 108:4,17

**fact** 34:2,11,14 36:22 88:25 89:12 93:16 101:13 108:7

**Factfinder** 70:10,11

**facts** 45:22 70:9 83:4 134:15

**factual** 130:16

**fair** 9:4 13:6 32:9 45:13,18 51:4 61:18 78:18 79:22 106:11,17 117:13 130:15

**falls** 31:12

**familiar** 59:7,18

**fast** 95:7

**FBI** 100:16 104:7,16,18 111:13 113:23

**FBI's** 111:18

**federal** 57:4,16

**feel** 101:25 112:22 114:5

**Feldman** 118:17 134:22 140:15

**figure** 80:25 142:11

**file** 9:25 10:2,22 12:11 52:17,22,23 63:7,8,12 141:23

**filed** 5:15 28:22 56:6,10

**files** 142:14

**filing** 57:3

**fill** 60:5

**final** 68:18 86:13,16 105:3

**find** 44:22 46:5 79:22 87:19 129:18

**finding** 33:15 39:14 130:4

**findings** 116:7 128:8 131:4

**fine** 6:1 7:15 32:15 81:1,2 101:6

**finish** 8:16 34:13 35:3 42:10 60:7 79:13

**finished** 42:11

**fire** 20:17 24:14,23 25:3,5 36:16 38:14 55:2 56:8 72:15,23 74:15 77:18 88:19 91:7 93:10,19,22,24 94:2 107:22 122:20 123:1 127:18 128:13

**firefighter** 56:6 71:23 72:21 73:4 75:8 76:23 86:14 107:19 108:5,7,9, 10,20 122:12 137:21 138:3,4,9

**firefighter's** 72:6

**firefighters** 74:23,25 75:16,22 76:19 100:9,12,19,22 109:8

**fiscal** 23:12

**five-minute** 81:14

**flash** 61:5

**flip** 27:17 64:7 81:23 84:13 103:8

**flood** 61:5

**floor** 72:14,22 73:17 74:14 77:17

**focus** 35:13 91:21

**focused** 113:8

**follow** 48:25 49:8

**followups** 142:23

**foregoing** 144:24

**forget** 13:8

**forgive** 24:17

**form** 99:12 120:1

**formed** 129:4

**forward** 47:16 52:11 95:11 108:2 121:9

**forwarded** 132:7

**found** 34:14 44:20 45:21 46:4,8 54:5 87:14 99:23 107:7,11,15,19 108:23 110:6 113:19 130:22 131:15

**fourth** 137:19

**frame** 100:12 108:4 117:1,2,5 120:5

**freeze** 25:10

**Friday** 11:3,4,8 65:3,9 82:10

**front** 88:5 103:7 131:20

**fully** 9:8

**functioning** 120:16

---

**G**

**gaining** 109:6

**gate** 100:21

**gather** 76:18

**gave** 13:17 102:14,16,20

**gender** 32:8,13,19 33:2 34:6,10,15, 17,22 35:5,11 36:18 37:13,15 38:3 42:4,6,14 43:9,16,25 44:21,22 45:11, 14,19 46:5,6,10 55:4 56:6,10 61:19 69:23 70:13 78:17,23 80:1,6,7 83:14 87:3,7,15

**general** 7:22 9:22 10:24 19:21,22, 23 27:18 28:13 38:4 50:4,6 66:2,4 68:1 70:24 85:2,8 91:2 100:23 105:13,16,18 109:13 115:5 116:22 118:10 122:23 123:18 133:19

**general's** 136:11

**generalities** 54:10

**generally** 30:17 133:11 142:4,5,10

**generated** 68:20 86:21

**George** 19:15 66:1 117:2

**give** 13:16 45:1,4,10 109:13 115:8,9 129:19 139:12



Case 4:18-cv-00644   Document 66-3   Filed on 11/18/19 in TXSD   Page 46 of 54
David Evans Watkins
s Index: giving..internal

**giving** 76:23 97:8 117:19 129:15

**Gonzales** 40:5,9,10 41:3 42:24
47:15 59:13,14,17 60:21 61:1 64:10
65:22 67:25 69:22 70:23 71:25 74:17
76:13 77:11 78:11,21 88:10

**Gonzales'** 41:21 70:8

**good** 5:5 13:9 90:1

**graffiti-related** 92:16

**graffiti-type** 93:19

**group** 129:6

**guess** 46:22,23 53:4

**guessing** 15:24

**guidance** 97:5

---

### H

**H-A-R-T-N-E-T-T** 23:7

**halfway** 70:20 137:17

**hand** 27:13 49:18 54:15 66:23 81:20
85:16 102:7 117:8 121:16

**handed** 135:13

**handing** 98:9 102:25

**handled** 23:10,11

**handles** 120:1

**handwriting** 100:11,15 104:7,11,
17 111:14,18,22 113:23

**happen** 81:11 95:7

**happened** 140:9,13

**happening** 78:17

**Hartnett** 23:6

**head** 39:7 56:19 57:1 59:9 91:5

**hear** 8:12

**hearing** 41:12

**Hector** 5:5

**held** 6:2 18:19 19:2,5

**helped** 13:5

**Henschel** 37:7 50:16

**HFD** 20:18

**hidden** 79:25

**High** 17:7

**higher** 127:19

**highest** 17:5 132:13

**highlight** 14:21

**highlighted** 14:20

**highlights** 14:18

**hiring** 25:10

**historically** 69:14

**hold** 18:1

**holding** 18:9

**home** 6:12,15 11:22

**honest** 77:19

**Honestly** 112:25

**hope** 77:24

**hot** 88:19

**HOU** 27:16 29:13 36:8 50:2 54:17
64:6 66:10 70:20 81:22 85:18 98:11,
12 102:9,10 103:3,9 105:4 108:12
112:5,12 114:18,19 115:9,17 117:9
118:2 135:4 137:16 140:8

**hour** 12:6 48:4

**hours** 94:11

**Houston** 5:12 6:3,7,22 7:18 9:21
17:9 19:12 22:20 23:1,3 27:18 48:14
54:18 64:9 81:24 85:19 91:7 98:13
100:4 109:18,24 110:5

**HPD** 58:2

**HPD's** 18:10

**Hurt** 113:22

**hygienically** 38:19

---

### I

**idea** 142:2

**identified** 67:9 75:6 139:7

**identify** 107:6 114:5,7

**illegal** 122:24 123:19

**illegible** 66:21 98:18

**illustrates** 85:1

**implies** 120:12

**imply** 22:16

**important** 96:14,24 99:20,23
106:20,24 131:11,15

**inability** 25:9

**incident** 61:15 88:17,18 91:22,23
92:2,5,16 95:3 130:13

**incidents** 37:8

**include** 10:13 104:14 111:13

**included** 10:2 45:7 131:5

**includes** 104:16 105:25 111:18

**Including** 13:21

**inconclusive** 44:15

**inconsistencies** 76:20

**incredibly** 141:3

**index** 66:22

**indirectly** 23:19

**individual** 96:6 107:7 112:17

**individuals** 94:10 139:18

**inform** 121:11

**information** 28:22 37:5 50:15 51:3,
6,18,20 52:3,7,12,16 53:8 59:1,5
60:10,18 62:7,21 63:17,21,24 72:5
78:4 97:14,15,24 98:6 104:14,18
111:23 127:23 138:8

**informational** 51:17,20,24

**informed** 87:14

**informing** 56:3

**initial** 54:3 76:17 95:16 104:10
109:6 138:11

**initialed** 55:6

**initials** 67:11,14 132:3,4

**initiated** 92:21

**initiates** 10:12

**inspector** 7:22 9:21 10:24 19:21,
22,23 27:18 28:13 38:3 50:4,6 66:2,3
68:1 70:24 85:2,8 91:1 100:23
105:13,16,18 112:21 115:5 116:22
118:10 122:23 123:18 133:18 136:10

**instance** 44:9

**instruct** 48:20 49:6

**instruction** 49:1,8

**instructs** 8:22 48:10

**insurance** 17:23

**interchangeably** 24:2

**Intercontinental** 93:20

**interesting** 116:23

**interject** 49:2

**internal** 133:22 134:2,4



Case 4:18-cv-00644   Document 66-3   Filed on 11/18/19 in TXSD   Page 47 of 54
David Evans Watkins
s Index: interoffice..long

**interoffice** 54:18 64:9 81:24

**interpreted** 32:11

**intervention** 5:15

**interview** 25:23 38:13 74:23 88:11

**interviewed** 25:22 26:2 61:25
74:25 76:7 89:5

**interviewing** 50:15 61:21 62:16

**investigate** 21:14 22:15 32:22
33:2,8,13 34:21 36:11,14 37:10,16,18
38:4,21 70:5 74:10 75:16 78:11 88:7
95:14 125:3 127:13 130:12

**investigated** 29:10 34:22,23 40:4
46:25 56:4,22 57:21 58:17 76:8 79:7
80:9 81:2 92:5 120:23 126:19 127:4,8
128:3 130:15 132:25 133:5,10

**investigating** 22:19 33:16,18
34:24 35:8 36:12,20 39:2 40:2 41:4,
13 51:12 53:6 59:23,25 60:16 61:1
69:22 78:24 80:14 88:12 100:15
120:19 121:12 133:16 134:6

**investigation** 10:4,5,9,10,12,15,
16,18,20 26:10,25 27:2 31:9 33:4,6,
10,25 34:20 35:13,24 38:9 39:10 40:7
41:8,16,20 42:2 43:5,6,15,22 44:1,19
45:13,15 46:1,14 47:5,12 50:22 51:7
52:4,8,13,17 53:1,9,14,17,21,25 54:6,
12 59:8,11,19 61:19,20 62:10 63:2
68:21 69:15 73:25 76:21 77:8 79:7
80:4 83:25 84:3 86:9,15,21 87:19,25
89:7 91:21,22,23 92:19,21,22,24 93:5
94:6,15 95:12 96:2,10,15 97:6,9,16,
19,25 99:2,10,13,16,20,24 102:1
104:5 105:1 106:21,25 107:4,10,14
109:4,11,20 112:21 113:18 114:8,15
116:17 119:9,10 120:12 121:1,5
127:22 128:4 129:5 131:11,16 132:20
134:15 135:1 136:5 137:11 141:6

**investigations** 9:20 20:16,17,18
22:8 23:11 24:10 26:2,6,7,8 27:10
40:25 50:20 53:12 61:23 62:6 92:23
115:4 116:16 120:1 141:19

**investigative** 10:3,6,7,13,17,18
20:9 21:23 22:11,15,18,24 23:4,14,21
24:7,14,23 25:19 29:2,5,9 45:7,8
47:10,11 50:13,18,19 55:12 63:6
64:11,21 65:20 68:21,23,25 69:4,8,12
70:1,6 78:10 79:11,13,21,23 80:8,11
82:2,19,23,24 83:4,20 84:5,10 85:12
87:18 88:3,4,8 89:9,16 90:11 95:6
98:14 99:1,8,12,25 100:25 101:7
102:4,17 103:12 104:4,22,25 105:22,
23,24,25 106:4,6,10,14,22 107:1,5,6
109:2 110:21 111:5,9,12,17 112:6,14
114:21 115:3,24 116:19 117:22
118:7,12,19 119:3,14,20,24 128:21,

23 129:1,8,18,25 130:8,10 131:5,12,
17,21 133:12,15 134:13,14 135:6,20
137:15 139:3

**investigator** 20:2 40:4,7,15,20
51:13 52:11,14 60:22 62:25 63:4
64:10 65:23 67:25 69:9,13,16,22
70:8,23 71:24 84:9 95:18 96:2,4,5
120:3

**investigators** 21:11,13,17,18
23:20,23 24:6,24,25 25:2,6,20 51:19
52:7 54:5 62:5,8,10,20 63:16 93:15,
24 94:12,18 95:15 133:14,22

**investigatory** 97:5

**involve** 22:20 61:20 69:9

**involved** 20:6 22:25 29:23 31:13,25
75:22 97:22 128:13

**involves** 31:19

**involving** 20:22 91:23 114:15
120:23

**issue** 33:21 35:20 38:24 39:13 42:6,
14 43:18 49:5 75:7 111:8 127:3,4
128:5

**issues** 23:13 29:24 57:21

**italics** 70:21

---

## J

**Jane** 5:14 26:20 27:5,7 28:7 33:1,11
35:4,9 38:16 43:8,12,23 44:6 51:8
56:9 61:10 64:13 69:23 70:12 80:5
82:1 87:20 103:10 109:19,25 110:5
114:15,20 121:2,7,21 127:14 130:16
136:22 137:4 138:17 141:7

**January** 85:20 130:14 136:23 141:7

**Jeremy** 5:8

**job** 57:15

**Jones** 11:19

**July** 50:4 51:16 54:19 93:13

**June** 114:19

**Justice** 5:6,10

---

## K

**K-A-R-P-A-T-I** 7:6

**K-E-I-T-H** 6:25

**Karpati** 7:2,6,8

**keeping** 49:25

**Keith** 6:21,24

**Keyes** 103:11 137:21 138:3

**kind** 12:18 51:24 73:21 142:12

**knew** 63:1 95:3 106:24 108:2

**Knowing** 34:12

**knowledge** 35:23 72:21

---

## L

**lab** 8:2 20:6

**lack** 77:1

**language** 96:22

**larger** 45:12,14,23 46:3 47:6 78:13,
16,22 79:1,10 80:5 83:13,19 84:4,8
87:3,7 126:5,13,21 127:3

**law** 57:16

**laws** 57:4,5

**layman's** 139:12

**lead** 77:24,25 95:15,17 96:4

**learn** 138:17

**learned** 139:2

**leave** 15:18

**left** 5:8 6:21 66:22 90:10 135:13,14
136:10

**legal** 11:14 12:25 18:14 91:4 116:25
120:18

**legible** 98:20 115:10

**letter** 56:13,16,18,24 57:2 86:13,17,
20 87:2,6 141:6,13

**letters** 141:22 142:6,16

**level** 17:5 69:4 85:3 88:1

**levels** 66:5 67:25

**lieutenant** 21:25 22:8,10 23:6,16
30:17 55:10,22 93:2,14 96:12 97:2,
12,22 105:7,9,12 110:21,22 116:16
131:24,25 132:3 134:18 135:19

**limited** 26:1 75:15

**lines** 95:2

**list** 89:3 94:7,9,13,14 99:17

**listed** 78:9 81:11 108:3

**lives** 6:6

**long** 12:4 18:3,13 54:13 76:3,4 96:9
133:24



Case 4:18-cv-00644   Document 66-3   Filed on 11/18/19 in TXSD   Page 48 of 54
David Evans Watkins
s Index: longer..occur

**longer** 15:10 16:4 48:13 117:3

**looked** 42:5 111:8

**Lorenzo** 101:24

**lot** 26:13 98:18 136:16

**lowest** 115:22,23

**lunch** 90:1

## M

**made** 28:25 29:3 38:6 42:3 43:11 44:14 55:3 78:25 90:15,19 121:8 128:7 129:25 131:4

**make** 13:9 14:12 22:3 33:15 35:24 38:6,25 39:7,10,13 41:10 42:5 43:20 44:17 45:2 56:2 62:19 69:7 70:11 79:8 80:2 95:6 110:8,16,19 130:21 134:16 137:7 139:15 140:9,12

**makes** 28:1 96:24 125:24 135:20 141:3

**making** 52:15 109:25 110:15 111:1

**male** 72:21 73:3 74:1

**males** 73:2,11

**manage** 20:2,10

**managed** 20:13 21:2,6,8,13 24:20

**manager** 21:1,24 22:1,5,11 23:5 24:16 42:19 55:11 59:21 60:25 66:6 82:18 93:1 141:20

**managerial** 15:25 21:5 49:4

**managers** 20:11 59:6,19

**managing** 20:9

**manual** 10:25

**March** 18:8 102:10 103:6,10 111:6

**Marjorie** 9:14 13:17 15:5 143:2

**mark** 64:4 111:4 114:16

**marked** 27:12,14 49:15 50:2 54:14 64:3 81:17 85:15,17 98:8,10,11 102:8,17,23 111:3 114:12 117:6 121:14

**marking** 49:18

**material** 11:2,10,13 12:8,15 13:3, 10,19 14:20,21 100:16

**materials** 12:7,19,21,24 13:1,7,13 14:4,7,9 17:3 64:20 65:12

**matter** 5:16 22:19 34:24 35:8 36:12, 21 40:15 42:22 51:3 70:5 84:3 100:15 119:21 120:20 129:10 132:16 136:5

**matters** 20:20,22 22:14 23:8,11 62:20 120:23 132:25 133:4,10,17

**Mccoy** 50:3,17 51:11,15 52:2 53:5, 11,25 60:11,14 62:25 88:24 93:23 94:2,6,21 95:12,17,24 96:7,11 97:2, 12,18 98:4 99:23 109:2 110:4,8,14 138:23 139:1

**Mccoy's** 99:4

**means** 17:13,14 116:6 128:2

**meant** 30:9

**meet** 12:1,4

**meeting** 127:20 129:6

**members** 21:5 96:12

**memo** 50:13 51:2,17,24 52:10,18 60:15 63:3 88:24 113:25

**memory** 13:5 24:20

**memos** 51:20 52:6,9

**men** 38:17 78:15

**mentioned** 24:14 42:18 80:17 94:17 101:15 117:19

**met** 27:7

**mid** 18:15 19:8 142:12

**midway** 71:4

**mind** 39:25 106:2

**mine** 115:15

**minute** 140:2

**minutes** 114:10 129:19 136:13

**mirror** 72:15,23 74:15 77:18

**mischaracterizes** 131:6

**mischief** 96:21,22

**misconduct** 20:24 22:17 23:2,12 31:14 75:6 120:2,13 127:19

**mistake** 24:5

**mistaken** 94:8 129:15

**moment** 64:14 98:15 103:15 114:24 117:11 121:17

**Monteiro** 5:9

**month** 136:11

**morning** 5:5 65:13

**move** 91:20 121:9 136:16

**moved** 21:21

**moves** 57:1

**moving** 120:6

**muscle** 95:6

## N

**names** 86:19

**Nasim** 5:13 142:22

**nature** 20:25 22:17 96:23

**necessarily** 120:2

**needed** 34:21 37:17 42:2 74:22 95:5 96:4

**noes** 29:25

**nonbolded** 72:5

**notate** 109:17

**notation** 29:14 42:3

**note** 13:11

**notes** 12:16,18 13:6,21 14:7,23,25 99:12

**noticed** 135:13

**notification** 39:7 55:2 56:13

**notwithstanding** 139:21

**November** 70:22 71:12 98:12 111:9,24

**number** 101:4 102:13 115:8 135:11 140:8

**numbered** 114:18

**numerous** 36:17 37:12 38:2 76:24

## O

**O311** 131:11

**oath** 90:8 121:20

**object** 48:18 136:3

**Objection** 32:23 46:18 76:9 87:9,22 124:3,16 126:7,25 128:9 130:19 131:6

**objects** 48:10

**obtain** 95:4 97:13 121:2

**obtained** 122:11

**obtaining** 121:7

**occasion** 21:21 52:5

**occur** 34:3 69:16 77:2 116:24 127:19

LEXITAS

Case 4:18-cv-00644   Document 66-3   Filed on 11/18/19 in TXSD   Page 49 of 54
David Evans Watkins
s Index: occurred..prevented

**occurred** 16:6 54:4 58:1 61:15
107:24 130:13 137:18

**occurrence** 92:13,14

**occurring** 33:23 92:3 120:8

**offer** 97:5

**office** 7:3,21 9:21 19:22 27:18 28:13
38:7 47:5 50:3,5 55:14 56:3 62:4,19
70:24 91:10 93:11 100:22 117:23
118:9 122:23 123:18 133:18 136:11
140:19 141:11

**officer** 6:7 101:14

**officers** 23:19

**official** 132:14

**OIG** 9:17 18:11,16,18,20,23 19:2,19,
20 20:15 26:6,9 27:3,4,19 28:4 32:10,
17 33:2,7,11 34:4,8,14,25 35:8,18
36:10,13,19 37:9 38:25 39:4 43:7,17,
22 44:10,20 46:2 57:10,21,22 61:25
62:5 64:13 79:9 80:4 82:1,18 84:8
85:21 86:15 90:18,20 91:15 92:5,8,21
99:2,20,24 101:1 102:1 103:6,11
106:20,25 107:18 108:19 114:20
116:24 119:20 120:9 121:6,11
124:14,25 127:12 131:11,16 132:13,
15 134:13,14,25 136:25 137:3,6
141:11,13,22

**OIG's** 43:21 47:5 51:7 116:18 125:2

**older** 13:8

**ongoing** 46:25 47:5,12 52:13 53:9
61:24 63:2 83:25 84:2

**opens** 91:13

**operating** 10:24 39:5 56:15

**operations** 59:7

**opinion** 139:12

**opportunity** 17:16 122:3

**opposition** 122:25

**optional** 136:4

**options** 17:18 29:16

**order** 37:17 38:9 121:8

**orders** 88:16,19,20,21

**org** 24:18,19

**original** 70:25

**outcome** 46:13 105:3

**outline** 70:1 135:14

**outlining** 50:14

**overbroad** 76:9 87:22

**P**

**P-E-R-R-E-T** 94:24

**p.m.** 90:3 110:12 114:11 136:14
140:4

**package** 118:23

**Page's** 121:1 131:7

**pages** 14:24 90:14 98:18 118:3
135:9

**Paginated** 115:14

**paid** 17:16,18

**paperwork** 47:16

**paragraph** 37:22,25 57:3 58:24
70:21 71:13 82:2 108:12 122:6,18
123:7 137:18,20,22,23 138:2

**parked** 136:16

**Parrett's** 95:22

**part** 25:18,20 41:23 52:16,17 63:7,12
64:22 86:2,4 98:1 121:1 125:2 133:23
135:6

**parts** 83:3

**pattern** 75:6,17

**pay** 15:17 17:22

**PD** 103:11

**pen** 66:24

**pending** 9:2

**people** 24:21 60:10 101:4 108:3
136:16

**period** 17:19 95:7 120:6 141:2

**permission** 109:6

**Perret** 94:23 95:1,13,19 96:1,3

**person** 6:6 11:16 15:5 30:3 46:9
55:6,9 59:11 71:25 73:25 74:13 75:19
76:13 77:13,16,21,22 107:15 108:16,
17 112:15 121:19 124:13,14 128:3

**personal** 5:14

**personally** 15:23 121:21

**personnel** 23:18,24 24:3,4,8,12,24
25:1,9,11 40:11 75:16 77:24

**persons** 21:8,11 57:17 73:16,22
74:13

**pertaining** 52:12

**pertinent** 99:13

**phase** 15:16 16:17 17:10,13 18:1

**Phil** 56:3,9

**phone** 5:13 102:12

**photocopied** 9:25 11:10,13

**phrased** 79:12

**physical** 129:21

**physiology** 138:20

**pick** 11:24 12:1

**piece** 37:21,22 47:15

**pieces** 89:2

**place** 26:3 63:19 90:1 118:18

**plaintiff** 5:15

**point** 24:18 35:2 37:2 47:9,17 56:7
60:9 73:21 74:13 75:23 76:14 77:16
108:2 118:18 139:24

**points** 34:21

**police** 6:3,7 7:18 9:21 17:9 19:13
20:8 76:4 100:4 109:18,24 110:5

**policy** 30:22 39:3,5

**polygraph** 101:2 109:7 137:17

**polygraphed** 101:5

**polygrapher** 138:19,22 139:11,22

**polygrapher's** 138:11,25

**polygraphs** 100:18 109:6

**pose** 71:25

**position** 18:19,23,24 19:2,5,19

**possibly** 62:6

**Post-it** 12:18 13:6,11,21 14:7,23,25

**potential** 23:12

**preliminary** 54:5

**premises** 93:20

**preparation** 48:1

**prepare** 9:15 12:12 13:1

**prepared** 137:25 141:14,17,18,22

**present** 100:12

**pressure** 114:5

**pressured** 114:7

**prevail** 64:1

**prevented** 122:19 123:8,9,24
124:9,11 128:6 130:6 136:1



Case 4:18-cv-00644   Document 66-3   Filed on 11/18/19 in TXSD   Page 50 of 54
David Evans Watkins
s Index: prevents..relating

**prevents** 9:7

**previous** 73:3,6 104:15,19

**previously** 98:18 103:18

**primarily** 20:11,22 98:5

**prior** 41:11 73:13 109:1,2 117:18

**privilege** 48:19,20,23 49:3

**problem** 69:18,21

**problems** 36:17 37:12 38:2

**procedure** 10:25 39:6 56:15

**proceed** 54:23

**proceeding** 40:25 97:16,25

**process** 20:2,9 38:24 39:2 47:17,19
69:4 88:6 105:6 112:2 117:20 131:22

**processes** 100:4,8,14

**procurement** 23:13

**product** 48:20 99:5

**progress** 97:19

**prohibiting** 57:16

**project** 8:2 20:7

**pronouncing** 113:15

**pronunciation** 101:19

**protected** 57:4

**provide** 65:12,13 78:3 97:13,15,23
98:2,5 109:3

**provided** 12:9 14:5 47:14 71:22
82:11 85:8,13 86:6 96:7 98:24
103:20,22 104:1 107:23 133:15

**providing** 53:8 71:25

**Public** 104:12

**publicly** 122:24

**purpose** 28:9 33:18 56:2 97:11
104:21,25 105:1 121:6 134:14

**put** 13:6,11,22 47:16 67:2 127:5

**puts** 106:14

---

**Q**

**qualified** 139:15

**qualify** 120:4

**question** 8:9,11,12,14,16,18,23 9:2,
3 34:10,13 35:3 36:2 38:23 42:10
43:20 45:12,15 46:3 47:6 48:9 51:22
58:23 60:7,13 64:19 71:22,24 72:10,
13,16,20 73:3,6,9,13 74:2 75:7 78:14,

16,22 79:2,5,10,12 80:5 83:13,19
84:4,8 87:3,7,25 108:18 124:20
126:5,13,21 127:3 137:2

**questioning** 76:18

**questions** 15:3 26:13 27:22 50:8
54:21 64:16 71:5 72:11 73:1,10,11,18
77:11,12 78:9,14 82:5 85:24 103:16
114:23 121:24 140:7 142:21,24,25

**quicker** 59:9

**quote** 70:21

---

**R**

**radio** 33:22

**raised** 39:13 43:18

**rank** 6:2 17:25 18:1,6,9 95:20

**ranking** 132:14

**rationale** 120:9

**Raymond** 40:7,9 41:7,21 42:24
47:14 64:10 65:22 70:23

**re-marked** 102:24

**reach** 34:25 35:9 38:15 105:2

**read** 8:11,13 9:25 31:21 57:8 72:18
105:15,19 123:4,10 135:1 140:13,16
144:24

**reading** 125:15

**reads** 132:6 138:2

**ready** 27:21 54:23 85:23

**realize** 102:21

**reason** 26:16 33:24 47:4,11 55:17,
19 59:16 73:15 75:25 76:2 80:16,18,
19,20 94:5 116:24 140:25 144:2

**recall** 11:5 12:5 21:20 26:1 27:8
33:21 35:23 39:23 40:13 43:12 46:20
48:2 53:15,23,24 58:3,4,7 61:12
78:16,18 81:9 84:23 85:11 87:11 92:2
93:12 98:2 101:17 113:1 114:4 117:4
119:25 120:9 124:18 128:15 131:8
132:17,22 134:24 138:8 140:16,20,22

**receive** 15:17 17:21,23 58:13 68:10
132:10

**received** 11:14,16,18 17:6 30:5
32:11,17 33:1 52:6 56:5 93:11 104:7
118:14

**receives** 91:13

**receiving** 58:7

**recently** 51:21

**recess** 14:1 47:23 49:14 61:8 81:16
90:3 110:12 114:11 136:14 140:4

**recipient** 118:4

**recognize** 55:5,6 61:24 65:17
66:14,17,20 67:12 84:15 115:18
119:4 132:3 134:17 140:14

**recognized** 62:2

**recognizing** 112:14

**recollection** 44:5 113:20 118:8

**recommendation** 129:24 130:5
135:18,24

**recommendations** 83:8 90:15,
18,19 105:2 106:1,15,18 134:16
135:5,19

**recommended** 112:10 119:7

**recommending** 136:15

**record** 6:8 8:6 10:11,20 13:24,25
14:3,12 26:18,24 27:1,2,18,25 28:3,6,
9,11,16,24 29:3 30:18,19 32:1,10
33:9 49:13,17 60:7 61:6,12 67:8
81:19 90:2,5 127:24

**records** 58:3 134:9

**recovery** 8:2 20:7

**refer** 5:24 35:22 108:11 136:18
139:11

**reference** 13:9,22 88:25 111:18

**referenced** 26:8 46:11,15 47:7,13
88:23 99:25 107:1 111:13 131:17

**references** 56:24

**referencing** 62:25 122:14

**referred** 19:20 86:18

**referring** 14:10 27:2 62:24 73:6
96:20 112:11

**refresh** 13:5 118:7

**regard** 113:18

**regarded** 122:25

**registered** 28:12

**regular** 71:15

**regularly** 57:21

**regulations** 57:5

**relate** 27:5

**related** 23:3

**relates** 86:8

**relating** 15:3 73:1 104:18



Case 4:18-cv-00644   Document 66-3   Filed on 11/18/19 in TXSD   Page 51 of 54
David Evans Watkins
s Index: relation..Sandra

**relation** 8:1

**relations** 20:19,21 22:5 25:7 29:22 31:2,8 119:24 120:15,23 133:5,9

**relationship** 71:18

**relayed** 52:16

**relevant** 10:19 56:22 89:7

**rely** 139:18

**remain** 95:13

**remained** 96:1,3

**remember** 18:5,10 21:1,22 36:6 40:10 48:5,11 53:20 54:7,10 81:13 83:15 85:14 93:4,9 96:7 97:8 98:3,5 110:17 111:15 112:23,25 113:3,7,10 117:23 128:11

**repeat** 30:6 31:4

**repeating** 106:2

**rephrase** 8:11 9:8 18:4 43:19 58:11 69:14

**report** 10:14,16,18 19:10 42:23,25 45:7 47:11 64:11,21 65:20 66:6 68:21 70:1,6 77:5 79:12,23 82:24 83:5 88:4, 8 89:18,23 98:14 99:1,8 100:1,3,5 102:17,22 105:24 106:4,10 107:6 109:2 111:5,9,12,17 112:6 114:21 115:3,24 116:2,4,7 117:22 118:12,20 128:22,23 129:1,8,18,25 130:9,11 131:3,5,13,18,21 136:8 137:15 138:12,22,25 139:3

**reported** 138:19,23,24 139:22

**reporter** 8:5,10,13,19 26:17 49:22

**reporting** 89:12

**represent** 15:25 16:3,10,14,16 67:17 84:18 119:6

**representation** 15:3,20

**represented** 9:11,13

**representing** 15:4,6,9,23

**represents** 5:14 32:15

**reprinted** 70:25

**require** 57:15

**required** 74:9,22 75:11 76:1 121:2

**requires** 59:1 121:9

**reread** 123:9

**reserve** 143:3

**resides** 6:6

**respect** 5:18 33:15 49:5 51:3,6,11 58:15 60:19 61:1 73:16 96:8 97:9,21,

24 98:4 99:15 102:2 111:14 112:21 118:9,12,19 128:5 130:5 135:25

**respond** 35:21 48:21 49:6 59:8 94:11 141:24

**responded** 93:7

**respondent** 28:2,21

**response** 72:7

**responses** 76:18,19

**responsibilities** 21:5,7 142:15

**responsibility** 91:16 98:1 125:2 127:12

**responsible** 78:21,24 79:4 87:20 96:6 107:7,11,15,19 108:20 112:18 141:12

**rest** 110:2

**restart** 58:22

**restate** 8:14 37:20 137:2

**restroom** 38:18,19 71:19 72:14,22 73:2,4,8,12,14,17 74:14 76:15,24 77:17 78:8,15 110:1

**restructure** 118:9

**results** 86:15 138:20

**retaliated** 126:5 127:14

**retaliation** 56:25 57:16,20,25 58:15,18 123:22 124:2,15 125:7,12, 17 126:15,23 130:17,22

**retaliatory** 57:4 123:1 124:5 137:1, 5,10

**retired** 15:15 48:15

**retiree** 40:12

**return** 128:14 129:6

**returned** 12:25

**returning** 122:20 123:25 128:6 130:6 136:1

**reveal** 54:6

**review** 10:1 11:1 14:4 24:17 27:20 37:22 39:16,17 41:9,17,21,25 50:7 54:20 56:14 58:2 63:6 64:15,18,21 66:5 67:25 68:8,11,16 69:4 76:19 77:4 82:4,8 85:3,7,22 86:2,6 87:24 98:15,24 102:8 103:15,20,23 105:6, 15 114:17,22,24 117:11 121:17 122:3 127:10,17 131:22 132:14 136:21 138:12

**reviewed** 9:17,19,24 10:23 11:3 12:19 14:14,17 17:3 29:1,4 64:20,23 65:8,15 67:18 68:6 77:10 82:7,9

84:19 85:25 86:1 98:17,22 100:7,22 103:18 104:11 105:19 116:2,21 117:16 119:6 134:19

**reviewing** 12:11,15 37:25 111:25

**Richard** 21:25 22:7,10 23:16 55:10, 21 116:16

**rights** 5:7,9

**ring** 124:14

**Robinson** 21:3,4 22:2,4 42:9,17,18, 22,25 43:3 46:21 58:25 59:4,17,18 60:24 66:6 68:3,7,10 82:17 85:2,4,12 90:16

**Rodriguez** 59:10

**role** 39:6 40:2 41:4,5,13 51:10,11 70:8,15

**roll** 129:6 130:13 136:23

**Ronald** 94:23 95:23

**Ronnie** 94:23

**room** 6:19 14:6

**roster** 88:18

**rotates** 94:11

**Roughly** 53:3,4

**routine** 56:16,17,18

**routinely** 133:1,3,4,8

**Ruiz** 5:4,5 7:9 13:18,21,25 14:2 16:2, 7,12,23 32:24 47:3,22,24 48:22 49:7, 13,16,24 61:6,9 67:5,7 76:11 81:14, 18 87:12 88:2 89:25 90:4 102:24 103:1 110:10,13 114:9,13 117:17 124:7,21 126:11,20 127:6 128:17 130:20 131:9 136:7,13,17 140:2,5 142:20

**rule** 136:4

**rules** 8:4 48:8 57:5

**run** 13:10 116:18

**running** 40:20,23

**runs** 27:16 64:6 81:22 98:11 103:3 114:18

---

## S

**Safety** 104:12

**samples** 100:11 111:14

**Sandra** 21:3,4 22:2,4 42:8,16,18,22 46:21 58:25 59:4 66:6 82:17 85:4 90:16



**save** 69:18

**scene** 93:16 101:14,16

**school** 17:7

**scope** 131:7

**seasoned** 120:3

**seat** 45:22 72:14,22 73:17 74:14,15 77:17

**seats** 38:12

**section** 20:11 21:1,7,24 22:11 23:5, 10 24:11,13,16 29:1,2,4 31:7,18 42:19 55:11 60:25 82:25 83:8 92:22 93:1 122:7 135:5

**sections** 20:12,15 59:6

**secure** 93:21

**selected** 25:6,15,20

**send** 51:19 55:22 56:13 93:16

**sending** 51:2,6 65:25 66:1 141:12

**senior** 64:10 70:23

**sense** 64:1

**sentence** 36:15 37:6,12

**sentences** 36:13

**separate** 52:14 136:5

**sergeant** 30:16 50:3,14,17,18,19 51:11 53:5,11,25 60:11,14 88:24 93:23 94:2,5,21,23,25 95:12,13,17, 19,20,22,24 96:1,3,7,11 97:2,12,18 98:4 99:4,23 109:2 110:4,8,14 115:3 116:10,15 119:17 121:7 129:3,10,25 130:1,12,21 131:3,7,10,15,23 132:17, 24 138:23,25

**sergeants** 23:18

**seriousness** 96:16

**serve** 28:10

**served** 6:9 20:7

**Serves** 28:11

**services** 91:11

**session** 92:8

**set** 100:12 127:9

**sex** 32:4,5,12 34:5

**shared** 113:3,6

**sharing** 63:17,20,24

**shield** 39:8

**shielding** 39:7

**Shirley** 11:19

**short** 31:12 47:21 120:5 133:25

**show** 118:4

**showed** 137:21 138:3

**shower** 33:22

**shows** 30:18 62:23 113:22

**side** 111:25 112:1

**sided** 115:15

**sign** 55:5

**signature** 55:23,25 66:22,25 67:9, 11,17 84:15,17 104:2 115:22,23,24 118:16 119:4 140:14 144:1,25

**signatures** 66:15,17 115:18

**signed** 41:10 91:1

**simply** 17:14 36:6 70:8 81:13 128:11 141:1,24

**singular** 96:6

**sink** 72:14,22 73:18 74:15 77:17

**sir** 5:5 6:5 7:15 11:1,20 12:11 13:4 17:5 19:14 20:5,13 22:3,10 23:4 26:5 27:13,15,21,24 29:18 31:16 34:8 38:23 41:6 44:12 49:17,19 52:19 57:6,13 60:8 61:16 64:4 65:17 66:8, 14 67:22 68:16 72:16 76:4 81:19 82:5,8 84:13,14 85:3 90:10,12 91:3, 20 92:3 98:23 101:3,17,25 102:25 103:2,5,13 104:24 109:1 112:4 115:7, 21 116:12,14 117:8,18 118:1,3 121:25 123:2 124:22 128:22 129:20 131:21 132:2 133:2 134:12 135:8,18 137:13,14 138:6 140:3 141:5,9 142:5, 10,20

**sitting** 39:21

**situation** 75:21 76:12

**SIU** 20:17

**slow** 30:7 41:19 128:18

**slurs** 50:23 53:18,22 54:1 61:15,20 91:24 92:20 107:7,11,15,19 108:21 109:20 110:1,6 112:18 113:19

**SOPS** 39:12

**sort** 31:14 93:19

**sound** 38:19

**sounds** 142:11

**speak** 76:1 135:19

**speaker** 33:22

**speaking** 133:11

**speaks** 39:17 44:24 124:4,17 126:8 127:1

**special** 20:17 23:4,11 24:7,10

**specific** 11:16 33:8,13,20,23 34:2, 21 35:13,25 38:5 44:6 47:1 51:10 78:25 79:17 83:2 133:18 134:4

**specifically** 15:5 21:20 40:17 43:11 44:6 54:13 58:3,8,14 62:2,13, 14 63:18 64:2 75:9,19 80:13 81:8 97:10 105:8,10 114:3 117:4 119:25 122:20,23 123:18 124:9 128:15 132:23 134:2 135:21 139:5 140:7

**speculate** 45:4

**speculating** 62:1 81:9,10

**speculation** 46:19 87:10,23 124:4, 17 126:8 127:1

**spell** 5:21 7:4

**spent** 48:4

**spoke** 66:7 76:8 109:5 122:24

**staff** 91:11 95:8

**staffed** 120:21

**stamp** 29:13

**stamped** 27:15 50:1 54:16 64:6,7 66:9 70:20 81:21 85:18 102:9 103:2,9 117:9 122:18

**stamps** 91:14

**Stan** 24:17

**standard** 10:24 39:5 56:15

**start** 8:17 15:6 71:18 93:8

**started** 15:8

**starting** 54:6

**state** 5:21 30:21 57:4 135:23

**stated** 15:4 30:17 34:20 35:17 36:23 39:11 52:25 108:14 121:23

**statement** 30:15 31:1,6,11 45:6,20 47:14 53:5 70:23,24,25 71:18,21 72:1,6 107:23 121:2,7,10,19,25 122:10,11,13,16 125:10,13,14,21,25 126:4,9 127:11,25

**statements** 41:9 45:21 71:14,17 77:23 88:12,15 89:6 95:4 100:8 125:22 129:2,9,23

**states** 5:12 6:22 31:18 36:16 37:6,7, 11 38:1 39:3 57:2 64:8 112:6,15 122:18 123:15 124:5,8



Case 4:18-cv-00644   Document 66-3   Filed on 11/18/19 in TXSD   Page 53 of 54
David Evans Watkins
s Index: station..types

**station** 36:16 50:23 53:18 54:2
61:11,16 72:15,23 73:2,12 74:15,24
77:18 88:19 91:25 93:24 94:2,18 95:1
107:8,12,16,20,22 108:24 110:2,7
113:19 122:21 130:7 136:1,23

**stations** 93:20,22

**status** 53:12,13 88:21 109:4

**step** 128:19

**steps** 62:4 70:2,4,5 99:9 107:3

**sticker** 98:21

**stopping** 90:1

**structure** 117:23

**stuff** 74:1

**subject** 64:12 81:25 85:20 103:6,10
114:19 133:12

**subjected** 34:10 44:22 61:11 83:14
87:15

**submit** 57:17

**submits** 46:9

**submitted** 28:6,15,19 30:3,12 34:5
42:24 51:8 70:22 84:9 131:23

**submitting** 100:15

**subpoena** 6:9,11,14

**subset** 125:6

**substantiate** 38:15

**suggested** 22:20

**Sullivan** 11:19 12:3,4 48:5,17

**summaries** 69:15

**summarize** 100:5 105:1 134:15

**summarizing** 106:13

**summary** 28:16,19 44:25 45:8
47:11 69:1,5,8,12 79:14,21 80:8,11
81:12 82:24 83:4 99:14 103:12 104:5,
15,22,25 105:22,23,25 106:7,14,22
107:1,6 112:9,15 118:7,17 119:3
129:2,9 134:13,14 135:6,20

**supervise** 23:17

**supervisory** 31:13

**support** 45:22 110:23

**supported** 45:16

**supports** 53:5 142:3

**suppose** 46:12 122:9 133:24

**supposed** 45:6 70:11 75:1,14
130:25

**surrounding** 37:17 130:16

**suspect** 108:8,11 112:6,17 113:4,5,
8,13 114:6,8 139:23,24 140:1

**suspected** 138:4,9,18 139:7,9,21

**sustained** 127:16

**switch** 98:21

**sworn** 5:2 23:23 24:2,4,7,24 25:1
40:11 70:22 75:16 121:9,10,18,22,25
122:10 127:25

**synopsis** 10:3,6,18 68:23 82:3,19,
23 83:20 84:5,10 85:1,13 90:11

**system** 88:20

---

## T

**taking** 37:21 91:16 102:19

**talk** 48:17 62:11

**talked** 43:2 78:13 132:9

**talking** 40:23 83:15 90:22

**target** 38:16

**targeted** 43:11 44:6 76:25

**targets** 75:19

**technique** 77:15

**techniques** 87:18 89:10,17

**telling** 34:25 35:7 53:20

**ten** 39:25 81:10 112:25

**tend** 13:8

**tenure** 19:6

**term** 15:16

**termed** 138:21

**terms** 93:6,7

**testified** 5:2 60:25 88:6 110:25
116:9 119:13 120:22

**testify** 80:22

**testifying** 9:7,8

**testing** 24:20 137:17

**tests** 137:20 138:2

**Texas** 5:12

**things** 13:9 43:15 78:17 120:8

**thinking** 18:7 51:17

**thoroughness** 42:1

**thought** 42:11 89:7 101:13

**three-minute** 110:10

**Thursday** 11:3,4,7 65:2,8 82:9,10

**time** 7:13,25 13:11 17:15,19 20:7
24:19 25:11 26:1 35:6 40:21,23 41:1
45:3 49:4 53:2 55:15 61:23 62:3
68:11 69:11,19 76:6 77:9 84:11 85:14
89:14 91:13 92:13,14,15 93:12,13
95:7 96:9,11 97:1 100:12 107:25
108:4,5 109:16 117:1,2,5,23 118:8
120:5,7,9 124:19 128:13 133:15
134:22 137:14 142:10

**times** 76:24 100:21

**title** 22:2 32:2 64:10 98:14 103:11
114:21 122:22 123:16,25 130:8 136:2

**titled** 81:23

**today** 5:11 9:7,9,11 12:16,22 13:14
17:1 26:5,8,9 39:22 86:2

**today's** 8:4 12:13 13:2 67:4,5

**toilet** 38:12 72:14,22 73:17 74:15
77:17

**told** 48:4,8 56:9 81:4 110:15

**Tom** 23:6

**tomorrow's** 117:15

**tool** 76:13 102:4

**tools** 78:10 97:6 100:25 101:7 107:5

**top** 27:17 50:2 54:17 81:24 85:18
98:13 118:3

**track** 59:20

**training** 57:24 58:1,2,4,5,7,13
133:16,19,23 134:2,5,9 139:19

**transcript** 8:15,19

**transferred** 18:14 25:17 142:14

**transition** 118:18 120:6,17 141:2,
10 142:5,12

**transitioning** 116:25

**trial** 143:3

**truthful** 76:10

**truthfully** 9:9 76:2,8

**Tuesday** 65:5,6

**turn** 36:7 79:17 114:14 115:6 122:16
128:21 135:4 137:15

**turned** 105:9

**type** 22:14 29:14 31:25 45:6 68:19
71:7,15

**types** 20:20 23:8 31:19

LEXITAS

Case 4:18-cv-00644   Document 66-3   Filed on 11/18/19 in TXSD   Page 54 of 54
David Evans Watkins
s Index: typically..years

**typically** 30:20 132:24 133:9

---

**U**

**U.S.** 7:3

**ultimate** 79:1

**ultimately** 66:1 79:8 85:2 110:20
134:21 139:1

**unable** 142:18

**uncleanliness** 33:22

**uncommon** 69:16

**uncovered** 51:18,21 52:7

**undefined** 123:20

**undersigned** 121:21

**understand** 5:17 8:9,20,24 11:7
16:8 19:17 44:17 46:7 56:2 57:16
65:22 68:19,22 69:21 84:24 90:7
91:25 96:18 106:9 112:5 117:7
124:20 125:8,15,16 131:22 140:9,12

**understanding** 63:11 79:9 83:18,
23 94:25 106:10 116:17 123:6
132:10,12

**unit** 20:16,17,18,19,21 21:23,24
22:5,9,12,15,18,25 23:4,5,8,11,15,21
24:7,9,10,14,16,24 25:5,7,16,20,21
29:23 31:2,8 50:20 55:12 56:22 57:11
92:24 93:16 101:14,16 115:5 116:16,
19 119:14,20,24 120:1,15,19,23
124:23 133:5,9,13,15 141:19

**United** 5:12 6:22

**units** 29:5,9

**universally** 133:20

**unknown** 55:3 56:8 112:15 126:9

**unlawful** 57:25 58:15

**unnecessary** 62:22

**unnoticed** 108:1

**unusual** 52:1,2

**update** 51:16 52:2 53:12,13 61:4
104:6,8

**updated** 111:13

**updates** 96:8 109:3,12,13,14 113:2

**updating** 52:7 97:18

**upper** 66:22

**urinate** 76:15

**urinated** 38:12 72:13 74:1,14 77:16

**urinating** 72:21 73:2,17 78:15

**urine** 45:21

---

**V**

**V-E-R-B-I-T-S-K-E-Y** 101:22

**vague** 32:23 126:25

**vehicles** 136:16

**verbal** 96:8 113:25

**verbally** 52:3 53:12,13 113:24
131:3

**verbatim** 70:25

**Verbitskey** 101:15,20,21

**version** 104:9,10 111:23

**versus** 5:12

---

**W**

**W-A-T-K-I-N-S** 5:23

**W-Y-A-T-T** 6:25

**wait** 8:16

**wall** 72:14,22 73:17 74:14 77:17

**walls** 77:17 107:7,11,16,20 108:23

**wanted** 79:17 92:15

**warning** 61:5

**warrants** 76:22

**Washington** 5:7

**water** 88:17,19

**Watkins** 5:1,22,23,25 7:10 9:6 14:3
16:24 27:14 47:25 49:18 50:1,5,12
54:16,20,25 64:5 80:3,24 81:20 85:17
87:17 90:6 98:9 114:9,14 115:2
136:18 140:6 144:24

**Wednesday** 50:4

**week** 11:4 64:24,25 82:10 98:24
103:20

**whistleblower** 30:1

**willingness** 60:4,6

**wise** 31:15

**witness'** 74:17,21 75:2,11

**witnesses** 61:21 62:7,17 88:11
89:5

**women** 38:18

**women'** 107:12,16

**women's** 38:18 50:23 53:18 54:1
71:19 72:14,22 73:2,4,12,14,15 74:14
76:15,24 78:15 91:24 107:8,20
108:23 110:1,2,6

**word** 30:9 71:17

**words** 123:11

**work** 7:18 18:10,13 20:21 23:3 25:4,
6 41:17,21 48:19 88:16,18,19,20,21
99:4 122:19,21 123:25 124:9,12
128:6,15 129:6 130:7 136:1

**worked** 18:16 76:7

**working** 7:24 88:20

**works** 11:19 16:18

**wreck** 16:16

**written** 15:19 39:3 99:4 121:2
134:18

**wrong** 40:5 102:11,14

**Wyatt** 6:21,24,25

---

**Y**

**year** 18:15,16

**years** 15:18 24:21 39:25 76:5,6
81:10 112:25 117:1 128:12 135:22

