## Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF        :
AMERICA                 :
                        :
VS.        : CIVIL ACTION NO. 4:18-CV-00644
                        :
CITY OF HOUSTON         :
_____

JANE DRAYCOTT AND       :
PAULA KEYES             :
                        :
VS.                     :
                        :
CITY OF HOUSTON         :

VIDEOTAPED ORAL DEPOSITION OF

GEORGE LUTHER McATEER, JR.

April 11, 2019          Houston, Texas

REPORTED BY:  Craig Michael Bechtel

## Page 2

### I N D E X

                                          PAGE

Appearances...................................... 3
Stipulations..................................... 4
Testimony of GEORGE LUTHER McATEER, JR.
EXAMINATION
  By Mr. Monteiro ............................ 5
  By Mr. Capodice ............................ 218
  By Ms. Sullivan ............................ 248
Correction and Signature Page.................. 250
Reporter's Certificate Page.................... 252

### EXHIBIT INDEX

                                          PAGE

Exhibit No. 1................................ 46
Exhibit No. 2................................ 52
Exhibit No. 3................................ 61
Exhibit No. 4................................ 81
Exhibit No. 5................................ 94
Exhibit No. 6................................ 124
Exhibit No. 7................................ 165
Exhibit No. 8................................ 189
Exhibit No. 9................................ 209
Exhibit No. 10............................... 217

## Page 3

A P P E A R A N C E S
COUNSEL FOR PLAINTIFF UNITED STATES OF AMERICA:
  Mr. Jeremy P. Monteiro
  Mr. Hector F. Ruiz, Jr.
  U.S. Department of Justice
  Civil Rights Division
  601 D Street, NW, Room 4500
  Washington, DC 20004
  hector.ruiz@usdoj.gov
  jeremy.monteiro@usdoj.gov

        and

  Ms. Elizabeth F. Karpati
  U.S. Department of Justice
  Southern District of Texas
  1000 Louisiana, Suite 2300
  Houston, Texas 77002
  713-567-9767
  elizabeth.karpati@usdoj.gov

COUNSEL FOR PLAINTIFFS JANE DRAYCOTT AND PAULA KEYES:
  Mr. Dwain Capodice
  Ahmad & Capodice
  24900 Pitkin, Suite 300
  The Woodlands, Texas 77386
  832-767-3207
  dcapodice@ahmad-capodice.com

COUNSEL FOR DEFENDANT:
  Ms. Deidra N. Sullivan
  Ms. Marjorie L. Cohen
  City of Houston Legal Department
  900 Bagby, 3rd Floor
  Houston, Texas 77002
  832-393-6457
  deidra.sullivan@houstontx.gov
  marjorie.cohen@houstontx.gov

ALSO PRESENT:
  Mr. Steve Green, Videographer
  Ms. Ilana Leuchtag

## Page 4

THE VIDEOTAPED ORAL DEPOSITION OF GEORGE LUTHER

McATEER, JR. was taken by PLAINTIFF UNITED STATES OF

AMERICA before Craig Michael Bechtel, a Certified

Shorthand Reporter in and for the State of Texas, in the

offices of the City of Houston Legal Department,

900 Bagby, 3rd Floor, Houston, Texas, between the hours

of 9:09 a.m. and 6:08 p.m., on April 11, 2019, pursuant

to Notice and the Federal Rules of Civil Procedure and

the following stipulations and waiver of counsel:

        IT IS STIPULATED AND AGREED by and between

counsel for the respective parties hereto that all

objections are reserved until the time of trial, except

those as to the form of the question and/or

responsiveness of the answer; that the Federal read-in

is waived.

George Luther McAteer, Jr.

Page 5

| | |
|---|---|
| 09:09 | 1    THE VIDEOGRAPHER:  The date is |
| 09:09 | 2  April 11th, 2019.  The time is approximately 9:09 a.m. |
| 09:09 | 3  We are on the record. |
| 09:09 | 4    GEORGE LUTHER McATEER, JR., |
| 09:09 | 5  having been first duly sworn, testified as follows: |
| 09:09 | 6    EXAMINATION |
| 09:10 | 7  BY MR. MONTEIRO: |
| 09:10 | 8    Q.  Good morning, sir. |
| 09:10 | 9    **A.  Good morning.** |
| 09:10 | 10    Q.  My name is Jeremy Monteiro.  I am an |
| 09:10 | 11  attorney for the Department of Justice, and I will be |
| 09:10 | 12  taking your deposition today. |
| 09:10 | 13    We have met a couple times before as |
| 09:10 | 14  well as this morning? |
| 09:10 | 15    **A.  Right.** |
| 09:10 | 16    Q.  Would you please state your name and spell |
| 09:10 | 17  your last name for the record? |
| 09:10 | 18    **A.  George McAteer.  The last name is** |
| 09:10 | 19  **M-c-A-t-e-e-r.** |
| 09:10 | 20    Q.  And what is your business address? |
| 09:10 | 21    **A.  My office is in terminal A south.** |
| 09:10 | 22  **Terminal A at IAH is 2800 North Terminal Road, Houston,** |
| 09:10 | 23  **Texas 77032.** |
| 09:10 | 24    Q.  And is there a phone number? |
| 09:10 | 25    **A.  Yes.  My office number is 281-233-7939.** |

Page 6

| | |
|---|---|
| 09:11 | 1    Q.  Thank you.  You understand that the United |
| 09:11 | 2  States has filed a lawsuit against the City of Houston |
| 09:11 | 3  relating to the Houston Fire Department.  Is that |
| 09:11 | 4  right? |
| 09:11 | 5    **A.  Yes.** |
| 09:11 | 6    Q.  I am going to go through a couple deposition |
| 09:11 | 7  ground rules so you understand how we will proceed |
| 09:11 | 8  today and let you know -- give you an opportunity to |
| 09:11 | 9  ask any questions. |
| 09:11 | 10    **A.  Right.** |
| 09:11 | 11    Q.  If you don't understand any of my questions, |
| 09:11 | 12  please state so, and I will do my best to rephrase |
| 09:11 | 13  them.  Do you understand that? |
| 09:11 | 14    **A.  Oh, yes.** |
| 09:11 | 15    Q.  And that's the next rule I was going to |
| 09:11 | 16  explain to you. |
| 09:11 | 17    The court reporter is taking down |
| 09:11 | 18  everything that you and I say, so you need to make sure |
| 09:11 | 19  to answer verbally.  The court reporter cannot take |
| 09:11 | 20  down if you nod your head.  So if you can just answer |
| 09:11 | 21  yes or no to my questions, that would be great.  Do |
| 09:11 | 22  you understand that? |
| 09:11 | 23    **A.  Yes.** |
| 09:11 | 24    Q.  And I will remind you if you nod your head. |
| 09:11 | 25    If you don't hear any of my questions, |

Page 7

| | |
|---|---|
| 09:12 | 1  please state so, and I will either restate my question |
| 09:12 | 2  or have the court reporter read it back.  Do you |
| 09:12 | 3  understand that? |
| 09:12 | 4    **A.  Yes.** |
| 09:12 | 5    Q.  And unless the City's attorney instructs you |
| 09:12 | 6  not to answer a question, I ask that you answer all my |
| 09:12 | 7  questions today.  Do you understand that? |
| 09:12 | 8    **A.  Yes.** |
| 09:12 | 9    Q.  If you need a break at any point, please let |
| 09:12 | 10  us know and we will do our best to accommodate that. |
| 09:12 | 11  Do you understand that? |
| 09:12 | 12    **A.  Yes.** |
| 09:12 | 13    Q.  The only caveat to that I will add is if |
| 09:12 | 14  there is a question pending at the time, I will ask |
| 09:12 | 15  that you the answer that question before we take a |
| 09:12 | 16  break.  Is that okay? |
| 09:12 | 17    **A.  Yes.** |
| 09:12 | 18    Q.  You are under oath.  Do you understand what |
| 09:12 | 19  testifying truthfully means? |
| 09:12 | 20    **A.  Yes.** |
| 09:12 | 21    Q.  And is there any reason that prevents you |
| 09:12 | 22  from testifying fully and truthfully today? |
| 09:12 | 23    **A.  No.** |
| 09:12 | 24    Q.  Are you on any medication that would |
| 09:12 | 25  interfere with your ability to testify fully and |

Page 8

| | |
|---|---|
| 09:12 | 1  truthfully today? |
| 09:12 | 2    **A.  No.** |
| 09:12 | 3    Q.  You also met the videographer down at the |
| 09:12 | 4  end who is videotaping your testimony today.  Do you |
| 09:13 | 5  understand that? |
| 09:13 | 6    **A.  Yes.** |
| 09:13 | 7    Q.  Chief McAteer, did you meet with anyone in |
| 09:13 | 8  preparation for your deposition? |
| 09:13 | 9    **A.  Yes.  I spoke to one of the City attorneys.** |
| 09:13 | 10    Q.  Who did you speak with? |
| 09:13 | 11    **A.  Deidra Sullivan.** |
| 09:13 | 12    Q.  When did you speak with Ms. Sullivan? |
| 09:13 | 13    **A.  A couple days ago.** |
| 09:13 | 14    Q.  Did you speak with her by telephone or in |
| 09:13 | 15  person? |
| 09:13 | 16    **A.  In person.** |
| 09:13 | 17    Q.  How long was your meeting? |
| 09:13 | 18    **A.  Hour, hour and a half.** |
| 09:13 | 19    Q.  Apart from your meeting with Ms. Sullivan a |
| 09:13 | 20  couple days ago, did you talk to anyone else about your |
| 09:13 | 21  deposition? |
| 09:13 | 22    **A.  No.** |
| 09:13 | 23    Q.  Did you speak with anyone from the Houston |
| 09:13 | 24  Fire Department about your deposition? |
| 09:13 | 25    **A.  No.** |

Case 4:18-cv-00644   Document 66-5   Filed on 11/18/19 in TXSD   Page 3 of 64
George Luther McAteer, Jr.

3 (9 - 12)

## Page 9

09:13 1     Q. Have you spoken with any members of the
09:13 2  Houston Fire Department about their depositions in this
09:14 3  case?
09:14 4     A. No.
09:14 5     Q. Did you review any documents in preparation
09:14 6  for your deposition?
09:14 7     A. I think Deidra Sullivan --
09:14 8           MS. COHEN:  Okay.  I am going to stop
09:14 9  you right there.
09:14 10          THE WITNESS:  Right.
09:14 11          MS. COHEN:  You are not going to talk
09:14 12  about anything that you discussed or whenever with
09:14 13  Deidra.
09:14 14          THE WITNESS:  Okay.
09:14 15  BY MR. MONTEIRO:
09:14 16    Q. It's just a yes or no answer.  You can
09:14 17  answer yes or no whether you reviewed any documents
09:14 18  with Ms. Sullivan.
09:14 19    A. Yes.
09:14 20    Q. Did those documents help refresh your
09:14 21  recollection of the events surrounding this litigation?
09:14 22    A. Yes.
09:14 23    Q. Can you identify those documents without
09:14 24  telling me, you know, the nature of your discussion?
09:14 25    A. The documents aren't really named.

## Page 10

09:14 1     Q. Can you describe what the documents were?
09:14 2     A. Transfer histories.  I think -- no.  What
09:15 3  else?  I think there was one kind of the -- that I had
09:15 4  written, describing the creation of the internship
09:15 5  program.
09:15 6          I am really not remembering any
09:15 7  specifics.
09:15 8     Q. So besides the transfer histories and the
09:15 9  document you wrote about the creation of the internship
09:15 10 program, you don't recall anything else you reviewed?
09:15 11    A. Not specifically, no.
09:15 12    Q. Do you remember if you reviewed any of your
09:15 13 affidavits or statements pertaining to OIG
09:15 14 investigations related to this matter?
09:16 15    A. No, no, we didn't --
09:16 16    Q. You didn't review --
09:16 17    A. We didn't talk about those, no.
09:16 18    Q. Are you represented today by an attorney?
09:16 19    A. No.
09:16 20          THE WITNESS:  Well, in my opinion, you
09:16 21 represent the City.
09:16 22 BY MR. MONTEIRO:
09:16 23    Q. You are not represented in your personal
09:16 24 capacity?
09:16 25    A. Correct.

## Page 11

09:16 1     Q. Ms. Cohen is representing the City?
09:16 2     A. Yes.
09:16 3     Q. Have you read the United States' lawsuit in
09:16 4  this case?
09:16 5     A. No.
09:16 6     Q. Have you read -- are you aware that
09:16 7  Ms. Draycott and Ms. Keyes have filed their own lawsuit
09:16 8  pertaining to this litigation?
09:16 9     A. I just know that there is a lawsuit.  I
09:16 10 don't know who filed what.
09:16 11    Q. Have you read news coverage of the lawsuit
09:16 12 in this case?
09:17 13    A. No, other than just being aware that there
09:17 14 has been a lawsuit filed.
09:17 15    Q. Are you currently employed with the Houston
09:17 16 Fire Department?
09:17 17    A. Yes.
09:17 18    Q. What is your current position and
09:17 19 assignment?
09:17 20    A. I am a deputy chief over aircraft rescue.
09:17 21    Q. Is aircraft rescue sometimes referred to as
09:17 22 ARFF?
09:17 23    A. Yes.
09:17 24    Q. A-A-R-F?
09:17 25    A. No.  A-R-F-F.

## Page 12

09:17 1     Q. A-R-F-F, thank you.  I may use that acronym
09:17 2  today.  And you will understand that I am referring to
09:17 3  ARFF, the aircraft rescue.  Is that okay?
09:17 4     A. Yes.
09:17 5     Q. How long have you been deputy chief over
09:17 6  ARFF?
09:17 7     A. Since July of 2015.
09:17 8     Q. What are the duties and responsibilities of
09:17 9  deputy chief over ARFF?
09:17 10    A. Create the budget, vehicle replacement plan,
09:18 11 chase down station maintenance issues, any new
09:18 12 construction needed for a fire station replacement,
09:18 13 overall schedule, contract the training, operational
09:18 14 guidelines, letters of agreement with Houston Airport
09:18 15 Systems and the air traffic control tower.
09:18 16    Q. Do you have any personnel responsibilities?
09:18 17    A. In terms of?
09:19 18    Q. Managing HFD personnel?
09:19 19    A. I am the direct supervisor for the district
09:19 20 chiefs at station 54, and I have a staff of a senior
09:19 21 captain and two training captains.
09:19 22    Q. Are you the direct supervisor for the
09:19 23 training captains?
09:19 24    A. No.  Really, the senior captain assistant
09:19 25 coordinator is the direct supervisor for the training

Case 4:18-cv-00644   Document 66-5   Filed on 11/18/19 in TXSD   Page 4 of 64
George Luther McAteer, Jr.

4 (13 - 16)

Page 13

09:19 1 captains.

09:19 2 Q. Are you the senior captain -- senior

09:19 3 captains' direct supervisor?

09:19 4 A. Yes.

09:19 5 Q. Who are the district chiefs at fire

09:19 6 station 54 that you are referring to? Who will report

09:19 7 to you?

09:20 8 A. Do you want their names?

09:20 9 Q. Yes, please.

09:20 10 A. A shift is Doug Poor.

09:20 11 B shift is Cory Richardson.

09:20 12 C shift is Lisa Campbell.

09:20 13 And D shift is Brad Curette,

09:20 14 C-u-r-e-t-t-e.

09:20 15 Q. Who is the senior captain that reports to

09:20 16 you?

09:20 17 A. Ron Krusleski, K-r-u-s-l-e-s-k-i.

09:20 18 Q. Who are the training captains that report to

09:20 19 the -- directly to the senior captain?

09:21 20 A. For Intercontinental it's Jeff Gentry.

09:21 21 And for Hobby, it's Bobby Thompson.

09:21 22 Q. Thank you. What are the stations that you

09:21 23 currently oversee within ARFF?

09:21 24 A. Intercontinental, stations 54, 92, and 99.

09:21 25 And at Hobby, it's station 82.

Page 14

09:21 1 Q. Are there any other stations that you

09:21 2 oversee?

09:21 3 A. No.

09:21 4 Q. Who do you report to currently?

09:21 5 A. Two assistant chiefs, Herbert Griffin and

09:21 6 Isaac Garcia.

09:22 7 Q. You said you became deputy chief in July of

09:22 8 2015. What position did you hold prior to that?

09:22 9 A. Okay. I was promoted to deputy chief in

09:22 10 2013, and so I was shift commander 15. You know, that

09:22 11 was my assignment.

09:22 12 Prior to that, I was EMS chief at

09:22 13 station 11 on the C shift.

09:22 14 Q. Can we just back up for one minute, sir?

09:22 15 A. Sure.

09:22 16 Q. So I am a little unclear the position that

09:22 17 you held from 2013 until 2015. Can you clarify that?

09:22 18 A. Yes. The fire department splits the City in

09:22 19 half, north and south. So the shift commanders are the

09:23 20 direct supervisors of the field district chiefs. So I

09:23 21 was in charge of the district chiefs north of I-10

09:23 22 essentially on the C shift.

09:23 23 Q. So what was your title?

09:23 24 A. I am sorry. I was on the D shift as a shift

09:23 25 commander.

Page 15

09:23 1 Q. Okay.

09:23 2 A. Yeah. And that was -- you know, I was a

09:23 3 deputy chief assigned as shift commander 15.

09:23 4 Q. Thank you. Was that -- was that position

09:23 5 based at the airport, as well?

09:23 6 A. No.

09:23 7 Q. Where did you work physically?

09:23 8 A. At station 15.

09:23 9 Q. Station 15, okay. And then -- so then, to

09:23 10 get back to where we were at before I asked you for the

09:24 11 clarification, you said you were EMS chief for some

09:24 12 period of time?

09:24 13 A. Yes. From -- sometime in 2010 until 2013.

09:24 14 Q. And was your title EMS chief, or were you

09:24 15 still a deputy chief?

09:24 16 A. No. I was a district chief at that time.

09:24 17 The call sign was 1100, and that designates the shift

09:24 18 district chief of EMS. So like I said, I was on the

09:24 19 C shift at station 11.

09:25 20 Q. And prior -- the position you held prior to

09:25 21 EMS chief, was that district chief of ARFF?

09:25 22 A. Yes.

09:25 23 Q. How long did you hold the position of

09:25 24 district chief in ARFF?

09:25 25 A. From about November of 2002 until around

Page 16

09:25 1 October of 2010.

09:25 2 Q. Where did you physically work when you were

09:25 3 the district chief during this period of time?

09:25 4 A. At station 99, at Intercontinental Airport.

09:26 5 Q. Why did you leave ARFF in October of 2010 to

09:26 6 become EMS chief?

09:26 7 A. I was ready for a change.

09:26 8 Q. Was it a voluntary move?

09:26 9 A. Yes.

09:26 10 Q. Is that an appointed position, or how do you

09:26 11 go about -- how did you go about moving to EMS chief?

09:26 12 A. District chiefs submit a -- basically a

09:26 13 letter of interest, and it's basically up to the fire

09:26 14 chief to move district chiefs. There is a process for

09:26 15 ranks below district chief, based on seniority.

09:26 16 Q. The transfer process you are referring to?

09:27 17 A. Right.

09:27 18 Q. So the fire chief approved your move from

09:27 19 district chief to EMS chief in 2010, October 2010?

09:27 20 A. Yes.

09:27 21 Q. Who was that at the time?

09:27 22 A. Acting fire chief.

09:27 23 Q. Flanagan?

09:27 24 A. Flanagan, yep.

09:27 25 Q. Did your move to EMS chief have anything to

**Page 17**

09:27 1 do with what happened at station 54 in 2009 and 2010?

09:27 2 A. No. Just ready for a change.

09:27 3 Q. What were your duties and responsibilities

09:28 4 as district chief in ARFF?

09:28 5 A. Actually, very similar to what they are now,

09:28 6 budget procurement, rolling stock, maintenance,

09:28 7 replacement items, operation guidelines, agreements

09:28 8 with other stakeholders.

09:28 9 Q. Were there -- strike that.

09:28 10 You testified earlier that there are

09:28 11 currently district chiefs at -- assigned to

09:28 12 district 54. Is that right?

09:28 13 A. Yep.

09:28 14 Q. So in the time period that you were the

09:28 15 district chief of ARFF between 2002 to 2010, were there

09:28 16 district chiefs at the airport?

09:28 17 A. No.

09:28 18 Q. You were the only district chief?

09:28 19 A. Yes.

09:28 20 Q. What stations did you oversee when you were

09:28 21 district chief of ARFF?

09:29 22 A. The same ones that I answered earlier.

09:29 23 Q. The four airport stations?

09:29 24 A. At Intercontinental Airport there is

09:29 25 station 54, 92, and 99; and at Hobby, station 81.

**Page 18**

09:29 1 Q. Who did you report to when you were district

09:29 2 chief of ARFF?

09:29 3 A. There were a number of assistant chiefs that

09:29 4 came through.

09:29 5 Q. How about in the 2009/2010 time period?

09:29 6 A. Omero Longoria was the assistant chief, and

09:29 7 Danny Snell was the executive assistant chief.

09:29 8 Q. Were one of those gentlemen your district

09:29 9 supervisor?

09:29 10 A. Yeah. Technically I suppose Omero Longoria

09:30 11 was the direct supervisor, but frankly, he deferred

09:30 12 most of the time to Danny Snell.

09:30 13 And that's who I talked to principally.

09:30 14 Q. Was chief Snell your second line supervisor?

09:30 15 A. What do you mean by second line?

09:30 16 Q. I mean, was he -- did Snell -- sorry.

09:30 17 Strike that.

09:30 18 Did Longoria report to Snell?

09:30 19 A. Yes.

09:30 20 Q. So Snell was second in your chain of

09:30 21 command. Is that right?

09:30 22 A. Yes, going up, yes.

09:30 23 Q. Going up, right. And who reported to you in

09:30 24 the 2009/2010 time frame when you were district chief

09:30 25 of ARFF?

**Page 19**

09:30 1 A. Well, all right. So my staff who works

09:31 2 days, senior captain Krusleski.

09:31 3 Let me think here. Who was the

09:31 4 Intercontinental training captain?

09:31 5 There was Les Fulghum for a while, then

09:31 6 Robert Wisniewski when Wisniewski took over from

09:31 7 Fulghum.

09:31 8 But Bobby Thompson was still the

09:31 9 training captain at Hobby.

09:31 10 Q. So what was Krusleski's position at that

09:31 11 time?

09:31 12 A. Same as it is now, senior captain/assistant

09:31 13 coordinator.

09:31 14 Q. And you mentioned Les Fulghum. Was he the

09:31 15 training --

09:31 16 A. Yes.

09:31 17 Q. -- captain, or what is the correct

09:31 18 terminology?

09:31 19 A. Intercontinental training captain.

09:32 20 Q. Did you have direct reports at the four fire

09:32 21 stations that you identified, as well?

09:32 22 A. Yes, because -- because I was the district

09:32 23 chief, basically every station captain on all four

09:32 24 shifts, I was their -- their direct supervisor.

09:32 25 Q. When you say station captain, are you

**Page 20**

09:32 1 referring to senior captain position or junior captain

09:32 2 or both?

09:32 3 A. Well, at a station that has both, it would

09:32 4 be the senior captain.

09:33 5 Q. So the -- who were the senior captains at

09:33 6 the four stations between 2008 and 2010?

09:33 7 A. Boy, I don't remember who was around.

09:33 8 Q. Was captain Tamez one of them?

09:33 9 A. Yes.

09:33 10 Q. Do you know of any other?

09:33 11 A. He was A shift.

09:33 12 Jose Ponce was B shift.

09:33 13 I am drawing a blank on C shift. You

09:33 14 know, that might have been Don Hoyt on the C shift.

09:33 15 Who was the captain on the D? Bryant

09:34 16 Holmes.

09:34 17 Q. Were all -- were those four senior captains

09:34 18 stationed at station 54 in this time period?

09:34 19 A. Yes. Yes, I believe so.

09:34 20 Q. Did you have senior captains at any of the

09:34 21 other airport stations during that time period?

09:34 22 A. Not at that time period.

09:34 23 Q. There were captains signed to the four

09:34 24 stations that we have discussed, as well. Is that

09:34 25 right?

George Luther McAteer, Jr.

6 (21 - 24)

## Page 21

09:34  1    **A. Yes.**

09:34  2    Q. Are those sometimes referred to as junior

09:34  3    captains?

09:34  4    **A. Yes. It's gotten to be old terminology.**

09:34  5    Q. Are the -- did the junior captains report to

09:34  6    you or their senior captains?

09:35  7    **A. If they worked at station 54, then they**

09:35  8    **reported to their senior captain.**

09:35  9    Q. All right. So most of our discussion today

09:35  10   will involve discussing your role as district chief

09:35  11   between 2003-2010 time frame. So unless I say

09:35  12   otherwise, you can assume that my questions that I am

09:35  13   asking are related to that time period. Is that okay?

09:35  14   **A. Yes, 2003 to 2010? Is that what you said?**

09:35  15   Q. Yeah.

09:35  16   **A. Okay.**

09:35  17   Q. What was your level of interaction with your

09:35  18   senior captains while you were district chief over

09:35  19   ARFF?

09:35  20   **A. Varied. Most of my days were taken up with**

09:36  21   **meetings with HAS groups, maybe meetings at HFD and**

09:36  22   **working on administrative things, you know, requests**

09:36  23   **for replacement of equipment and procurement and all**

09:36  24   **that entails.**

09:36  25        **I didn't go by station 54 daily to line**

## Page 22

09:36  1    **out their day for them, no.**

09:36  2    Q. You relied on the senior captains to do

09:36  3    that?

09:36  4    **A. Yes.**

09:36  5    Q. Is that fair?

09:36  6    **A. Yes.**

09:36  7    Q. Did you have like a standing meeting with

09:36  8    the senior captains where you met at a certain

09:36  9    frequency?

09:37  10   **A. We tried to have quarterly officer meetings.**

09:37  11   **It didn't always work out, but....**

09:37  12   Q. Who would attend the quarterly officer

09:37  13   meetings?

09:37  14   **A. Well, the officers.**

09:37  15   Q. That would be the captains and senior

09:37  16   captains?

09:37  17   **A. Yes.**

09:37  18   Q. When you have your -- when you held these

09:37  19   quarterly meetings, was there a set agenda, or how did

09:37  20   they proceed?

09:37  21   **A. I typically tried to create an agenda of**

09:37  22   **things that I wanted to cover and leave time for**

09:37  23   **questions.**

09:38  24   Q. So you mentioned earlier that you kind of

09:38  25   left the day-to-day management of station 54 to your

## Page 23

09:38  1    senior captains. Is that fair?

09:38  2    **A. Oh, yes.**

09:38  3    Q. What kind of -- what were your expectations

09:38  4    in terms of what types of issues your senior captains

09:38  5    or captains would make you aware of?

09:38  6    **A. Really, anything out of the ordinary. You**

09:38  7    **know, I told them I want to be notified of anything**

09:38  8    **that could show up on the news, anything that impacts**

09:39  9    **operation readiness, truck breaks down, someone gets**

09:39  10   **hurt, damage to the station or equipment.**

09:39  11   Q. How did you communicate these instructions

09:39  12   to the officers?

09:39  13   **A. Verbally.**

09:39  14   Q. Are there any -- are you aware of any HFD

09:39  15   policies or procedures which lay out what sorts of

09:39  16   issues the officers should bring to the district

09:39  17   chief's attention?

09:40  18   **A. I don't -- I don't really recall anything**

09:40  19   **written down. This is the same instructions I have**

09:40  20   **received verbally from my bosses.**

09:40  21   Q. And what level of discretion did you provide

09:40  22   to the officers to manage their crews and shifts?

09:40  23   **A. I think a reasonable level, you know, if --**

09:41  24   **if they can take care of the issue, resolve it, or**

09:41  25   **direct how to proceed, I don't need to be brought in**

## Page 24

09:41  1    **on -- on every -- on every detail of the running of the**

09:41  2    **station.**

09:41  3    Q. You don't -- you wouldn't consider yourself

09:41  4    a micromanager?

09:41  5    **A. Right. I don't believe I am a micromanager.**

09:41  6    Q. What sorts of situations would you find

09:41  7    yourself getting involved with at the stations?

09:41  8    **A. Mostly I was trying to enforce the**

09:42  9    **department guidelines.**

09:42  10        **Parking, for example, for whatever**

09:42  11   **reason firefighters want to park inside the station,**

09:42  12   **you know, behind the apparatus stalls. And the**

09:42  13   **department has written guidelines on that, and I put**

09:42  14   **out several reminders that, you know, officers are not**

09:42  15   **to allow firefighters to park in or behind the station.**

09:42  16   **There is a parking lot.**

09:42  17   Q. Are there other examples that come to mind?

09:42  18   **A. For what I would get involved with?**

09:42  19   Q. Right.

09:42  20   **A. Okay. You know, if I saw someone who was**

09:43  21   **obviously outside the norm of the grooming guideline,**

09:43  22   **you know, males with hair that's way too long or**

09:43  23   **mustaches down to the jawline, those kinds of things, I**

09:43  24   **mentioned that to the captains.**

09:43  25        **If the station was looking really**

## Page 25

09:43 1 unkempt, you know, I bring that to their attention.

09:43 2 Q. That would be based on your personal

09:43 3 observation you would raise those types of issues?

09:43 4 A. Right, yeah, but then, you know, sometimes

09:43 5 they would ask: You know, hey, I got this situation.

09:43 6 What do you think?

09:43 7 So -- so I would, you know, if I

09:43 8 didn't -- if I didn't know the answer, well, let me go

09:44 9 check.

09:44 10 You know, chief Snell was very

09:44 11 knowledgeable, lots of experience, so I try to get

09:44 12 direction from my supervisor.

09:44 13 Q. How often did you visit the stations under

09:44 14 your -- under your command?

09:44 15 A. Well, since I officed in one of them, you

09:44 16 know, I didn't really -- did not and still don't have a

09:44 17 schedule of, you know, visiting any number of stations

09:44 18 on any kind of regular basis. It's generally as

09:44 19 needed.

09:44 20 Q. Apart from station 99, which you were there

09:44 21 every day?

09:44 22 A. Right.

09:45 23 Q. And when you say as needed, would that be at

09:45 24 the request of one of your officers, or would you do

09:45 25 that on your own volition?

## Page 26

09:45 1 A. Both.

09:45 2 Q. If there was behavior going on at a station

09:45 3 that violated some HFD guideline, would that be enough

09:45 4 to warrant your attention?

09:45 5 A. If the officer wasn't -- wasn't handling it

09:45 6 or it wasn't getting resolved, sure.

09:45 7 Q. And you would need the officer to make you

09:45 8 aware of that, obviously?

09:46 9 A. Yes.

09:46 10 This is probably silenced.

09:46 11 Q. When you visited the stations, did you have

09:46 12 a practice of reviewing the captains' logs?

09:46 13 A. No, not unless the reason I was there was to

09:46 14 look something up.

09:46 15 Q. Was one of your responsibilities during this

09:46 16 time to investigate OIG complaints?

09:46 17 A. If -- if they sent me to investigate, I

09:46 18 would.

09:46 19 Q. And who would send you OIG complaints to

09:46 20 investigate?

09:46 21 A. OIG -- well, staff services. You know, it's

09:46 22 like the same thing.

09:47 23 Q. It sounds like you weren't investigating all

09:47 24 of the OIG complaints?

09:47 25 A. No. Typically if it's criminal in nature,

## Page 27

09:47 1 OIG investigates it.

09:47 2 If it's a rules violation, staff

09:47 3 services would assign it.

09:47 4 And if there was some sort of conflict

09:47 5 of interest, they would assign it to someone other than

09:47 6 me.

09:47 7 Q. When you say staff services would assign

09:47 8 complaints regarding rules violations, is that to you?

09:47 9 MS. COHEN: Objection; asked and

09:47 10 answered.

09:47 11 BY MR. MONTEIRO:

09:47 12 Q. I am just looking for clarification.

09:47 13 A. If there wasn't -- if there was not a

09:47 14 conflict of interest on my part, that maybe I had

09:47 15 already addressed the issue with this member, okay, if

09:47 16 none of that existed, then they would assign it to me

09:48 17 or -- or another investigator. You know, I -- I don't

09:48 18 know their methodology of assigning complaints to

09:48 19 investigators.

09:48 20 Q. Are you aware of any policies or procedures

09:48 21 which lay out that process?

09:48 22 A. No.

09:48 23 Q. Would that be an OIG procedure?

09:48 24 A. Yes. I mean....

09:48 25 Q. So when you were brought in to investigate

## Page 28

09:48 1 OIG complaints, how did you go about conducting your

09:48 2 investigation?

09:48 3 A. Well, I think the first few times, since it

09:48 4 really wasn't any training on how to conduct an

09:48 5 investigation, I would ask my supervisor: So how does

09:49 6 one go about doing this?

09:49 7 And so they would tell me their

09:49 8 thoughts.

09:49 9 And okay.

09:49 10 Q. That would be assistant chief Snell that you

09:49 11 would ask that of?

09:49 12 A. Yeah, I think, you know, early on, we are

09:49 13 still in the 2003 to 2010. I mean, I think the first

09:49 14 one I investigated was probably in '03 or '04. That

09:49 15 was chief Raul Reyes.

09:49 16 Q. Were you provided with any standards to

09:49 17 follow when conducting your investigation?

09:49 18 A. It seemed like there was one page of, you

09:49 19 know, you fill out this form and you come up with a --

09:49 20 with a ruling, one of these four outcomes and

09:50 21 instructions on how to route your paperwork and what

09:50 22 kind of forms to have, you know, signed by certain

09:50 23 deadlines.

09:50 24 Q. Anything else that you remember?

09:50 25 A. No. It was just here is an investigation;

George Luther McAteer, Jr.

Page 29

09:50 1  go investigate.

09:50 2      Q. And when you completed your investigation,

09:50 3  what would you do with your findings or

09:50 4  recommendations?

09:50 5      A. Take it back, hand it to staff services.

09:50 6      Q. Did you make recommendations as part of your

09:50 7  investigation, or did you just reach conclusions?

09:51 8      A. Generally just reached conclusions.

09:51 9      Q. Would OIG then -- sorry.

09:51 10      Would staff services then make any

09:51 11  recommendations or take any further action as

09:51 12  necessary?

09:51 13      A. That's my understanding, but it's -- it's

09:51 14  all a very confidential process. I'm not privy to it.

09:51 15      Q. Once you provided your conclusions to staff

09:51 16  services, your role was finished?

09:51 17      A. Yes.

09:51 18      Q. How does a firefighter who wants to work at

09:51 19  ARFF get assigned there?

09:51 20      A. All right. There is -- as a prerequisite,

09:51 21  you have to be ARFF certified. So there is a -- we

09:52 22  solicit applications for -- generally it's an annual

09:52 23  class.

09:52 24      Members turn in their applications.

09:52 25      There is a point system, and seniority

Page 30

09:52 1  is a factor, also.

09:52 2      So we tally up the applications, rank

09:52 3  them based on the point system, and for whatever ranks,

09:52 4  the number of each different rank that we are looking

09:52 5  for, then we select that number of people from the

09:52 6  application list and they go to ARFF school and get

09:52 7  certified.

09:52 8      Q. Can I interrupt you for just one second?

09:52 9      A. Yes.

09:52 10      Q. You mentioned -- you said seniority is one

09:52 11  of the factors.

09:52 12      What are the other factors in the point

09:52 13  system?

09:52 14      A. There were things like associate's degree,

09:53 15  bachelor's degree, advanced firefighter, master

09:53 16  firefighter. Those are Texas Commission on Fire

09:53 17  Protection certifications. Other certifications back

09:53 18  then, paramedic, if you had prior ARFF from somewhere,

09:53 19  rescue, hazmat. So generally there was a maximum of

09:53 20  five certification points and a maximum of five

09:53 21  seniority points.

09:53 22      Q. And before my question you testified that

09:54 23  you have a pool of applicants who take the ARFF class

09:54 24  to get certified.

09:54 25      What happens next in the process?

Page 31

09:54 1      A. Okay. At some point we come up with

09:54 2  recurrent CE. I think that was later, like

09:54 3  2009/2010 -- 2010, I think.

09:54 4      So early on, they were just ARFF

09:54 5  certified. And then when the next vacancy posting

09:54 6  comes out, they are now eligible to submit a transfer

09:54 7  request for one of the ARFF vacancies.

09:54 8      Q. Okay. And do you get a lot of -- have you

09:54 9  typically gotten a lot of applicants?

09:54 10      A. Yes. More and more.

09:55 11      Q. Is it considered -- is ARFF considered a

09:55 12  desirable place to work?

09:55 13      A. I believe so.

09:55 14      Q. Why do you think that?

09:55 15      A. Well, from -- I personally enjoy the

09:55 16  assignment. I think the crews do a very good job. I

09:55 17  think when -- when people see a well-run group within

09:55 18  the fire department, that's attractive, and they would

09:55 19  like to be a part of that.

09:55 20      Q. Is it considered specialized work?

09:55 21      A. Yes.

09:55 22      Q. Within HFD?

09:55 23      A. Yes.

09:55 24      Q. What is specialized about the work compared

09:55 25  to work at a suppression station?

Page 32

09:55 1      A. Okay. So we are part of special operations,

09:55 2  which includes ARFF, rescue, and hazmat. So there is

09:55 3  an additional body of knowledge beyond the structural

09:56 4  firefighting and EMT certifications.

09:56 5      There are different rules of

09:56 6  engagements. You know, you have FAA mandates, how

09:56 7  airports are operated, and anyone who works here has to

09:56 8  follow these rules.

09:56 9      And you know, there has to be

09:56 10  documented training on every aspect of the ARFF

09:56 11  firefighter's job and documented testing of the

09:56 12  equipment and demonstration of proficiency, operating

09:56 13  the equipment, operating the equipment on the air

09:56 14  field, communicating with the air traffic control

09:57 15  tower.

09:57 16      So these are all things that the

09:57 17  structural firefighter is not required to do.

09:57 18      Q. So the job knowledge requirement of an ARFF

09:57 19  firefighter is more complex than a suppression

09:57 20  firefighter. Is that fair?

09:57 21      A. Yes. It's different. I am not saying it's

09:57 22  better or worse. It's just -- it's different.

09:57 23      There is a lot of training burdens

09:57 24  placed on the ARFF firefighter. He has to essentially

09:57 25  memorize all the pertinent details of the aircraft that

## Page 33

09:57 1 operate out of your airport, the size of the aircraft,

09:57 2 number of passengers, amount of fuel, number of exits,

09:57 3 where are the exits, where are cutoffs, all of the

09:57 4 signage, markings, lighting systems at the airport.

09:57 5     So it's -- it's -- there is a lot of

09:58 6 information to acquire and master.

09:58 7     Q.  Are the -- your response vehicles

09:58 8 specialized or different than what you find at the --

09:58 9 in suppression?

09:58 10     A.  Yes, very different.  They are larger, more

09:58 11 powerful, faster, bigger capacities, complex,

09:58 12 electronics.  You know, they use a joystick to operate

09:58 13 the turrets instead of pulling hose.  We have got three

09:58 14 radios to juggle versus the one HFD radio to listen to.

09:58 15     You know, we have to bring -- we are

09:58 16 self sustained, self contained.  We have to bring our

09:58 17 water with us, because there are no hydrants on the

09:58 18 airfield, so you know, learn what agents to use, when,

09:59 19 use them sparingly, because that's all you got.

09:59 20     Q.  So the operation of the response vehicles

09:59 21 requires a separate body of knowledge.  Is that fair?

09:59 22     A.  Yes.

09:59 23     Q.  Are there any EMT responsibilities within

09:59 24 ARFF for firefighters?

09:59 25     A.  Yes.  There are about 12 to 15 EMS calls per

## Page 34

09:59 1 day at the airport, you know, a number of passengers

09:59 2 going through -- through the terminals.  It's a -- it's

10:00 3 like a moderate size city.

10:00 4     Q.  And do you-all have ambulances or how do the

10:00 5 firefighters respond to those types of calls?

10:00 6     A.  We have one medical unit.  And then at

10:00 7 Intercontinental we have a structural fire truck that

10:00 8 is a first responder.

10:00 9     Of course anyone on the airfield could

10:00 10 walk into the fire station, you know, bring an injured,

10:00 11 sick person and drop him off.

10:00 12     Q.  If you know, how does the volume of EMS

10:00 13 calls received within ARFF compare to volume of EMS

10:00 14 calls received throughout -- outside of ARFF?  More or

10:01 15 less?

10:01 16     A.  That's really a -- you know, a hard question

10:01 17 to answer.  Each station or area has varying call

10:01 18 volumes.

10:01 19     In general, you know, I would say

10:01 20 that's probably close to an average call volume for --

10:01 21 for an EMS unit in the Houston Fire Department.

10:01 22     Q.  So it's about the same?

10:01 23     A.  Yes.

10:01 24     Q.  I want to shift our focus to the captain's

10:01 25 position within ARFF, and when I am talking about

## Page 35

10:01 1 captain, I am referring to these -- they would be the

10:01 2 station captain, I guess, within ARFF.

10:02 3     A.  Okay.

10:02 4     Q.  When I am referring to station captain,

10:02 5 let's assume that it's station 54 so we are talking

10:02 6 about the junior captain's responsibilities.

10:02 7     A.  Okay.

10:02 8     Q.  What are the -- what are the junior

10:02 9 captain's responsibilities?  What were the junior

10:02 10 captain's responsibilities during this time frame?

10:02 11     A.  Generally the captain and the senior work

10:02 12 that out.  There is some administrative work in the

10:02 13 morning in terms of basically count the people who

10:03 14 showed up for work, is anyone missing, you know, are

10:03 15 there any issues, somebody is running late, a -- I have

10:03 16 got an issue.  I will be in at 10:00, so you know --

10:03 17 because we have to nail that down by 6:30.

10:03 18     Q.  And is that something that a junior captain

10:03 19 typically handles or senior captain or --

10:03 20     A.  It's really kind of however they want to

10:03 21 parcel that out.

10:03 22     Q.  It's within their discretion to figure that

10:03 23 out?

10:03 24     A.  Yeah.  Some senior captains want to

10:03 25 personally talk to someone calling in second.  I don't

## Page 36

10:03 1 know.

10:03 2     You know, that's really their -- their

10:03 3 business, but -- so they have to figure out their

10:03 4 manpower, roster of, you know -- essentially say who is

10:04 5 on what riding position on each vehicle that day.

10:04 6     And you know, no -- they will kind of

10:04 7 make sure the crew is checking out their equipment, you

10:04 8 know, cleaning their apparatus, clean the station, you

10:04 9 know, their -- their daily duties.

10:04 10     And there is usually some kind of

10:04 11 training to captain or senior captain, either one, you

10:04 12 know, can kind of assign what the training is today,

10:04 13 let the crew know about new bulletins, guidelines,

10:05 14 events of the day.

10:05 15     Q.  Who are -- who are the junior captain's

10:05 16 subordinates within the station?

10:05 17     A.  Well, the firefighters and

10:05 18 engineer/operators.

10:05 19     Q.  And is the junior captain those individuals'

10:05 20 first line supervisor?

10:05 21     A.  Yes.

10:05 22     Q.  Can the junior captain order his or her

10:05 23 subordinates to perform specific duties?

10:05 24     A.  Yes.

10:05 25     Q.  Can the junior captain counsel or coach his

Page 37

10:05   1   or her subordinates?

10:05   2       A.   Yes.

10:05   3       Q.   Does the junior captain have responsibility

10:05   4   for evaluating his or her subordinates' work

10:05   5   performance?

10:05   6       A.   Yes.

10:05   7       Q.   Is the junior captain required to document

10:05   8   his or her subordinates' work performance?

10:06   9       A.   Yes, either on a performance evaluation or

10:06   10  personnel file.

10:06   11      Q.   When you are referring to personnel file,

10:06   12  are you referring to either a form 42 or a form 34?

10:06   13      A.   Yes.

10:06   14      Q.   Are those the forms that the junior captain

10:06   15  would use to document his or her subordinates' work

10:06   16  performance?

10:06   17      A.   Yes, both good and bad.

10:06   18      Q.   What is a form 42?

10:06   19      A.   It's part of a personnel file to document

10:06   20  good or bad performance.

10:07   21      Q.   And as the district chief did you have any

10:07   22  role in reviewing the form 42s or discussing those with

10:07   23  your captains?

10:07   24      A.   Not on a routine basis.  You know, if they

10:07   25  pointed something out, hey, look at this, what do you

Page 38

10:07   1   think, I would look at it or if -- if I told them, hey,

10:07   2   you know, this person had a failure, a leak failure

10:07   3   while driving on the AOA, you need to make sure that's

10:07   4   documented on a 42.

10:07   5       Q.   So you could direct the captain to fill that

10:07   6   out?

10:07   7       A.   Right, uh-huh.

10:07   8       Q.   That would be based on your observation, the

10:07   9   example you just gave us?

10:08   10      A.   Either my observation or I heard that this

10:08   11  happened, you know.  Hey, did this happen?

10:08   12          Yeah.

10:08   13          Okay.  Well, did you document it on a

10:08   14  42?

10:08   15          Well, no, I talked to him.

10:08   16          No.  You need to document it.

10:08   17      Q.   So your expectation is that the captains

10:08   18  would use the form 42 to document any problems with the

10:08   19  employee's performance?

10:08   20      A.   Yes.

10:08   21      Q.   And the form 34, what is that?

10:08   22      A.   We call it a counseling form.  The best I

10:08   23  can describe, it's -- it's either a repeat occurrence

10:08   24  of a problem that was previously documented on a 42 or

10:08   25  if it's -- it might be of a serious enough nature that

Page 39

10:08   1   a -- a 42 is not enough.  You need to escalate it to

10:09   2   a 34.

10:09   3       Q.   Is it a progression so the captain has to

10:09   4   fill out a form 42 and then a 43 -- sorry -- 34?

10:09   5       A.   Well, like I said, if it's a -- if it's a

10:09   6   serious enough nature, then you skip the 42 and go

10:09   7   right to the 34.

10:09   8       Q.   As the district chief did you have any role

10:09   9   in reviewing the form 34 entries?

10:09   10      A.   I think it required my signature.

10:10   11      Q.   And you expected your captains to use the

10:10   12  form 34 to document any problems with the -- with their

10:10   13  employees' performance?

10:10   14          MS. COHEN:  Objection; mischaracterizes

10:10   15  prior testimony.

10:10   16  BY MR. MONTEIRO:

10:10   17      Q.   You can answer.

10:10   18      A.   Yes.  I expect them to document good and bad

10:10   19  performance.

10:10   20      Q.   You also mentioned performance evaluations.

10:10   21  What is the -- sorry.  Let me back up.

10:10   22          Who had responsibility for filling out

10:10   23  the performance evaluations for the firefighter and the

10:10   24  EEO?

10:10   25      A.   The supervisor, the captain.

Page 40

10:10   1       Q.   The junior captain at station 54?

10:10   2       A.   Yes.  You know, the current -- the current

10:11   3   rank is called captain, so there is a captain and

10:11   4   senior captain, okay?

10:11   5       Q.   So when you say captain, you are referring

10:11   6   to what we previously talked about as the junior

10:11   7   captain?

10:11   8       A.   Yes.

10:11   9       Q.   Thank you.  And what is the purpose of the

10:11   10  performance evaluation?

10:11   11      A.   Well, it's an annual evaluation of an

10:11   12  employee's performance.

10:11   13      Q.   Is one of the purposes to provide the

10:11   14  employee with feedback on their performance?

10:11   15      A.   Yes.

10:11   16      Q.   Is one of the purposes to raise any problems

10:11   17  with the employee's performance?

10:11   18      A.   It could be that, or it could be to praise

10:11   19  the employee's superior performance.

10:12   20      Q.   So it could be good performance or bad

10:12   21  performance?

10:12   22      A.   Yes.

10:12   23      Q.   The same as the 34 and 42 we talked about?

10:12   24      A.   Yeah.  The 34 is not -- is not for

10:12   25  complimenting the good performance.

Page 41

| | |
|---|---|
| 10:12 | 1     So the 42 is -- is basically just to |
| 10:12 | 2 document good and bad. |
| 10:12 | 3     The -- the 34 is typically just to |
| 10:12 | 4 document repetitive or a more serious bad performance. |
| 10:12 | 5     Q. Is one of the purposes of the performance |
| 10:12 | 6 evaluation to provide the employee's supervisors with |
| 10:12 | 7 information about their performance? |
| 10:12 | 8     A. Yes. |
| 10:12 | 9     Q. And would that include -- strike that. |
| 10:13 | 10     And did the performance evaluations |
| 10:13 | 11 also provide you, as the district chief, with |
| 10:13 | 12 information about the employee's performance? |
| 10:13 | 13     A. Yes. |
| 10:13 | 14     Q. Do you expect your captains to use the |
| 10:13 | 15 performance evaluation process to make you aware of any |
| 10:13 | 16 problems with an employee's performance? |
| 10:13 | 17     A. As the initial, you know, hey, here is a |
| 10:13 | 18 problem, no.  You know, the performance evaluation |
| 10:13 | 19 should reflect that employee's performance, you know. |
| 10:13 | 20     If there is a problem that the |
| 10:13 | 21 supervisor can't fix, then I would expect, you know, |
| 10:13 | 22 the supervisor would say, hey, I am having a problem |
| 10:13 | 23 with this employee. |
| 10:13 | 24     Q. So if there is just a generalized poor level |
| 10:14 | 25 of performance, that would be reflected on the -- that |

Page 42

| | |
|---|---|
| 10:14 | 1 could be reflected on the performance evaluation, as |
| 10:14 | 2 well, right? |
| 10:14 | 3     A. Yes. |
| 10:14 | 4     Q. There is rating of 1 to 5, I think? |
| 10:14 | 5     A. Yes. |
| 10:14 | 6     Q. Now, when you were district chief over ARFF, |
| 10:14 | 7 what was your responsibility with regard to the |
| 10:14 | 8 performance evaluations for the members who worked at |
| 10:14 | 9 the airport stations? |
| 10:14 | 10     A. I would sign them as the district chief. |
| 10:14 | 11     Q. You were the reviewing authority.  Is that |
| 10:14 | 12 the right terminology? |
| 10:14 | 13     A. Well, let's see.  I don't remember really |
| 10:14 | 14 what the -- what the different levels are. |
| 10:15 | 15     Yeah.  Reviewing authority sounds |
| 10:15 | 16 familiar. |
| 10:15 | 17     Q. Okay.  And by signing the performance |
| 10:15 | 18 evaluations, you were approving them.  Is that right? |
| 10:15 | 19     A. I guess you could say, yeah. |
| 10:15 | 20     Q. Did the -- did the captain have the first |
| 10:15 | 21 responsibility for filling out the performance |
| 10:15 | 22 evaluation for the firefighter and the |
| 10:15 | 23 engineer/operator? |
| 10:15 | 24     A. Yes. |
| 10:15 | 25     Q. And what was the senior captain's |

Page 43

| | |
|---|---|
| 10:15 | 1 responsibilities with respect to that? |
| 10:15 | 2     A. Well, generally the captain and the senior |
| 10:15 | 3 should kind of get together on grading the employees. |
| 10:16 | 4 And I don't recall if there is a spot for a captain and |
| 10:16 | 5 a senior captain or if it just says station officer.  I |
| 10:16 | 6 don't recall who signs it. |
| 10:16 | 7     Q. You mentioned that your signature was an |
| 10:16 | 8 approval of the performance evaluation.  Did you have |
| 10:16 | 9 the opportunity to provide input as part of the |
| 10:16 | 10 evaluation? |
| 10:16 | 11     A. I suppose if I did not agree with the |
| 10:16 | 12 evaluation, I could return it to the -- the grading |
| 10:16 | 13 officer and talk to him about it, but yeah. |
| 10:17 | 14     Q. What steps, if any, did you undertake to |
| 10:17 | 15 make sure that an employee's performance evaluation was |
| 10:17 | 16 reflective of their actual performance when you were |
| 10:17 | 17 the district chief? |
| 10:17 | 18     A. As it relates to the firefighters and the |
| 10:17 | 19 EOs, I -- I don't really have a role in making sure |
| 10:17 | 20 that their -- that their evaluation matches their |
| 10:17 | 21 performance?  Was that the question? |
| 10:17 | 22     Q. Yeah.  You would rely on the captains to do |
| 10:17 | 23 that.  Is that fair? |
| 10:17 | 24     A. Yeah, because the station officers work with |
| 10:17 | 25 their people.  I don't. |

Page 44

| | |
|---|---|
| 10:17 | 1     Q. But if you saw something that was |
| 10:17 | 2 inconsistent with your own experience with that |
| 10:17 | 3 employee, is that something you would raise with the |
| 10:17 | 4 captains? |
| 10:17 | 5     A. I could. |
| 10:18 | 6     MS. COHEN:  Jeremy, we have been going |
| 10:18 | 7 about an hour.  Could we take a break? |
| 10:18 | 8     MR. MONTEIRO:  Could I ask two more |
| 10:18 | 9 questions? |
| 10:18 | 10     MS. COHEN:  Sure. |
| 10:18 | 11 BY MR. MONTEIRO: |
| 10:18 | 12     Q. You mentioned that you would -- you could |
| 10:18 | 13 send the evaluation back to your captains if there was |
| 10:18 | 14 a specific concern you have? |
| 10:18 | 15     A. Right. |
| 10:18 | 16     Q. Would that -- would you have a meeting with |
| 10:18 | 17 them, or how would that play out? |
| 10:18 | 18     A. It could be a face-to-face meeting.  It |
| 10:18 | 19 could be a phone call. |
| 10:18 | 20     Q. And could the evaluation then be revised |
| 10:18 | 21 based on your input? |
| 10:18 | 22     A. If the station officer was pretty sure that, |
| 10:19 | 23 no, this is my evaluation of an employee, then, again, |
| 10:19 | 24 that officer works with that employee.  I don't. |
| 10:19 | 25     Q. You would defer to the captain? |

Page 45

10:19 1    A. I would.

10:19 2         MR. MONTEIRO: Okay. Let's take a

10:19 3    break.

10:19 4         THE VIDEOGRAPHER: 10:18, off record.

10:19 5         (Recess from 10:19 to 10:33 a.m.)

10:32 6         THE VIDEOGRAPHER: 10:32, back on

10:33 7    record, disk 2.

10:33 8    BY MR. MONTEIRO:

10:33 9    Q. We are back on the record after a break.

10:33 10   When we left, when we ended, we were talking about

10:33 11   performance evaluations, and I will pick up with that.

10:33 12        Ms. Draycott, Jane Draycott, was

10:33 13   assigned to station 54 from 2008 to 2010. Is that

10:33 14   correct, approximately?

10:33 15   A. Yeah, that sounds -- yes.

10:33 16   Q. She was on the A shift?

10:33 17   A. Yes.

10:33 18   Q. Her captain was Erich Henschel. Is that

10:33 19   correct?

10:33 20   A. Probably. I mean, right now Henschel works

10:33 21   on 99 on the B. I don't know when -- I don't recall

10:33 22   when he moved out of -- you know, I just know Henschel

10:33 23   as being at 99.

10:34 24   Q. Okay. And the senior captain, you told us

10:34 25   earlier, was senior captain Tamez during that time

Page 46

10:34 1    period?

10:34 2    A. Right, right.

10:34 3    Q. I will show you --

10:34 4         MR. MONTEIRO: Will you mark that?

10:34 5         (Exhibit 1 marked.)

10:34 6    BY MR. MONTEIRO:

10:34 7    Q. Chief McAteer, I am showing you what's been

10:34 8    marked as deposition exhibit 1 to your deposition. For

10:34 9    identification purposes it bears the Bates numbers

10:34 10   HOU 2120 through 2123.

10:34 11        If you would please review exhibit 1

10:34 12   and let me know when you have had chance to complete

10:34 13   your review.

10:34 14   A. Okay.

10:35 15   Q. Chief, what is deposition exhibit 1?

10:35 16   A. It's a performance evaluation.

10:35 17   Q. Who is it for?

10:35 18   A. Ena Draycott.

10:35 19   Q. And is that Jane Draycott?

10:35 20   A. Yes.

10:35 21   Q. Was this for -- was this an evaluation of

10:35 22   Ms. Draycott's 2008 performance --

10:35 23   A. Yes.

10:35 24   Q. -- as a firefighter?

10:35 25   A. Yes.

Page 47

10:35 1    Q. And I want to direct your attention to the

10:35 2    final page under the reviewing authority figure.

10:35 3         Is that your signature, sir?

10:35 4    A. Yes, it is.

10:35 5    Q. You reviewed and signed the evaluation on

10:35 6    March 31st of 2009?

10:35 7    A. Yes.

10:35 8    Q. Based on your earlier testimony, it's likely

10:35 9    that either -- well, let me back up for a minute.

10:35 10        There is two other signatures above

10:35 11   yours. Do you recognize those signatures?

10:36 12   A. Yes. First one looks like Henschel. I

10:36 13   can't tell who the senior captain's signature is.

10:36 14   Q. Based on your earlier testimony, the senior

10:36 15   captain of station 54 in March of 2009 was captain

10:36 16   Tamez?

10:36 17   A. I believe so.

10:36 18   Q. Do you know who prepared this evaluation?

10:36 19   A. No.

10:36 20   Q. Do you recall raising any concerns about

10:36 21   this evaluation when it was presented to you?

10:36 22   A. No.

10:36 23   Q. Do you agree with your captain's evaluation

10:36 24   of Ms. Draycott's performance?

10:36 25   A. Yes. I mean, I don't -- I don't agree or --

Page 48

10:36 1    if something looks out of line, I would raise the issue

10:36 2    with the captain. You know, this could have been lower

10:37 3    or higher, and I would have still signed it.

10:37 4    Q. If there was anything that you didn't agree

10:37 5    with, you would have raised it with one of captains.

10:37 6    Is that correct?

10:37 7    A. Yes.

10:37 8    Q. So as of March 31st of 2009, do you agree

10:37 9    that this evaluation accurately reflected

10:37 10   Ms. Draycott's performance as a firefighter?

10:37 11   A. It's really for the officers to evaluate.

10:37 12   Q. Did you -- when you signed this evaluation,

10:37 13   did you see anything in the evaluation that did not

10:37 14   accurately reflect Ms. Draycott's performance based on

10:37 15   your knowledge?

10:37 16   A. You know, typically I don't go page by page

10:38 17   and -- you know, so -- I did not read every comment on

10:38 18   every firefighter.

10:38 19   Q. Would you agree that the evaluation does not

10:38 20   reflect any problems with her performance from her

10:38 21   captain's standpoint?

10:38 22   A. Yes.

10:38 23   Q. Would you agree that the evaluation does not

10:38 24   reflect any problems with Ms. Draycott's physical

10:38 25   ability to perform her duties as a firefighter?

Page 49

10:38 1    A. Correct.

10:39 2    Q. Would you agree that the evaluation does not

10:39 3 reflect any problems with Ms. Draycott's mental

10:39 4 abilities to perform her job as a firefighter?

10:39 5    A. There is not really a rating for that, but I

10:39 6 don't see anything on here that would indicate.

10:39 7    Q. Let's look at page 4 under suggestions for

10:39 8 career development.

10:39 9    A. Okay.

10:39 10    Q. Is that something that you would have

10:39 11 reviewed in 2009? I know you said you don't typically

10:39 12 review the entire document.

10:39 13    A. Right. I might have.

10:39 14    Q. Do you have any recollection of reviewing

10:39 15 the suggestions for career development on exhibit 1

10:39 16 back in 2009?

10:39 17    A. That's 10 years ago, and there is 160 of

10:40 18 these every year to review. So no, I don't recall

10:40 19 specifically, no.

10:40 20    Q. It says: Firefighter Draycott is ready for

10:40 21 promotion. She should make every effort to qualify for

10:40 22 a promotion, which would qualify her for positions as

10:40 23 increased responsibility.

10:40 24        Did I read that correct?

10:40 25    A. Yes.

Page 50

10:40 1    Q. Do you know whose suggestion that was?

10:40 2    A. No. As I stated, I don't know who filled

10:40 3 this out.

10:40 4    Q. It would have been one of the captains. Is

10:40 5 that correct?

10:40 6    A. Yes.

10:40 7    Q. Either captain Henschel or senior captain

10:40 8 Tamez?

10:40 9    A. Yes.

10:40 10    Q. So one of her supervisors believed that she

10:40 11 was ready for promotion as of 2009. Is that fair?

10:40 12    A. That's what it says, yes.

10:40 13    Q. That would be promotion to the

10:40 14 engineer/operator position?

10:40 15    A. Correct.

10:40 16    Q. And is it fair to say that you had no reason

10:41 17 to disagree with this recommendation?

10:41 18    A. Yes.

10:41 19    Q. Do you know if the fire department would

10:41 20 have completed a performance evaluation for

10:41 21 Ms. Draycott for the work she performed in 2009?

10:41 22    A. I don't know. I mean, it should have

10:41 23 happened.

10:41 24    Q. And if there was one completed, where would

10:41 25 it be found currently?

Page 51

10:41 1    A. One copy in HR and I think another copy to

10:41 2 the employee.

10:41 3    Q. When you say the employee, are you referring

10:41 4 to an employee's file, or are you referring to the

10:41 5 employee actually?

10:42 6    A. Generally, it's kept in the employee's file.

10:42 7    Q. What is HR that you reference?

10:42 8    A. Human resources.

10:42 9    Q. Where is that located currently, if you

10:42 10 know?

10:42 11    A. There are parts of it in several places.

10:42 12 Physically, I don't know where the repository for all

10:42 13 of these is.

10:42 14    Q. Do you know -- I am sorry. I cut you off.

10:42 15 Go ahead.

10:42 16    A. No. There are HR reps over at fire

10:42 17 department headquarters at Smith Street. I think back

10:42 18 in '08, '09 Dart Street was the headquarters.

10:42 19    Q. Do you know who would know where

10:42 20 Ms. Draycott's performance for 2009 is currently

10:42 21 located?

10:43 22    A. If it's not at -- I said HR. It says here

10:43 23 records section. If it's not there or if it's not in

10:43 24 her personnel file, then, no, I don't know.

10:43 25    Q. Did HFD -- Ms. Draycott also worked for some

Page 52

10:43 1 period of time, at least in 2010, at station -- within

10:43 2 ARFF. Is that accurate?

10:43 3    A. You know, I don't recall. There were many

10:43 4 transfers. I don't recall when she was transferred

10:43 5 from 54, off, back, somewhere else, back, or whether --

10:44 6 I know for a time she was working in 99. I don't

10:44 7 recall if that was a transfer or if that was an agreed

10:44 8 what we call a fill in.

10:44 9    Q. Well, assuming that she worked within ARFF

10:44 10 in 2010 --

10:44 11    A. Okay.

10:44 12    Q. -- should a performance evaluation for her

10:44 13 work in 2010 have been completed?

10:44 14    A. Yes. That's the department standard.

10:44 15    Q. And again, if one was completed, you think

10:44 16 it would be either in HR or in her employee file. Is

10:44 17 that right?

10:44 18    A. Yes.

10:44 19    Q. You can give that document back to the court

10:44 20 reporter. I am done with it.

10:45 21        Are you familiar with an HFD rule and

10:45 22 regulation pertaining to coaching and counseling?

10:45 23    A. Yes.

10:45 24        (Exhibit 2 marked.)

10:45 25    Q. Chief McAteer, I am showing you what's been

Page 53

10:45  1  marked as deposition exhibit 2. For identification
10:45  2  purposes it bears the Bates numbers 2856 to 2860.
10:46  3      A.  I am sorry.  What?
10:46  4      MS. COHEN:  It's at the bottom of the
10:46  5  page.
10:46  6  BY MR. MONTEIRO:
10:46  7      Q.  There is numbers at the bottom of the page.
10:46  8  I just identified those for the record.
10:46  9      A.  Oh, okay.  Oh, okay.
10:46 10      Q.  Can you identify what this document is, sir?
10:46 11      A.  The Houston Fire Department coaching,
10:46 12  counseling, and motivating guideline.
10:46 13      Q.  This was in effect as of August 1st of 2005.
10:46 14  Is that correct?
10:46 15      A.  Yes.
10:46 16      Q.  What is this document?
10:46 17      A.  Basically department guidance to really all
10:46 18  the membership on what should happen to coach and
10:46 19  counsel employees.
10:46 20      Q.  Okay.  And we talked earlier about the use
10:47 21  of a form 42 and 43.  You explained a little bit about
10:47 22  your understanding of that.
10:47 23          Is this the guidance that kind of
10:47 24  formalizes the use of those documents?
10:47 25      A.  I would say so, yes.

Page 54

10:47  1      Q.  Are you familiar with this document?
10:47  2      A.  Reasonably.
10:47  3      Q.  You have seen it before?
10:47  4      A.  Yes, I have seen it before.  Yes.  Over the
10:47  5  years it's gone through many, many versions.
10:47  6      Q.  That's a good point.  So when the fire
10:47  7  department revises its policies, how are the members
10:47  8  made aware of those revisions?
10:47  9      A.  Basically department sends it out and
10:47 10  expects it to be read, understood, and complied with.
10:47 11      Q.  Is it sent to every member?
10:48 12      A.  I believe it is.  I believe the -- the
10:48 13  e-mail is an all employee e-mail.
10:48 14      Q.  So those are -- those are currently
10:48 15  distributed by e-mail?
10:48 16      A.  Yes.
10:48 17      Q.  Did that process change at some point?
10:48 18      A.  I don't recall when e-mails started in the
10:48 19  fire department, but I remember chief Kinealy.  He was
10:48 20  2000, 2001.  We received things by e-mail at that time.
10:48 21  I think he was one of the first to use kind of an
10:48 22  electronic signature.  I just -- I just remember that.
10:49 23      Q.  Are the members required to provide any sort
10:49 24  of certification that they reviewed the revised
10:49 25  guidelines, or how is that documented, if you know?

Page 55

10:49  1      A.  There is an acknowledgement box to check,
10:49  2  but -- but typically, at daily meetings, roll calls, or
10:49  3  maybe one of the trainings that month would be what's
10:49  4  online.
10:49  5          And then online would also say, you
10:49  6  know, review these guidelines and these procedures.
10:49  7  And so at some point if you don't get it on your own,
10:49  8  it should be reviewed with you during one of the
10:49  9  training classes.
10:50 10      Q.  Okay.  If we can look at page 3 of this
10:50 11  document, which starts -- which is entitled 6.00
10:50 12  guidelines, do you see that?
10:50 13      A.  Yes.
10:50 14      Q.  Let's look at 6.01.  It says:  Should it
10:50 15  become necessary for an officer to institute steps
10:50 16  necessary to amend action or inaction, the guidelines
10:50 17  set forth shall be strictly adhered to.
10:50 18          Did I read that right?
10:50 19      A.  Yes.
10:50 20      Q.  So the use of the word shall, is it your
10:50 21  understanding that the officer has no discretion to go
10:50 22  outside of these guidelines; these are the guidelines
10:50 23  to follow?
10:50 24      A.  Yes.  Shall is -- oh, what's the right word?
10:50 25  It's -- it's not discretionary.

Page 56

10:50  1      Q.  Got it.  And why is it important for the
10:50  2  officer to strictly adhere to these guidelines?
10:51  3      A.  For consistency.
10:51  4      Q.  What sorts of things might happen if an
10:51  5  officer fails to adhere to these guidelines?
10:51  6      A.  In terms of impact to morale or what
10:51  7  should -- what would happen to him if he doesn't?
10:51  8      Q.  Well, as I understand, this is the procedure
10:51  9  that the officer follows in coaching, counseling, and
10:51 10  motivating the subordinate.  Is that right?
10:51 11      A.  Yes.
10:51 12      Q.  So you know, what sorts of things might
10:51 13  happen to a subordinate if the officer fails to follow
10:51 14  these guidelines?
10:51 15      A.  I am still not exactly sure -- so what would
10:51 16  happen to the employee if the officer fails to follow
10:51 17  the guideline?
10:51 18      Q.  Yeah.  I mean, you said that -- you
10:51 19  testified that it's important for the officer to follow
10:52 20  these guidelines for consistency purposes, right?
10:52 21      A.  Yes, departmental consistency so that, in
10:52 22  general, behaviors are -- are treated equally,
10:52 23  uniformly.
10:52 24      Q.  Okay.  So -- so one -- if an officer fails
10:52 25  to follow these guidelines, a subordinate can feel like

Page 57

10:52  1  they haven't been treated equally.  Is that fair?

10:52  2  A.  Yeah, yeah.

10:52  3  Q.  These provide some sort of objective

10:52  4  criteria by which to document an employee's

10:52  5  performance?

10:52  6  A.  Right.

10:52  7  Q.  Let's look at page 4 under section D, which

10:52  8  discusses the procedure for relief of duty.  If you can

10:53  9  just review that section, I am going to ask you a

10:53  10  couple questions.

10:53  11  A.  Okay.

10:53  12  Q.  What does it mean to relieve a member of

10:53  13  duty?

10:53  14  A.  Okay.  You -- if one of these situations are

10:53  15  present, you know, the officer checks with the

10:53  16  supervisor:  Hey, this person is out of control.  He is

10:53  17  doing whatever, you know.

10:53  18  You have to describe what's actually

10:53  19  going on and get your supervisor's buy-in that, yes, I

10:54  20  agree with you; this person needs to be relieved of

10:54  21  duty.

10:54  22  You tell the member:  We are relieving

10:54  23  you of duty.  We will advise -- we will advise you by

10:54  24  whatever means, phone call, e-mail, what the next step

10:54  25  is, but you know, you are not to remain at work.  Don't

Page 58

10:54  1  come back to work until -- until you hear from whatever

10:54  2  authority that you are cleared to return to work.

10:54  3  Q.  And what does the -- so you said that the

10:54  4  officer has to get their supervisor's buy-in.  How does

10:54  5  that play out?  Is it --

10:55  6  A.  Well, all right.  So there is -- there is

10:55  7  some situation going on at the station.  You know, the

10:55  8  officer has told this member, hey, knock it off.

10:55  9  And you know, the member is just out of

10:55  10  control:  You know, no, I am not going to do that.  You

10:55  11  can't make me.

10:55  12  So we can't run the station with one

10:55  13  member saying:  No, I ain't going to do anything you

10:55  14  say.

10:55  15  All right.  So because there are so

10:55  16  many different people -- officers are individuals.

10:55  17  They are people.  There are different thresholds that

10:55  18  people see as, oh, that crossed over the line.

10:56  19  And so the intent is to try to -- try

10:56  20  to overcome, get a second opinion.  So the supervisor

10:56  21  listens to the situation, and you know, like, sometimes

10:56  22  it's a -- are you sure you are really maybe not reading

10:56  23  this wrong, maybe overreacting?  Because to me, that

10:56  24  really doesn't rise to the level of relieving somebody

10:56  25  of duty.

Page 59

10:56  1  Or you know, the person could, you

10:56  2  know, also say:  Wow, that really happened?  Okay.

10:56  3  Were there witnesses?  You know, and try to see how

10:56  4  strong is your -- is your case, captain?  Is it going

10:57  5  to come down you are alone in the room and he said/he

10:57  6  said?  Just try to -- try to sort out exactly what are

10:57  7  we looking at.  What did you do to try to -- try to

10:57  8  correct this guy?  You know, did he just say this, and

10:57  9  you are immediately calling me?  Have you even tried

10:57  10  talking to him?

10:57  11  So that's what the call to a supervisor

10:57  12  should try to determine, what are we really looking at,

10:57  13  what really happened, what steps did you take to try to

10:57  14  correct it.

10:57  15  Q.  Thank you.  So the captain -- would the

10:57  16  captain go to the senior captain, or would they go to

10:57  17  you as the district chief in this type of -- if a

10:57  18  situation like this arose, as their supervisor?

10:57  19  A.  Oh, if it was at station 54, I would expect

10:58  20  the senior captain would be involved.

10:58  21  Q.  Okay.  Could the senior captain get you

10:58  22  involved or make you aware of what's going on?

10:58  23  A.  He should, yes.

10:58  24  Q.  He should?

10:58  25  A.  Because honestly, I am going to call my boss

Page 60

10:58  1  and you know:  Hey, just letting you know this is

10:58  2  what's going on.  I agree with the captain.  What do

10:58  3  you think?

10:58  4  Q.  This is a -- this is something that you

10:58  5  would elevate to your supervisor, that level of

10:58  6  seriousness?

10:58  7  A.  Oh, absolutely, yes.

10:58  8  Q.  Is there some sort of form that would be

10:58  9  completed or --

10:58  10  A.  No.  The guidance I got from staff services

10:58  11  was, okay, just send us an e-mail that you are -- that

10:58  12  you are relieving this person.  Give us their payroll

10:58  13  number so they have something in their records.

10:59  14  Q.  Under section D2 of the policy, it says:  If

10:59  15  someone -- it says one of grounds for relief of duty is

10:59  16  that if they are not physically or mentally capable of

10:59  17  performing their duties.

10:59  18  A.  Right.

10:59  19  Q.  What does it mean if someone is not

10:59  20  physically -- a member is not physically capable of

10:59  21  performing their duties?

10:59  22  A.  Well, for example, someone with medical

10:59  23  restrictions, not supposed to lift anything over

10:59  24  10 pounds.  Well, that's inconsistent with the job.

10:59  25  You know, the person says:  My back

Page 61

10:59 1 hurts. I can't do anything, but you know -- but I am
11:00 2 here. I will answer the phones.
11:00 3        No, that's inconsistent with your job
11:00 4 as a truck operator.
11:00 5    Q. Okay. And then what does it mean if someone
11:00 6 is mentally incapable of performing their duties?
11:00 7    A. Well, everyone has probably got their own
11:00 8 answer, but to me, what that means is a person is out
11:00 9 of control, screaming, or to the other side, so
11:00 10 withdrawn that they will not respond to -- to anyone
11:00 11 verbally. You know, just anything other than -- if you
11:00 12 are dispatched on an emergency, will you get up, put
11:00 13 your gear up, get on the apparatus, and respond and
11:01 14 perform as expected?
11:01 15    Q. You can return that to the court reporter.
11:01 16 We are done with that.
11:01 17        I want to shift our focus to the fire
11:01 18 department's complaint policies and procedures that
11:01 19 were in effect while you were district chief. I am
11:01 20 going to have this marked as exhibit 3, please.
11:01 21        (Exhibit 3 marked.)
11:01 22        MS. COHEN: Did you give me one?
11:02 23        MR. MONTEIRO: Oh, I am sorry. Sorry
11:02 24 about that.
11:02 25 BY MR. MONTEIRO:

Page 62

11:02 1    Q. Chief McAteer, I am showing you what's been
11:02 2 marked as deposition exhibit 3. For identification
11:02 3 purposes it's marked as HOU 2821 through 2826.
11:02 4    A. Okay.
11:02 5    Q. Have you seen this document before, sir?
11:02 6    A. Yes.
11:02 7    Q. What is it?
11:02 8    A. Houston Fire Department complaint guideline.
11:02 9    Q. This was in effect as of August 1st of 2005.
11:02 10 Is that correct?
11:02 11    A. Yes.
11:02 12    Q. And is this the fire department's
11:02 13 discrimination complaint policy as of August 1st, 2005?
11:03 14    A. Discrimination complaint -- it could be
11:03 15 discrimination. It could be bad behavior. It could
11:03 16 be -- I guess it's not just the discrimination
11:03 17 complaint policy. I don't remember when mayor's orders
11:03 18 came out. But there was something about discrimination
11:03 19 on a mayor's order.
11:03 20    Q. Okay. Let's look at page 3.
11:03 21    A. Okay.
11:03 22    Q. Under 6.01, it talks about receiving
11:03 23 complaints, and sections B and C discuss the
11:03 24 obligations for employees who receive complaints of
11:04 25 criminal violations or that allege discrimination or

Page 63

11:04 1 that allege violations of fire department rules,
11:04 2 regulations, orders, bulletins, directives or
11:04 3 guidelines. Is that correct?
11:04 4    A. Right.
11:04 5    Q. So this document provides HFD members with
11:04 6 information in terms of how they should make a
11:04 7 complaint?
11:04 8    A. Yes.
11:04 9    Q. And one of complaints that it provides
11:04 10 members -- one of the complaints that -- it provides
11:04 11 members with information as to how to make such a
11:04 12 complaint would be a discrimination complaint. Is that
11:04 13 fair?
11:04 14    A. Yes.
11:04 15    Q. Did you receive any training on this policy
11:04 16 when it was issued in 2005?
11:05 17    A. Not that I recall.
11:05 18    Q. Do you know if your captains would have
11:05 19 received any training on the policy when it was issued
11:05 20 in 2005?
11:05 21    A. No. Just like other guidelines, it's
11:05 22 distributed, read it, understand it, and comply.
11:05 23    Q. Okay. If you know, when a captain is first
11:05 24 elevated to -- when a captain is first elevated from
11:05 25 engineer/operator, do they receive any kind of

Page 64

11:05 1 supervisory training?
11:05 2    A. Now they do. I don't remember when that
11:06 3 started. It's called newly promoted officer training,
11:06 4 NPO.
11:06 5    Q. And prior to the implementation of the NPO
11:06 6 training, do you know if there was any training for
11:06 7 newly promoted captains?
11:06 8    A. I don't believe so. It was generally
11:06 9 understood that as you -- as you work, you become
11:06 10 familiar with the duties and responsibilities of the
11:06 11 next rank up. Essentially, pay attention. There was
11:06 12 not organized -- the newly promoted officer training.
11:07 13    Q. It sounds like it was on-the-job training, a
11:07 14 fair characterization of that?
11:07 15    A. Yes, yes, right.
11:07 16    Q. If we can go back to the document and look
11:07 17 at 6.01, subsection B.
11:07 18    A. All right.
11:07 19    Q. And it says: Quote, employees confronted
11:07 20 with serious complaints that cannot be resolved
11:07 21 immediately, that allege criminal violations, and/or
11:07 22 complaints of alleged discrimination based on race,
11:07 23 color, gender, religion and/or national origin, shall
11:07 24 instruct the complaining party to forward their
11:07 25 complaint to the Office of Inspector General, unquote.

George Luther McAteer, Jr.

Page 65

| | | |
|---|---|---|
| 11:07 | 1 | Did I read that right? |
| 11:07 | 2 | **A.  Yes.** |
| 11:07 | 3 | Q.  So what's your understanding of an officer's |
| 11:08 | 4 | responsibilities under the section of the policy |
| 11:08 | 5 | once -- upon notice of discrimination complaint? |
| 11:08 | 6 | **A.  Well, that he should advise the complaining** |
| 11:08 | 7 | **party to, you know, that's serious.  You should forward** |
| 11:08 | 8 | **that to -- to the OIG.** |
| 11:08 | 9 | Q.  OIG, okay.  We talked about this earlier. |
| 11:08 | 10 | There is the -- this section uses the word shall again. |
| 11:08 | 11 | Is that again nondiscretionary? |
| 11:08 | 12 | **A.  Yes.** |
| 11:08 | 13 | Q.  Would this policy apply to an officer who |
| 11:08 | 14 | learns of a discrimination complaint? |
| 11:08 | 15 | **A.  Yes.  I think it says employees confronted** |
| 11:08 | 16 | **with.  Now, you know -- you know, so when you say when** |
| 11:09 | 17 | **an officer learns of, you are describing an employee** |
| 11:09 | 18 | **confronts the officer with this happened to me.  Is** |
| 11:09 | 19 | **that the question?** |
| 11:09 | 20 | Q.  Yeah. |
| 11:09 | 21 | **A.  Okay, yes.  You know, that officer shall** |
| 11:09 | 22 | **instruct the complaining party.** |
| 11:09 | 23 | Q.  And if a firefighter reports a |
| 11:09 | 24 | discrimination complaint to their captain, the captain |
| 11:09 | 25 | is then to direct the firefighter to OIG? |

Page 66

| | | |
|---|---|---|
| 11:09 | 1 | **A.  Yes.** |
| 11:09 | 2 | Q.  The provision uses the terminology serious |
| 11:09 | 3 | complaints.  Do you see that? |
| 11:09 | 4 | **A.  Yes.** |
| 11:09 | 5 | Q.  What is your understanding of what a serious |
| 11:10 | 6 | complaint is? |
| 11:10 | 7 | **A.  Well, that's up to the receiver's** |
| 11:10 | 8 | **interpretation.** |
| 11:10 | 9 | Q.  So it's a judgment call by the officer? |
| 11:10 | 10 | **A.  Yes.  Now, an example of a serious complaint** |
| 11:10 | 11 | **that cannot be resolved immediately alleging criminal** |
| 11:10 | 12 | **violations, hey, that employee just took a baseball bat** |
| 11:10 | 13 | **and broke out every window of my car.** |
| 11:10 | 14 | **You know, and then by the same token on** |
| 11:10 | 15 | **discrimination, you know, the employee would have to** |
| 11:10 | 16 | **say this person broke out all of my windows because I** |
| 11:10 | 17 | **am a protected class or -- you know, because of I am** |
| 11:11 | 18 | **female or -- you know, so that should key in the** |
| 11:11 | 19 | **officer's mind, okay, so this is discrimination, yes.** |
| 11:11 | 20 | **Okay.  So I should -- you know, that's an OIG thing.** |
| 11:11 | 21 | Q.  Okay.  Do you know if there are any policies |
| 11:11 | 22 | or procedures in place that define what a serious |
| 11:11 | 23 | complaint is? |
| 11:11 | 24 | **A.  Not that I am aware of.** |
| 11:11 | 25 | Q.  Have you been provided any training as to |

Page 67

| | | |
|---|---|---|
| 11:11 | 1 | what constitutes a serious complaint? |
| 11:11 | 2 | **A.  No.  I think we have had occasional** |
| 11:11 | 3 | **discrimination classes, but I believe it's left to the** |
| 11:12 | 4 | **officer's good judgment.** |
| 11:12 | 5 | Q.  Do you know if captains received any |
| 11:12 | 6 | training as to what constitutes a serious complaint? |
| 11:12 | 7 | **A.  I believe they would have had the same** |
| 11:12 | 8 | **occasional discrimination classes, you know, sexual** |
| 11:12 | 9 | **harassment classes, but -- like, I am describing, they** |
| 11:12 | 10 | **are not training that say, well, this is minor; this is** |
| 11:12 | 11 | **serious.** |
| 11:12 | 12 | Q.  Okay.  So how would you determine -- make |
| 11:12 | 13 | the determination whether a complaint is serious or not |
| 11:13 | 14 | under this policy? |
| 11:13 | 15 | **A.  Well, probably my best judgment.** |
| 11:13 | 16 | Q.  Would you have to conduct some level of |
| 11:13 | 17 | initial investigation to determine the level of |
| 11:13 | 18 | seriousness? |
| 11:13 | 19 | **A.  Okay.  So again, we are talking about an** |
| 11:13 | 20 | **employee personally bringing a complaint?** |
| 11:13 | 21 | Q.  Right. |
| 11:13 | 22 | **A.  Okay, all right.** |
| 11:13 | 23 | Q.  Or making you aware of a complaint. |
| 11:13 | 24 | **A.  Aware, okay.  Generally, I -- I consult my** |
| 11:13 | 25 | **supervisor and say, hey, what do you think, you know.** |

Page 68

| | | |
|---|---|---|
| 11:14 | 1 | **I -- I think it should probably be investigated, but** |
| 11:14 | 2 | **we -- we don't have the ability to -- we, officers --** |
| 11:14 | 3 | **to just initiate an investigation, you know, because** |
| 11:14 | 4 | **that's a particular -- that term means a particular** |
| 11:14 | 5 | **thing.** |
| 11:14 | 6 | Q.  Sure.  And I don't mean -- I guess I didn't |
| 11:14 | 7 | mean like some sort of formal OIG investigation. |
| 11:14 | 8 | But you know, if an incident occurs and |
| 11:14 | 9 | an employee comes to you and says, this happened, I |
| 11:14 | 10 | think it was discriminatory, and these two people were |
| 11:14 | 11 | there and saw it, in determining the level of |
| 11:14 | 12 | seriousness, would you kind of informally maybe speak |
| 11:14 | 13 | with the other folks who might have witnessed what |
| 11:15 | 14 | happened? |
| 11:15 | 15 | **A.  You know, generally, anytime --** |
| 11:15 | 16 | **discrimination is a trigger word.  And generally, me --** |
| 11:15 | 17 | **most of the officers that I talk to, as soon as that** |
| 11:15 | 18 | **word is said, hey, you need to go -- you know, the** |
| 11:15 | 19 | **place for your complaint is OIG.** |
| 11:15 | 20 | Q.  What if they don't use the word |
| 11:15 | 21 | discrimination? |
| 11:15 | 22 | **A.  Well, if what they are describing and -- and** |
| 11:15 | 23 | **as the receiving officer -- so are you saying that they** |
| 11:15 | 24 | **did this because of your gender, your race, you know,** |
| 11:15 | 25 | **then if the answer is yes, then you need to go to OIG.** |

Page 69

| | | |
|---|---|---|
| 11:16 | 1 | Q. Okay. Going back to the policy, it says |
| 11:16 | 2 | complaints -- it uses the terminology complaints that |
| 11:16 | 3 | allege discrimination. Do you see that? |
| 11:16 | 4 | A. Yes. |
| 11:16 | 5 | Q. Are you aware of any policies or procedures |
| 11:16 | 6 | in place that define what a complaint that alleges |
| 11:16 | 7 | discrimination is? |
| 11:16 | 8 | A. It's been awhile since I read the mayor's |
| 11:16 | 9 | order. That may have examples. |
| 11:16 | 10 | Q. Which mayor's order are you referring to? |
| 11:16 | 11 | A. I can't name it. I would have to look it |
| 11:16 | 12 | up. |
| 11:16 | 13 | Q. Was it in place in 2005? Do you know? |
| 11:16 | 14 | A. I don't remember if there was a mayor's |
| 11:17 | 15 | order before mayor Parker's order that came out. I |
| 11:17 | 16 | don't know if she revised or if she added a new one. |
| 11:17 | 17 | Q. When was mayor Parker in charge of the city, |
| 11:17 | 18 | approximately? |
| 11:17 | 19 | A. Let's see. I think she came after Bill |
| 11:17 | 20 | White. |
| 11:17 | 21 | Q. Is 2010 about right, sound about right? |
| 11:17 | 22 | A. It could be. '08, '09, or '10. |
| 11:17 | 23 | Q. Okay. |
| 11:17 | 24 | A. Okay. |
| 11:17 | 25 | Q. Have you been provided any training as to |

Page 70

| | | |
|---|---|---|
| 11:17 | 1 | how to identify what constitutes a complaint that |
| 11:17 | 2 | alleges discrimination? |
| 11:17 | 3 | A. Like I said, other than the occasional HR |
| 11:18 | 4 | class, sexual harassment, that's about it. |
| 11:18 | 5 | Q. And I think you said earlier, but the |
| 11:18 | 6 | complaining party doesn't have to use the word |
| 11:18 | 7 | discrimination. Is that right? |
| 11:18 | 8 | A. Yeah, that's correct. If what you are |
| 11:18 | 9 | describing fits, you know, the -- walks like a duck, |
| 11:18 | 10 | talks like a duck, then, you know, are you describing a |
| 11:18 | 11 | duck? Then, yes. |
| 11:18 | 12 | Q. For you, what are some indicators that -- |
| 11:18 | 13 | which lead you to believe that somebody was raising a |
| 11:18 | 14 | discrimination complaint? |
| 11:18 | 15 | A. Well, if what they are saying seems to be |
| 11:18 | 16 | out of the norm or if they are describing disparate |
| 11:19 | 17 | treatment given -- I don't know -- unfavorable work |
| 11:19 | 18 | assignments, more work assignments than the other crew |
| 11:19 | 19 | members, and -- it's because of my race, gender, |
| 11:19 | 20 | whatever. |
| 11:19 | 21 | Q. Could a complaint of harassment be a |
| 11:19 | 22 | complaint that alleges discrimination? |
| 11:19 | 23 | A. Sir? |
| 11:19 | 24 | Q. Could a series of harassing events be a |
| 11:19 | 25 | complaint that alleges discrimination? |

Page 71

| | | |
|---|---|---|
| 11:19 | 1 | A. Yes. |
| 11:19 | 2 | Q. If an employee reports numerous problems at |
| 11:19 | 3 | work and they believe it's because of their gender, |
| 11:19 | 4 | could that be a complaint of discrimination? |
| 11:20 | 5 | A. Yes. |
| 11:20 | 6 | Q. How about if an employee reports unfair |
| 11:20 | 7 | treatment at work and they believe it's because of |
| 11:20 | 8 | their gender? Could that be a complaint that alleges |
| 11:20 | 9 | discrimination? |
| 11:20 | 10 | A. Yes. |
| 11:20 | 11 | Q. If an employee reports inappropriate |
| 11:20 | 12 | behaviors at work and they believe they are occurring |
| 11:20 | 13 | because of their gender, could that be a complaint that |
| 11:20 | 14 | alleges discrimination? |
| 11:20 | 15 | A. Yes. |
| 11:20 | 16 | Q. At the end of the day is it a judgment call |
| 11:20 | 17 | by the officer? |
| 11:20 | 18 | A. I don't believe so. If what the employee is |
| 11:20 | 19 | telling you says that this is happening because of my |
| 11:20 | 20 | gender, I think the officer should direct that employee |
| 11:20 | 21 | to OIG. |
| 11:20 | 22 | Q. What if the employee reports harassment, but |
| 11:21 | 23 | doesn't say I believe this is happening because of my |
| 11:21 | 24 | gender? At that point does the officer then need to |
| 11:21 | 25 | make a determination as to whether or not the person is |

Page 72

| | | |
|---|---|---|
| 11:21 | 1 | making a complaint of discrimination? |
| 11:21 | 2 | A. Okay. I am sorry. I guess you kind of lost |
| 11:21 | 3 | me on that. |
| 11:21 | 4 | MR. MONTEIRO: Let me ask the court |
| 11:21 | 5 | reporter to read it back for you. |
| 11:21 | 6 | (THE FOLLOWING WAS READ: |
| 11:20 | 7 | "QUESTION: What if the employee |
| 11:21 | 8 | reports harassment, but doesn't say I believe this is |
| 11:21 | 9 | happening because of my gender? At that point does the |
| 11:21 | 10 | officer then need to make a determination as to whether |
| 11:21 | 11 | or not the person is making a complaint of |
| 11:21 | 12 | discrimination?") |
| 11:21 | 13 | A. Okay. So the employee reports harassment. |
| 11:21 | 14 | I think generally the officer would ask |
| 11:22 | 15 | questions, okay, when, who, okay, why do you think they |
| 11:22 | 16 | are doing that? |
| 11:22 | 17 | Now, again, if it -- if it looks and |
| 11:22 | 18 | sounds like they are reporting discrimination, then I |
| 11:22 | 19 | would expect myself or any officer to advise the |
| 11:22 | 20 | employee to go to OIG. |
| 11:22 | 21 | BY MR. MONTEIRO: |
| 11:22 | 22 | Q. So the officer -- under the scenario I |
| 11:22 | 23 | described, the officer should kind of flesh out, you |
| 11:22 | 24 | know, what exactly the employee is raising and what |
| 11:22 | 25 | they believe is -- why they believe what's happening is |

Page 73

11:22  1  happening.  Is that correct?
11:22  2  **A.  Yes.**
11:22  3  Q.  The policy also uses the terminology cannot
11:23  4  be resolved immediately.  Do you see that?
11:23  5  **A.  Yes.**
11:23  6  Q.  What does that mean to you?
11:23  7  **A.  There are so many possibilities.  If**
11:23  8  **something can be resolved immediately, one of the fire**
11:23  9  **stations in the city that doesn't have separate**
11:23  10  **quarters, maybe doesn't have shower curtains, and the**
11:23  11  **complaint is raised by a female firefighter that, you**
11:23  12  **know, gee, this -- I don't have any privacy, well, then**
11:23  13  **if -- if they could run down to Wal-Mart and pick up a**
11:24  14  **shower curtain.**
11:24  15  Q.  They have resolved the issue?
11:24  16  **A.  Right, right.**
11:24  17  Q.  Does it mean that the issue doesn't reoccur
11:24  18  or the problem doesn't reoccur?
11:24  19  **A.  Well, resolving that the first time doesn't**
11:24  20  **guarantee that it won't reoccur, I suppose.**
11:24  21  Q.  Okay.
11:24  22  **A.  But you would like to think that you heard**
11:24  23  **of a problem and you acted to resolve it.**
11:24  24  Q.  Should it be unlikely to occur again?
11:24  25  **A.  It should be.**

Page 74

11:24  1  Q.  So if the same issue were to occur on
11:24  2  multiple occasions, would you agree that the issue
11:24  3  hadn't been resolved immediately?
11:24  4  **A.  Well, if there is reoccurrence, then it**
11:25  5  **wasn't a permanent resolution.**
11:25  6  Q.  What if a complaint is made and the alleged
11:25  7  wrongdoer cannot be identified?  Does that mean that
11:25  8  there is no way to resolve the complaint immediately?
11:25  9  **A.  Okay.  That's -- that seems like kind of a**
11:25  10  **vague -- okay.**
11:25  11  **There is a complaint of a wrongdoing.**
11:25  12  **The wrongdoer cannot be identified.**
11:25  13  Q.  Right.
11:25  14  **A.  Now, through a -- through an investigation?**
11:25  15  Q.  No.  Just by the officer.  Again, I am
11:26  16  talking about the receiving point.
11:26  17  **A.  All right.**
11:26  18  Q.  So if an officer is made aware of a
11:26  19  discrimination complaint, but the employee can't
11:26  20  identify who the wrongdoer is, I am assuming the
11:26  21  officer can't resolve the issue immediately under those
11:26  22  circumstances?
11:26  23  **A.  Okay, okay, right, yes, right.**
11:26  24  Q.  So under those circumstances the complainant
11:26  25  should be directed to OIG?

Page 75

11:26  1  **A.  Yes.  Now, I would also expect the officer**
11:26  2  **to maybe make an announcement or you know, hey,**
11:26  3  **reminder, make sure that you don't ever do this or you**
11:26  4  **always do that.**
11:26  5  Q.  Now, once the officer directs the employee
11:26  6  to OIG, should the officer follow up with the employee
11:27  7  to make sure they have gone to OIG?
11:27  8  **A.  To make sure that they filed?**
11:27  9  Q.  That -- yeah, that they went to OIG?
11:27  10  **A.  Let's -- that's not really -- once -- once**
11:27  11  **something goes to OIG, there is this cloak of secrecy**
11:27  12  **and confidentiality.**
11:27  13  **Basically, no, it's not the officer's**
11:27  14  **role to essentially follow up on an OIG complaint,**
11:27  15  **because he has given the employee direction:  This is**
11:27  16  **what the policy says, so that's what I am advising you.**
11:27  17  Q.  Should the officer follow up with the
11:27  18  employee to find out if the issues are reoccurring once
11:28  19  they have directed them to OIG?
11:28  20  **A.  I suppose.  There is not a requirement to,**
11:28  21  **but I would think -- I would think good practice would**
11:28  22  **just -- checking in with your crew members, you know,**
11:28  23  **hey, how are things going.**
11:28  24  Q.  And a discrimination complaint under this
11:28  25  policy can be either written or verbal.  Is that

Page 76

11:28  1  correct?
11:28  2  **A.  At some point I think it needs to be**
11:28  3  **written.  It can maybe be -- initially be verbal.**
11:28  4  Q.  And I am referring to an employee who makes
11:28  5  a report of discrimination to their captain, not
11:28  6  someone who goes to OIG.
11:29  7  **A.  Oh, okay, right.  The initial report.**
11:29  8  Q.  Yeah, the initial complaint, that could be
11:29  9  verbal or written?
11:29  10  **A.  Yes, yeah.**
11:29  11  Q.  If an officer is aware that an employee has
11:29  12  gone to OIG, should the officer make that -- keep that
11:29  13  confidential?
11:29  14  **A.  Yes.**
11:29  15  Q.  Do you know if there were any other policies
11:29  16  other than exhibit -- exhibit 3 in place governing how
11:30  17  complaints of discrimination should be handled in the
11:30  18  2008-2010 time period?
11:30  19  **A.  Other than that mayor's order that I**
11:30  20  **referred to.**
11:30  21  Q.  Nothing else?
11:30  22  **A.  No.**
11:30  23  Q.  That you are aware of?
11:30  24  **A.  Not that I can recall, correct.**
11:30  25  Q.  Now, if we go down to 6.01, subsection C --

Page 77

11:30  1  again, I am back on page 3.

11:30  2     **A. All right.**

11:30  3     Q. -- this says: Quote, employees confronted

11:30  4  with serious complaints that cannot be resolved

11:30  5  immediately, that allege violations of Houston Fire

11:30  6  Department rules, regulations, orders, bulletins,

11:30  7  directives, or guidelines shall instruct the

11:30  8  complaining party to forward their complaint to the HFD

11:30  9  staff services, unquote.

11:30  10     Did I read that correctly?

11:30  11    **A. Yes.**

11:30  12     Q. So what is your understanding of an

11:30  13  officer's responsibilities under this section?

11:31  14    **A. Well, kind of similar to the last, you know,**

11:31  15  **what you are alleging sounds serious; you should direct**

11:31  16  **that complaint to staff services.**

11:31  17     Q. And the allegation would be a violation of

11:31  18  the rules, regulations, orders, bulletins, directives,

11:31  19  or guidelines. Is that right?

11:31  20    **A. Yes.**

11:31  21     Q. We talked about this under the earlier

11:31  22  section, but the use of the terminology serious

11:31  23  complaint, would you apply kind of the same definition

11:31  24  that we talked about earlier to this section?

11:31  25    **A. Yes. It's up to kind of the officer's good**

Page 78

11:32  1  **judgment, discernment, past experience. You know,**

11:32  2  **years ago at a different station a similar thing came**

11:32  3  **up and that person didn't realize their approach was**

11:32  4  **offensive or insulting. So you know, have you talked**

11:32  5  **to this person?**

11:32  6     **You know, I mean, there are so many**

11:32  7  **possibilities of offenses that fall under this, it's**

11:32  8  **hard to pick one. And through my experience, I have --**

11:32  9  **I have seen a lot of them that -- so trying to answer**

11:32  10  **your question, but --**

11:32  11     Q. I understand.

11:32  12    **A. -- serious is interpretive.**

11:32  13     Q. Got it. You are not aware of any specific

11:33  14  policies or procedures that define what serious

11:33  15  complaint is under this subsection, right?

11:33  16    **A. Correct.**

11:33  17     Q. And you don't have -- you haven't received

11:33  18  any particularized training as to what constitutes a

11:33  19  serious issue under this section?

11:33  20    **A. Not that I recall. The rules and regs**

11:33  21  **change over time, you know. There was a behavior**

11:33  22  **manual. Then that was modified.**

11:33  23     **I can't remember what time frames, but**

11:33  24  **like I said, the methods of reporting and what should**

11:33  25  **be reported shift a little bit over time.**

Page 79

11:33  1     Q. Is it possible for a complaint -- is it

11:34  2  possible for a complaint to allege discrimination as

11:34  3  well as a violation of the fire department's rules and

11:34  4  regulations?

11:34  5    **A. Yes.**

11:34  6     Q. So this policy requires a discrimination

11:34  7  complaint to go to OIG and a violation of the rules and

11:34  8  regulations to go to staff services.

11:34  9     How would an officer determine where to

11:34  10  send the complainant under that scenario?

11:34  11    **A. Right. Basically, in practice, you just --**

11:34  12  **you send the employee to advise them to go to staff**

11:34  13  **services.**

11:34  14     **Staff services will look at your**

11:34  15  **complaint, okay? There is a discrimination part of**

11:34  16  **this, and there is rules and regs. So you know, they**

11:34  17  **may say, okay, OIG, you have got this one.**

11:35  18     **But -- so there does not have to be two**

11:35  19  **separate complaints filed. One -- one will be directed**

11:35  20  **and handled.**

11:35  21     Q. Okay. So the employee will be sent to staff

11:35  22  services, and staff services would kind of sort out how

11:35  23  the complaint is investigated?

11:35  24    **A. Correct. You know, there is always EEOC,**

11:35  25  **which is, you know, another reporting input.**

Page 80

11:35  1     Q. And again, where you have a firefighter

11:35  2  being directed to staff services regarding a complaint

11:35  3  about the -- a violation of the fire department's

11:35  4  rules, regulations, orders, bulletins, directives, or

11:35  5  guidelines, should their captain follow up with them to

11:35  6  make sure that the issue is not reoccurring?

11:36  7    **A. Just kind of like the last answer, I think**

11:36  8  **it would be good practice, but there is not a**

11:36  9  **requirement.**

11:36  10     Q. Is that something that you would want your

11:36  11  captains to do?

11:36  12    **A. Yes. It makes sense.**

11:36  13     Q. This section also uses the same terminology

11:36  14  about cannot be resolved immediately. Do you see that?

11:36  15    **A. Yes.**

11:36  16     Q. And would you kind of use the same criteria

11:36  17  that we talked about under subsection B for applying

11:36  18  subsection C?

11:36  19    **A. In general, yes.**

11:37  20     Q. And apart from exhibit 3 do you know if

11:37  21  there were any other policies or procedures in place at

11:37  22  the fire department in the 2008-2010 time period

11:37  23  governing how complaints alleging a violation of fire

11:37  24  departments rules, regulations, orders, bulletins,

11:37  25  directives, or guidelines should be processed?

## Page 81

11:37  1    A.  No, not other than the mayor's order that I

11:37  2  referenced.

11:38  3    Q.  You can return that to the court reporter.

11:38  4    I am going to shift my focus now to

11:38  5  some of the complaints regarding fire station 54 when

11:38  6  you were the district -- when you were district chief

11:38  7  over that.

11:38  8    A.  Okay.

11:38  9    Q.  Do you remember being interviewed by an OIG

11:38  10  investigator regarding an anonymous complaint submitted

11:38  11  by a firefighter's wife regarding the conditions of the

11:38  12  female restroom at station 54 back in 2006?

11:38  13    A.  I vaguely remember something about that

11:38  14  complaint.  I -- I don't remember being involved with

11:39  15  it myself.  It's possible, but I don't remember talking

11:39  16  to OIG or anybody.

11:39  17    (Exhibit 4 marked.)

11:39  18    Q.  Chief McAteer, I am showing you what's been

11:39  19  marked as deposition exhibit 4.  For identification

11:39  20  purposes it bears the Bates numbers of HOU 8991 through

11:40  21  HOU 9006.

11:40  22    A.  Okay.

11:40  23    Q.  Are you able to identify this record?

11:40  24    MS. COHEN:  Can you give him a few

11:40  25  minutes to look at it?

## Page 82

11:40  1    A.  Looks like it's from the Office of Inspector

11:40  2  General.

11:40  3    Okay.  It looks like it must have been

11:40  4  investigated by OIG, the female bathroom complaint.

11:41  5    Should I read the whole thing?

11:41  6  BY MR. MONTEIRO:

11:41  7    Q.  If you want to, you can.  I am going to ask

11:41  8  you some questions.  I can certainly direct you to

11:41  9  where my questions are, but if you would like to review

11:41  10  it, you are welcome to do so.

11:42  11    A.  Okay.

11:42  12    Q.  Have you had a chance to review exhibit 4?

11:42  13    A.  Yes.

11:42  14    Q.  Does it help refresh your recollection

11:43  15  regarding the anonymous complaint that was made in

11:43  16  2006 --

11:43  17    A.  Yes.

11:43  18    Q.  -- regarding the condition of the women's

11:43  19  bathroom?

11:43  20    A.  Yes.

11:43  21    Q.  Do you know if you -- if we can look at 8996

11:43  22  through 8998, which is where you are at right now --

11:43  23    A.  Okay.

11:43  24    Q.  -- do you know if you ever saw this

11:43  25  interoffice correspondence from Mr. Jensen?

## Page 83

11:43  1    A.  I don't remember it, you know, because I

11:43  2  just remember hearing about it.  Allison Stein said

11:43  3  that, you know, she called me and let me know that

11:43  4  there was going to be an investigation.

11:43  5    And you know, I said okay.

11:44  6    Q.  This is -- I mean, is this basically a

11:44  7  report of the investigator's investigation into this

11:44  8  complaint?

11:44  9    A.  Yes.  So I would not have received this.

11:44  10    Q.  Okay.  Do you know if it would have been the

11:44  11  practice of OIG in 2007 to make you aware, as the

11:44  12  district chief over station 54, of its investigation?

11:44  13    A.  My experience is that they don't inform me

11:44  14  of -- much of anything.

11:44  15    Q.  Did they inform you of the results of the

11:44  16  investigation?

11:44  17    A.  No.

11:44  18    Q.  Okay.  Do you know who would have been

11:45  19  informed of the results of this investigation at the

11:45  20  fire department?

11:45  21    A.  It would have been whoever was in charge of

11:45  22  staff services, and that person would report to the

11:45  23  fire chief.  So I assume I would find out whatever

11:45  24  they, the fire chief, wanted me to know, hey, from now

11:45  25  on, do this to prevent this from reoccurring.

## Page 84

11:45  1    Q.  So if the fire chief had recommendations in

11:45  2  terms of practices that should be changed, he would

11:45  3  have instructed you to make those in response to this

11:45  4  complaint?

11:45  5    A.  Yes.

11:45  6    Q.  Do you have any memory of chief Boriskie

11:45  7  doing so?

11:45  8    A.  No.  But I remember talking to chief Snell

11:45  9  and -- because I remember saying:  Look, I have put out

11:46  10  notices that males shall not enter the female quarters

11:46  11  or restrooms.

11:46  12    You know, and he goes:  Well, what

11:46  13  about to inspect and clean daily?

11:46  14    Well, I expect that to happen.

11:46  15    But you know, apparently the

11:46  16  interpretation was, no, we should not ever go in there.

11:46  17  So I -- I modified the directive to:  You shall inspect

11:46  18  and clean all areas of the fire station daily, and then

11:46  19  if you are a male, stay out of the women's quarters and

11:46  20  restroom, period.

11:46  21    Q.  And I think what you are explaining is maybe

11:47  22  at the bottom of page 8997, the second to last

11:47  23  paragraph, very last sentence says:  Chief McAteer

11:47  24  stated he would institute a policy that the female

11:47  25  restroom be inspected for cleanliness by the oncoming

## Page 85

11:47  1  captains at station 54.

11:47  2  Was that your response to this

11:47  3  complaint?

11:47  4  A. Yes, because I believe I had already spoken

11:47  5  to chief Snell just about the situation, and he was --

11:47  6  well, but if you told them all to stay out and they

11:47  7  took you literally, then when would -- when would the

11:47  8  bathroom be cleaned?

11:47  9  Huh.

11:47  10  Q. Now, this complaint, if we go to 9001 --

11:48  11  A. All right.

11:48  12  Q. -- have you seen -- have you seen this

11:48  13  document before, the anonymous complaint?

11:48  14  A. Not that I recall. That would not have

11:48  15  been -- staff services is very confidential. If I was

11:48  16  not a complainant or a direct respondent, then I get no

11:48  17  documents.

11:48  18  Q. Would the pages that we reviewed earlier

11:48  19  reflect that you had spoken with the investigator and

11:48  20  met with him or her at least a couple times, right,

11:48  21  regarding this issue?

11:48  22  A. Yes.

11:48  23  Q. So would the investigator at least have

11:48  24  given you some -- enough information to understand what

11:48  25  the issue was?

## Page 86

11:48  1  A. Yeah. Would have described, well -- the

11:49  2  complaint is about the conditions, you know, looks --

11:49  3  complaint was about urine and the smell of sewage.

11:49  4  Q. And do you remember receiving that

11:49  5  information from the investigator?

11:49  6  A. I really don't remember talking to -- I

11:49  7  think it says Jensen and Stein. I mean, I remember

11:49  8  Allison Stein calling me. So I -- I don't think she

11:49  9  came out. I don't remember her coming out to the fire

11:49  10  station, you know.

11:49  11  She may have, and I was -- because this

11:49  12  was at 54, and I was at -- officing in 99. If she

11:49  13  didn't call and say, hey, can you come over and meet me

11:50  14  over here, then I -- I don't know where I would have

11:50  15  met with Bo Jensen, whether that was 54 or you need to

11:50  16  come to my office at 99. I don't remember.

11:50  17  Q. Now, is it fair to say the complaint is a

11:50  18  much bigger issue than just lack of cleanliness? Would

11:50  19  you agree?

11:50  20  A. Well --

11:50  21  Q. I mean, the person is not complaining that

11:50  22  the bathroom hasn't been cleaned, right?

11:50  23  A. Well, right, okay. And there is a

11:50  24  perception now, did the investigation conclude that

11:50  25  yes, that was urine on the countertop? I mean, because

## Page 87

11:50  1  there is an allegation doesn't --

11:50  2  Q. Right.

11:50  3  A. -- doesn't mean that it's factual.

11:50  4  Q. I understand.

11:50  5  A. So I don't know what the --

11:50  6  Q. I am just asking you about the complaint

11:51  7  itself.

11:51  8  A. Okay, right.

11:51  9  Q. So the complaint alleges, right, urine on

11:51  10  the countertops and smells like sewage?

11:51  11  A. Okay.

11:51  12  Q. And -- and that men were going in the dorm

11:51  13  in the bathroom, right? That's the other allegation?

11:51  14  A. Yes.

11:51  15  MR. MONTEIRO: Okay. Let's go off the

11:51  16  record for a minute.

11:51  17  THE VIDEOGRAPHER: 11:50, off record.

11:51  18  (Recess from 11:41 a.m. to 12:03 p.m.)

12:02  19  THE VIDEOGRAPHER: 12:02, back on

12:03  20  record, disk 3.

12:03  21  BY MR. MONTEIRO:

12:03  22  Q. Chief McAteer, when we left off we were

12:03  23  looking at page 9001 which is the anonymous complaint?

12:03  24  A. Yes.

12:03  25  Q. If I understand your testimony right, you

## Page 88

12:03  1  don't have a recollection of actually seeing this

12:03  2  complaint, right?

12:03  3  A. Correct.

12:03  4  Q. Okay. In terms of the allegations that are

12:03  5  contained in here, do you remember hearing that there

12:03  6  had been an allegation that there was urine on the

12:03  7  countertop, wall, and sink of the women's dorm back in

12:03  8  2006?

12:03  9  A. I don't remember exactly what I heard, but

12:03  10  something about urine on the countertops.

12:03  11  Q. Okay. How about the allegation that the

12:04  12  facility smelled like raw sewage? Do you remember

12:04  13  hearing that back in 2006?

12:04  14  A. Yes.

12:04  15  Q. And how about the allegation that the dorm

12:04  16  smelled like urine? Do you remember hearing that

12:04  17  allegation back in 2006?

12:04  18  A. No. I don't remember the -- no.

12:04  19  Q. And then, finally, the allegation that male

12:04  20  firefighters are allowed or using the women's dorm or

12:04  21  women's bathroom, do you remember hearing about that

12:04  22  allegation back in 2006?

12:04  23  A. Specific to this, no. You know, I think

12:05  24  later on, you know, I did remember hearing allegations,

12:05  25  evidence that males had been in the women's dorm.

George Luther McAteer, Jr.

## Page 89

12:05  1    Q.  If we go back to 8996, which was the
12:05  2  investigative report -- I think it's four pages back or
12:05  3  so.  You want to go forward.
12:05  4    **A.  Oh, 8996?**
12:05  5    **A.  Yeah.**
12:05  6    **A.  Okay.**
12:05  7    Q.  Now, this -- this reflects that I think
12:05  8  it's -- Allison Stein is reporting that she spoke with
12:05  9  you on September 26 and informed you of an
12:06  10  investigation -- of this investigation.  Is that right?
12:06  11    **A.  Yes.**
12:06  12    Q.  And then on -- you testified earlier you
12:06  13  weren't entirely clear about whether you met with
12:06  14  Ms. Stein.
12:06  15        If you go to the third paragraph down,
12:06  16  exhibit 4 reflects that on September 27th, she went to
12:06  17  fire station 54 and met with chief McAteer along with a
12:06  18  number of other individuals.  She says:  I interviewed
12:06  19  each of the above personnel and discussed the
12:06  20  allegations of this case.
12:06  21        Do you see that?
12:06  22    MS. COHEN:  Objection; mischaracterizes
12:06  23  the exhibit.
12:06  24    MR. MONTEIRO:  Where is the
12:06  25  mischaracterization?

## Page 90

12:06  1    MS. COHEN:  This is not from Allison
12:06  2  Stein.
12:06  3    MR. MONTEIRO:  His testimony was
12:06  4  Allison Stein was the investigator.
12:06  5    MS. COHEN:  One of investigators.
12:06  6    MR. MONTEIRO:  Okay.
12:06  7  BY MR. MONTEIRO:
12:06  8    Q.  Do you remember if you met with Allison
12:06  9  Stein or WC Jensen back in -- in connection with this?
12:07  10    **A.  Right.  I don't recall meeting with Allison**
12:07  11  **Stein.**
12:07  12        **Possibly Jensen because I -- you know,**
12:07  13  **clearly I met with an investigator, so you know, if it**
12:07  14  **was -- if his name was Jensen, then okay.**
12:07  15    Q.  So you would agree that you met with an
12:07  16  investigator on September 27th and that investigator
12:07  17  interviewed you and discussed the allegations of the
12:07  18  case.  Is that fair?
12:07  19    **A.  Yes.**
12:07  20    Q.  And then if we go to the following page, the
12:07  21  first sentence says:  I went to -- on October 24th I
12:07  22  went to station 99 and met with firefighter L. Woods
12:07  23  and met again with district chief McAteer.
12:07  24        Would you agree you met with the
12:08  25  investigator again back at station 99 on October 24th,

## Page 91

12:08  1  2006?
12:08  2    **A.  Yes.  I don't recall the meeting, but...**
12:08  3    Q.  You don't have any reason to believe it
12:08  4  didn't happen?
12:08  5    **A.  No, I don't object to it.**
12:08  6    Q.  Going down two paragraphs, the first
12:08  7  sentence says:  My investigation confirms the fact that
12:08  8  there has been evidence of male employees using the
12:08  9  female restroom at station 54.
12:08  10        Did the -- did the investigator make
12:08  11  you aware of this?
12:08  12    **A.  Not that I recall.  It was -- I don't**
12:08  13  **receive information of investigations.**
12:08  14    Q.  I understand.  I am just -- we went through
12:08  15  kind of a timeline where you spoke with the
12:08  16  investigator a couple times.  I didn't know if the
12:09  17  investigator would have mentioned that during one of
12:09  18  these meetings.  That's why I was asking.
12:09  19        And had you heard -- had you heard that
12:09  20  men were using the women's restroom at station 54 prior
12:09  21  to this complaint coming in?
12:09  22    **A.  No.  I think as a -- I think as I answered a**
12:09  23  **little while ago, no, I was not aware of complaints.**
12:09  24    Q.  If we flip back to 9001, this is the
12:10  25  anonymous complaint, right, that we reviewed earlier?

## Page 92

12:10  1    **A.  Okay.**
12:10  2    Q.  And if you go to the page before that, it
12:10  3  looks like a fax cover sheet from Office Depot --
12:10  4  sorry.  The page after that, it should be 9002.
12:10  5    **A.  Okay.**
12:10  6    Q.  Do you recognize the fax number, either of
12:10  7  the fax numbers?  Are those the fax numbers for
12:10  8  station 54, do you know, back in 2006?
12:10  9    **A.  No.  I don't recognize the number.  The fire**
12:10  10  **station phone numbers were area code 281 and 233**
12:10  11  **something.**
12:10  12    Q.  Was there a fax machine at the station?  Do
12:11  13  you know?
12:11  14    **A.  There probably was.  This fax number is the**
12:11  15  **City number.  713-247 is a City number.**
12:11  16    Q.  Okay, thank you.  Do you know who submitted
12:11  17  this anonymous complaint?
12:11  18    **A.  No, I have no idea.**
12:11  19    Q.  You never found out?
12:11  20    **A.  No.**
12:11  21    Q.  Now, if we go back to the investigative
12:11  22  report on 8997, if you go to the second to the last
12:11  23  paragraph, there is a sentence in there which says:
12:11  24  Chief McAteer informed me that there is a rule that no
12:11  25  male firefighters enter the female's restrooms or

Page 93

| | | |
|---|---|---|
| 12:11 | 1 | dormitories at any station at any time. |
| 12:11 | 2 | Do you see that? |
| 12:11 | 3 | **A.  Yes.** |
| 12:11 | 4 | Q.  Was that -- do you know who put that rule in |
| 12:12 | 5 | place? |
| 12:12 | 6 | **A.  I did.** |
| 12:12 | 7 | Q.  When? |
| 12:12 | 8 | **A.  I don't remember.** |
| 12:12 | 9 | Q.  Why did you put that rule in place? |
| 12:12 | 10 | **A.  Made sense to -- it seemed like -- I think** |
| 12:12 | 11 | **there were -- I think we moved in '03.  They were** |
| 12:12 | 12 | **brand-new fire stations, and sometimes crew members,** |
| 12:12 | 13 | **you know, just want to be alone, you know.  Hey, I** |
| 12:12 | 14 | **don't want to hang out in the lounge or the group dorm,** |
| 12:12 | 15 | **and there is no females on today, so I will just hang** |
| 12:13 | 16 | **out and watch TV in the women's dorm by myself.** |
| 12:13 | 17 | **And so -- so at some point after 2003,** |
| 12:13 | 18 | **you know, it must have been enough of an issue that,** |
| 12:13 | 19 | **okay, let's create some ground rules here.  You know,** |
| 12:13 | 20 | **there are separate quarters and so respect them as** |
| 12:13 | 21 | **such.** |
| 12:13 | 22 | Q.  And how did you go about putting that rule |
| 12:13 | 23 | in place? |
| 12:13 | 24 | **A.  Through a bulletin that I typed out and** |
| 12:13 | 25 | **distributed.** |

Page 94

| | | |
|---|---|---|
| 12:13 | 1 | Q.  Okay. |
| 12:13 | 2 | **A.  We call them ARFF bulletins.** |
| 12:13 | 3 | Q.  Now, I am familiar with an ARFF bulletin |
| 12:13 | 4 | that was issued in February of 2007, and we will look |
| 12:14 | 5 | at that a bit later. |
| 12:14 | 6 | Is that what you are referring to, or |
| 12:14 | 7 | do you know if you issued a bulletin prior to that, |
| 12:14 | 8 | because this complaint was 2006? |
| 12:14 | 9 | **A.  As I said, I don't remember when the first** |
| 12:14 | 10 | **ARFF bulletin and then when the subsequent** |
| 12:14 | 11 | **clarification went out.  I don't remember.  I would** |
| 12:14 | 12 | **have to see the bulletin.** |
| 12:14 | 13 | Q.  Okay.  Well, let me show it to you and maybe |
| 12:14 | 14 | it will help clarify the timeline. |
| 12:14 | 15 | **A.  We are talking about over 10 years ago.** |
| 12:14 | 16 | Q.  I understand. |
| 12:14 | 17 | (Exhibit 5 marked.) |
| 12:15 | 18 | **A.  I am 60 years old.** |
| 12:15 | 19 | Q.  So I am showing you what's been marked as |
| 12:15 | 20 | deposition exhibit 5.  And for identification purposes |
| 12:15 | 21 | it has a Bates number of HOU 6037. |
| 12:15 | 22 | **A.  Okay.** |
| 12:15 | 23 | Q.  Have you had a chance to review this |
| 12:15 | 24 | document? |
| 12:15 | 25 | **A.  Okay.** |

Page 95

| | | |
|---|---|---|
| 12:15 | 1 | Q.  So this document is dated February 18th of |
| 12:15 | 2 | 2007, correct? |
| 12:15 | 3 | **A.  Right.** |
| 12:15 | 4 | Q.  Is that the date that the bulletin would |
| 12:15 | 5 | have been issued? |
| 12:15 | 6 | **A.  Yes.** |
| 12:15 | 7 | Q.  Around that time? |
| 12:15 | 8 | **A.  Yes.** |
| 12:16 | 9 | Q.  Okay.  Does this -- does reviewing exhibit 5 |
| 12:16 | 10 | help refresh your memory in terms of when you first |
| 12:16 | 11 | issued a bulletin or directive that men should stay out |
| 12:16 | 12 | of the women's dorm? |
| 12:16 | 13 | **A.  No, not really.** |
| 12:16 | 14 | Q.  Is it helpful that it was issued -- is it |
| 12:16 | 15 | helpful to you that it was issued on February 18th of |
| 12:16 | 16 | 2007? |
| 12:16 | 17 | **A.  Helpful in what way?** |
| 12:16 | 18 | Q.  In terms of establishing a timeline. |
| 12:16 | 19 | **A.  Well, this -- this is probably not the first** |
| 12:16 | 20 | **bulletin.** |
| 12:16 | 21 | Q.  Okay.  Because as we looked at exhibit 4, |
| 12:16 | 22 | you are -- you have told the investigator that there is |
| 12:16 | 23 | a rule that no male firefighters enter the female's |
| 12:17 | 24 | restrooms or dormitories at any station at any time, |
| 12:17 | 25 | correct? |

Page 96

| | | |
|---|---|---|
| 12:17 | 1 | **A.  Yes.** |
| 12:17 | 2 | Q.  And you had that conversation with an |
| 12:17 | 3 | investigator either in September or October of 2006, |
| 12:17 | 4 | according to exhibit 4? |
| 12:17 | 5 | **A.  Okay.** |
| 12:17 | 6 | Q.  And the bulletin was issued in February |
| 12:17 | 7 | of '07, right? |
| 12:17 | 8 | **A.  Uh-huh.** |
| 12:17 | 9 | Q.  So you were referencing some other directive |
| 12:17 | 10 | you had issued prior to September or October of 2006. |
| 12:17 | 11 | Is that fair? |
| 12:17 | 12 | **A.  Yes.** |
| 12:17 | 13 | Q.  Do you have any memory of what form that |
| 12:17 | 14 | directive took when you issued it? |
| 12:17 | 15 | **A.  Well, it probably would have been an ARFF** |
| 12:17 | 16 | **bulletin, but I don't have the stack of ARFF bulletins** |
| 12:17 | 17 | **here to go through.** |
| 12:17 | 18 | **Now, it would -- it would have also** |
| 12:17 | 19 | **been covered in officer meetings.** |
| 12:17 | 20 | Q.  Have the ARFF bulletins from 2006 been |
| 12:18 | 21 | preserved? |
| 12:18 | 22 | **A.  I'm not sure.** |
| 12:18 | 23 | A.  Go ahead. |
| 12:18 | 24 | **A.  No.  Go ahead.** |
| 12:18 | 25 | Q.  I was just going to ask:  Where would those |

Page 97

12:18   1   be located?

12:18   2   A.  In binders.

12:18   3   Back during that time, I would have

12:18   4   kept it on my -- on my computer, but since, you know,

12:18   5   the assignments changed, I don't have any of that

12:18   6   information back then.  You know, assignments changed,

12:18   7   work locations, computers, physical computers

12:18   8   themselves, changed.  And so I -- I don't have them.

12:18   9   Q.  You have reviewed your computer for

12:18   10  documents related to this matter, right?

12:19   11  A.  Not really.  I mean, when -- if I was

12:19   12  requested to produce a document, then I would review

12:19   13  the computer, yes.

12:19   14  Q.  Have you done that?

12:19   15  A.  I haven't been requested to produce any

12:19   16  documents.

12:19   17  Q.  Do you know if you were asked to give

12:19   18  access -- if you were asked to provide access to your

12:19   19  computer to anyone to review it for responsive

12:19   20  documents in this litigation?

12:19   21  A.  Yes.  I think some -- I believe some City

12:20   22  legal people came out to my office and searched and

12:20   23  downloaded onto a thumb drive.

12:20   24  Q.  And without telling me what that -- or

12:20   25  without telling me any conversations you had, do you

Page 98

12:20   1   know when that occurred?

12:20   2   A.  I don't recall.

12:20   3   Q.  And I am sorry.  Have you -- have you looked

12:20   4   for any other bulletins related to -- any other

12:20   5   bulletins you issued related to access to the women's

12:20   6   dorms on your computer?

12:20   7   A.  No, I haven't -- I haven't looked for

12:20   8   things.  No.

12:20   9   Q.  Do you know if there are -- if those old --

12:20   10  do you know if you kept those bulletins in your

12:21   11  computer?

12:21   12  A.  Well, like I said, my computer has changed.

12:21   13  I have had several assignments since 2010.

12:21   14  I think -- I think some of --

12:21   15  apparently some of the old stuff might have been

12:21   16  located by City legal, but you know, I -- I don't go

12:21   17  searching my computer for 10-year-old documents.  Some

12:21   18  may exist as paper in a binder.

12:21   19  Q.  Let's talk about the binders.  Where would

12:21   20  those binders be kept currently?

12:21   21  A.  Are you talking about in my office or --

12:21   22  Q.  Well, earlier you testified -- I asked

12:21   23  you -- you said that you had probably issued an ARFF

12:22   24  bulletin prior to one that was issued in February

12:22   25  of '07, right?

Page 99

12:22   1   A.  Right.

12:22   2   Q.  And I asked you where that might be, and you

12:22   3   said in binders.

12:22   4   So I am just -- I am just asking for

12:22   5   clarification on what you meant by binders.

12:22   6   A.  Well, generally the fire stations print out

12:22   7   and preserve orders, special bulletins, bulletins, ARFF

12:22   8   bulletins, guidelines -- anything that comes out that

12:22   9   we are expected to read, understand, and comply with is

12:22   10  printed out and put in a binder.  So -- and so you

12:22   11  know, I was just trying to understand.  You are talking

12:22   12  about my computer.

12:22   13  Q.  Right.

12:22   14  A.  And then when you said where is that binder,

12:23   15  I was just trying to clarify do you mean in my office

12:23   16  where my computer is.

12:23   17  So -- but at fire stations, generally

12:23   18  the binders -- and there are many, many binders.  They

12:23   19  could be in the bookcase, in the kitchen.  They could

12:23   20  be in the bookcase in the captain's room.  If the

12:23   21  station has a training room, the training material

12:23   22  binders would be in there.

12:23   23  Q.  Okay.  So one place that the bulletin could

12:23   24  be is in each of the stations where -- that the

12:23   25  bulletin was applicable to in a binder.  Is that right?

Page 100

12:23   1   A.  Yeah.  Bulletins are applicable to all fire

12:23   2   stations, so every fire station should have bulletins,

12:23   3   orders, everything printed out.

12:23   4   Now, there is -- as far as retention of

12:23   5   documents, that's -- it seemed like some years ago

12:24   6   there was a -- in 34 years I have seen one records

12:24   7   management document come out about how long to retain

12:24   8   things.  And generally the maximum length I saw that I

12:24   9   remember from that document was five years.

12:24   10  Q.  Now, this is an ARFF bulletin, right?

12:24   11  A.  Yes.

12:24   12  Q.  So does that mean it's only public to the

12:24   13  four airport stations?

12:24   14  A.  Yes, correct.

12:24   15  Q.  Okay.  So the crew at -- if you issued a

12:24   16  bulletin in 2006, the crew at station 54 or the officer

12:24   17  at station 54 would have printed it out and put it in a

12:24   18  binder?

12:24   19  A.  Yeah, right, and hopefully make the members

12:24   20  aware of it.

12:24   21  Q.  Right.  And did you -- did you print out

12:24   22  your bulletins and print them in binders in your

12:25   23  office, as well, or in the administrative office?

12:25   24  A.  We did for a while.  And then in the

12:25   25  administrative offices we just decide, well, we are

Page 101

12:25  1  running out of space.  You know, we will just catalog
12:25  2  these -- you know, in our computers and -- so....
12:25  3      Q.  Do you know when that occurred?
12:25  4      A.  No.  At some point.  '08, '09, '10,
12:25  5  somewhere in there.
12:25  6      Q.  Okay.  If we go back to exhibit 4, 8997,
12:26  7  page 8997, about halfway down it says:  Several
12:26  8  incidents of unclean conditions in the female restroom
12:26  9  at station 54 have been reported to the captains at
12:26  10 station 54.
12:26  11     Do you see that?
12:26  12     A.  Oh, here it is.  The big paragraph?
12:26  13     Q.  Yeah, sorry.
12:26  14     A.  Yeah, I see it, yes.
12:26  15     Q.  Have any of your captains reported to you
12:26  16 that they had received several incidences of reports of
12:26  17 incidences of unclean conditions in the female restroom
12:26  18 at station 54?
12:26  19     A.  I don't remember if they had at this point
12:26  20 in time reported complaints.
12:27  21     Q.  Is that something that you would have
12:27  22 expected to hear about from your captains?
12:27  23     A.  If there were complaints, yes.  And -- you
12:27  24 know, I -- I would have asked:  Well, captain, why are
12:27  25 the conditions in your fire station?  You know, why

Page 102

12:27  1  don't -- why aren't you aware of that?
12:27  2      Q.  And then if we go back to the last
12:27  3  sentence -- sorry -- the last sentence in that big
12:27  4  paragraph, it talks about -- which we reviewed earlier,
12:27  5  it says chief McAteer stated that he would institute a
12:27  6  policy that the female restrooms be inspected for
12:27  7  cleanliness by the oncoming captains in station 54.
12:28  8      How did you institute that policy?
12:28  9      A.  I believe, like I stated, that there was an
12:28  10 ARFF bulletin that would have clarified no males ever
12:28  11 go in the female quarters, but I can't give you the
12:28  12 date or the reference number for that.  And we would
12:28  13 have covered it in officer meetings.
12:28  14     Q.  And did that same policy require the
12:28  15 oncoming captain to inspect the female restroom at the
12:28  16 start of their shift?
12:28  17     A.  Yes.  You know, so that -- you would have
12:28  18 the earliest notice if there was something wrong.
12:28  19     Q.  That would be at the start of the shift
12:28  20 which would be, like, 6:30 in the morning?
12:29  21     A.  Correct.
12:29  22     Q.  And apart from instituting the inspection
12:29  23 policy that we just talked about, were there any other
12:29  24 steps you took to prevent the conditions that were
12:29  25 complained about in exhibit 4 from reoccurring?

Page 103

12:29  1      A.  Well, okay.  As the last line, you know, I
12:29  2  remember bringing up that this fire station has a
12:29  3  recurring sewage backup problem, you know.  Could that
12:29  4  have been the sewage smell that the anonymous complaint
12:29  5  was about?
12:29  6      And that's part of -- part of my job is
12:30  7  to follow up with airport maintenance to -- hey, is
12:30  8  there a solution to this recurring sewage backup
12:30  9  problem?
12:30  10     Q.  Was that a stationwide problem or just
12:30  11 limited to the women's dorm or bathroom area?
12:30  12     A.  Oh, no.  It bubbles up in the kitchen day
12:30  13 room, both restrooms, so it's -- it's still a problem
12:30  14 today.
12:30  15     Q.  Was there -- so you said you followed up
12:30  16 with the -- some entity.  I didn't catch what you said.
12:30  17     A.  Houston Airport System maintenance group.
12:30  18     Q.  You followed up with the Houston airport
12:31  19 sewer maintenance group?
12:31  20     A.  Houston Airport Systems is the City of
12:31  21 Houston's aviation department.
12:31  22     Q.  Followed up with them regarding the sewage
12:31  23 backup problem?
12:31  24     A.  Yes, right.
12:31  25     Q.  Okay.  And do you know if anything was done

Page 104

12:31  1  to address the issue?
12:31  2      A.  Typically it's only when the sewage backs
12:31  3  up.  They come out and clear the line and roll up the
12:31  4  equipment and leave.  So our crews have to clean up,
12:31  5  disinfect.
12:31  6      Q.  And that's not an isolated -- that's not an
12:31  7  issue that's isolated to the women's dorm or bathroom,
12:31  8  right?
12:31  9      A.  No.
12:31  10     Q.  Okay.  So one of the things you did is you
12:31  11 reached out to the Houston Airport System about the
12:31  12 sewage backup.
12:31  13     Was there anything else you did to try
12:31  14 to prevent the conditions that were complained of from
12:31  15 occurring again?
12:32  16     A.  Meet with the officers and you know:  Hey,
12:32  17 you know, you-all are physically here.  You are
12:32  18 directly responsible for the conditions at your fire
12:32  19 station.
12:32  20     So you know, just -- it's an ongoing
12:32  21 caution to the officers to be engaged.
12:32  22     Q.  Did you instruct anyone to take any action
12:32  23 in response to the complaint?
12:32  24     A.  Well, I didn't receive this.  So I was aware
12:33  25 of it from the investigator, and like I am describing,

Page 105

12:33   1   meet with the officers, caution them about being on top
12:33   2   of what's going on at your fire station, the
12:33   3   conditions, you know.  You know, it needs to be as
12:33   4   clean as possible.
12:33   5       Q.  Okay.  Anything else you remember doing?
12:33   6       A.  No.
12:33   7       Q.  Did you take any steps to control access to
12:33   8   the women's restroom or dorm at station 54?
12:33   9           MS. COHEN:  Objection; asked and
12:33  10   answered.
12:33  11   BY MR. MONTEIRO:
12:33  12       Q.  You can answer.
12:33  13       A.  I don't know how to -- I don't know how to
12:33  14   restrict access.  I mean, it's a bathroom door.
12:34  15       Q.  Well, let's break it down.
12:34  16           So let's talk about the dorm first, the
12:34  17   women's dorm at 54.  There is -- there is locks on the
12:34  18   door, right?
12:34  19       A.  Yes.
12:34  20       Q.  Interior locks.  Is that right?
12:34  21       A.  Yes.
12:34  22       Q.  No exterior locks, correct?
12:34  23       A.  Right.
12:34  24       Q.  So --
12:34  25       A.  There is a key on the exterior.

Page 106

12:34   1       Q.  There is a key?
12:34   2       A.  Well, a keyhole where you -- where you would
12:34   3   insert a key to unlock -- I -- I think there is.  I
12:34   4   mean, there is -- there was a key on my office door,
12:34   5   which was essentially an officer's quarters.  So I -- I
12:34   6   am assuming that that same key was in the doorhandle on
12:34   7   the women's dorm.  I assume it was.
12:34   8       Q.  Okay.  Is it possible that there was no way
12:35   9   to lock the women's dorm from the exterior with the
12:35  10   key?
12:35  11       A.  I would say that's probably correct,
12:35  12   correct, because the key would only unlock the door.
12:35  13       Q.  Well, is it possible that there is no -- no
12:35  14   keyhole on the women's dorm from the exterior?
12:35  15       A.  I could be remembering wrong.
12:35  16       Q.  Did you ever --
12:35  17       A.  I am just thinking back to when I officed at
12:35  18   station 99, and the last time I did was 10 years ago.
12:35  19   You know, there was a key that operated my office door
12:35  20   handle.
12:35  21       Q.  Okay.  But that's not the women's dorm,
12:35  22   right?
12:35  23       A.  Correct, right.
12:35  24       Q.  Okay.  So if there wasn't a -- if the
12:35  25   women's dorm couldn't be locked from the exterior with

Page 107

12:35   1   the key --
12:35   2       A.  Okay.
12:36   3       Q.  -- could you have controlled access to the
12:36   4   dorm by putting a key lock on that door?
12:36   5           MS. COHEN:  Objection; calls for
12:36   6   speculation.
12:36   7       A.  Okay.  Could I have changed the lock to put
12:36   8   a key on there?  Is that the question?
12:36   9   BY MR. MONTEIRO:
12:36  10       Q.  A key lock on there, on the exterior?
12:36  11       A.  Well, then, who would have keys?
12:36  12       Q.  Could you have given those keys to either
12:36  13   your -- to the officers to distribute to the women?
12:36  14       A.  Well, I suppose it's a possibility, but
12:36  15   the -- you know, I think the locks were on the doors,
12:36  16   you know, interior operated locks, so that the women in
12:37  17   the dorm could have some privacy.  You know, at night
12:37  18   to make sure, you know, airport employee coming through
12:37  19   didn't, you know, invade that space.
12:37  20       Q.  Okay.  So you have received some reports
12:37  21   that men are going into the women's dorm, right, around
12:37  22   this time period?
12:37  23       A.  Well, I think as I have --
12:37  24       Q.  That's why you issued the bulletin?
12:37  25       A.  We are referencing this, okay?  And I

Page 108

12:37   1   have -- I have said I don't remember at this time
12:37   2   having complaints about problems, men going into the
12:37   3   women's dorm or restroom.  So you know, the initial
12:37   4   directive that I can't identify the date or the
12:37   5   bulletin number, basically told, you know, men to stay
12:38   6   out.
12:38   7       Q.  So earlier you testified that you issued
12:38   8   this initial directive because you heard that men were
12:38   9   going into the dorm, women's dorm, and there were no
12:38  10   women there, right?  That was one of the reasons?
12:38  11       A.  Yes.
12:38  12       Q.  Okay.  And now you have an anonymous
12:38  13   complaint which you spoke with the investigator about,
12:38  14   about, again, men going into the dorm and also
12:38  15   urinating in the women's restroom, right?
12:38  16           MS. COHEN:  Objection; mischaracterizes
12:38  17   prior testimony.
12:38  18   BY MR. MONTEIRO:
12:38  19       Q.  You can answer.
12:38  20       A.  Okay.  I am confused.  What is the question?
12:39  21           (THE FOLLOWING WAS READ:
12:38  22           "QUESTION:  Okay.  And now you have an
12:38  23   anonymous complaint which you spoke with the
12:38  24   investigator about, about, again, men going into the
12:38  25   dorm and also urinating in the women's restroom,

Page 109

12:38  1  right?")

12:39  2  A.  Okay.  So -- so there is -- the complaint

12:39  3  referenced in here, yes.

12:39  4  BY MR. MONTEIRO:

12:39  5  Q.  And you spoke with the investigator about

12:39  6  some of those allegations?

12:39  7  A.  Yes.

12:39  8  Q.  I think we already talked about that.

12:39  9  A.  (Witness moves head up and down.)

12:39  10  Q.  So in response to -- in response to at least

12:39  11  two instances of people being in the dorm who shouldn't

12:39  12  be in there, I asked you whether you could -- whether

12:39  13  you could have locked the women's dorm when women were

12:39  14  not on shift.  Would that have been a solution?

12:39  15  A.  Well, that -- that's not something done

12:39  16  anywhere in the fire department that I am aware of.

12:40  17  That would have to be something requested through the

12:40  18  Houston Airport System's maintenance group.

12:40  19      It seemed like later on I was -- in,

12:40  20  say, later in '09/2010, we were looking for solutions,

12:40  21  okay?  How can we document who went into either the

12:40  22  women's dorm or restroom, because, you know, we need

12:40  23  some -- we need some resolution here, okay?  Can we put

12:40  24  a video camera in the hallway, not in the restroom, not

12:40  25  in the dorm?

Page 110

12:40  1      No, you can't do that.

12:40  2      Can we put a card reader that you have

12:41  3  to swipe your card?

12:41  4      The airport IT group said:  No, we

12:41  5  don't do that.

12:41  6      So I am at a loss.

12:41  7  Q.  Okay.

12:41  8  A.  I am running a standard fire station.

12:41  9  Q.  So when you said someone told you that

12:41  10  locking the women's dorm is not done in the fire

12:41  11  department, what did you mean by that?

12:41  12  A.  Well, nowhere that I know of are there rooms

12:41  13  that -- you are suggesting that would be locked when

12:41  14  there are no women on duty.

12:41  15  Q.  Right.

12:41  16  A.  So how does it get cleaned?  Who inspects it

12:41  17  before locking it?  If you -- once someone unlocks it

12:42  18  and there is a problem, how do we identify what shift,

12:42  19  who was responsible for that problem?

12:42  20  Q.  Well, did you ever consider putting a

12:42  21  lock on the door?

12:42  22  A.  Well, it has a lock on the door, operated

12:42  23  from the inside.

12:42  24  Q.  Did you ever consider putting a lock on the

12:42  25  exterior of the door so it could be locked when women

Page 111

12:42  1  were not on the shift?

12:42  2  A.  No.  That wasn't any of the solutions

12:42  3  offered.

12:42  4  Q.  Okay.

12:42  5  A.  I believe I asked my bosses what do I do,

12:42  6  and none of the -- there was nothing about adding

12:43  7  locks, because, well, now if you are locking it from

12:43  8  the outside, could you lock a female employee in the

12:43  9  room?

12:43  10  Q.  And I understand you are raising -- or you

12:43  11  are explaining what some of the issues might be with

12:43  12  locking it?

12:43  13  A.  Right.

12:43  14  Q.  I just -- I just want to know whether it was

12:43  15  considered, whether there was a discussion about it?

12:43  16  A.  No.  At this time I don't remember a

12:43  17  discussion about additional locks.

12:43  18  Q.  Okay.  And you also mentioned something

12:43  19  about the Houston maintenance group telling you no?

12:43  20  A.  Well, on video cameras, yes.

12:43  21  Q.  Is that what it was?  You asked the

12:43  22  maintenance group to put a video camera in?

12:44  23  A.  Yes, as I described, later on, '09/2010, I

12:44  24  wanted to put a video camera in the hallway, both

12:44  25  hallways, and they wouldn't do it.

Page 112

12:44  1      The union objected:  No, that's an

12:44  2  invasion of firefighter privacy.

12:44  3      So okay.

12:44  4  Q.  Is that -- was that after Ms. Draycott had

12:44  5  left the station or before, if you know?

12:44  6  A.  No, I don't remember.

12:44  7  Q.  How was that effort documented?

12:44  8  A.  I don't think it was.  It was a verbal

12:44  9  request and -- you know, and a verbal note.

12:44  10  Q.  From who?

12:44  11  A.  As I said, from both the airport system and

12:44  12  my boss through the union -- that is, chief Snell --

12:45  13  through the union, he kind of floated that idea.

12:45  14      And they objected.

12:45  15      And he agreed.

12:45  16  Q.  Okay.  How about the card reader option?

12:45  17  Airport IT told you, no, that couldn't be done?

12:45  18  A.  They didn't say it couldn't be done.  They

12:45  19  said, you know, there is already a card reader on the

12:45  20  gate in their IT room.  They said we don't see a need

12:45  21  to put a card reader on a dorm in a bathroom.  That's a

12:45  22  waste of their resources.

12:45  23  Q.  And who -- is this something that -- were

12:45  24  you communicating with someone from airport IT, or was

12:45  25  this chief Snell?

## Page 113

12:45 1    A. No. That would have come through airport
12:46 2  IT, but I did -- you know, there was an airport
12:46 3  employee who was kind of our main liaison. But
12:46 4  sometimes I talked directly to the maintenance group,
12:46 5  and sometimes I went through the liaison. I don't
12:46 6  remember, but I -- I don't remember who I talked to,
12:46 7  but I remember the word back was, no, they are not
12:46 8  going to do that.
12:46 9    Q. Did you make them aware of the problems that
12:46 10 were happening at the station?
12:46 11   A. Yes.
12:46 12   Q. With the access to the dorm and bathroom?
12:46 13   A. Yes. And again, this is -- I am talking
12:46 14 2009/2010.
12:46 15   Q. Right. Was this -- were these -- would
12:46 16 these communications have been documented?
12:47 17   A. No. Like I said, it was verbal.
12:47 18   Q. Who was the airport liaison that you
12:47 19 referenced?
12:47 20   A. It changed over time.
12:47 21   Q. Do you remember?
12:47 22   A. There was Joel Conwell, Chuck Vareno, Steve
12:47 23 Rungy.
12:47 24     What's that other cat's name?
12:47 25     Greg Cunningham.

## Page 114

12:47 1    Q. So you would have made your request to one
12:47 2  of those four folks?
12:47 3    A. Yeah, unless the liaison said: Hey, here is
12:47 4  a phone number, you know. Call this person.
12:47 5     But I don't recall talking to an IT
12:48 6  person directly.
12:48 7    Q. Was chief Snell involved in communications
12:48 8  about the -- putting the card reader in the dorm?
12:48 9    A. I just advised that I am looking into it,
12:48 10 you know, and then advised them that, you know, I have
12:48 11 been told no.
12:49 12   Q. So how do you make -- how do you make
12:49 13 maintenance requests for one of the ARFF stations?
12:49 14   A. If it's a routine, it's generally a phone
12:49 15 call. They have a maintenance -- oh, a main
12:49 16 maintenance phone number.
12:49 17     And you call it in, and the station
12:49 18 would also fill out form 15. You know, it's a request
12:49 19 for repair.
12:49 20     But the City -- this chair keeps
12:49 21 sliding back.
12:49 22     The City building services does not
12:49 23 have anything to do with airport property. So the
12:49 24 building services that would come out and fix any of
12:50 25 the City fire stations, it's -- airport maintenance

## Page 115

12:50 1  does that for airport fire stations.
12:50 2    Q. That's the only way you can have a
12:50 3  maintenance -- maintenance done at the airport station?
12:50 4    A. Correct.
12:50 5    Q. Okay. And you -- you fill out a form 15 and
12:50 6  also make a phone call to someone?
12:50 7    A. Right, right.
12:50 8    Q. If we could look at page 8998, I just have
12:50 9  one question, and then I think we are ready for a lunch
12:50 10 break.
12:50 11   A. All right.
12:50 12   Q. It says: Therefore, I recommend OIG
12:50 13 No. 06552 be closed as information only.
12:50 14     Do you see that?
12:50 15   A. Yes.
12:50 16   Q. Do you know what that means for a complaint
12:50 17 to be closed as information only?
12:50 18   A. No.
12:50 19   Q. Did you ever receive any recommendations
12:51 20 from OIG regarding any measures you could take to
12:51 21 prevent the allegations that happened?
12:51 22   A. No, not at all.
12:51 23     MR. MONTEIRO: Can we go off the
12:51 24 record?
12:51 25     THE VIDEOGRAPHER: 12:50, off record.

## Page 116

12:51 1       (Recess from 12:51 to 1:57 p.m.)
01:57 2     THE VIDEOGRAPHER: 1:56, back on
01:57 3  record, disk 4.
01:57 4  BY MR. MONTEIRO:
01:57 5    Q. Chief McAteer, we are back from a lunch
01:57 6  break. Do you understand you are still under oath?
01:57 7    A. Yes.
01:57 8    Q. Before we took our break, we had started
01:57 9  looking at exhibit 5, which was the ARFF bulletin from
01:57 10 February 18, 2007.
01:57 11     Could you get that?
01:57 12   A. Yes.
01:57 13   Q. Do you recall issuing this bulletin in
01:58 14 February of 2007?
01:58 15   A. Yes, this is my bulletin. That is the day.
01:58 16     Do I recall hitting send on the
01:58 17 computer? I mean, no. You know, that's 12 years ago,
01:58 18 but yes, I sent this out.
01:58 19   Q. You have no reason to believe you didn't
01:58 20 issue this?
01:58 21   A. Right.
01:58 22   Q. What is -- what is an ARFF bulletin?
01:58 23   A. It's just an informational correspondence
01:58 24 within the stations assigned to ARFF.
01:58 25   Q. Is it considered an order?

## Page 117

01:58  1    A.  Depends on what's in the bulletin.  If there

01:58  2  is the some sort of a directive, then, yes, it is an

01:59  3  order.

01:59  4    Q.  So for exhibit 5 did you consider exhibit 5

01:59  5  to be an order?

01:59  6    A.  Yes.

01:59  7    Q.  And the order is that the assigned female

01:59  8  dorms are only to be used by our female ARFF members,

01:59  9  correct?

01:59  10    A.  Yes.

01:59  11    Q.  Does the order need to be followed strictly?

01:59  12    A.  Yes, I assume.

01:59  13    Q.  That was your intention?

01:59  14    A.  Yes, yeah, yeah.

01:59  15    Q.  I think we talked about this earlier, but

01:59  16  can you remind me who Don Hoyt is, whose name is at the

01:59  17  bottom of exhibit 5?

01:59  18    A.  He was at that time my assistant

01:59  19  coordinator.

01:59  20    Q.  So is it likely that you directed Mr. Hoyt

01:59  21  to issue this bulletin?

01:59  22    A.  Yes.

01:59  23    Q.  Why did you have this bulletin issued on

02:00  24  February 10 of 2007?

02:00  25    A.  Well, so it starts off, you know -- I am

## Page 118

02:00  1  guessing this one was probably -- we had a -- the dorm

02:00  2  room down at Hobby modified.  Then the restroom cut out

02:00  3  a portion of the -- what was the common restroom,

02:00  4  walled it off.  Let's see.  I think we took two of the

02:00  5  showers.  So one drain would have been for a commode.

02:00  6    And then -- so essentially had a

02:00  7  separate women's restroom.  So -- because this fire

02:00  8  station was similar to station 92, they were not

02:00  9  separate quarters.  So we created separate quarters.

02:01  10    Q.  So is it your belief that you issued this

02:01  11  bulletin in connection with modification of the women's

02:01  12  dorm at station 81?

02:01  13    A.  Yes, and as a reminder, cautionary reminder.

02:01  14    Q.  Now, the bulletin states:  Our male members

02:01  15  shall not use the room for watching TV, studying for

02:01  16  promotional exams, holding conferences, et cetera.

02:01  17    Do you see that?

02:01  18    A.  Yes.

02:01  19    Q.  Are these -- are those some of the issues

02:01  20  that you had been hearing about having occurred at

02:01  21  the -- at the stations within ARFF?

02:01  22    A.  Yes.  Maybe captain Hoyt had heard about

02:01  23  those and was throwing those out there as examples.

02:01  24    Q.  Well, my question is:  Had you heard about

02:02  25  them?  Are these issues that you had heard about?

## Page 119

02:02  1    A.  Well, as I said earlier, prior to the 2006

02:02  2  investigation, the anonymous complaints, you know, I

02:02  3  really had not heard about problems.

02:02  4    You know, now, specifically what kind

02:02  5  of problems are you asking about?

02:02  6    Q.  So in the bulletin it says --

02:02  7    A.  Okay.

02:02  8    Q.  -- our male members shall not use the room

02:02  9  for --

02:02  10    A.  Watching TV.

02:02  11    Q.  -- watching TV, studying -- studying for

02:02  12  promotional exams, holding conferences, et cetera?

02:02  13    A.  Uh-huh.

02:02  14    Q.  So my question is:  Are those -- are those

02:02  15  some of the -- are those the issues that you had heard

02:02  16  about as having -- as occurring at the stations which

02:02  17  had women's dorms in ARFF?

02:02  18    A.  I don't remember specifically.

02:02  19    Q.  Did you write the bulletin, or did Don Hoyt

02:03  20  write the bulletin?

02:03  21    A.  Don Hoyt wrote it, and then I approved it.

02:03  22    Q.  At your direction?

02:03  23    A.  Yes.

02:03  24    Q.  So if you would receive complaints about men

02:03  25  watching TV, studying for promotional exams, and

## Page 120

02:03  1  holding conferences, could that have been a reason why

02:03  2  this bulletin was issued in February of 2007?

02:03  3    A.  Well, like I said, I -- I don't remember

02:03  4  getting those specific complaints.

02:03  5    Maybe captain Hoyt had been talking.  I

02:03  6  don't know.

02:03  7    But -- but the station 81 modification

02:03  8  was complete, and it was probably an opportunity to

02:04  9  remind.

02:04  10    Q.  And you reviewed the bulletin before it went

02:04  11  out, right?

02:04  12    A.  Yes.

02:04  13    Q.  So at this point at least -- strike that.

02:04  14    Who would the bulletin have been issued

02:04  15  to?

02:04  16    A.  All members of ARFF.

02:04  17    Q.  And I think we talked about this earlier.

02:04  18  Is that -- would it have been issued by e-mail with a

02:04  19  certification request?

02:04  20    A.  No, we don't do certification requests.

02:04  21    Q.  I am sorry.  Acknowledgement requests, is

02:04  22  that what you told me earlier?

02:04  23    A.  No.  The -- that was in reference to

02:04  24  departmental guidelines, orders, special bulletins.

02:04  25    Q.  So what's the process for distributing an

Page 121

02:04 1 ARFF bulletin?  What was the process for distributing
02:04 2 an ARFF bulletin in 2007?
02:05 3    **A.  E-mail.**
02:05 4    Q.  And did you send that e-mail out, or did Don
02:05 5 Hoyt?  Do you know?
02:05 6    **A.  I would imagine captain Hoyt sent it out.**
02:05 7    Q.  Who does the e-mail go to?
02:05 8    **A.  Well, all members of ARFF.**
02:05 9    Q.  So as of February 18th of 2007, everyone
02:05 10 working in ARFF knew that the female dorms and
02:05 11 restrooms were off limits for men.  Is that right?
02:05 12         MS. SULLIVAN:  Objection; calls for
02:05 13 speculation.
02:05 14         Go ahead, and answer.
02:05 15    **A.  That was my intention.  I send out the**
02:05 16 **directive, and I expect it to be complied with.**
02:05 17 BY MR. MONTEIRO:
02:05 18    Q.  So and everyone who was working at
02:05 19 station 54, it was your intention that as of
02:05 20 February 10th of 2007, they would have been aware that
02:05 21 the female dorms and female restrooms were off limits
02:06 22 to men?
02:06 23    **A.  Yes.  That's the intent of this bulletin.**
02:06 24    Q.  The bulletin also says:  We expect the girls
02:06 25 to extend the same courtesy to the male dorms and

Page 122

02:06 1 bathrooms.
02:06 2         Do you see that?
02:06 3    **A.  Where is that?**
02:06 4    Q.  That's about a line after what we just
02:06 5 reviewed.
02:06 6    **A.  Okay.**
02:06 7         **Okay.**
02:06 8    Q.  Do you know if you included that language?
02:06 9    **A.  Again, I think captain Hoyt wrote this, and**
02:06 10 **I approved it.**
02:06 11    Q.  Had you heard of women using the men's dorms
02:06 12 or men's bathrooms at the stations in ARFF?
02:06 13    **A.  I don't remember hearing any issues.  I**
02:07 14 **don't remember hearing that women were using the men's**
02:07 15 **facilities.  That wouldn't make sense.**
02:07 16    Q.  When you visited the stations, would you
02:07 17 kind of spot-check the dorm, the women's dorm or
02:07 18 women's bathroom, to make sure that, you know, they
02:07 19 were being kept clean and orderly fashion?
02:07 20    **A.  No.  Typically I was there for a purpose, to**
02:07 21 **talk to the captain, look at something in particular**
02:07 22 **that might need to be repaired or replaced.**
02:08 23    Q.  You never went -- never went to station 54
02:08 24 just to check on the status of the women's dorm or
02:08 25 women's bathroom.  Is that right?

Page 123

02:08 1    **A.  Specifically -- for that specific reason,**
02:08 2 **no, but there were -- I am sure there were a few times**
02:08 3 **while at 54:  You know, hey, how are things looking?**
02:08 4 **Let's go take a look.**
02:08 5         **You know, but that wasn't the intent of**
02:08 6 **the visit.**
02:08 7    Q.  So you do remember going into the dorm or
02:08 8 bathroom to check the cleanliness.  Is that right?
02:08 9    **A.  Yes.**
02:08 10    Q.  Okay.  Who would accompany you when you went
02:08 11 in on those inspections?
02:08 12    **A.  Whichever station captain was on duty.**
02:09 13    Q.  Did you ever find any problems in there?
02:09 14    **A.  No, I didn't.**
02:09 15    Q.  Ms. Draycott transferred to station 54 in
02:09 16 late 2008.  Does that sound about right?
02:09 17    **A.  Okay.**
02:09 18    Q.  You don't have any reason to disagree with
02:10 19 that?
02:10 20    **A.  I don't have her transfer history in front**
02:10 21 **of me, but if -- it's probably -- that's the right**
02:10 22 **neighborhood.  Let's say that.**
02:10 23    Q.  Sure.  So at some point did you become aware
02:10 24 that Ms. Draycott had made complaints to captain
02:10 25 Henschel about the conditions of the women's dorm and

Page 124

02:10 1 women's bathroom at station 54?
02:10 2    **A.  Yes.**
02:10 3    Q.  And were you aware that captain Henschel was
02:10 4 documenting some of her complaints in the captain's
02:10 5 log?
02:10 6    **A.  It seemed like I asked about it:  Okay.  So**
02:10 7 **are you documenting this anywhere?**
02:10 8         **Oh, yeah, yeah.**
02:10 9         **Okay.**
02:10 10         **So I don't remember if I asked him**
02:10 11 **specifically how are you documenting it, you know, but**
02:10 12 **it seemed like I got a -- an e-mail from him.**
02:11 13    Q.  So you were aware that he was documenting
02:11 14 her complaints.  You weren't necessarily -- or you
02:11 15 don't remember how he was documenting them?
02:11 16    **A.  Right.**
02:11 17    Q.  Is that right?
02:11 18    **A.  Right.**
02:11 19         (Exhibit 6 marked.)
02:11 20    Q.  Chief McAteer, I am showing you what's been
02:11 21 marked as deposition exhibit 6.  For identification
02:11 22 purposes, these are selected pages from the City's
02:11 23 seventh supplemental production, and they have a Bates
02:12 24 range of 146524 through 146488.
02:12 25    **A.  Okay.**

George Luther McAteer, Jr.

## Page 125

| | | |
|---|---|---|
| 02:12 | 1 | Q.  Are you familiar with the form of exhibit 6? |
| 02:12 | 2 | **A.  Yes.  It's a daily captain's log.** |
| 02:12 | 3 | Q.  What is the purpose of the captain's log? |
| 02:12 | 4 | **A.  Essentially a record of that shift, workday,** |
| 02:12 | 5 | **who worked where, who was there, who was off, fuel** |
| 02:12 | 6 | **readings.** |
| 02:12 | 7 | **The other side of this would be kind of** |
| 02:12 | 8 | **a narrative.  The -- was anyone in the station to work** |
| 02:13 | 9 | **on equipment or the goings on, what happened that day.** |
| 02:13 | 10 | Q.  And what information is typically recorded |
| 02:13 | 11 | in the captain's log? |
| 02:13 | 12 | **A.  Everything I just described.** |
| 02:13 | 13 | Q.  Are there any policies and procedures in |
| 02:13 | 14 | place which provide guidance in terms of what |
| 02:13 | 15 | information should be contained in the captain's log? |
| 02:13 | 16 | **A.  I'm not sure.  I suppose somewhere there** |
| 02:13 | 17 | **is -- that might be in the newly promoted officer** |
| 02:13 | 18 | **information that they give now.** |
| 02:13 | 19 | **And along the way there was a** |
| 02:13 | 20 | **guideline, but I am not aware of any current** |
| 02:14 | 21 | **guidelines, policies, that direct what should or should** |
| 02:14 | 22 | **not be in a captain's log.** |
| 02:14 | 23 | Q.  Okay.  Let's shift our focus back to 2009. |
| 02:14 | 24 | **A.  Okay.** |
| 02:14 | 25 | Q.  Do you know if there was any guidance in |

## Page 126

| | | |
|---|---|---|
| 02:14 | 1 | place? |
| 02:14 | 2 | **A.  Again, that was just something that was** |
| 02:14 | 3 | **generally passed on, you know.  If you were -- if you** |
| 02:14 | 4 | **were a captain, if you were a riding captain, you know,** |
| 02:14 | 5 | **that was just something:  Hey, let me -- make sure you** |
| 02:14 | 6 | **fill out the log, and you know, just put who goes where** |
| 02:14 | 7 | **and anything that happens that day.** |
| 02:14 | 8 | **That's generally the extent of** |
| 02:14 | 9 | **directions on how to fill out a captain's log.** |
| 02:15 | 10 | Q.  Okay.  And who has access to the captain's |
| 02:15 | 11 | log at the station? |
| 02:15 | 12 | **A.  It's kept in the captain's room.** |
| 02:15 | 13 | Q.  Can anyone look at the captain's log -- |
| 02:15 | 14 | sorry. |
| 02:15 | 15 | Can any member look at the captain's |
| 02:15 | 16 | log? |
| 02:15 | 17 | **A.  Well, yes and no.  If a member just walks** |
| 02:15 | 18 | **into the captain's room, you know, and says, hey,** |
| 02:15 | 19 | **captain, I want to look at that captain's log, you** |
| 02:15 | 20 | **know, to me, that would -- what's up?  What for?  This** |
| 02:15 | 21 | **is my business.  This is for me to fill out.  What do** |
| 02:15 | 22 | **you need?** |
| 02:15 | 23 | **Now, if the captain is out on a run, I** |
| 02:15 | 24 | **suppose someone could walk into his room and open the** |
| 02:15 | 25 | **binder and look at it.** |

## Page 127

| | | |
|---|---|---|
| 02:16 | 1 | Q.  Okay.  And what -- in 2009 what was your |
| 02:16 | 2 | practice in terms of reviewing the captain's logs for |
| 02:16 | 3 | the four stations that you oversaw? |
| 02:16 | 4 | **A.  Oh, just as needed.  There was no -- no** |
| 02:16 | 5 | **requirement for me to go around reading their captain's** |
| 02:16 | 6 | **logs every day.** |
| 02:16 | 7 | Q.  So unless your captain brought something to |
| 02:16 | 8 | your attention, there wouldn't be any reason for -- |
| 02:16 | 9 | there wouldn't -- it wouldn't be your normal practice |
| 02:16 | 10 | to look at the logs? |
| 02:16 | 11 | **A.  Yes.  That's correct.** |
| 02:16 | 12 | Q.  So let's look at the first page of the log, |
| 02:16 | 13 | which is marked 146524. |
| 02:16 | 14 | So the first page appears to contain |
| 02:16 | 15 | information relating staffing for this particular |
| 02:16 | 16 | shift, right? |
| 02:17 | 17 | **A.  Right.** |
| 02:17 | 18 | Q.  And it's dated April 8th of 2009? |
| 02:17 | 19 | **A.  Right.** |
| 02:17 | 20 | Q.  On that day the A shift started at 6:30 a.m. |
| 02:17 | 21 | Is that right? |
| 02:17 | 22 | **A.  Right.** |
| 02:17 | 23 | Q.  And the senior captain on duty was Tamez? |
| 02:17 | 24 | **A.  Right.** |
| 02:17 | 25 | Q.  The captain was Henschel? |

## Page 128

| | | |
|---|---|---|
| 02:17 | 1 | **A.  Yep.** |
| 02:17 | 2 | Q.  That's captain Henschel's signature on |
| 02:17 | 3 | page 1 on the first page? |
| 02:17 | 4 | **A.  I assume it is.  It's not really legible.** |
| 02:17 | 5 | Q.  Would anyone else have signed the log? |
| 02:17 | 6 | **A.  Well, the captains kind of decide who fills** |
| 02:17 | 7 | **out the -- the senior captain might prefer to fill this** |
| 02:17 | 8 | **out himself, but I am guessing that's Henschel's** |
| 02:17 | 9 | **signature.** |
| 02:17 | 10 | Q.  Let's look at the second page where it says |
| 02:17 | 11 | 146525 for a minute.  This is entitled events of the |
| 02:18 | 12 | day, right? |
| 02:18 | 13 | **A.  Yes.** |
| 02:18 | 14 | Q.  And whose responsibility is it to input the |
| 02:18 | 15 | information in this timeline? |
| 02:18 | 16 | **A.  As I said, the station captain -- the senior** |
| 02:18 | 17 | **and the captain can work it out between them, but one** |
| 02:18 | 18 | **of them needs to enter this information.** |
| 02:18 | 19 | Q.  What level of discretion does the captain |
| 02:18 | 20 | have in terms of what information they put in the |
| 02:18 | 21 | events of the day, what information they record in the |
| 02:18 | 22 | events of the day? |
| 02:18 | 23 | **A.  I would say pretty wide discretion, but if** |
| 02:18 | 24 | **it's something important, then not much discretion.** |
| 02:18 | 25 | **It -- it should be in here.** |

## Page 129

02:19  1  Q. So the log indicates that -- sorry -- the
02:19  2  events of the day indicates that Paula Keyes reported
02:19  3  for duty as a new member on April 8th of 2009. Is that
02:19  4  right?
02:19  5  A. Yes.
02:19  6  Q. And if we go back to the staffing -- the
02:19  7  staffing table, it looks like Ms. Draycott was on duty
02:19  8  that day?
02:19  9  A. Yes.
02:19  10  Q. If we go look at the last entry on the log
02:19  11  on 146526 -- it should be the very next page -- this is
02:19  12  the log entry for April 10th of 2009. Is that correct?
02:19  13  A. Okay.
02:19  14  Q. If we look at the events of the day -- if we
02:20  15  can take a look for entry at 8:50 a.m. --
02:20  16  A. Okay.
02:20  17  Q. -- it says F/F's Draycott and Keyes called
02:20  18  in the captain's room to discuss the TV situation and
02:20  19  advised they would contact the captain if they
02:20  20  encounter problems in their dormitory or bathroom.
02:20  21  Did I read that right?
02:20  22  A. Yes.
02:20  23  Q. Do you know why captain Henschel called
02:20  24  Ms. Draycott and Ms. Keyes into the captain's office to
02:20  25  discuss the TV situation and to direct them to contact

## Page 130

02:20  1  him if they run into any problems in the women's dorm
02:20  2  or bathroom on April 10th?
02:21  3  A. No. I don't know what prompted this entry.
02:21  4  Q. Do you know what the TV situation was?
02:21  5  A. I just heard anecdotally at some point that
02:21  6  Draycott wanted the TV out of the female dorm room.
02:21  7  Q. You don't know when that was, though, that
02:21  8  you heard it?
02:21  9  A. No.
02:21  10  Q. Do you know what the problems in their
02:21  11  bathroom or dormitory are referring to?
02:21  12  A. No.
02:21  13  Q. Would you agree that it's likely that some
02:21  14  issue must have been brought to captain Henschel's
02:21  15  attention to get him to call Ms. Keyes and Ms. Draycott
02:21  16  into his office?
02:21  17  MS. SULLIVAN: Objection; calls for
02:21  18  speculation.
02:21  19  Go ahead, and answer.
02:21  20  A. Again, like I said, I don't know what caused
02:22  21  him to make this entry.
02:22  22  BY MR. MONTEIRO:
02:22  23  Q. I mean, is it possible that an issue came
02:22  24  up?
02:22  25  MS. SULLIVAN: Objection; calls for

## Page 131

02:22  1  speculation.
02:22  2  Go ahead, and answer.
02:22  3  BY MR. MONTEIRO:
02:22  4  Q. You can answer.
02:22  5  A. Sure, it's possible.
02:22  6  Q. Did captain Henschel report whatever the
02:22  7  issue was to you on April 10th of 2009?
02:22  8  A. Not that I recall.
02:22  9  Q. Do you think he -- should he have?
02:22  10  A. Well, he has got a senior captain there. I
02:22  11  would probably first get with the senior captain.
02:22  12  Q. Do you know if he did that?
02:22  13  A. No, I have no idea.
02:22  14  Q. Let's flip to the next date in the log,
02:22  15  which is May 12th of 2009.
02:22  16  A. Okay.
02:22  17  Q. It starts on page 146512.
02:23  18  A. Right.
02:23  19  Q. Again, if we go to the events of the day,
02:23  20  you can look at the entry for 7:40. It says: EJ --
02:23  21  quote, EJ Draycott asked captain Henschel to come
02:23  22  witness urine on the women's toilet seat and stated
02:23  23  that it was not left that way last day on the A shift,
02:23  24  quote.
02:23  25  Did I read that right?

## Page 132

02:23  1  A. Yes.
02:23  2  Q. Then let's look at the entry at 1800 hours
02:23  3  which says: Quote, senior captain Tamez spoke with
02:23  4  senior captain Ponce about the ladies' bathroom problem
02:23  5  and stated that this has got to stop and that this is
02:23  6  not first or second time it has happened. Senior
02:23  7  captain Ponce said he would talk to his captain and
02:23  8  crew tomorrow on the B shift, quote.
02:23  9  Did I read that right?
02:23  10  A. Yes.
02:23  11  Q. Do you know what the ladies' bathroom
02:24  12  problem was that was entered at 1800 hours? What's
02:24  13  that a reference to?
02:24  14  A. I don't know. I would have to ask these two
02:24  15  captains what were you referencing.
02:24  16  Q. So at 7:40 Draycott's -- Henschel recorded
02:24  17  that Draycott has asked him to come witness urine on
02:24  18  the lady's toilet seat, right?
02:24  19  A. Yes.
02:24  20  Q. And then later that day senior captain Tamez
02:24  21  spoke with senior captain Ponce about the ladies'
02:24  22  bathroom problem.
02:24  23  Is it likely that discussion was
02:24  24  prompted by Ms. Draycott's report at 7:40?
02:24  25  MS. SULLIVAN: Objection; calls for

George Luther McAteer, Jr.

## Page 133

02:24  1   speculation.

02:24  2       Go ahead, and answer.

02:24  3       **A.  Yes, it's possible.  Yes.**

02:25  4   BY MR. MONTEIRO:

02:25  5       Q.  So in 2009 did HFD policy prohibit male

02:25  6   firefighters in ARFF from --

02:25  7       THE REPORTER:  I'm sorry.  I didn't get

02:25  8   that.

02:25  9   BY MR. MONTEIRO:

02:25  10      Q.  In 2009 did HFD policy prohibit male

02:25  11  firefighters in ARFF from using station bathrooms

02:25  12  dedicated to females?

02:25  13      **A.  Let me say HFD -- I assume you are referring**

02:25  14  **specifically to ARFF.  So --**

02:25  15      Q.  Right.

02:25  16      **A.  It was HFD ARFF policy, yes.**

02:25  17      Q.  Okay.  So male -- male firefighters cannot

02:25  18  use the women's bathroom at ARFF stations, correct?

02:25  19      **A.  Correct.**

02:25  20      Q.  And there is no exceptions for this rule?

02:25  21      **A.  That's correct.  Station 92 does not have**

02:25  22  **separate quarters.**

02:25  23      Q.  So at station 54 male firefighters cannot

02:26  24  use the women's bathroom, right?

02:26  25      **A.  Correct.**

## Page 134

02:26  1       Q.  And why was this -- was that policy in

02:26  2   place?

02:26  3       **A.  Well, okay.  I think I have answered that**

02:26  4   **several times, just to respect the separate quarters.**

02:26  5       **Well, you say, well, why was the policy**

02:26  6   **in place?**

02:26  7       **So initially we had brand-new stations,**

02:26  8   **the first stations with separate quarters.  And you**

02:26  9   **know, to keep people from encroaching into the women's**

02:26  10  **dorm for TV watching, then it was not -- no, these are**

02:26  11  **designated quarters and restrooms, you know.**

02:27  12      **So just -- I am just trying to enforce**

02:27  13  **the separation.**

02:27  14      Q.  And is compliance with that policy optional?

02:27  15      **A.  No.**

02:27  16      Q.  It was not?

02:27  17      **A.  It's not supposed to be.**

02:27  18      Q.  So if you have male firefighters using the

02:27  19  women's bathroom at station 54, what kind of bad things

02:27  20  can happen?

02:27  21      MS. SULLIVAN:  Objection; calls for

02:27  22  speculation.

02:27  23      **A.  Yeah.  I mean, I would imagine, you know,**

02:27  24  **complaints that it's left dirty.**

02:27  25  BY MR. MONTEIRO:

## Page 135

02:27  1       Q.  Left dirty, okay.

02:27  2       **A.  Right.**

02:27  3       Q.  Could it -- could it present a safety issue

02:28  4   for women to have men in the women's bathroom?

02:28  5       MS. SULLIVAN:  Objection; calls for

02:28  6   speculation.

02:28  7       Go ahead, and answer.

02:28  8       **A.  I don't know about a safety issue.**

02:28  9   **Certainly if there -- if they are in there at the same**

02:28  10  **time, I mean, you know -- I'm not -- I don't know how**

02:28  11  **to answer what kinds of things could happen.**

02:28  12      **I don't know.  I suppose anything could**

02:28  13  **happen.**

02:28  14  BY MR. MONTEIRO:

02:28  15      Q.  Well, I mean, could it present a privacy

02:28  16  issue?

02:28  17      **A.  Absolutely.**

02:28  18      Q.  Could it -- if a man -- if a male is inside

02:28  19  the women's bathroom, could it interfere with a women's

02:28  20  working conditions?

02:28  21      MS. SULLIVAN:  Objection; legal

02:28  22  conclusion, calls for speculation.

02:29  23      Go ahead, and answer.

02:29  24      **A.  It would be awkward.**

02:29  25  BY MR. MONTEIRO:

## Page 136

02:29  1       Q.  Could it make the woman feel uncomfortable?

02:29  2       **A.  Yes.**

02:29  3       MS. SULLIVAN:  Objection; calls for

02:29  4   speculation.

02:29  5       Q.  I think you said you don't know if it could

02:29  6   present a safety issue for women if men are in the

02:29  7   women's dorm, but could a woman be assaulted in the

02:29  8   women's bathroom by a male who wasn't supposed to be in

02:29  9   there?

02:29  10      MS. SULLIVAN:  Objection; calls for

02:29  11  speculation.

02:29  12      **A.  Yes.  Anyone could be assaulted anywhere.**

02:29  13  BY MR. MONTEIRO:

02:29  14      Q.  So if the policy is violated but only on one

02:29  15  occasion, is that okay?

02:29  16      **A.  No.  It should not be.**

02:29  17      Q.  And in 2009 did ARFF have a policy that

02:30  18  prohibited male firefighters from entering the station

02:30  19  dormitory dedicated to women?

02:30  20      **A.  Yes.**

02:30  21      **I think I have answered that.**

02:30  22      Q.  So male firefighters cannot enter the

02:30  23  women's dorm at station 54.  Is that right?

02:30  24      **A.  Yes, according to my ARFF bulletin.**

02:30  25      Q.  Are there any exceptions to that rule?

| | | Page 137 |
|---|---|---|
| 02:30 | 1 | **A.  Daily inspection and cleaning.** |
| 02:30 | 2 | Q.  So only for the daily inspection and |
| 02:30 | 3 | cleaning? |
| 02:30 | 4 | **A.  Yes.** |
| 02:30 | 5 | Q.  Why was that -- what purpose does that |
| 02:30 | 6 | policy serve? |
| 02:30 | 7 | MS. SULLIVAN:  Objection; vague. |
| 02:30 | 8 | **A.  What purpose does the policy serve?  To** |
| 02:30 | 9 | **direct people to inspect and clean and then stay out.** |
| 02:30 | 10 | BY MR. MONTEIRO: |
| 02:30 | 11 | Q.  No.  Sorry.  Let me clarify. |
| 02:30 | 12 | What purpose does prohibiting men from |
| 02:30 | 13 | going into the women's dorm serve? |
| 02:31 | 14 | **A.  To be respectful of what should be private** |
| 02:31 | 15 | **areas.** |
| 02:31 | 16 | Q.  Was compliance with that policy optional? |
| 02:31 | 17 | **A.  No.** |
| 02:31 | 18 | Q.  And again, if a man -- if a male firefighter |
| 02:31 | 19 | is in the women's dorm, would that present a privacy |
| 02:31 | 20 | issue for the women? |
| 02:31 | 21 | MS. SULLIVAN:  Objection; calls for |
| 02:31 | 22 | speculation. |
| 02:31 | 23 | Go ahead, and answer. |
| 02:31 | 24 | **A.  I would assume it would, yes.** |
| 02:31 | 25 | BY MR. MONTEIRO: |

| | | Page 138 |
|---|---|---|
| 02:31 | 1 | Q.  Could it present a safety issue? |
| 02:31 | 2 | MS. SULLIVAN:  Objection; calls for |
| 02:31 | 3 | speculation. |
| 02:31 | 4 | Go ahead, and answer. |
| 02:31 | 5 | **A.  It could, yes.** |
| 02:31 | 6 | BY MR. MONTEIRO: |
| 02:32 | 7 | Q.  Now, if a male firefighter not only uses the |
| 02:32 | 8 | bathroom -- uses the toilet at station 54 but is |
| 02:32 | 9 | urinating on the toilet seat in the women's bathroom at |
| 02:32 | 10 | station 54, would that also be a violation of HFD's |
| 02:32 | 11 | rules and regulations? |
| 02:32 | 12 | MS. SULLIVAN:  Objection; improper |
| 02:32 | 13 | hypothetical. |
| 02:32 | 14 | Go ahead, and answer. |
| 02:32 | 15 | **A.  Okay.  Department rules and regulations?** |
| 02:32 | 16 | BY MR. MONTEIRO: |
| 02:32 | 17 | Q.  Right. |
| 02:32 | 18 | **A.  I don't recall seeing anything about** |
| 02:32 | 19 | **urinating on the seat of a toilet in the department** |
| 02:32 | 20 | **rules and regs.** |
| 02:32 | 21 | Q.  Would it violate your -- the language of |
| 02:32 | 22 | your bulletin? |
| 02:32 | 23 | MS. SULLIVAN:  Objection; improper |
| 02:32 | 24 | hypothetical, vague. |
| 02:32 | 25 | Go ahead, and answer. |

| | | Page 139 |
|---|---|---|
| 02:32 | 1 | **A.  Okay.  So would -- would a male firefighter** |
| 02:33 | 2 | **urinating on the toilet seat in the women's restroom be** |
| 02:33 | 3 | **a violation of the ARFF bulletin policy?  Is that the** |
| 02:33 | 4 | **question?** |
| 02:33 | 5 | BY MR. MONTEIRO: |
| 02:33 | 6 | Q.  Yes. |
| 02:33 | 7 | **A.  Then, well, yes, it would.** |
| 02:33 | 8 | Q.  Because they weren't supposed to be in |
| 02:33 | 9 | there, right? |
| 02:33 | 10 | **A.  Correct.** |
| 02:33 | 11 | Q.  And the fact that they are urinating on the |
| 02:33 | 12 | toilet seat, does that make it an even more serious |
| 02:33 | 13 | violation of your bulletin than for them just to be in |
| 02:33 | 14 | there? |
| 02:33 | 15 | MS. SULLIVAN:  Objection; improper |
| 02:33 | 16 | hypothetical, vague. |
| 02:33 | 17 | Go ahead, and answer. |
| 02:33 | 18 | **A.  I don't -- I don't really see degrees of** |
| 02:33 | 19 | **violation, but do we know for a fact was there an** |
| 02:33 | 20 | **investigation to see was that in fact urine.** |
| 02:33 | 21 | **I mean, we are assuming that all of** |
| 02:33 | 22 | **these allegations are true and factual.** |
| 02:34 | 23 | BY MR. MONTEIRO: |
| 02:34 | 24 | Q.  I am asking you to assume that that |
| 02:34 | 25 | happened, okay? |

| | | Page 140 |
|---|---|---|
| 02:34 | 1 | **A.  Okay, all right.** |
| 02:34 | 2 | Q.  Okay.  Put it to the side whether or not it |
| 02:34 | 3 | was urine.  Assume that a male firefighter goes into |
| 02:34 | 4 | the women's dorm and urinates on the toilet seat. |
| 02:34 | 5 | **A.  Right.** |
| 02:34 | 6 | MS. SULLIVAN:  Objection; improper |
| 02:34 | 7 | hypothetical and vague. |
| 02:34 | 8 | Go ahead, and answer. |
| 02:34 | 9 | BY MR. MONTEIRO: |
| 02:34 | 10 | Q.  My question is:  Would that be even a more |
| 02:34 | 11 | serious violation of just the male firefighter using |
| 02:34 | 12 | the women's restroom? |
| 02:34 | 13 | MS. SULLIVAN:  Same objection. |
| 02:34 | 14 | Go ahead and answer. |
| 02:34 | 15 | **A.  All right.  It's still a violation of the** |
| 02:34 | 16 | **ARFF bulletin, a violation of my directive, because if** |
| 02:34 | 17 | **the male firefighter had not been in the bathroom, he** |
| 02:34 | 18 | **would not have had an opportunity to urinate on the** |
| 02:34 | 19 | **toilet seat.** |
| 02:34 | 20 | BY MR. MONTEIRO: |
| 02:34 | 21 | Q.  And who -- did the women firefighters have |
| 02:34 | 22 | to clean their own bathrooms in 2009? |
| 02:35 | 23 | **A.  At some point, you know, when the** |
| 02:35 | 24 | **clarification -- so I guess of -- so the 2007 -- no --** |
| 02:35 | 25 | **'8.** |

## Page 141

02:35  1      When was the captain Hoyt?

02:35  2      Q.  That was February '07.

02:35  3      A.  February '07, all right.  So the

02:35  4  clarification bulletin had already come out, so no, at

02:35  5  this time all members were to inspect and clean all

02:35  6  areas of the station daily.

02:35  7      Q.  So at some point were women responsible for

02:35  8  cleaning the women's restroom and dorm?

02:35  9      MS. SULLIVAN:  Objection; vague.

02:35  10      Go ahead, and answer.

02:35  11      A.  Apparently they interpreted my first

02:35  12  directive as literally, an absolute, males never, ever

02:35  13  enter the women's restroom.  So I guess you women are

02:35  14  going to go have to clean -- have to clean the women's

02:35  15  room, because we are not allowed.

02:36  16  BY MR. MONTEIRO:

02:36  17      Q.  That was not your intention?

02:36  18      A.  Correct.

02:36  19      Q.  So there was some period of time where it

02:36  20  sounds like women were responsible for cleaning the

02:36  21  women's dorm and the women's restroom.  Is that

02:36  22  correct?

02:36  23      A.  Yes.  By the same token, they were not

02:36  24  expected to clean the men's restroom.

02:36  25      Q.  Okay.  Do you know when that was, by the

## Page 142

02:36  1  way?

02:36  2      A.  That's what I am saying.  I don't remember,

02:36  3  okay?  I know we have clarification -- one of the

02:36  4  clarifications in 2007 here.

02:36  5      Q.  Okay.  So if a woman is required to clean

02:37  6  the women's bathroom after a male has urinated on the

02:37  7  toilet seat, would that interfere with the women's

02:37  8  working conditions?

02:37  9      MS. SULLIVAN:  Objection; calls for a

02:37  10  legal conclusion, vague, improper hypothetical.

02:37  11      But go ahead, and answer.

02:37  12      A.  I would see it as unpleasant and awkward.

02:37  13  BY MR. MONTEIRO:

02:37  14      Q.  She shouldn't have to clean up after a male

02:37  15  who used the women's bathroom, right?

02:37  16      MS. SULLIVAN:  Objection; vague,

02:37  17  improper hypothetical.

02:37  18      Go ahead, and answer.

02:37  19      A.  Correct, yeah.  Philosophically, I agree.

02:37  20  BY MR. MONTEIRO:

02:37  21      Q.  And the station -- the fire station is

02:37  22  essentially the firefighters' home when they are on

02:37  23  duty, right?

02:37  24      A.  Yes.

02:37  25      Q.  They live there, correct?

## Page 143

02:37  1      A.  Yes.

02:37  2      Q.  They sleep there?

02:37  3      A.  Yes.

02:37  4      Q.  And they eat there?

02:37  5      A.  Yes.

02:38  6      Q.  It sounds like they can go -- can leave the

02:38  7  station when they are on duty to go use a different

02:38  8  bathroom.  Is that right?

02:38  9      MS. SULLIVAN:  Objection; improper

02:38  10  hypothetical, vague.

02:38  11      Go ahead, and answer.

02:38  12      A.  Okay.  Well, if they take one of the

02:38  13  apparatus over to the terminal building and go do some

02:38  14  building familiarity, there is restrooms over in the

02:38  15  terminal building or wherever they go.  I mean, they

02:38  16  have to stay on the airport.

02:38  17  BY MR. MONTEIRO:

02:38  18      Q.  Okay.  Would you -- would it be okay with

02:38  19  you if women were leaving the station to use the

02:38  20  restroom at another station because their station's

02:38  21  bathroom was dirty?

02:38  22      MS. SULLIVAN:  Objection; improper

02:38  23  hypothetical, vague.

02:38  24      Go ahead, and answer.

02:38  25      A.  Well, no, because, one, if they go on their

## Page 144

02:39  1  own, then their truck is understaffed.

02:39  2      Two, if they take that truck off of

02:39  3  their runway complex, now, we have less than required

02:39  4  coverage for that runway complex.

02:39  5  BY MR. MONTEIRO:

02:39  6      Q.  They should be able to -- you would agree

02:39  7  that they should be able to be comfortable using the

02:39  8  bathroom at their station, right?

02:39  9      A.  Yes.

02:39  10      Q.  So if a male firefighter continues to

02:39  11  urinate on the toilet seats in the women's bathroom

02:39  12  even after being instructed not to, would you consider

02:39  13  that a serious problem?

02:40  14      MS. SULLIVAN:  Objection; vague,

02:40  15  improper hypothetical.

02:40  16      Go ahead.

02:40  17      A.  Yes.  If in fact that was happening, yes.

02:40  18  BY MR. MONTEIRO:

02:40  19      Q.  Would you consider that behavior to be

02:40  20  harassing?

02:40  21      MS. SULLIVAN:  Objection; calls for a

02:40  22  legal conclusion, improper hypothetical, vague.

02:40  23      Go ahead, and answer.

02:40  24      A.  I categorize it as rude, gross -- I mean,

02:40  25  knock it off.

Page 145

02:40  1  BY MR. MONTEIRO:
02:40  2      Q.  Could it be harassing?
02:40  3          MS. SULLIVAN:  Objection; calls for a
02:40  4  legal conclusion, improper hypothetical, vague.
02:40  5          Go ahead, and answer.
02:40  6      A.  Harassing?  I suppose it could be.
02:40  7  BY MR. MONTEIRO:
02:40  8      Q.  And if that issue was happening, should it
02:40  9  have been dealt with?
02:41 10          MS. SULLIVAN:  Objection; vague.
02:41 11          Go ahead, and answer.
02:41 12      A.  Yes.  If it was reported and there is
02:41 13  evidence that that's -- that's what's going on, yes, it
02:41 14  should be dealt with.
02:41 15  BY MR. MONTEIRO:
02:41 16      Q.  Why?
02:41 17      A.  Well, because you want bad behavior to stop.
02:41 18      Q.  If a female firefighter is discovering urine
02:42 19  on the toilet seats at the fire station bathroom
02:42 20  dedicated to females, is that something that she should
02:42 21  raise with her captain?
02:42 22      A.  Yes.
02:42 23      Q.  And what should the captain do?
02:42 24          MS. SULLIVAN:  Objection; calls for
02:42 25  speculation.

Page 146

02:42  1          But go ahead, and answer.
02:42  2      A.  Look into it:  Okay.  Show me.  When did you
02:42  3  find this?
02:42  4  BY MR. MONTEIRO:
02:42  5      Q.  Some level of investigation.  Is that fair?
02:42  6      A.  Yes.
02:42  7      Q.  Not a formal investigation, but some sort of
02:42  8  informal investigation?
02:42  9      A.  Right.  And then I would expect if you raise
02:42 10  the issue with the other captains on other shifts, say,
02:42 11  hey, this happened the other day, you know, you-all
02:42 12  need to, you know, get with all of your crew members
02:43 13  and you know -- because this has to stop.
02:43 14      Q.  Let's go back to the log.
02:43 15          Now, the entry at 1800 hours which we
02:43 16  reviewed earlier, is it fair to say that captain Tamez
02:43 17  is reporting to captain Ponce that this is at least the
02:43 18  third time an issue had come up with regard to a
02:43 19  problem in the ladies' bathroom?
02:43 20          MS. SULLIVAN:  Objection; calls for
02:43 21  speculation.
02:43 22          Go ahead, and answer.
02:43 23  BY MR. MONTEIRO:
02:43 24      Q.  Is that your interpretation?
02:43 25          MS. SULLIVAN:  Objection; calls for

Page 147

02:43  1  speculation.
02:43  2          Go ahead, and answer.
02:43  3      A.  Well, from the language, he is saying it's
02:43  4  not the first or second time it has happened.
02:43  5  BY MR. MONTEIRO:
02:43  6      Q.  So it's at least the third time?
02:44  7          MS. SULLIVAN:  Objection; calls for
02:44  8  speculation.
02:44  9  BY MR. MONTEIRO:
02:44 10      Q.  Is that fair?
02:44 11          MS. SULLIVAN:  Objection calls for
02:44 12  speculation.
02:44 13          Go ahead, and answer.
02:44 14      A.  That's how I would interpret it, yes.
02:44 15  BY MR. MONTEIRO:
02:44 16      Q.  So there -- the log indicates that there is
02:44 17  some ongoing problem in the ladies' bathroom.  Is that
02:44 18  fair?
02:44 19          MS. SULLIVAN:  Objection; calls for
02:44 20  speculation.
02:44 21          Go ahead, and answer.
02:44 22      A.  Okay.  Well, he is describing that the
02:44 23  ladies' bathroom problem, which I assume he is
02:44 24  referring to the 7:40 -- referring to a problem.
02:44 25          And -- okay.  What was --

Page 148

02:45  1  BY MR. MONTEIRO:
02:45  2      Q.  So you said that your interpretation is he
02:45  3  is referring to the entry at 7:40 that Ms. Draycott
02:45  4  asked captain Henschel to come witness urine on the
02:45  5  women's toilet seat?
02:45  6      A.  Right.
02:45  7      Q.  So is your interpretation of the log that
02:45  8  there is an ongoing problem with urine ending up on the
02:45  9  toilet seat in the women's dorm -- women's restroom at
02:45 10  station 54?
02:45 11          MS. SULLIVAN:  Objection; calls for
02:45 12  speculation.
02:45 13          Go ahead, and answer.
02:45 14      A.  Okay.  As far as ongoing, I don't know, but
02:45 15  they seem to indicate that it has happened -- it's not
02:45 16  the first or second time that it's happened.
02:45 17          Now, is it ongoing?  I don't know.
02:45 18  BY MR. MONTEIRO:
02:45 19      Q.  But it's happened a couple times, at least?
02:45 20      A.  That's what they are indicating, yes.
02:46 21      Q.  Okay.  So from the log entry would you say
02:46 22  it appeared that Dr. Henschel was trying to document
02:46 23  the issue, but he had not been able to immediately
02:46 24  resolve the issue?
02:46 25          MS. SULLIVAN:  Objection; calls for

Page 149

02:46  1  speculation.
02:46  2       Go ahead, and answer.
02:46  3       **A.  He is documenting it.**
02:46  4  BY MR. MONTEIRO:
02:46  5       Q.  And from the 1800 entry, it's happened at
02:46  6  least two other times, right?
02:46  7       **A.  That's what he is saying, yes.**
02:46  8       Q.  So that means that he wasn't immediately
02:46  9  able to resolve it, fair?
02:46  10      MS. SULLIVAN:  Objection; calls for
02:46  11  speculation.
02:46  12      Go ahead, and answer.
02:47  13  BY MR. MONTEIRO:
02:47  14      Q.  You can answer.
02:47  15      **A.  Okay.  Right.  It apparently was not**
02:47  16  **resolved after the first time he was notified.**
02:47  17      Q.  And according to the complaint policy that
02:47  18  we had reviewed earlier, if captain Henschel wasn't
02:47  19  able to resolve the issue immediately, the correct
02:47  20  procedure would be for him to direct Ms. Draycott to
02:47  21  either OIG or staff services.  Is that correct?
02:47  22      MS. SULLIVAN:  Objection -- let's see,
02:47  23  hold on for a second -- improper hypothetical, calls
02:47  24  for speculation, mischaracterizes the evidence.
02:47  25      Go ahead, and answer.

Page 150

02:47  1       **A.  Okay.  Well, I think -- I think the language**
02:48  2  **in the complaint policy is basically someone brings me**
02:48  3  **a complaint about an event, an action, and you know, if**
02:48  4  **you are not able to resolve it, right, then you advise**
02:48  5  **the employee to take it to OIG.**
02:48  6       **Now, you know, apparently the captains**
02:48  7  **were trying to resolve it by communicating with the**
02:48  8  **captains, their colleagues on the other shifts, you**
02:48  9  **know: Hey, you know, this needs to stop.  We don't**
02:48  10 **know -- we don't know who.  We don't know when.**
02:48  11      **But it's -- it's not -- there are other**
02:48  12 **people besides firefighters, okay?  There are airport**
02:49  13 **workers who come through, police officers, contractors,**
02:49  14 **you know.  So there is a number of possibilities other**
02:49  15 **than firefighters.**
02:49  16 BY MR. MONTEIRO:
02:49  17      Q.  I understand that, but my question was:  If
02:49  18 this problem had raised itself at least three times,
02:49  19 which I think you agreed it had according to the log,
02:49  20 should captain Henschel have directed Ms. Draycott to
02:49  21 staff services or OIG because the complaint hadn't been
02:49  22 resolved immediately?
02:49  23      MS. SULLIVAN:  Same objection I had to
02:49  24 this question before.
02:49  25      Go ahead, and answer.

Page 151

02:49  1       **A.  At any time Draycott can go to OIG.**
02:49  2  BY MR. MONTEIRO:
02:50  3       Q.  I understand that.
02:50  4       **A.  And I think sometimes, you know, the**
02:50  5  **employee would rather, hey, can we -- can we work this**
02:50  6  **out?  So you know, there is not exactly a trigger point**
02:50  7  **that if this amount of time goes by, captain, you must**
02:50  8  **now send this employee to OIG.**
02:50  9       **What if the employee doesn't want to**
02:50  10 **go?**
02:50  11      Q.  Again, I don't think you are answering my
02:50  12 question.
02:50  13      The question I have is:  Under the
02:50  14 complaint policy we reviewed earlier --
02:50  15      **A.  Right.**
02:50  16      Q.  -- should captain Henschel have directed
02:50  17 Ms. Draycott to OIG or staff services since this issue
02:50  18 had come up at least three times?
02:51  19      MS. SULLIVAN:  Objection; asked and
02:51  20 answered and same objection to this line of questioning
02:51  21 that I have already stated on the record.
02:51  22      Go ahead, and answer.
02:51  23 BY MR. MONTEIRO:
02:51  24      Q.  Does the policy require it?  I can show you
02:51  25 the policy again if you like.

Page 152

02:51  1       **A.  No.  I remember what it says.**
02:51  2       **That's kind of open to interpretation.**
02:51  3       **What is -- what's the boundary between**
02:51  4  **employee and officer trying to find a solution?  And**
02:51  5  **okay.  So then -- when does it become an unresolved?**
02:51  6  **When is the requirement for the officer to direct the**
02:51  7  **employee?**
02:51  8       **I know what the guideline says, but in**
02:51  9  **practice, if the employee is satisfied that they are**
02:52  10 **working on it, okay, so anytime in there, an employee**
02:52  11 **can go to OIG.**
02:52  12      Q.  Well, I think you agreed earlier that the
02:52  13 policy is -- uses language shall, right?
02:52  14      **A.  Yes.**
02:52  15      Q.  It's not discretionary, correct?
02:52  16      **A.  Right.**
02:52  17      Q.  And it says if a complaint cannot be
02:52  18 resolved immediately, the employee shall instruct the
02:52  19 complaining party to forward their complaint to either
02:52  20 OIG or staff services, correct?
02:52  21      MS. SULLIVAN:  Where are you looking?
02:52  22      MR. MONTEIRO:  Looking back at
02:52  23 exhibit 5, I think.
02:52  24      MS. SULLIVAN:  Where specifically?
02:52  25      MR. MONTEIRO:  Subsection B and

Page 153

02:52  1   subsection C.

02:52  2       MS. SULLIVAN:  Of 6.01?

02:52  3       MR. MONTEIRO:  6.01.

02:52  4   BY MR. MONTEIRO:

02:52  5   Q.  You can pull that out too, chief.  It might

02:52  6   be easier.

02:53  7       So why don't you review

02:53  8   subsection 6.01B and C and let me know when you have

02:53  9   had a chance to re-review those sections.

02:53  10  A.  I was trying to remember where it said.

02:53  11  Q.  I am looking at page HOU 2823.

02:53  12  A.  Coaching -- no, I have got the wrong

02:53  13  document.  Complaints.  There we go.  There we go.

02:54  14      Well, I mean --

02:54  15  Q.  Have you had a chance to review subsection B

02:54  16  and C of 6.01?

02:54  17  A.  Yes.

02:54  18  Q.  Okay.  So I think you agreed earlier that

02:54  19  the language in subsection B and C, it's

02:54  20  nondiscretionary, correct?

02:54  21  A.  Yes.

02:54  22  Q.  It says shall?

02:54  23  A.  Yes.

02:54  24  Q.  Then when we talked about what resolved

02:54  25  immediately was, I think you said if a complaint

Page 154

02:54  1   reoccurred -- you can correct me if I'm wrong -- if a

02:54  2   complaint was reoccurring more than once, that means

02:54  3   that it hadn't been resolved immediately.  Is that

02:54  4   correct?

02:54  5   A.  There are a lot of possibilities and

02:55  6   circumstances.  So -- but technically, yes, that is

02:55  7   correct.  If it happens again, it hasn't been resolved.

02:55  8   Q.  Okay.  So we can go back to exhibit 6 with

02:55  9   that testimony in mind.

02:55  10      The -- the entry at 1800 hours is

02:55  11  captain Henschel recording that there is a

02:55  12  communication between senior captain Tamez and senior

02:55  13  captain Ponce that there is a problem in the women's

02:55  14  bathroom, and it's happened -- it's not the first or

02:55  15  second time it's happened.  Is that fair?

02:55  16  A.  Yes.

02:56  17  Q.  So -- and Ms. Draycott had complained about

02:56  18  it earlier in the day to captain Henschel, right?

02:56  19  A.  Yes.

02:56  20  Q.  So if that's what's going on under the

02:56  21  complaint policy we just looked at, would you agree

02:56  22  that Ms. Draycott should have been -- should have been

02:56  23  directed to either OIG or staff services at this point?

02:56  24      MS. SULLIVAN:  Objection; asked and

02:56  25  answered, calls for speculation, improper hypothetical.

Page 155

02:56  1       MR. MONTEIRO:  It hasn't been answered.

02:56  2       MS. SULLIVAN:  Oh, it has, more than

02:56  3   once.

02:56  4       But go ahead, and answer.

02:56  5   A.  Right.  Well, as -- as I have tried to

02:56  6   describe it -- I am not maybe doing a good job

02:56  7   describing it.

02:56  8       But there is a difference between, you

02:56  9   know, hey, this is really serious and it needs to go

02:56  10  and an employee might -- I don't know what the

02:56  11  conversation between Draycott and Henschel was earlier

02:57  12  in the day.

02:57  13  But if the employee says, hey, look, I

02:57  14  don't want to -- I don't want to say anything, you

02:57  15  know, don't tell anybody, but I am just telling you

02:57  16  that, you know, that there is a problem, okay?  Then --

02:57  17  then --

02:57  18      THE WITNESS:  Are you okay?

02:57  19      MR. CAPODICE:  I am okay.  I am good.

02:57  20  I am listening.  Sorry.  I am sitting like that.  My

02:57  21  bad.

02:57  22      THE WITNESS:  I have been in cardiac

02:57  23  arrests in a situation like this before.

02:57  24  BY MR. MONTEIRO:

02:57  25  Q.  I understand that.  I am just asking you

Page 156

02:57  1   based on what's in this log --

02:57  2   A.  Right.

02:57  3   Q.  -- whether or not she should have been

02:57  4   directed to OIG or staff services.

02:57  5       MS. SULLIVAN:  Again, asked and

02:58  6   answered.  Just because you don't like the answer does

02:58  7   not mean he hasn't answered it.  So....

02:58  8       MR. MONTEIRO:  It hasn't been answered.

02:58  9       MS. SULLIVAN:  It's the third or fourth

02:58  10  time.

02:58  11      MR. MONTEIRO:  He keeps offering

02:58  12  alternative scenarios that haven't been asked about.

02:58  13      MS. SULLIVAN:  Yes, so --

02:58  14      MR. MONTEIRO:  I'm going to keep asking

02:58  15  it until my question is answered.  You can object as

02:58  16  long as you wish.

02:58  17      MS. SULLIVAN:  And I will stop the

02:58  18  deposition if we are going to spend the rest of the day

02:58  19  on this one question.  He has answered it.

02:58  20      MR. MONTEIRO:  He has not answered it.

02:58  21      MS. SULLIVAN:  Yes.  He says that there

02:58  22  is a possibility.  It depends on the situation.  You

02:58  23  are asking him about log entries that he has not seen

02:58  24  before, that he doesn't know the background information

02:58  25  on, and you are asking him to speculate.

Page 157

02:58 1 So this -- this is the problem that
02:58 2 I have with this line of questioning.
02:58 3 You can answer it again.
02:58 4 But counselor, I will ask you to move
02:58 5 on.
02:58 6 A. And the answer is maybe. He absolutely
02:58 7 could have said, okay, Draycott, it's time to go to
02:58 8 OIG. He certainly could have.
02:59 9 BY MR. MONTEIRO:
02:59 10 Q. That would -- that could -- that would have
02:59 11 been an appropriate -- strike that.
02:59 12 Had he done that, that would have been
02:59 13 in compliance with the complaint policies we reviewed
02:59 14 earlier, correct?
02:59 15 MS. SULLIVAN: Objection; calls for
02:59 16 speculation.
02:59 17 Go ahead, and answer.
02:59 18 A. Yes, if that's -- if that meets the
02:59 19 employee's expectations, also. If the employee says I
02:59 20 don't want to file a grievance, I don't want to file a
02:59 21 complaint, I just want it handled, well, okay.
02:59 22 Then how does that fit with the -- the
02:59 23 complaint guideline?
02:59 24 BY MR. MONTEIRO:
03:00 25 Q. The guideline doesn't force the officer

Page 158

03:00 1 to -- sorry. Strike that.
03:00 2 The guideline doesn't require the
03:00 3 officer to order the employee to OIG, right?
03:00 4 A. To direct the employee --
03:00 5 Q. Right.
03:00 6 A. -- to OIG.
03:00 7 Q. Right. Is that an order in your mind? Is
03:00 8 that the same as ordering them?
03:00 9 MS. SULLIVAN: Objection; vague.
03:00 10 BY MR. MONTEIRO:
03:00 11 Q. Or is that making them aware of that option,
03:00 12 if you know?
03:00 13 A. Some people could interpret it as a
03:00 14 directive, as an order.
03:00 15 Q. What's your interpretation?
03:00 16 A. I have been around a few years.
03:00 17 My interpretation is that you make the
03:00 18 employee aware of this is the process and you know,
03:00 19 this could fit and it -- if you want to pursue, you
03:01 20 know, a formal complaint, this is how you do it and
03:01 21 this is where you go.
03:01 22 Q. Okay. You mentioned earlier that you had a
03:01 23 conversation at some point with captain Henschel about
03:01 24 documenting Ms. Draycott's complaints. Is that right?
03:01 25 A. Yes.

Page 159

03:01 1 Q. And is this the type of documentation that's
03:01 2 in exhibit 6 that you had asked to be kept?
03:01 3 A. I just kind of remember asking him: Okay.
03:01 4 So are you documenting this stuff?
03:01 5 Oh, yeah, yeah, yes, I am.
03:01 6 Okay, because that's important.
03:02 7 So this -- this would meet my
03:02 8 expectations, yes.
03:02 9 Q. Okay. If a male firefighter was using the
03:02 10 women's bathroom at station 54, would you consider that
03:02 11 to be harassing behavior toward Ms. Draycott in this
03:02 12 case?
03:02 13 MS. SULLIVAN: Objection; calls for a
03:02 14 legal conclusion, improper hypothetical.
03:02 15 You can go ahead and answer.
03:02 16 A. Well, I think we have kind of been
03:02 17 through -- I would consider it improper, rude, gross.
03:02 18 It could be harassing.
03:02 19 BY MR. MONTEIRO:
03:02 20 Q. And if it was done with the intention of
03:02 21 driving either Ms. Draycott or Ms. Keyes away from the
03:02 22 station, could that be harassing or discriminatory?
03:03 23 MS. SULLIVAN: Objection; calls for a
03:03 24 legal conclusion, improper hypothetical, calls for
03:03 25 speculation.

Page 160

03:03 1 Go ahead, and answer.
03:03 2 A. Okay. So if it was done with the intention
03:03 3 of driving them out of the station, would I consider
03:03 4 that --
03:03 5 BY MR. MONTEIRO:
03:03 6 Q. Harassing or discriminatory?
03:03 7 MS. SULLIVAN: Same objection.
03:03 8 A. Okay. Well, if -- assuming all those things
03:03 9 to be present and true, yes.
03:03 10 BY MR. MONTEIRO:
03:03 11 Q. Do you know if captain Henschel reported the
03:03 12 incidents that he recorded in this log on May 12th of
03:03 13 2009 to you?
03:03 14 A. I don't remember if he did that day. It
03:03 15 seems like at some point I got an e-mail.
03:03 16 Q. Is that -- when you got the e-mail, was that
03:03 17 the first time you learned of -- excuse me -- was that
03:03 18 the first time you learned of Ms. Draycott's
03:04 19 complaints?
03:04 20 A. I don't remember. I mean, I -- I don't
03:04 21 remember when or how I first learned of her complaints
03:04 22 specific to urine on the toilet seats.
03:04 23 Q. Would you have wanted to know about the
03:04 24 events that are recorded in the log from May 12th on
03:04 25 the day that they occurred?

## Page 161

03:04  1      A.  I would say that's significant, but if --

03:04  2   you know, if the captains were able to get together,

03:05  3   let's just say some crew members said, okay, I am

03:05  4   sorry, I will never do it again, then, you know, they

03:05  5   kind of get some resolution.

03:05  6           But again, we don't know that it was a

03:05  7   crew member.

03:05  8      Q.  So would you have wanted to know that this

03:05  9   situation was going on on May 12th of 2009?

03:05  10          MS. SULLIVAN:  Objection; calls for

03:05  11  speculation.

03:05  12          Go ahead.

03:05  13     A.  Yes.  You know, if -- if something was

03:05  14  documented that it was not the first or second time,

03:05  15  then, yes, I would want to know about that.

03:05  16  BY MR. MONTEIRO:

03:05  17     Q.  If we can flip to the next entry in the log

03:05  18  which is from May 18, 2009, starts on 146514.

03:06  19          MS. SULLIVAN:  I have to take a quick

03:06  20  break to respond to an e-mail, so when you get to a

03:06  21  stopping point --

03:06  22          MR. MONTEIRO:  Okay.

03:06  23  BY MR. MONTEIRO:

03:06  24     Q.  Are you there at the May 18th entry, sir?

03:06  25     A.  Yes.

## Page 162

03:06  1      Q.  If you could turn to the next -- the events

03:06  2   of the day entry, and if we look at the entry at 7:00,

03:06  3   7:00 p.m., it says, quote, EJ Draycott reported urine

03:06  4   again on toilet of ladies' bathroom witnessed by

03:06  5   captain Henschel.

03:06  6           Do you see that?

03:06  7      A.  Yes.

03:06  8      Q.  Would this have been the next shift for

03:06  9   Ms. Draycott follow following the May 12th shift that

03:06  10  we just reviewed, if you know?

03:07  11     A.  Probably, because that would be five days

03:07  12  off in between shifts.

03:07  13     Q.  And she is reporting at 7:00 p.m., correct?

03:07  14          MS. SULLIVAN:  Objection; calls for

03:07  15  speculation.

03:07  16  BY MR. MONTEIRO:

03:07  17     Q.  Well, the log reflects that there is an

03:07  18  entry --

03:07  19     A.  The log says it's 0700.

03:07  20     Q.  Okay.  That's 7:00 a.m., sorry.

03:07  21     A.  Right.

03:07  22     Q.  Correct?

03:07  23     A.  Yes.

03:07  24     Q.  Okay.  Now, the oncoming captain that

03:07  25  morning was captain Henschel, correct?

## Page 163

03:07  1      A.  Yes.

03:07  2      Q.  So he would have come on duty at 6:30 that

03:07  3   morning?

03:07  4      A.  Yes.

03:07  5      Q.  And under your inspection policy captain

03:08  6   Henschel would have inspected the women's bathroom

03:08  7   at -- when he came on duty that morning at 6:30 that

03:08  8   morning, correct?

03:08  9           MS. SULLIVAN:  Objection;

03:08  10  mischaracterizes his testimony.

03:08  11          Go ahead, and answer.

03:08  12     A.  He was -- every shift's responsibility to

03:08  13  inspect and clean all areas of the station daily.

03:08  14  These are done at 6:30, at 7:00, 7:30.

03:08  15          You know, first things first,

03:08  16  operational redness.  You check out your gear, check

03:08  17  out your truck.  You know, does everything work?  Okay?

03:08  18          Once you have got all that, then you

03:08  19  can move onto the station.  So what time they start

03:08  20  inspecting and cleaning the station varies depending on

03:09  21  how long the morning equipment check takes.

03:09  22  BY MR. MONTEIRO:

03:09  23     Q.  What was your intention of when the

03:09  24  inspection would take place when you issued the -- when

03:09  25  you issued the policy?

## Page 164

03:09  1      A.  As soon as practical.

03:09  2      Q.  And the idea, I guess, is that you want --

03:09  3   don't want too much time to pass because if there is a

03:09  4   problem, you want to be able to identify when it

03:09  5   occurred, correct?

03:09  6           MS. SULLIVAN:  Objection; calls for

03:09  7   speculation.

03:09  8           Go ahead, and answer.

03:09  9      A.  We want to identify problems as soon as we

03:10  10  can.

03:10  11  BY MR. MONTEIRO:

03:10  12     Q.  Do you know if captain Henschel made you

03:10  13  aware of this incident on May 18th of 2009?

03:10  14     A.  I don't remember.  Like I have said before,

03:10  15  I don't remember when Henschel made me aware.  It seems

03:10  16  like I recall an e-mail.

03:10  17     Q.  Okay.  And is this something that you would

03:10  18  have wanted to be aware of, given that it's reoccurring

03:10  19  on a somewhat frequent basis?

03:11  20     A.  I wouldn't say somewhat frequently.

03:11  21          Based on the last captain's log, you

03:11  22  know, I think I said, yes, you know, they are saying

03:11  23  it's not the first or second time.  I had said, yes, I

03:11  24  would want to know about that.  If this was a

03:11  25  subsequent, yes, I would want to know about that.

## Page 165

| | | |
|---|---|---|
| 03:11 | 1 | Q. And then if we could go to the next log. |
| 03:11 | 2 | MR. MONTEIRO: Actually, let's go off |
| 03:11 | 3 | the record for a minute. |
| 03:11 | 4 | THE VIDEOGRAPHER: 3:11, off record. |
| 03:11 | 5 | (Recess from 3:11 to 3:23 p.m.) |
| 03:23 | 6 | THE VIDEOGRAPHER: 3:23, back on the |
| 03:23 | 7 | record, disk 5. |
| 03:24 | 8 | MS. COHEN: Are we in the course of |
| 03:24 | 9 | discussing an exhibit so I know where we are? |
| 03:24 | 10 | MR. MONTEIRO: We just finished |
| 03:24 | 11 | discussing exhibit 6, and I just asked the court |
| 03:24 | 12 | reporter to mark exhibit 7. |
| 03:24 | 13 | MS. COHEN: All right. Thank you. |
| 03:24 | 14 | (Exhibit 7 marked.) |
| 03:24 | 15 | BY MR. MONTEIRO: |
| 03:24 | 16 | Q. Chief, you mentioned a couple times earlier |
| 03:24 | 17 | that you remember captain Henschel sending you an |
| 03:24 | 18 | e-mail about some of the issues Ms. Draycott was |
| 03:24 | 19 | reporting to him. |
| 03:24 | 20 | I am showing you what's been marked as |
| 03:24 | 21 | deposition exhibit 7, which is Bates stamped as |
| 03:25 | 22 | HOU 5981. |
| 03:25 | 23 | Is this the e-mail you have been |
| 03:25 | 24 | referencing? |
| 03:25 | 25 | A. Yes. |

## Page 166

| | | |
|---|---|---|
| 03:25 | 1 | Q. And is this the -- was this the first |
| 03:25 | 2 | written communication you received from captain |
| 03:25 | 3 | Henschel regarding issues that Ms. Draycott was having |
| 03:25 | 4 | at station 54? |
| 03:25 | 5 | A. I don't remember if there was -- if there |
| 03:25 | 6 | was anything else. |
| 03:25 | 7 | Q. You don't remember receiving anything else. |
| 03:25 | 8 | Is that fair? |
| 03:25 | 9 | A. No. I think I said I don't remember if |
| 03:25 | 10 | there was anything else. |
| 03:25 | 11 | Q. Is there anything that comes to mind? |
| 03:25 | 12 | A. No. I am not saying that there wasn't. I |
| 03:25 | 13 | just -- I don't remember. It's been over 10 years. |
| 03:25 | 14 | Q. And what was your response to captain |
| 03:26 | 15 | Henschel when you received the e-mail that's marked as |
| 03:26 | 16 | exhibit 7? |
| 03:26 | 17 | A. Well, it seems like probably had to wait |
| 03:26 | 18 | until that shift got back to work, kind of got with |
| 03:26 | 19 | them to see, okay, well, so what -- what have you-all |
| 03:26 | 20 | done so far? What does captain Tamez think? You have |
| 03:26 | 21 | talked to captain Tamez, you know, I assume. And you |
| 03:26 | 22 | know, just running through, okay, so what do we do with |
| 03:27 | 23 | this? |
| 03:27 | 24 | I remember going to my boss, you know: |
| 03:27 | 25 | This is a puzzler. I have never had this before. What |

## Page 167

| | | |
|---|---|---|
| 03:27 | 1 | do you do with this? |
| 03:27 | 2 | Essentially there was: Well, tell |
| 03:27 | 3 | people not to do that. |
| 03:27 | 4 | That was the guidance I got. |
| 03:27 | 5 | Q. Who gave you that guidance? |
| 03:27 | 6 | A. Chief Snell. |
| 03:27 | 7 | Q. All right. Did you respond to captain |
| 03:27 | 8 | Henschel's e-mail by e-mail? |
| 03:27 | 9 | A. I don't recall. |
| 03:27 | 10 | Q. Do you remember if you spoke to him by |
| 03:27 | 11 | telephone in response to the e-mail? |
| 03:27 | 12 | A. I don't remember if it was telephone or in |
| 03:27 | 13 | person. You know, it would seem like I would prefer to |
| 03:28 | 14 | talk to someone in person. |
| 03:28 | 15 | Q. Do you remember if you went to the station |
| 03:28 | 16 | to talk to him? |
| 03:28 | 17 | A. That's what I -- that's what I am saying. I |
| 03:28 | 18 | don't remember. |
| 03:28 | 19 | Q. Okay. So the direction -- you testified |
| 03:28 | 20 | that you took it up to assistant chief Snell, and the |
| 03:28 | 21 | direction you got from assistant chief Snell was to |
| 03:28 | 22 | tell people not to go in there, correct? |
| 03:28 | 23 | A. That's my recollection, yes. |
| 03:28 | 24 | Q. How did you communicate that direction to |
| 03:28 | 25 | captain Henschel? |

## Page 168

| | | |
|---|---|---|
| 03:28 | 1 | A. I really don't remember. |
| 03:28 | 2 | Q. Well, let me step back for a minute. |
| 03:28 | 3 | A. Okay. |
| 03:28 | 4 | Q. Do you remember communicating that direction |
| 03:28 | 5 | to captain Henschel? |
| 03:28 | 6 | A. Not specifically. You know, I would have |
| 03:28 | 7 | gone back to, really, the senior captains and, okay, |
| 03:28 | 8 | what's going on here? |
| 03:29 | 9 | That's -- that's what I believe I did. |
| 03:29 | 10 | Q. Do you remember providing captain Snell -- |
| 03:29 | 11 | sorry. |
| 03:29 | 12 | Do you remember providing chief Snell's |
| 03:29 | 13 | directive to senior captain Tamez? |
| 03:29 | 14 | A. I can't remember specifically. |
| 03:29 | 15 | Q. And by the way, how would you communicate |
| 03:29 | 16 | with assistant chief Snell at the time? Was it by |
| 03:29 | 17 | phone or some other means? |
| 03:29 | 18 | A. Generally in person or phone. Sometimes |
| 03:29 | 19 | e-mail. |
| 03:30 | 20 | Q. Did you either -- did you direct either |
| 03:30 | 21 | Tamez or Henschel to direct Ms. Draycott to OIG or |
| 03:30 | 22 | staff services at this time, after you got this e-mail? |
| 03:30 | 23 | A. Probably not. |
| 03:30 | 24 | Q. Did you yourself direct Ms. Draycott to OIG |
| 03:30 | 25 | or staff services after you got this e-mail? |

## Page 169

03:30 1  A. No.

03:30 2  Q. Did you take any other action in response to

03:30 3 this e-mail?

03:30 4  A. I can't remember specifically, but I -- like

03:30 5 I said, I believe I got back with at least Henschel and

03:31 6 likely the seniors on the other shifts. That's what I

03:31 7 vaguely remember doing, to say: Hey, what's going on

03:31 8 here?

03:31 9  Q. Captain Krusleski is also on the e-mail from

03:31 10 captain Henschel, correct?

03:31 11  A. Correct.

03:31 12  Q. Do you know, was captain Krusleski involved

03:31 13 in any of your communications about this e-mail?

03:31 14  A. Was he involved?

03:31 15  Q. Well, you said you spoke to -- you said you

03:31 16 spoke to assistant chief Snell, and then you went back

03:31 17 to the folks at the station.

03:31 18       Was captain -- was captain Krusleski

03:31 19 involved at all in any of those communications?

03:32 20  A. I generally told Krusleski, filled him in on

03:32 21 everything going on.

03:32 22       Now, did he go with me over to the fire

03:32 23 station to talk about this? I don't recall how I got

03:32 24 back with Henschel and the seniors. So I don't recall

03:32 25 whether Krusleski was part of that.

## Page 170

03:32 1  Q. Okay. Did you ever receive instruction from

03:32 2 anyone in the fire department to preserve your e-mails

03:32 3 regarding Ms. Draycott?

03:33 4  A. Yes.

03:33 5  Q. What were you told with respect to

03:33 6 preserving your e-mails?

03:33 7  A. Basically to preserve e-mails and any

03:33 8 relevant documents.

03:33 9  Q. And exhibit 7, would you consider that a

03:33 10 relevant document?

03:33 11  A. Yes.

03:33 12  Q. Do you know -- do you have any -- strike

03:33 13 that.

03:33 14       Do you know why this e-mail was not

03:33 15 found in your e-mail in box when it was searched in

03:33 16 connection with this litigation?

03:33 17  A. No.

03:33 18  Q. Do you remember deleting it?

03:33 19  A. No, I do not.

03:33 20  Q. We have been talking about some of the

03:34 21 problems that happened at station 54 regarding the

03:34 22 women's dorm and bathroom.

03:34 23       Did you ever hear of similar complaints

03:34 24 at either -- at any of the other ARFF stations that

03:34 25 have dedicated women's dorms and bathrooms?

## Page 171

03:34 1  A. No. That would only be station 99.

03:34 2  Q. Okay. Did you ever hear of any problems

03:34 3 happening at station 99?

03:34 4  A. Not that I recall.

03:34 5  Q. Now, at some point Ms. Draycott did go to

03:34 6 OIG to file a complaint regarding the conditions of the

03:34 7 women's dorm and bathroom, right?

03:34 8  A. Yes.

03:34 9  Q. And you were made aware of that?

03:34 10  A. Probably as a respondent.

03:34 11  Q. Okay. Let's go back to that captain's log

03:34 12 that we looked at.

03:35 13  A. Okay.

03:35 14  Q. So if I can direct you to HOU 146505.

03:35 15  A. Okay.

03:35 16  Q. And if you can review the log entries at

03:35 17 9:00 and 10:00, let me know when you have had a chance

03:35 18 to review that.

03:35 19  A. Okay.

03:36 20  Q. So we are looking at the captain's log for

03:36 21 June 29th of 2009, correct?

03:36 22  A. Yes.

03:36 23  Q. And the 9:00 entry concludes that both

03:36 24 firefighters stated they would like to go forward with

03:36 25 their complaint to OIG today. Is that correct?

## Page 172

03:36 1  A. Yes.

03:36 2  Q. And then the next entry says captain

03:36 3 Henschel called and notified D54 chief McAteer of the

03:36 4 situation, correct?

03:36 5  A. Yes.

03:36 6  Q. So do you remember captain Henschel calling

03:36 7 you and telling you that Draycott and Keyes had gone to

03:36 8 OIG to file a complaint?

03:36 9  A. Vaguely remember. But okay, I will -- I

03:37 10 will agree that he did that.

03:37 11  Q. In 2009 OIG was in charge of investigating

03:37 12 discrimination complaints, right?

03:37 13  A. Yes.

03:37 14  Q. What did captain Henschel tell you when he

03:37 15 called you at 10:00 a.m.?

03:37 16  A. I don't recall specifically, but reading the

03:37 17 log entry, I remember something about speakers -- you

03:37 18 know, the speakers being turned down and that they want

03:37 19 to -- they want to go file a complaint.

03:37 20       So okay. That probably sounds like a

03:37 21 good idea.

03:37 22  Q. Did captain Henschel ever tell you that he

03:37 23 thought Ms. Draycott was making up some of the

03:38 24 complaints she was reporting to him?

03:38 25  A. No.

## Page 173

03:38 1    Q. Did he ever tell you whether he had actually

03:38 2    observed urine in the women's bathroom when

03:38 3    Ms. Draycott had called him in to inspect?

03:38 4    **A. It seemed like early on he would say when I**

03:38 5    **went to go -- wanted her to show me, she said she**

03:38 6    **already fixed it, already cleaned it up.**

03:38 7    **        So -- but according to the log entries,**

03:38 8    **apparently later on, you know, I guess he was able to**

03:38 9    **witness some of the stuff.**

03:39 10   Q. Did you speak with your captains about the

03:39 11   fact that Ms. Keyes and Ms. Draycott had filed a OIG

03:39 12   complaint?

03:39 13   **A. I don't believe so.  That wouldn't -- why**

03:39 14   **would I do that?**

03:39 15   **        No, I don't.  I don't recall telling**

03:39 16   **captains: Hey, they went and filed a complaint.**

03:39 17   **No.**

03:39 18   Q. Well, it was in the log, right?  The

03:39 19   captains knew they had gone to OIG?

03:39 20   **A. Right.**

03:39 21   Q. So I am just wondering if you had a more

03:39 22   substantive conversation with your captains about any

03:39 23   steps that should be taken regarding the situation, or

03:40 24   was the idea just to wait for OIG to make a

03:40 25   determination?

## Page 174

03:40 1    **A. Well, there were several times I recall**

03:40 2    **meeting with -- exactly who I don't remember, but**

03:40 3    **officers at station 54 and just letting them know that,**

03:40 4    **look, I don't know what's going on over here, but you**

03:40 5    **guys need to be as engaged as you possibly can to make**

03:40 6    **sure guys, whether they are firefighters or airport**

03:40 7    **employees or whoever, are staying out of the women's**

03:40 8    **quarters.  You know, asking them, okay, what are your**

03:40 9    **ideas?  You know, how can we make sure this -- this**

03:41 10   **stops?**

03:41 11   Q. I asked you earlier about whether captain

03:41 12   Henschel had spoken to you about whether or not he had

03:41 13   found urine in the women's bathroom.

03:41 14   And I think you said the logs -- you

03:41 15   said early on he said that by the time he had gone in

03:41 16   there, Ms. Draycott had cleaned it up, right?

03:41 17   **A. Right.**

03:41 18   Q. Did he ever acknowledge that to you, that he

03:41 19   had found urine in -- on the women's toilet seat when

03:41 20   Ms. Draycott called him in there?

03:41 21   **A. I don't recall him ever saying:  I saw**

03:41 22   **urine.**

03:41 23   **        You know, he said:  Well, there was --**

03:41 24   **there was something.**

03:41 25   Q. Okay.  He found something when she called

## Page 175

03:41 1    him in there.  He acknowledged that he found something

03:42 2    out of the ordinary?

03:42 3    **A. Yes.**

03:42 4    Q. Okay.  Did you have any involvement in OIG's

03:42 5    investigation into Ms. Draycott's complaint regarding

03:42 6    the bathroom and the dorm use?

03:42 7    **A. Involvement?  I mean, there were -- there**

03:42 8    **were a number of complaints.**

03:42 9    Q. Okay.

03:42 10   **A. I remember writing several responses.**

03:42 11   Q. Let me see if I can clarify.

03:42 12   The log -- the log that we are looking

03:42 13   at indicates that on June 29th Ms. Draycott filed a

03:42 14   complaint, an OIG complaint, right?

03:42 15   **A. Right.**

03:42 16   Q. And that was related to the conditions of

03:42 17   the women's dorm and women's bathroom that we have seen

03:42 18   in the earlier dates in the log were reoccurring from

03:42 19   time to time?

03:42 20   **A. Right.**

03:42 21   Q. Do you know if you had any involvement in

03:42 22   OIG's investigation into that complaint?

03:43 23   **A. I don't recall.  If you have documents that**

03:43 24   **say I was a respondent or -- I mean, I had no role in**

03:43 25   **investigating it, if that's what you are asking.**

## Page 176

03:43 1    Q. That's what I am asking, yeah.

03:43 2    **A. Oh, oh, no, no, no.**

03:43 3    Q. I know you said earlier that sometimes you

03:43 4    were asked to investigate --

03:43 5    **A. Right.**

03:43 6    Q. -- by OIG?

03:43 7    **A. Right.**

03:43 8    Q. But not for this particular --

03:43 9    **A. Oh, yeah, no, no, no, no.**

03:43 10   Q. Is that because there would have been a

03:43 11   conflict if you --

03:43 12   **A. No.  I think it's the nature of the alleged**

03:43 13   **offense --**

03:43 14   Q. Okay.

03:43 15   **A. -- you know, possibly --**

03:43 16   Q. Because it was discrimination?

03:43 17   **A. -- discrimination.  So if that's ever a**

03:43 18   **factor, then that's not a staff services issue.**

03:43 19   Q. That's in OIG's purview?

03:43 20   **A. Yes.**

03:43 21   Q. Okay.  Did you ever become aware that other

03:44 22   women had reported to OIG that they had made -- that

03:44 23   they had made similar complaints as Ms. Draycott

03:44 24   regarding the women's dorm and women's bathroom at

03:44 25   station 54?

Page 177

03:44 1    A. I don't remember specifically. It seems
03:44 2 like I kind of became aware or heard that, oh, you
03:44 3 know, somebody else said -- yeah, same thing happened
03:44 4 to me or I saw the same thing.
03:44 5        I don't remember who they were or
03:44 6 whether it was just 54 or -- I don't recall.
03:44 7    Q. Do you remember hearing that Nefatari
03:44 8 Alexander had had -- had made similar reports as
03:44 9 Ms. Draycott?
03:45 10    A. Like I said, I don't remember who -- who
03:45 11 said what. You know, I just recall that some others
03:45 12 had -- had raised, you know, similar complaints.
03:45 13    Q. And how did you learn of that?
03:45 14    A. Like I said, I -- I don't recall how or
03:45 15 when, but I -- either fire station conversation or it
03:45 16 may have been on the news. It seemed like a lot of
03:45 17 the -- you know, it was on public media.
03:45 18    Q. Now, were you made aware of the outcome of
03:45 19 the OIG investigation into Ms. Draycott's and
03:45 20 Ms. Keyes' complaints regarding the dorm and bathroom?
03:45 21    A. I am not on the distribution list for any
03:45 22 notifications.
03:46 23    Q. I think you told me earlier that -- that
03:46 24 that type of finding would typically go to the fire
03:46 25 chief and the fire chief would direct it to you, if

Page 178

03:46 1 necessary. Is that right?
03:46 2    A. Yes.
03:46 3    Q. Okay. So --
03:46 4    A. Well, he would give me directions on what to
03:46 5 do going forward.
03:46 6    Q. Got it.
03:46 7    A. He would not pass on what was in the
03:46 8 findings.
03:46 9    Q. Do you remember receiving directions from
03:46 10 either chief Boriskie or chief Flanagan as to what to
03:46 11 do going forward following Ms. Draycott's OIG
03:46 12 complaint?
03:46 13    A. No. It was just -- just another reminder
03:46 14 to, well, just have them inspect and clean all areas of
03:46 15 the station daily.
03:46 16    Q. I am sorry. Do you have a memory of that,
03:46 17 of chief Boriskie or chief Flanagan directing you
03:47 18 that -- to do that?
03:47 19    A. No. That was from chief Snell.
03:47 20    Q. Okay. Where -- do you know where chief
03:47 21 Snell got that information from?
03:47 22    A. No.
03:47 23    Q. Did he tell you that that was because of the
03:47 24 OIG complaint?
03:47 25    A. No.

Page 179

03:47 1    Q. Do you know if it was -- if he was telling
03:47 2 you to do this because of the OIG complaint?
03:47 3    A. No, I don't. It was just a conversation:
03:47 4 You know, chief, I don't -- I am at my wit's end, you
03:47 5 know. How can we -- what do we do?
03:47 6    Q. I want to shift our focus to the -- a little
03:47 7 bit and discuss the layout of the women's dorm and
03:47 8 bathroom at station 54.
03:48 9        Now, at some point the women's dorm at
03:48 10 54 was modified. Is that correct?
03:48 11    A. Sometime before I returned -- and I think it
03:48 12 was still ongoing when I returned in July of '15.
03:48 13    Q. The modification was ongoing in July of
03:48 14 2015?
03:48 15    A. Yes.
03:48 16    Q. And do you know who made the determination
03:48 17 to modify the women's dorm at station 54?
03:48 18    A. The ARFF chief before me was Tim Neil. So
03:49 19 as I understand it, he got with the airport maintenance
03:49 20 group to get this done.
03:49 21    Q. Do you know why the station was modified?
03:49 22    A. Well, the addition of the chief took up
03:49 23 officer quarters.
03:49 24    Q. You are talking about when the district
03:49 25 chief was assigned to station 54?

Page 180

03:49 1    A. Yes, because prior to July 2015, there was
03:49 2 not a district chief assigned at station 54.
03:49 3        So that was -- that was what prompted
03:49 4 my return, because someone has to supervise the
03:49 5 district chiefs, all right? So they needed officer
03:50 6 quarters at station 54.
03:50 7        And they thought it was a good idea,
03:50 8 since the women's dorm was underused, cut it in half,
03:50 9 you know, floor to ceiling, insulate the wall. And one
03:50 10 side is the senior captain; the other side is the
03:50 11 women's dorm.
03:50 12    Q. Okay. So how many women firefighters can
03:50 13 station 54 currently accommodate?
03:50 14    A. Well, it all depends when they rank.
03:50 15    Q. I am sorry. I said firefighters.
03:50 16    A. Firefighters.
03:50 17    Q. Meaning upper case firefighter, I guess.
03:50 18    A. Okay. I would say two in private quarters.
03:50 19 There is the women's dorm, and then there is a watch
03:51 20 office. Both can be locked. Both have access to a
03:51 21 private restroom.
03:51 22    Q. So the women's dorm has one bed. Is that
03:51 23 correct?
03:51 24    A. One bed, yes.
03:51 25    Q. And the watch office?

## Page 181

03:51  1   A.  One bed.

03:51  2   Q.  One bed.  And when you say they both can be

03:51  3   locked, you are referring to -- from the interior,

03:51  4   correct?

03:51  5   A.  Yes.

03:51  6   Q.  What are -- if -- if someone is sleeping in

03:51  7   the watch office, are they on watch office duty -- let

03:51  8   me start over.

03:51  9       If a woman is assigned to be in the

03:51  10  watch office, does that put her on watch office duty

03:51  11  automatically?

03:51  12  A.  Yes.

03:51  13  Q.  Have there been any women permanently

03:52  14  assigned to station 54 since Ms. Draycott left in 2010?

03:52  15  A.  I don't know.  I would have to check a

03:52  16  roster.

03:52  17  Q.  Earlier I think you said Lisa Campbell is

03:52  18  the district chief at 54, right?

03:52  19  A.  Yes.  I didn't say her name, but....

03:53  20  Q.  Sorry, okay.  I think you did, but that's --

03:53  21  when I asked you who the district chiefs were, I think

03:53  22  you identified her.

03:53  23  A.  Oh, yeah, yeah.

03:53  24  Q.  Way at the beginning.

03:53  25  A.  Okay.

## Page 182

03:53  1   Q.  So she is -- she is currently the district

03:53  2   chief at station 54.  Is that correct?

03:53  3   A.  On the C shift.

03:53  4   Q.  And do you know if district chief Campbell

03:53  5   has had any issues with the -- sorry.

03:53  6       Would district chief Campbell use the

03:53  7   dedicated women's dorm and women's bathroom at

03:53  8   station 54, or would she get her own as a district

03:53  9   chief?

03:53  10  A.  I believe she shares a restroom with the

03:53  11  station captain, the -- typically officer quarters, the

03:54  12  restrooms -- they call it a Jack and Jill.  The

03:54  13  restroom is in between the office quarters.

03:54  14  Q.  And would that include shower facilities?

03:54  15  A.  Yes.

03:54  16       I don't know specifically.  I believe I

03:54  17  heard her tell me that she just shares the restroom

03:54  18  attached to her office.

03:54  19  Q.  Okay.  And how about Terry Salinas?  Was she

03:54  20  assigned to station 54 as a captain?

03:54  21  A.  I have only known her as a captain at

03:54  22  station 99.

03:54  23  Q.  Did she complete some sort of internship at

03:54  24  station 54?

03:54  25  A.  It's possible.

## Page 183

03:54  1   Q.  How about Graciela Oliveras?  Does she work

03:55  2   at station 54?

03:55  3   A.  I think she was assigned in to 92, but debit

03:55  4   date, overtime day --

03:55  5   Q.  She might have filled in there?

03:55  6   A.  Yes.

03:55  7   Q.  How about Tina Mulligan?

03:55  8   A.  She is assigned to 92.

03:55  9   Q.  And Laurie Woods?

03:55  10  A.  Assigned to 99.  She is off injured.

03:55  11  Q.  Okay.  So sitting here today, can you

03:55  12  identify any women firefighters, capital letter, who

03:55  13  have been assigned to station 54 permanently since

03:55  14  2010?

03:55  15  A.  Well, I wasn't there from 2010 to 2015.  I

03:55  16  would have to go back and look to see.  I can't -- I

03:55  17  don't know who was assigned there from 2010 to 2015.

03:56  18  Q.  Okay.  That's fair; that's fair.  I forgot

03:56  19  about that.

03:56  20       And is the prohibition against men

03:56  21  using the women's dorm and bathroom at station 54 still

03:56  22  in place?

03:56  23  A.  Yes.

03:56  24  Q.  Is the inspection policy still in place?

03:56  25  A.  Yes.

## Page 184

03:56  1   Q.  Have you received any reports of men using

03:56  2   the women's dorm since you have been back as district

03:56  3   chief?

03:56  4   A.  I heard them talking about -- when they have

03:56  5   extra -- extra personnel, extra rank and there are no

03:56  6   women on duty, you know, they said:  Hey, chief, we are

03:56  7   out of beds.  We have got nowhere for anyone to go.

03:57  8       Huh.  You know the history.

03:57  9       This is what I told the chiefs:  You

03:57  10  know the history.  I understand the logistical problem

03:57  11  that you have got.  I tell you what, I guess you have

03:57  12  got to do what you have got to do, but make sure -- if

03:57  13  that's the case, make sure everything is cleaned up to

03:57  14  your satisfaction.  But there -- there won't be any TV

03:57  15  watching.  This is just for extra rank, officers

03:57  16  when -- if you don't have a bed somewhere for this

03:57  17  person to quarter for the night, I guess you have got

03:58  18  to do what you have got to do.

03:58  19  Q.  How many times has that issue come up?

03:58  20  A.  I don't know.

03:58  21  Q.  It was brought to your attention once?

03:58  22  A.  Yes, you know.

03:58  23  Q.  And what was your understanding of why there

03:58  24  weren't enough beds?

03:58  25  A.  Well, I mean, there -- there are only so

## Page 185

03:58 1 many beds in the fire station. You know, and if they

03:58 2 have interns, okay -- now the interns work days. Back

03:58 3 then the interns were on shift, okay? So you might

03:58 4 have two or three interns, you know. These are new

03:58 5 personnel learning the job, okay? They are just --

03:58 6 they are just out of beds. We only have a certain

03:59 7 limited number of beds.

03:59 8     Q. So your understanding is that there has been

03:59 9 situations where all the bed -- all the beds in the

03:59 10 men's dorms have been fully occupied?

03:59 11     A. Yes.

03:59 12     Q. And that's just come up since you returned

03:59 13 as district chief, right?

03:59 14     A. Right.

03:59 15     Q. Correct?

03:59 16     A. Right.

03:59 17     Q. Okay. Now, I am going to shift my focus to

03:59 18 talk about the day that the racial and gender slurs

03:59 19 were found in the women's dorm at station 54?

03:59 20     A. Okay.

03:59 21     Q. That was July 7th of 2009, right?

03:59 22     A. I don't recall what date.

03:59 23     Q. Okay. Does that sound about right?

04:00 24     A. Yes.

04:00 25     Q. Okay. Are you looking at the log for

## Page 186

04:00 1 July 7th of 2009?

04:00 2     A. Yes.

04:00 3     Q. In exhibit 5?

04:00 4     A. Yep.

04:00 5     Q. Does that reflect that activity?

04:00 6     A. Yeah. That's the basics, yes.

04:01 7     Q. And after the racial and gender slurs were

04:01 8 found in the women's dorm, HPD conducted an

04:01 9 investigation, right?

04:01 10     A. Yes, from OIG.

04:01 11     Q. I assume that you didn't have any role in

04:01 12 terms of the investigating?

04:01 13     A. Correct, right.

04:01 14     Q. Were you ever kept apprised as to the status

04:01 15 of the investigation?

04:01 16     A. No.

04:01 17     Q. Did anyone from the fire department speak to

04:01 18 you about the status of the investigation?

04:01 19     A. No. I would ask chief Snell: Have you

04:02 20 heard anything?

04:02 21         And he would occasionally talk to the

04:02 22 investigation group, but he said: No, you know, they

04:02 23 are still investigating.

04:02 24     Q. Okay. Did you ever become aware of the

04:02 25 outcome of that investigation?

## Page 187

04:02 1     A. Certainly never saw anything, but I believe

04:02 2 I -- I heard, probably from chief Snell and the news,

04:02 3 was that the investigation did not identify the person

04:02 4 responsible.

04:02 5     Q. And based on your -- based on your

04:02 6 description of the process earlier, the -- am I correct

04:03 7 that the fire chief would have been made aware through

04:03 8 OIG of the findings of the investigation?

04:03 9     A. Now, from OIG, I don't know, because OIG

04:03 10 reports to the mayor. And so....

04:03 11     Q. In 2009, correct?

04:03 12     A. Yes, right.

04:03 13         So I don't believe they would -- I

04:03 14 don't believe OIG would give the fire chief the results

04:03 15 of the investigation.

04:03 16     Q. Okay. But you never learned the results of

04:03 17 the investigation, right?

04:03 18     A. No details, no.

04:03 19     Q. Were you ever directed to take any sort of

04:03 20 action or institute any policies in response to the

04:03 21 outcome of the OIG investigation?

04:03 22     A. No.

04:03 23     Q. Were there any steps taken to prevent access

04:03 24 to the women's dorm and bathroom in the future as a

04:03 25 result of the investigation?

## Page 188

04:04 1     A. No.

04:04 2     Q. And at some point there was a roll call

04:04 3 where -- when Ms. Draycott returned to station 54 after

04:04 4 the investigation. Is that right?

04:04 5     A. Yes. Call it a roll call, a meeting, sure.

04:04 6     Q. Okay. And this was in about January of

04:04 7 2010?

04:04 8     A. Okay. I don't recall -- I don't recall the

04:04 9 date, but --

04:04 10     Q. Were you still the district chief over ARFF

04:04 11 in January of 2010?

04:04 12     A. Yes.

04:04 13     Q. And Ms. Draycott was off of work for some

04:04 14 period of time during the investigation and then

04:04 15 returned at some date?

04:04 16     A. Yes.

04:04 17     Q. Were you -- did you have any role in the

04:05 18 decision for Ms. Draycott to return to station 54 in

04:05 19 January of 2010?

04:05 20     A. No. I was just informed that -- she left

04:05 21 and came back several times.

04:05 22         But no. I was informed by probably

04:05 23 chief Snell that they -- you know, that they are going

04:05 24 to put her back to work at 54.

04:05 25     Q. Did you provide any input into that

Page 189

04:05  1  decision?

04:05  2  **A.  Oh, no, no.**

04:05  3  Q.  Do you know who made that decision?

04:05  4  **A.  What I remember from chief Snell was, hey,**

04:05  5  **you know -- you know, City legal advises, you know, the**

04:05  6  **fire department that this is -- this is what needs to**

04:06  7  **happen.**

04:06  8  Q.  Were you ever asked for your opinion?

04:06  9  **A.  No, I was not asked for my opinion.  I did**

04:06  10  **offer a question:  So what has changed?**

04:06  11  **And well, you know, the -- this is --**

04:06  12  **this is the decision, and so now we have to implement**

04:06  13  **it.**

04:06  14  Q.  Who did you ask that question of:  Chief

04:06  15  Snell?

04:06  16  **A.  Chief Snell.**

04:06  17  Q.  And he didn't provide you with any input,

04:06  18  right?

04:06  19  **A.  No.  He took it as a rhetorical question.**

04:06  20  Q.  Did you express any concerns with

04:06  21  Ms. Draycott returning to station 54 to chief Snell?

04:06  22  **A.  No.**

04:07  23  (Exhibit 8 marked.)

04:08  24  Q.  Chief McAteer, I am showing you what's been

04:08  25  marked as exhibit 8 to your deposition.  For

Page 190

04:08  1  identification purposes it's HOU 5518 through 5527.

04:08  2  **A.  All right.**

04:08  3  Q.  Do you recognize this document?

04:08  4  **A.  Yeah, vaguely.  I know that's my signature.**

04:08  5  Q.  Is this your affidavit regarding --

04:08  6  regarding Ms. Draycott's return to work on January 13th

04:08  7  of 2010?

04:08  8  **A.  Oh, I would have to read it and see.**

04:08  9  Q.  Okay.  Well, why don't you take time to read

04:08  10  through the first four pages.

04:11  11  **A.  Okay.**

04:11  12  Q.  Have you had a chance to review exhibit 8?

04:11  13  **A.  Yes.**

04:11  14  Q.  Does this appear to be a true and accurate

04:11  15  copy of your affidavit from March 26 of 2010?

04:11  16  **A.  May 26.**

04:11  17  Q.  I am sorry.  May 26 of 2010.  Thank you.

04:11  18  **A.  You are trying to trick me.  I am kidding.**

04:11  19  Q.  And does reviewing the first four pages of

04:11  20  exhibit 8 help refresh your memory --

04:11  21  **A.  Yes.**

04:11  22  Q.  -- in terms of the roll call that was --

04:11  23  that happened when Ms. Draycott sought to return to

04:12  24  work and some of the issues that came up during that?

04:12  25  **A.  Right.**

Page 191

04:12  1  Q.  Okay.  So if we look at 5519 --

04:12  2  **A.  Okay.**

04:12  3  Q.  -- it appears that there was a meeting on

04:12  4  January 7th that you attended with the crew of 54 A as

04:12  5  well as several members of command staff.  Is that

04:12  6  fair?

04:12  7  **A.  Yes.**

04:12  8  Q.  And the crew raised some concerns about

04:12  9  Ms. Draycott's return to work during that meeting,

04:12  10  correct?

04:12  11  **A.  Yes.**

04:12  12  Q.  And you write here that the main concern of

04:12  13  the crew was that the criminal investigation had not

04:12  14  been completed and there was no named suspect, right?

04:12  15  **A.  Yes.**

04:12  16  Q.  In response to that concern, was the crew

04:12  17  given any update as to the status of the investigation?

04:12  18  **A.  Not that I recall.**

04:12  19  Q.  How did the command staff respond to that

04:13  20  concern?

04:13  21  **A.  I believe -- I believe it's in here, that it**

04:13  22  **said the law requires that she be placed back to her**

04:13  23  **last work assignment, something -- it may not be the**

04:13  24  **exact words.**

04:13  25  Q.  Okay.

Page 192

04:13  1  **A.  But I believe chief Boriskie said that the**

04:13  2  **law requires that she be placed back here.**

04:13  3  Q.  Was there any specific response to the

04:13  4  concern about the ongoing investigation that you

04:13  5  remember?

04:13  6  **A.  No.  I mean, I know the -- a concern was**

04:14  7  **voiced, but it was really kind of waved off.**

04:14  8  Q.  By the command staff?

04:14  9  **A.  Yes.**

04:14  10  Q.  Okay.  And were you willing to accept

04:14  11  Ms. Draycott back notwithstanding the ongoing

04:14  12  investigation?

04:14  13  **A.  Oh, yes.  I follow orders.**

04:14  14  Q.  And then the -- the next sentence says:

04:14  15  Draycott had voiced that station 54 A was a hostile

04:14  16  work environment, and they could not understand why she

04:14  17  would be placed back into the same environment that she

04:14  18  had criticized.

04:14  19  Do you see that?

04:14  20  **A.  Which paragraph?**

04:14  21  Q.  I am sorry.  That was the next sentence from

04:14  22  where we read.  It's the third full paragraph, about

04:14  23  halfway down.

04:14  24  **A.  Okay.  So it's -- didn't understand why she**

04:14  25  **is not being shielded -- oh, okay.  It's up here in the**

Page 193

04:14  1  paragraph.

04:14  2      Q.  Had voiced?

04:15  3      A.  Oh, okay.  Had voiced that 54 A was a

04:15  4  hostile work environment and they couldn't understand

04:15  5  why she would be placed back into the same environment

04:15  6  that she criticized.

04:15  7          That was my understanding of the crew's

04:15  8  concerns.

04:15  9      Q.  That was the crew's concerns, okay.  And

04:15 10  when you say hostile work environment, is that a

04:15 11  reference to her complaints about the misuse of the

04:15 12  dorm and the bathroom that we have been talking about

04:15 13  today?

04:15 14      A.  Well, and I think there had been some sort

04:15 15  of complaint filed saying hostile work environment.

04:15 16  And I don't remember what all was said on the media,

04:15 17  but it seemed like Draycott and Keyes and their lawyer,

04:16 18  you know, made a lot of public allegations in the

04:16 19  media.

04:16 20          I think that's kind of what the crew

04:16 21  was -- you know, hey, you know, she said hostile work

04:16 22  environment.  Aren't there some laws that require some

04:16 23  sort of separation or you know, either -- either the

04:16 24  one bringing the complaint or the other members, you

04:16 25  know, get separated, temporary work location change?

Page 194

04:16  1      Q.  Okay.  So what was your understanding of

04:16  2  what the hostile work environment was that Ms. Draycott

04:16  3  had raised, that the crew was concerned about her

04:16  4  returning?

04:16  5      A.  You know, bathroom, dorm, you know, the

04:17  6  speaker.

04:17  7          At some point -- I don't remember

04:17  8  exactly when -- there was a complaint that people don't

04:17  9  talk to me.  They are avoiding me and saying that

04:17 10  contributed to the hostile work environment.

04:17 11      Q.  And did this have to do with Ms. Draycott's

04:17 12  internal and OIG complaints regarding the conditions of

04:17 13  the women's dorm and bathroom?

04:17 14      A.  I am sorry?  Did what have to do with her

04:17 15  complaints?

04:17 16      Q.  You just -- I asked you what your

04:17 17  understanding of the hostile work environment was that

04:17 18  the crew was concerned about.

04:17 19      A.  My understanding of what her complaints

04:17 20  that -- describing a hostile work environment, right,

04:17 21  so that's what I described, what I remember as being

04:18 22  her complaints.

04:18 23      Q.  Those were -- she made those complaints both

04:18 24  internally and also to OIG?

04:18 25      A.  Yes.

Page 195

04:18  1      Q.  Is that correct?

04:18  2      A.  Right.

04:18  3      Q.  And were you willing to accept her back

04:18  4  notwithstanding those complaints?

04:18  5          MS. COHEN:  Objection; asked and

04:18  6  answered.

04:18  7      A.  Yes.  If the fire chief says she is to be

04:18  8  transferred back, then that's what we do.

04:18  9  BY MR. MONTEIRO:

04:18 10      Q.  You go on to say in your statement that the

04:18 11  crew did not seem satisfied with chief Boriskie's

04:18 12  answer in response to their concerns?

04:18 13      A.  Right.

04:18 14      Q.  How was that -- how did the crew express

04:18 15  that they were unsatisfied?

04:18 16      A.  I think in general grumbling, oh, that's not

04:18 17  right.

04:18 18      Q.  Was there anyone in particular that was

04:19 19  expressing concern?

04:19 20      A.  Not that I recall.  I can't remember who

04:19 21  exactly said what.

04:19 22      Q.  Okay.  Were you -- in light of the fact that

04:19 23  the crew did not seem satisfied, were you concerned

04:19 24  that there could be a problem when Ms. Draycott

04:19 25  returned in a week?

Page 196

04:19  1      A.  My concern was we haven't identified

04:19  2  anybody.  We are going to put her right back in the

04:19  3  same environment, location, same crew.  What's changed?

04:19  4  So what if this same thing happens again?

04:19  5      Q.  Well, you -- you told me a few minutes ago

04:19  6  that you were ready to follow orders and accept her

04:19  7  back, right?

04:19  8      A.  Well, right.

04:19  9      Q.  Okay.  So even though you had some concerns,

04:20 10  it sounds like, you were ready to bring her back and

04:20 11  accept her back, given the fire chief's orders?

04:20 12      A.  Those were internal concerns.

04:20 13      Q.  Internal to yourself?  Is that --

04:20 14      A.  Yeah.  When you say did you have any

04:20 15  concerns, yeah, in my mind and thinking through this.

04:20 16      Q.  So the crew raises their concerns at this

04:20 17  meeting on January 7th, and you say in your affidavit

04:20 18  that they didn't seem satisfied with the fire chief's

04:20 19  answer, that they should treat Ms. Draycott like any

04:20 20  other crew member?

04:20 21      A.  Right.

04:20 22      Q.  Were you concerned that there could be a

04:20 23  problem when she comes back in a week's time in light

04:20 24  of the crew's concerns?

04:20 25      A.  Okay.  Again, if I am given a directive that

## Page 197

04:21 1 she is going to be placed back at this fire station,

04:21 2 that's what we are going to do. You know, they --

04:21 3 that's an order. There is no decision to be made, you

04:21 4 know. That is the decision.

04:21 5 Q. And you expected the crew to follow that?

04:21 6 A. Yes, yeah. We can have, you know, concerns

04:21 7 in our minds, but that doesn't -- that does not affect

04:21 8 are we going to carry out this order.

04:21 9 Absolutely we are.

04:21 10 Q. And did you speak with your captains -- I

04:21 11 guess it was captain Williamson and senior captain

04:21 12 Tamez -- separately prior to Ms. Draycott's return?

04:21 13 A. No, because I thought the fire chief and the

04:21 14 command staff had already given the order. This is the

04:22 15 way it's going to be.

04:22 16 Q. Did you have any concerns that the crew

04:22 17 might treat Ms. Draycott poorly because of her --

04:22 18 because of her OIG complaints?

04:22 19 A. No.

04:22 20 Q. Well, did you -- so there was the

04:22 21 January 7th meeting, right, prior to the roll call, and

04:22 22 then there was a roll call on January 13th?

04:22 23 A. Yes.

04:22 24 Q. Do you know if there were any meetings in

04:22 25 between that time?

## Page 198

04:22 1 A. Not that I was aware of.

04:22 2 Q. You didn't attend any meetings?

04:23 3 A. No.

04:23 4 Q. Was there any conversations with -- between

04:23 5 you and command staff in terms of how the January 13th

04:23 6 return to work would play out -- Ms. Draycott's return

04:23 7 to work would play out?

04:23 8 A. No. I was just told to be there as an

04:23 9 attendee.

04:23 10 Q. Did you know what the -- and you knew that

04:23 11 the fire chief was going to be there, right?

04:23 12 A. Yes.

04:23 13 Q. And you knew that Dr. Finney was going to be

04:23 14 there?

04:23 15 A. I didn't know who all from the command

04:23 16 staff.

04:23 17 Q. You knew some command staff was going to be

04:23 18 there?

04:23 19 A. Yes.

04:23 20 Q. Including the fire chief?

04:23 21 A. Right, because....

04:23 22 Q. Had anyone -- had anyone communicated to you

04:23 23 what the -- what the plan was for the 13th prior to you

04:23 24 coming in station 54?

04:24 25 A. Chief Boriskie told -- I must have been in

## Page 199

04:24 1 chief Snell's office one day. Boriskie said: Look,

04:24 2 this is what I am thinking, okay? We -- we go out and

04:24 3 talk to just the shift, give them an opportunity to

04:24 4 voice their concerns, you know. Sometimes maybe if

04:24 5 they -- they never had a chance to get anything off

04:24 6 their chest. And then secondly, when -- when Jane

04:24 7 comes back, we have another meeting, give both Jane and

04:24 8 the crew an opportunity to voice their concerns,

04:24 9 because they have never really, you know, been given

04:24 10 that opportunity, you know, hey, this is what's really

04:25 11 bugging me that you guys do, okay? Well, gee, this is

04:25 12 what's really bugging us about what you have been

04:25 13 doing, okay?

04:25 14 So that was -- that's what his -- what

04:25 15 chief Boriskie stated was his intent, was just try

04:25 16 to -- let's see if when people get things off their

04:25 17 chest, maybe now we can get along.

04:25 18 Q. What was your reaction to the chief's plan?

04:25 19 A. I don't remember specifically, but you know,

04:25 20 when the fire chief says this is what we are going to

04:25 21 do, well, that's what we are going to do.

04:25 22 Q. But did he ask you for input?

04:25 23 A. No.

04:25 24 Q. Did you have concerns about his plan,

04:25 25 whether or not you expressed them?

## Page 200

04:25 1 A. I don't remember exactly. I remember just

04:26 2 kind of thinking, well, I don't know. It could work.

04:26 3 It could go horribly wrong.

04:26 4 Q. That was a -- that was a possible outcome in

04:26 5 your mind?

04:26 6 A. Yes.

04:26 7 Q. Why did you think that was a potential

04:26 8 outcome?

04:26 9 A. Which? What? It could work --

04:26 10 Q. That it could go horribly wrong.

04:26 11 A. Well, you know, you have a number of crew

04:26 12 saying what could be construed as mean things when they

04:26 13 were told to speak their concerns. If it's interpreted

04:26 14 as they are mean, they are ganging up on me, then

04:27 15 that's how it could go wrong.

04:27 16 Q. And did you -- I forget. You did not

04:27 17 express that to chief Boriskie. Is that correct?

04:27 18 A. Correct.

04:27 19 Q. And is that essentially what happened, that

04:27 20 it went horribly wrong and --

04:27 21 A. Yeah, I think the outcome was probably not

04:27 22 what chief Boriskie was hoping for.

04:27 23 Q. Ms. Draycott felt like she had been ganged

04:27 24 up on. Is that right?

04:27 25 MS. COHEN: Objection; calls for

Page 201

04:27 1 speculation.

04:27 2 BY MR. MONTEIRO:

04:27 3 Q. Do you know if Ms. Draycott felt like she

04:27 4 had been ganged up on?

04:27 5 A. She never spoke to me, so I don't know what

04:28 6 she was thinking. I think that's what I have read

04:28 7 somewhere, maybe one of complaints, maybe a lawsuit. I

04:28 8 don't remember.

04:28 9 Q. Let's go back to exhibit 8, and if we can

04:28 10 look at the page marked 5519 --

04:28 11 A. Okay.

04:28 12 Q. -- and the bottom paragraph.

04:28 13 A. Okay.

04:28 14 Q. The last sentence which continues onto the

04:28 15 next page, it says: Quote, I believe that captain

04:28 16 Williamson thought that by presenting an organized

04:28 17 argument, then the case for not bringing Draycott back

04:28 18 to station 54 until the investigation was complete

04:28 19 would be more compelling, period, quote?

04:28 20 A. Okay.

04:28 21 Q. Did I read that right?

04:28 22 A. Yes.

04:28 23 Q. So was -- did captain Williamson verbally

04:29 24 oppose Ms. Draycott's return to station 54 that

04:29 25 morning?

Page 202

04:29 1 A. I think that was probably the gist of it. I

04:29 2 don't -- a lot of time has gone by. I don't remember

04:29 3 exactly what -- what he said, but -- but he said he had

04:29 4 written some notes down in what came to be described as

04:29 5 a letter so he would stay on topic.

04:29 6 And so that last sentence is kind of my

04:29 7 recollection of, you know -- talking to Williamson

04:29 8 afterward, you know, that was -- that's what he told me

04:30 9 his intent: You know -- you know, my job is to

04:30 10 represent the whole crew, and my crew has concerns

04:30 11 that --

04:30 12 Q. I am sorry. Are you explaining -- are you

04:30 13 talking about what Williamson told you?

04:30 14 A. Yes, yes.

04:30 15 Q. Okay, go ahead. I wanted to make sure I

04:30 16 understand.

04:30 17 A. Yeah, sorry. I was trying to paraphrase

04:30 18 Williamson, saying my job is to represent my crew here

04:30 19 at station 54. And I don't know if maybe some of the

04:30 20 things I say might be persuasive or convincing that,

04:30 21 oh, hey, I guess we hadn't thought about that or -- but

04:30 22 his -- his crew had concerns.

04:30 23 And essentially he didn't feel like

04:31 24 Ms. Draycott could come back -- should come back while

04:31 25 the investigations into her OIG complaints were open.

Page 203

04:31 1 Is that correct?

04:31 2 A. I would say yes.

04:31 3 Q. Now, you say he made an argument -- or he

04:31 4 presented -- he thought by presenting an organized

04:31 5 argument -- was it your sense that he was trying to

04:31 6 persuade command staff that Ms. Draycott should not be

04:31 7 brought back until the investigation into her

04:31 8 complaints were resolved?

04:31 9 A. That was my impression, yes.

04:31 10 Q. Was he also trying to persuade -- was it

04:31 11 your impression he was also trying to persuade

04:31 12 Ms. Draycott that she should not come back to work

04:32 13 while her complaints were pending?

04:32 14 A. I don't know that -- I don't know that it

04:32 15 was directed at Draycott as much as it was trying to

04:32 16 restate and summarize the situation: You know, here we

04:32 17 are. Did this make any sense to anybody? That's --

04:32 18 Q. He had raised the concerns -- he had raised

04:32 19 the concerns the week before, right, outside the

04:32 20 presence of Ms. Draycott?

04:32 21 A. Yes.

04:32 22 Q. Okay.

04:32 23 A. But I don't think he felt like he was

04:32 24 allowed time or opportunity, so at any rate, I guess he

04:32 25 organized his thoughts and -- and they were -- the crew

Page 204

04:33 1 was -- oh, this is an opportunity to voice your

04:33 2 concerns.

04:33 3 Q. Who told him that?

04:33 4 A. Chief Boriskie.

04:33 5 Q. During the -- during the roll call on

04:33 6 January 13th or after the roll call?

04:33 7 A. I don't remember exactly what he said on

04:33 8 the 13th, but the earlier, the 7th or the first meeting

04:33 9 just with command staff and the crew.

04:33 10 Q. Okay.

04:33 11 A. Before that, he told me and Snell, maybe

04:33 12 Longoria: This is what I am thinking the intent for

04:33 13 this is.

04:33 14 I believe on that meeting with the

04:33 15 shift, you know: Hey, guys, I know you-all really

04:33 16 haven't had an opportunity to voice your concerns. You

04:33 17 know, everybody else gets to talk, but you-all can't.

04:33 18 So -- so you know, there we are.

04:34 19 Q. If not for Ms. Draycott's complaints which

04:34 20 resulted in these investigations, do you think

04:34 21 Williamson would have welcomed Ms. Draycott back?

04:34 22 MS. COHEN: Objection; calls for

04:34 23 speculation.

04:34 24 BY MR. MONTEIRO:

04:34 25 Q. Based on what he said -- based on what he

Page 205

04:34  1  said at the roll call?

04:34  2  A. Well, that's taking away a lot of -- if you

04:34  3  wave the wand and say if there had never been any

04:34  4  complaints, then, no, he would not have objected. When

04:34  5  I say complaints, I mean, okay -- sorry. I am talking

04:34  6  in a circle.

04:34  7  If there were no history of the

04:35  8  bathrooms, the dorm, the speaker, if none of that had

04:35  9  happened, then no, Williamson would have no reason to

04:35  10  object, you know, to Draycott being there or coming

04:35  11  back.

04:35  12  MS. COHEN: Can we take a short break?

04:35  13  MR. MONTEIRO: Sure.

04:35  14  THE VIDEOGRAPHER: 4:34, off record.

04:35  15  (Recess from 4:35 to 4:45 p.m.)

04:45  16  THE VIDEOGRAPHER: 4:44, back on

04:45  17  record, disk 6.

04:45  18  BY MR. MONTEIRO:

04:45  19  Q. Chief, were you aware of the City hiring two

04:45  20  law firms to conduct an assessment of the fire

04:45  21  department in 2009?

04:45  22  A. I don't remember anything about that.

04:45  23  Q. You didn't have any involvement with that?

04:45  24  A. No.

04:45  25  Q. Okay. Do you remember receiving the

Page 206

04:45  1  assessment from the law firms?

04:45  2  A. Not that I recall.

04:45  3  Q. Were you made aware of any of the

04:45  4  recommendations that the law firm has made as part of

04:45  5  their assessment?

04:45  6  A. Now, that -- no, I don't remember. Now,

04:46  7  that would be logical if that -- if that were

04:46  8  communicated to the fire chief and he would communicate

04:46  9  that down, but I don't recall anything like that.

04:46  10  I am sorry. Remind me, when did you leave

04:46  11  ARFF, in 2010, November?

04:46  12  A. September or October 2010.

04:46  13  Q. And then you returned in?

04:46  14  A. July 2015.

04:46  15  Q. 2015. And if I tell you that the assessment

04:46  16  was involving the fire department's EEO practices, does

04:46  17  that help you refresh your memory in terms of whether

04:46  18  you had any involvement in that or learned of those

04:46  19  results?

04:46  20  A. No. That's not ringing a bell.

04:47  21  Q. And what is the HFD pipes and drums

04:47  22  organization?

04:47  23  A. It's a bagpipe band.

04:47  24  Q. How is it -- how is the organization run?

04:47  25  A. It's a 501(c)3. It's not a City sponsored,

Page 207

04:47  1  funded.

04:47  2  Q. Does it have a board?

04:47  3  A. Yeah. There are officers that -- I think I

04:47  4  am the treasurer.

04:47  5  Q. Are you the -- are you the highest ranking

04:47  6  HFD official involved with the pipes and drums

04:47  7  organization?

04:47  8  A. Right now I am -- well, no, sorry, I am not.

04:48  9  There is an executive assistant chief bass drummer.

04:48  10  Q. How about in 2010?

04:48  11  A. 2010, let's see. We were two or three -- at

04:48  12  least two chiefs, district chiefs. I was one of

04:48  13  them.

04:48  14  Q. Who was the other?

04:48  15  A. Richard Cole and -- you know, I don't

04:48  16  remember when Hunter got promoted.

04:48  17  Q. And what was your role in the organization

04:48  18  in 2010?

04:48  19  A. Bagpiper.

04:48  20  Q. You are a bagpiper?

04:48  21  A. Yes.

04:48  22  Q. Did you have any sort of role on the board,

04:49  23  as well, in 2010?

04:49  24  A. Well, that's what I am saying. I may be the

04:49  25  treasurer, but Hunter really kind of does all that.

Page 208

04:49  1  Q. And did the pipes and -- pipes and drums

04:49  2  organization sell a calendar to raise funds in 2010?

04:49  3  A. There was a calendar project. I don't

04:49  4  remember when it was.

04:49  5  That's already -- already been

04:49  6  investigated.

04:49  7  Q. What was your role with respect to the --

04:49  8  well, was this the only time that a calendar was sold

04:49  9  by the pipes and drums organization?

04:49  10  A. Yes.

04:49  11  Q. What was your role with respect to the

04:49  12  selling of the calendar, if any?

04:49  13  A. Really none. I got a call from Hunter:

04:49  14  Hey, Manny wants to do a calendar, and you know, it

04:50  15  would be similar to the firefighter calendar.

04:50  16  Okay.

04:50  17  Q. What was your understanding of the

04:50  18  firefighter calendar?

04:50  19  A. Well, you know, the firefighter calendar --

04:50  20  I don't know. It's got guys, you know, muscular,

04:50  21  and -- that's what I was telling him: Well, who is --

04:50  22  who do they think they are going to take pictures of,

04:50  23  because we are not -- we are not calendar boys.

04:50  24  Q. You didn't volunteer?

04:50  25  A. No.

## Page 209

04:50  1    Q.  So who ultimately -- what were the images

04:50  2  that ended up on the calendar?

04:50  3    **A.  Oh, Manny took pictures of Heather**

04:50  4  **what's-her-name, you know, wearing a short kilt and**

04:50  5  **so....**

04:50  6    Q.  Who is Manny, by the way?

04:50  7    **A.  Manny Chavez.  He was active in the union.**

04:51  8  **At the time he was probably a captain, yeah, probably a**

04:51  9  **captain.**

04:51 10    Q.  Who is Heather?

04:51 11    **A.  Firefighter.  She is a dispatcher now.**

04:51 12    Q.  Was she the only person who was depicted in

04:51 13  the calendar?

04:51 14    **A.  Yes.**

04:51 15        (Exhibit 9 marked.)

04:51 16    Q.  Chief, I am showing you what's been marked

04:51 17  as deposition exhibit 9.

04:51 18        The images on exhibit 9, are those

04:51 19  the images -- are those two of the images from the

04:52 20  calendar that we have been discussing?

04:52 21    **A.  Yes.**

04:52 22    Q.  Okay.  And were you -- when did you become

04:52 23  aware of the content of the calendar prior to it being

04:52 24  sold?

04:52 25    **A.  When it was being sold.  You know, I**

## Page 210

04:52  1  **didn't -- I didn't see it before they had been ordered**

04:52  2  **and being sold.**

04:52  3    Q.  Were you aware that -- were you aware of the

04:52  4  general nature of the photographs on the calendar prior

04:52  5  to --

04:52  6    **A.  No.**

04:52  7    Q.  -- being sold?

04:52  8    **A.  Nope.  Hunter just said:  You know, Manny**

04:52  9  **wants to do a calendar, and you know, it could be a**

04:52 10  **fundraiser for us.**

04:52 11    Q.  Did you understand, though, that it would be

04:53 12  pictures of women similar to what's reflected in

04:53 13  exhibit 9?

04:53 14    **A.  No.**

04:53 15    Q.  You never knew that?

04:53 16    **A.  Correct.**

04:53 17    Q.  Okay.  You said there was an investigation,

04:53 18  right?

04:53 19    **A.  Yes.**

04:53 20    Q.  Into the calendar?

04:53 21    **A.  Yes.**

04:53 22    Q.  What was the outcome of the investigation?

04:53 23    **A.  Well, it was not sustained against me.**

04:53 24    Q.  So --

04:53 25    **A.  And I am not notified of outcomes of other**

## Page 211

04:53  1  **investigations.**

04:53  2    Q.  Were you interviewed?

04:53  3    **A.  Yes.**

04:53  4    Q.  Did you provide a statement?

04:53  5    **A.  Yes.**

04:53  6    Q.  Do you know who else -- are you aware of

04:53  7  anyone else who was disciplined?

04:53  8        MS. COHEN:  Objection; mischaracterizes

04:53  9  prior testimony.

04:54 10  BY MR. MONTEIRO:

04:54 11    Q.  You can answer.

04:54 12    **A.  Well, like I said, I am not notified of**

04:54 13  **outcomes of investigations.**

04:54 14    Q.  Now, this came out right around the time --

04:54 15  the calendar came out right around the time that

04:54 16  Ms. Draycott came back to work; is that right, at

04:54 17  station 54?  Is that correct?

04:54 18    **A.  I really don't remember.**

04:54 19        **Do you know when the complaint -- when**

04:54 20  **I gave a statement?  I don't remember.**

04:54 21    Q.  Well, the article, at least, says

04:54 22  January 20th of 2010?

04:54 23    **A.  Okay.**

04:54 24    Q.  So that would have been -- at least the

04:54 25  article would have been about a week after Ms. Draycott

## Page 212

04:54  1  came back to station 54.  Is that fair?

04:54  2    **A.  Okay.  So it was -- it was between -- they**

04:55  3  **have a -- they have a month to serve a formal**

04:55  4  **complaint.  They have six months to investigate it.  So**

04:55  5  **it seemed like I remember they got on it fairly quick,**

04:55  6  **so I probably gave a statement -- let's see.**

04:55  7        **You are saying this was -- this article**

04:55  8  **was January?**

04:55  9    Q.  That article was January 20th, and it's --

04:55 10    **A.  There you go, okay.**

04:55 11        **So give it a couple weeks for the**

04:55 12  **complaint to be filed and assigned.  It was probably a**

04:55 13  **month, month to six weeks after January 20 when I**

04:55 14  **probably gave a statement.**

04:55 15    Q.  Do you know why the complaint was not

04:55 16  sustained against you?  Were you notified?

04:56 17    **A.  No, they don't really say.  They just give**

04:56 18  **me a -- send me a letter saying complaint**

04:56 19  **such-and-such, you know, has been investigated.  The**

04:56 20  **ruling, the outcome, whatever they call it, is not**

04:56 21  **sustained.**

04:56 22    Q.  And this article, at least, is reporting

04:56 23  that this calendar has sold out as of January 20th,

04:56 24  2010.  Is that consistent with your memory?  Did you

04:56 25  sell out the calendar?

## Page 213

| | | |
|---|---|---|
| 04:56 | 1 | A. I don't recall if there were any left, but |
| 04:56 | 2 | it probably did sell out. |
| 04:56 | 3 | Q. And Ms. Draycott also was returning to |
| 04:56 | 4 | station 54 in January 2010 after about six months of |
| 04:56 | 5 | leave. Is that right? |
| 04:57 | 6 | A. That's about right. |
| 04:57 | 7 | Q. We talked about the roll call that happened |
| 04:57 | 8 | in January 2010? |
| 04:57 | 9 | A. Right, right. |
| 04:57 | 10 | Q. Now, did you -- at some point did you become |
| 04:57 | 11 | aware of Ms. Draycott's arrest for shoplifting in 2010? |
| 04:57 | 12 | A. Yes. |
| 04:57 | 13 | Q. Did you -- how did you become aware? |
| 04:57 | 14 | A. I know it was on the evening news. |
| 04:57 | 15 | Q. How about in your official capacity? Did |
| 04:57 | 16 | you have any involvement in -- in the investigation |
| 04:57 | 17 | into her arrest? |
| 04:57 | 18 | A. Oh, no, no, no. |
| 04:57 | 19 | Q. Were you involved in any conversations about |
| 04:58 | 20 | any action that the fire department would take against |
| 04:58 | 21 | Ms. Draycott because of her arrest? |
| 04:58 | 22 | A. No. |
| 04:58 | 23 | Q. Do you know what the -- what the outcome -- |
| 04:58 | 24 | do you know of any action that the fire department took |
| 04:58 | 25 | against Ms. Draycott because of her arrest? |

## Page 214

| | | |
|---|---|---|
| 04:58 | 1 | A. No, I'm not aware. |
| 04:58 | 2 | Q. You are weren't made aware? |
| 04:58 | 3 | A. No. |
| 04:58 | 4 | Q. What is the phase down requirement, if you |
| 04:58 | 5 | know? |
| 04:58 | 6 | A. Okay. So if you are eligible for a service |
| 04:58 | 7 | retirement and you have accumulated benefit time on the |
| 04:58 | 8 | books, then you could sign up with the HR and the |
| 04:58 | 9 | pension office to -- to phase down. |
| 04:58 | 10 | So basically, you know, you are making |
| 04:59 | 11 | a decision to retire, and they use your accumulated |
| 04:59 | 12 | benefit time, each of your assigned workdays, until |
| 04:59 | 13 | they use it down to zero. So you keep getting a |
| 04:59 | 14 | regular City paycheck. |
| 04:59 | 15 | Q. And then a fire deferred termination, do you |
| 04:59 | 16 | know what that is? |
| 04:59 | 17 | A. I am sorry? |
| 04:59 | 18 | Q. Firefighter deferred termination? |
| 04:59 | 19 | A. No, I never heard that term. |
| 04:59 | 20 | Q. Were you made aware that Ms. Draycott was |
| 04:59 | 21 | sent to a Dr. Nemias for a fitness for duty in 2010? |
| 04:59 | 22 | A. No. |
| 04:59 | 23 | Q. Did you have any involvement in that |
| 04:59 | 24 | decision to send her for a fitness for duty? |
| 04:59 | 25 | A. None, no. |

## Page 215

| | | |
|---|---|---|
| 04:59 | 1 | Q. You -- at some point captain Henschel left |
| 05:00 | 2 | station 54, and captain Williamson replaced him, |
| 05:00 | 3 | correct? |
| 05:00 | 4 | A. Yes. |
| 05:00 | 5 | Q. Do you know why captain Henschel left |
| 05:00 | 6 | station 54? |
| 05:00 | 7 | A. No. He didn't tell me, and I didn't really |
| 05:00 | 8 | ask. I think there was a vacancy posting, and he |
| 05:00 | 9 | transferred over to station 99. I just have to assume |
| 05:00 | 10 | he wanted to get away from, you know, the |
| 05:00 | 11 | controversies. |
| 05:00 | 12 | Q. Was it a voluntary transfer? |
| 05:00 | 13 | A. Yes. |
| 05:00 | 14 | Q. Were you -- and then after the roll call, |
| 05:00 | 15 | captain Williamson was also transferred from |
| 05:00 | 16 | station 54. Is that correct? |
| 05:00 | 17 | A. Sometime after that he and captain Tamez |
| 05:00 | 18 | both. |
| 05:00 | 19 | Q. Were you involved in those decisions? |
| 05:00 | 20 | A. No, I was not. |
| 05:00 | 21 | Q. Do you know who was? |
| 05:00 | 22 | A. I was informed about it. |
| 05:01 | 23 | Q. You were informed, okay. |
| 05:01 | 24 | A. So no. |
| 05:01 | 25 | Chief Snell, I don't know who else. I |

## Page 216

| | | |
|---|---|---|
| 05:01 | 1 | assume -- I don't remember exactly when Boriskie left. |
| 05:01 | 2 | Then acting fire chief Flanagan came |
| 05:01 | 3 | in. |
| 05:01 | 4 | But somewhere in there I was informed |
| 05:01 | 5 | by chief Snell the decision has been made. We are |
| 05:01 | 6 | going to transfer captain Tamez, captain Williamson |
| 05:01 | 7 | out. Do you have any way of filling those vacancies? |
| 05:01 | 8 | That was my degree of involvement, was, |
| 05:01 | 9 | you know, how can you make this the station keep |
| 05:01 | 10 | operating? |
| 05:01 | 11 | So, well, we happen to have a captain |
| 05:01 | 12 | being promoted to senior captain and an EO being |
| 05:02 | 13 | promoted to captain today. So I can fill those spots. |
| 05:02 | 14 | Q. Do you know -- did chief Snell tell you why |
| 05:02 | 15 | Williamson and Tamez were being transferred? |
| 05:02 | 16 | A. Told me the same thing that's printed on |
| 05:02 | 17 | their transfers, to provide fresh leadership. |
| 05:02 | 18 | Q. And that was -- this was at the direction of |
| 05:02 | 19 | whoever the fire chief was at the time? |
| 05:02 | 20 | A. Yes. |
| 05:02 | 21 | Q. And captain Williamson then tried to return |
| 05:02 | 22 | to ARFF a couple months later. Is that correct? |
| 05:02 | 23 | A. Not that I recall. |
| 05:02 | 24 | Q. You don't remember that? |
| 05:02 | 25 | A. No. |

## Page 217

05:02 1    Q.  Do you remember communicating with him by

05:02 2    e-mail about him returning to ARFF in March of 2010?

05:02 3    **A.  No, because he went to fours.  He liked it**

05:03 4    **there.  I would bump into him occasionally.**

05:03 5    **Is it possible he sent me an e-mail,**

05:03 6    **hey, someday I would like to -- he may have, but -- but**

05:03 7    **I am not aware that he tried to return to ARFF.**

05:04 8    (Exhibit 10 marked.)

05:04 9    Q.  Chief, I am showing you what's been marked

05:04 10   deposition exhibit 10.  For identification purposes, it

05:04 11   is HOU 81402.

05:04 12   Can you take a look at that and let me

05:04 13   know when you have had a chance to read it?

05:04 14   **A.  Oh, okay.**

05:05 15   Q.  Does reviewing exhibit 10 help refresh your

05:05 16   recollection with regards to captain Williamson

05:05 17   attempting to return to ARFF in March of 2010?

05:05 18   **A.  I did not remember this, but -- but okay.  I**

05:05 19   **don't dispute.  It might have come from me.  I don't**

05:05 20   **know what -- I don't know what's further down in the**

05:05 21   **e-mail.**

05:05 22   Q.  Okay.  Well, in the e-mail you were saying

05:05 23   that you wanted him to come back to ARFF.  Is that

05:05 24   correct?

05:05 25   **A.  Yes.**

## Page 218

05:05 1    Q.  Okay.

05:05 2    **A.  Someday.  You know, I remember telling him**

05:06 3    **that now is not a good time.**

05:06 4    MR. MONTEIRO:  Chief, those are all the

05:06 5    questions I have for you.  Thank you very much.  I turn

05:06 6    it over to Mr. Capodice.

05:06 7    MR. CAPODICE:  My turn.

05:06 8    EXAMINATION

05:06 9    BY MR. CAPODICE:

05:06 10   Q.  Good afternoon, chief.  My name is Dwain

05:06 11   Capodice.  I am an attorney representing Ms. Draycott

05:06 12   and Ms. Keyes today.  I have a couple questions that I

05:06 13   want to follow up with you.

05:06 14   On exhibit 10 it says that you wanted

05:06 15   Williamson to come back to ARFF someday.  Is that

05:06 16   correct?

05:06 17   **A.  Yes.**

05:06 18   Q.  Was there nothing that you have seen in

05:06 19   Williamson's conduct to be someone that you wouldn't

05:06 20   want in a leadership position at ARFF?

05:06 21   **A.  He was a good captain, tactician.  He**

05:06 22   **motivated his crews.**

05:06 23   Q.  Let me ask you more specifically.

05:06 24   Nothing that happened at that roll call

05:06 25   meeting with that morning you had a problem with, what

## Page 219

05:07 1    Williamson had said or done at that roll call meeting

05:07 2    that morning?  That is an example of a good leader for

05:07 3    you for the fire department?

05:07 4    **A.  Does that permanently disqualify him for --**

05:07 5    **you know, for a captain position?  I don't think so.**

05:07 6    Q.  Right.  He transferred and was a captain

05:07 7    somewhere else, correct?

05:07 8    **A.  Yes.**

05:07 9    Q.  But I am talking about ARFF, which is your

05:07 10   division, correct?

05:07 11   **A.  Yes.**

05:07 12   Q.  And you are responsible for the conduct of

05:07 13   its leaders and its officers?

05:07 14   **A.  Responsible, okay.  They report to me.**

05:07 15   Q.  I get that.  Obviously chief Boriskie can

05:07 16   overrule you or chief Snell, I mean, but ARFF is your

05:07 17   rodeo, more or less, as district chief, correct?

05:07 18   **A.  Yes.**

05:07 19   Q.  So Williamson is an example of a leader that

05:07 20   you would want in ARFF after that roll call meeting.

05:07 21   There is nothing that he did in that meeting that you

05:07 22   think should disqualify him permanently from being a

05:07 23   member as a leader of ARFF for you, for your division?

05:07 24   **A.  He is a good, knowledgeable ARFF technician.**

05:07 25   Q.  I understand that, but he has also got to

## Page 220

05:07 1    lead people, correct?

05:08 2    **A.  Yes.**

05:08 3    Q.  He has also got to get the trust of his

05:08 4    female employees?

05:08 5    **A.  Yes.**

05:08 6    Q.  He has also got to deal with complaints of

05:08 7    discrimination and retaliation?

05:08 8    **A.  Right.  And at that roll call he was**

05:08 9    **following the fire chief's order to voice your**

05:08 10   **concerns.**

05:08 11   Q.  Was he following the fire chief's orders to

05:08 12   allow Draycott to return to 54?

05:08 13   **A.  He was told to voice his concerns.  I think**

05:08 14   **that's what he did.**

05:08 15   Q.  And you don't think he did anything

05:08 16   inappropriate at that meeting that you wouldn't do

05:08 17   yourself?

05:08 18   MS. COHEN:  Objection; mischaracterizes

05:08 19   witness' testimony and is harassing.

05:08 20   BY MR. CAPODICE:

05:08 21   Q.  Go ahead, and answer.

05:08 22   **A.  Okay.  I would have probably approached it**

05:08 23   **differently.**

05:08 24   Q.  Why?

05:08 25   **A.  And it is in that -- in that setting,**

## Page 221

| | | |
|---|---|---|
| 05:08 | 1 | visually, there are a lot more of you than there is of |
| 05:09 | 2 | one firefighter.  I would not have handled that whole |
| 05:09 | 3 | thing in a mass big group setting like that, but -- but |
| 05:09 | 4 | that's -- |
| 05:09 | 5 | Q.  He attempted obviously to air his grievances |
| 05:09 | 6 | on January 7th, correct? |
| 05:09 | 7 | MS. COHEN:  Were you done with your |
| 05:09 | 8 | response? |
| 05:09 | 9 | THE WITNESS:  Yeah, pretty much. |
| 05:09 | 10 | BY MR. CAPODICE: |
| 05:09 | 11 | Q.  He had an opportunity to air his grievances |
| 05:09 | 12 | on the 7th, correct? |
| 05:09 | 13 | A.  Yes.  But the -- per chief Boriskie, the -- |
| 05:09 | 14 | the second, 12th, 13th, was the opportunity for both |
| 05:09 | 15 | Draycott and crew members to maybe -- maybe address to |
| 05:09 | 16 | each other directly what their concerns were. |
| 05:09 | 17 | Q.  And -- |
| 05:09 | 18 | A.  To see if there was some -- some common |
| 05:10 | 19 | ground, you know, gee, I hadn't thought about that. |
| 05:10 | 20 | Q.  And did you think that Williamson did that |
| 05:10 | 21 | in a productive manner that morning? |
| 05:10 | 22 | A.  I think he did it the way it made sense to |
| 05:10 | 23 | him. |
| 05:10 | 24 | Q.  Did he do it in a way that you would want a |
| 05:10 | 25 | leader of the ARFF organization to be? |

## Page 222

| | | |
|---|---|---|
| 05:10 | 1 | A.  Well, that was kind of a unique situation. |
| 05:10 | 2 | When the fire chief and command staff come out and say, |
| 05:10 | 3 | okay, this is your opportunity to get a -- get it off |
| 05:10 | 4 | your chest, that's what you do. |
| 05:10 | 5 | Q.  So is that a yes? |
| 05:10 | 6 | A.  Yeah.  I would say I know captain Williamson |
| 05:10 | 7 | well enough to know that he would respond appropriately |
| 05:11 | 8 | on a crash truck to an aircraft emergency and |
| 05:11 | 9 | competently lead his crew. |
| 05:11 | 10 | Q.  What about captain Tamez?  Would you want |
| 05:11 | 11 | him back at ARFF? |
| 05:11 | 12 | A.  Tamez? |
| 05:11 | 13 | Q.  Yes. |
| 05:11 | 14 | A.  Well, he is a different case.  He has |
| 05:11 | 15 | demonstrated several times a lack of leadership, |
| 05:11 | 16 | untruthfulness. |
| 05:11 | 17 | Q.  With what? |
| 05:11 | 18 | A.  All right.  He had -- I had called him over |
| 05:11 | 19 | to my office one time to ask him why -- why did you |
| 05:11 | 20 | not -- or refuse to take the job knowledge assessment |
| 05:11 | 21 | with the rest of your crew, because when the FAA |
| 05:12 | 22 | inspectors come around in the annual 139 inspection, |
| 05:12 | 23 | they question the entire crew, including officers.  The |
| 05:12 | 24 | intent here is to -- prior to the inspection, gauge the |
| 05:12 | 25 | level of knowledge, are there any weak areas. |

## Page 223

| | | |
|---|---|---|
| 05:12 | 1 | Well, I had had a report that captain |
| 05:12 | 2 | Tamez refused to take the assessment and walked off. |
| 05:12 | 3 | So I called him over to ask him about |
| 05:12 | 4 | that. |
| 05:12 | 5 | And he just blew up and said:  You |
| 05:12 | 6 | know, I am not taking that bullshit exam.  It's |
| 05:12 | 7 | humiliating, degrading.  I am not taking it. |
| 05:12 | 8 | And you know, and then went off into: |
| 05:13 | 9 | You know, you have been undermining my authority for |
| 05:13 | 10 | years and -- |
| 05:13 | 11 | Whoa, whoa, whoa, hey, captain, time |
| 05:13 | 12 | out.  Clearly this is going to be a conversation for |
| 05:13 | 13 | another day with a witness in the room.  So why don't |
| 05:13 | 14 | you gather your things, go back to your fire station? |
| 05:13 | 15 | So you can -- can you respond appropriately for the |
| 05:13 | 16 | rest of this shift, or do I need to call somebody in? |
| 05:13 | 17 | No, no.  I got it. |
| 05:13 | 18 | So it was sometime a week or two later |
| 05:13 | 19 | I had a witness in the room, and you know, Tamez denied |
| 05:13 | 20 | ever saying any of those things that he said. |
| 05:13 | 21 | So I have a problem with that. |
| 05:14 | 22 | Q.  Other than the incident with regards to him |
| 05:14 | 23 | taking this test and -- was there any other issues that |
| 05:14 | 24 | you had with his truthfulness? |
| 05:14 | 25 | A.  No.  But the day of the graffiti incident -- |

## Page 224

| | | |
|---|---|---|
| 05:14 | 1 | you know, you are asking about examples of poor |
| 05:14 | 2 | leadership -- he stayed in -- he stayed in his office. |
| 05:14 | 3 | Captain Henschel and I were securing |
| 05:14 | 4 | the room, you know, greeting investigators, kind of |
| 05:14 | 5 | showing them what's what.  You know, somebody needs to |
| 05:14 | 6 | keep the rest of the crew on task in case we get called |
| 05:14 | 7 | out to an aircraft emergency. |
| 05:14 | 8 | And several times I had to go to |
| 05:14 | 9 | Tamez's room:  Hey, what are you doing?  You know, we |
| 05:15 | 10 | have kind of a crisis out here.  Henschel is out here |
| 05:15 | 11 | by himself.  I am on the phone. |
| 05:15 | 12 | He goes:  People know where to find me. |
| 05:15 | 13 | So you know, yeah, when I have to keep |
| 05:15 | 14 | trying to engage a senior captain, I have a problem |
| 05:15 | 15 | with that. |
| 05:15 | 16 | Q.  I guess when you talk about undermining your |
| 05:15 | 17 | authority for years earlier, he accused you of that, |
| 05:15 | 18 | did he give you any examples? |
| 05:15 | 19 | A.  No. |
| 05:15 | 20 | Q.  None? |
| 05:15 | 21 | A.  So -- |
| 05:15 | 22 | Q.  Are you aware today, as you sit here today, |
| 05:15 | 23 | of any examples of where he accused you of undermining |
| 05:15 | 24 | your authority -- undermining his authority?  Sorry. |
| 05:15 | 25 | A.  One, it's a little comical.  How can a |

Page 225

05:15 1  superior officer undermine his authority?

05:15 2  Q. I get that it's comical, but are you aware

05:15 3  today, as you sit here today, of any incidents where

05:15 4  Tamez has accused you of undermining his authority?

05:15 5  A. I don't recall specifics.

05:16 6  Q. Okay. Have you had any complaints of gender

05:16 7  discrimination or racial discrimination made against

05:16 8  you or retaliation? Sorry.

05:16 9  A. Yes, yeah.

05:16 10  Q. By who?

05:16 11  A. I am probably going to forget some. I have

05:16 12  had several.

05:16 13  Q. Okay. Give me the list.

05:16 14  A. Jane Draycott.

05:16 15  Q. Okay.

05:16 16  A. Elmer Williams.

05:16 17  Q. Okay.

05:16 18  A. Huh. Johnny McGarrett.

05:16 19  Q. Okay.

05:16 20  A. Let's see. I don't remember if Sharon

05:16 21  Branch is -- Sharon Branch was complaining about Bobby.

05:17 22  It was sort of me, too, but I don't think I was

05:17 23  respondent.

05:17 24       There may be something I am forgetting.

05:17 25  Q. What about Tamez?

Page 226

05:17 1  A. He probably did.

05:17 2  Q. You don't know?

05:17 3  A. I don't remember. I have responded to quite

05:17 4  a few complaints over the years.

05:17 5  Q. How many have come from your captain?

05:17 6       MS. SULLIVAN: Objection; vague.

05:17 7  A. How many come from captains in general?

05:17 8  BY MR. CAPODICE:

05:17 9  Q. No. From your own captains accusing you

05:17 10  gender/race discrimination, or retaliation?

05:17 11       MS. SULLIVAN: Objection; vague as to

05:17 12  time.

05:17 13  BY MR. CAPODICE:

05:17 14  Q. While at ARFF. Let's just talk about ARFF.

05:17 15  A. Right.

05:17 16  Q. How many times has a captain accused you of

05:17 17  gender/race discrimination or retaliation?

05:18 18  A. Probably just Tamez, but I have had -- I

05:18 19  have had issues with other captains, you know.

05:18 20  Q. What was Tamez's allegations against you?

05:18 21  Was it related to race, gender, or retaliation?

05:18 22       MS. SULLIVAN: Objection to this line

05:18 23  of questioning. At this point I do believe Mr. Tamez

05:18 24  actually has a -- let's go off the record, because I

05:18 25  have already addressed this one time before.

Page 227

05:18 1       MR. CAPODICE: Okay.

05:18 2       MS. SULLIVAN: Off the record, please.

05:18 3       THE VIDEOGRAPHER: 5:17, off record.

05:18 4       (Recess from 5:18 to 5:28 p.m.)

05:27 5       THE VIDEOGRAPHER: 5:27, back on the

05:28 6  record, disk 7.

05:28 7  BY MR. CAPODICE:

05:28 8  Q. Before Draycott came to station 54, were you

05:28 9  aware of any issues with regards to her employment at

05:28 10  other stations?

05:28 11  A. No. She went to station 92 first. So

05:28 12  that's -- that's when I became aware of her employment,

05:28 13  is when she came to us.

05:28 14  Q. Were you aware of any complaints she had

05:28 15  made at station 92 or about her time at station 92?

05:28 16  A. Yes.

05:28 17  Q. What complaints were you aware of?

05:28 18  A. Let's see. Taking a picture down -- formal

05:28 19  complaints or just complaints in general?

05:28 20  Q. Either.

05:29 21  A. Let's see, let's see. She didn't like

05:29 22  people blowing their nose at the dinner table, started

05:29 23  not getting along with Julie Childers, wanted a captain

05:29 24  or somebody to order Julie to not talk to her.

05:29 25       And then, okay, Jane, don't talk to

Page 228

05:29 1  Julie.

05:29 2       And then Reggie got involved.

05:29 3       Okay, Jane, don't talk to Reggie.

05:29 4       So...

05:29 5  Q. And which one of those -- which one of the

05:29 6  complaints you mentioned above were formal, if any?

05:30 7  A. The taking her picture down and Julie is

05:30 8  being mean to me.

05:30 9  Q. I guess were you involved in the decision to

05:30 10  transfer Draycott to 54?

05:30 11  A. That was a fill-in assignment to complete

05:30 12  training, so I did not transfer her to 54.

05:30 13  Q. So upon her completion of her training

05:30 14  at 92, she transferred to 54 and I guess filled the

05:30 15  position there?

05:30 16  A. No. She did not complete her training

05:30 17  at 92. When she left and came back, she was still

05:30 18  assigned to station 92, had not completed her training,

05:30 19  but the captain at that station had transferred out.

05:30 20  And so I spoke to the officers at 54 B shift.

05:31 21       She was at 92 B shift.

05:31 22       Hey, we need -- we need a new set of

05:31 23  eyes to get her training completed.

05:31 24       And so they said: That's fine. Send

05:31 25  her over.

Page 229

05:31  1      Q.  Can you look at exhibit 7?  Did Henschel
05:32  2  complain to you about the complaints that Draycott was
05:32  3  making?
05:32  4      A.  Well, in this e-mail he is notifying me.
05:32  5      Q.  Right.  I get that he is telling you there
05:32  6  were complaints made and here is the information that
05:32  7  you need to know.
05:32  8          Did he ever complain to you at any time
05:32  9  about the complaints that Draycott had made at
05:32  10 station 54?
05:32  11         MS. SULLIVAN:  Objection; vague.
05:32  12     A.  I don't recall specifically.  From time to
05:32  13 time in going by 54 to say how are things going, he
05:32  14 would, you know -- you know, give me kind of an update,
05:32  15 but you know, was that at the same time or close to the
05:32  16 same time as things were discovered?  I don't recall.
05:32  17 BY MS. COHEN:
05:32  18     Q.  I guess you never took any of these updates
05:32  19 as complaints that Henschel was making against Draycott
05:32  20 or Keyes, correct?
05:33  21         MS. SULLIVAN:  Objection; vague.
05:33  22         Go ahead, and answer.
05:33  23     A.  I took it as:  This is what she is saying.
05:33  24 This is what we are -- we are doing about it.  We are
05:33  25 talking to the other shifts and really try to -- you

Page 230

05:33  1  know, if it's not crew members, let's be sure that we
05:33  2  were aware of airport employees in the station, those
05:33  3  kind of things.
05:33  4  BY MR. CAPODICE:
05:33  5      Q.  Did he ever mention that it was aggravating
05:33  6  him the number of complaints that she is making?
05:33  7      A.  What I remember is -- his frustration was he
05:33  8  just wanted -- he just wanted everything -- everyone to
05:33  9  get along, and let's just -- anything was being -- was
05:33  10 going wrong to complain about.
05:34  11     Q.  And I guess on the e-mail at the top here to
05:34  12 you, he says:  But I feel as though I may be able to
05:34  13 bring this to a halt if the members realize the
05:34  14 aggravation I must put up with.
05:34  15         Did you ever ask him what he meant by
05:34  16 that?
05:34  17     A.  No.  But it's like -- I am describing his --
05:34  18 his aggravation was just that the -- there is
05:34  19 controversy.  He doesn't like confrontation or
05:34  20 controversy.
05:34  21     Q.  And then the e-mail below I notice Tamez's
05:34  22 name isn't on there.  Do you know why that might be?
05:34  23     A.  No.
05:34  24     Q.  It looks like a pretty exhaustive list of
05:34  25 the ARFF captains at the time, correct, and the

Page 231

05:34  1  leadership?
05:34  2      A.  No.  It looks like captains.  I don't think
05:35  3  there are senior captains.  I don't see -- I don't see
05:35  4  Ponce.
05:35  5      Q.  Okay.
05:35  6      A.  So it looks like he is sending it to his
05:35  7  colleagues, his other captains.
05:35  8      Q.  Did you ask him why he didn't send that to
05:35  9  Ponce?
05:35  10     A.  No.
05:35  11     Q.  Or Tamez?
05:35  12     A.  No.  I have to assume that the captain is
05:35  13 talking to his senior captain.
05:35  14     Q.  I guess on a scale of 1 to 10, let me talk
05:35  15 to you a little bit about some of the allegations, and
05:35  16 I want you to give me a number ranking from severe
05:35  17 being -- 10 being the most severe on a scale of 1 to 10
05:35  18 for the following things.
05:35  19         The numerous complaints with regard to
05:35  20 urine being on toilet seats, how severe of an issue is
05:35  21 that for you on scale of 1 to 10?
05:35  22         MS. SULLIVAN:  Objection; incomplete
05:35  23 hypothetical, vague, calls for a legal conclusion,
05:35  24 speculative.
05:35  25         Go ahead, and answer.

Page 232

05:36  1      A.  We don't rate things like that in the fire
05:36  2  department.  It's a problem, or it's not.  You know,
05:36  3  does it need to be investigated, or can it be handled
05:36  4  at the station level?
05:36  5  BY MR. CAPODICE:
05:36  6      Q.  Okay.  So there is no difference in degree
05:36  7  of severity between that and let's say, the hot
05:36  8  water-related issue that's talked about in this e-mail?
05:36  9          MS. SULLIVAN:  Objection; calls for a
05:36  10 legal conclusion, speculative, and incomplete
05:36  11 hypothetical, vague, speculative.
05:36  12         Go ahead, and answer.
05:36  13     A.  Well, okay.  Once it was reported, they
05:36  14 called the plumber:  Hey, what's going on?
05:36  15         You know, we don't know if the valve
05:36  16 was intentionally -- we don't know what happened.
05:37  17 Plumber fixed it.
05:37  18 BY MR. CAPODICE:
05:37  19     Q.  I understand that, you know.  I am just
05:37  20 asking:  Is there a degree of severity or degree of
05:37  21 concern that the water incident was more or less than
05:37  22 the pee on seats, for instance?
05:37  23         MS. SULLIVAN:  Objection; legal
05:37  24 conclusion, speculative, vague, improper hypothetical.
05:37  25     A.  They are both -- they are both problems.  We

## Page 233

```
05:37   1   don't -- we don't rate problems.
05:37   2         Severity comes in if there is gun
05:37   3   violence, someone threatens to shoot someone else.
05:37   4   That's more urgent and more severe than -- than the
05:37   5   toilet or the hot water.
05:37   6   BY MR. CAPODICE:
05:37   7   Q.   Yeah.  And that's a perfect example.  I
05:37   8   mean, if someone turns off the cold water to a shower
05:37   9   and other people don't know about it, can someone get
05:37  10   hurt?
05:37  11         MS. SULLIVAN:  Objection; calls for
05:37  12   speculation.
05:37  13         Go ahead.
05:38  14   A.   I suppose you could.
05:38  15         Don't most people turn the water on and
05:38  16   then test it before walking into the shower.
05:38  17   BY MR. CAPODICE:
05:38  18   Q.   What about the radio issue?
05:38  19         MS. SULLIVAN:  Objection; vague.
05:38  20   BY MR. CAPODICE:
05:38  21   Q.   When I say the radio issue, you know what I
05:38  22   am talking about, correct, with the women's dorm?
05:38  23   A.   The speaker in the ceiling?
05:38  24   Q.   Correct.
05:38  25   A.   Okay.  Well, that was reported, and what I
```

## Page 234

```
05:38   1   remember from that was the electrician said loose
05:38   2   wires --
05:38   3   Q.   Okay.  So electrician came by?
05:38   4   A.   -- fixed it.
05:38   5         Yes.
05:38   6   Q.   And said the reason why there is no volume
05:38   7   on the speakers is because of loose wires?
05:38   8   A.   Okay.
05:38   9   Q.   I didn't see that in the captain's reports.
05:38  10         Is there any reason why that's not in
05:38  11   the captain's reports on any documentation?
05:38  12         MS. SULLIVAN:  Sorry.
05:39  13   A.   Seems like I remember seeing a -- the
05:39  14   maintenance repair slip that an electrician came by and
05:39  15   you know, loose wires.  I don't remember if that was at
05:39  16   the station, but -- but that's what I got back from as
05:39  17   the outcome of that service request.
05:39  18   BY MR. CAPODICE:
05:39  19   Q.   Has that ever been an issue that has ever
05:39  20   happened before in your employment, that someone
05:39  21   reported radios being turned off?
05:39  22   A.   Yes.
05:39  23   Q.   When?
05:39  24   A.   The speakers at 99 and 54 are in the
05:39  25   ceiling.  There is a volume adjustment knob, okay?
```

## Page 235

```
05:39   1         From time to time, somebody thinks it's
05:39   2   too loud, so they turn the volume down.
05:40   3         The next shift comes in, and I can't
05:40   4   hear anything.  You know, so they call in a -- an
05:40   5   urgent radio repair.
05:40   6         And the technician comes out and says:
05:40   7   Well, somebody turned the volume down.
05:40   8   Q.   I think in response to the questions about
05:40   9   Draycott's return to 54, you said you would accept
05:40  10   Draycott back because you follow orders.  Is that
05:40  11   correct?
05:40  12   A.   Yes.
05:40  13   Q.   If there was no order, would you have
05:40  14   accepted Draycott back?
05:40  15   A.   I don't understand the question, because she
05:40  16   would come back as a natural result of whatever leave
05:40  17   she was on, whether it's injured on duty or city
05:40  18   business.
05:40  19         At the end of that the department says:
05:40  20   Okay.  You are coming back to work.  What's your last
05:41  21   assignment?  Okay.  Well, we will code transfer you
05:41  22   back to your last assignment.
05:41  23         So there is no opportunity to object
05:41  24   or -- you know, that's just what happens.
05:41  25   Q.   And I guess we talked a little bit earlier
```

## Page 236

```
05:41   1   about your opinion with Williamson's potential return
05:41   2   or Tamez's potential return.
05:41   3         With regard to Draycott in particular,
05:41   4   you didn't form an opinion whether or not she should be
05:41   5   able to return to 54?
05:41   6   A.   If the law says she is to be returned to her
05:41   7   last place of employment, that's what we do.
05:41   8   Q.   And I don't -- did you have a problem with
05:41   9   her coming back to 54?
05:41  10   A.   No.
05:41  11   Q.   Do you have any problems with any of the
05:41  12   allegations that Draycott, Keyes, or their lawyers made
05:42  13   in allegations -- made in the media, I guess, media
05:42  14   coverages, anything they said in the media?
05:42  15         MS. SULLIVAN:  Objection; vague.
05:42  16   A.   Frankly, I don't remember all the -- all the
05:42  17   allegations that they made.  It seemed like it was
05:42  18   throwing a lot of accusations out there.
05:42  19         You know, I was probably named a couple
05:42  20   times, but it wasn't -- I don't recall anything saying
05:42  21   mean chief McAteer did this to me.
05:42  22         So you know -- you know, the problem
05:42  23   that the membership has is we are told -- we are
05:42  24   ordered to not speak to the media about department
05:42  25   issues.  So the crews voice to me a concern about a
```

Page 237

05:43  1  double standard.

05:43  2  BY MR. CAPODICE:

05:43  3  Q.  When did they voice that to you?

05:43  4  A.  Every time this topic came up in the media.

05:43  5  Q.  Multiple times?

05:43  6  A.  Yes.

05:43  7  Q.  So did they have issue with -- were they

05:43  8  accused of -- I guess let me ask you this.

05:43  9  Did any of the firefighters or

05:43  10  employees of ARFF in the ARFF division believe that

05:43  11  Draycott and told you that Draycott wrote the graffiti?

05:43  12  A.  Did any of them tell me that they believed

05:43  13  that?  Is that the question?

05:44  14  Q.  Correct.

05:44  15  MS. SULLIVAN:  Objection; vague as to

05:44  16  time.

05:44  17  A.  There is a full investigation done.  There

05:44  18  was no determination of who did it.

05:44  19  MR. CAPODICE:  Objection;

05:44  20  nonresponsive.

05:44  21  A.  Could she have -- could she have done it?

05:44  22  Sure.  Could someone else have done it?  Sure.

05:44  23  BY MR. CAPODICE:

05:44  24  Q.  Do you believe she did it?

05:44  25  A.  I don't know.

Page 238

05:44  1  Q.  Did anyone tell you that they believed

05:44  2  Draycott did it?

05:44  3  MS. SULLIVAN:  Objection; vague as to

05:44  4  time.

05:44  5  A.  I have heard:  Well, what if -- what if she

05:44  6  did it, huh?  What about that?

05:44  7  You know, but I don't remember, you

05:44  8  know, people saying I believe she did that.

05:44  9  BY MR. CAPODICE:

05:44  10  Q.  So no one told you that?

05:44  11  A.  No.  It was generally what ifs and you know,

05:45  12  what has changed from prior to graffiti to now?  You

05:45  13  know, that was their main concern, was:  Since nothing

05:45  14  has changed, if unknown person does this again, oh, my

05:45  15  gosh, we look horrible.  How can we keep this from

05:45  16  happening again?

05:45  17  Q.  In 2006 with the complaints with regard to

05:45  18  the restroom, I believe you said that the policy now is

05:45  19  for the captain to inspect the premises upon the start

05:45  20  of his shift.  Do you recall that?

05:45  21  A.  Yeah, the captain or someone, you know.  The

05:45  22  captain can delegate that.  I mean, the captain has got

05:45  23  things to do at the beginning of the shift.

05:45  24  Q.  And one of the things that they are to do is

05:46  25  to have one person inspect the facilities including the

Page 239

05:46  1  women's dorm and bathroom, correct?

05:46  2  A.  It doesn't have to be one person.

05:46  3  MS. SULLIVAN:  Objection;

05:46  4  mischaracterizes his testimony.

05:46  5  Go ahead, and answer.

05:46  6  A.  It doesn't have to be one person.  I mean,

05:46  7  they generally -- they, firefighters, generally do

05:46  8  things as a group.  So one person is not out sweeping

05:46  9  and mopping.  So --

05:46  10  BY MR. CAPODICE:

05:46  11  Q.  And throw away my mischaracterization about

05:46  12  one person.  Just someone is supposed to have checked

05:46  13  each shift at 54, the women's dormitory and bathroom,

05:46  14  correct?

05:46  15  A.  Along with every other area of the fire

05:46  16  station.

05:46  17  Q.  Absolutely.  With regards to the graffiti

05:46  18  incident, were you aware of any checks that were done

05:46  19  in the days prior?

05:46  20  A.  I am not notified that, hey, we did it -- we

05:46  21  checked the whole station today.

05:46  22  I assume it's being done every day.

05:46  23  Q.  When you got that e-mail from Henschel, did

05:46  24  you circle back with him and go if we are checking the

05:46  25  bathrooms each day, we should be able to narrow down

Page 240

05:47  1  the time?

05:47  2  A.  Well, okay, okay.  Yeah, so that was -- like

05:47  3  I said, I don't remember specifically what I -- what I

05:47  4  went back and talked to Henschel about or talked to the

05:47  5  senior captains about.

05:47  6  I do kind of remember saying if we are

05:47  7  doing that, if we are looking every morning, then --

05:47  8  then we would know what the bathroom looks like so we

05:47  9  can maybe grab the off going shift:  Hey, what's going

05:47  10  on here?

05:47  11  Q.  Were they not following the policy?

05:47  12  A.  I don't know.

05:47  13  Q.  Okay.  Did you follow up with them and ask

05:47  14  them if they were following the policy?

05:47  15  A.  Yes.

05:47  16  Q.  And did they say that they were?

05:47  17  A.  Yeah.

05:48  18  Whether it was directly after this, I

05:48  19  can't say, but you know, I have had conversations,

05:48  20  officer meetings with the officers, you know:  If

05:48  21  you-all are checking out the entire station every

05:48  22  morning, then we can identify problems quicker and

05:48  23  hopefully get some resolution on it.

05:48  24  So that's the kind of message I had

05:48  25  with the officers.  I assume that they are doing the

Page 241

05:48 1  right thing.

05:48 2      Q.  I guess when you continued to have issues

05:48 3  with women's dormitory and bathrooms, you circled back

05:48 4  with them again and say:  How are we having these

05:48 5  problems when we were checking them each day?

05:48 6      MS. SULLIVAN:  Objection;

05:48 7  mischaracterizes his testimony.

05:48 8      Go ahead.

05:49 9      A.  Basically with the problems with the

05:49 10  bathroom -- now, the shower and the speaker would not

05:49 11  be identified as a problem during a station visual

05:49 12  check and clean.

05:49 13      But you know, there is a run of the

05:49 14  bathroom complaints, but you know, I don't recall

05:49 15  hearing that it was still an ongoing problem.

05:49 16  BY MR. CAPODICE:

05:49 17      Q.  Have you ever given a depo before?

05:49 18      A.  Yes.

05:49 19      Q.  When?

05:49 20      A.  Several months ago for the Tamez lawsuit.

05:50 21      Q.  Any other depos?

05:50 22      A.  I don't remember.  Typically it's a written

05:50 23  affidavit for a complaint response.  So I -- if I have,

05:50 24  I don't remember it.

05:50 25      Q.  I think we talked earlier about the issues

Page 242

05:50 1  in the bathrooms, and I guess your captains are kind of

05:50 2  keeping you informed on the issues.

05:50 3      Did you have any problem with the

05:50 4  performance of the captains once the graffiti problem

05:50 5  occurred with regards to them keeping you in the loop

05:50 6  of problems with the bathrooms and the women's dorms?

05:50 7      MS. SULLIVAN:  Objection; vague,

05:50 8  compound.

05:50 9      Go ahead.

05:51 10      Confusing.

05:51 11      A.  So did I have any problems with my captains

05:51 12  keeping me informed?  I don't believe so.

05:51 13  BY MR. CAPODICE:

05:51 14      Q.  Especially after viewing exhibit 6 today

05:51 15  where they documented a lot of the issues, some of

05:51 16  which you said you didn't know about, correct?

05:51 17      MS. SULLIVAN:  Vague to the

05:51 18  characterization of what's in exhibit 6.

05:51 19      MR. MONTEIRO:  It's the captain's log,

05:51 20  right?

05:51 21      MR. CAPODICE:  Yeah, the captain's log.

05:51 22      A.  Oh, okay, okay.  Well, you know -- you know,

05:51 23  as I said earlier, did I get notified at the same time

05:51 24  they made this?  I don't remember.  I don't remember

05:51 25  when I got notified.

Page 243

05:51 1  BY MR. CAPODICE:

05:51 2      Q.  Okay.  What is your training with regards to

05:51 3  captain logs and documenting employees making

05:51 4  complaints to OIG or staff services?

05:52 5      MS. SULLIVAN:  Objection; vague as to

05:52 6  time.

05:52 7      A.  Generally on the job, this is how you fill

05:52 8  out a captain's log.  You know, you jot down who is at

05:52 9  work today, you know, who is off, fuel readings, note

05:52 10  significant events of the day, you know, and then

05:52 11  basically the complaint guideline, the mayor's order

05:52 12  on, you know, discrimination, you know, sexual

05:52 13  harassment.  It's basically read and -- read,

05:52 14  understand, and comply the best you can.

05:52 15  BY MR. CAPODICE:

05:52 16      Q.  And I guess are you trained to document

05:52 17  employees' complaints regarding gender discrimination

05:53 18  and retaliation on a captain's log?

05:53 19      A.  I wouldn't put specifics in there, but it

05:53 20  might -- am I trained?  No.

05:53 21      MR. CAPODICE:  Let's take a quick

05:53 22  five-minute break.  Let me jot down a couple questions,

05:53 23  and I think we will be done, I think.

05:53 24      THE VIDEOGRAPHER:  5:52, off record.

05:53 25      (Recess from 5:53 to 5:59 p.m.)

Page 244

05:59 1      THE VIDEOGRAPHER:  5:58, back on

05:59 2  record.

05:59 3  BY MR. CAPODICE:

05:59 4      Q.  Chief, quick question, following the

05:59 5  Draycott -- following the graffiti incident at 54, did

05:59 6  you criticize Tamez for allowing pictures of the scene

05:59 7  to be taken?

05:59 8      A.  I don't recall that.

05:59 9      I remember Paula had the pictures of

05:59 10  the scene up on the computer in the kitchen.  I tell

05:59 11  her:  Hey, you are not e-mailing anything, right?

05:59 12      Oh, I have already e-mailed it to Isiah

05:59 13  Carey.

05:59 14      So we are not allowed to do that.  Take

05:59 15  that down right now.

06:00 16      And so that was part of the, hey,

06:00 17  captain Tamez, you need to be out here engaged so

06:00 18  things like this don't happen.

06:00 19      Q.  Did you witness Krusleski criticize Tamez

06:00 20  and call him unprofessional for allowing the pictures

06:00 21  to be taken?

06:00 22      A.  No, I don't remember anything like that.

06:00 23      Q.  And did Tamez ever tell you that he

06:00 24  instructed Williamson not to write the letter that he

06:00 25  read on the roll call during roll call?

Page 245

| | |
|---|---|
| 06:00 | 1 A. No, he did not tell me that, that I recall. |
| 06:00 | 2 I have -- I have seen that somewhere. If it was a |
| 06:00 | 3 complaint -- I don't remember where -- where I saw |
| 06:01 | 4 that, but the -- Tamez said he had told Williamson not |
| 06:01 | 5 to write that letter. |
| 06:01 | 6 Q. Have you ever heard Williamson refer to |
| 06:01 | 7 having been a leader of an informal group called a wolf |
| 06:01 | 8 pack or good old boys? |
| 06:01 | 9 A. No. |
| 06:01 | 10 Q. Did you witness any divisiveness between the |
| 06:01 | 11 men and women in ARFF before or after the -- before or |
| 06:01 | 12 after the graffiti incident? |
| 06:01 | 13 A. What do you mean by divisiveness? |
| 06:01 | 14 Q. That's a good question. |
| 06:01 | 15 Any type of issues -- let me switch -- |
| 06:02 | 16 let me switch gears. |
| 06:02 | 17 As parts of Sharon Branch's complaints |
| 06:02 | 18 against you, did the issue of radios and the fact that |
| 06:02 | 19 they were turned off when she was giving orders, is |
| 06:02 | 20 that kind of your understanding of the situation or the |
| 06:02 | 21 complaint that she had made? |
| 06:02 | 22 A. I don't believe Sharon Branch made the |
| 06:02 | 23 complaint. |
| 06:02 | 24 Q. That was one of the ways Tamez accused you |
| 06:02 | 25 of undermining? |

Page 246

| | |
|---|---|
| 06:02 | 1 A. Right. And that came from Tamez. Sharon |
| 06:02 | 2 did not voice a -- voice or file a formal complaint |
| 06:02 | 3 alleging the radios had been turned off. |
| 06:02 | 4 Q. Do you recall the issue? Did she report to |
| 06:02 | 5 you that the radios were turned off? |
| 06:03 | 6 A. Okay. That was a bomb scare. I mean, I |
| 06:03 | 7 remember what Tamez reported was completely different |
| 06:03 | 8 than what I witnessed. It was a bomb scare at Hobby, |
| 06:03 | 9 Southwest aircraft. |
| 06:03 | 10 I responded out there: You know, hey, |
| 06:03 | 11 Sharon, how is -- how is everything going, you know? |
| 06:03 | 12 Well, you know, waiting on HPD. They |
| 06:03 | 13 won't send the bomb sniffing dogs. The -- the trucks |
| 06:03 | 14 were not on the right tac channel, but you know, we got |
| 06:03 | 15 that fixed real quick. We told them to go to this tac |
| 06:03 | 16 channel instead of the main dispatch channel. |
| 06:03 | 17 She never said anyone had turned their |
| 06:03 | 18 radios off. |
| 06:04 | 19 That's absolutely nuts. No one would |
| 06:04 | 20 do that anyhow. |
| 06:04 | 21 She said everything was under control. |
| 06:04 | 22 She didn't need anything. You know, she said she, you |
| 06:04 | 23 know, went over to the trucks: You know, hey we are on |
| 06:04 | 24 tack, whatever, 10, kind of motioned to them. |
| 06:04 | 25 They -- she never said anything about |

Page 247

| | |
|---|---|
| 06:04 | 1 they wouldn't listen to her because she was a female, |
| 06:04 | 2 never got that at all. |
| 06:04 | 3 Q. And then if a firefighter is away for six |
| 06:04 | 4 months on their ARFF lineup duty, are they required to |
| 06:04 | 5 take a test before they come back? |
| 06:04 | 6 MS. SULLIVAN: Objection; vague as to |
| 06:04 | 7 time. |
| 06:04 | 8 A. At some point, you know, the ARFF internship |
| 06:04 | 9 program kind of got formalized probably '09-ish. |
| 06:05 | 10 Then the question came up what about if |
| 06:05 | 11 someone goes and comes back? |
| 06:05 | 12 Well, how long? |
| 06:05 | 13 Okay. So well, what we kind of came up |
| 06:05 | 14 with, with command staff approval, was if you had been |
| 06:05 | 15 away more than six months but less than a year, it's a |
| 06:05 | 16 modified internship. You know, you don't have to redo |
| 06:05 | 17 everything. It's just airport familiarization, maybe |
| 06:05 | 18 airport emergency plan. It was something else. |
| 06:05 | 19 You know, the regular interns -- okay. |
| 06:05 | 20 If you have been off more than a year, it's a regular |
| 06:05 | 21 internship. |
| 06:05 | 22 BY MR. CAPODICE: |
| 06:05 | 23 Q. When was that formalized? |
| 06:05 | 24 A. '09 -- '08 -- it was sometime in '08. |
| 06:06 | 25 Q. That was the document that you had reviewed |

Page 248

| | |
|---|---|
| 06:06 | 1 in preparation for your deposition -- you said |
| 06:06 | 2 something related to tracking the internship program? |
| 06:06 | 3 That's what you are talking about? |
| 06:06 | 4 A. Yes. |
| 06:06 | 5 MR. CAPODICE: Pass the witness. |
| 06:06 | 6 EXAMINATION |
| 06:06 | 7 BY MR. SULLIVAN: |
| 06:06 | 8 Q. How many years have you been in the |
| 06:06 | 9 department? |
| 06:06 | 10 A. I'm in my 34th year. |
| 06:06 | 11 Q. And you have worked at a variety of |
| 06:06 | 12 stations, correct? |
| 06:06 | 13 A. Yes, ma'am. |
| 06:06 | 14 Q. Have you found urine on the seats in the |
| 06:06 | 15 men's bathroom? |
| 06:06 | 16 A. Yes. |
| 06:06 | 17 Q. You were asked a series of questions by |
| 06:06 | 18 Mr. Monteiro as it relates to McAteer exhibit 6, which |
| 06:06 | 19 is the captain's daily log. There is references to, I |
| 06:06 | 20 believe, urine on the toilet seats. |
| 06:06 | 21 Do you remember that line of |
| 06:06 | 22 questioning? |
| 06:06 | 23 A. Yes. |
| 06:06 | 24 Q. Okay. And it's your testimony that you did |
| 06:07 | 25 not review those captains' logs at that -- at that |

## Page 249

| | |
|---|---|
| 06:07 | 1 time? |
| 06:07 | 2    **A. Yes, correct.** |
| 06:07 | 3    Q. Okay. And as you sit here today, did you |
| 06:07 | 4 see any information on -- in those entries that would |
| 06:07 | 5 indicate to you that those were intentionally left by |
| 06:07 | 6 any member or person that had access to station 54? |
| 06:07 | 7    **A. No. I mean, so the -- the log entries did** |
| 06:07 | 8 **not indicate that the urine was intentionally left on** |
| 06:07 | 9 **the seat, right.** |
| 06:07 | 10    Q. In the fire station, when you are doing the |
| 06:07 | 11 inspections, there is a time period where they kind of |
| 06:07 | 12 generally clean up the station. Is that correct? |
| 06:07 | 13    **A. Yes.** |
| 06:07 | 14    Q. Okay. And is it the responsibility of all |
| 06:07 | 15 firefighters to clean up behind whoever in the fire |
| 06:07 | 16 station? |
| 06:07 | 17    **A. Yes.** |
| 06:08 | 18    MS. SULLIVAN: That's all the followup |
| 06:08 | 19 I have. |
| 06:08 | 20    MR. MONTEIRO: Nothing further. |
| 06:08 | 21    MR. CAPODICE: We are good. |
| 06:08 | 22    THE VIDEOGRAPHER: 6:07, off the |
| 06:08 | 23 record. |
| | 24 |
| | 25 |

## Page 250

1    CORRECTIONS AND SIGNATURE

2 PAGE  LINE  CHANGE     REASON

3 _____

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24    I, GEORGE LUTHER McATEER, JR., have read the

25 foregoing deposition and hereby affix my signature that

## Page 251

1 same is true and correct, except as noted herein.

2

3    _____
   GEORGE LUTHER McATEER, JR.

4

5 THE STATE OF _____ )

6 COUNTY OF _____ )

7    Before me, _____, on this
   day personally appeared GEORGE LUTHER McATEER, JR.,

8 known to me (or proved to me under oath through
   _____) (description of identity card or other

9 document) to be the person whose name is subscribed to
   the foregoing instrument and acknowledged to me that

10 they executed the same for the purposes and
   consideration therein expressed.

11    Given under my hand and seal of office this

12 _____ day of _____, _____.

13

14    _____
   NOTARY PUBLIC IN AND FOR

15 THE STATE OF _____

16

17

18

19

20

21

22

23

24

25

## Page 252

1    UNITED STATES DISTRICT COURT
   FOR THE SOUTHERN DISTRICT OF TEXAS

2    HOUSTON DIVISION

3 UNITED STATES OF    :
   AMERICA

4 VS.        : CIVIL ACTION NO. 4:18-CV-00644

5 CITY OF HOUSTON    :

6 _____

7 JANE DRAYCOTT AND   :
   PAULA KEYES

8 VS.        :

9 CITY OF HOUSTON    :

10

11    REPORTER'S CERTIFICATION

12    DEPOSITION OF GEORGE LUTHER McATEER, JR.

13    April 11, 2019

14

15    I, Craig Michael Bechtel, Certified Shorthand

16 Reporter in and for the State of Texas, hereby certify

17 to the following:

18    That the witness, GEORGE LUTHER McATEER, JR., was

19 duly sworn by the officer and that the transcript of the

20 oral deposition is a true record of the testimony given

21 by the witness;

22    That the deposition transcript was submitted on

23 _____ to the witness or to the attorney

24 for the witness for examination, signature and return to

25 me by _____;

## Page 253

1    That the amount of time used by each party at the

2    deposition is as follows:

3    Mr. Jeremy Monteiro - 06:03

4    Mr. Dwain Capodice - 00:43

5    Ms. Deidra Sullivan - 00:02

6    That pursuant to information given to the

7    deposition officer at the time said testimony was taken,

8    the following includes counsel for all parties of

9    record:

10    COUNSEL FOR PLAINTIFF UNITED STATES OF AMERICA:
    Mr. Jeremy P. Monteiro

11    Mr. Hector F. Ruiz, Jr.
    U.S. Department of Justice

12    Civil Rights Division
    601 D Street, NW, Room 4500

13    Washington, DC 20004
    hector.ruiz@usdoj.gov

14    jeremy.monteiro@usdoj.gov

15    and

16    Ms. Elizabeth F. Karpati
    U.S. Department of Justice

17    Southern District of Texas
    1000 Louisiana, Suite 2300

18    Houston, Texas 77002
    713-567-9767

19    elizabeth.karpati@usdoj.gov

20    COUNSEL FOR PLAINTIFFS JANE DRAYCOTT AND PAULA KEYES:
    Mr. Dwain Capodice

21    Ahmad & Capodice
    24900 Pitkin, Suite 300

22    The Woodlands, Texas 77386
    832-767-3207

23    dcapodice@ahmad-capodice.com

24

25

## Page 254

1    COUNSEL FOR DEFENDANT:
2    Ms. Deidra N. Sullivan
    Ms. Marjorie L. Cohen
3    City of Houston Legal Department
    900 Bagby, 3rd Floor
4    Houston, Texas 77002
    832-393-6457
5    deidra.sullivan@houstontx.gov
    marjorie.cohen@houstontx.gov

6    I further certify that I am neither counsel for,

7    related to, nor employed by any of the parties or

8    attorneys in the action in which this proceeding was

9    taken, and further that I am not financially or

10    otherwise interested in the outcome of the action.

11    Further certification requirements will be

12    certified to after they have occurred.

13    Certified to by me this _____ day of

14    _____, _____.

15

16

17

18    _____
    Craig Michael Bechtel, Texas CSR 6462
19    Lexitas
    Firm Registration No. 95
20    13101 Northwest Freeway, Suite 210
    Houston, Texas 77040
21    888-893-3767
    Expiration: 10-31-21

22

23

24

25