United States District Court
Southern District of Texas

**ENTERED**

May 15, 2020

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff, | § | |
| | § | |
| JANE DRAYCOTT and PAULA KEYES, | § | |
| Plaintiffs-Intervenors, | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-0644 |
| | § | |
| THE CITY OF HOUSTON, TEXAS, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, the United States of American ("USA"), and plaintiff-intervenors, Jane Draycott ("Draycott") and Paula Keyes ("Keyes"), bring this action against defendant, the City of Houston (the "COH"), for engaging in employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 et seq. Pending before the court are Plaintiff United States's Motion for Summary Judgment and Memorandum in Support ("USA's MSJ") (Docket Entry No. 59), Defendant's Motion for Summary Judgment ("COH's MSJ") (Docket Entry No. 63), Plaintiff United States' Motion to Exclude Testimony of Defendant's Expert Dr. Dwight D. Steward ("USA's Motion to Exclude Steward Testimony") (Docket Entry No. 81), Defendant's Motion to Exclude or Limit Opinion Testimony of Plaintiffs' Designated Economics Expert Jon Wainwright ("COH's Motion to Exclude Wainwright Testimony") (Docket Entry No. 82), Defendant's Motion to Exclude or Limit Opinion Testimony of Plaintiff's Designated Mental Health Experts (Docket

Entry No. 83), Defendant's (Corrected) Motion to Exclude or Limit Opinion Testimony of Plaintiff's Designated Mental Health Experts ("COH's Corrected Motion to Exclude Mental Health Experts' Testimony") (Docket Entry No. 85), and Defendant's Objections to and Motion to Strike Plaintiff United States' Summary Judgment Exhibits ("COH's Objections and Motion to Strike") (Docket Entry No. 120). Because the parties have tentatively resolved all claims brought on behalf of Keyes, the pending motions relate solely to claims brought on Draycott's behalf.[1]  For the reasons set forth below, the USA's MSJ (Docket Entry No. 59) will be granted, the COH's MSJ (Docket Entry No. 63) will be denied, the USA's Motion to Exclude Steward Testimony (Docket Entry No. 81) will be granted, the COH's Motion to Exclude Wainwright Testimony (Docket Entry No. 82) will be denied, Defendant's Motion to Exclude or Limit Opinion Testimony of Plaintiff's Mental Health Experts (Docket Entry No. 83) will be declared moot in light of the COH's Corrected Motion to Exclude Mental Health Experts' Testimony (Docket Entry No. 85) which will be denied, and the COH's Objections and Motion to Strike (Docket Entry No. 120) will be denied.

---

[1]See USA's MSJ, Docket Entry No. 59, p. 6 n. 1 ("Ms. Keyes has resolved all of her claims against the City, pending finalizing of the settlement agreement."); COH's MSJ, Docket Entry No. 63, p. 11 n. 1) ("The parties have tentatively resolved all claims brought by Plaintiff on behalf of Paula Keyes, including injunctive relief arising from Keyes' claims, and claims brought by Keyes, individually as intervenor."). Page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system.

## I.   Factual and Procedural Background[2]

This civil rights action stems from events that occurred in 2009 and 2010 at Houston Fire Department ("HFD") Station No. 54, which was one of HFD's four Aircraft Rescue and Firefighting ("ARFF") Stations.   Station 54 staffed firefighters on four shifts known as A, B, C, and D.   A Junior Captain and a Senior Captain were on duty during each shift.   Both Captains reported to an off-site District Chief.

Draycott began working for HFD in August of 2000.   On September 26, 2006, her 17-year old daughter Amanda was killed in a motor vehicle crash in Arizona.   On October 22, 2007, Draycott completed the requirements of Firefighter Master, a certification required to respond to aircraft accidents and other emergencies at airports.[3]   Draycott transferred to ARFF Station 54 A shift in August of 2008.   Keyes was assigned to Station 54 A shift in April

---

[2]The factual background is based on the Appendix: Statement of Material Facts in Support of City of Houston's Motion for Summary Judgment ("COH's Statement of Facts"), Docket Entry No. 63-1; the Statement of Facts in COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85, pp. 7-10; Appendix 2: Plaintiff United States' Separate Statement of Material Facts Foreclosing Summary Judgment ("USA's Statement of Facts"), Docket Entry No, 105-2; and the Factual Background included in Plaintiff-Intervenor Jane Draycott's Response to Defendant's Motion for Summary Judgment ("Draycott's Response to the COH's MSJ"), Docket Entry No. 114, pp. 7-21.

[3]See Draycott Firefighter Master Certificate, Exhibit 35 to Plaintiff United States' Opposition to Defendant's Motion for Summary Judgment ("USA's Response in Opposition to the COH's MSJ"), Docket Entry No. 100-4.

of 2009.  When Draycott and Keyes were assigned to the Station 54
A shift, Isidro Tamez ("Tamez") was the Senior Captain and Erich
Hencshel ("Hencshel") was the Junior Captain.  Tamez and Hencshel
reported to District Chief George McAteer ("McAteer").

Firefighters at Station 54 worked two 24-hour shifts per week,
as well required "debit days" (an extra 24-hour shift worked once
a month).  During their shifts firefighters lived, ate, and slept
at the station.  Station 54 had separate dormitories and bathrooms
for men and women.  Female firefighters were expected to clean the
women's dormitory and bathroom.  Although HFD ARFF policy
prohibited male firefighters from entering female dormitory and
bathroom areas,[4] male firefighters were allowed to violate that
policy when no women were on shift.

When Draycott and Keyes arrived for their shifts, they
regularly found urine on the toilets, the floors, and the walls,
and in the sink in the women's bathroom.  They found chewing
tobacco spit cups in the women's dormitory, finger nail clippings
in their beds, and their personal items disturbed and sometimes
removed from their lockers and damaged.  On occasion chewing
tobacco was found spit directly into the women's dresser drawers.

Draycott and Keyes complained repeatedly to Hencshel about the
conditions regularly found in the women's dormitory and bathroom.

_____

[4]See ARFF Bulletin from Chief McAteer's Office dated February
18, 2007, Exhibit 33 to USA's Response in Opposition to the COH's
MSJ, Docket Entry No. 100-3.

Beginning on April 10, 2009, Hencshel began recording complaints about the women's dormitory and bathroom in the station Log Book which was accessible to every firefighter at the Station. On May 13, 2009, Hencshel recorded that during Roll Call he questioned whether any firefighter had gone into the women's dormitory and reminded his staff that those areas were off limits. On May 18, and June 19, 2009, Hencshel recorded that urine was reported on the toilet in the women's bathroom. On June 19, 2009, Draycott reported to Hencshel that she had tried to take a shower and had been scalded by hot water. An investigation revealed that the cold water valve in the ceiling had been manually turned off although there were no records of any maintenance work around that time.

On June 21, 2009, Hencshel emailed the other captains at Station 54, informing them that he had received numerous complaints about urine on the women's toilet seat and rim, and asked them to advise their staffs that the women's dormitory and bathroom were off limits. Following that notification, the announcement speakers in the women's dormitory were manually turned off, causing Keyes to miss a call, and Draycott to nearly miss a call, and the cables to the television in the women's dormitory went missing. District Chief McAteer was apprised of at least some of the problems about which Draycott and Keyes were complaining, but his only response was to instruct the Station 54 captains to manage the situation.

-5-

After complaining to Henschel repeatedly, but to no avail, about the conditions regularly found in the women's dormitory and bathroom, Draycott filed a gender discrimination complaint with Staff Services on June 29, 2009. Draycott's complaint was referred to the COH's Office of Inspector General ("OIG") for investigation. OIG investigated the following allegations: (1) women's restroom conditions including urine being left on the toilet, walls, and floors, and in the sink; (2) Draycott's locker being disturbed; (3) Draycott's mattress being moved; (4) cold water to the women's shower being turned off; (5) television cables being removed from the women's dormitory; (6) announcement speakers in the women's dormitory being turned off; and (7) debris, including tobacco spit and nail clippings, being left in the women's dormitory. OIG sustained Draycott's complaints about the cold water to the women's shower and the volume to the speakers in the women's dormitory being turned off, but did not recommend corrective action.[5]

After Draycott filed the complaint with Staff Services, she and Keyes were scheduled to be off for a week. When they returned to work on July 7, 2009, Draycott and Keyes found the women's dormitory vandalized, "die bitch" written on the door to Draycott's locker, and "die bitch" and "nigger lover" written on the wall above her desk next to a picture of her children. Inside

---

[5]See OIG Investigation No. 2009-424, Exhibit L to COH's MSJ, Docket Entry No. 75 (stating that this exhibit is filed on a CD).

Draycott's locker the word "dead" was written on a picture of her deceased daughter, the word "die" was written on her picture, and black marks were made on her other family pictures. Above Keyes' desk, the words "die nigger" were written and her family photographs were defaced and knocked off her desk. Emotionally distraught by the vandalism, Draycott and Keyes were both placed on administrative leave.

Draycott reported the vandalism to her captains, and she and Keyes filed complaints with the OIG, which were referred for investigation to the Houston Police Department ("HPD"). During investigation of the vandalism of the women's dormitory at Station 54, HPD ordered 18 firefighters, including Draycott and Keyes, to submit to polygraph tests. HPD also collected handwriting samples from a number of firefighters, including Draycott and Keyes. No suspects were identified.[6] While HPD investigated the July 7, 2009, vandalism of the women's dormitory at Station 54, Keyes transferred to the Hobby Airport station, and Draycott was instructed to work at Station 99. Because the male firefighters at Station 99 were openly hostile, Draycott returned to administrative leave until the investigation was completed.

Draycott filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 15, 2009,

---

[6]See OIG Investigation No. 2009-407, Exhibit K to COH's a CD, Docket Entry No. 75 (stating that this exhibit is filed on a CD).

and amended her charge to include additional charges of retaliation on April 6, 2010.[7]

The COH retained the law firm of Thompson & Horton to evaluate the effectiveness of HFD policies, practices, and training related to workplace harassment and discrimination, and on December 7, 2009, the firm issued their assessment and recommendations.[8]  Based on the Thompson & Horton Assessment, the COH moved OIG from HPD to the legal department, and revised policies and procedures related to investigations of complaints of work place harassment, discrimination, and retaliation.

In October of 2009, Draycott began therapy with Dr. William E. Metcalfe, an HPD staff psychologist.  Dr. Metcalfe was able to treat Draycott because her husband was employed by HPD.

In November of 2009, then Fire Chief Phil Boriskie informed Draycott's attorney that his preference was for Draycott not to return to Station 54 but, instead, to accept another assignment. Boriskie told Draycott's attorney that she could work any assignment that she wished, including in his office.  Draycott, however, wanted to return to work the Station 54 A shift.

Boriskie scheduled Draycott to return to work the Station 54 A shift on January 13, 2010.  On January 7, 2010, Boriskie and

_____

[7]See Charge of Discrimination, Exhibit 57 to USA's Response in Opposition to the COH's MSJ, Docket Entry No. 105-43.

[8]See Houston Fire Department Assessment ("Thompson & Horton Assessment"), Exhibit R to COH's MSJ, Docket Entry No. 74-2.

members of his command staff met with the other members of Station 54's A shift to inform them that Draycott would be returning to work on January 13th, and that a Critical Incident Stress Management ("CISM") meeting with HFD staff psychologist Dr. Finney would be held immediately after Roll Call the day Draycott returned.  Station 54 A shift members told Boriskie that they did not want Draycott to return.

On January 11, 2010, Captain Brian Williamson who was then the Junior Captain for Station 54's A shift, organized a meeting of select firefighters who decided to oppose Draycott's return by delivering prepared statements at Roll Call the day of her return.

On January 13, 2010, Boriskie arrived at Station 54 about 6:00 a.m. so that he would be present when Draycott returned and he could participate in the CISM meeting.  Also present at Station 54 that morning were members of Boriskie's command staff, Assistant Fire Chiefs Karen DuPont, Omero Longoria, and Daniel Snell, District Chief McAteer, ARFF division-wide coordinator Ronald Krusleski, staff psychologist, Dr. Finney, union representative, Alvin White, all members of the Station 54 A shift, some members of the previous shift, and some firefighters from other stations.

During the 7:00 a.m. Roll Call Captain Williamson read a prepared statement opposing Draycott's return to Station 54 stating, _inter alia,_ that he did not trust Draycott, he could not guarantee her safety, and he questioned her mental health and

ability to do her job.[9]   Other firefighters made similar statements
opposing Draycott's return to Station 54 stating that they did not
trust her and blamed her for a host of negative consequences
attributed to the investigation of her complaints.   Draycott tried,
but was not allowed, to respond.   Although present, neither
Boriskie, the members of his command staff present, nor the HFD
psychologist intervened, but allowed the firefighters to speak
against Draycott without interruption.

The statements being made against her without recourse made
Draycott visibly upset.   At the recommendation of the union
representative, Alvin White, Draycott did not work her shift but,
went to meet with psychologist, Dr. William Metcalfe, who had been
treating her since October of 2009.   Following her meeting with
Dr. Metcalfe, Draycott went home and started another period of
administrative leave.

Draycott filed a retaliation complaint with OIG about the
events of January 13, 2020.[10]

On March 30, 2010, OIG informed Draycott and Keyes that while
their complaints about the July 7, 2009, vandalism of the women's
dormitory at Station 54 would be sustained, "there is not enough

---

[9]See Captain Williamson's Statement Read at January 13, 2010,
Roll Call, Exhibit 65 to USA's Response in Opposition to COH's MSJ,
Docket Entry No. 101-5.

[10]See OIG Investigation No. 2010-311, Exhibit M to COH's MSJ,
filed on a CD, Docket Entry No. 75.

evidence to determine the identity of any person or persons who participated in this criminal act."[11]   OIG sent its findings to Acting Fire Chief Rick Flanagan, who took no action.

On April 6, 2010, Draycott amended her EEOC charge to include a charge of retaliation.[12]

In April of 2010 Draycott returned to work the B shift at Station 54 without incident.

On August 9, 2010, Draycott injured her knee at work and left to see a doctor.  That same day, she received news from the District Attorney in Phoenix, Arizona, who was prosecuting a case arising from the crash that killed her daughter, that the person responsible for the crash would not receive any jail time. Disturbed by this news, Draycott drank a bottle of vodka at her daughter's grave.  Draycott then went to Wal-mart, picked up some merchandise, went to get a bag of ice past the check-out line, kept going, and was arrested for shoplifting.  Following her arrest, Draycott was hospitalized, and placed on relief of duty status with pay pending evaluation of her psychological fitness for duty.[13]

---

[11]See March 30, 2010, Letters from G. Buenik, Inspector General, to J. Draycott and P. Keyes, Exhibit 56 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 101-1, pp. 2 and 3.

[12]See Charge of Discrimination, Exhibit 57 to USA's Response in Opposition to the COH's MSJ, Docket Entry No. 105-43, pp. 2-13.

[13]See October 7, 2010, Letter from T. Garrison, Fire Chief, to Jane Draycott,  Exhibit 75 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 105-48, p. 2.

In October of 2010 Draycott reached out to the Houston Firefighters Relief and Retirement Fund ("HFRRF") to begin the process of seeking disability pension benefits. As part of the process, Dr. Metcalfe prepared and submitted a "Physician's Certificate of Applicant's Disability" to the HFRRF in which he opined that Draycott's disability was "likely to be permanent" and was the result of an "on-duty illness/accident."[14]

On December 16 and 27, 2010, Forensic Psychiatrist, Dr. Larry Nahmias, examined Draycott at the COH's request. Dr. Nahmias concluded that Draycott was "not psychologically fit to perform her duties as a firefighter presently or in the future,"[15] and was "suffering from significant and severe psychological problems that prevent her from returning to her usual occupation. Her symptoms cause her permanent total impairment in her usual occupation."[16]

On June 27, 2011, at the request of the HFRRF, Draycott was examined by independent psychiatrist, Dr. William K. Drell, who found her permanently unable to work as a firefighter, and stated,

---

[14]Physician's Certificate of Applicant's Disability completed by William E. Metcalfe, M.D., Exhibit 7 to the COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-8, p. 2.

[15]Nahmias Evaluation, Exhibit 5 to the COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-6, p. 10.

[16]Id. at 11.

"I do believe Mrs. Draycott's disabling symptoms are directly related to her work related incidents."[17]

In July of 2011 Draycott resigned because she was not able to work as a firefighter.

On August 7, 2012, Dr. Drell re-evaluated Draycott, and again concluded that "her disability was directly caused by experience with the fire department," and stated that "I do not believe she can perform the usual and customary duties of a firefighter/EMT due to her Post Traumatic Stress Disorder. I do anticipate her ability to work for HFD will be permanent."[18]

On or about April 4, 2016, "the EEOC sent letters advising that 'efforts to conciliate this charge as required by Title VII . . . have been unsuccessful' and that the charges were being referred to the Department of Justice."[19]

In October of 2017, HFD staff psychologists, Dr. Jana Tran and Dr. Sam Buser, produced a memo ("Tran-Buser Memo") that they

---

[17]July 11, 2011, Letter from William K. Drell to Glenna Hicks, Deputy Director of Member Services, Exhibit 79 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 103-7, p. 4.

[18]August 13, 2012, Letter from William K. Drell to Glenna Hicks, Deputy Director of Member Services, Exhibit 80 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 103-8, p. 4.

[19]See Declaration of Jeremy P. Monteiro, Esq., in Support of Plaintiff United States' Response in Opposition to the City of Houston's Motion for Summary Judgment ("Monteiro Declaration"), p. 1 ¶ 3, Exhibit 1 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 105-5, p. 1 ¶ 3 (citing Attachment A, April 4, 2016, Letters from EEOC to the City of Houston Legal Department Re: Conciliation Failure (Draycott and Keyes Charges)).

provided to HFD command staff stating the findings from a survey of female firefighters that they undertook in an effort to determine how the HFD compared to fire departments across the country with respect to gender discrimination and harassment in a range of categories including, shunning and isolation, verbal harassment, pornography, hazing, and hostile notes.   In pertinent part the Tran-Buser Memo stated:

> We surveyed our women based on the April 2008 National Report Card on Women in Firefighting, which documented gender discrimination and harassment problems in departments across the nation.  How did HFD compare? . . . Our HFD female firefighters were given the opportunity to elaborate.  In reviewing their responses, it was clear that they are often faced with harassment, bullying, and discrimination.  Specifically, they gave personal accounts of sexual advances, walking in on men watching porn, and finding pornographic material at the station. They described incidents of being bullied by their crew, being told they are not good enough, and not having the same opportunities as men to prove themselves.[20]

On February 28, 2018, the United States filed this action for gender discrimination, hostile work environment and retaliation against the COH.  The United States subsequently notified Draycott and Keyes of their right to intervene, and on March 29, 2018, they filed their complaint in intervention.

---

[20]October 5, 2017, Memo to HFD Command Staff from Dr. Jana Tran & Dr. Sam Buser, HFD Staff Psychologists, Exhibit 81 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 105-49, p. 2.

## II.   <u>Motions to Exclude, Limit, and Strike Evidence</u>

Citing Rule 702 of the Federal Rules of Evidence, <u>Daubert v.</u> <u>Merrell Dow Pharmaceuticals, Inc.,</u> 113 S. Ct. 2786 (1993), and its progeny, the United States moves to exclude the opinion testimony of the COH's designated economics expert, Dr. Dwight D. Steward (Docket Entry No. 81), and the COH moves to exclude or limit the opinion testimony of the United States' designated economics expert, Dr. Jon Wainwright (Docket Entry No. 82), and mental health experts, Dr. Metcalfe and Dr. Drell (Docket Entry Nos. 83 and 85). The COH also seeks to exclude Dr. Drell's testimony by arguing that the United States' designation of him as an expert witness does not comply with Rule 26(a)(2)(C).  Citing Federal Rule of Evidence 702, the COH objects to and moves to strike the United States' Summary Judgment Exhibit 81 (Docket Entry No. 105-49), the October 5, 2017, Tran-Buser Memo prepared and distributed to HFD Command Staff by HFD Staff Psychologists, Dr. Jana Tran and Dr. Sam Buser, and citing Federal Rules of Evidence 801 and 802, the COH also moves to strike as hearsay the United States Summary Judgment Exhibit 28 (Docket Entry No. 104), the Statement of Margaret Roberts (Docket Entry No. 120).

## A.    Applicable Law

Federal Rule of Evidence 702 allows expert testimony to be admitted that assists the trier of fact to understand the evidence or determine a fact in issue. Fed. R. Evid. 702.  Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

When asked to do so, a district court must make a preliminary determination as to whether the requirements of Rule 702 are satisfied with respect to a particular expert's proposed testimony. See Daubert, 113 S. Ct. at 2796 (citing Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, . . . or evidence is admissible.").  Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 119 S. Ct. 1167, 1176 (1999).  The party offering the expert's testimony bears the burden

of proving by a preponderance of the evidence that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable.  <u>Daubert,</u> 113 S. Ct. at 2794.  <u>See also  Pipitone v. Biomatrix, Inc.,</u> 288 F.3d 239, 244 (5th Cir. 2002) ("[E]xpert testimony is admissible only if it is both relevant and reliable.").

To be qualified an expert "witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." <u>United States v. Hicks,</u> 389 F.3d 514, 524 (5th Cir. 2004), <u>cert. denied,</u> 126 S. Ct. 1022 (2006) (quoting <u>United States v. Bourgeois,</u> 950 F.2d 980, 987 (5th Cir. 1992)).  To be relevant the reasoning or methodology underlying the expert's testimony must be applicable to the facts in issue.  <u>See Curtis v. M&S Petroleum, Inc.,</u> 174 F.3d 661, 668 (5th Cir. 1999) (citing <u>Daubert,</u> 113 S. Ct. at 2796).  To be reliable the reasoning or methodology underlying the expert's testimony must be scientifically valid.  <u>Id.</u>  "The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." <u>Moore v. Ashland Chemical, Inc.,</u> 151 F.3d 269, 276 (5th Cir. 1998) (en banc), <u>cert. denied,</u> 119 S. Ct. 1454 (1999).  <u>See also Guy v. Crown Equipment Corp.,</u> 394 F.3d 320, 325 (5th Cir. 2004) ("Although the <u>Daubert</u> analysis is applied to ensure expert witnesses have employed reliable principles and

methods in reaching their conclusions, the test does <u>not</u> judge the expert's conclusions themselves.").

The Fifth Circuit has recognized that <u>Daubert</u> articulated a non-exclusive, list of flexible criteria for determining reliability, including:

> (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.

<u>Moore</u>, 151 F.3d at 275 (citing <u>Daubert,</u> 113 S. Ct. at 2796-97). Not all of the factors will necessarily apply to every expert's testimony.  <u>See Watkins v. Telsmith, Inc.,</u> 121 F.3d 984, 990-91 (5th Cir. 1997).  The court should first decide whether the factors mentioned in <u>Daubert</u> apply, and then consider whether other factors not mentioned in <u>Daubert</u> are relevant to the case.  <u>See Black v.</u> <u>Food Lion, Inc.,</u> 171 F.3d 308, 310-12 (5th Cir. 1999).  <u>See also</u> <u>Moore,</u> 151 F.3d at 275 & n. 6 (recognizing that expert medical testimony is governed by <u>Daubert</u> analysis).

Disclosure of expert testimony is governed by Federal Rule of Civil Procedure 26.  If a party retains an expert to provide testimony in anticipation of litigation (a retained testifying expert), the party must provide a written report that includes the facts or data considered by the expert, any exhibits to be used to summarize or support the expert's testimony, the expert's qualifications, a list of cases in which the expert has testified

-18-

previously, and a statement of compensation.  Fed. R. Civ. P. 26(a)(2)(B).  If the party does not retain the expert in anticipation of litigation (a non-retained expert), the party need only provide a disclosure stating "(i) the subject matter on which the [expert] is expected to present evidence . . . and (ii) a summary of the facts and opinions to which the [expert] is expected to testify."  Fed. R. Civ. P. 26(a)(2)(C).  The Rule 26(a)(2)(C) disclosure requirement applicable to non-retained experts was added in 2010 and is intended to be less stringent than the requirements applicable to retained experts.  Fed. R. Civ. P. 26 advisory committee's note (2010).  Rule 26's disclosure requirements are intended to prevent prejudice and exclude surprise as a factor in the outcome of trials.  See Joe Hand Promotions, Inc. v. Chios, Inc., 544 F. App'x 444, 446 (5th Cir. 2013)(per curiam).

Courts do not rely solely on the labels used by the parties in their disclosures.  A court may find that a party mischaracterized an expert as non-retained, for example, when the party should have characterized the expert as retained, and thus hold the party subject to the Rule 26(a)(2)(B) report requirement.  See McCranie v. Home Depot U.S.A., Inc., No. 4:15-CV-00423-ALM-CAN, 2016 WL 7626597, * 6 & n. 2 (N.D. Tex. August 25, 2016) (citing Skyeward Bound Ranch v. City of San Antonio, No. SA-1-CV-0316-XR, 2011 WL 2162719, at * 3 n. 25 (W.D. Tex. June 1, 2011).

**B.  Analysis**

    1.   <u>The USA's Motion to Exclude Steward's Testimony and the</u>
        <u>COH's Motion to Exclude Wainwright's Testimony</u>

The United States' economics expert, Dr. Wainwright, submitted his initial report on March 25, 2019, estimating the present value of the economic loss Draycott suffered as a result of her alleged constructive discharge from HFD, as falling between $1,200,278 and $1,248,335.[21]  Dr. Wainwright issued a revised report in July of 2019, concluding that the present value of Draycott's economic loss falls between $748,461 and $929,747.[22]  In both of his reports, Dr. Wainwright relied on the medical evaluations produced by Dr. Nahmias, who was hired by the COH to evaluate Draycott's fitness for duty, and Dr. Drell, who was hired by HFRRF to evaluate Draycott's eligibility for disability retirement benefits.  Based on the evaluations of Dr. Nahmias and Dr. Drell, Dr. Wainwright concluded that Draycott was not fit to perform the duties of an HFD firefighter.[23]

---

[21]Estimation of Economic Losses for Jane Draycott, Exhibit 1 to USA's Motion to Exclude Steward Testimony, Docket Entry No. 81-1, pp. 8-9 ¶ 5.

[22]Estimation of Economic Losses for Jane Draycott, Exhibit 2 to USA's Motion to Exclude Steward Testimony, Docket Entry No. 81-2, pp. 7-8 ¶ 5.

[23]<u>See id.</u>, at p. 7 ¶ 4 ("Both of these evaluations conclude that Mrs. Draycott is prevented from returning to work in her usual occupation.  Therefore, the only post-departure earnings I have included in my estimate of loss for Mrs. Draycott are those from her HFD On-Duty Occupational Disability Retirement Pension and her
(continued...)

The COH retained Dr. Steward, an economist and statistician, as its expert to rebut Dr. Wainwright's reports.  Dr. Steward submitted an initial report in April of 2019 responding to Dr. Wainwright's March 2019 report,[24] and a supplemental report in July of 2019 responding to Dr. Wainwright's July 2019 report.[25]

    (a)   The USA's Motion to Exclude Dr. Steward's Testimony Will Be Granted

The United States moves to exclude the opinion testimony of the COH's designated economics expert Dr. Steward

> on what jobs Ms. Draycott "could have been, and still can be, expected to obtain" (Ex. 3 at ¶¶ 40-41, 43), as well as his opinion that Ms. Draycott "is in fact employable" (Ex. 3 at ¶ 39), because these opinions fail to meet the requirements of Federal Rule of Evidence 702. Dr. Steward is an economist and statistician.  He is not a physician and has no medical training.  By opining that Ms. Draycott can "be expected to obtain" different types of employment and that she "is in fact employable" without considering medical conclusions from the City's own doctor that Ms. Draycott suffered a permanent impairment which prevents her from working as a firefighter, Dr. Steward goes beyond his expertise as an economist and statistician.  As a result, Dr. Steward's

---

[23](...continued) one time $5,000 Additional Disability Retirement Benefit."). <u>See also</u> Estimation of Economic Losses for Jane Draycott, Exhibit 1 to USA's Motion to Exclude Steward Testimony, Docket Entry No. 81-1, p. 8 ¶ 4 (same).

[24]Expert Report Dwight D. Steward, Ph.D. Economist April 25, 2019 ("Steward Report"), Exhibit 3 to USA's Motion to Exclude Steward Testimony, Docket Entry No. 81-3.

[25]Supplement Expert Report Dwight D. Steward, Ph.D. Economist July 15, 2019 ("Steward Supplement Report"), Exhibit 4 to USA's Motion to Exclude Steward Testimony, Docket Entry No. 81-4.

opinions addressing Ms. Draycott's employability and employment opportunities available to her are neither helpful nor reliable, and should be excluded.[26]

The United States argues that

> [i]n paragraph 39, Dr. Steward opines that Ms. Draycott "is in fact employable," asserting that Dr. Wainwright employed a false assumption. . . In paragraph 40, Dr. Steward states Ms. Draycott "could have been, and can still be, expected to obtain" replacement employment, and he identifies three occupations — Fire Inspector, Forest and Conservation Worker, and Hazardous Material Removal Worker — as jobs similar to a Firefighter-EMT that Ms. Draycott "could reasonably be expected to obtain." . . . In paragraph 43, Dr. Steward states that Ms. Draycott "could have been expected to obtain a comparable job within a reasonable period of time . . ." . . .
>
> As shown below, Dr. Steward's opinions regarding what (if any) employment Ms. Draycott could obtain are not reliable and not helpful. Dr. Steward is not qualified to opine that Ms. Draycott could obtain comparable work (see Ex. 3 at ¶¶ 39, 40-41, 43) given the medical diagnoses from two physicians determining that Ms. Draycott has impairments impacting her ability to work. In forming his opinions on her employability, Dr. Steward failed to consider the diagnoses of not only the City's own examining physician, but also that of the pension fund's examining physician. Further, Dr. Steward's opinions cannot assist in the determination of whether Ms. Draycott can work and, if so, what occupations might be suitable because he admits he is not qualified to opine on whether Ms. Draycott can perform any of the jobs he identifies in his report and because he testified that he is not actually offering an opinion on whether she can work. For these reasons, Dr. Steward's opinions on Ms. Draycott's employability are not helpful and not reliable, and should be excluded.[27]

---

[26]USA's Motion to Exclude Steward Testimony, Docket Entry No. 81, p. 9.

[27]Id. at 8-9. See also Plaintiff United States' Reply in Support of Its Motion to Exclude Testimony of Defendant's Expert
(continued...)

The United States "requests that this Court issue on Order excluding Dr. Steward from opining on Ms. Draycott's employability and employment opportunities available to her for purposes of the United States' pending motion for summary judgment and for trial."[28]

The COH responds that "Dr. Steward provided his opinion that Dr. Wainwright inappropriately assumed that Draycott was, is, and will always be unemployable. Plaintiff has moved to exclude the opinion testimony of Dr. Steward in that regard. Plaintiff's motion should be denied."[29]  The COH argues that

> [w]hile the record in this case includes some opinions that Draycott cannot return to work at her own occupation as a firefighter, nobody has ever said that she is unable to work at any occupation whatsoever. Therefore, it was appropriate for Dr. Steward to provide the opinion that Dr. Wainwright should have considered whether Draycott could work as a Fire Inspector, Forest and Conservation Worker or Hazardous Materials Removal Worker. Dr. Steward is qualified to provide this opinion, and all the opinions in his expert report. Additionally, Dr. Steward's testimony will assist the trier of fact in determining whether Draycott is entitled to recover damages for lost wages. Accordingly, Defendant has proved, by a preponderance of the evidence, that Dr. Steward's testimony satisfies Daubert.[30]

---

[27](...continued)
Dr. Dwight D. Steward, Docket Entry No. 129, pp. 5-9 (arguing that Dr. Steward's Testimony on Draycott's employability is unreliable).

[28]USA's Motion to Exclude Steward Testimony, Docket Entry No. 81, p. 18.

[29]Defendant's Response in Opposition to Plaintiff United States' Motion to Exclude Testimony of Defendant's Expert Dr. Dwight D. Steward, Docket Entry No. 122, p. 5.

[30]Id. at 8-9.

"[E]xpert testimony is admissible only if it is both relevant and reliable." Pipitone, 288 F.3d at 244.  The United States does not argue that Dr. Steward's opinions about Draycott's employability are not relevant but, instead, argues only that his opinions that she is employable, and can be expected to obtain replacement employment as a Fire Inspector, Forest and Conservation Worker, or Hazardous Material Removal Worker, as expressed in ¶¶ 39-41 and 43 of his report, are not reliable because he is an economist and statistician unqualified to render opinions as to her future employability.  The court agrees.

In ¶ 39 Dr. Steward asserts that "[i]n contrast to Dr. Wainwright's flawed assumption, Mrs. Draycott . . . is in fact employable."[31]  In ¶¶ 40-41 and 43 Dr. Steward asserts:

> 40.  If Mrs. Daycott were to consistently and diligently seek comparable replacement employment, she could have been, and still can be, expected to obtain a job position with comparable earnings to what she was making at HFD. Generally accepted and widely used sources such as the United States Bureau of Labor Statistics (BLS) Occupational Outlook Handbook (OOH) identify a number of related and similar positions and occupations that Mrs. Draycott could reasonably be expected to obtain given her employment background and experience.  For instance, the jobs that the OOH identifies as similar job positions to a Firefighter-EMT include Fire Inspectors, Forest and Conservation Workers, and Hazardous Materials Removal Workers.  The BLS OOH is a widely used labor market resource that is generally relied upon by labor economists in my area of research.  The salaries associated with these similar job positions are comparable to Mrs. Draycott's salary at HFD. . .

---

[31]Steward Report, Exhibit 3 to USA's Motion to Exclude Steward Testimony, Docket Entry No. 81-3, p. 17 ¶ 39.

41. From 2013 through 2018, the Texas Workforce Commission (TWC) shows that there were at least 87 job openings for Fire Inspectors, Hazardous Material Removal Workers and Forest and Conservations Workers in the Houston area that Mrs. Draycott could have applied for during this time period. . . TWC job openings data from March 2019 show there were 24 job openings for Fire Inspectors, Hazardous Material Removal Workers and Forest and Conservation Workers in the Houston area. If Mrs. Draycott were to pursue employment opportunities as a firefighter, either in the private or public sector, her job opportunities would be even higher. It is my understanding that Mrs. Draycott has not attempted to obtain employment in a similar position or any job position. Dr. Wainwright does not consider that Mrs. Draycott may obtain employment in any type of positions at some point in the future.

. . .

43. Mrs. Draycott could have been expected to obtain a comparable job position within a reasonable period of time if she were to have performed a sufficiently diligent and consistent job search for comparable employment. Labor market data from the BLS Current Population Survey (CPS) indicate that Mrs. Draycott could have been expected to obtain comparable employment within approximately 11 to 25 weeks of beginning a sufficient job search following her employment termination in July 2011. . . [32]

Missing from Dr. Steward's report is any consideration of the impact that Draycott's disability and permanent inability to work as a firefighter has on her future employability. During his deposition Dr. Steward admitted that (1) he is not qualified to offer an opinion as to whether Draycott is physically or mentally able to perform any of the jobs comparable to her firefighter position that he opined were available had she searched for a job,

---

[32]Id. at 17-19 ¶¶ 40-41 and 43.

and (2) he did not consider whether she is mentally able to perform any of those jobs:

> Q.   So are you qualified to offer an opinion as to whether Ms. Draycott was physically able to perform any of those jobs?
>
> A.   No.
>
> Q.   Did you consider Ms. Draycott's mental abilities to perform any of those jobs?
>
> A.   I don't consider any of these factors. Again, my analysis is not an analysis of Ms. Draycott. I am telling you what Dr. Wainwright needs to do in his analysis. So I did not look at her mental state. That's not, has nothing to do with my expertise.
>
> Q.   If you could answer my question, that would be great. Did you consider Ms. Draycott's mental ability to perform any of these jobs? It's a yes or no answer.
>
> A.   Did I consider -- no.
>
> Q.   Thank you. And are you qualified to offer an opinion as to whether Ms. Draycott was mentally able to perform any of these jobs?
>
> A.   Again, what jobs are you referring to?
>
> Q.   The -- you've identified fire inspector, hazardous materials removal worker and forest conservation worker.
>
> A.   Yes, but that's what I'm telling you. I didn't identify those as jobs that she can work. I identified those as jobs that Dr. Wainwright needs to look at as potential jobs that she can work at. I'm not -- so no, I did not look at any of that, because that's not my opinion. I'm not performing an analysis of Ms. Draycott. I'm telling you what Dr. Wainwright needs to consider.[33]

---

[33]Oral Deposition of Dwight D. Steward, Ph.D., pp. 125:8-
(continued...)

Moreover, when asked about the use of vocational experts in injury cases and whether there was an injury aspect to this case, Dr. Steward acknowledged that he typically relies on a vocational expert to tell him what jobs the injured party can do, that he knew there was a post-traumatic stress issue in this case, but he did not "know how that relates to this case [and that it was] outside of [his] area."[34]

Because Dr. Steward has testified that he is not qualified to offer an opinion as to whether Draycott was physically or mentally able to perform any of the jobs that he opined were available and she would have found had she searched for a job, that he did not consider whether she is physically or mentally able to perform those jobs, and that in cases involving impairments, he typically relies on a vocational expert to tell him what jobs the impaired person can do, the court concludes that Dr. Steward's opinions that Draycott is "in fact employable,"[35] that she "could have been, and still can be expected to obtain a job position with comparable earnings to what she was making at HFD,"[36] that "[f]rom 2013 through

---

[33](...continued)
126:11, Exhibit 5 to USA's Motion to Exclude Steward Testimony, Docket Entry No. 81-5, p. 32.

[34]Id. at pp. 184:17-185:7, Exhibit 5 to USA's Motion to Exclude Steward Testimony, Docket Entry No. 81-5, pp. 46-47.

[35]Steward Report, Exhibit 3 to USA's Motion to Exclude Steward Testimony, Docket Entry No. 81-3, p. 17 ¶ 39.

[36]Id. ¶ 40.

2018, the . . . TWC shows that there were at least 87 job openings for Fire Inspectors, Hazardous Material Removal Workers and Forest Conservations Workers in the Houston area that Mrs. Draycott could have applied for,"[37] and/or that she "could have been expected to obtain a comparable job position within a reasonable period of time,"[38] are neither relevant nor reliable, and would not assist the trier of fact to understand the evidence or determine a fact at issue in this case. See Fed. R. Evid. 702. See also Moore v. International Paint, L.L.C., 547 F. App'x 513, 515 (5th Cir. 2013) (per curiam)("[E]xpert testimony that relies on 'completely unsubstantiated factual assertions' is inadmissible.") (citations omitted). See also Dunmiles v. Jubilee Towing, LLC, No. CV-16-14325, 2017 WL 1212091, at *4 (E.D. La. April 3, 2017) ("when calculating future lost wages, economists typically rely on other experts — such as vocational rehabilitation experts — to advise them as to the income a plaintiff can probably earn due to his injuries. Economists then use that information in conjunction with actuarial data to estimate the wage loss the plaintiff will probably sustain over the course of his lifetime."). Accordingly, the USA's motion to exclude Steward's testimony as to Draycott's employability as expressed in ¶¶ 39, 40-41, and 43 of his report will be granted.

---

[37] Id. at 18 ¶ 41.

[38] Id. at 19 ¶ 43.

> (b) The COH's Motion to Exclude Wainwright's Testimony
>     Will Be Denied

The COH moves to strike or limit the testimony of Dr. Wainwright, plaintiffs' designated expert on economic loss arguing that "it is unhelpful and not based on sufficient facts and/or data or reliable principles and methods."[39] Asserting that "Dr. Wainwright should not be permitted to testify because all of his opinions regarding Draycott's lost earnings and benefits are unreliable and inadmissible,"[40] the COH argues that Dr. Wainwright's

> opinions and conclusions regarding [Draycott's] economic damages are not based on sufficient facts and are not the product of reliable, verifiable, principles and methods. Because his testimony is based on speculation and conjecture, it cannot be used to support [Draycott's] claims for damages, and he should not be permitted to testify.[41]

The COH argues that Dr. Wainwright's opinions are unreliable because he (1) failed to base his damages calculations on Draycott's gross earnings, (2) relied on improper assumptions regarding Draycott's earnings from higher classification and overtime pay, (3) improperly assumed that Draycott would have worked until age 56, (4) failed to mention or analyze Draycott's ability to mitigate her losses by future employment, (5) improperly assumed that HFD would have provided Draycott an annual salary

---

[39]COH's Motion to Exclude Wainwright Testimony, Docket Entry No. 82, p. 6.

[40]Id. at 16.

[41]Id.

-29-

increase of 2.05%, and (6) failed to base his pension-related damages on facts.[42]

The United States responds that the issues the COH has identified go to the weight of the evidence, not to its admissibility, and can be adequately addressed during the COH's cross-examination of Dr. Wainwright.[43]   The court agrees.

For the reasons stated in § III.D, below, the COH's MSJ on Draycott's constructive discharge claim will be denied.  The COH does not challenge Dr. Wainwright's qualifications, training, or experience to provide an economic estimate of Draycott's economic damages stemming from her constructive discharge.  Nor does the COH challenge any of Dr. Wainwright's calculations or methodologies. Instead, the COH challenges the bases and sources of his opinions and variables used in his calculations.  If Dr. Wainwright missed any important facts, the oversight should go to the weight of his opinions, not to their admissibility.  See Puga v. RCX Solutions, Inc., 922 F.3d 285, 294 (5th Cir. 2019) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility.").   Accordingly, the COH's motion to exclude Dr. Wainwright's testimony will be denied.

---

[42]Id. at 7, 16-29.

[43]Plaintiff United States' Response in Opposition to Defendant's Motion to Exclude or Limit Testimony of Dr. Wainwright, Docket Entry No. 121, pp. 12 and 21.

2.   <u>The COH's Corrected Motion to Exclude Mental Health
     Experts' Testimony Will Be Denied</u>

On March 25, 2019, the United States designated Dr. Metcalfe

and Dr. Drell as expert witnesses under Rule 26(a)(2)(C).[44]

Asserting that Dr. Metcalfe is a psychologist who is expected to

offer testimony and provide opinions based on information learned

through medical treatment of Draycott between approximately 2009-

2013, and that Dr. Drell is a board certified psychiatrist who is

expected to offer testimony and provide opinions based on

information learned through treatment of Draycott in 2011-2012, the

United States stated that both Dr. Metcalfe and Dr. Drell may be

called to testify regarding:

> (1) Ms. Draycott's injuries sustained during her
> employment with HFD; (2) Ms. Draycott's conditions,
> symptomatology, diagnosis, and treatment resulting from
> the injuries sustained during her employment with HFD;
> (3) the cause(s) of Ms. Draycott's injuries, symptoms
> and/or condition sustained during her employment with
> HFD; (4) the authenticity and admissibility of any []
> medical records pertaining to Ms. Draycott he maintained;
> and (5) any pain and suffering, past and future,
> sustained by Ms. Draycott as a result of her employment
> with HFD.[45]

Asserting that plaintiffs seek to use the testimony of

Dr. Metcalfe and Dr. Drell to establish that the incidents at

Station 54 caused Draycott to develop mental health issues in

---

[44]Plaintiff United States' Disclosures Pursuant to Federal Rule
of Civil Procedure 26(a)(2), Exhibit 1 to COH's Corrected Motion to
Exclude Mental Health Experts' Testimony, Docket Entry No. 85-2,
pp. 2-3.

[45]<u>Id.</u> at 2 (Dr. Metcalfe) and p. 4 (Dr. Drell).

support of her claim for constructive discharge, the COH moves to exclude or limit their testimony by arguing that they "are not qualified to testify regarding causation and/or their testimony is not based on sufficient facts and/or data or reliable principles and methods."[46]   The COH argues that

> [n]either Dr. Metcalfe nor Dr. Drell were qualified to perform an occupational disability assessment. Nor are they qualified to provide opinions regarding whether Draycott was harassed while at HFD (an ultimate issue for the jury). They are not qualified to provide opinions regarding the cause of Draycott's mental health diagnoses. Further, their opinions regarding the cause of Draycott's mental health issues are not reliable because they are based on Draycott's unreliable and incomplete account of her contributing life experiences. And, neither purported expert's opinions are reliable or based on sound medical practices, because neither of them performed a differential diagnosis before reaching their conclusions.[47]

Citing <u>Daubert,</u> 113 S. Ct. at 2786, the COH argues that

> [t]he opinions of Dr. Metcalfe and Dr. Drell go beyond their expertise, and their methodologies in reaching their causation opinions are not reliable. Therefore, testimony by Dr. Metcalfe and Dr. Drell on causation will not assist the trier of fact.[48]

The COH also argues that Dr. Drell's testimony should be excluded because "Plaintiff did not accurately disclose the subject matter on which Dr. Drell is expected to present evidence."[49]

---

[46]COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85, p. 6.

[47]<u>Id.</u> at 10-11.

[48]<u>Id.</u> at 11.

[49]<u>Id.</u> at 30.

Asserting that they have no intention of asking any medical expert whether the acts Draycott alleged occurred violated Title VII or constituted discrimination or retaliation,[50] plaintiffs argue that the opinions of Dr. Metcalfe and Dr. Drell regarding the cause of Draycott's mental health conditions are admissible because both experts are qualified, and their opinions are both relevant and reliable.[51]   The United States argues that

> [n]either witness was retained by any party in this litigation. Rather, both witnesses treated and evaluated Ms. Draycott within their ordinary course of business using techniques and methods that are accepted within their professions. The United States seeks only to offer testimony from these medical professionals that was reached based on their personal knowledge and observations obtained during their course of care,

---

[50]Plaintiff United States' Response to Defendant City of Houston's (Corrected) Motion to Exclude or Limit Testimony of Plaintiff's Designated Mental Health Experts ("USA's Response to COH's Motion to Exclude Mental Health Experts' Testimony"), Docket Entry No. 126, p. 6 ("The United States did not designate either witness to provide testimony as to whether the events that give rise to this litigation or were relayed to them by Ms. Draycott amount to a violation of Title VII, and the United States will not seek such opinion testimony at trial.") and p. 23 ("With respect to the City's argument that Dr. Drell should not be allowed to opine that Ms. Draycott's allegations amount to a violation of Title VII's prohibition against workplace harassment, the United States has no intention of eliciting such testimony."); Plaintiff-Intervenor Jane Draycott's Response to Defendant City of Houston's Motion to Exclude or Limit Testimony of Plaintiff's Mental Health Experts ("Draycott's Response to COH's Motion to Exclude Mental Health Experts' Testimony"), Docket Entry No. 127, p. 4 ("Plaintiff-Intervenor has no intention of asking any medical expert whether the acts Draycott alleged occurred violated Title VII or was discrimination or retaliation.").

[51]USA's Response to COH's Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 126, pp. 13-30; Draycott's Response to COH's Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 127, pp. 5-16.

treatment, or evaluation of Ms. Draycott.  Such testimony
includes   their   diagnoses   and   prognoses   regarding
Ms. Draycott, their opinions that Ms. Draycott could no
longer work as a firefighter, and their opinions that the
events at HFD caused Ms. Draycott's inability to continue
as a firefighter.   These are all facts upon which the
United States bases its claims.  The City does not like
the testimony these medical professionals will provide,
has failed to retain an expert to counter these medical
professionals, and now seeks to prevent these medical
professionals    from    testifying    regarding    their
conclusions.   The Court should deny the City's motion
seeking  to  limit  or  exclude  Dr.  Metcalfe's  and
Dr. Drell's testimony on the issue of causation.[52]

Plaintiffs also argue that the COH's complaint the subject matter

on  which  Dr.  Drell  is  expected  to  testify  was  not  accurately

disclosed has no merit.[53]


(a)   Additional Law

Courts  have  recognized  that  treating  physicians,  who  are

experts regarding medical care, confound easy application of the

law governing expert witnesses, particularly where a party seeks to

use  their  expertise  to  testify  to  matters  of  causation.   See

McCranie, 2016 WL 7626597, at * 6.  Although the Fifth Circuit has

not  yet  ruled  on  (i)  the  applicability  of  Rule  26(a)(2)(C)  to

non-retained treating physicians or (ii) the scope of the testimony

permitted  by  such  experts  where  proper  disclosure  is  made,  the

---

[52]USA's  Response  to  COH's  Motion  to  Exclude  Mental  Health
Experts' Testimony, Docket Entry No. 126, pp. 6-7

[53]Id. at 28-30.  See also Draycott's Response to COH's Motion
to Exclude Mental Health Experts' Testimony, Docket Entry No. 127,
pp. 16-17.

trend among district courts in the Fifth Circuit is toward applying Rule 26(a)(2)(C) to treating physician experts. Id. Treating physicians, therefore, generally qualify as Rule 26(a)(2)(C) witnesses subject only to disclosure of a summary of the facts and opinions on which the physician intends to rely. See Fed. R. Civ. P. 26 advisory committee's notes (2010) ("A witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony . . . Frequent examples include physicians or other health care professionals . . . Parties must identify such witnesses . . . and provide the disclosure required under Rule 26(a)(2)(C)[, which] does not include facts unrelated to the expert opinions the witness will present."). See also See McCranie, 2016 WL 7626597, at * 6 (citing LaShip, LLC v. Hayward Baker, Inc., 296 F.R.D. 475, 478 (E.D. La. 2013) ("A [Rule] 26(a)(2)(c) witness's opinion must be based on facts or data obtained or observed in the course of the sequence of events giving rise to the litigation.")).

Where a treating physician is qualified under Rule 26(a)(2)(C), courts typically require the physician's testimony to remain within the bounds of "the facts and circumstances developed during the care of the patient," which may "include opinions as to causation, diagnosis, prognosis, and the extent of disability or injury[,]" as long as such opinions were developed in the course of diagnosis and treatment. Id. at *7 (citing Jones v. Chevron U.S.A., Inc., No. H-11-0851, 2012 WL 6652364, at *2 (S.D. Tex.

-35-

December 20, 2012)).  Such experts are generally allowed to offer testimony as to causation only if the physician formed such an opinion in the course of treatment.  Id. (citing LaShip, 296 F.R.D. at 479-81 (surveying other circuit courts before concluding that, with regard to treating physicians, 26(a)(2)(C) applies and that, where it does, the physician's "opinion must be based on facts or data obtained or observed in the course of the sequence of events giving rise to the litigation"); and Jones, 2012 WL 6652364, at *2 (limiting a nonretained examining expert's trial testimony "regarding the cause of [claimant's] psychiatric condition . . . to the opinions and conclusions actually expressed in his report"); Lindquist v. Union Pacific Railroad Co., No. 9:07-CV-27-TH, 2008 WL 4560603, at *1 (E.D. Tex. Oct. 7, 2008) (limiting "nonretained treating physician" testimony "to the facts and circumstances developed during the care of the patient").

> (b)  The COH's Motion to Exclude Metcalfe Testimony Will Be Denied

The COH argues that Dr. Metcalfe's testimony should be excluded or limited because he is not qualified to opine as to the cause of Draycott's mental disability, and because his opinion that her mental disability was caused by the events that occurred at Station 54 is neither scientifically nor technically reliable.[54]

---

[54]COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85, p. 16.

### (1)  Dr. Metcalfe is Qualified to Testify

Dr. Metcalfe has been practicing psychology since 1994,[55] and by the time he began treating Draycott in October of 2009 he had served as either Director or Assistant Director of two university counseling centers, obtained a job working at HPD's Psychological Services Division, and established an independent part-time practice performing psychological evaluations for people seeking jobs as police officers in jurisdictions other than the COH.[56] Moreover, the COH acknowledges that

> [a]t all times relevant, Dr. Metcalfe was a staff psychologist in [HPD's] Psychological Services Division and his primary duties included (1) providing counseling services to all eligible employees and their family members; (2) conducting psychological evaluations to determine the ability of HPD applicants to perform police-oriented type work; (3) teaching classes in a variety of areas such as stress management; (4) consulting with HPD management's concerns about HPD officers and/or civilian employees; and (5) occasionally providing assistance at a shooting scene or other crisis-type situation.[57]

---

[55] Oral Deposition of William Elton Metcalfe, Ph.D. ("Metcalfe Deposition"), Exhibit 2 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, p. 12:6-11, Docket Entry No. 85-3, p. 13.

[56] Id. at 10:22-11:5, 12:16-16:25, Exhibit 2 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony Docket Entry No. 85-3, pp. 11-17.

[57] COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85, p. 16 (citing Metcalfe Deposition, pp. 14:5-15:17, Exhibit 2 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, pp. 15-16).

The COH argues that Dr. Metcalfe is not qualified to opine as to the cause of Draycott's mental disability because at the time he provided the "Physician's Certificate of Applicant's Disability," for Draycott, he did not have any previous experience providing assessments for purposes of disability retirement.[58] Asserting that Dr. Metcalfe testified he felt uncomfortable providing the assessment that Draycott needed for her disability pension,[59] the COH argues that his "opinion testimony that Draycott was disabled as a result of an on-duty illness/injury should be stricken or limited at summary judgment and/or at trial."[60]

Although Draycott was Dr. Metcalfe's first disability assessment, and he did not conduct any tests specifically for the disability assessment, he testified that he had previously tested Draycott and was qualified to make the assessment.[61] His discomfort came from the fact that he was her treating psychologist and he

---

[58]Id. at 17 (citing Metcalfe Deposition, p. 77:1-10, Exhibit 2 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, p. 78).

[59]Id. (citing Metcalfe Deposition, p. 125:6-126:7, Exhibit 2 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, pp. 126-27).

[60]Id.

[61]Metcalfe Deposition, p. 158:2-161:2, Exhibit 2 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, pp. 159-62.

thought an opinion of someone more detached might be better.[62]
Because the record shows not only that Dr. Metcalfe has the
training and experience needed to counsel Draycott, but also that
he counseled Draycott for almost two years before she retired as
disabled, and because Dr. Metcalfe did not testify that he was not
qualified to provide the "Physician's Certificate of Applicant's
Disability" that he provided to Draycott in October of 2010, the
court concludes that Dr. Metcalfe is qualified to opine and testify
as to the causes of Draycott's mental health conditions.


### (2)   Dr. Metcalfe's Opinions are Reliable

Asserting that Dr. Metcalfe's opinion is based solely on what
Draycott reported to him, the COH argues that his testimony is not
reliable and that his "opinion amounts to nothing more than
speculation and should be stricken."[63]   The COH argues that
Dr. Metcalfe's opinions are not reliable because he did not perform
any psychometric or other formal testing to support his opinion
that Draycott's disability resulted from events which occurred at
Station 54 for the purpose of receiving disability benefits, he did
not perform any differential diagnoses to rule out other possible

---

[62]Id. at 129:19-130:12, Exhibit 2 to COH's Corrected Motion to
Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3,
p. 130-31.

[63]COH's Corrected Motion to Exclude Mental Health Experts'
Testimony, Docket Entry No. 85, p. 20.

causes for Draycott's mental health conditions, and he did not consult with or review medical records from Draycott's other treating health care professionals.[64]

The COH faults Dr. Metcalfe's testing methods because he did not do any testing before filling out the HFRRF disability evaluation. But the testimony on which the COH relies shows only that Dr. Metcalfe did not do any specific, additional, testing for the disability evaluation. Dr. Metcalfe testified that he performed psychological testing on Draycott, including a Beck Depression Inventory ("BDI") and a Personality Assessment Inventory ("PAI") before he filled out the HFRRF disability evaluation.[65] There is no evidence that the testing methods Dr. Metcalfe employed are either unaccepted in the psychology field or unreliable. As such, any deficiencies in the tests themselves or in Dr. Metcalfe's testing methods can be explored on cross examination.

The COH faults Dr. Metcalfe for not performing any differential diagnoses to rule out other possible causes for Draycott's mental health conditions. But contrary to the COH's contention, the treatment that Metcalfe provided to Draycott did not focus solely on her work-related issues. Dr. Metcalfe testified that he treated Draycott with respect to many, if not

---

[64]Id. at 18-20.

[65]Metcalfe Deposition, pp. 77:11-78:19, 159:3-21, Exhibit 2 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, pp. 78-79, and 160.

most, of the confounding factors that the COH faults him for not considering including, her daughter's death, her suicidal thoughts, her alcohol abuse, and her shoplifting arrest.[66]   Moreover, Dr. Metcalfe considered these factors when forming his opinion about the cause of Draycott's mental health conditions.[67]

The COH faults Dr. Metcalfe for not consulting or reviewing medical records from Draycott's other treating health care professionals, but the COH fails to cite any records that pre-date Dr. Metcalfe's treatment of Draycott.   Instead, the COH cites to medical records from Cypress Creek Hospital and the Veteran's Administration ("VA"), all of which post-date Dr. Metcalfe's treatment of Draycott.   The Cypress Creed Hospital records show that Draycott initially sought treatment there in November of 2012,[68] and the VA records show that she initially sought treatment there in December of 2013.[69]

_____

[66]Id. at 18:23-19:23, 36:12-39:25, Exhibit 2 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, pp. 19-20, and 37-40.

[67]Id. at 83:24-84:8, Exhibit 2 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony Docket Entry No. 85-3, pp. 84-85 (explaining that following the death of her daughter, Draycott actually appeared to regain her functioning fairly well and was capable of performing her job as firefighter).

[68]Cypress Creek Hospital Medical Records, Exhibit 8 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-9, p. 4.

[69]Michael E. Debakey V.A. Medical Center Medical Records, Exhibit 9 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-10, p. 50.

Dr. Metcalfe is a staff psychologist for HPD who treated Draycott from approximately October 28, 2009, to December 4, 2012.[70] A treating physician may opine as to the causation of a plaintiff's injuries and a plaintiff's prognosis as long as the doctor formed those opinions "based on the care-provider's personal knowledge and observations obtained during the course of care and treatment." See Kim v. Time Insurance Co., 267 F.R.D. 499, 502 (S.D. Tex. 2008). When Draycott retired from HFD with disability benefits in July of 2011, Dr. Metcalfe had been her treating psychologist for almost two years. Because Dr. Metcalfe's diagnoses and opinions regarding the cause of Draycott's mental health conditions arose during the ordinary course of treating Draycott, his diagnoses and opinions formed while treating Draycott are reliable. The concerns raised by the COH regarding the reliability of his diagnoses and opinions go to the weight to be accorded to his testimony and not to the admissibility of his testimony. Puga, 922 F.3d at 294 ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."). Accordingly, the COH's motion to exclude or limit Dr. Metcalfe's testimony will be denied.

---

[70]Metcalfe Deposition, Exhibit 2 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, pp. 17:21-18:3, and 49:9-16, Docket Entry No. 85-3, pp. 18-19, and 50.

(c)   The COH's Motion to Exclude Drell Testimony Will Be Denied

The COH argues that Dr. Drell's testimony should be excluded or limited because his opinions regarding causation are based on unreliable and incomplete information from Draycott, because he did not perform a differential diagnosis, and because the United States did not accurately disclose the subject matter on which he is expected to testify.[71]

(1)   **The United States Accurately Disclosed the Subject of Dr. Drell's Testimony**

Asserting that the United States designated Dr. Drell to provide opinion testimony "based on information learned through treatment of Jane Draycott in 2011-2012," the COH argues that the United States did not accurately disclose the subject matter on which Dr. Drell is expected to testify because he did not treat Draycott.[72]  Citing Dr. Drell's deposition testimony, the COH argues that he was hired by the HFRRF solely to evaluate Draycott regarding her disability application, that he did not consider Draycott as his patient, he did not create a treatment plan for her, and thus his testimony should be excluded.[73]

_____

[71]COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85, pp. 25-30.

[72]Id. at 30.

[73]Id.

-43-

Dr. Drell is a board certified psychiatrist who was hired by the HFRRF to perform an independent medical examination of Draycott in connection with her claim for disability retirement benefits due to work-related injuries. Like Dr. Metcalfe, Dr. Drell was not retained or specially employed to provide expert testimony in this case. Fed. R. Civ. P. 26(a)(2)(B). Rule 26 does, however, require plaintiffs to timely disclose the subject matter of Dr. Drell's testimony. Fed. R. Civ. P. 26(a)(2)(C) and (D).

The COH does not cite any authority in support of its argument that the United States' disclosure of the subject matter of Dr. Drell's testimony is inaccurate, and the court has found none. To the contrary, courts regularly allow examining physicians to testify as nonretained experts. See Jones, 2012 WL 6652364, at *2; Lindquist, 2008 WL 4560603, at *1-2. Rule 26's disclosure requirements are intended to prevent prejudice and exclude surprise as a factor in the outcome of trials. See Joe Hand Promotions, 544 F. App'x at 446. Because the COH does not argue that the United States failed to disclose Dr. Drell, and does not argue that the disclosure about which it complains caused any prejudice, the court concludes that the United States did not fail to accurately disclose the subject matter of Dr. Drell's testimony.

## (2)  Dr. Drell's Opinions are Reliable

Dr. Drell was hired by the HFRRF to examine Draycott to determine if she was disabled, and, if so, whether her disability was permanent and work-related.  Dr. Drell examined Draycott on June 27, 2011, and again on August 7, 2012.

The COH argues that Dr. Drell's testimony is unreliable because his opinions regarding causation are based on incomplete information from Draycott, and because he did not perform a differential diagnosis, i.e., he did not differentiate between all possible causes of Draycott's mental impairments.  But Dr. Drell testified at his deposition that he reviewed the records of Dr. Metcalfe and Dr. Nahmias before reaching his conclusions;[74] and those records contained numerous references to many of the non-work related issues that the COH contends Draycott never told Dr. Drell. Moreover, Dr. Drell diagnosed Draycott with more than one condition, i.e., post-traumatic stress disorder, alcohol abuse in partial remission, and major depression, single episode, severe,[75] and testified that her severe depression stemmed from multiple stressors unrelated to her job situation, including the loss of her

---

[74]Oral Deposition of William Kadison Drell, M.D., ("Drell Deposition"), pp. 69:14-70:1, Exhibit 4 to the COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-5, pp. 70-71.

[75]Id. at 31:18-24, Exhibit 4 to the COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-5, p. 32.

daughter, marital and legal problems.[76]   As to the cause of
Draycott's disability, Dr. Drell stated in his first report, that
he "believe[ed] Ms. Draycott's disabling symptoms are directly
related to her work related incidents."[77]   On August 7, 2012,
Dr. Drell re-evaluated Draycott, and again concluded that "her
disability was directly caused by experience with the fire
department," and stated that "I do not believe she can perform the
usual and customary duties of a firefighter/EMT due to her Post
Traumatic Stress Disorder.  I do anticipate her ability to work for
HFD will be permanent."[78]   Neither of Dr. Drell's reports purport
to give a definitive opinion regarding the cause of Draycott's
mental conditions.   The court will allow Dr. Drell to testify, but
only as to the facts and circumstances developed during his
examinations of Draycott and the opinions and conclusions actually
expressed in the reports that he provided to the HFRRF.   With that
caveat, the motion to exclude Dr. Drell's testimony will be denied.
See Jones, 2012 WL 6652364, at *2 (limiting a nonretained examining
expert's trial testimony "regarding the cause of [claimant's]

_____

[76]Id. at 32:1-6, Exhibit 4 to the COH's Corrected Motion to
Exclude Mental Health Experts' Testimony, Docket Entry No. 85-5,
p. 33.

[77]July 11, 2011, Letter from William K. Drell to Glenna Hicks,
Deputy Director of Member Services, Exhibit 79 to USA's Opposition
to COH's MSJ, Docket Entry No. 103-7, p. 4.

[78]August 13, 2012, Letter from William K. Drell to Glenna
Hicks, Deputy Director of Member Services, Exhibit 80 to USA's
Opposition to COH's MSJ, Docket Entry No. 103-8, p. 4.

psychiatric condition . . . to the opinions and conclusions actually expressed in his report"); Lindquist, 2008 WL 4560603, at *1 (limiting "nonretained treating physician" testimony "to the facts and circumstances developed during the care of the patient").

3.   The COH's Objections and Motion to Strike Tran-Buser Memo and Statement of Margaret Roberts Will Be Denied

The COH objects to and moves to strike the United States' Summary Judgment Exhibit 81 (Docket Entry No. 105-49), the Tran-Buser Memo, and a portion of United States Exhibit 28 (Docket Entry No. 104) identified as the Statement of Margaret Roberts.[79]

(a)   The Tran/Buser Memo is Admissible

Plaintiffs' Exhibit 81 is a Memo to HFD Command Staff from Dr. Jana Tran and Dr. Sam Buser, HFD Staff Psychologists, dated October 5, 2017, and titled "Research with Female Firefighters" (the "Tran/Buser Memo").   In its MSJ, the COH argues that injunctive relief is unwarranted because the challenged conduct is unlikely to reoccur.  A significant portion of the City's briefing on this issue relies on the COH's creation of and response to the 2009 Thompson & Horton Assessment, a lengthy report prepared by two

_____

[79]See Notice of Conventional Filing, Docket Entry No. 104 ("The following exhibits cannot be filed electronically and need to be filed under seal. . .  ● Exhibit 28, Confidential Investigative Report, OIG No. 09-0424, HOU00005870-5960").  See also Docket Entry No. 75 (stating that Exhibit L to COH's MSJ, OIG Investigation No. 2009-424, is filed on a CD in a brown folder).

law firms engaged by City Council.[80]   The COH argues that it has met its burden to prove that the conduct challenged is unlikely to reoccur because the Thompson & Horton Assessment identified shortcomings in the HFD's compliance and complaint systems and, in response, the COH took actions to address the findings and recommendations in the Thompson & Horton Assessment.[81] Plaintiffs seek to use the Tran/Buser Memo as evidence that the allegedly discriminatory conduct at issue in this case is likely to reoccur in support of the claim for injunctive relief.[82]   The COH objects to use of the Tran-Buser Memo for this purpose arguing that

> [t]he Tran/Buser Memo is not competent summary judgment evidence and should not be considered for any purpose in this case because neither Dr. Tran nor Dr. Buser has been designated as an expert witness and the opinions in the Tran/Buser Memo are neither reliable nor relevant to the issues in this case.[83]

The United States argues in response that the Trans-Buser Memo is admissible as the statement of a party opponent, and is not properly considered expert evidence.[84]

---

[80]Thompson & Horton Assessment, Exhibit R to COH's MSJ, Docket Entry No. 74-2.

[81]See COH's MSJ, Docket Entry No. 63, pp. 49-61.

[82]See USA's Opposition to COH's MSJ, Docket Entry No. 105, pp. 62-63.

[83]COH's Objections and Motion to Strike, Docket Entry No. 120, pp. 1-2.

[84]Plaintiff United States' Response in Opposition to Defendant's Objections to and Motion to Strike Plaintiff's Summary Judgment Evidence, Docket Entry No. 136, pp. 9-20.

Federal Rule of Evidence 801(d)(2) states that a statement made by a party's "employee on a matter within the scope of [the employment relationship] and while it existed" is not hearsay and may be offered against that party.  Fed. R. Evid. 801(d)(2)(D). Similarly, a statement that a "party manifested that it adopted or believed to be true" may be used against the party, as may statements "made by a person whom the party authorized to make a statement on the subject."  Fed. R. Evid. 801(d)(2)(B)-(C).  The COH employed Dr. Tran and Dr. Buser when they prepared their memo about the HFD's workforce, and the memo was prepared as part of their job duties as HFD staff psychologists.  Moreover, the COH manifested that it adopted or believed the information contained in the Trans-Buser Memo to be true by distributing it to the HFD command staff,[85] and by subsequently publishing an abbreviated version of the same information to its nonsupervisory staff.[86] These distributions also demonstrate that Dr. Tran and Dr. Buser were authorized to make statements on the COH's behalf on the subjects reflected in the memo.  For these reasons the court concludes that the Tran-Buser Memo is admissible as the non-hearsay

---

[85]October 5, 2017, Memo to HFD Command Staff from Dr. Jana Tran & Dr. Sam Buser, HFD Staff Psychologists, Exhibit 81 to USA's Opposition to COH's MSJ, Docket Entry No. 105-49, p. 2.

[86]HFD Shrink Rap Article by Jana K. Tran, Ph.D., HFD Staff Psychologist, and Christine Pao, HFD Psychology Intern, Exhibit 1 to Plaintiff United States' Response in Opposition to Defendant's Objections to and Motion to Strike Plaintiff's Summary Judgment Exhibits, Docket Entry No. 136-3.

admission by a party opponent under Federal Rule of Evidence 801(d)(2).  Accordingly, the COH's motion to strike the Tran-Buser Memo will be denied and its objection thereto will be overruled.

　　　　　(b)  The Margaret Roberts Statement is Admissible

The COH objects to any use of the Statement of Margaret Roberts as evidence to prove the truth of the matters asserted within the statement because the statement is erroneous and is hearsay not subject to any hearsay exception.  The COH argues that

> Plaintiff relies on a "reprint" of a sworn statement by Margaret Roberts located [in] the Investigative Report of Inspector General G.T. Buenik in OIG #09-0424 and bates labeled as HOU00005879-5881. *See* Doc. 105, p. 29; 105-2, ¶¶ 113, 124, 134.  The original Statement of Margaret Roberts, reprinted by Inspector General Buenik, was submitted to Senior Investigator Raymond Gonzales of the Office of Inspector General at 9:05 a.m. on September 1, 2009.  HOU00006082-6085.  The investigative file reflects that at 11:38 p.m. on that date, Margaret Roberts emailed Raymond Gonzalez and said, "After reading my Sworn Affidavit, I see several errors and need to make an amendment to the Affidavit." HOU00006036.  However, no amendment is reflected in the Investigative File or in the Investigative Report.  The erroneous statement should not be considered.
>
> 　　In addition to being erroneous, the statement is hearsay and is not admissible. *See* Fed. R. Evid. 801, 802.  Margaret Roberts is deceased and is not subject to cross-examination, therefore her prior statement is hearsay, even though it was sworn. *See* Fed. R. Evid. 801(d)(1); Doc. 105-8, p. 19; 105-10, p. 20; 105-11, p. 21, 105-45, p. 7.  None of the Exceptions to the Rule Against Hearsay apply . . .[87]

---

[87]COH's Objections and Motion to Strike, Docket Entry No. 120, pp. 6-7.

Federal Rule of Evidence 803(6) allows for the admission of records that were made at or near the time by someone with knowledge as long as the record was kept in the course of a business's regularly conducted activities and the creation of the record was a regular practice of that activity. The OIG is the division of the COH tasked with conducting investigations into allegations of discrimination at the HFD.[88] The OIG prepares investigative reports in the course of its regularly conducted activities.[89] Because the Margaret Roberts Statement is contained in an OIG investigative report, it is an admissible part of an admissible business record. See La Day v. Catalyst Technology, Inc., 302 F.3d 474, 481 n. 7 (5th Cir. 2002) (stating that investigator's "notes . . . fall within the business records exception to the hearsay rule"). The COH's MSJ cited and relied upon the Margaret Roberts Statement in particular, and the OIG investigative file in which it appears in general;[90] the COH's

---

[88]COH's Statement of Facts, Docket Entry No. 63-1, p. 2 ¶ 6.

[89]Id. at 11-12 ¶¶ 57-61 (describing OIG responsibilities).

[90]COH MSJ, Docket Entry No. 63, p. 27 ("[F]ormer (now deceased) female firefighter, Margaret Roberts informed the investigator from the [OIG] that she would leave the [toilet] seat up after cleaning the women's bathroom. (Ex. L, OIG Investigation No. 2009-407, Sworn Statement of Margaret Roberts)."). See also id. at 35-36 (referencing Exhibit L, OIG Investigative File No. 2009-424). Exhibit L to the COH's MSJ is actually OIG Investigative File No. 2009-424, the reference to OIG Investigative File No. 2009-407 in reference to the Margaret Roberts Statement is typographical error.

-51-

attempt to exclude the Margaret Roberts Statement, while retaining and relying upon the rest of the investigative report is improper.

Moreover, the Margaret Roberts Statement is not necessarily hearsay, which the Federal Rules of Evidence define as an out of court statement offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The United States' argues that the Margaret Roberts statement is not offered for the truth of the matter stated but, instead, to show the state of the COH's knowledge regarding the nature of the alleged conduct as gender based. The United States argues that

> Roberts' statement is offered at least in part to illustrate the City's knowledge that the urine in the women's dormitories was linked to gender. The City devoted an entire section of its brief to arguing that "[t]he conduct complained of [was] not harassment based on sex." See D.E. 63, pp. 14-21. But Roberts advised the City that she believed that by "urinating in the women's sleeping quarters and . . . in the women's restroom sinks, which [they] use to wash [their] faces and brush [their teeth[]," male firefighters were "disrespecting" female firefighters and "invading their space with malicious intent." See Ex. L. HOU5881, HOU6085. She reminded the . . . OIG that women did not enter the men's restroom and dormitory (other than in trainings). Id. Roberts told OIG that "[t]he men overstep[ped] their boundaries by invading [the women's] space and it was disrespectful to do so." Id. She finished by observing that all the female firefighters wanted was "to be treated with the same respect that most men in [the HFD] would demand." Id.[91]

---

[91]Plaintiff United States' Response in Opposition to Defendant's Objections to and Motion to Strike Plaintiff's Summary Judgment Exhibits, Docket Entry No. 136, pp. 20-21.

The Fifth Circuit has held that investigative notes documenting employee statements are admissible if offered to illustrate the state of the employer's knowledge. See Brauninger v. Motes, 260 F. App'x 634, 636-37 (5th Cir. 2007) (finding that trial court properly admitted statements given to human resources officials during an investigation, because the statements bore on the employer's knowledge at the time it made the employment decision and because the investigative record was a business record).

Because the Margaret Roberts Statement is part of a lengthy investigative file that is admissible as a business record under Federal Rule of Evidence 803(6), and is not necessarily hearsay, the COH's motion to exclude the Margaret Roberts Statement will be denied and the COH's objection will be overruled.

### III. Summary Judgment Motions

Plaintiffs allege that Draycott was subjected to a hostile environment based on sex, and that when she opposed the City's discriminatory treatment she suffered retaliation and constructive discharge for having complained of discrimination. Plaintiffs seek recovery of back pay and future lost wages and benefits incurred by Draycott as a result of the alleged discrimination, damages for mental anguish and emotional distress caused by the COH's wrongful

acts, and injunctive relief.[92]   The COH's Amended Answer asserts several affirmative defenses including, <u>inter alia</u>, that plaintiffs' claims are barred by the doctrine of laches, and are barred in whole or in part, or their recoverable damages should be reduced, because Draycott failed to take reasonable steps to mitigate her damages.[93]

## A.   Standard of Review

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.   Fed. R. Civ. P. 56.   Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S. Ct. 2505, 2511 (1986).   The Supreme Court has interpreted the plain language of Rule 56 to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   <u>Celotex Corp. v. Catrett</u>, 106

---

[92]Complaint, Docket Entry No. 1; Original Complaint in Intervention, Docket Entry No. 10.

[93]City of Houston's Amended Answer to Plaintiff's Complaint and Its Defenses, Docket Entry No. 43, pp. 24 ¶ 6 (laches), and 25 ¶ 13 (failure to mitigate damages).

S. Ct. 2548, 2552 (1986).   A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not <u>negate</u> the elements of the nonmovant's case." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) <u>(en banc)</u> (per curiam) (quoting <u>Celotex</u>, 106 S. Ct. at 2553). If the moving party meets this burden, the nonmovant must go beyond the pleadings and show by admissible evidence that facts exist over which there is a genuine issue for trial.   <u>Id.</u>   Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy that is, when both parties have submitted evidence of contradictory facts." <u>Little,</u> 37 F.3d at 1075. <u>See also Antoine v. First Student, Inc.,</u> 713 F.3d 824, 830 (5th Cir. 2013) (same). "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Products, Inc.,</u> 120 S. Ct. 2097, 2110 (2000).


**B.   Applicable Law**

Title VII protects individuals from discrimination by an employer based on the "individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).   Plaintiffs may establish claims for employment discrimination in violation of Title VII by using direct evidence or by using the indirect method of proof set forth in <u>McDonnell Douglas Corp. v. Green,</u> 93 S. Ct.

-55-

1817 (1973). "Direct evidence is evidence which, if believed, proves the fact [of discrimination] without inference or presumption." Brown v. East Mississippi Electric Power Association, 989 F.2d 858, 861 (5th Cir. 1993). Plaintiffs' initial burden under the McDonnell Douglas framework is to establish a prima facie case. 93 S. Ct. at 1824. If plaintiffs establish a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Id. If the defendant meets this burden, plaintiffs must adduce evidence capable of establishing that the defendant's stated reasons for its actions are false and, instead, pretexts for discrimination. Id. at 1825.

**C.    The COH's Motion for Summary Judgment**

The COH moves for summary judgment on Draycott's claims arguing that they are barred by laches, claims based on actions that occurred more than 300 days before Draycott filed her charge of discrimination with the EEOC are time-barred, Draycott was not subjected to a hostile work environment based on sex, Draycott cannot meet her burden to demonstrate retaliation, Draycott was not constructively discharged, and the United States is not entitled to injunctive relief.

1.   <u>The COH's MSJ Based on Laches Will be Denied</u>

Asserting that Draycott filed her charge of discrimination with the EEOC in July 2009, but that this action was not filed until February of 2018, the COH argues that plaintiffs' claims are barred by laches because the United States unreasonably and inexcusably delayed in bringing suit for almost nine years.[94]   The COH argues that the delay in bringing suit has caused material prejudice because several witnesses have died or can no longer remember specifics of the events, and because documents have been lost or destroyed.[95]   Plaintiffs respond that the COH is not entitled to summary judgment based on laches because the COH has failed to cite evidence capable of establishing unreasonable or inexcusable delay or material prejudice.[96]

(a)   Applicable Law

Laches is an affirmative defense that bars suit when a plaintiff's inexcusable or unreasonable delay in bringing a cause of action has unduly prejudiced the defendant.   <u>Retractable Technologies, Inc. V. Becton Dickenson & Co.</u>, 842 F.3d 883, 899-900 (5th Cir. 2016), <u>cert. denied</u>, 137 S. Ct. 1349 (2017) (citing <u>Elvis</u>

---

[94]COH's MSJ, Docket Entry No. 63, pp. 17-20.

[95]<u>Id.</u> at 18-19.

[96]USA's Response in Opposition to COH's MSJ, Docket Entry No. 105, pp. 16-21; Draycott's Response to the COH's MSJ, Docket Entry No. 114, pp. 33-37.

Presley Enterprises, Inc. V. Capece, 141 F.3d 188, 205 (5th Cir.
1998)).  "To prevail, the defendant must demonstrate: '(1) a delay
asserting a right or claim; (2) that the delay was inexcusable;
[and] (3) that undue prejudice resulted from the delay.'"   Id.
(quoting Capece, 141 F.3d at 205).  The delay must unduly prejudice
the defendant's ability to present an adequate defense.  National
Association of Government Employees v. City Public Service Board of
San Antonio, Texas, 40 F.3d 698, 708 (5th Cir. 1994) (citing Geyen
v. Marsh, 775 F.2d 1303, 1310 (5th Cir. 1985)).  When the relevant
facts are not in dispute, district courts enjoy considerable
discretion in deciding whether to apply the laches defense.   Id.

       The Supreme Court has held that when a Title VII defendant is
prejudiced by a private plaintiff's unexcused conduct, the trial
court may restrict or even deny back pay relief.  See Occidental
Life Ins. Co. of California v. EEOC, 97 S. Ct. 2447, 2458 (1977)
(citing Albemarle Paper Co. v. Moody, 95 S.Ct. 2362, 2374-2375
(1975)).  See also Bernard v. Gulf Oil, Inc., 596 F.2d 1249 (5th
Cir. 1979)(recognizing that laches may apply to Title VII suits
brought by private plaintiffs if the evidence indicates that the
plaintiff inexcusably delayed in bringing the suit and that the
delay prejudiced the defendant).  But whether laches may be used to
deny relief in a case brought by the EEOC is an open question.  See
National Railroad Passenger Corp. v. Morgan, 122 S. Ct. 2061, 2077
n. 14 (2002) ("[T]raditionally the doctrine may not be applied

against the sovereign.  We note, however, that in Occidental[, 97 S. Ct. at 2458,] there seemed to be general agreement that courts can provide relief to defendants against inordinate delay by the EEOC.").  Assuming without deciding that the laches defense may be applied against the EEOC, the Fifth Circuit has held that "this bar arises only if the EEOC has delayed unreasonably after it has completed conciliation."  National Association of Government Employees, 40 F.3d at 708-09 (quoting Fowler v. Blue Bell, Inc., 596 F.2d 1276, 1279 (5th Cir.1979), cert. denied, 100 S. Ct. 671 (1980)).  As with all affirmative defenses, the burden of proof on laches rests with the defendant.  Thomas v. Bryant, 919 F.3d 298, 312 (5th Cir. 2019).

### (b)  Application of the Law to the Facts

The COH asserts that plaintiffs unreasonably and inexcusably delayed the filing of this action for almost nine years after the plaintiffs filed charges of discrimination with the EEOC.  In support of this argument the COH merely cites a general time line of events, and summarily concludes that shorter delays have been deemed unreasonable.[97]  The parties do not dispute that the EEOC notified the COH that conciliation efforts were terminated on April 4, 2016, that the United States filed suit less than two years

---

[97]COH's MSJ, Docket Entry No. 63, pp. 18-19.

later on February 28, 2018, and that the individual plaintiffs intervened a month later on March 29, 2018.[98]

The facts of this case are analogous to the facts at issue in Fowler, 596 F.2d at 1279, where the Fifth Circuit held that the time elapsed during ongoing EEOC conciliation efforts could not be counted toward the calculation of the unreasonable delay element of the laches defense. See also National Association of Government Employees, 40 F.3d at 709-11 (finding a 9-year delay between the end of the conciliation period and the filing of suit an unreasonable delay that unduly prejudiced the defendant). Because the time period during which conciliation efforts are ongoing cannot be counted against plaintiffs in calculating delay for laches, the court concludes that the delay in filing this action was not nine years as the COH argues, but was less than two years. Fowler, 596 F.2d at 1279; National Association of Government Employees, 40 F.3d at 708-09. The COH does not argue — and the court does not find — that the two year delay in filing suit after conciliation failed was unreasonable or inexcusable.

---

[98]Id. at 18 ("On April 4, 2016, the EEOC notified the City that efforts to conciliate Draycott's and Keyes' charges were unsuccessful."). See also USA's Response in Opposition to COH's MSJ, Docket Entry No. 105, p. 18 ("As the City notes, the EEOC did not conclude its conciliation efforts until April 4, 2016. D.E. 63, 8."); Draycott's Response to the COH's MSJ, Docket Entry No. 114, p. 34 ("Conciliation efforts failed in 2016 and suit was filed in early 2018. It took only a single month before Plaintiffs intervened.").

Asserting that it has been materially prejudiced by the plaintiffs' delay in filing this action, the COH agues that it faces the hardship of relying on the memories of witnesses for events that occurred more than nine years ago and attempting to fill the factual void due to the deaths of key Human Resources Personnel, Juan Padilla, Matt Russell and Kelly Shreck.[99]  The COH describes these Human Resources Personnel as "key," but the COH did not identify any of these three individuals as potential witnesses among the 48 potential witnesses identified in its initial disclosures.[100]  While the COH subsequently identified Shreck as a potential witness who "may have information concerning training provided to employees of the Houston Fire Department,"[101] the COH has never identified Padilla or Russell as potential witnesses,[102] and has not made any showing that any of these three individuals possesses evidence that is not available from another source.   Nor has the COH provided any information about the medical records that it contends have been destroyed.   Instead, the COH asserts that

> [a]lthough Houston does not believe that the Plaintiffs
> can establish Title VII violations, Houston reserves the
> right to raise prejudice to the extent the Court finds

---

[99]COH's MSJ, Docket Entry No. 63, p. 19.

[100]Defendant's Initial Disclosures (June 22, 2018), Exhibit 2 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 105-6.

[101]Defendant City of Houston's First Supplemental Disclosures and Exhibit A Thereto, p. 12, Exhibit 3 to the USA's Response in Opposition to COH's MSJ, Docket Entry No. 105-7, p. 17.

[102]See id. (neither Padillo nor Russell is named).

> that the Plaintiffs meet their burdens, Houston will be
> prejudiced if it is required to defend itself based on
> the aged memories of its witnesses, information only
> within the personal knowledge of now deceased witnesses,
> and/or documents related to Draycott's medical condition
> that were not maintained by health care professionals who
> evaluated Draycott.[103]

Because the COH has failed to provide any factual evidence capable of establishing that either the United States or Draycott unreasonably or inexcusably delayed in filing this action, or that the plaintiffs' delay in filing this action has caused the COH to suffer any prejudice, the COH's motion for summary judgment based on the affirmative defense of laches will be denied. See Powell v. City of Key West, Florida, 434 F.2d 1075, 1080 (5th Cir. 1970) (affirming district court's denial of motion for summary judgment based on laches because the motion "completely lack[ed] . . . a factual basis for applying [the laches] defense").

2.   The COH's MSJ Based on Limitations Will be Denied

Asserting that claims based on acts that allegedly occurred more than 300 days before Draycott filed a charge of discrimination with the EEOC are time-barred, the COH argues that it is entitled to summary judgment on Draycott's claims that she was sexually harassed by a male firefighter while at Station 46 and denied overtime while at Station 74.[104]

---

[103]COH's MSJ, Docket Entry No. 63, pp. 19-20.

[104]Id. at 20-21.

The complaints filed both by the United States and by the intervenor plaintiffs, the statement of facts that plaintiffs have filed in opposition to the COH's MSJ, and plaintiffs' briefs in opposition to the COH's MSJ, make clear that the claims asserted in this action are all based on events that occurred at Fire Station No. 54 in 2009 and 2010 within 300 days of the filing of Draycott's EEOC charge on July 15, 2009.[105]  The COH's contention that claims asserted in this action are time barred because they are based on acts that allegedly occurred more than 300 days before Draycott filed a charge of discrimination with the EEOC has no basis in fact.  Accordingly, the COH's motion for summary judgment based on the contention that plaintiffs have asserted claims that are time-barred will be denied.

---

[105]See Complaint, Docket Entry No. 1; and Original Complaint in Intervention, Docket Entry No. 10; USA's Statement of Facts, Docket Entry No, 105-2, pp. 12-30, ¶¶ 92-225.  See also USA's Response in Opposition to COH's MSJ, Docket Entry No. 105, p. 8 ("The United States brings this Title VII case alleging that the Houston Fire Department ("HFD") discriminated against Jane Draycott ("Draycott") and Paula Keyes ("Keyes"), on the basis of sex while both were employed as firefighters at HFD's Station 54."); Draycott's Response to the COH's MSJ, Docket Entry No. 114, p. 6 ("In this Title VII suit, Draycott alleges that she was subjected to a gender-based hostile work environment at Station 54.").

3.   The COH's MSJ on Plaintiffs' Claims for Hostile Work
     Environment Based on Sex Will be Denied

     (a) Applicable Law

For a Title VII hostile work environment claim plaintiffs must show that Draycott (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment was based on her protected characteristic (female sex); (4) the harassment was sufficiently severe or pervasive to affect a term, condition, or privilege of employment; and (5) the COH knew or should have known of the harassment and failed to take prompt remedial action. See Hernandez v. Yellow Transportation, Inc., 670 F.3d 644, 651 (5th Cir.), cert. denied sub nom. Ketterer v. Yellow Transportation, Inc., 133 S. Ct. 136 (2012) (citing Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002)).   For harassment to affect a term, condition, or privilege of employment, it "must be 'both objectively and subjectively offensive.'" Id. (citing Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2283 (1998)).   In determining whether a work environment is objectively hostile or abusive and therefore actionable under Title VII, courts look to the totality of the circumstances and examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (citing Ramsey, 286 F.3d at 268). See also Harris v. Forklift Systems, Inc., 114 S. Ct. 367, 371 (1993)

-64-

(harassment must be such that "the environment would reasonably be perceived, and is perceived, as hostile or abusive"). Conduct that is merely offensive is not actionable. "[The] conduct must be extreme to amount to a change in the terms and conditions of employment." Faragher, 118 S. Ct. at 2284.

### (b) Application of the Law to the Facts

The COH does not dispute that Draycott belongs to a protected group (female), but disputes that she was harassed, that any harassment was based on her sex, or sufficiently severe or pervasive to affect a term, condition, or privilege of employment, and that the COH knew or should have known of the harassment but failed to take prompt remedial action.[106]  The COH argues that

> Plaintiffs cannot establish a prima facie case of a hostile work environment based on sex. The undisputed evidence in the record is that the alleged conduct was not based on sex and was equally experienced by male firefighters. Once Houston determined or learned that the conduct could have been based on gender, it took prompt remedial action and the conduct stopped.[107]

### (1) Plaintiffs Cite Evidence Capable of Establishing Harassment Based on Sex

Citing Oncale v. Sundowner Offshore Services, Inc., 118 S. Ct. 998 (1998), for its holding that Title VII does not prohibit all workplace harassment, the COH argues that messy co-workers and

---

[106]COH's MSJ, Docket Entry No. 63, pp. 22-36.

[107]Id. at 23.

messy bathrooms are not evidence of sex-based harassment, that plaintiffs cannot rely on media reports and rumors as evidence that Draycott was the target of the investigation of vandalism at Station 54, and that the Fire Chief's decision to hold a CISM meeting on Draycott's first day back at work was not for the purpose of harassing her.[108]    But contrary to the COH's characterization, plaintiffs have presented substantial evidence to dispute the COH's contention that the alleged conduct was neither harassing nor based on sex.  The harassment that plaintiffs allege constituted a hostile work environment include (1) unsanitary conditions of the women's dormitory and bathroom at Station 54; (2) the July 7, 2009, vandalism of the women's dormitory at Station 54; and (3) the January 13, 2010, Roll Call meeting where members of HFD's command staff allowed members of Station 54's A shift tell Draycott they did not want her to return to work there.

Citing the deposition testimony of HFD Captains Hencshel and Holmes, and HFD Assistant Chief McAteer, the COH argues that

> [w]hen female firefighters were not on shift at Station 54, male firefighters used the women's dormitory to watch television, study for promotional exams, hold conferences, sleep, or allow their family members to stay in those rooms on Family Day at the station. . . Also, if a shift had extra personnel, especially at the officer level (e.g. Captain or Senior Captain), the women's dormitory would be utilized as overflow. . . It is not against the law for the dormitory to be used for these reasons.  Nor can it be said that a male firefighter

---

[108]Id. at 24-31.

using the women's dormitory for these reasons is
harassment based on sex in violation of Title VII.[109]

The COH also cites the deposition testimony of Firefighter EMT
Eduardo Ramirez as evidence that the men's bathroom at Station 54
and other HFD stations "suffered the same fate as [Station] 54's
women's bathroom; urine would be found everywhere but in the
toilet."[110]  The COH argues that this and other evidence establishes
that Draycott was not subjected to a hostile work environment based
on sex because "[w]hile the events complained of by Draycott, if
proven, could be considered uncivil or hostile conduct, there is
nothing to indicate that any hostility was sex-based."[111]    The COH

> [e]xpressly denies the mess in the women's dormitory and
> restrooms was anything other than just that, a mess.
> While men were not supposed to go into the women's areas,
> there is no evidence they had any nefarious motives for
> going there, whether discriminatory or otherwise hostile.
> The evidence supports that men on shifts where there were
> no female firefighters saw the women's dorm and restroom
> as places where they could get away from the crowd and
> have a private spot to sleep, watch tv, or, in the case
> of the restroom, void their bowels.[112]

--------------------------------------------------

[109]Id. at 24-25 (citing Videotaped Deposition of Erich John
Hencshel ("Hencshel Deposition"), pp. 66, 201, Exhibit D to COH's
MSJ, Docket Entry No. 63-6, pp. 17, 52; Oral Videotaped Deposition
of Robert Bryant Holmes ("Holmes Deposition"), p. 44, Exhibit G to
COH's MSJ, Docket Entry No. 63-9, p. 12; Videotaped Oral Deposition
of George Luther McAteer, Jr. ("McAteer Deposition"), p. 118,
Exhibit GGG to COH's MSJ, Docket Entry No. 66-5, p. 30.

[110]Id. at 27 (citing Oral Deposition of Eduardo Ramirez,
pp. 169-70, Exhibit E to COH's MSJ, Docket Entry No. 63-7, pp. 44-
45).

[111]Defendant's Reply in Support of Its Motion for Summary
Judgment ("COH's Reply in Support of MSJ"), Docket Entry No. 124,
p. 8.

[112]Id. at 10.

-67-

Although the COH cites testimony that the men's bathroom had urine on the toilets, walls, and floors, Draycott and Keyes testified that the women's bathroom regularly had urine not only on the toilets, walls, and floors but also in the sink where women washed their faces and brushed their teeth.[113]   The COH cites evidence that male firefighters regularly found spit cups left at various places throughout Station 54, but Draycott testified that in addition to finding spit cups in the women's dormitory and bathroom, she also found tobacco spit directly into her desk drawers.[114]   Draycott also testified that after she began to complain about the conditions in the women's dormitory and bathroom, she found fireworks attached to the doors of the stalls in the women's bathroom and one exploded when she opened the door,[115] the cold water to the women's shower was turned off causing

_____

[113]USA's Response in Opposition to COH's MSJ, Docket Entry No. 105, p. 25 (citing USA's Statement of Facts, Docket Entry No. 105-2, p. 12 ¶ 96 (citing  Oral and Videotaped Deposition of Ena Jane Draycott ("Draycott Deposition"), pp. 79:12-81:8, Exhibit 38 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 105-35, pp. 19-21).  See also USA's Statement of Facts, Docket Entry No. 105-2, p. 14 ¶ 110 (citing Oral Deposition of Paula Denise Keyes ("Keyes Deposition"), pp. 100:1-101:1, Exhibit 37 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 105-34, pp. 39-40 (finding urine in sink in women's bathroom)).

[114]USA's Response in Opposition to COH's MSJ, Docket Entry No. 105, p. 25 (citing USA's Statement of Facts, Docket Entry No. 105-2, ¶ 108 (citing Draycott Deposition, p. 74:4-10, Exhibit 38 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 105-35, p. 14).

[115]Id. (citing United States' Statement of Facts, Docket Entry (continued...)

her to be scalded,[116] the volume on the announcement speakers in the women's dormitory and bathroom was turned down causing Keyes to miss a call,[117] and on July 7, 2009, the women's dormitory was vandalized and the words "die bitch" were scrawled above her desk and on the door to her locker.[118]

The COH has not cited any evidence of tobacco being spit directly into drawers in the men's dormitory, of fireworks being attached to the stall doors in the men's bathroom, of the cold water to the men's showers or the announcement speakers in the men's dormitory or bathroom being turned off, or of the men's dormitory or bathroom ever being vandalized with death threats and gender-specific slurs.   Nor has the COH cited any evidence that

---

[115](...continued)
No. 105-2, p. 13 ¶ 99 (citing Draycott Deposition, pp. 76:14-77:21, Exhibit 38 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 105-35, pp. 16-17)).

[116]See United States' Statement of Facts, Docket Entry No. 105-2, pp. 16-17 ¶¶ 131-32 (citing Email from Erich Hencshel to George McAteer, and Ronald Krusleski dated June 21, 2009, Exhibit 43 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 100-5, p. 2).

[117]See United States' Statement of Facts, Docket Entry No. 105-2, p. 17 ¶¶ 135 (citing Keyes Deposition, pp. 86:2-87:13, Exhibit 37 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 105-34, pp. 32-33).

[118]USA's Response in Opposition to COH's MSJ, Docket Entry No. 105, p. 25 (citing United States' Statement of Facts, Docket Entry No. 105-2, p. 18 ¶ 143 (citing Statement of HFD Firefighter Jane Draycott and Photographs of Gender and Racial Slurs at Station 54 on July 7, 2009, Exhibits 53 and 54, Docket Entry Nos. 100-11 and 100-12, respectively).

women ever used the men's dormitory or bathroom, or that women ever
had to be told not to use the men's dormitory or bathroom.
Moreover, the COH acknowledges not only that female firefighters
had complained about the conditions of the women's dormitory and
bathroom at Station 54 long before Draycott and Keyes worked there,
but also that a Bulletin issued by Assistant Fire Chief McAteer on
February 18, 2007, expressly prohibited male firefighters from
using the women's dormitories and bathrooms,[119] but that prohibition
was not enforced at Station 54.[120]

Based on plaintiffs' evidence of the conditions regularly
found in the women's dormitory and bathroom at Station 54, a
reasonable fact finder could conclude that the unsanitary
conditions about which plaintiffs complain far exceeded any general
messiness in the men's areas of Station 54 and are in fact evidence
of gender-based harassment.   Moreover, the vandalism involving
gender-specific slurs was solely confined to the women's dormitory
(a gender-specific location), and the slurs used targeted the only
female firefighters at the workplace.   See Reeves v. C.H. Robinson
Worldwide, Inc., 594 F.3d 798, 810 (11th Cir. 2010)(en banc)

---

[119]See COH's MSJ, Docket Entry No. 63, p. 25 (citing McAteer
Deposition, pp. 118-19, Exhibit GGG to COH's MSJ, Docket Entry
No. 66-5, p. 30).

[120]Id. (asserting that "a violation of a workplace rule is not
a per se violation of Title VII").   See also id. at 24 (citing
Holmes Deposition, p. 44, Exhibit G to COH's MSJ, Docket Entry
No. 63-9, p. 12 (acknowledging that when female firefighters were
not on shift male firefighters used the women's dormitory).

("[W]hen a co-worker calls a female a 'bitch,' the word is gender-derogatory, . . . calling a female colleague a "bitch" is firmly rooted in gender. It is humiliating and degrading based on sex."). See also Oncale, 118 S. Ct. 1002 ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed"). The conditions in the women's dormitory and bathroom, and the vandalism accompanied by gender-specific slurs and death threats share only one clear connection: they affected the only two women assigned to Station 54. A reasonable jury could conclude that the conditions in the women's dormitory and bathroom at Station 54 constituted harassment and that the harassment was based on sex.

> (2) **Plaintiffs  Cite  Evidence  Capable  of Establishing that the Harassment Effected a Term, Condition, or Privilege of Employment**

Arguing that the alleged harassment did not affect a term, condition, or privilege of Draycott's employment, the COH characterizes plaintiffs complaints about unsanitary conditions in the women's dormitory and bathroom as complaints about messy co-workers whose conduct was not sufficiently severe or pervasive to support a hostile work environment claim. But contrary to the COH's argument, plaintiffs have presented evidence from which a reasonable fact finder could conclude that the harassment

-71-

complained of was both subjectively and objectively offensive and
sufficiently severe to affect a term, condition, or privilege of
employment.  See Hernandez, 670 F.3d at 651 (citing Faragher, 118
S. Ct. at 2283).  Evidence that the harassment Draycott experienced
at Station 54 was subjectively offensive is found in the numerous
complaints that she lodged with Captain Hencshel, the COH's OIG,
and then the EEOC.  See Aryain v. Wal-Mart Stores Texas LP, 534
F.3d 473, 480 (5th Cir. 2008) (holding that female plaintiff's
pursuit of harassment claims would allow a jury to conclude that
she subjectively perceived her working environment to be hostile or
abusive).

In determining whether a work environment is objectively
hostile or abusive courts look to the totality of the circumstances
and examine "the frequency of the discriminatory conduct; its
severity; whether it is physically threatening or humiliating, or
a mere offensive utterance; and whether it unreasonably interferes
with an employee's work performance."  Hernandez, 670 F.3d at 651.
See also Harris, 114 S. Ct. at 371 (harassment must be such that
the environment "would reasonably be perceived, and is perceived,
as hostile or abusive").  Draycott testified that she found urine
in the women's bathroom at the beginning of every shift, including
in the sink where she brushed her teeth and washed her face,
tobacco spit into the drawers of her desk, and fingernail clippings

on her bed.[121]   Captain Hencshel testified that he believed Draycott's complaints and acknowledged discovering "what might have been urine stains on the toilet and possible urine spots on the wall."[122]   Because the women were responsible for cleaning their dormitory and bathroom, Draycott was frequently and unnecessarily required to clean up other people's urine, spit, and nail clippings.

Plaintiffs have also cited evidence showing that fireworks attached to a stall door in the women's bathroom exploded when Draycott opened the door, Draycott was scalded in the women's shower when the cold water had been turned off, Keyes missed a call when the volume of the speakers in the women's area was turned off, and Draycott and Keyes were both placed on administrative leave following their discovery of the vandalism of the women's dormitory that occurred only a week after they filed complaints with the OIG. Attaching fireworks to stall doors in the women's bathroom, turning

---

[121]Draycott Deposition of February 27, 2019, pp. 73:24-74:12 (tobacco spit and nail clippings), 79:12-81:8 (urine), Exhibit 38 to USA's Opposition to COH's MSJ, Docket Entry No. 105-35, pp. 13-14, 19-21).  See also Keyes Deposition, pp. 100:1-101:1, Exhibit 37 to USA's Opposition to COH's MSJ, Docket Entry No. 105-34, pp. 39-40 (testifying to finding urine in the sink in the women's bathroom).

[122]Hencshel Deposition, pp. 230:11-231:1, Exhibit G to COH's MSJ, Docket Entry No. 63-6, p. 59; Statement of HFD Captain Erich J. Hencshel, Exhibit 44 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 100-6, p. 4 ("I inspected the area and discovered what might have been urine stains on the toilet and possible urine spots on the wall").

off the cold water to the women's showers, turning down the volume of the speakers in the women's area, and vandalizing the women's dormitory threatened not only Draycott's and Keyes' safety and but also their ability to do their jobs. A reasonable jury could conclude from this evidence that the harassment at issue was both objectively offensive and sufficiently severe or pervasive to alter a term, condition, or privilege of the plaintiffs' employment.

Citing Faragher, 118 S. Ct. at 2283, and asserting that the vandalism of the women's dormitory was an isolated occurrence, that the graffiti was removed the day it appeared, and that there is no allegation that any graffiti reappeared, the COH argues that "[i]solated incidents will not amount to discriminatory changes in the terms and conditions of employment."[123] Asserting that "neither Draycott nor Keyes subjectively believed the graffiti in the women's dorm to be sexually offensive or intended as sexual harassment, . . . both of them perceived the graffiti to be retaliation for having filed a protected complaint,"[124] the COH argues that "[a]bsent any subjective perception that the conduct was sexually harassing, there can be no actionable hostile environment claim."[125] But in Faragher, 118 S. Ct. at 2283, the Supreme Court recognized that a single incident of harassment, if

---

[123]COH's MSJ, Docket Entry No. 63, p. 32.

[124]COH's Reply in Support of MSJ, Docket Entry No. 124, p. 13.

[125]Id.

sufficiently severe, can give rise to a viable Title VII claim just as a continuous pattern of much less severe incidents of harassment. Moreover, since the protected complaint that Draycott and Keyes had filed was for gender discrimination, a reasonable fact finder could also conclude that the vandalism was an escalation of gender-based harassment.

Asserting that the comments made by Draycott's male co-workers on January 13, 2010, were not physically threatening, humiliating, or gender-based, the COH argues that there is no evidence that Draycott's gender was the motive behind the comments.[126]  Citing Captain Williamson's comments, the COH argues that the comments were motivated by (1) the fact that the person(s) who committed the vandalism had not been identified; (2) the investigation of the vandalism had not been concluded; and (3) Draycott's behavior at Station 54 did not support her return to work there.[127]  Asserting that neither Williamson nor the other firefighters who made comments on January 13, 2010, had authority over Draycott's employment, and that authority over Draycott's conduct rested exclusively with Fire Chief Boriskie, the COH argues that the "firefighter's expression of their feelings, although it may have felt harsh and humiliating for Draycott, is not objectively offensive or humiliating enough to effect a term and condition of

---

[126]COH's MSJ, Docket Entry No. 63, p. 33.

[127]Id. (citing Captain Williamson's Statement Read at January 13, 2010 Roll Call, Exhibit LL to COH's MSJ, Docket Entry No. 68-2).

employment."[128]  This argument is belied by the fact that on January
13, 2010, Williamson was Draycott's first line supervisor, and Fire
Chief Boriskie as well as members of his command staff were present
at the Roll Call during which Draycott was disparaged but took no
action to stop the disparagement.  Moreover, the disparagement was
so severe that Draycott was unable to work her shift but, instead,
left to go see her psychologist, Dr. Metcalfe, for emergency
counseling, and was unable to return to work until April.  Based on
this evidence a reasonable fact finder could conclude that the
conduct Draycott experienced at Station 54 on January 13, 2010, was
both subjectively and objectively offensive, and sufficiently
severe to effect a  term, condition, or privilege of employment.

> ### (3)  Plaintiffs  Cite  Evidence  Capable  of Establishing that the COH Failed to Take Prompt Remedial Action

The COH argues that prompt remedial action was taken with
respect to the conditions in the women's dormitory and bathroom
because Henschel attempted to address Draycott's complaints in-
house by investigating the complaints, speaking to other
firefighters, notifying the captains of other shifts, and informing
District Chief McAteer, and that once it was determined that the
concerns could not be addressed in-house, Captain Hencshel and

---

[128]Id. at 34.

Senior Captain Tamez told Draycott to file a complaint with OIG.[129]
The COH argues that prompt remedial action was taken with respect
to the vandalism of the women's dormitory because the day the
vandalism was discovered the graffiti was removed, a criminal
investigation was initiated, Draycott and Keyes were placed on paid
leave, and after about a month Draycott and Keyes were temporarily
assigned to other stations pending the outcome of the
investigation.[130]  The COH argues that prompt remedial action was
taken with respect to the January 13, 2010, Roll Call because after
the investigation concluded, employees from the COH's Human
Resources Department conducted and completed EEO ("Equal Employment
Opportunity") training for all ARFF stations, Boriskie was demoted
to District Chief, McAteer left ARFF and went to EMS, Williamson
transferred out of ARFF, and  there is no evidence that sex-based
harassment has since occurred at Station 54.[131]

The COH's argument that prompt remedial action was taken to
prevent and/or correct any inappropriate behavior is contradicted
not only by evidence that after Draycott complained to Hencshel and
to OIG, the harassment represented by the unsanitary conditions in
the women's dormitory and bathroom did not end but, instead,

---

[129]Id. at 34.

[130]Id. at 34-35.  See also COH's Reply in Support of MSJ,
Docket Entry No. 124, p. 14.

[131]Id. at 35.

-77-

escalated, to vandalism of the women's dormitory, gender slurs, and death threats.   Moreover, the investigation of the vandalism neither identified the vandals nor ended the harassment which, on January 13, 2010 — the day Draycott attempted to return to work, escalated to disparaging and confrontational remarks made by her immediate supervisor, Captain Williamson, in the presence of Fire Chief Boriskie and members of his command staff. Based on this evidence a reasonable fact finder could conclude that the COH failed to take prompt remedial action.

      (c)   Conclusions as to Hostile Work Environment Claim

There is simply no reasonable basis to support granting the COH's MSJ on plaintiffs' hostile work environment claim. Considering all the facts in the light most favorable to the plaintiffs, genuine issues of material fact exist as to whether the repeated gender-based defilement of the women's dormitory and bathroom at Station 54, the escalating nature of the harassing conduct, the vandalism accompanied by gender-specific slurs and death threats found written on the walls of the women's dormitory on July 7, 2009, and the disparaging comments made to Draycott when she attempted to return to work on January 13, 2010, were based on gender, was sufficiently severe to effect a term, condition, or privilege of employment, and whether the COH took prompt remedial action to end the harassment. Accordingly, the COH's MSJ on plaintiffs' hostile work environment claim will be denied.

-78-

4. __The COH's MSJ on Plaintiffs' Claims for Retaliation Against Draycott Will be Denied__

(a)   Applicable Law

Title VII protects employees from retaliation for exercising protected rights.  See 42 U.S.C. § 2000e-3.  See also Aryain, 534 F.3d at 484.   In order to establish a prima facie case of retaliation under Title VII plaintiffs must show that (1) Draycott engaged in activity protected by Title VII, (2) Draycott suffered a materially adverse employment action, and (3) a causal connection exists between the protected activity and the materially adverse employment action.  Aryain, 534 F.3d at 484.  For purposes of a Title VII retaliation claim, an adverse employment action is an action that could dissuade a reasonable worker from making or supporting a charge of discrimination.  Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405, 2409 (2006).  Once plaintiff establishes a prima facie case the burden shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse employment action.  Aryain, 534 F.3d at 484.  "If the employer meets this burden of production, the plaintiff then bears the burden of proving that the employer's reason [for the adverse action] is a pretext for the actual retaliatory reason.  Id. (citing McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir. 2017) (per curiam)).  Plaintiff is required to demonstrate that the adverse employment action would not have occurred "but for" Draycott's protected activity.  University of Texas Southwestern

Medical Center v. Nassar, 133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in [42 U.S.C] § 2000e-2(m)."). To avoid summary judgment on their retaliation claim plaintiffs must show a conflict in substantial evidence on the question of whether the COH would not have taken the challenged adverse employment actions but for her protected activity. See Hernandez, 670 F.3d at 660. "Evidence is 'substantial' if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." Id.

(b) Application of the Law to the Facts

The COH does not dispute that Draycott engaged in protected activity by repeatedly complaining to her immediate supervisors, filing a formal complaint of gender discrimination with Staff Services on June 29, 2009, and filing complaints for gender discrimination and retaliation with the EEOC on July 15, 2009, and April 6, 2010. See Valderaz v. Lubbock County Hospital District, 611 F. App'x 816, 821 (5th Cir. 2015)(per curiam)("internal report of perceived discrimination . . . is protected by Title VII"). The COH argues, however, that Draycott has not suffered any adverse employment action as a result of her protected activity, and that even if Draycott did suffer an adverse employment action, there is

-80-

no causal connection between the adverse employment action and her
protected activity.[132]    Plaintiffs respond that a jury could
conclude that Captain Williamson's retaliatory Roll Call, condoned
by the Fire Chief and members of his command staff, would dissuade
a reasonable employee from making a charge of discrimination.[133]
The court agrees.

Citing Valderaz, 611 F. App'x at 821, the COH argues that
Chief Boriskie's decision to hold the CISM and failure to stop the
male firefighters from expressing their feelings about Draycott's
attempt to return to work on January 13, 2010, was not for purposes
of retaliating against Draycott and, therefore, cannot serve as the
basis for her retaliation claim.   The COH argues that

> Station 54A's crew's decision to express their feelings
> regarding the events at issue also is not a material
> action that would dissuade a reasonable person from
> complaining.      Williamson, Vara, and the other
> firefighters who expressed their feelings about what had
> occurred at Fire Station 54 back in the summer of 2009
> had absolutely no control over Draycott's employment
> status.  As a matter of State law, collective bargaining
> agreement, and HFD policy, only the Fire Chief has the
> authority to transfer any firefighter. . . "The actions
> of ordinary employees are not imputable to their employer
> unless they are conducted 'in furtherance of the
> employer's business.'"   Hernandez[, 670 F.3d at 657].
> Additionally, comments made by persons who had no
> authority to take employment action at issue (e.g.
> transfer) are not adverse actions.[134]

---

[132]Id. at 38-42.

[133]USA's Response in Opposition to COH's MSJ, Docket Entry
No. 105, pp. 40-43; Draycott's Response to the COH's MSJ, Docket
Entry No. 114, pp. 22-23.

[134]COH's MSJ, Docket Entry No. 63, pp. 41-42.

In _Valderaz_ the Fifth Circuit held that a supervisor setting a meeting with the plaintiff's co-workers in an effort to resolve a conflict was not actionable retaliatory conduct.  611 F. App'x at 821.  The Fifth Circuit explained that

> Valderaz has not given the Court any reason to conclude that [the supervisor] set that meeting with any intentions other than to address the conflict.  While there may be circumstances which would counsel against a supervisor confronting wayward employees about their treatment of a co-employee and disclosing that the co-employee's complaint with specificity, this was not one of them.

_Id._  This case is distinguishable from _Valderaz_ because while the plaintiff in that case was unable to cite evidence capable of establishing that the supervisor set the meeting at issue for any reason other than to resolve a conflict, here, plaintiffs cite direct evidence that Draycott was subjected to an adverse action because of her protected activities.  "Direct evidence is evidence which, if believed, proves the fact [of intentional retaliation] without inference or presumption."  _Brown,_ 989 F.2d at 861.

Plaintiffs have presented uncontradicted evidence that during Roll Call on the day that Draycott attempted to return to work at Station 54, Captain Williamson read a prepared statement opposing her return stating, _inter alia,_ that she had accused her co-workers of harassing her, investigations stemming from her complaints were on-going, her accusations and the ensuing investigations had taken great tolls on his crew members' professional careers and personal lives, he and his crew members did not trust her, questioned her

-82-

mental health and ability to do her job, and did not want her to
return, and he could not guarantee her safety.[135]     Williamson
testified at his deposition that the statement he read at Roll Call
was intended to dissuade Draycott from returning to Station 54.[136]
Other firefighters made similar statements opposing Draycott's
return to Station 54 stating that they did not trust her and blamed
her for a host of problems attributed to the investigation of her
complaints.[137]     Although present at the Roll Call, Fire Chief
Boriskie did not stop Williamson or the other firefighters from
making their statements, and did not ask any of his subordinates to
stop the statements from being made.[138]

---

[135]See Captain Williamson's Statement Read at January 13, 2010,
Roll Call, Exhibit 65 to USA's Response in Opposition to COH's MSJ,
Docket Entry No. 101-5.

[136]Oral Videotaped Deposition of Brian Williamson ("Williamson
Deposition"), p. 243:4-7, Exhibit 20 to USA's Response in
Opposition to COH's MSJ, Docket Entry No. 105-24, p. 108.

[137]See Oral Deposition of Dennis James King, pp. 194:12-201:4,
Exhibit 23 to USA's Response in Opposition to COH's MSJ, Docket
Entry No. 105-27, pp. 48-55 (blaming Draycott for tension in his
marriage because she was the person who created the investigation
and his wife believed that Draycott was the victim of acts done by
men); Oral Deposition of Roberto Garcia Vara, pp. 81:17-82:10,
Exhibit 24 to USA's Response in Opposition to COH's MSJ, Docket
Entry No. 105-28, pp. 20-21 (stating that he did not want Draycott
to return to Station 54 because of the problems that kept coming up
and by problems he meant her complaints).

[138]Videotaped Oral Deposition of Phil Anthony Boriskie,
p. 145:8-24, Exhibit 17 to USA's Response in Opposition to COH's
MSJ, Docket Entry No. 105-21, p. 67.

The COH argues that "[t]he firefighters' expression of their feelings, although it may have felt harsh and humiliating for Draycott, is not objectively offensive or humiliating,"[139] is contradicted by the testimony of Draycott's co-workers who were present at the Roll Call and said that the comments were intended to dissuade Draycott from returning to work at Station 54. The COH's contention that the firefighters' expression of their feelings are not capable of raising a genuine issue of material fact for trial because they were not the acts of supervisors and were not undertaken in furtherance of COH business is belied by the presence of the Fire Chief and members of his command staff, all of whom allowed the statements to continue despite seeing that Draycott was in tears. Accordingly, the court concludes that plaintiffs have cited evidence capable of establishing that Draycott suffered an adverse employment action in retaliation for having engaged in activity protected by Title VII.

5.   The COH's MSJ on Plaintiffs' Claims for Constructive Discharge of Draycott Will be Denied

"A successful claim of constructive discharge entitles an employee who resigned to recover 'all damages available for formal discharge." Aryain, 534 F.3d at 480 (quoting Suders, 124 S. Ct. at 2354). In certain circumstances a constructive discharge can also be considered an adverse employment action that precludes an

---

[139]COH's MSJ, Docket Entry No. 63, p. 34.

employer from asserting the <u>Ellerth/Faragher</u> defense to vicarious liability.  <u>See Burlington Industries, Inc. v. Ellerth,</u> 118 S. Ct. 2257, 2270 (1998) (holding that an employer is strictly liable for supervisor harassment that "culminates in a tangible employment action").  <u>See also Suders,</u> 124 S. Ct. at 2351 ("We conclude that an employer does not have recourse to the <u>Ellerth/Faragher</u> affirmative defense when a supervisor's official act precipitates the constructive discharge.").

The COH argues that it is entitled to summary judgment on Draycott's claim for retaliatory constructive discharge because

> [t]he undisputed evidence in the record is that (1) Draycott's unchecked grief over the death of her daughter and her PTSD from her 1987 rape are the reasons Draycott ultimately resigned from her employment with the Houston Fire Department; and (2) after the incident on January 13, 2010, there were no additional allegations by Draycott that would establish [] a greater severity.[140]

Asserting that Draycott fails to allege that she suffered any discriminatory or retaliatory conduct after she returned to work in April of 2010, and that all of the conduct Draycott contends caused her constructive discharge occurred at least sixteen months before she resigned, the COH argues that there is no causal connection between the alleged conduct and Draycott's retirement.[141]  Citing Draycott's V.A. medical records as evidence that her disability is attributable to non-work related events, the COH argues that events

---

[140]<u>Id.</u> at 43.

[141]<u>Id.</u> at 44.  <u>See also</u> COH's Reply in Support of MSJ, Docket Entry No. 124, pp. 23-24.

unrelated to Draycott's employment were contributing factors that accounted for more than 50% of the reason Draycott was not mentally fit to perform the duties of a firefighter.[142]   Citing Keyes' transfer to another station, the COH argues that no reasonable person would have resigned under the same or similar circumstances as those that Draycott faced,[143] and that the decision to resign and seek disability benefits was Draycott's — not the COH's — decision.[144]

The COH's argument that Draycott was not constructively discharged by the COH's conduct is contradicted by three different medical experts — Dr. Metcalfe, Dr. Nahmias, and Dr. Drell — each of whom examined Draycott and concluded that she was permanently disabled and unable to work as a firefighter, and that the COH's conduct caused her  disability.

(a)  Draycott's Treating Psychologist Dr. Metcalfe

Plaintiffs cite evidence showing that Draycott began seeing HPD staff psychologist, Dr. William Metcalfe, in October of 2009. Draycott was eligible to see Metcalfe because her husband was an

---

[142]COH's MSJ, Docket Entry No. 63, pp. 45-46.

[143]Id. at 46. See also COH's Reply in Support of MSJ, Docket Entry No. 124, pp. 22-23.

[144]COH's MSJ, Docket Entry No. 63, p. 46.  See also COH's Reply in Support of MSJ, Docket Entry No. 124, pp. 20-21 (asserting that Draycott chose to resign her employment with the City).

HPD employee.[145]  Draycott's presenting concern to Dr. Metcalfe was "occupational problems and grief."[146]   The COH argues that Draycott's condition was caused by the death of her daughter in 2006, i.e., a non-work related event that predated the July 2009 vandalism.  But Dr. Metcalfe contradicts the COH's argument by testifying that following the death of her daughter, Draycott actually appeared to regain her functioning fairly well and she was fully capable of performing her job as a firefighter.[147]   He concluded that the incident at Station 54 resurrected many feelings of grief Draycott had about her daughter's passing, and ultimately caused her disability.  In pertinent part Dr. Mecalfe testified:

> Q.   . . . [Y]ou have there, "And that the disability is the result of an," and you've checked "on-duty illness/accident."  Is that correct?
>
> A.   Yes.[148]
>
> . . .
>
> Q.   And when you refer to on-duty illness/accident, specifically what are you referring to?

---

[145]Metcalfe Deposition, pp. 14:5-20, 17:17-22, 18:23-19:1, Exhibit 1 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, pp. 15 and 18-20.

[146]Id. at 21:11-14, Exhibit 1 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, p. 22.

[147]Id. at 83:24-84:8, Exhibit 1 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, pp. 84-85.

[148]Id. at 52:1-5, Exhibit 1 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, p. 53.

A.   I believe I was thinking about the incident at the firehouse, and the series of incidents really, that might be described as harassment towards Jane.[149]

. . .

Q.   So would it be fair to say that the incident that occurred in July 2009, along with the meeting in January 2010, put her in a state of mind where she was very susceptible to having traumatic incidents or occurrences because of what had happened to her?

. . .

A.   I think it's reasonable.[150]

. . .

Q.   Doctor, based on your treatment of Ms. Draycott and the information that was available to you, did Ms. Draycott have a mental disability that prevented her from functioning as a firefighter for the Houston Fire Department before the graffiti/ vandalism incident in July 2009?

A.   Just to make sure I understand your question.  Was she disabled before that incident?  No, I don't think she was.[151]

. . .

Q.   Prior to the July 7, 2009[,] incident, Ms. Draycott was fully able to perform her job at Station 54, correct?

---

[149]Id. at 54:11-15, Exhibit 1 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, p. 55.

[150]Id. 43:1-9, Exhibit 1 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, p. 44.

[151]Id. at 55:11-19, Exhibit 1 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, p. 56.

A.   To the best of my knowledge.[152]

Dr. Metcalfe also testified that Draycott's condition is permanent, and that she will never again work as a firefighter:

Q.   And is it your opinion, your professional opinion, that based on Ms. Draycott's condition that her disability is likely to be permanent?

A.   Yes.  That's what I've checked off.[153]

· · ·

Q.   And when you indicate at the top of this document that in your professional opinion the applicant's condition is likely permanent, what condition are you referring to?

A.   I believe I was thinking her ability to work as a firefighter.[154]

(b)   The COH's Medical Expert Dr. Nahmias

In December of 2010 the COH instructed Draycott to submit to a fitness-for-duty examination with Dr. Larry Nahmias.[155]   Draycott

---

[152]Id. at 154:8-11, Exhibit 1 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, p. 155.

[153]Id. at 51:22-25, Exhibit 1 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, p. 52.

[154]Id. at 53:13-18, Exhibit 1 to COH's Corrected Motion to Exclude Mental Health Experts' Testimony, Docket Entry No. 85-3, p. 54.

[155]See October 7, 2010, Letter from T. Garrison to J. Draycott, Exhibit 75 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 105-48, p. 2.  See also Report of L. Nahmias, p. 2, Exhibit 77 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 103-5, p. 3.

met with Dr. Nahmias twice and Dr. Nahmias issued a report in February of 2011 concluding that Draycott was

> not psychologically fit to perform her duties as a firefighter permanently or in the future. . . [Draycott] is suffering from significant and severe psychological problems that prevent her from returning to her usual occupation. Her symptoms cause her permanent total impairment in her usual occupation.[156]

Dr. Nahmias testified that as a result of seeing her child's picture defaced, Draycott developed severe psychological problems and relived those experiences including having nightmares due to her PTSD-related symptoms, paranoia and suspiciousness.[157] Dr. Nahmias' examination of Draycott confirmed that seeing her child's picture defaced by vandalism that occurred on July 7, 2009, contributed to Draycott's inability to work as a firefighter.[158]

### (c)   The HFRRF's Medical Expert Dr. Drell

On June 27, 2011 at the request of the HFRRF, Draycott was examined by independent psychiatrist, Dr. William K. Drell, who found her permanently unable to work as a firefighter, and stated, "I do believe Mrs. Draycott's disabling symptoms are directly

---

[156]Report of L. Nahmias, pp. 8-9, Exhibit 77 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 103-5, pp. 9-10.

[157]Nahmias Deposition, pp. 110:22-111:11, Exhibit 76 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 103-4, pp. 16-17.

[158]Id. at 111:12-16, Exhibit 76 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 103-4, p. 17.

related to her work related incidents."[159]   On August 7, 2012, Dr. Drell re-evaluated Draycott, and again concluded that her disability "was directly caused by experience with the fire department," and stated that "I do not believe she can perform the usual and customary duties of a firefighter/EMT due to her Post Traumatic Stress Disorder.  I do anticipate her ability to work for HFD will be permanent."[160]

Because a reasonable fact finder could conclude from the testimony of Dr. Metcalfe, Dr. Nahmias, and Dr. Drell that the COH's conduct left Draycott permanently disabled and unable to perform the functions of her job as a firefighter, the COH is not entitled to summary judgment on Draycott's claim for constructive discharge.

### 6.   The COH's MSJ on Plaintiffs' Claims for Injunctive Relief Will be Denied

The United States alleges upon information and belief that the discriminatory situation persists at Station 54, and that

> a wall has been built in Station 54's female dormitory that reduces the dormitory's size to fit only a single bed.  The remainder of the room has been converted into space for male firefighters.  As a result, under the

---

[159]July 11, 2011, Letter from William K. Drell to Glenna Hicks, Deputy Director of Member Services, Exhibit 79 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 103-7, p. 4.

[160]August 13, 2012, Letter from William K. Drell to Glenna Hicks, Deputy Director of Member Services, Exhibit 80 to USA's Response in Opposition to COH's MSJ, Docket Entry No. 103-8, p. 4.

current configuration, no more than one female
firefighter can be assigned to Station 54.[161]

The United States seeks injunctive relief ordering the COH

> to develop and implement appropriate and effective
> measures to prevent discrimination and retaliation,
> including but not limited to implementing appropriate
> anti-discrimination and investigation policies and
> procedures applicable to employees working at Station 54,
> and implementing adequate training to all employees and
> officials, including but not limited to: (1) taking
> proper steps to investigate complaints of sexual
> harassment and sex-based discrimination; (2) disciplining
> employees found responsible for sexual harassment;
> (3) instituting effective anti-retaliation policies and
> procedures; (4) disciplining employees found responsible
> for retaliation; (5) distributing its anti-harassment and
> anti-retaliation policies to all employees; and
> (6) providing mandatory sexual harassment and anti-
> retaliation training for all supervisors and employees.[162]

The COH argues that it is entitled to summary judgment on the

United States' claim for injunctive relief because that claim is

moot and impermissibly vague and overbroad, and because plaintiffs

have failed to comply with Federal Rule of Civil Procedure 65.[163]


> (a)  Plaintiffs' Claim for Injunctive Relief is Not Moot

The COH argues that plaintiffs' claim for injunctive relief is

moot because neither Draycott nor Keyes will benefit from the

requested relief, and the challenged conduct is not likely to

reoccur.

---

[161]Complaint, Docket Entry No. 1, p. 14, ¶ 87.

[162]Id. at 18 ¶ (e).

[163]COH's MSJ, Docket Entry No. 63, pp. 46-62.  See also COH's
Reply in Support of MSJ, Docket Entry No. 124, pp. 24-25.

Asserting that Draycott voluntarily took disability retirement from HFD in 2011, and Keyes has since promoted to Captain and transferred to HFD's Communications Center, and citing Pederson v. Louisiana State University, 213 F.3d 858, 869-870 (5th Cir. 2000), the COH argues that the United States' claim for injunctive relief is moot because neither plaintiff will benefit from the relief sought.[164]  But Pederson is inapposite and the COH's reliance on it misplaced.

Pederson was a Title IX case brought by three private individuals, not by a federal agency charged with upholding a federal civil rights statute.  Id. at 864-66.  The relief sought in Pederson included injunctive relief to benefit the three individuals who brought the suit, as well as injunctive relief for a class.  Id. at 873.  Although the Fifth Circuit held that injunctive relief for the three named plaintiffs was moot because they had graduated, id. at 874, the court held that injunctive relief was not moot with regard to the putative class.  Id.  Unlike Pederson, which was brought by private plaintiffs, this action has been brought by the Department of Justice in the name of the United States.  The Supreme Court has held that federal agencies charged by Congress with upholding Title VII serve the public interest of eliminating employment discrimination, even when enforcing the rights of private individuals.  See General Telephone Co. of the

---

[164]COH's MSJ, Docket Entry No. 63, p. 48.

Northwest, Inc. v. EEOC, 100 S. Ct. 1698, 1706 (1980) ("Any
violations that the EEOC ascertains in the course of a reasonable
investigation of the charging party's complaint are actionable.").
See also EEOC v. Waffle House, Inc., 122 S. Ct. 754, 765 (2002)("We
are persuaded that, pursuant to Title VII . . . whenever the EEOC
chooses from among the many charges filed each year to bring an
enforcement action in a particular case, the agency may be seeking
to vindicate a public interest, not simply provide make-whole
relief for the employee, even when it pursues entirely victim-
specific relief"). The Fifth Circuit has similarly allowed federal
agencies to pursue injunctive relief even when make whole relief
for a charging party is not at issue. See EEOC v. Jefferson Dental
Clinics, P.A., 478 F.3d 690, 698-699 (5th Cir. 2007). Accordingly,
the court concludes that the United States' claim for injunctive
relief is not moot despite the fact that neither of the two
individual plaintiffs stand to benefit from that relief.

Citing the Thompson & Horton Assessment from December of 2009,
and EEOC v. Flambeau, 846 F.3d 941, 950 (7th Cir. 2017), the COH
argues that the challenged conduct is not likely to reoccur because
the COH responded to the Thompson & Horton Assessment by making
changes to the policies and procedures governing the operations of
both HFD and the OIG.[165]   The COH argues that the changes in
policies and procedures coupled with an increase in training and

---

[165]Id. at 49-61.

other changes made over time indicates that injunctive relief for
conduct rooted in 2009/2010 is not legally supported. The COH also
argues that plaintiffs' reliance on the Tran-Buser Memo is fatal
for purposes of withstanding summary judgment for the reasons set
forth in the COH's Objections and Motion to Strike Plaintiff's
exhibits (Docket Entry No. 120).[166]

The Fifth Circuit has repeatedly made clear that "injunctive
relief is mandatory in the wake of a Title VII violation 'absent
clear and convincing proof of no reasonable probability of further
noncompliance with the law.'" EEOC v. Boh Brothers Construction
Co., LLC, 731 F.3d 444, 469-70 (5th Cir. 2013) (en banc)(citations
omitted). The City's reliance on Flambeau, 846 F. 3d at 941, is
also misplaced. In Flambeau, 846 F.3d at 948-50, the court found
that the injunctive relief sought by the EEOC was moot because no
damages could be proven with respect to the charging party and the
mandatory wellness program challenged by the EEOC was abandoned by
the employer for economic reasons long before the EEOC filed suit
for unrelated reasons. That is not the case here. Moreover, for
the reasons stated in § II.B.3, above, the court has concluded that
the COH's objections to and motion to strike the Tran-Buser Memo
should be denied. The court concludes, therefore, that genuine
issues of material fact exist as to whether the challenged conduct
is likely to reoccur. Accordingly, the United States' claim for
injunctive relief is not moot.

---

[166]COH's Reply in Support of MSJ, Docket Entry No. 124, p. 24.

(b)   Plaintiffs' Have Not Failed to Comply with Rule 65

Citing <u>Scott v. Schedler</u>, 826 F.3d 207, 211 (5th Cir. 2016)(per curiam), the COH argues that plaintiffs' request for an injunction should be denied because the request fails to comply with Federal Rule of Civil Procedure 65(d)(1). In <u>Scott</u> the Fifth Circuit held that "an injunction is overly vague if it fails to satisfy the specificity requirements set out in Rule 65(d)(1), and it is overbroad if it is not 'narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order' as determined by the substantive law at issue." <u>Id.</u> (quoting <u>Doe v. Veneman</u>, 380 F.3d 807, 818 (5th Cir. 2004)). Citing <u>Meyer v. Brown & Root Construction Co.</u>, 661 F.2d 369, 373 (5th Cir. 1981), for its statement that Rule 65 does not permit a "general injunction which in essence orders a defendant to obey the law," <u>id.</u> at 373, the COH argues that:

> [t]he injunctive relief requested in Plaintiff's Complaint is, in essence, nothing more than a request ordering the City to obey Title VII. The request is neither specific nor narrowly tailored. Plaintiff fails to specify what it considers to be "appropriate and effective measures to prevent discrimination and retaliation" such that the City would be able to comply with the request. If Plaintiff does not believe the extensive changes already implemented by the City are sufficient, what else should be done? What are the terms of the policies Plaintiff believes to be appropriate and effective? What should the requested training cover and how should it be conducted? How should offending employees be disciplined? Further, it is unclear whether Plaintiff's requested injunction is targeted to Station 54 and HFD, or the City as a whole. Therefore, the

request does not comply with Rule 65, and Defendant is entitled to summary judgment for this reason as well.[167]

In pertinent part, Rule 65 states:

(d)   Contents and Scope of Every Injunction and Every Restraining Order:

   (1)   Contents.  Every order granting an injunction and every restraining order must:

      (A)   state the reasons why it issued;

      (B)   state its terms specifically; and

      (C)   describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required.

Fed. R. Civ. P. 65(d)(1).  Rule 65(d) addresses the requirements of <u>orders</u> granting an injunction; Rule 65(d) does not address requirements for stating a <u>claim</u> or a prayer for injunctive relief. A prerequisite for granting injunctive relief in this case is a finding of intentional employment discrimination.  If and when such a finding is made, the court has broad discretion to fashion an appropriate remedy, including, an injunction.  Accordingly, the court is not persuaded that the United States has failed to comply with Rule 65.

Because the court has concluded that the United States' claim for injunctive relief is not moot, and that the United States has not failed to comply with Rule 65, the COH's MSJ on the United States' claim for injunctive relief will be denied.

---

[167]COH MSJ, Docket Entry No. 63, pp. 61-62.

D.   **The United States' Motion for Partial Summary Judgment**

The United States moves for summary judgment on the COH's affirmative defense that "Plaintiff's claims are barred in whole or in part, or recoverable damages should be reduced, because Draycott . . . ha[s] wholly failed to take reasonable steps to mitigate [her] damages as required by law."[168]   Plaintiffs argue that

> [s]ummary judgment is appropriate because the City cannot prove that substantially equivalent jobs were available for which Draycott was qualified.   The City's sole evidence on this defense comes from its rebuttal expert on damages, Steward, who identified three positions that could have been considered in an analysis of Draycott's economic issues.   But Steward did not compare the three occupations he identified with the HFD firefighter job to determine whether they were substantially equivalent. Nor could he say that Draycott was minimally qualified for these positions, or that she could have performed any of these jobs, given her medical diagnoses.   For these reasons, the City's affirmative defense must fail.[169]

Asserting that the USA's MSJ should be denied, the COH argues that Draycott had a duty to mitigate lost wages incurred as a result of her alleged constructive discharge by using reasonable diligence to find other suitable employment.[170]   Asserting that

---

[168]USA's MSJ, Docket Entry No. 59, p. 10 (citing City of Houston's Answer and Affirmative Defenses, Docket Entry No. 9, p. 10 ¶ 5).

[169]Id. at 11.

[170]Defendant City of Houston's Response in Opposition to Plaintiff United States' Motion for Summary Judgment, Docket Entry No. 95, pp. 6-7.   The COH also argues that Draycott had a duty to mitigate her alleged hostile work environment damages by taking advantage of the City's corrective opportunities, and that Draycott had a duty to mitigate her alleged mental anguish damages by
(continued...)

Draycott failed to seek "any other employment whatsoever, either before or after she left HFD,"[171] the COH argues that "[b]ecause she did not seek employment, there is no need to establish the availability of substantially comparable work."[172]   The COH also argues that

> the requirement of substantially comparable work only applies to claims for back pay, not claims for alleged lost future wages.   However, substantially comparable work was available to [Draycott] with the City, and it would have been offered to her had she requested a accommodation for her mental disability.   There is no requirement that the failure to mitigate be supported by expert testimony.   The fact evidence in the summary judgment record defeats Plaintiff's claim for judgment as a matter of law.[173]

Asserting that Title VII does not impose a duty to mitigate compensatory damages for emotional distress, the United States replies that it is only seeking partial summary judgment on the COH's affirmative defense of failure to mitigate damages for back pay.[174]   Citing Sparks v. Griffin, 460 F.2d 433, 443 (5th Cir. 1972), the United States argues that the City must prove that

---

[170](...continued)
complying with her mental health providers' treatment recommendations, but the COH cites no evidence capable of establishing its entitlement to judgment as a matter of law on either of these bases.

[171]Id. at 7.

[172]Id.

[173]Id.

[174]Plaintiff United States' Reply in Support of Its Motion for Summary Judgment, Docket Entry No. 125, pp. 7-8.

substantially similar positions were available for Draycott, and that the COH cannot do so on this record.[175]


1.   Applicable Law

Title VII claimants have a statutory duty to mitigate damages for back pay.  See 42 U.S.C. § 2000d-5(g) ("Interim earnings or amounts earnable with reasonable diligence by the persons discriminated against shall operate to reduce the back pay otherwise allowable.").  Plaintiffs in employment discrimination cases must mitigate their damages by searching for substantially equivalent employment.  See West v. Nabors Drilling USA, Inc., 330 F.3d 379, 393 (5th Cir. 2003).

> Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has been discriminatorily terminated.

Id.  Courts in the Fifth Circuit are split over whether employers asserting this defense must prove both that substantially equivalent employment was available and that the plaintiff failed to exercise reasonable diligence to obtain it.  Compare id. ("Although the employer is normally required to prove that substantially equivalent work was available and that the former employee did not exercise reasonable diligence to obtain it, once

---

[175]Id. at 8-16.

the 'employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent employment.'") (quoting <u>Sellers v. Delgado College</u>, 902 F.2d 1189, 1193 (5th Cir. 1990), <u>cert. denied</u>, 111 S. Ct. 525 (1991)), <u>with</u> <u>Sparks</u>, 460 F.2d at 443 (holding that the defendant must prove that plaintiff failed to diligently search for employment, and that there were jobs available that the plaintiff could have discovered and for which the plaintiff was qualified). Because neither <u>West</u> nor <u>Sellers</u> was an <u>en banc</u> decision, courts in this district have held that the Fifth Circuit's earlier holding in <u>Sparks</u> controls. <u>See Miles-Hickman v. David Powers Homes, Inc.</u>, 613 F. Supp. 2d 872, 887 & n. 22 (S.D. Tex. 2009) (holding that the Fifth Circuit's rule of orderliness requires adherence to <u>Sparks).  See also Lowrey v.</u> <u>Texas A & M University System</u>, 117 F.3d 242, 247 (5th Cir. 1997)("[O]ne panel of this court cannot overrule the decision of another panel; such panel decisions may be overruled only by a subsequent decision of the Supreme Court or by the Fifth Circuit sitting <u>en banc.</u>").  The COH, as Draycott's emloyer, bears the burden of proving that Draycott unreasonably failed to mitigate her damages by establishing both that plaintiff failed to diligently search for employment, and that there were jobs available that the plaintiff could have discovered and for which the plaintiff was qualified.  <u>See Sparks</u>, 460 F.2d at 443.

-101-

2.  <u>Application of the Law to the Facts</u>

Asserting that the COH cannot prove that the positions its expert witness, Steward, identifies as available were substantially equivalent to the firefighter position, or that Draycott was qualified for any of those positions, the United States argues that the COH is not able prove its failure to mitigate affirmative defense.[176]   Recognizing that "[t]he gravamen of [the United States'] Motion is the argument that the City did not prove that jobs exist for which Draycott is qualified,"[177] the COH argues that

> under the controlling law of this Circuit, there is no need for the City to make such a showing.  And even if there were such a requirement, the summary judgment [record] shows that alternate jobs are available with the City, outside of HFD, which are substantially equivalent to the firefighter position that Draycott voluntarily left.[178]

Citing the deposition testimony of Draycott's husband and then Fire Chief Boriskie, the COH argues that Draycott failed to look for other employment and that substantially comparable work exists.[179] The COH argues that Draycott's husband testified that since leaving HFD Draycott spends her time home schooling their children, doing

---

[176]USA's MSJ, Docket Entry No. 59, pp. 10-16.  <u>See also</u> § II.B.1(a), above, concluding that the United States' motion to exclude Dr. Steward's testimony as to Draycott's employability and employment opportunities should be granted.

[177]COH's Response in Opposition, Docket Entry No. 95, p. 11.

[178]<u>Id.</u>

[179]<u>Id.</u> at 13-15.

housework, quilting, and reading.[180]   The COH argues that Boriskie
testified that Draycott could have gone to "any fire station in the
city, any shift . . . or she could have come down and work days on
staff."[181]   Boriskie also testified:

> I even offered her that she could be housed in my office,
> because I could use someone in — helping with
> correspondence and mail.  And we had multiple, multiple
> work locations, and I was — that would have been my
> strong preference for her instead of going back to 54 on
> the A shift.[182]

Boriskie's testimony is not capable of raising a genuine issue
of material fact as to whether substantially equivalent employment
was available for Draycott.  Boriskie testified that he made his
offer of an assignment for Draycott anywhere within HFD to
Draycott's attorney in November of 2009 in an effort to prevent
Draycott from returning to work on the A shift at Station 54.  But
Draycott did not leave her employment — and her duty to mitigate
her damages — did not accrue until July of 2011, over a year and a
half later.  When Draycott left her employment, Boriskie was no
longer Fire Chief, and the COH has failed to present any evidence
that substantially equivalent employment was available for Draycott

---

[180]Id. at 13 (citing Oral and Video Deposition of Jason
Draycott, pp. 5:24-6:1, 41:21-42:3, Exhibit J to COH's MSJ, Docket
Entry No. 63-12, pp. 3 and 12).

[181]Id. at 14 (citing Videotaped Oral Deposition of Phil Anthony
Boriskie ("Boriskie Deposition"), p. 57:16-18, Exhibit C to COH's
MSJ, Docket Entry No. 63-5, p. 16)).

[182]Boriskie Deposition, p. 57:19-24, Exhibit C to COH's MSJ,
Docket Entry No. 63-5, p. 16.

at HFD or anywhere else at the COH at anytime after her employment ended in July of 2011.  The COH has, therefore, failed to adduce evidence from which a reasonable fact finder could conclude that substantially equivalent employment was available for Draycott.

Because the COH has failed to raise evidence capable of creating a genuine issue of material fact as to the availability of substantially equivalent employment, the United States' motion for partial summary judgment on the COH's affirmative defense that Draycott failed to mitigate her damages will be granted.

## IV.   Conclusions and Order[183]

As and for the reasons stated in § III.D, above, Plaintiff United States's Motion for Summary Judgment, Docket Entry No. 59, is **GRANTED**.

For the reasons stated in § III.C, above, Defendant's Motion for Summary Judgment, Docket Entry No. 63, is **DENIED**.

---

[183]The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with the pending motions.  As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments.  While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion.  Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.

As and for the reasons stated in § II.B.1(a), above, Plaintiff United States' Motion to Exclude Testimony of Defendant's Expert Dr. Dwight D. Steward, Docket Entry No. 81, is **GRANTED**.

For the reasons stated in § II.B.1(b), above, Defendant's Motion to Exclude or Limit Opinion Testimony of Plaintiffs' Designated Economics Expert Jon Wainwright, Docket Entry No. 82, is **DENIED**.

Defendant's Motion to Exclude or Limit Opinion Testimony of Plaintiff's Designated Mental Health Experts, Docket Entry No. 83, is **MOOT** in light of the defendant's filing of Docket Entry No. 85.

As and for the reasons stated in § II.B.2, above, Defendant's (Corrected) Motion to Exclude or Limit Opinion Testimony of Plaintiff's Designated Mental Health Experts, Docket Entry No. 85, is **DENIED**.

As and for the reasons stated in § II.B.3, above, Defendant's Objections to and Motion to Strike Plaintiff United States' Summary Judgment Exhibits, Docket Entry No. 120, is **DENIED**.

Motions in limine will be filed by June 5, 2020, the joint pretrial order will be filed by July 6, 2020, and Docket call will be held on July 10, 2020, at 3:00 p.m. in Courtroom 9-B, 9th Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002.

**SIGNED** at Houston, Texas, on this 15th day of May, 2020.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE